IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEX NAIN SAAB MORAN, and
ALVARO PULIDO VARGAS, a/k/a
"German Enrique Rubio Salas,"

    Defendants.

Case No. 19-20450-CR-Scola

**ORAL HEARING REQUESTED**

## MOTION OF ALEX NAIN SAAB MORAN TO DISMISS THE INDICTMENT

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

The Legal Standard .............................................................................................. 1

Argument .............................................................................................................. 2

I.  Mr. Saab Is Entitled to Absolute Diplomatic Immunity ....................................... 2

    A.  The Vienna Convention Confers Diplomatic Immunity ........................................................................ 2

    B.  Customary International Law Confers Diplomatic Immunity ........................................................................ 4

    C.  Immunity Includes Inviolability and a Right of Free Passage ................................................................... 6

    D.  Immunity Does Not Turn on the State of Current Diplomatic Relations ............................................... 7

    E.  Immunity Is Essential to International Order and United States Interests ............................................. 9

II.  The Specified Unlawful Activities Identified in the Indictment Are Not Legally Cognizable Under the Facts Alleged ................................................................................................. 10

    A.  There Is No Offense Against a Foreign Nation ..................................... 10

    B.  There Can Be No Extraterritorial Application of the FCPA Here ........................................................ 11

        1.  Mr. Saab Cannot Be Charged Under the FCPA ............................................................... 12

        2.  The Government Cannot Establish an FCPA Violation as an SUA ........................................ 12

            a.  No FCPA Violation Alleged as to Anyone ....................................................... 13

            b.  Money-Laundering Extraterritoriality Provision ............................................. 14

            c.  FCPA Provision Not an SUA ......................................... 15

          d.      Rule of Lenity ................................................................15

III.    Extending the Statutes at Issue to the Extraterritorial Conduct Described in the Indictment Would Render Them Unconstitutional as Applied.................................................................15

       A.    Mr. Saab Has No Connection With the United States ...............................................................................16

       B.    The Assertion of Jurisdiction Finds No Support in International Law ......................................................................17

             1.      No Effect in the United States ....................................17

             2.      Crime Not Constituent of All Developed Systems ...................................................................17

             3.      No Compelling United States Interest .........................17

       C.    Due Process Cannot Be Satisfied Through the Acts of Others..............................................................................19

Conclusion .............................................................................................20

## INTRODUCTION

This prosecution presents an alarming contravention of the United States' international obligations and the Diplomatic Relations Act, which binds the courts to adhere to those obligations. The moving defendant, Alex Nain Saab Moran ("Mr. Saab"), is a diplomat of Venezuela and was arrested at the government's insistence in Cape Verde, while on a diplomatic, humanitarian mission to obtain medicine and supplies for Venezuela's battle against Covid-19. Mr. Saab remains in custody, his mission unfulfilled. This should not have occurred. Venezuela's proper authorities appointed Mr. Saab as a special envoy, the government of Iran accepted him as such, and Eleventh Circuit precedent confirms that this status carries diplomatic immunity.

An equally fundamental legal defect is that the indictment alleges no United States interest sufficient to justify trying Mr. Saab here, when every alleged act on his part occurred abroad. The government alleges a conspiracy by foreign nationals acting outside the United States to bribe the Venezuelan government in connection with a housing construction project in Venezuela. Mr. Saab denies these allegations, but the Court need not reach any fact question to dismiss this case. The foundational predicate offense of this supposed money-laundering conspiracy is a provision of the Foreign Corrupt Practices Act ("FCPA") that applies only to a foreign national who commits corrupt practices "while in the territory of the United States." 15 U.S.C. § 78dd-3(a). Mr. Saab is not alleged to have stepped foot in this country at any relevant time. Meanwhile, "[t]he Due Process Clause requires 'at least some minimal contact between a State and the regulated subject,'" *United States v. Baston*, 818 F.3d 651, 669 (11th Cir. 2016) (citation omitted), which is not alleged here. Mr. Saab therefore respectfully moves the Court to dismiss the indictment against him.

## THE LEGAL STANDARD

The Diplomatic Relations Act ("DRA") provides: "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under section 254b or 254c of this title, or under any other laws extending diplomatic privileges and immunities, shall be dismissed." 22 U.S.C. § 254d. "Such immunity may be established upon motion or suggestion by or on behalf of the

individual, or as otherwise permitted by law or applicable rules of procedure." *Id.* Because diplomatic immunity deprives federal courts of subject matter jurisdiction, courts have "an affirmative obligation to consider" assertions of immunity and their factual bases. *United States v. Al Sharaf*, 183 F. Supp. 3d 45, 49 (D.D.C. 2016); *see id.* at 47 (reviewing facts outside the indictment to adjudicate assertion of immunity).[1]

An indictment must contain a "statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and must be dismissed if, among other things, it "fail[s] to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v). "In judging the sufficiency of the indictment, the court must look to the allegations and, taking the allegations to be true, determine whether a criminal offense has been stated." *United States v. Fitapelli*, 786 F.2d 1461, 1463 (11th Cir. 1986).

## ARGUMENT

### I.      Mr. Saab Is Entitled to Absolute Diplomatic Immunity

#### A.      The Vienna Convention Confers Diplomatic Immunity

Mr. Saab is entitled to immunity under the Vienna Convention on Diplomatic Relations ("Vienna Convention"), Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502.[2] As a special envoy of Venezuela to Iran, Mr. Saab qualifies as a "diplomatic agent" who "shall not be liable to any form of arrest or detention." *Id.* at 3240, Art. 29; *see also id.* at 3240, Art. 31. The Convention defines "diplomatic agent" as "the head of the mission or a member of the diplomatic staff of the mission," *id.* at 3231, Art. 1(e), and a "mission" includes "representing the sending State in the receiving State," *id.* at 3231, Art 3(1)(a). The Convention further clarifies that a "[h]ead of mission" includes

---

[1] The facts stated in Mr. Saab's Motion to Vacate Order Conferring Fugitive Status and for Leave for Special Appearance to Challenge Indictment are indisputable and sufficient to establish immunity. Mr. Saab will not burden the Court with restating them here.

[2] As noted, the DRA binds federal courts to apply the Vienna Convention. The Convention also "codified longstanding principles of customary international law with respect to diplomatic relations," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 441 (2d Cir. 2019) (quoting *767 Third Ave. Assocs. v. Permanent Mission of the Republic of Zaire to the United Nations*, 988 F.2d 295, 300 (2d Cir. 1993)), and binds even non-signatories, *Swarna v. Al-Awadi*, 622 F.3d 123, 135 (2d Cir. 2010); *United States v. Enger*, 472 F. Supp. 490, 505 (D.N.J. 1978). Immunity therefore bars this case on its own force, with or without the DRA.

"envoys, ministers and internuncios accredited to Heads of State." *Id.* at 3235, Art 14(b). Mr. Saab is plainly an *envoy*.

Mr. Saab also holds the diplomatic post of Alternate Permanent Representative of the Bolivarian Republic of Venezuela to the African Union. *See* Exhibit E, Resolution Venezuela Ministry of Popular Power for Foreign Relations (Dec. 24, 2020). The United States recognizes the African Union as a public international organization, *see* Exec. Order No. 13,377, 70 Fed. Reg. 20,263 (April 13, 2005), and maintains an ambassadorial-level representative to the organization in Addis Ababa, Ethiopia, *see* Congressional Research Service, N. Cook & T. Husted, *The African Union (AU): Key Issues and U.S.-AU Relations* 16 (2016).[3]

"[T]he Vienna Convention premises diplomatic immunity upon recognition by the receiving state, which requires notification from the sending state." *Ali v. Dist. Dir., Miami Dist., U.S. Citizenship & Immigration Servs.*, 743 F. App'x 354, 358 (11th Cir. 2018) (internal edits and quotation marks omitted). Both elements are met here. Venezuela's foreign minister, Mr. Jorge Arreazo Montserrat, appointed Mr. Saab as special envoy in April 2018, conferring on him "broad powers on behalf of the Bolivarian Republic of Venezuela to make arrangements for procuring basic goods and services." Exhibit A, Diplomatic Authorization (April 9, 2018). In April 2020, Mr. Saab was charged in that capacity with missions to Iran to deliver documents requesting humanitarian assistance needed because of the Covid-19 pandemic. Exhibit B, Letter from Arreaza to Saab (April 1, 2020). Mr. Saab was accredited to Ayatollah Ali Kamenei, Supreme Leader of the Islamic Revolution of Iran, and was to carry letters asking for Iranian assistance. *See* Exhibit C, Letters from Venezuelan Officials to Iranian Officials (June 2020). Iran, in turn, approved the mission. Exhibit D, Verbal Note from Embassy of Iran Verbal to Ministry of People's Power for Foreign Affairs of Venezuela (June 8, 2020). Because he was recognized by Venezuela and Iran

---

[3] Under the International Organizations Immunities Act, 22 U.S.C. §§ 288–288*l*, representatives to such organizations have immunity from "legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives." *Id.* § 288d(b). Mr. Saab was unlawfully detained when acting as a special envoy and so enjoys immunity under this provision.

as Venezuela's representative to Iran, Mr. Saab qualifies as a diplomatic agent under the Vienna Convention.

Mr. Saab's status as a "special envoy," rather than a permanent diplomatic representative, does not disqualify him from diplomatic-agent status. The Eleventh Circuit in *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328 (11th Cir. 1984), rejected the argument that a defendant's "classification as 'special envoy' is not protected by the Diplomatic Relations Act." *Id.* at 1331. That case involved claims brought against a Saudi prince who was designated a "special envoy" during the litigation. Finding this designation dispositive, the court reasoned that "[t]he broadness in the language of the Vienna Convention is necessary, since it is the foreign country that actually ranks its envoys, not the State Department."[4] *Id.* It also noted that "Article 14 of the Vienna Convention classifies 'envoys' as Heads of Missions" and that "Heads of Missions are defined in § 254a of the Diplomatic Relations Act, and are protected by the Act." *Id.*; *see* 22 U.S.C. § 254a(1)(A). On that basis, the court found immunity and affirmed dismissal of the claims. *Abdulaziz* controls here and demands dismissal for the same reasons.[5] *See also United States v. Khobragade*, 15 F. Supp. 3d 383, 388 (S.D.N.Y. 2014) (noting that "*Abdulaziz* is persuasive precedent given that the standard for dismissing criminal and civil cases based on diplomatic immunity is the same." (footnote omitted)).

### B.    Customary International Law Confers Diplomatic Immunity

Mr. Saab is independently entitled to immunity under customary international law. *See, e.g., Enger*, 472 F. Supp. at 504 ("The United States has long recognized the responsibilities imposed upon individual nations by force of international custom and treats the Law of Nations as

---

[4] Indeed, the United States has also used this title and status for the head of its diplomatic missions. *See United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 121 (D.D.C. 2015) (noting that the ill-fated United States mission in Benghazi, Libya, was initially headed by J. Christopher Stevens as special envoy, before his later appointment as ambassador).

[5] *Abdulaziz* was later distinguished in *United States v. Sissoko*, 995 F. Supp. 1469 (S.D. Fla. 1997), because the defendant in that case did not obtain State Department certification of his diplomatic status, whereas the diplomat in *Abdulaziz* did. *Id.* at 1471. But State Department certification is not required under the Convention here, where Mr. Saab's mission was not to the United States. Mr. Saab was formally recognized by Iran, rendering this case like *Abdulaziz*, not *Sissoko*.

the law of the land."). An applicable immunity is recognized in a United Nations-sponsored Convention on Special Missions ("UNCSM"), Dec. 8, 1969, G.A. Res. 2530, 24 U.N. GAOR Supp. No. 30, at 99 *et seq.*, which recognizes that "persons of the representatives of the sending State in the special mission and of the members of its diplomatic staff shall be inviolable. They shall not be liable to any form of arrest or detention." *Id.* at 102, Art. 29.

Although the United States has not ratified this treaty, many of its provisions (like those of the Vienna Convention itself) represent customary international law. The Court of Appeal of England and Wales (Civil Division) recently held that the UNCSM has obtained the status of customary international law insofar as it codifies the "core" immunities of "personal inviolability (that is, freedom from arrest or detention)" for diplomats on special missions. *R. (on the application of Freedom and Justice Party) v. Secretary of State for Foreign and Commonwealth Affairs*, [2018] EWCA Civ 1719, [5], 2018 WL 03459145 ("*FJP*"). The courts there (both the Court of Appeal and Divisional Court) recognized the immunity of an Egyptian official, allegedly responsible for atrocities during the 2013 coup against Egypt's elected government, who was to undertake a special mission to the United Kingdom. The Court of Appeal explained that "a rule of customary international law has been identified which now obliges a state to grant to the members of a special mission, which the state accepts and recognizes as such, immunity from arrest or detention (i.e., personal inviolability)." *Id.* at [136]. The courts founded this conclusion, in part, on United States practice and, in particular, the 2007 statement of Department of State legal advisor John B. Bellinger III that "special mission immunity" should "be accorded to foreign officials" because it is "grounded in customary international law" and recognized in United States judicial precedents. *R (on the application of Hamed) and Others v. Secretary of State For Foreign and Commonwealth Affairs and Others*, [2016] EWHC 2010 (Admin) [127] (quoting John Bellinger III, *Immunities*, OpinioJuris (Jan. 18, 2007), http://opiniojuris.org/2007/01/18/immunities/); *see also FJP*, EWCA Civ 1719, at [32] (approving the Divisional Court's reliance on this statement).[6]

---

[6] The English courts addressed a 1997 decision of this court, which opined that the UNCSM does not qualify as customary international law, *Sissoko*, 995 F. Supp. at 1471, and reasoned that its

### C.     Immunity Includes Inviolability and a Right of Free Passage

By virtue of the Vienna Convention and customary international law, Mr. Saab is entitled to the highest levels of diplomatic immunity. Chief among them is "[p]ersonal inviolability," which is "of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized." *Tachiona v. United States*, 386 F.3d 205, 223 (2d Cir. 2004) (quoting *Satow's Guide to Diplomatic Practice* 120 (Lord Gore-Booth ed., 5th ed. 1979)); *see also 767 Third Ave.*, 988 F.2d at 299–300. Because a diplomatic agent like Mr. Saab "shall not be liable to any form of arrest or detention," Vienna Convention, 23 U.S.T. at 3240, Art. 29, the arrest and detention of Mr. Saab at the government's behest is plainly unlawful.

Mr. Saab is also entitled to a right of free passage. Diplomatic agents enjoy personal inviolability and immunity from arrest by third states as they travel to and from their countries of destination. *See id.* at 3246, Art. 40(1). This, too, is among the most basic and ancient requirements of international law. As one of the premier international-law publicists stated more than two hundred years ago concerning diplomatic ministers, "that prince alone to whom the minister is sent, is under a particular obligation that he shall enjoy all the rights annexed to his character: yet the others through whose dominions he passes, are not to deny him those regards to which the minister of a sovereign is intitled, and which nations reciprocally own to each other." Emmerich de Vattel, *The Law of Nations or Principles of the Law of Nature Applied to the Conduct and*

---

relevant provisions have *since* become customary and accepted in the United States. As discussed (*supra* note 5), *Sissoko* is not on point, it is a non-binding district-court decision, and its reasoning is no longer sound, since the relevant provisions of the UNCSM have become customary law even if they were not in 1997. *Sissoko* relied on the Third Restatement of Foreign Relations Law for its conclusion that the CSM "is not yet 'customary international law.'" 995 F. Supp. at 1471. That Restatement, however, is more than thirty years old, and it noted that the UNCSM "reflects what is increasingly practiced and in many respects may emerge as customary international law." Restatement (Third) of Foreign Relations Law of the United States § 464, Reporters' Note 13 (1987). "[T]he up to date position in relation to United States practice and case law was that the courts and the government in the United States considered that official visitors, accepted as such by the executive, were entitled to immunity for the duration of their visit." *FJP*, EWCA Civ 1719, at [32].

*Affairs of Nations and Sovereigns* § 55 (Luke White ed. 1792). As the United Nations Secretariat more recently put it, "[t]he custom of sending a special envoy on mission from one State to another, in order to mark the dignity or importance of a particular occasion, is probably the oldest of all means by which diplomatic relations may be conducted." Michael Wood, *The Immunity of Official Visitors*, 16 Max Planck UNYB 35, 40 (2012); *see also Bergman v. De Sieyes*, 170 F.2d 360, 363 (2d Cir. 1948).

The right of passage is also recognized in the UNCSM, which guarantees an envoy on special mission "inviolability and such other immunities as may be required to ensure his transit or return" from third states. *See* UNCSM, 24 U.N. GAOR Supp. No. 30, at 104, Art. 42(1); *see also id.* at 104, Art. 42(2)–(3).[7] As these sections are drawn from the Vienna Convention, there can be no question that they represent binding customary international law. *See* International Law Commission to the General Assembly, *Draft Articles on Special Missions with Commentaries* 365 (1967), available at https://legal.un.org/ilc/texts/instruments/english/commentaries/9_3_1967.pdf. As a result, Mr. Saab cannot be legally detained in Cape Verde, nor can the United States— consistent with its international obligations—request his detention or extradition.

### D.     Immunity Does Not Turn on the State of Current Diplomatic Relations

The irregular diplomatic relations between the United States and Venezuela do not permit the Court to ignore the Vienna Convention, customary international law, or the DRA. After elections in Venezuela in 2019, the United States recognized Juan Guaidó as the "interim president" of Venezuela, even though Nicolás Maduro claims status as Venezuela's president. However, the United States still maintains diplomatic relations with Venezuela. *See* U.S. Department of State, *U.S. Relations with Venezuela, Bilateral Relations Fact Sheet* (July 6, 2020), https://www.state.gov/u-s-relations-with-venezuela/. Although Mr. Saab carried letters from

---

[7] The fact that Mr. Saab was detained in Cape Verde at the United States' insistence, rather than on United States soil, does not change his status or erase his immunity. Indeed, if he were to be transported here, his diplomatic status would not change, and the United States would still be required to recognize his personal immunity from arrest and to release him to continue his mission.

Maduro to Iran's leader, Ayatollah Ali Khamenei, he was appointed special envoy of the state of Venezuela in 2018—when the United States recognized Mr. Maduro as Venezuela's president—and it was in that capacity that he embarked from Caracas to Tehran. Whatever its opinion of Mr. Maduro, the United States continues to recognize Venezuela as a sovereign member of the community of nations, and the law of nations requires it to respect that state's sovereign rights, including to dispatch diplomatic emissaries to any other country in the world.

Indeed, even a full break in diplomatic relations between the United States and Venezuela—which has not occurred—would not justify abrogation of immunity.[8] It is the sovereignty of Venezuela, and its status as a Vienna Convention signatory, not the fluctuating state of diplomatic relations, that establishes immunity. By comparison, in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), the Supreme Court held that the actions of the Cuban government, despite the "severance of diplomatic relations, commercial embargo, and freezing of Cuban assets in this country," must nevertheless be recognized as sovereign acts in American courts, *see id.* at 410–11, 413, and that the act of state doctrine—there involving expropriations of property by the Castro regime—applied despite the failed diplomatic relationship, *id.* at 437. And, although the Court also concluded that the "act of state" doctrine is not required by international law, *id.* at 421, it continues to be the rule in American courts. *Id.* at 436–437.

Venezuela's sovereign prerogative merits equal respect here, and it enjoys support in the act of state doctrine itself, which provides that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The Court in *Underhill* applied the doctrine to reject the claims of an American citizen, then present in Venezuela, for injuries suffered at the hands of government

---

[8] The United States has, of course, broken its diplomatic ties with Iran. *See* U.S. Department of State, *Relations with Iran, Bilateral Relations Fact Sheet* (Dec. 7, 2020), https://www.state.gov/u-s-relations-with-iran/. But that does not exempt the United States from its international law obligations towards Iran, including under the Vienna Convention, which both countries have joined as parties.

officials there. The Court upheld the immunity of the responsible Venezuelan official, explaining that "the acts of the defendant were the acts of the government of Venezuela, and as such are not properly the subject of adjudication in the courts of another government." *Id.* at 254 (citation omitted). Here, Mr. Saab was established in his diplomatic status by the proper authorities, then recognized as such by the United States, and his status has not been changed by that government, or by the administration of Mr. Guaidó, as it is dealt with by the United States. *Cf. United States v. Noriega*, 746 F. Supp. 1506, 1521 (S.D. Fla. 1990) ("In order for the act of state doctrine to apply, the defendant must establish that his activities are 'acts of state,' i.e., that they were taken on behalf of the state and not, as private acts, on behalf of the actor himself."). Nor has there been any waiver of his immunity. This would require a clear act by the relevant state, and there has been no such act. *See, e.g.*, *Laventure v. United Nations*, 279 F. Supp. 3d 394, 399 (E.D.N.Y. 2017) (requiring clear and express manifestation of intent to waive by proper authority); *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1111 (4th Cir. 1987) (same).

### E.     Immunity Is Essential to International Order and United States Interests

International law is grounded in the sovereign equality of all states, a principle internationally acknowledged since at least the 1648 Treaty of Westphalia and codified in the United Nations Charter, which the United States has endorsed. *See* United Nations Charter, Art. 2(1), 59 Stat. 1037, T.S. No. 993 (1945) ("The Organization is based on the principle of the sovereign equality of all its Members."). The consequence of permitting the government to circumvent that equality of nations is difficult to overstate. The United States depends on other nations to honor its own diplomats' immunity, and honoring its treaty obligations and customary diplomatic immunity encourages reciprocity. *See, e.g.*, *Devi v. Silva*, 861 F. Supp. 2d 135, 142–13 (S.D.N.Y. 2012) ("[T]he diplomatic immunity mandated by 22 U.S.C. § 254d….[is] to protect the interests of comity and diplomacy among nations, and, not incidentally, to ensure the protection of our own diplomats abroad."). To demand, and achieve, the arrest of a diplomat while on a

mission of the highest diplomatic consequence and international urgency rattles the status quo of international diplomatic relations. The Court should not permit this anomalous state of affairs, so vexing to international order, to persist. Mr. Saab's immunity, standing alone, requires that the indictment against him be dismissed.

## II.     The Specified Unlawful Activities Identified in the Indictment Are Not Legally Cognizable Under the Facts Alleged

The indictment fails for the additional reason that Mr. Saab's conduct does not fall within the ambit of the statutes alleged as the basis of the indictment. The government alleges a money-laundering conspiracy under 18 U.S.C. § 1956(h) and laundering of monetary instruments under 18 U.S.C. § 1956(a)(2)(A). But a defendant is guilty of money laundering, or conspiring to launder money, only if the defendant engages in a monetary transaction (or conspires to) with the "intent to promote the carrying on of *specified unlawful activity*" or "SUA." 18 U.S.C. § 1956(a)(2)(A) (emphasis added); *see also* 18 U.S.C. § 1956(h) (requiring the government to show that the defendant "conspire[d] to commit" an offense under Sections 1956 or 1957, which require a "specified unlawful activity," 18 U.S.C. § 1957(a)). The government alleges two SUAs: violations of the money-laundering statute's prohibition on "bribery of a public official" as part of an "offense against a foreign nation" under 18 U.S.C. § 1956(c)(7)(B)(iv), and of a single provision of the FCPA, 15 U.S.C. § 78dd-3(a). But there is no basis in the indictment to infer a violation of either statute.

### A.     There Is No Offense Against a Foreign Nation

The first SUA requires the government to prove that the defendant committed "an offense against a foreign nation," 18 U.S.C. § 1956(c)(7)(B)(iv), which means a "violation of foreign law," *United States v. Chi*, 936 F.3d 888, 894 (9th Cir.), *as amended* 942 F.3d 1159 (9th Cir. 2019); *see also United States v. Thiam*, 934 F.3d 89, 92 (2d Cir. 2019). The indictment identifies neither a law of Venezuela nor its elements nor the offense. "For an indictment to be valid, it must 'contain the elements of the offense intended to be charged.'" *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003) (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)). It was therefore incumbent on the government to identify an offense against the law of Venezuela. *See id.* at 1084 (rejecting

indictment in part because "the government made no mention in the indictment of a federal statute which prohibits the type of conduct alleged here"). It failed to do so.

The indictment does not "sufficiently apprise the defendant of what he must be prepared to meet." *Russell*, 369 U.S. at 763 (internal quotation marks omitted). Mr. Saab cannot reasonably be expected to rummage through Venezuela legal codes to identify what offenses *might* fall within the factual content of the indictment. "An indictment that requires speculation on a fundamental part of the charge is insufficient." *Bobo*, 344 F.3d at 1084; *United States v. Peterson*, 544 F. Supp. 2d 1363, 1374 (M.D. Ga. 2008). Further, the indictment does not "state the offense with particularity." *Bobo*, 344 F.3d at 1083; *see also id.* at 1084 (finding an indictment that did "not contain" relevant "language of the statute" predictably failed also "to specify of what precisely" the defendant was accused). And it does not indicate why the grand jury determined that the law of Venezuela has been violated or even if it did. *See Peterson*, 544 F. Supp. 2d at 1374 ("Thus, allowing the prosecutor, or even the court, to make a guess as to what the grand jury had in their minds when they indicted the defendants 'would deprive the defendant[s] of a basic protection which the guaranty of the intervention of a grand jury was designed to secure.'" (quoting *Russell*, 369 U.S. at 770)). Prosecuting Mr. Saab in the absence of this notice is unconstitutional.

### B.     There Can Be No Extraterritorial Application of the FCPA Here

The FCPA provision cited as the government's second SUA also does not apply because its extraterritorial application falls short of this case. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Moreover, where Congress does expressly address the question of extraterritoriality, "the presumption against extraterritoriality operates to limit that provision to its terms." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100, 2102 (2016). The presumption also requires the government to "establish[] a 'clearly expressed congressional intent to' allow conspiracy and complicity liability to broaden the extraterritorial reach" of the statutes at issue. *United States v.*

*Hoskins*, 902 F.3d 69, 95 (2d Cir. 2018) (quoting *RJR Nabisco*, 136 S. Ct. at 2100). Under this presumption, the FCPA cannot qualify as an SUA in this case.

### 1.    Mr. Saab Cannot Be Charged Under the FCPA

Congress addressed, and limited, the extraterritorial reach of the FCPA. The provision at issue applies only to a person acting "while in the territory of the United States." 15 U.S.C. § 78dd-3(a). Mr. Saab cannot be liable under this provision because the indictment does not (and cannot) allege that he acted in the United States at any relevant time. As the Second Circuit held in *Hoskins*, a foreign national (in that case, a British citizen) acting abroad (in that case, in Paris) without entering United States territory during the alleged scheme (as was undisputed in that case) cannot be directly liable under Section 78dd-3. 902 F.3d at 76. So too here.

Mr. Saab also cannot be held liable for conspiring others to violate the FCPA—even though a defendant ordinarily can be held liable for conspiracy to commit crimes the defendant personally could not have committed, *see id.* at 77 (quoting *Salinas v. United States*, 522 U.S. 52, 64 (1997)). *Hoskins* reasoned that Congress's express curtailment of the FCPA's extraterritorial reach foreclosed the application of conspiracy liability beyond that reach. *See also Gebardi v. United States*, 287 U.S. 112, 118–23 (1932); *United States v. Castle*, 925 F.2d 831, 835–36 (5th Cir. 1991) (affirming dismissal of an indictment that charged a foreign official with conspiracy to violate the FCPA where direct liability was not possible). Accordingly, Mr. Saab, who is not alleged to have done anything in the indictment "while in the territory of the United States," 15 U.S.C. § 78dd-3(a), also cannot be drawn within the FCPA's scope by the acts of others.

### 2.    The Government Cannot Establish an FCPA Violation as an SUA

The indictment represents an attempted end-run around the FCPA's express word on extraterritorial reach, which should be rejected for reasons outlined in *Hoskins*. Just as it was improper for the government in *Hoskins* to use conspiracy doctrine to void the FCPA's territorial limits, it is improper for it here to use the money-laundering statutes for that same end. As noted, the presumption against extraterritorial application limits express statutory provisions on the topic just as it bars inferences of extraterritorial reach in the face of congressional silence. *RJR Nabisco*, 136 S. Ct. at

2102. Yet the government has ostensibly attempted to plead around *Hoskins*, and the FCPA, by declining to charge Mr. Saab either with an FCPA count or an FCPA conspiracy count—despite that the FCPA features prominently in the indictment's *first paragraph*. Instead, it has charged Mr. Saab with money-laundering counts (2–8) and one count of conspiracy to launder money (count 1). There are multiple problems with this attempt to circumvent *Hoskins*, and all counts, 1 through 8, should be dismissed.

a.      *No FCPA Violation Alleged as to Anyone*. The money-laundering and money-laundering-conspiracy statutes all require an SUA, so the government must establish an FCPA violation as a predicate to laundering. *See, e.g., United States v. Handakas*, 286 F.3d 92, 112–13 (2d Cir. 2002) (rejecting money-laundering conviction where SUA failed), *overruled on other grounds by United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (*en banc*); *United States v. Truesdale*, 152 F.3d 443, 449 (5th Cir. 1998) (same). It cannot do so against Mr. Saab, for reasons stated, and it also cannot do so against Mr. Saab's supposed co-ringleader, Alvaro Pulido Vargas, who is also not alleged to have done anything relevant to the indictment "while in the territory of the Untied States." 15 U.S.C. § 78dd-3(a). Thus, the two prominent actors in the indictment are beyond the statute's reach, and their conduct cannot establish an FCPA violation or, in turn, an SUA.

That leaves the supporting cast, unnamed co-conspirators 1, 2, and 3. Although the indictment alleges vaguely that these Colombian nationals spent time in the United States, Indictment at *3 ¶¶ 8–10, it fails to allege that they were present when they committed relevant acts. The statute requires that, "while in the territory of the United States," a person do "any act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—any foreign official…." 15 U.S.C. § 78dd–3. But the indictment does not provide that these unnamed persons either made an offer, payment, promise to pay, authorization, or so forth in the United States or even an act in "furtherance" thereof here—the word "furtherance" requiring the "advancement" or "helping forward" of one of those things, Webster's New World College Dictionary 575 (4th ed. 2002). The indictment claims co-conspirators *received* money *in* the United States, but the FCPA requires that the payment "*to*" the

"foreign official" be advanced *from* the United States. 15 U.S.C. § 78dd–3 (emphasis added). On that, the indictment is silent.

Moreover, the indictment does not establish that any unnamed co-conspirator violated the FCPA independently of Messrs. Saab and Pulido. Again, the FCPA is triggered on the very specific event where a "person" does an "act" in "furtherance" of a "payment" (or the like) "to—a foreign official." In alleging that these acts occurred, the indictment does not differentiate Messrs. Saab and Pulido, who could not violate the FCPA or even conspire to, from co-conspirators 1, 2, or 3. *See, e.g.*, Indictment at *7, ¶ 14. Grouping co-conspirators 1, 2, and 3 with Messrs. Saab and Pulido in this way fails to plead around *Hoskins*: because Messrs. Saab and Pulido could not have violated the FCPA from outside the United States, the government must plead and prove that co-conspirators 1, 2, and 3—while in the United States—committed actions sufficient on their own to violate the FCPA, independent of Messrs. Saab and Pulido. The government's monolithic treatment of these persons impliedly asks the Court to assume that extraterritorial acts of Messrs. Saab and Pulido beyond the FCPA's reach nonetheless create FCPA liability and an SUA.

Nor can it be inferred from the indictment that acts of co-conspirators 1, 2, and 3 acting independently of Messrs. Saab and Pulido were sufficient to violate the FCPA. Importantly, the indictment is clear that co-conspirators 1, 2, and 3 were adjuncts brought in for "assistance." Indictment at *5, ¶ 5. It is not at all obvious or even probable that co-conspirators 1, 2, and 3 violated the FCPA in the United States independent of acts of Messrs. Saab and Pulido.[9]

b.      *Money-Laundering Extraterritoriality Provision.* It does not matter that the money-laundering statute addresses the scope of its own extraterritorial reach. *See* 18 U.S.C. § 1956(f). Because there is no SUA, there is no violation of Section 1956, and its reach is irrelevant. In any event, section 1956(f) requires "that in the case of a non-United States citizen, the conduct occur[] in

---

[9] Importantly, the FCPA's extraterritoriality provision requires that a discrete "act" by a "person" occur in full "while [that person is] in the Untied States." 15 U.S.C. § 78dd-3(a). This is not a provision permitting extraterritorial reach where "conduct" occurs in the United States "in part." *See, e.g.*, 18 U.S.C. § 1956(f)(2).

part in the United States" for the statute to reach it. *Id.* The indictment does not adequately allege any conduct on Mr. Saab's part "in the United States," even "in part."

      c.    *FCPA Provision Not an SUA*. Another defect is that Section 78dd-3 does not qualify as an SUA in the first instance. Congress added the FCPA to the list of SUAs under Section 1956(c) in 1992. *See* Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, § 1534, 106 Stat. 3672, 4066 (1992). But Section 78dd-3 did not then belong to the FCPA; it was added in 1998. *See* International Anti–Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, § 4, 112 Stat. 3302 (1998). "According to the 'reference' canon…a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019). As a result, Congress's reference to "the Foreign Corrupt Practices Act," 18 U.S.C. § 1956(c), incorporated the FCPA as it existed in 1992 and not subsequent amendments.[10] *Hassett v. Welch*, 303 U.S. 303, 313–14 (1938) (applying this canon).

      d.    *The Rule of Lenity*. All statutory questions in this case must be resolved under the rule of lenity—in addition to the presumption against extraterritoriality—which mandates "that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Yates v. United States*, 574 U.S. 528, 547–48 (2015) (citation omitted). Whatever modicum of merit the government's position may have, it cannot show that Congress spoke "in language that is clear and definite" in extending the cited statutes to reach this case. *Id.* (citation omitted).

## III.    Extending the Statutes at Issue to the Extraterritorial Conduct Described in the Indictment Would Render Them Unconstitutional as Applied

      Even if Congress "state[s] that it intends [a] law to have extraterritorial effect," "application of the law must comport with due process, meaning that application of the law 'must not be

---

[10] The Second Circuit's recent conclusion that phrase "*any* felony violation of the Foreign Corrupt Practices Act" incorporated subsequent amendments is unpersuasive. *See United States v. Ho*, -- F.3d--, 2020 WL 7702576, at *7–8 (2d Cir. Dec. 29, 2020) (citation omitted). The term "any" is an adjective that may maximize the phrase "violation of the Foreign Corrupt Practices Act" but cannot change its meaning. The fact remains that Congress used a "specific title" incorporating the "statute as it existed" and "without any subsequent amendments." *Jam*, 139 S. Ct. at 769.

arbitrary or fundamentally unfair.'" *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1378 (11th Cir. 2011) (citation omitted). Among its many dictates, "[t]he Due Process Clause requires 'at least some minimal contact between a State and the regulated subject.'" *United States v. Baston*, 818 F.3d 651, 669 (11th Cir. 2016) (quoting *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 221 F.3d 1211, 1216 (11th Cir. 2000)). This "minimal contact" standard "serves the same purpose as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country." *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). That test is not met here, and the mere constitutional doubt the government's position creates militates against it. *See United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019) (discussing the "constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality"); *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (applying this canon).

A.      **Mr. Saab Has No Connection With the United States**

Mr. Saab established no contact with the United States, and the indictment does not allege otherwise. He "was a citizen of Colombia," Indictment at *3, ¶ 6, alleged to have conspired to make "bribe payments to Venezuelan foreign officials," *id.* at *4–5, ¶ 3, in connection with "a contract…with the government of Venezuela," *id.* at*5, ¶ 4. The alleged harm is that Venezuelan agencies "made multiple payments on these false and fraudulent invoices and documents for construction goods and materials that were never imported." *Id.* at *6, ¶ 10. This is an alleged injury to Venezuela by a foreign citizen operating outside the United States. The case involves no "minimal contact between" the United States and Mr. Saab. *Baston*, 818 F.3d at 669.

This case is analogous to *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015), which rejected the government's assertion of constitutional jurisdiction over two foreign nationals, residing and acting outside of the United States, who allegedly bribed an employee of the United Nations' International Civil Aviation Organization in Canada, *id.* at 1132, and *United*

*States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006), which rejected the government's assertion of jurisdiction over persons found aboard Colombian vessels in foreign waters, *id.* at 1153–57, 1168–69. As in those cases, the government here targets a foreign national for conduct outside the United States, neither threatening nor causing harm within the United States.

**B.      The Assertion of Jurisdiction Finds No Support in International Law**

This prosecution is also not justified under principles of international law. "In determining whether an extraterritorial law comports with due process, appellate courts often consult international law principles…." *Ibarguen-Mosquera*, 634 F.3d at 1378. This is not because international law limits congressional power, but because international law "puts a defendant 'on notice' that he could be subjected to the jurisdiction of the United States." *Baston*, 818 F.3d at 669. International-law doctrines that may serve this notice function include "the objective principle, the protective principle, [and] the territorial principle," *Ibarguen-Mosquera*, 634 F.3d at 1378–79 (footnotes omitted), as well as the universal-jurisdiction principle, *see id.* at 1379; *United States v. Ali*, 718 F.3d 929, 934 (D.C. Cir. 2013). None of these doctrines support jurisdiction.[11]

The only remotely colorable principle is the "objective principle," under which Congress "may criminalize behavior that has a 'nexus' to the United States."[12] *Ibarguen-Mosquera*, 634 F.3d at 1379 n.4. This principle requires, as a threshold matter, that the "conduct that occurs outside its territory…cause[] an effect within its territory." *Id.* (quoting the Restatement (Second) of

---

[11] Hence, yet another presumption dooms the government's statutory theory: the "*Charming Betsy* canon" mandates that "[a]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814–15 (1993) (quoting *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)).

[12] The alleged crimes are not like piracy, slave trading, or traveling the high seas on a stateless ship, which are "recognized by the community of nations as of universal concern" for purposes of universal jurisdiction. *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013) (citation omitted). Nor is there a jurisdictional foundation under the protective principle, by which "Congress may criminalize behavior that may threaten the security of the United States," *Ibarguen-Mosquera*, 634 F.3d at 1379 n.5, since no interest of United States "security" is in play. There is also no foundation under the territorial principle, which allows one state to apply its law within the territory of another "to the extent provided by international agreement with the other state." *Ibarguen-Mosquera*, 634 F.3d at 1379 n.6. No such agreement exists here.

Foreign Relations Law of the United States § 18 (1965)). Not any fortuitous "effect" qualifies; the "effect within [the government's] territory" must also be "of a type which justifies the state in prohibiting or regulating this conduct." Restatement (Second) of Foreign Relations Law of the United States § 18 cmt. b (1965). If the government crosses that threshold, it must then establish that either (a) "the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems," or (b) "(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with principles of justice generally recognized by states that have reasonably developed legal systems." *Id.* § 18 (a) & (b). The indictment fails under this framework at several steps.

1.      *No Effect in the United States*. There is no cognizable "effect" in the United States. Mr. Saab is alleged to have helped bribe and defraud Venezuelan governmental agencies, and that is where the relevant effect occurred (if anywhere). Although the government alleges that some of the money obtained in the supposed scheme landed in United States bank accounts, this alleged nexus consists of contacts too "attenuated" and "fortuitous" to be cognizable. *Sun Bank, N.A. v. E.F. Hutton & Co.*, 926 F.2d 1030, 1034 (11th Cir. 1991) (citation omitted); *see, e.g.*, *Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1350–51 (S.D. Fla. 2001) (finding monetary wire transfer insufficient to support assertion of personal jurisdiction); *Steinberg v. A Analyst Ltd.*, No. 04-60898-CIV, 2009 WL 838989, at *5 (S.D. Fla. Mar. 26, 2009) (similar conclusion). Similarly, the mere brief presence of some funds in the United States in transit from one foreign account to another, Indictment at *7, ¶ 14, does not, on its own, establish a cognizable effect here. There is no allegation that Mr. Saab owned the accounts where money was transferred, and "no aim to harm the United States is alleged anywhere in this Indictment." *Sidorenko*, 102 F. Supp. 3d at 1133.

2.      *Crime Not Constituent of All Developed Systems*. The government cannot establish that both "the conduct *and* its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed systems." Restatement (Second) of

18

Foreign Relations Law of the United States § 18(a) (1965) (emphasis added). Both the money-laundering statute and the FCPA are relatively recent developments in American law, being enacted in 1986 and 1977, respectively. And, as discussed, specific provisions relevant here were not enacted until 1992 and 1998. If all "reasonably developed systems" must have these laws, then the United States had no reasonably developed system for 200 years or more.

      3.    *No Compelling United States Interest*. The government cannot establish the other Restatement factors. Restatement (Second) of Foreign Relations Law of the United States § 18(b) (1965). The "conduct" is not a constituent element of United States criminal money laundering prohibitions, which does not criminalize the mere movement of money in the absence of an SUA. The alleged bribery did not involve a "direct and foreseeable result" in the United States, since there was no reason the money had to flow to the United States, as opposed to Colombia or anywhere else. The alleged effect in the United States, if it is even cognizable, is insubstantial. And it is entirely inconsistent with generally recognized principles for one nation to try to regulate supposed bribery within another, especially where the supposed victim nation protests that intrusion. *See* Exhibit F, Arreaza Letter to Saab (July 1, 2020).

      **C.    Due Process Cannot Be Satisfied Through the Acts of Others**

      The only other conceivable assertion of a United States connection is through the acts of three unnamed co-conspirators who are alleged to have "spent significant time in Miami, Florida." Indictment at *3, ¶¶ 8–10. But the government cannot satisfy Mr. Saab's due-process rights by asserting that an action against those co-conspirators might comport with due process. Because due process protects an "individual," *Walker v. Sun Tr. Bank of Thomasville, GA*, 363 F. App'x 11, 17 (11th Cir. 2010), Mr. Saab's rights cannot rise or fall with the rights of others.

      For this reason, the Supreme Court recently clarified that the due-process minimum-contacts inquiry looks only to "contacts that the 'defendant *himself*' creates with the forum State" and does not count "contacts between the plaintiff (or third parties) and the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). This focus on individual rights leaves no room for vicarious due process, under a conspiracy doctrine or otherwise. *See, e.g.*, *Cockrum v. Donald J. Trump for*

*President, Inc.*, 319 F. Supp. 3d 158, 186 n.25 (D.D.C. 2018) ("[M]ost courts addressing the issue of conspiratorial jurisdiction have refused to apply the theory or have limited it"); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-696, 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) ("[I]t is highly unlikely that any concept of conspiracy jurisdiction survived the Supreme Court's ruling in *Walden v. Fiore*").

That is the holding of the Ninth Circuit in *Perlaza*, which rejected an aiding-and-abetting theory of nexus jurisdiction in a criminal case. 439 F.3d 1168–69. The government tried to assert jurisdiction over crew members of one vessel on the theory that they aided and abetted a separate vessel the government alleged to be stateless, but the Ninth Circuit found that assertion legally defective: "Relying on the theory of aiding and abetting does not vitiate the need to consider the underlying bases for jurisdiction." *Id.* at 1168. Whereas "[a]iding and abetting is a substantive area of criminal law that allows courts to punish vicariously a defendant who, in some way, associates himself with an illegal venture," "[t]he ability of a United States court to exercise jurisdiction over that particular defendant…is a preliminary determination totally distinct from the crime itself." *Id.* Conspiracy has the same vicarious-liability characteristics as aiding-and-abetting, is a substantive theory of law rather than a contact in fact between a defendant and the United States, and thus fares no better as a basis for asserting a jurisdictional nexus to this case.

Finally, even if a vicarious theory were viable, the government would at least be required to establish that an act advancing the conspiracy was perpetrated in the United States. *Cf. United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009). The indictment falls short. It alleges that unnamed co-conspirators were present in the United States at times, that one may have enjoyed profits here, and that some funds saw a very brief pass through United States bank accounts on their way abroad. But it identifies no acts in the United States materially furthering the object of the conspiracy.

## CONCLUSION

The motion should be granted and the indictment dismissed.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9

Counsel has conferred with Counsel for the United States of America pursuant to Local Rule 88.9 in a good faith effort to resolve the issues raised in this motion and has been unable to do so.

## REQUEST FOR ORAL HEARING

Mr. Saab respectfully requests the Court set this motion for a hearing at its earliest convenience. As outlined above, Mr. Saab presents multiple complex questions of legal interpretation, including questions of the United States' international treaty obligations and of statutory interpretation and due process. Mr. Saab respectfully submits that the Court would benefit from oral presentation and the opportunity to question legal counsel.

January ___, 2021                                Respectfully submitted,

David B. Rivkin, Jr.*                            /s/_____
Lee A. Casey*                                    Lindy K. Keown
Jonathan R. Barr*                                Baker & Hostetler LLP
Kendall E. Wangsgard*                            200 South Orange Avenue
Richard B. Raile*                                Suite 2300
Baker & Hostetler LLP                            Orlando, FL 32801
1050 Connecticut Ave, NW                         lkeown@bakerlaw.com
Suite 1100                                       (T) (407) 649-4000
Washington, DC 20036                             (F) (407) 841-0168
drivkin@bakerlaw.com
(T) (202) 861-1500                               Jonathan B. New*
(F) (202) 861-1783                               Baker & Hostetler LLP
                                                 45 Rockefeller Plaza
                                                 New York, NY 10111
                                                 jnew@bakerlaw.com
                                                 (T) (212) 589-4200
                                                 (F) (212) 589-4201

                                                 *Attorneys for Defendant Alex Nain Saab Moran*

*Pro hac vice* applications forthcoming