IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEX NAIN SAAB MORAN, and
ALVARO PULIDO VARGAS, a/k/a
"German Enrique Rubio Salas,"

        Defendants.

Case No. 19-20450-CR-Scola

**REPLY IN FURTHER SUPPORT OF MOTION TO VACATE ORDER CONFERRING
FUGITIVE STATUS AND FOR LEAVE FOR SPECIAL APPEARANCE
TO CHALLENGE INDICTMENT**

## I.       Questioning Counsel's Engagement is a Diversion and Should Be Disregarded

The government asserts that Mr. Saab's Motion should be denied due to "concerns as to whether counsel . . . actually represent the defendant." Opp'n at 5-6. The sole basis for these "concerns" is counsel's refusal to provide a copy of its engagement letter (itself a communication between counsel and client) to the government. *Id.* at 6. There is no such obligation, and the government cites no case, rule or statute supporting its position. Nevertheless, rather than waste the Court's time, counsel provided the Court with a redacted engagement letter *ex parte* and under seal. ECF No. 27. On February 27, 2021, the Court confirmed that it is satisfied that counsel has been retained by the Defendant to represent him in this matter. ECF No. 28.

## II.      The Diplomatic Documents are Authentic

The government claims that Mr. Saab's diplomatic documents were not properly authenticated under Federal Rule of Evidence ("FRE") 902(3).[1] *See* Opp'n at 15-16 n.3. However, the documents are self-authenticating under FRE 902(3)(A) without the need for a final consular certification. Alternatively, their distinctive characteristics provide authentication under FRE 901(b)(4). *See Nester v. Textron, Inc.*, 888 F.3d 151, 160 n.5 (5th Cir. 2018) (Rules 901 and 902 are alternatives).

Under FRE 901, a document may be authenticated if its proponent "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is." FRE 901(a). The burden "is a light one," *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015), and "does not require the proponent . . . to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). "[E]nough evidence that a jury could have reasonably concluded that a document was authentic" is sufficient. *United States v. Williams*, 865 F.3d 1328, 1343 (11th

---

[1] The government cursorily references FRE 803(8), the hearsay exception for public records, but does not move to exclude this evidence. Any such motion should be denied as any record of a public office that sets out "the office's activities" is admissible if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." FRE 803(8)(A)(i), 803(8)(B). The government makes no attempt to carry this burden.

Cir. 2017) (quoting *In re Int'l Mgmt. Assocs*., 781 F.3d at 1267). This may be satisfied by the document's "distinctive characteristics" such as "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." FRE 901(b)(4); *see Williams*, 865 F.3d at 1343; *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985).

Mr. Saab's diplomatic documents have multiple "distinctive characteristics" that "support a finding that the item is what [he] claims it is," FRE 901(a), including signatures and addresses of appropriate government officials, governmental stamps and letterheads, official document numbers, standard form and appearance, and use of the appropriate vernacular.[2] *See, e.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 957-58 (2d Cir. 1990) (logo, content, and location of copy at co-defendant's home established authenticity). They contain appropriate dates, reference his mission to Iran, are on letterhead, stamped, dated, signed and numbered by officials of two different sovereigns confirming Mr. Saab's diplomatic mission. ECF Nos. 10-2, 10-3, 10-4. They were found inside Mr. Saab's suitcase, taken from his private charter plane, Pinto Decl. ¶¶ 1-4, Ex. 1-2, exactly where such documents should be found during a diplomat's transit. *See Williams*, 865 F.3d at 1343 (Columbian "zarpe" document authenticated by circumstantial evidence including location onboard vessel); *Int'l Mgmt. Assocs*., 781 F.3d at 1267 (discovery at office is circumstantial evidence of authenticity); *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 20 (1st Cir. 1997) (document found in briefcase is evidence of authenticity). Additional documents provided by Mr. Saab's Cape Verdean lawyer corroborate these documents' authenticity, including correspondence from Venezuela's Foreign Minister to his Cape Verde equivalent, Pinto Decl. Ex. 3, 5, from Venezuela's Cape Verde embassy to the Cape Verde Foreign Ministry, *id.* Ex. 4, and from Iran's Ambassador there cross-referencing a letter from the Venezuelan Foreign Minister,

---

[2] The originals' "size and 'feel' of the paper, the embossed coat of arms, [and] the way that each letter was in its individual folder . . . and individual envelope" bearing the name of the relevant Venezuelan offices are all consistent with official diplomatic communications. *See* Declaration of Dr. José Manuel Pinto Monteiro ("Pinto Decl.") filed herewith, ¶ 5, Ex. 1 (photos).

confirming Iran's anticipated reception of Mr. Saab. Pinto Decl. *Id.* Ex. 6. All considered, a reasonable trier of fact should conclude the letters are authentic under FRE 901.

Alternatively, the documents are authentic under FRE 902(3)(A). Foreign public documents are "presumptively authentic without final certification" if: (1) there is "good cause" for dispensing with the final certification; and (2) the other party has been "given a reasonable opportunity to investigate the document[s'] authenticity and accuracy . . . ." FRE 902(3); *see also United States v. McGowan*, 552 Fed. App'x 950, 954-55 (11th Cir. 2014). Both are met. First, "good cause" exists to dispense with final certification. Rule 44(a)(2) of the Federal Rules of Civil Procedure ("FRCP")—which applies to criminal proceedings via Federal Rule of Criminal Procedure 27—is the foundation upon which FRE 902(3) is based.[3] The advisory committee notes to Rule 44(a)(2) explain that dispensing with final certification upon "good cause" is permitted because "in some situations it may be difficult or even impossible to satisfy the basic requirements of the rule." FRCP 44(a)(2)(C) advisory committee's note (1966 amendment). Here, it is "difficult or impossible" to obtain final certification because the United States will not deal with Maduro's government. Opp'n at 20. There are no diplomatic or consular officials "assigned or accredited to the United States" who would provide final certification, as those individuals represent Mr. Guaido.[4] "Good cause" to dispense with final certification clearly exists.

Second, the government has been "given a reasonable opportunity . . . to investigate the document[s'] authenticity and accuracy . . . ." FRE 902(3)(A). They were submitted with the Motion to Vacate, ECF No. 10. The government's Response, ECF No. 24, was filed one month later, sufficient time for the government to investigate authenticity. *See McGowan*, 552 Fed. App'x

---

[3] *See* FRE 902(3) advisory committee notes (explaining that 902(3) "is derived from Rule 44(a)(2) of the Rules of Civil Procedure but is broader in applying to public documents . . . [not] limited to public records.").

[4] The U.S. "maintains formal diplomatic relations with Venezuela and the Guaido interim government through its accredited Ambassador to the United States." *See* U.S. Dep't of State, *U.S. Relations with Venezuela, available at* https://www.state.gov/u-s-relations-with-venezuela/#:~:text=The%20United%20States%20maintains%20formal,Venezuela%20Affairs %20Unit%20(VAU).

at 954 (finding *two weeks* satisfies "reasonable opportunity" to investigate). The government does not suggest otherwise. It has known of these documents for *many months*, as they have been used in Cape Verdean proceedings since Mr. Saab's June 2020 arrest.[5] *See* Pinto Decl. ¶ 11, Exs. 1-6; Opp'n, Ex. 2. Accordingly, because there is good cause for dispensing with a final consular certification and the government has been provided a reasonable opportunity to investigate authenticity, the documents are presumptively authentic under FRE 902(3)(B).

## III.    The Fugitive-Disentitlement Doctrine Does Not Apply

Fugitive disentitlement is a "blunt [] instrument," which "is limited by the necessity giving rise to its exercise." *Degen v. United States*, 517 U.S. 820, 828-29 (1996). The government's plea to apply the doctrine to a foreign diplomat bound to obey his government falls flat.

As Mr. Saab's opening brief explains (at 7-9), because he was never at any relevant time in the United States and has been commanded by Venezuela to resist extradition, he did not "constructively flee by *deciding* not to *return*." *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997) (emphasis added). The government demands an even greater expansion of the doctrine than what the Seventh Circuit rejected in *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009), which found the doctrine inapplicable to a defendant who "did not flee from the jurisdiction or from any restraints placed upon him." *Id.* at 412. The same is true of Mr. Saab, in *addition* to the fact that he owes allegiance to a foreign nation, as its diplomat, and has been ordered to resist extradition.

The government is wrong to contend "that the Eleventh Circuit has expressly disagreed with [*Hijazi*]." Opp'n at 10. First, on the merits of fugitive disentitlement, the Eleventh Circuit distinguished *Hijazi*, and did not split with it, because the defendant in that case had "significant contacts with the United States," including that he "once resided in the Southern District of Florida." *United States v. Shalhoub*, 855 F.3d 1255, 1264-65 (11th Cir. 2017) (emphasis added). The government ultimately concedes, Opp'n at 13, that, on the merits, *Shalhoub* "distinguish[ed]

---

[5] Despite knowing of these documents' existence, neither Cape Verdean nor U.S. authorities have ever questioned their authenticity in either the Cape Verde or ECOWAS proceedings. Pinto Decl. ¶¶ 7-10.

*Hijazi*."[6] Other decisions have applied the same distinction. *See, e.g.*, *United States v. Bokhari*, 757 F.3d 664, 672 (7th Cir. 2014) ("Unlike Hijazi, whose prosecution posed significant extraterritoriality concerns, Bokhari should have understood that, as a citizen of the United States who had lived in this country for many years, he had an obligation to return to stand trial."); *see also United States v. Catino*, 735 F.2d 718, 720 (2d Cir. 1984) (applying doctrine to individual who was present in New York, found guilty there, and then fled).[7]

Second, the *Shalhoub* Court found an "adequate remedy," Opp'n at 10 (quoting 855 F.3d at 1265), for purposes of an extraordinary-writ analysis vis-à-vis its appellate jurisdiction, an issue irrelevant here. *See* 855 F.3d at 1263-65. *See also United States v. Martirossian*, 917 F.3d 883, 890 (6th Cir. 2019) (same posture, same holding, same reasoning). Mr. Saab does not seek mandamus. Whatever *Shalhoub*'s discussion *might* mean vis-à-vis that remedy, it did not reject *Hijazi*'s fugitive-disentitlement analysis.[8] And, *Shalhoub*'s fugitive-disentitlement discussion is entirely inapposite. Unlike *Shalhoub*, Mr. Saab was in another country when the indictment issued, the United States has never been his home, *see Shalhoub*, 855 F.3d at 1263, and he was *never* in the United States at any relevant time.

And, Mr. Saab has been *ordered*—by the country to which he owes diplomatic allegiance—*not* to come to the United States. Thus, even if Mr. Saab knew of his indictment, he

---

[6] The government's claim that Mr. Saab has U.S. contacts, Opp'n at 13-14, identifies those of *others*. *See id.* It does not dispute that he has not visited this country in decades. The expansion of the doctrine that originally applied to "a criminal defendant who had escaped and remained at large," *Pesin v. Rodriguez*, 244 F.3d 1250, 1252 (11th Cir. 2001), to a defendant based on the presence of others in this country, and their failure to return, would be precisely the unfounded expansion of the doctrine condemned in *Degen*, 517 U.S. at 828-29.

[7] The government's reliance on *In re Kashamu*, 769 F.3d 490, 493 (7th Cir. 2014), is misplaced. That case involved tolling of the statute of limitations, presenting entirely different considerations.

[8] While the government faults Mr. Saab, Opp'n at 10, for focusing on the district court's *Shalhoub* decision, it was the district court's decision that is situated similarly to this motion. *United States v. Itriago*, No. 13-20050-CR, 2019 WL 1232128, at *2 (S.D. Fla. Feb. 8, 2019), cited by the government, Opp'n at 10, did not appreciate the distinction between *Shalhoub*'s adequate-remedy analysis for appellate mandamus and initial consideration of a motion like this one. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) ("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court.").

has not "refused" to surrender, Opp'n at 11 (quoting *Shalhoub*), as he has not made a free choice, *see* 855 F.3d at 1263 (Shalhoub did "not want to submit" to the court's jurisdiction."). Indeed, the government's claim, Opp'n at 14, that Mr. Saab "refused" to submit to the Court's jurisdiction implies that every person on Earth owes allegiance to the United States and any other national allegiance comes second.[9] Under that logic, the Queen of England would, if charged in the U.S., be a fugitive merely by asserting that England's sovereign immunity would be offended if she submitted to U.S. custody. Neither *Shalhoub*, nor any other of the government's cases, support this extraordinary doctrine. Importantly, *Shalhoub* also distinguished *Hijazi* because, in that case, "the Government of Kuwait has formally protested on three occasions the fact that Hijazi is under indictment," 589 F.3d at 411, whereas "Shalhoub cites no refusal by the Saudi Government to extradite him." 855 F.2d at 1264.

The government's cases also posit that, in ordinary fugitive-disentitlement cases, there is no cognizable harm to a defendant by requiring his submittal to the Court's jurisdiction. *Shalhoub*, 855 F.3d at 1265; *see also Martirossian*, 917 F.3d at 890. But, Mr. Saab has been ordered, based on his diplomatic immunity, by his own country not to submit. Forcing his appearance in such circumstances, where he would have to defy his own government, alone is sufficient to make this case like *Hijazi*. Even if *Shalhoub* imposed an extraordinary-writ-style adequate remedy requirement, 855 F.3d at 1259, that standard would be met here. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985) (holding that "immunity is in part an entitlement not to be forced to litigate" and hence confers an immediate appeal right); *Swarna v. Al-Awadi*, 622 F.3d 123, 141 (2d Cir. 2010) (finding this reasoning applicable to diplomatic immunity). Requiring Mr. Saab to submit to assert his immunity denies that immunity.

Finally, the government identified no impediment to adjudication of the pending motion caused by Mr. Saab's absence. *See Degen*, 517 U.S. at 825-27. Its claim, Opp'n at 14, that Mr.

---

[9] The Supreme Court has long recognized that "ministers, consuls, and citizens or subjects of foreign States" do not owe allegiance to the United States, a doctrine codified in the Fourteenth Amendment. *See Slaughter-House Cases*, 83 U.S. 36, 73 (1872).

Saab will not "comply with an adverse order from this Court" ignores that he is detained in Cape Verde. *Cf. Mastro v. Rigby*, 764 F.3d 1090, 1096 (9th Cir. 2014) ("[W]e have generally confined our application of the fugitive disentitlement doctrine to challenges to detentions, where an appellant's status as a fugitive from confinement clearly undercuts his challenge to his confinement."). There is no policy supporting fugitive disentitlement present here. The United States recognizes diplomatic immunity doctrinally, so there is no "indignity visited upon the District Court by [Mr. Saab's] absence" *before* immunity is adjudicated, *Degen*, 517 U.S. at 828, for much the same reason that collateral-order appeals from the denial of immunity are routinely allowed. *Mitchell*, 472 U.S. at 527.

Indeed, the United States, being the world's preeminent diplomatic power with the largest number of special envoys tremendously benefits from the recognition of such envoys' diplomatic immunity. And because defendants can only in exceptional cases claim immunity, there is no need to expand the doctrine "to deter flight from criminal prosecution by [Mr. Saab] and others." *Id.* at 828. No "necessity giving rise" to fugitive disentitlement is present, so the doctrine cannot apply. *Degen*, 517 U.S. at 829.

## IV.    Mr. Saab's Diplomatic Immunity Creates Special Circumstances

Even if fugitive disentitlement applied here, it is difficult to formulate more compelling special circumstances than Mr. Saab's diplomatic immunity. The fact that the Secretary of State has not accepted his diplomatic status, Opp'n at 16, is irrelevant as U.S. notification and acceptance requirements do not apply to a diplomat accredited to Iran.

As explained in Mr. Saab's proposed motion to dismiss the indictment, at a minimum he qualifies for immunity under the Vienna Convention on Diplomatic Relations ("Vienna Convention"), Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, and under customary international law, being head of a diplomatic mission from Venezuela to Iran. *See* Vienna Convention Arts. 1(e), 3(1)(a), 14(b) 29, 31 29, 31. As such, he is entitled to personal "inviolability," and is not "liable to any form of arrest or detention." Vienna Convention Art. 29. The United States is a party to the Vienna Convention and has enacted the Diplomatic Relations

Act, 22 U.S.C. §§ 254a-258a ("DRA"), requiring dismissal of any action or proceeding against an individual entitled to such immunity. *See* 22 U.S.C. § 254d.

The deference normally due to a State Department determination of diplomatic status, *see* Opp'n at 17, is inapplicable.[10] *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328 (11th Cir. 1984), and other cases treating such determinations as conclusive involve the question whether an individual, within the United States and claiming diplomatic status as a representative *to the United States*, is a diplomat with immunity. Deference in such cases is grounded in the President's exclusive power to appoint and "receive Ambassadors and other public Ministers." U.S. Const., Art. II, §§ 2, 3.

The government's reliance on *In re Baiz*, 135 U.S. 403 (1890) is misplaced. There, the Court considered whether an American citizen, as an "acting minister or *charge d'affairs*" of Guatemala, Salvador, and Honduras within and to the United States, was entitled to diplomatic immunity. He was not so entitled as the Secretary of State had not received him as such and the Secretary's determination was the best evidence of his status, given the President's power to receive ambassadors. *Id.* at 419, 432. *See also United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004) (explaining that the *Baiz* Court found the State Department's certificate the best evidence to show diplomatic status based on the President's authority to send and receive ambassadors).

The United States is neither the sending nor the receiving state here, but it is bound by treaty obligations and customary international law to recognize the diplomatic status of third country envoys. Article 40 of the Vienna Convention, and customary international law, guarantee immunity to diplomats who are in transit (or *in transitu*) from their sending state (Venezuela), to their designated receiving state (Iran), whether that diplomat is passing through or present in the territory of a third state. Under these provisions "recognition" by the third state is not required, and a passport is required only if "necessary." Art. 40 (1). As Mr. Saab had no plans to traverse

---

[10] In addition, the State Department has suggested only that it is unaware of any basis for Mr. Saab's claim to immunity, Opp'n at 17—not surprising as he has never been posted to the U.S.

the United States, or Cape Verde, while traveling to Iran, securing such passports was neither necessary nor possible.

Law-abiding nations do not molest or interfere with the diplomats of other states, so there is little precedent in this area. However, American courts have recognized the immunity of foreign diplomats "*in transitu*" under customary international law, now codified in the Vienna Convention. The leading authority is Judge Learned Hand's opinion in *Bergman v. De Sieyes*, 170 F.2d 360 (2d Cir. 1948), where the Second Circuit recognized the immunity of a French diplomat, transiting New York City to take up his post in Bolivia.[11] *See also United States v. Rosal*, 191 F. Supp. 663, 664 (S.D.N.Y. 1960) ("diplomats-in-transit (although not accredited to the United States) are entitled to immunity when they are in the United States en route. . . ."). This reflects the non-interference principle (*ne impediatur officium/legatio, i.e.* "'*[m]ay the legation not be impeded'. A maxim expressing the immunity of diplomatic persons and their papers. . . .*": Fellmeth, A.X. and Horwitz, M., *A Guide to Latin in International Law* (Oxford University Press 2009), which also is enshrined in Article 2(1) of the United Nations Charter.

The question in *Bergman* was whether *in transitu* diplomatic immunity was limited to "immunity to an arrest, or other restraint," a given, or whether it also included immunity from civil process. *Id.* at 361. The Second Circuit affirmed the district court's conclusion that a diplomat *in transitu* was entitled to the same immunities as one resident (*in situ*) in the jurisdiction. Judge Hand reasoned that the primary reason for recognizing diplomatic immunity (in addition to respect for the dignity of the sending sovereign) was to avoid the "interference with his duties which either arrest or service entails," and that this was more powerful in the case of a diplomat *in transitu*: "the second reason [interference with duties] is weightier in the case of a diplomat *in transitu*, for it will ordinarily more interfere with the discharge of his duties to be obliged to attend the trial of an action pending in a third state, than that of one pending in the state of his post." *Id.* at 363.

---

[11] The court's conclusions were based on what it believed New York's courts would hold applying international law principles, but approved these principles as applied, finding no misapprehension or refusal to "accept a well-established doctrine of international law." *Id.* at 361.

Like Mr. Saab, the diplomat in *Bergman* was not accredited to the United States, and had not yet reached his destination. Judge Hand found that "[i]t is scarcely necessary to add that immunity would be altogether frustrated, in the case of all diplomats seeking their posts for the first time, if it were limited to those already accepted by the sovereign to whom they are accredited." *Id.* With regard to any requirement of Executive Branch approval for an *in transitu* diplomat, Judge Hand noted that "[i]f such a limitation should be thought to exist in § 252, Title 22, U.S. Code [giving immunity to diplomats "authorized and received as such by the President"], it is not relevant to the situation at bar." *Id.* And, if Mr. Saab were to be transferred to the United States, he would certainly qualify as a diplomat "in the territory of a third State" under Article 40, fully entitled to immunity under the Vienna Convention and customary international law.

The poor relations between the United States and both Venezuela and Iran do not change this conclusion. Both Venezuela and Iran are state parties to the Vienna Convention and the United States remains bound by that multilateral agreement and by customary international law. Moreover, Mr. Saab's Special Envoy appointment predates the United States' refusal to recognize Nicolas Maduro as the winning candidate in 2019. *See* Mot. to Vacate, Ex. A.[12] And, as the Eleventh Circuit ruled in *Abdulaziz*, the fact that Mr. Saab was designated as a "special envoy," rather than an ambassador, also does not affect his entitlement to diplomatic immunity. *Abdulaziz*, 741 F.2d at 1331.[13]

---

[12] The State Department's position on Venezuela's government is far from clear. It states that "the Venezuelan National Assembly [is] . . . the only legitimate federal institution, according to the Venezuelan Constitution." *See* U.S. Department of State, U.S. Relations with Venezuela, Bilateral Relations Fact Sheet (July 6, 2020), https://www.state.gov/u-s-relations-with-venezuela/. But, there has been no break in diplomatic relations. *See id.* The United States has no diplomatic relations with Iran, but recognizes its government. *See* https://history.state.gov/countries/iran (noting mutual recognition in 1850).

[13] *United States v. Sissoko*, 995 F. Supp. 1469, 1470 (S.D. Fla. 1997) is inapposite, involving a special mission *to the United States*. Its conclusion that "special missions" are not immune is inconsistent with *Abdulaziz*, and has been overtaken by later State Department recognition of this immunity. *See* John Bellinger III, Department of State Legal Adviser, *Immunities*, OpinioJuris (Jan. 18, 2007), http://opiniojuris.org/2007/01/18/immunities/. *See also Weixum v. Xilai*, 568 F. Supp. 2d 35 (D.D.C. 2008) (court deferring to State's suggestion that a member of a special diplomatic mission from China enjoyed immunity).

March 1, 2021

David B. Rivkin, Jr.*
Lee A. Casey*
Elizabeth Price Foley
Jonathan R. Barr*
Kendall E. Wangsgard*
Richard B. Raile*
Baker & Hostetler LLP
1050 Connecticut Ave, NW
Suite 1100
Washington, DC 20036
drivkin@bakerlaw.com
(T) (202) 861-1500
(F) (202) 861-1783

Respectfully submitted,

/s/ Lindy K. Keown
Lindy K. Keown
Baker & Hostetler LLP
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
lkeown@bakerlaw.com
(T) (407) 649-4000
(F) (407) 841-0168

Jonathan B. New*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
jnew@bakerlaw.com
(T) (212) 589-4200
(F) (212) 589-4201

*Attorneys for Defendant Alex Nain Saab Moran*

* Admitted *pro hac vice*