# EXHIBIT A

COMMUNITY COURT OF JUSTICE,
ECOWAS

COUR DE JUSTICE DE LA COMMUNATE,
CEDEAO

TRIBUNAL DE JUSTICA DA COMMUNIDADE,
CEDEAO



No. 10 DAR ES SALAAM CRESCENT
OFF AMINU KANO CRESCENT,
WUSE II, ABUJA-NIGERIA.
PMB 567 GARKI, ABUJA
TEL: 234-9-78 22 801
Website: www.courtecowas.org

# IN THE COURT OF JUSTICE OF THE ECONOMIC COMMUNITY

## OF WEST AFRICAN STATES

## (ECOWAS)

## IN THE CASE

ALEX NAIN SAAB MORÁN ........................ **APPLICANT**

Versus

REPUBLIC OF CABO VERDE ............... ……..**RESPONDENT**

**JUDGMENT**

**HOLDEN IN ABUJA, NIGERIA**

**On 15ᵀᴴ MARCH 2021**

## SUIT No ECW/CCJ/APP/43/20

## JUDGMENT No ECW/CCJ/JUD/07/2021

ALEX NAIN SAAB MORÁN ........................ **APPLICANT**

Versus

REPUBLIC OF CABO VERDE ............... ........**RESPONDENT**

## COMPOSITION OF THE COURT

Hon. Justice Edward Amoako **ASANTE** .................**Presiding**

Hon. Justice Dupe -**ATOKI** ................................ **Member**

Hon. Justice Januária T. S. Moreira **COSTA**........ **Member/Rapporteur**

Assisted by:

Mr. Tony Anene **MAIDOH** ........................ ......**Chief Registrar**

1



## *I. REPRESENTATION OF PARTIES*

1 - Femi Falana, SAN

2 - Marshal Abubakar, ESQ.

3 - Dr. José Manuel Pinto Monteiro …..…… **Counsel for the Applicant**

4 - Dr. Henrique Borges …………………… **Counsel for the Respondent**

## *II - DESCRIPTION OF THE PARTIES*

5 - The Applicant is a Colombian and Venezuelan citizen who was in transit in Cabo Verde.

6 - The Respondent is the Republic of Cabo Verde, an ECOWAS Member State and signatory to the African Charter on Human and Peoples' Rights.

## *III - INTRODUCTION*

7 - In the instant case, the Applicant claimed violation of his human rights to liberty and security, not to be subjected to torture or cruel and inhumane treatment and to freedom of movement, because, while in transit through Cabo Verde, he was detained by the authorities of the Respondent State for the purpose of extradition requested by the United States of America, in the context of criminal proceedings initiated against him.

## *IV – PROCEDURE BEFORE THE COURT*

2



8 - The application initiating proceedings was lodged at the Registry of this Court on September 29, 2020 and served on the Respondent State on October 13, 2020.

9 - By separate application pursuant to Article 20 of the 2005 Additional Protocol and Article 79 of the Rules of Procedure of the Court, registered at the Registry and served on the Respondent on the same date, the Applicant pleaded for provisional measures.

10 - The date, 10 November 2020, was set for the hearing of the parties on the application for provisional measures. The Respondent pleaded the postponement of the hearing on the grounds that it had been notified at very short notice and that it still had time to present its defence, which it intended to do.

11 - After hearing the Applicant's representatives, the hearing was adjourned to 30 November 2020 so that the Respondent could still submit its defense.

12 - The Respondent lodged its defense (doc. 3) on November 24, 2020, which was served on the Applicant's representatives on the same date.

13 - By application registered at the Registry of this Court on November 27, 2020, the Applicant came to present his Reply (doc. 4) to the defense presented by the-Respondent, which was also served on the latter.

14 - On November 30, 2020, the Respondent came to present a new application (doc. 5) containing its defense, replacing doc. 3, which was served on the Applicant on December 1st, 2020.

15 - A virtual hearing was held on 30 November 2020, which was attended only by the Applicant's representatives, who formulated their submissions on the application for provisional measures.

3



16 - The Applicant submitted on December 2, 2020 his reply to the application (doc.6) submitted by the Respondent on November 30, 2020, which was served on the later on the same date.

17 - In a virtual hearing held on December 2, attended only by the Applicants' representatives, the Ruling No. ECW/CCJ/Rul/07/2020 was delivered on the sought Provisional Measures.

18 - In sequence and in reaction to the provisional measure declared, the Respondent came, on December 4, 2020, to file an application (doc.7) which was served on the Applicant on the same date.

19 - The Applicant filed an application (doc. 8) registered on December 17, 2020, in which he asks the Court to order the ECOWAS Authority of heads of State and Government to impose sanctions on the Respondent

20 - The Respondent was served on with this application on the same date.

21 - On December 18, 2020, a new application was filed by the Applicant (doc. 9) on sanctions against Member States that do not honor their obligations to ECOWAS and under the inherent jurisdiction of this Court, which was served on the Respondent on the same date.

22 - The Applicant, by means of an application lodged at the Registry on 29 January 2021 (doc. 10), informed the Court that he was appointed as Alternate Permanent Ambassador of the Bolivarian Republic of Venezuela to the African Union.

23 - The Respondent was served on this application on the same date.

24 - On 5 February 2021, the parties attended the virtual hearing held and at which they were heard and presented their oral submissions.

4



## *V - APPLICANT'S CASE*

### *a) Summary of Facts:*

25 - On June 12, 2020 at 8:09 pm, the plane on which the Applicant was traveling in order to carry out his special mission, made a stopover in the Republic of Cabo Verde for refueling. About an hour later, at 9:30 pm, the Applicant was detained by the Cape-Verdean authorities in response to an international arrest warrant that was allegedly circulated by INTERPOL on the basis of a Red Alert against the Applicant, issued at the request of the United States (the "**Red alert**"), for the purpose of extradition, based on the United Nations Convention against Transnational Organized Crime (the "**UNTOC**"), to which both Cabo Verde and the USA are signatories and as a result of the decision issued by the US District Court for the District of South Florida on July 25, 2019 to indict the Applicant, for money laundering offenses, allegedly committed between November 2011 and September 2015.

26 - At the time of his detention, neither the copy of the Red Alert nor the arrest warrant against him was presented.

27 - On April 9, 2018, the Applicant was appointed as Special Envoy of the Government of Venezuela, which vested on him the responsibility of acquiring humanitarian resources of great need in Venezuela. In this context, and within the scope of his mandate as Special Envoy, on April 1, 2020, Venezuela entrusted the Applicant with the mission of negotiating with organizations in Iran to obtain the necessary resources for Venezuela.



28 - Therefore, in June 2020, the Governments of Venezuela and Iran agreed that the Applicant would travel to Iran to purchase food and medicines that Venezuela needed urgently. In view of obstacles imposed by the United States, it was decided that the Applicant's mission should be kept in secrete, which explains why the Applicant's name was not on the passenger list of the plane in which he was traveling on.

29 - After taking legal cognizance of the arrest of its Special Envoy, Venezuela pleaded the Applicant's immunity and inviolability under international law by means of letters sent to the Minister of Foreign Affairs, Communities and Defense of Cabo Verde on 13 and 14 June 2020 and 25 September 2020 respectively.

30 - Between June 14, 2020 and July 22, 2020, the Applicant's Counsel challenged his detention through a series of *habeas corpus* and appeals. In general, such appeals were based (1) on the Applicant's inviolability and immunity, (2) on the illegality of the Red Alert and (3) on the Applicant's health problems, aggravated by his detention. All of these appeals were rejected by the Cape-Verdean courts, which decided to maintain the Applicant's detention.

31 - Since July 16, 2020 until the present moment, the Applicant has been filing a series of appeals against the extradition request presented by the USA based on the fact that (1) he cannot be extradited on account of his immunity and inviolability, (2) the extradition requested by the United States is purely political, (3) the Applicant has been arbitrarily detained and his procedural rights have been violated, and (4) if he is extradited, the Applicant will be subject to a violation of his human rights. All of these appeals have been denied by the Cape-Verdean courts, which have ruled to authorize the Applicant's extradition to the USA.

6



### b) Pleas in Law

32 - The Applicant, in support of his claim, relied on Articles 1, 2, 3, 5, 6, 7 and 12 (4) of the African Charter on Human and Peoples' Rights, 9 of the Declaration of Human Rights, 91 of the International Covenant on Civil and Political Rights.

33 - He also relied on Articles 2 and 103 of the Charter of the United Nations, Articles 2, 3 and 31 of the Constitution of INTERPOL, Articles 63 (1) 77 (1), 79 (1), 86 and 87 of the Regulations of INTERPOL; Articles 4 (1) and 16 (14) of the International Convention on Transnational Crime (UNTOC) Article 40 of the Vienna Convention on Diplomatic Relations; Articles 11 and 37 of the Constitution of the Republic of Cabo Verde, as well as, Articles 6 (1) (g) and 55 (1) and (3) of Law No. No. 6/VIII/2011 of 29 August 2002, which regulates mutual assistance in judicial matters in Cabo Verde.

34 - He also relied on Article 19(2) of the Protocol (A/P1/7/91) on the Court of Justice of the Community, Article 24(2) and (3) of the Supplementary Protocol on the ECOWAS Court, Article 77 of the ECOWAS Revised Treaty and Article 9(1) of the Supplementary Act A/SP.13/02/12.

### c) Reliefs Sought

35 - The Applicants sought from the Court the following orders:

a. A declaration that the Applicant's arrest by the Respondent at Amílcar Cabral International Airport, Sal, Cabo Verde, on June 12, 2020, is illegal for violating his human right to personal freedom, guaranteed by Article 6 of the Charter.

7



b. A declaration that the Applicant's continued detention by the Respondent in Sal, Cabo Verde from June 12, 2020 to the present date is illegal, as it violates his human right to personal freedom guaranteed by Article 6 of the Charter.

c. A declaration that the Applicant's detention without due judgment by the Defendant in Sal, Cabo Verde since June 12, 2020 is illegal for violating his human right to fair trial guaranteed by Article 7 of the Charter.

d. A declaration that the Respondent menace to expel the Applicant from Cabo Verde and extradite him to the United States violates his human right to freedom of movement guaranteed by Article 12 of the Charter.

e. An order instructing the Respondent to provide adequate security and guarantees to the Applicant and to cancel all personal precautionary measures that prevent him from leaving Cabo Verde, with a view to returning to Venezuela, where his domicile is.

f. An injunction that prevents the Respondent from expelling the Applicant from Cabo Verde and extraditing him to the United States in any manner whatsoever.

g. The sum of 5,000,000.00 USD (five million dollars) in damages for the violation of the Applicant's human rights to personal liberty, fair trial and freedom of movement.

8



h. An order instructing the Authority of Heads of State and Government to impose sanctions on the Respondent State;

i. A conviction of the Respondent to pay the Applicant a penalty payment of USD 900,000 for each 24-hour period, following the delivery of the Court order of 2 December 2020 in Case ECW/CCJ/APP/43/20 and Judgment No ECW/CCJ/Rul/07/2020 which has not yet been fully complied with.

j. That the extradition process be canceled in the Respondent State due to the appointment of the Applicant as Alternate Ambassador to the African Union.

## *VI – RESPONDENT'S CASE*

### *a) Summary of facts:*

36 - In the only reply (doc.5 which replaced doc. 3) submitted by the Respondent, the latter confirms that the detention of the Applicant on 12 June 2020, at the airport of the island of Sal, occurred at the request of the US Government, specifically the Florida District Court, on account of a series of crimes allegedly committed by the Applicant on US territory.

37 - This detention was carried out based on the general principles of international mutual assistance in judicial matters, in strict compliance with the provisions of Arts. 3 and 4 of Act no. 6/VIII/2011, of 29 August.

38 - That there is no breach with Cape-Verdean law nor with any agreement, treaty or international convention to which Cabo Verde is a party, in the procedure for the arrest of Mr. Alex Saab.

9



39 - After the arrest, the Applicant was presented to the District Court of the Sal island, for the purposes of legalization of the same, which happened deeming the diligence to be in accordance with Cape-Verdean legislation, and the respective magistrate ordered the Public Prosecutor's Office to arrange with the Barlavento Court of Appeal the subsequent legal procedures, with a view to the extradition of the detainee.

40 - It further affirms that on the day following the arrest, that is on 13 June 2020, Venezuela, through its Minister of Foreign Affairs, informed the State of Cabo Verde, through its Minister of Foreign Affairs, of the capacity in which the detainee was traveling and that consequently he was protected by immunity under international law, arguing for the recognition of the immunity of Mr. Alex Saab, saying that the "*Applicant traveled as a representative of the President of Venezuela, Nicolás Maduro Moras, who could not leave Venezuela in his capacity as the country guide and leader in the fight against the COVID-19 pandemic*".

41 - The Barlavento Court of Appeal ratified the decision of the Judge of the District Court of the island of Sal, maintaining, therefore, the arrest of Mr. Alex Saab, which originated a request for "*habeas corpus*", which was disregarded by the Supreme Court of Justice.

42 - The Respondent maintains that the Applicant does not enjoy the immunity on which he relies, since he does not meet the requirements of a special envoy, for the purposes of diplomatic immunity enshrined in the 1969 United Nations Convention on Special Missions, thus defeating all the

construction and the grounds that he has used in all his challenges to the decisions rendered by the Cape-Verdean judicial authorities.

43 - The Respondent attached a document that reports the medical assistance provided to the Applicant between July 27, 2020 to November 24, 2020. (See doc.7 -Respondent's reaction to the Ruling delivered by the Court on provisional measures).

### b) Pleas in Law

44 - There is no plea in law relied on.

### c) Reliefs Sought

The Respondent submitted that:

*a)* The Applicant, Alex Saab, was arrested pursuant to an international arrest warrant, with full respect to the Cape-Verdean law and the international agreements to which Cabo Verde is a party;

*b)* The Applicant, Alex Saab, does not enjoy any diplomatic immunity on which he relies, wherefore the grounds of his various internal and international appeals based on his supposed immunity are mere fantasy and have no correspondence with the law.

## VII – PROCEDURE BEFORE THE COURT

### On the Application for the Adoption of Interim Measures

11



45 - Through Ruling No ECW/CCJ/Rul/07/2020, the Court ruled on the application for provisional measures.

## *VIII – JURISDICTION*

46 –Since no objection was filed, the Court assumes jurisdiction as when it rendered the aforementioned Ruling already delivered.

## *IX – ADMISSIBILITY*

47 - The admissibility of the application has already been verified in the same Ruling ECW/CCJ/Rul/07/2020.

## *X. MERITS*

48 - The Applicant seeks from the Court a decision over the following issues:
   a) *Whether the Applicant has been subjected to arbitrary detention in Cabo Verde;*
   b) *Whether the Applicant is the victim of political persecution by the United States and, consequently, by Cabo Verde;*
   c) *Whether The Applicant's procedural rights were violated during the detention and extradition procedure in Cabo Verde;*
   d) *Whether there is a real probability that the Applicant's human rights will be violated if he is extradited to the USA.*

49 - He thus claims the violation of the following human rights:

12



a) Right to liberty and security, guaranteed by Article 6 of the Charter.

b) Right to a fair trial, guaranteed by Article 7 of the Charter.

c) Right to freedom of movement guaranteed by Article 12 of the Charter.

50 - The Court will then assess each of the human rights allegedly violated by the Respondent State, taking into consideration the questions put forth by the Applicant for the Court's consideration.

**Court's Analysis,**

### *On the burden of proof*

51 - Firstly, it should be noted that the general principle of proof places the burden of proof on the one who makes the allegations.

52 - Therefore, as a rule, the burden of proof lies with the Applicant, who must demonstrate the facts he has claimed. In other words, the burden of proof lies with the party who asserts the fact, and this would fail if the evidence offered is not strong enough to convince the Court of the veracity of the alleged fact. (See the case *FEMI FALANA AND ORS VS. THE REPUBLIC OF BENIN AND ORS* (2012) CCJELR 1

53 - In order to support his claims, the Applicant can use all legal means and provide all evidence, and there must be a nexus between the evidence and the facts alleged which makes them convincing. (See in the case *MESSIEURS WIAYAO GNANDAKPA ET AUTRES v. ETAT DU TOGO, (2015) ECW/CCJ/JUD/18/15 (Unreported)*

54 - However, it should not be overlooked that the evidentiary requirement in international human rights courts is more flexible and less formal than in domestic law cases, while taking into account the principle of legal certainty

13



and procedural balance of the parties, because the set of convincing elements to be incorporated into a specific case results from the evidence offered by both the Applicant and the Respondent State. *(See* the case *DAOUDA GARBA v. RÉPUBLIQUE DU BÉNIN (2010) CCJELR 1.*

55 - It is a settled case-law that the facts can be proved by documents.

56 - In the instant case, the Applicant, in order to support and corroborate his allegations, attached to the proceedings documents that constitute Exhibits 1 to 11 and 13 to 16 (attached to doc. 1) and Exhibits 1 to 3 (attached to doc.10).

57 - In turn, the Respondent added, to its first reply (doc. 3) (replaced by doc. 5), 4 documents, all of which are texts of judgments delivered by domestic jurisdiction.

## *a) Whether the Applicant has been subjected to arbitrary detention in Cabo Verde*

### *I.) The alleged violation of the right to liberty and security*

58 - To uphold the claim of violation of his right to liberty and security, guaranteed by Article 6 of the African Charter, the Applicant submits two reasons, which, in his opinion, make his arrest arbitrary and illegal:

1st - His *immunity and inviolability*, due to the principle of non-interference in internal affairs of other States and the fact that he was acting as "Special Envoy" of Venezuela, on behalf of President Nicolás Maduro Moros (President Maduro).

14



59 - On this claim, the Applicant maintained that, because President Maduro cannot leave Venezuela due to the Covid-19 pandemic, he authorized and sent him to represent him in the conduct of matters relating to Venezuela, and therefore, the Applicant enjoys the same immunity *ratione personae* that the President of Venezuela (President Maduro) would have enjoyed had he traveled through Cabo Verde. That such immunity has not been waived by Venezuela and that the Government of Venezuela has informed the Government of Cabo Verde that the Applicant has immunity.

2nd - At the time of his arrest, the Applicant was not the subject of an arrest warrant nor even of a Red Alert in Cabo Verde.

60 - As to this claim, the Applicant contends that the Red Alert issued by INTERPOL is illegal since it was issued after his arrest, in violation of international law and therefore of INTERPOL rules.

61 - He further submits on the Red Alert, with the control number: A-537/6-2020 and reference NCB: 20191243598, that the request from the United States National Central Bureau for the issuance of a Red Alert against the Applicant was dated June 12, 2020. It was assigned the case number: 2020/39602 and was diffused on June 13, 2020, presumably, because the legal review prescribed by Article 86 was only completed on that date. That, therefore, on June 12, 2020, at the time of the arrest, there was no request from INTERPOL urging Cabo Verde, as an INTERPOL member country, to locate and arrest, detain or restrict the Applicant's movement, for the purpose of extradition, surrender or similar legal action.

62 - That the facts described above were communicated by the Criminal Police in Cabo Verde to the Office of the Prosecutor-General of the Republic of Cabo Verde, through an email sent on June 15, 2020, in which was stated

15



that when consulting the INTERPOL Information System there was only "*a Diffusion that would not allow his arrest, since the law requires the 'red alert'.*"

63 - That the absence of a Red Alert on June 12, 2020, therefore, was a notorious fact in Cabo Verde. However, in a declaration issued for the purpose of the police inquiry related to the Applicant, members of the Criminal Police of Cabo Verde stated that, at the time of the Applicant's arrest (which occurred on June 12, 2020), they had given him a copy of the Red Alert.

64 - In turn, the Respondent affirmed that the Applicant's arrest, on June 12, 2020, at the airport on the Island of Sal occurred at the request of the American Government, more specifically by the Florida District Court, and that it was carried out based on the general principles of mutual assistance in judicial matters, in strict compliance with the provisions of Arts. 3 and 4 of Act No 6/VIII/2011, of 29th August.

65 - That there is no breach with Cape-verdean law nor with any agreement, treaty or international convention to which Cabo Verde is a party, in the procedure for the arrest of the Applicant.

66 - After the arrest, the Applicant was taken before the District Court of the Sal Island with a view to its legalization, what eventually happened in accordance with Cape-Verdean law, and the relevant magistrate ordered the Public Prosecutor's Office to arrange for subsequent legal proceedings to be brought before the Barlavento Court of Appeal with a view to the extradition of the detainee.

✓

67 - The Article 6 of the African Charter on Human and Peoples' Rights (ACHPR), provides that: "*Every individual shall have the right to liberty*

16



*and to the security of his person. No one may be deprived of his freedom except for reasons and conditions previously laid down by law. In particular, no one may be arbitrarily arrested or detained.*"

68 - This right is equally enshrined in the Universal Declaration of Human Rights UDHR (Arts. 3 and 9) and in the International Covenant on Civil and Political Rights (ICCPR) (Art. 9).

69 - Similarly, Article 7 of the American Convention on Human Rights and Article 5 of the European Convention on Human Rights guarantee this same right to liberty and security of individuals, the latter being the only Convention that specifically lists in paragraphs (a) to (f) the grounds that can legally justify the deprivation of liberty.

70 - All the human rights protection instruments mentioned above guarantee individuals the right to personal liberty and security, establishing that the deprivation of liberty must, in all cases, happen *for reasons and under conditions previously determined by law,* (it is thus understood to be the domestic or national law of the States Parties), that is, with due respect to the *principle of legality.*

71- Likewise, the Human Rights Committee noted that "*no one shall be deprived of liberty except on such grounds and in accordance with such procedure as are established by law. (...). Deprivation of liberty without such legal authorization is unlawful.*" (See General *Commentary n°* 35 §22).

72 - In this regard, the Court held in the case of *BENSON OLUA OKOMBA v. REPUBLIQUE DU BENIN, the Judgment ECW/CCJ/JUD/05/15*, that: "*The above-mentioned human rights treaties, provides that deprivation of liberty within a State must in all cases be carried out in accordance with the*

17



*law."* (Pag.16) (See further the case of *CHIEF EBRIMAH MANNEH v. THE REPUBLIC OF GAMBIA (2004-2008) CCJELR 181 @ 189.*

73 – Also this Court held in the case *HADJITOU MANI KORAOU V. REPUBLIC OF NIGER (2004-2008) CCJELR 217* that "*une détention est dite arbitraire lorqu´elle ne repose sur aucune base légale.*"

74 - This court has defined arbitrary arrest as: "*any form of curtailment of individual liberty that occurs without a legitimate or reasonable ground, and is in violation of the conditions set out under the law.*" (See *BADINI SALFO v. REPUBLIC OF BURKINA FASO (2012) CCJELR 281 @ 289.*

75 - The notion of arbitrariness also covers deprivation of liberty contrary to the standards of reasonableness, that is, if it is "*just, necessary, proportionate and equitable as opposed to unjust, absurd and arbitrary.*" (See African Commission, in the Case *MUKONG V. CAMEROON* Communication No. 458/1991, and Further the *Human Rights Committee In GENERAL COMMENT No. 35 (§12).*

76 - Likewise, the African Court on Human and Peoples' Rights (AfCHPR), in the case *ONYACHI AND NJOKA V. TANZANIA, Application No. 003/2015, of September 28th, 2017* ruled that: "*The established International human rights jurisprudence sets three criteria to determine whether or not a particular deprivation of liberty is arbitrary, namely, the lawfulness of the deprivation, the existence of clear and reasonable grounds and the availability of procedural safeguards against arbitrariness. These are cumulative conditions and non-compliance with one makes the deprivation of liberty arbitrary.*"

18



77 - And as stated in the "*PRINCIPLES AND GUIDELINES ON THE RIGHT TO A FAIR TRIAL AND LEGAL ASSISTANCE IN AFRICA*", "*States must ensure that no one shall be subject to arbitrary arrest or detention, and that arrest, detention or imprisonment shall only be carried out strictly in accordance with the provisions of the law and by competent officials or persons authorized for that purpose, pursuant to a warrant, on reasonable suspicion or for probable cause.*" *(See Principle M. [1. (b)])*

78 - The European Court of Human Rights also stressed that "*... on the question whether detention is 'lawful', including whether it complies with "a procedure prescribed by law" within the meaning of article 5§1, the Convention refers back essentially to national law, including rules of public International law applicable in the state concerned*" - (See *TONIOLO V. SAN MARINO AND ITALY - Application No. 44853/10 of 26 June 2012 §44*).

79 - The concept of reasonableness of the grounds for suspicion that legitimize deprivation of liberty, was given by the European Court in the case *FOX CAMPBELL & HARTLEY v. THE UNITED KINGDOM, 1990 ECHR 12244/86, where it wrote that*: "*'Reasonable Suspicion' presupposes the existence of facts or information which would satisfy an objective observer that the persons concerned may have committed the offence.*" *(Vide Para. 32)*

✓

80 - The Court will now examine each of the claims put forward by the Applicant.

19



a) *The enjoyment of immunity and inviolability by reason of the principle of non-interference stemming from the UN Charter and his status as "Special Envoy".*

81 - In relation to this first claim, it should be noted that, from the analysis of the documents submitted by the Applicant, it is established that he was detained by the Respondent's Criminal Police Authorities when he was in transit, on a trip allegedly from Iran, in the use of two ordinary passports. (See Exhibit 13, page 5)

82 - The copy of the diplomatic passport attached to the case file shows that it had expired since March 2020 (see Exhibit 1).

83 - This means that the Applicant was not detained, showing the status of diplomat.

84 - It was only after his arrest, as he admits, that the Venezuelan authorities came to inform that the Applicant was traveling as a Special Envoy of the Government of Venezuela and for that reason he enjoyed immunity and inviolability.

85 - It must be agreed with the Applicant that inviolability and immunity are prerogatives granted to diplomatic agents under the 1961 Vienna Convention and to the Head of State, Prime Minister and Minister for Foreign Affairs under international customary law. That such immunities and privileges are granted, not for the benefit of individuals, but to guarantee the effective performance of the functions of diplomatic missions, as representatives of States. And that in international law it is a peaceful understanding that certain holders of high positions in a State, such as the Head of State, Head of Government and Ministers of Foreign Affairs, enjoy immunity *ratione*

20



*personae* implying total immunity from criminal jurisdiction and inviolability, which applies to public and private conduct and even to acts performed before assuming office.

86 - Indeed, the immunity of Head of State, as a rule, is based on immunity from jurisdiction based on international law, essentially customary, associated with respect for the sovereignty of States.

87 - However, although the definition of Head of State is given by the internal legal order of each State that defines the functions and forms of election of such entity, the recognition of states or governments is regulated by both international law and domestic law of the government to be recognized and by the domestic law of third states or forum state, that is, the one where immunity will be granted or not.

88 - And all this can influence the granting of immunity to Heads of States.

89 - And as a rule, the recognition of governments, that is, the recognition by the international community of the collective of certain individuals as supervisory body of a certain State, is an issue that influences the granting of immunities.

90 - The Institute of International Law wrote in Article 1 of its 1936 Brussels Resolution that "*The recognition of a new State is the free act by which one or more States establish the existence on a given territory of a politically organised human society, independent of any other existing State, capable of observing the prescriptions of international law and consequently manifest their willingness to consider it a member of the international community.*"

91 - The problem of recognition arises, especially in those cases in which new governments arise after socio-political changes, failing to respect, as a

21



rule, the internal legal framework that regulates the electoral process, the formation and inauguration of the government. (See *Baptista, Eduardo Correia, in "Direito Internacional Público, Vol.II – Sujeitos e Responsabilidades" – Almedina"*).

92 - And the act of non-recognition of governments, is a unilateral and discretionary act of each state with a particular focus on the issue of the granting of immunities and inviolabilities, because if there is no recognition in Law or de facto, immunity cannot be claimed. (See *Fox Hazel "The Law of State Immunity" pg.* 435 - 437).

93 - The immunities of the Heads of State and diplomatic agents can be functional or personal and the grounds for each differ.

94 - In the instant case, what is at issue is not functional immunities (or *ratione materiae*) that is to say, those that exempt State officials from liability, before foreign courts, in relation to acts performed in the exercise of their functions and, therefore, acts of the State that, as a rule, should not be subject to the jurisdiction of another state (*par in parem non habet imperium*) but rather, personal immunities (*ratione personae*), as claimed by the Applicant, who, in turn, aim to guarantee the free exercise of the functions of the Head of State or diplomatic agent, when they are in a foreign state.

95 - Functional or personal immunities always aim to guarantee the interests of the State represented in the foreign state.

96 - In relation to the Head of State, there is no conventional legal regulation and the rules are essentially established by customary law. However, some existing instruments influence the immunity regime of the Heads of State.

22



97 - This is the case of the *New York Convention on Diplomatic Missions*, which, in its Article 21 establishes that (1) "*The Head of the sending State, when he leads a special mission shall enjoy in the receiving State or in a third State the facilities, privileges and immunities accorded by International law to Heads of State on an official visit.*" (2) "*The Head of the Government, the Minister for Foreign Affairs and other persons of high rank, when they take part in a special mission of the sending State, shall enjoy in the receiving State or in a third State, in addition to what is granted by the present Convention, the facilities, privileges and immunities accorded by international Law.*"

98 - And also the *1961 Vienna Convention on Diplomatic Relations* which, despite being essentially addressed to diplomatic agents, provides important guidance on how to understand the immunity regime of Heads of State, using an analogical interpretation of their rules, to ensure the principle of sovereign equality of States.

99 - In relation to personal immunities, these have a more restricted subjective scope, since they are conferred only on the Heads of State, Heads of Government (Prime Minister), the Minister of Foreign Affairs and diplomats accredited to a foreign state. (See *Caeiro Pedro, "Fundamentos, Conteúdo e Limites da Jurisdição Penal do Estado…"* Coimbra editora – 2010, pg. 364)

100 - Thus, the claim made by the Applicant that he enjoys the same personal immunities as the Head of State, namely, those that the "President Maduro", who, according to him, sent him on a special mission would have enjoyed, is unfounded, when such immunities are conferred on *ratione personae.*



101 - On the other hand, it is worth considering that the *1961 Vienna Convention on Diplomatic Relations*, as an instrument that establish diplomatic missions, stated in its Article 1 who are the agents or persons related to the diplomatic mission and determined the terms and conditions under which it is established.

102 - That Convention establishes – following what was already established international custom – the principle that accredited diplomatic agents enjoy immunity from jurisdiction of the accrediting State (Arts 29 and 31).

103 - Therefore, only after the accreditation of diplomatic agents, they actually enjoy the immunities and privileges provided for in the aforementioned Convention.

104 - Accreditation is a formal act by which the diplomatic representative is received. It is usually done by the Head of State or Head of Government. Consenting to receive the diplomatic representative means believing that the acts he performs are for his State.  Accreditation is a discretionary act.

105 - Indeed, as stated in Article 2 of the aforementioned Convention *"The establishment of diplomatic relations between States, and of permanent diplomatic missions, takes place by mutual consent."*

106 - For that reason, Article 39 (1) of the aforementioned Convention provides that "*Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed."*

107 - And pursuant to Article 13 (1) of the aforementioned Convention "*The head of the mission is considered as having taken up his functions in the*

24

*receiving State either when he has presented his credentials or when he has notified his arrival and a true copy of his credentials has been presented to the Ministry for Foreign Affairs of the receiving State, or such other ministry as may be agreed, in accordance with the practice prevailing in the receiving State which shall be applied in a uniform manner."*

108 - In the instant case, the Applicant, besides not relying on this Convention as the source of the immunity and inviolability he claims to have, is not unaware that the same does not cover the itinerant nature of the diplomacy he allegedly performs.

109 - This form of diplomacy, considered as a special mission, is covered by the *1969 New York Convention on Special Missions*.

110 - It also enshrines the criminal immunity of a State's representatives on mission in another State, including all members of its diplomatic staff, also in accordance with existing and unequivocal international custom.

111 - As provided in Article 1 (a) of this Convention *"a 'special mission' is a temporary mission, representing the State, which is sent by one State to another State with the consent of the latter for the purpose of dealing with it on specific questions or of performing in relation to it a specific task."*

112 - Under such circumstance, "*the representatives of the sending State in the special mission and the members of its diplomatic staff shall enjoy immunity from the criminal jurisdiction of the receiving State*", as provided for in Article 31 (1) of the said Convention.

113 - It is also relevant to mention the provisions of Article 43 of the same Convention, concerning the duration of privileges and immunities.

25



"(1). Every member of the special mission shall enjoy the privileges and immunities to which he is entitled from the moment he enters the territory of the receiving State for the purpose of performing his functions in the special mission or, if he is already in its territory, from the moment when his appointment is notified to the Ministry of Foreign Affairs or such other organ of the receiving State as may be agreed. (2). *When the functions of a member of the special mission have come to an end, his privileges and immunities shall normally cease at the moment when he leaves the territory of the receiving State, or on the expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, in respect of acts performed by such a member in the exercise of his functions, immunity shall continue to subsist.*"

114 - It follows that, in the case of an envoy on a special mission, the immunity from criminal jurisdiction, which he or she enjoys, is granted by the receiving State which in this case was allegedly Iran and may still be granted by a third State, to which he or she transits as long as the formalities required by Article 42 of the same Convention are complied with.

115 - The above-mentioned Article 42 of the Convention, as regards transit through the territory of a third State, provides that:

"(1). *f a representative of the sending State in the special mission or a member of its diplomatic staff passes through or is in the territory of a third State while proceeding to take up his functions or returning to the sending State, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return.* (…)



(4). *The third State shall be bound to comply with its obligations in respect of the persons mentioned in paragraphs 1, 2 and 3 of this article **only if it has been informed in advance, either in the visa application or by notification, of the transit of those persons as members of the special mission**, members of their families or couriers, and has raised no objection to it. (...)"*

116 - None of these terms and conditions set out in No 4 transcribed above relied on or demonstrated by the Applicant, as existing at the time of his arrest, to justify the source of the immunity and inviolability he claims. The Applicant himself stated in his application initiating proceedings that his name was not on the passenger list of the plane he was traveling on and that the mission he was carrying out was secret. (See the application for provisional measures).

117 - The mere claim of "Special Envoy" status before the third State of transit is not enough to guarantee immunity or inviolability from criminal jurisdiction, as claimed by the Applicant.

118 - And as can be seen, the Applicant does not resort to either of the two aforementioned Conventions to justify the immunity and inviolability he claims to enjoy.

119 - He simply claims the principle of non-interference found in the UN Charter as the source of his immunity and inviolability as a "Special Envoy".

120 - However, it is the understanding of this Court that since the Applicant is neither a diplomat accredited to Cabo Verde or any other foreign state, nor does he hold a high governmental office in the State of Venezuela, and that he was traveling secretly without informing the Cabo Verde authorities that

27



he was traveling through their territory on a special diplomatic mission, his detention, carried out in the context of criminal proceedings by the judicial authorities of the Respondent State, in no way interfered with the internal affairs of the State of Venezuela, and furthermore, the failure to inform the Cape-Verdean authorities of this fact placed the Applicant in a situation in which he was unable to claim any diplomatic status as a special envoy at the time of his detention.

121 - Therefore, this Court concludes that the Applicant has not demonstrated the grounds on which, at the date of his arrest, he could invoke diplomatic immunity and inviolability vis-à-vis the Respondent State.

122 - His detention on that ground is therefore neither unlawful nor arbitrary.

## b) At the time of his arrest he was not the subject of an arrest warrant or even of a Red Alert in Cabo Verde.

123 - The Applicant was appointed as Special Envoy for the Government of Venezuela on 1st April 2020, and entrusted with the mission of negotiating with organizations in Iran to obtain the necessary resources for Venezuela.

124 - On 12th June 2020 at (8:09 pm), the plane in which the Applicant was traveling made a stopover in the Republic of Cabo Verde to refuel and the Applicant was arrested by the Cabo Verde authorities allegedly on the basis of a Red Alert issued at the request of the United States for the purpose of his extradition, based on the United Nations Convention against Transnational Organized Crime.

125 - He averred that at the time of his arrest, neither the copy of the Red Alert nor the arrest warrant was presented to him and thus submits that his detention

28



was arbitrary and in violation of his right to liberty and security as enshrined in Article 6 of the African Charter and Article 9 of the International covenant on civil and political rights.

126 - The Respondent contends that the detention of the Applicant on 12 June 2020, at the airport of the island of Sal, was at the request of the US Government, specifically the Florida District Court, on account of a series of crimes allegedly committed by the Applicant on US territory. That the said detention was carried out based on the general principles of international mutual assistance in judicial matters, in strict compliance with the provisions of **Arts. 3 and 4 of Act no. 6/VIII/2011, of 29 August** of the Republic of Cabo Verde. That there is no breach of Cape-Verdean law nor any agreement, treaty or international convention to which Cabo Verde is a party, in the procedure for the arrest of Mr. Alex Saab in that after the arrest, the Applicant was taken to the District Court of the Sal Island on the 14th for the purposes of legalization of his arrest.

127 - It is pertinent to note that a Red Alert is not an international arrest warrant. It is a request to law enforcement to locate and provisionally arrest a person pending extradition which arrest has to comply with the laid down laws of the target state.    In accordance with Article 79 (1) of the INTERPOL's Rules on the Processing of Data ("**IRPD**"), Red alerts are issued by the INTERPOL General Secretariat at the request of the National Central Bureau (NCB) of a country member. And must comply with INTERPOL constitution and rules. It is thus an international wanted persons notice and not an arrest warrant. This is why on the face of the red notice it is stated that "*This request will be treated as a formal request for provisional*



*detention, in accordance with applicable national and/or bilateral and multilateral treaties*".

128 - In addressing the legality of the arrest and subsequent detention of the Applicant, two issues arose from above which must be determined. 1) Whether the Respondent in possession of a Red Alert from INTERPOL at the time of arrest of the Applicant 2) Whether the arrest was in conformity with the national law of the Respondent.

## Whether the Respondent in possession of a Red Alert from INTERPOL at the time of arrest of the Applicant.

129 - The case of the Respondent is hinged on a request by the US Government, specifically the Florida District Court to provisionally arrest the Applicant pending extradition on account of a series of crimes allegedly committed on US territory. Therefore, it goes without saying that the Respondent must be in possession of the said request before or the time of the arrest. Indeed, The Red Alert is a foundational document that sets the series of action in motion culminating in possible extradition.

130 - The Applicant contend that there was no such document at the time of his arrest at 9.30 pm on the 12th of June 2020. The Respondent's response in this wise is that the arrest was lawful. Before addressing whether the arrest was in compliance with the national law, the Court must be satisfied that there was a request for arrest evidenced by a Red Alert.

131 - The present Red Alert, with the control number: A-537/6-2020 and reference NCB: 20191243598, was dated June 13, 2020. Thus by implication on June 12, 2020, at the time of arrest of Applicant, there was no request from INTERPOL for Cabo Verde, as an INTERPOL member country, to locate , arrest, detain or restrict the Applicant's movement for the purpose of extradition.



132 - The Court takes cognizance of the email attached to Doc… and the time zone issue raised therein. Whilst this was not pleaded by the Respondent, however since it is in evidence via the said document which is before the Court, it behooves on the Court to analyse its probative value. The email alludes to the three hour difference in time between Lyons in France where the Red Alert was alleged to have been issued and Cabo Verde to justify the date on the Red Alert. Accordingly, by calculation of the three hours claimed, whilst the Applicant was arrested by 9.30 pm on the 12th of June in Cabo Verde it would have been 0030 hrs. on13th of June in Lyons.

133 - This explanation is very fluid and same being based on time precision, the Respondent is obliged to produce evidence of the precise time-hour & minutes when the Red Alert was issued in Lyons and the same need time it was received in Cabo Verde to support the fact that based on the time difference, the Red Alert though dated the 13th of June was received on the 12th of June in Cabo Verde **before** the arrest. In the absence of this vital evidence, the Court finds the relevant portion in the said email irrelevant and that the Red Alert was issued on the 13th of June as inscribed on its face which is after the arrest of the Applicant on the 12th of June.

134 - The Court therefore comes to the inevitable conclusion that Respondent acted without authority from INTERPOL to arrest the Applicant on the 12th of June, and therefore holds that the ensuing arrest and subsequent detention of the Applicant is unlawful and contrary to Article 6 of the Charter.

**Whether the arrest was carried out in compliance with the Respondent's national law.**

31



135 - The Exhibit 14 (attached to Doc. 1), which is the Red Alert, dated 13 June 2020, states that *"This request will be treated as a formal request for provisional arrest, in accordance with applicable national and/or bilateral and multilateral treaties"*. The effect of this declaration is that the execution of any arrest based on the Red Alert must comply with established national laws or the conditions prescribed in the applicable bilateral or multilateral treaties.

136 - We now proceed to analyze the applicable national legislation of Cabo Verde to determine whether the Applicant's arrest and detention were in compliance with said legislation.

137 - The *Act No. 6/VIII/2011 of 29 August*, defines the object, scope and general principles of international Mutual Assistance in Judicial Matters in the Respondent State, regulating passive extradition in its Articles 31 to 68.

138 - It follows from the regime contained in these articles that the extradition procedure can be initiated in one of two ways: by "anticipatory or provisional detention" which is formally requested by the requesting entity in case of urgency and ordered by the judge (under the terms of Articles 38 and 62) or, by "detention not directly requested" carried out by the criminal police authorities and regulated by Articles 39 and 64.

139 - In the instant case, whereas the Applicant was arrested by order of the criminal police authorities, it is important to review the regime provided for in Article 39, which states:

*"Under the terms of the criminal procedural law in force, the criminal police authorities may detain individuals who, according to official information, namely from INTERPOL, are wanted by competent foreign authorities for*

32



*the purpose of prosecution or execution of criminal penalty for facts that clearly justify extradition.*"

140 - It is established that there is no bilateral extradition treaty between Cabo Verde and the United States of America. Consequently, there are no other provisions that regulate mutual assistance in this regard between the USA and Cabo Verde, except the United Nations Convention against Transnational Organized Crime.

141 - The Respondent, in justifying the detention, insists that it was carried out based on the general principles of international mutual assistance in criminal matters, and in strict compliance with the provisions of Articles 3 and 4 of Act No. 6/VIII/2011 of 29 August of the Republic of Cabo Verde.

142 - *The applicable Criminal Procedure Code*

143 - The aforementioned Article 39 refers, in terms of detention, to the terms of the Penal Procedure Code in force in the Respondent State.

144 - The relevant national legislation referred to above is contained in Articles 264 to 269 of the Criminal Procedure Code in force in the Respondent State.

145 - In this instrument it is necessary, first of all, to consider Articles 264 to 269.

146 - "*Detention is the act of depriving a person of his or her liberty for a **period of no longer than forty hours** for one of the following purposes, as set out in paragraphs a) to d), one of which is for initial judicial inquiry or the enforcement of personal cautionary measures. (See article 264 of the Code of Criminal Procedure).*

33



147 - Detention can be determined in case of flagrante delicto or outside the flagrante delicto pursuant to Articles 265, 266 and 268, the latter of which determines the requirements for detention outside the flagrante delicto, which includes detention for the purpose of extradition, pursuant to Article 30(f) of the Constitution of the Republic.

148 - Thus, the detention by the criminal police authority for this purpose must comply with the requirements set out in Article 268 of the Criminal Procedure Code, in force in the Respondent State, which provides as follows:

"*1. Arrest without flagrante delicto can only take place on the basis of a warrant from the judge or, in cases where preventive detention is permitted, by a warrant from the Public Prosecutor's Office.*

*2. Criminal police authorities may also order detention out of the act, on their own initiative, when, cumulatively, the following requirements are met:*

*a) If it is an intentional crime punishable by imprisonment whose maximum limit is greater than three years;*

*b) There are strong indications that the person being detained is preparing to evade justice;*

*c) It is not possible, given the situation of urgency and danger in the delay, to wait for the intervention of the judicial authority.*"

149 - Furthermore, Article 269:

*1. The arrest warrants will be issued in triplicate and contain, under penalty of being declared void:*

    *a) The identification of the person (...)*

34



*b) The identification and signature of the competent judicial or criminal police authority*

*c) The indication of the fact that motivated the arrest and the circumstances that legally justify it.*

*(2) In the cases provided for in paragraphs c) and d) of article 264, the warrant shall also contain an indication of the offense committed, the penalty or security measure applied and the sentence that decreed it.*

*(3) In case of urgency and danger in the delay, the request for detention by any means of telecommunication will be admissible, followed immediately by warrant confirmation, under the terms of the preceding paragraph.*

*(4) The detainee shall be shown the arrest warrant and handed one of the copies; in the case of the previous paragraph, he shall be shown the arrest warrant stating the request, the identification of the authority that made it and the other requirements referred to in paragraph 1 and handed the respective copy."*

150 - When considering the provisions of Article 268 above, it is found that the Applicant was not arrested in the course of committing an offence so as to trigger the powers of the police under that article. Nor can it be said that there was an emergency or danger situation in the delay, since his departure from the Respondent's airspace is firmly under the control of the Respondent's authorities, as the plane landed at Sal airport. The aforementioned Article is, therefore, inapplicable to the instant case.

151 - This brings us to the provisions of Article 269. This Article speaks for itself, but further elaboration will do no harm. Paragraphs 1 and 2 deal with the components of an arrest warrant, including the identification and signature of the judicial or police authority. Paragraph 3 recognizes means

35



of telecommunication to request detention in case of urgency and danger in delay, with a condition of immediate confirmation of the warrant, in accordance with Article 264 (c) and (d), which is reproduced below:

152 - Article 264.

Concept and purposes - Detention is the act of deprivation of liberty for a period not exceeding forty-eight hours, for one of the following purposes:

*a) Put the detainee on summary trial or ensure his or her presence before the judge entertaining jurisdiction for a first judicial interrogation or for the application of a cautionary measure;*

*b) To ensure the detainee's immediate presence before the judicial authorities in a procedural act;*

*c) To ensure the notification of conviction sentences pronounced, in the exceptional cases provided for in this Code, in a trial without the presence of the defendant;*

*d) To ensure the enforcement of imprisonment or an internment detention order.*

153 - Paragraph 4 of article 269 provides that in the case of the previous paragraph, that is, when the means of telecommunication have been used, the detention order stating the request, the identification of the authority that made it and the other requirements referred to in paragraph 1 shall be shown and a copy thereof shall be handed over.

154 - The Respondent, claims that two days after the arrest, the Applicant was presented to the District Court of Sal Island, for the purposes of legalization of the arrest, which occurred, deeming the diligence to be in accordance with the Cape-Verdean legislation.



155 - The legalization of the arrest takes place in the "First judicial interrogation of the accused detainee" under the terms of article 78 which provides that:

*"The detained defendant (...) shall be interrogated by the competent judge within forty-eight hours of detention, as soon as he is brought before him with an indication of the reasons for the detention and the evidence on which it is based."*

156 - After the first inquiry, the judge, having verified or not the factual and legal presuppositions that justify the detention, should decide whether to validate the detention or to apply any other cautionary measure or to return the accused to liberty, as applicable under the law, without prejudice to the possible continuation of the criminal process (See Article 89).

157 - However, the arrest made pursuant to Article 269 (3), does not exempt the immediate confirmation by warrant in accordance with paragraph 2 of the same Article.

158 - The Court is also mindful of the provisions of Articles 150-151 that allow a certain detention irregularity to be remedied. The non-compliance here is not procedural, but is of substance. Consequently, the enforcement of a detention without a valid warrant as in this case, being an illegal act, c cannot be suppressed by the aforementioned provisions.

159 - Having said that, from the provisions of Article 269 ( 3), it follows that when the arrest is requested by means of telecommunications, the arrest must be made by means of a warrant, which must be produced in three copies, signed by a judiciary or judicial authority and must contain the identification of the intended person to whom a copy of the said arrest warrant must be handed over.

37



160 - We conclude, therefore, that the Applicant's arrest and imprisonment did not fulfill the formalities required by the provisions of Articles 268 and 269 of the Respondent's Criminal Procedure Code, wherefore it was illegal and arbitrary.

161 - We further conclude that the illegal detention was not cure by the purported validation by a national judge on 14 June 2020 because it does not fall within the exceptions of Article 268(2) of the Criminal Procedure Code.

162 - Therefore, the illegality in the arrest and detention of the Applicant committed *ab initio* on 12 June 2020 cannot be cure by any act of validation by a national judge on 14 June 2020, as nothing comes from nothing - *ex nihilo nihil fit*.

163 - The consequence of any arrest carried out in Cabo Verde without complying with these laid down national laws is not only unlawful but arbitrary. This is so fundamental that any subsequent detention based on such an arrest will also be arbitrary.

164 - The Respondent also has a duty in the arrest and detention of the Applicant to comply with the Treaty obligations under the international human rights standards applicable to it. Article 6 of the African Charter on Human and Peoples Rights (ACHPR) provides as follows: "*Every individual shall have the right to liberty and to the security of his person. No one may be deprived of his freedom except for reasons and conditions previously laid down by law. In particular, no one may be arbitrarily arrested or detained*". Similarly, Article 9(1) of the International Covenant on Civil and Political Rights (ICCPR) provides as follows: "*Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention.*

38



*No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as established by law*".

165 - In our view, it is contrary to national and international standards to arrest and detain the Applicant or deprive him of his liberty except in accordance with the procedure and grounds established by the national law as clearly provided in Article 6 of the African Charter. This Court has on many occasions emphasized the need for compliance with procedure established by national law in the arrest and detention of persons by the Police. Deprivation of liberty must not be done arbitrarily or in reckless disregard of the national law. Deprivation of liberty must in all cases be carried out in accordance with the law (The principle of legality). When an Applicant is arrested without warrant or due process and kept in detention without any court order, it amounts to a violation of a right to freedom from arbitrary arrest or detention as provided in Article 9(1) of the ICCPR.

166 - In CHIEF EBRIMAH MANNEH v. THE REPUBLIC OF THE GAMBIA (Supra) @ pg. 20, this Court held that:

> *"The Applicants arrest on the 11th July 2006, by the Police Force of the Gambia and his detention incommunicado without being charged or informed of the reason of his arrest, or proof that the act was in accordance with a previously laid down law, is clearly in violation of the provisions of Articles 2, Article 6 and 7 (1) of the African Charter on Human and Peoples Rights*".

167 - This Court adopted a similar position in the case of COL. MOHAMMED SAMBO DASUKI (RTD) v. THE FEDERAL REPUBLIC



OF NIGERIA, ECW/CCJ/JUD/23/16 Pg. 31 Unreported where the Applicant was arrested without a valid arrest warrant and held that the arrest was arbitrary. In elucidating on this point the Court stated as follows:

> *"The right to enjoy respect for their liberty and security by all human beings is recognized by law. It is axiomatic that without an efficient guarantee of the liberty and security of the human person, the protection of other individual rights is vulnerable and illusory. Despite this recognition, arrest and detention without reasonable cause and devoid of legal remedies to victims are common place in most jurisdictions, the world over.*

> *In the course of such arbitrary arrests and deprivation of liberty, the victims are also deprived access both to their lawyers, their own families and subjected to torture and other forms of degrading and in human treatment.*

> *Article 9(1) of the International Covenant on Civil and Political Rights and Article 6 of the African Charter on Human and Peoples' Rights (the relevant International Instrument for the determination of this case) guaranteed a person's right to personal liberty and security. The diction of the International Court of Justice (ICJ) in the Hostages in Teheran case (America vs. Iran) ICJ REP (1980) p.42 para 91 is instructive:*

> *Wrongfully to deprive human beings of their freedom and to subject them to physical constraint in conditions of hardship is in itself incompatible with the principle of the Charter of the United Nations, as well as with the*



> *fundamental principles enunciated in the Universal*
> *Declaration of Human Rights Article 3 of which guarantees*
> *the right to life, liberty and security of the human person".*

168 - Even where a State has not ratified or adhered to any of the international human instruments stated above, it is nonetheless bound by other legal sources, especially Customary International Law to ensure that a person's right to respect for his or her liberty and security.

169 - Article 9(1) of the International Covenant on Civil and Political Rights provide as follows:

> *"Everyone has the right to liberty and security of persons.*
> *No one shall be subjected to arbitrary arrest or detention.*
> *No one shall be deprived of his liberty except on such*
> *grounds and in accordance with such procedure as are*
> *established by law".*

170 - Similarly, Article 6 of the African Charter on Human and Peoples' Rights provides that:

> *"Every individual shall have the right to liberty and*
> *security of his person. No one may be deprived of his*
> *freedom except for reasons and conditions previously laid*
> *down by law. In particular no one may be arbitrarily*
> *arrested or detained"*

171 - An analysis of these provisions suggests even if in different terms, that deprivation of liberty must in all cases be carried out in accordance with the law (the principle of legality). Furthermore, deprivations of liberty must not be **arbitrary.**

41



172 - With regard to the principle of legality, it has been held by the Human Rights Committee of the United Nations that;

> "It is violated if an individual is arrested or detained on grounds which are not clearly established by legislation". In other words;
>
> "The grounds for arrest and detention must be established by law."
>
> See: Communication No 702/1996 MCLAWRENCE vs. JAMAICA (views adopted 18th July, 1997) UN. Doc. GAOR A/52/40 (Vol 11) pp.230 – 231 Para. 5.5

173 - In a case where a person was arrested without a warrant, which was issued more than three days after the arrest, the Human Rights Committee hereinafter referred to as the (Committee), concluded that there has been a violation of Article 9(1) because the author had been *'deprived of his liberty in violation of a procedure as established by law'. (Grindin Vs. Russian Federation) (Views adopted on 20th July, 2000). In UN doc. GAOR A/55/40 (Vol. II) p.175 Para 8.1.*

174 - With regard to "arbitrary arrest", the committee in interpreting Article 9(1) of the Covenant on Civil and Political Rights observed (and rightly in our view).

> "arbitrariness is not to be equated with against the law", but must be interpreted more broadly to include elements of inappropriateness, injustice, lack of predictability and due process"...."........Clearly, when a person is arrested without warrant or summons and then simply kept in

42



> *detention without any Court order, this also amounts to a violation of the right to freedom from arbitrary arrest and detention set forth in Article 9(1) of the International Covenant on Civil and Political Rights (ICCPR)."*

175 - The African Court on Human and Peoples' Rights in ONYACHI AND NJOKA V. TANZANIA (Application No. 003/2015, of September 28th, 2017) ruled that: "*The established International human rights jurisprudence sets three criteria to determine whether or not a particular deprivation of liberty is arbitrary, namely, the lawfulness of the deprivation, the existence of clear and reasonable grounds and the availability of procedural safeguards against arbitrariness. These are cumulative conditions and non-compliance with one makes the deprivation of liberty arbitrary.*"

176 - In *Wing Commander Danladi A Kwasu v. the Federal Republic of Nigeria*, ECW/CCJ/JUD/04/17, this Court has held that "*In interpreting arbitrariness, regard must be had to such considerations as appropriateness, justice, predictability, reasonableness, necessity and proportionality. Any violation arising from a violation of the procedural or substantive safeguards in the African Charter including on the basis of discriminating grounds or practices is arbitrary and thus unlawful.*

177 - The European Court of Human Rights held in the case of MAKARATZIS v. GREECE (2004) ECHR 5038/99 AT PARA 58, that

> *"under national law, policing operations must be sufficiently regulated by it, within the framework of a system of adequate and effective safeguards against arbitrariness and abuse of force.*

43



178 - In conclusion, since the Court has held that the Applicant's arrest on the 12th of June without a Red Alert amounts to an ultra vires act, therefore a nullity, the issue whether the said arrest complies with the national law of the Respondent becomes otiose. Nevertheless, since the Court proceeded to analyse its compliance with the national law and found that the arrest was effected without a warrant contrary to the national law, the conclusion of the matter is that Respondent carried out an unauthorized act in an unlawful manner.

179 - The totality of the findings of the Court is that at the time of arrest of the Applicant, the Respondent acted without a Red Alert, without a warrant, without informing him of the reason of the arrest. From the foregoing, it is our considered opinion that the arrest and detention of the Applicant was arbitrary and unlawful as it was unathoriesd and further carried out in violation of the national law of the Respondent State particularly Article 268 and 269 of the Criminal Procedure Code, therefore in violation of Article 6 of the African Charter on Human and Peoples Rights and Article 9(1) of the International Covenant on Civil and Political Rights and we so hold.

## c) *Whether the Applicant is the victim of political persecution by the United States and, consequently, by Cabo Verde*

180 - The Applicant begins by claiming that he is a victim of political persecution by the United States and, consequently, by Cabo Verde.

181 - He maintains that in the instant case, the criminal proceedings initiated against the Applicant in the United States do not have a genuine law enforcement purpose.

44



182 - That it is widely known that, in recent years, Venezuela has been inolved in a political, economic and diplomatic struggle in which several States, including the United States, have sought mainly to delegitimize and overthrow the Venezuelan government, led by President Maduro.

183 - On July 8, 2019, the U.S. Department of State described the U.S. position in the following terms: "*Nicolás Maduro's unconstitutional and fraudulent re-election in May 2018 led the United States and 53 other countries to recognize the President of the National Assembly, Juan Guaidó, as Venezuela's provisional constitutional president on January 23, 2019.*" This struggle resulted in a series of adverse measures by the United States, aimed at the Venezuelan government's ability to satisfy the basic needs of its citizens. As a result, Venezuela has suffered from severe food and drug shortages. This shortage was exacerbated by the COVID-19 pandemic.

184 - As a result, a series of lawsuits and investigations were initiated in different US courts where the people under investigation were not only politicians, but also PDVSA officials and employees and even some close relatives of President Maduro. This explains a general political persecution that now materializes in the concrete prosecution and extradition request against the Applicant.

185 - Since the beginning of this process of manipulating the Judiciary to achieve its external political objectives, the USA has increased the intensity of its interference in Venezuela's internal affairs.

186 - In late March 2020, the U.S. Department of Justice indicted President Maduro and 14 Venezuelan officials, and the U.S. State Department offered a \$15 million reward for information leading to President Maduro's detention.



187 - In fact, two days before the Applicant began his mission to Iran, that mission was interrupted by the Cape-Verdean police.

188 - Simultaneously, it was discovered that the United States was preparing sanctions against up to 50 tankers and fuel ships as part of an effort to cut trade between Iran and Venezuela.

189 - The Applicant, as the architect of the solidarity plan between Iran and Venezuela, which broke the US blockade, became a target to be neutralized from the USA perspective.

190 - It is evident that US interventions are designed to delegitimize and overthrow the government led by President Maduro. As such, US interventions constitute interference in Venezuela's internal affairs and violate international law.

191 - The Applicant's extradition was not requested for the purposes of the common law enforcement, but for the purposes of political persecution.

192 - Accordingly, there is no doubt that the Applicant will not have due process if extradited and tried in the USA.

✓

193 - This Applicant's submission that he is the victim of political persecution is vague and imprecise and is not supported by any means of proof.

194 - On the other hand, the description of the United States' position vis-à-vis the Venezuelan government has nothing to do with the charges brought against the Applicant, in criminal proceedings against him. The Applicant was criminally prosecuted for his alleged criminal acts and not for his alleged political activity.

46



195 - In relation to this argument, this Court understands that the Applicant offers no evidence, since it is certain that the burden of proving the facts he alleges rests on him.

196 - Consequently, this Court finds that this ground is unfounded.

C) *Whether the Applicant's procedural rights were violated during the detention and extradition proceedings brought against him in Cabo Verde*

197 - The Applicant maintains that, in addition to the initial illegalities he claimed, there are several violations of provisions of the African Charter.

198 - He submits that Cabo Verde also violated the following principles of the African Charter:

(1) The prohibition of discrimination (Article 2) and equality before the law (Article 3);

(2) Respect for dignity and the prohibition of torture (Article 5);

(4) The right to a fair trial (Article 7);

(5) The right to freedom of movement (Article 12).

199 - The Court now proceeds to analyze each of the rights, allegedly violated.

*1. On the principles of prohibition of discrimination of equality before the law*

200 - The Applicant stated that since he is not a citizen of a state party to the Charter, such as Cabo Verde, but rather a victim of it, the provisions of the Charter should be interpreted in light of Article 2 of the Charter, which

47



provides for the principle of non-discrimination and which requires that all persons enjoy the rights and freedoms enshrined and guaranteed in the Charter and expressly prohibits discrimination on the basis of nationality.

201 - He further cites, to support his position, the jurisprudence of the African Commission, namely that contained in the case *Institute for Human Rights and Development in Africa (on behalf of Esmaila Connateh and 13 others) vs. Angola*, where it was held that *"'The right of a State to expel people is not absolute and is subject to certain restrictions', one of which is the prohibition of discrimination based on national origin"*.

202 - As to the principle of equality before the law (Article 3 of the Charter), the Applicant also alleges that he considers equality before the law as a human right and as a principle that must inform the rest of the Charter. That is why this right must be read and interpreted in connection with other rights whose violation is now being denounced.

203 - He maintains that the Article 3 of the Charter, read in conjunction with Article 7 on the right to a fair trial, Article 6 on personal freedom and security and Article 12 on freedom of movement, not only contains a personal element regarding the non-discrimination of individuals before the law, but also encompasses the principle of legality, whereby the actions of States are subject to the existence of a prior law, whose application cannot be arbitrary.

✓

204 - Article 2 of the African Charter states that:

*"Every individual shall be entitled to the enjoyment of the rights and freedoms recognized and guaranteed in the present Charter without distinction of any kind such as race, ethnic group, colour, sex, language,*

48



*religion, political or any other opinion, national and social origin, fortune, birth or other status.*"

205 - In turn, Article 3 of the African Charter states that:

*"1. Every individual shall be equal before the law.*

*(2) Every individual shall be entitled to equal protection of the law."*

206 - Articles 2 and 3 of the African Charter basically constitute the anti-discrimination and equal protection provisions of the African Charter. Article 2 establishes a principle that is essential to the spirit of the African Charter and therefore necessary to eradicate discrimination in all its forms, while Article 3 is important because it guarantees the fair treatment of individuals within a legal system of a particular country.

207 - These provisions are not revocable and must therefore be respected in all circumstances so that any person can enjoy all the other rights provided for in the African Charter. (See *African Commission on Human and Peoples' Rights in case PUROHIT AND ANOR v. GAMBIA, Communication No. 241/2001 of 15-29 May 2003, and Para 49*).

208 - It should be noted that the right to equality, as set out in the Charter, unfolds into the right to equality before the law and the right to equal protection under the law. (See African Court in the case *KENNEDY OWINO ONYACHI, CHARLES JOHN MWANINI NJOKA v. UNITED REPUBLIC OF TANZANIA, Application N.º 003/2015, 28th September, 2017, Pag. 39*)

209 - The right to equality before the law means that citizens should expect to be treated fairly and impartially by the legal system and have the security of equal treatment under the law and equal enjoyment of the rights available to all citizens. This implies the right to have access and to be subject to the

49



same procedures and principles applied under the same conditions. The principle that all people are equal before the law means that existing laws must be applied in the same way to everyone who is subject to them. (See *African Commission in the case LEGAL RESOURCES FOUNDATION v. ZAMBIA, COMMUNICATION No. 211/98, of April 23 - May 7, 2001, Para. 63*).

210 - In the present case, the Applicant's submission does not demonstrate how the right not to be discriminated against or the right to equal treatment under the law were violated by the Respondent.

211 - The Applicant did not claim nor succeed in proving facts that demonstrate that he had discriminatory treatment when compared to a person placed in a situation similar to his, that he was treated in a partial and unfair manner by the legal system and that he did not have equal treatment before the law and equal enjoyment of the rights available to all citizens in the terms set out above.

212 - Thus, it is this Court understanding that the Applicant has not demonstrated that the Defendant has violated the principles of the prohibition of discrimination and equality before the law, provided for in Articles 2 and 3 of the African Charter.

213 - On the other hand, even if he demonstrates the violation of such rights, the Applicant sough no relief in this regard.

## 2. Respect for dignity and prohibition of torture

214 - The Applicant claimed that the respondent violated his *human right to dignity* (Article 5) by deliberately refusing to recognize his legal status as Special Envoy for his country.



215 - In support of his position, he also relies on the Commission's case law in the case of "*The Nubian Community in Kenya vs The Republic of Kenya*", where the Commission held that "*the right to the recognition of one's legal status (or juridical personality) is protected in many international and regional human rights instruments. The right to the recognition of juridical personality implies one's capacity to be the holder of rights and obligations. The recognition of one's legal status is an indispensable requirement for the enjoyment of the rights enshrined in the Charter because it grants an individual recognition before the law.*"

216 - The Applicant further adds that by keeping him for more than three months, away from his country and his family, despite his condition as Special Envoy and diplomatic immunity and inviolability, resulting from such condition and refusing his requests for access to a doctor and his international legal team, the Respondent subjected him to mental, moral and psychological torture, which also constitutes inhuman and degrading treatment.

217 - He submitted that in this way, the Applicant is entitled to compensation for the psychological torture suffered.

218 - In turn, the Respondent, in its reply, stated that the Applicant had access to the medical care available to all prisoners and to demonstrate this fact, it enclosed a copy of a document entitled "attendance chronology" (attached to doc. 7) which the Applicant did not contest.

219 - The article 5 of the ACHPR provides that:

"*Every individual shall have the right to the respect of the dignity inherent in a human being and to the recognition of his legal status. All forms of exploitation and degradation of man particularly slavery, slave trade,*

51



torture, cruel, inhuman or degrading punishment and treatment shall be prohibited."

220 - On the Article 1 of the UDHR, it is stated that: "All human beings are born free and equal in dignity and rights (...)"

221 - And Article 10 of the ICCPR provides that: "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."

222 - The above-mentioned provision of the ACHPR enshrines the right to respect for the inherent dignity of human beings as a central value on which International Human Rights Law is founded, which is largely embodied in the various special rights, although, it should not be confused with the later.

223 - As noted by the Human Rights Committee, Article 10(1) of the ICCPR applies to any person deprived of his or her liberty under the law and the authority of the State, who is held in prisons, hospitals, detention centers or correctional institutions, or in any other place. (See GENERAL COMMENT No. 21, §2).

224 - The Human Rights Committee also noted that the "Article 10 paragraph 1, imposes on States parties a positive obligation towards persons who are particularly vulnerable because of their status as persons deprived of liberty and complements for them the ban on torture or other cruel, inhuman or degrading treatment or punishment contained in article 7 of the Covenant. Respect for the dignity of such persons must be guaranteed under the same conditions as for that of free persons (…)." (See §3)

52



225 - The Committee also submitted that treating all persons deprived of their liberty with humanity and respect for their dignity is a fundamental and universally applicable rule. (See § 4) (See §4)

226 - Thus, it is stated in the *"UNITED NATIONS 1999 BASIC PRINCIPLES FOR THE TREATMENT of prisoners that: "All prisoners shall be treated with the respect due to their inherent dignity and value as human beings."* (See *Principle 1*)

227 - Likewise, the African Commission established that: "(a) *States shall ensure that all persons under any form of detention or imprisonment are treated in a humane manner and with respect for the inherent dignity of the human person." (b) In particular States must ensure that no person, lawfully deprived of his or her liberty is subjected to torture or to cruel, inhuman or degrading treatment or punishment."*(See *PRINCIPLES AND GUIDELINES ON THE RIGHT TO A FAIR TRIAL AND LEGAL ASSISTANCE IN AFRICA – M – 7, a) and b)).*

228 - Also, in the above-mentioned *PUROHIT AND ANOR v. GAMBIA* case, paragraph 58, it stressed that: **"***exposing victims to "personal suffering and indignity" violates the right to human dignity. Personal suffering and indignity can take many forms and will depend in the particular circumstances of each communications brought before the African Commission."* (See also the *African Commission, in the case of JOHN K.MODISE V BOTSWANA, Communication No. 97/93, 23 October to 6 November 2000, Para. 92*)

53



229 - In the instant case, the fact claimed above as a plea in law for the violation of the Applicant's right to dignity does not proceed as the diplomatic status that the Applicant claims to possess has not been established.

230 - And no other facts have been pleaded or demonstrated by the Applicant, from which it can be deduced that the Respondent has acted violently towards him or has caused him any moral or physical suffering or infringed his dignity as a human being.

231- Thus, this Court understands that the Respondent did not violate the Applicant's right to dignity.

232 - The first submission made by the Applicant in order to support the violation of his right not to be subjected to torture mental, moral and psychological, or inhuman and degrading treatment it is the lack of recognition by the Respondent of his condition as a special envoy and despite the diplomatic immunity and inviolability resulting from this condition that he claims to enjoy.

233- In view of the foregoing, this argument also fails, since the condition of diplomatic agent, as alleged by the Applicant, has not been established.

234 - On the other hand, the Applicant was detained and preventively arrested as a result of criminal proceedings against him, a fact that placed him in the situation of staying away from his country and his family.

235 - The second submission is that he was refused his requests for access to a doctor and his international legal team.

54



216 - As for the alleged refusal to access a doctor, it could amount to a violation of the right to health provided for by Article 16 of the African Charter.

237 - The Article 16 of the ACHPR establishes that:

*"(1) Every individual shall have the right to enjoy the best attainable state of physical and mental health. (2) States parties to the present Charter shall take the necessary measures to protect the health of their people and to ensure that they receive medical attention when they are sick."*

238 - This Article thus provides broad protection to the right to health, either as an individual right (1) or as an object of obligations and tasks incumbent on the State (2).

239 – The same is enshrined, under the same terms enshrined in Articles 12 of the International Covenant on Economic, Social and Cultural Rights.

240 - In the instant case, the alleged refusal of access to a doctor refers to an individual deprived of liberty, that is, in detention.

241- As it follows from Principle 24 of the Body of "Principles for the Protection of All Persons under Any Form of Detention or Imprisonment", adopted by the United Nations General Assembly in 1988, "*A proper medical examination shall be offered to a detained or imprisoned person as promptly as possible after his admission to the place of detention or imprisonment, and thereafter medical care and treatment shall be provided whenever necessary...*"

55



242 - The Guidelines on the Conditions of Arrest, Police Custody and Pre-Trial Detention in Africa, adopted by the African Commission in 2014, follow in the same vein by establishing as one of the rights of the detainee: "*The right to urgent medical assistance, to request and receive a medical examination and to obtain access to existing medical facilities.*" (See al. G) No. 4 of part 1).

243 – It should also be noted that, as the African Commission wrote in the case *MEDIA RIGHTS AGENDA v. NIGERIA, Communication No 105/93,128/94, 130/94,152/96 of 30th October 1998*: "*the responsibility of the government is heightened in cases where the individuals in its custody and therefore someone whose integrity and well-being is completely dependent on the activities of the authorities. To deny a detainee access to doctors while his health is deteriorating is a violation of Article 16.*"(§ 91). (See also the case *INTERNATIONAL PEN, CONSTITUTIONAL RIGHTS PROJECT, INTERIGHTS ON BEHALF OF KEN SARO-WIWA JR. AND CIVIL LIBERTIES ORGANISATION v. NIGERIA, African Commission on Human and Peoples' Rights, Communication. Nos.* 137/94, 139/94, 154/96 AND 161/97 (1998) (§112).)

244 - Likewise, this Court, in the case *ASSIMA KOKOU INNOCENT & 2 OTHERS V. REPUBLIC OF TOGO*, Judgment No. *ECW/CCJ/JUD/08/11, of 3 July 2013, LRCCJ (2013), pag. 207 §84*, admitted that: "*lorsqu'un détenu se plaint de la violation du droit à la santé consacré par l'article 16 de la Charte, il lui revient de démontrer que les autorités carcérales n'ont pas pris les mesures indiquées ou que ces mesures ont été inadéquates au regard des circonstances particulières.* (§73)



*Or la Cour note qu'en l'espèce, les requérants n'excipent au soutien de leurs griefs aucun fait circonstancié notable rapporté, aucune preuve tendant à montrer l'inexistence ou l'inadaptation des soins médicaux qu'ils auraient dû recevoir ou qu'ils auraient reçus.La Cour conclut dès lors que les arguments des requérants sur ce point ne sont pas fondés. La Cour juge en conséquence que la violation du droit à la santé des requérants consacrée par l'article 16 de la charte n'est pas établie.*" (§74).

245 -It follows, therefore, from the aforementioned jurisprudence, that it is up to the Applicant to demonstrate that upon his request, the penitentiary authorities did nothing to ensure the medical care he needed. This burden falls on the Applicant.

246 - In the instant case, the Respondent offered no evidence to demonstrate that he made such a demand and that it was denied by the Respondent's prison services.

247 - In addition, this submission is contradicted in view of the document submitted by the Respondent (Attached to doc. 7), which contains a chronology of service granted by the Respondent to the Applicant during the course of his detention. This document was not challenged by the Applicant.

248 - Thus, in the absence of any proof that the Applicant was refused requests for access to a doctor, as alleged, it must be concluded that his right to health has not been violated and that any mental agony suffered by the Applicant cannot be imputed to the Respondent.

249 - The last submission made by the Applicant is that he was refused access to his international legal team.



250 - On this regard, the Applicant also did not specify the extent to which such access was refused and the implications of that refusal on his right to dignity, or how it constituted torture or inhuman treatment.

251 - Consequently, such claims stand unsubstantiated and unfounded.

252 - However, even if it were to be found such an infringement, the Court could not declare them so since same was not requested from the Court by the Applicant.

## 1. Right to a fair trial guaranteed by Article 7 of the Charter

253 - The Applicant alleges that the Respondent has violated his rights under Article 7 of the Charter, namely: a) the *right to a hearing*; b) the *right of defence* and c) *the right to a presumption of innocence*.

✓

254 - The claim of the violation of Article 7 of the African Charter, refers the Court to the analysis of the right to a fair trial.

255 - This right implies: (i) access to the courts, so that everyone can present their cause and have it heard; (ii) the fairness of the proceedings with regards to equality of arms; (iii) the right to: be heard in defense and be informed of the evidential material produced; (iv) demand for motivation and justification of decisions; (v) be present in the hearings and the effective participation in the procedures; (vi) specific formal and material requirements with regards to the court, being the first, related with its constitution and the second with its independence and impartiality; (vii) specific demands regarding the process which, among others, includes the

58



public nature of the hearings and (viii) the delivery of judgment in a reasonable period of time.

256 - The same right is expressly enshrined in several other international human rights instruments.

257 - The right to a fair trial is a fundamental principle of any democratic society, deeply intertwined with the Rule of Law, and there is no plea in law for any restrictive interpretation, which aims, above all, to defend the interests of the parties and those of the dispensation of justice, so that litigants can present their case to the court in an effective manner.

258 - Its basic meaning is that the parties to the case have the right to submit any observations they consider relevant to the assessment of the plea, which must be properly examined by the court, whose duty is to carry out a careful and diligent examination of the allegations, submissions and evidence presented by the parties and that fairness of the dispensation of justice, in addition to being substantive, should be evident (*justice must not only be done, it must also be seen to be done*).

259 – This Court has ruled to that effect in the case of *CHIEF EBRIMAH MANNEH v. THE REPUBLIC OF THE GAMBIA (2004-2008)CCJELR 181 191*,para 21 that *"Article 7 (1) clearly states that every individual shall have the right to have his cause heard and this comprises among other things the right to be presumed innocent until proven guilty by a competent Court or tribunal, the right to defense, including the right to be defended by counsel of his choice and the right to be tried within a reasonable time by an impartial Court or tribunal."*

59



260 - In the instant case, the Applicant alleges, as stated above, the violation of his right to a hearing, the right to a defense and his right to a presumption of innocence, which the court now examines.

### a) *On the alleged violation of the right to a hearing*

261 - In support of the violation of his right to a hearing, the Applicant submits that under Cabo Verde law, he has the right to be heard at a hearing during extradition proceedings. However, the hearing to which the Applicant was entitled and which was preceptive at least from the moment he requested the presentation of evidence in accordance with Article 55.1.3 of Law No. 6/VIII/2011 of 29 August 2002, and that witness statements and expert reports presented by his counsel be considered, never took place and that the Court of Appeals directly ruled, without communicating to his Counsel the non-admission decision of the production of evidence and handed down the favorable judgment on the extradition request, without production of the evidence presented by the Applicant.

262 - The Applicant further submits that he did not appear before a judicial authority until after his detention and that he never had the opportunity to defend himself or to rebut before a court the contents of the full extradition file which was sent by the US subsequent to his detention.

263 - Article 55 of Law No. 6/VIII/2011, of August 29, 2002, which approves the general principles of mutual assistance in judicial matters, in force in the Defendant, establishes that:

1) "*After the hearing of the extraditee, the case is made available to the constituted defender or counsel to, in eight days, plead in writing a substantiated opposition to the request for extradition and indicate the*

60



*means of evidence admitted by Cape-Verdean law, being however, the number of witnesses limited to 10."*

2) *"The objection can only be based on the fact that the person whose extradition is requested is not the detainee or that the conditions for extradition are not met."*

264 - What is foreseen in the cited Article is that the extraditee may file a written appeal on the extradition request, provided that the requirements provided for in paragraph 2 of the same Article are verified.

265 - The Applicant claimed that, pursuant to the aforementioned Article, he submitted evidence and requested that witness statements and expert reports offered by his defense be considered, but that this never took place.

266 - That the Court Of Appeal ruled directly without communicating to the Counsel the non-admission decision of the evidence produced and delivered the favorable judgment on the extradition request without considering the evidence presented by the Applicant.

267 - As claimed by the Applicant, he wanted to be heard in order to refute the content of the *"complete extradition file that was sent by the USA after his arrest"*.

268 - This argument does not constitute grounds for lodging an opposition to the extradition request, since this is not the proper means of contesting the facts contained in the file sent by the USA, but only for eventually demonstrating that the detainee is not the person wanted or that the extradition conditions have not been met, grounds which the Applicant has neither claimed nor proven.



269 - In this respect the Court finds that the arguments put forward by the Applicant are not sufficient to conclude that the Defendant infringed his right to a fair hearing.

### b) *On the alleged violation of the right of defense*

270 - The Applicant claimed that the Respondent has constantly prevented him from freely exercising his right of defence by imposing all kinds of obstacles on international jurists, which was expressed in: (1) Impossibility of foreign members of the Applicant's counsel team to visit him at the prison center; (2) Reduction in the Applicant's visiting hours, (3) Double deportation within 25 hours of one of the Applicants' members of the Applicant's international counsel team, and (4) Unannounced visit by a Cabo Verde Prosecutor to the Applicant without notifying the local Counsel, Dr. Pinto, taking place, initially, without his presence.

271 - The Applicant alleged such facts but was unable to prove them.

272 - Moreover, at no time has the Applicant pleaded that the Respondent prevented him from freely choosing his lawyer, that he was prevented from contacting him, was not given adequate time to prepare his defence or to exercise all remedies available to him under the Respondent's judicial system. (See *Principles and Guidelines on the Right to a Fair Trial and Legal Assistance in Africa*)

273 - Once again this Court finds that the Respondent did not violate the Applicant's right of defense.

### c) *Right to presumption of innocence*

62



274 - In order to substantiate the alleged violation of his right to be presumed innocent, the Applicant submitted that the Barlavento Court of Appeal, in its decision of 18 July 2020, stated that the Applicant is likely to be convicted in the United States. That according to the jurisprudence of the African Commission, (referring to Communication No. 222/98-229/99 in the case *Law Office of Ghazi Suleiman vs, Republic of Sudan* §56), this presumption of the judge of the Barlavento Court of Appeal goes beyond what is expected of a court in an extradition case. In this case, the Court did not just assess whether there is a "*probable cause*" that justifies the Applicant's extradition request, but also made a categorical assumption that the Applicant will be convicted by US courts, even though legal proceedings against the Applicant, both in Cabo Verde and in the United States, were still ongoing.

275 - He thus submits, that by declaring the Applicant "*guilty of an offense even before a competent court establishes [his] guilt*", The Barlavento Court of Appeal violated the Applicant's presumption of innocence.

276 - The Applicant refers to a decision of the Barlavento Court of Appeal dated, July 18, 2020, a copy of which was not attached to the case file.

277 - The only decision of the Barlavento Court of Appeal gathered to the case file is that of July 31, 2020, and this does not include the statement attributed to the court.

278 - This implies that the Court has no way of verifying the existence or the context of the statement attributed to the domestic court and qualified by the Applicant as violating his right to the presumption of innocence.

279 - Therefore, this submission, equally, is not to be accepted, either because the existence of the declaration attributed to the Court of Appeal has

not been demonstrated since the burden of prove falls on the Applicant, or because this is not the meaning of the right of presumption of innocence.

280 - The aforementioned right, as mentioned above, has its essence in the prescription that any suspect in a criminal trial is considered innocent in all stages of the process, from the preliminary investigation to the delivery of the judgment that legally establishes his guilt.

281 - Hence, even if the existence of the claim as attributed by the Applicant to the Barlavento Court of Appeal was to be admitted: "*that the Applicant is likely to be convicted in the United States*", the case law of the African Commission, cited above, would not serve as a ground.

282 - What the African Commission said in the aforementioned judgment is that it "*…condemns the fact that State officers carried out the publicity aimed at declaring the suspects guilty of an offence before a competent court establishes their guilt.*" (See §56)

283 - In this respect, the European Court, in the case *ESMAILOV AND OTHERS v. RUSSIA*, Application No 2947/2006, Judgment of April 24, 2008, noted that the presumption of innocence "*… prohibits the premature expression by the tribunal itself of the opinion that the person "charged with a criminal offence" is guilty before he has been so proved according to law (see Minelli v. Switzerland, judgment of 25 March 1983, Series A no. 62) (…) it also covers statements made by other public officials about pending criminal investigations which encourage the public to believe the suspect guilty and prejudge the assessment of the facts by the competent judicial authority (see Allenet de Ribemont, § 41,; see also DAKTARAS v. LITHUANIA, No. 42095/98, §§ 41 to 43, ECHR 2000-X; and Butkevičius v. Lithuania, No. 48297/99, § 49, ECHR 2002-II (extracts)).* (See §161)




284 - This Court also found that the right to the presumption of innocence will be violated if *"...a judicial decision or a statement by a public official concerning a person charged with a criminal offence reflects an opinion that he is guilty before he has been proved guilty according to law.* It suffices, even in the absence of any formal finding, that there is some reasoning suggesting that the court or the official regards the accused as guilty. A fundamental distinction must be made between a statement that someone is merely suspected of having committed a crime and a clear declaration, in the absence of a final conviction, that an individual has committed the crime in question(…) Vide §166.

285 - In the instant case, even if one were to admit the existence of the statement as attributed by the Applicant to the Barlavento Court of Appeal, it does not contain any finding of guilt liable to violate the Applicant's right to presumption of innocence as guaranteed by Article 7 (1.c) ) of the African Charter.

## d) *Right to freedom of movement (Article 12)*

286 - The Applicant maintains that, in general terms, Article 12 of the Charter guarantees the right to freedom of movement. And that more specifically its paragraph 4, provides that "*A non-national legally admitted in a territory of a State Party to the present Charter, may only by expelled from it by virtue of a decision taken in accordance with the law.*"

287 - That the Applicant's right contained in Article 12 (4) of the Charter will certainly be violated if the Applicant is extradited to the USA.



288 - He further maintains that in the instant case, the Applicant, a foreigner, was legally admitted to the territory of Cabo Verde and can only be expelled if such expulsion is in accordance with the law.

289 - Therefore, extradition can only be granted if the internal legal procedure is respected and the norms of conventional and customary international law are complied with.

290 - He submitted that considering the Applicant's diplomatic inviolability and immunity, as well as the political persecution of which he is a victim and the violation of his minimum procedural rights guaranteed by the law of Cabo Verde, the probable surrender of the Applicant to the USA is illegal and violates the Article 12 of the Charter.

291 - This Article 12 of the Charter, like other instruments of international human rights law of Human Rights enshrines the rights associated with internal and international mobility, that is, the right to movement.

292 - And number 4 of the aforementioned Article, relied on by the Applicant, contains rules on expulsion, which consist of an order dictated by administrative or judicial authorities for removal from national territory applied to foreigners.

293 - Although the decision to deport and the decision to extradite seek to remove a person from national territory, they are not interchangeable insofar as they are based on different assumptions.

294 - Therefore, the Applicant by substantiating the violation of his right to movement with allegation of his diplomatic inviolability and immunity as well as the political persecution of which he claims to be a victim, both facts that he has not demonstrated, it is evident that the invocation of Article 12 of the Charter is unfounded.



295 - Thus, it is this Court's understanding that the Applicant has not proven the violation of his alleged right to movement.

## D) *Whether there is a real probability that the Applicant's human rights will be violated if he is extradited to the USA*

296 - The Applicant submits that there is a reasonable ground for considering that his extradition to the United States will expose him to violations of Article 5 of the African Charter and that it would constitute a violation of Article 6 (1) (g) of Cabo Verde's Act on International Judicial Mutual Assistance in Criminal Matters.

297 - That these probable violations stem from two factors:

*(1) The repeated practice of torture by the USA, especially in relation to political prisoners*

298 - In support of this contention the Applicant states that his foreseeable exposure to torture in the US is a real possibility due to his political value and the public allegations he has made about torture already suffered in Cabo Verde and which may have been influenced by the United States.

299 - That the Applicant has sensitive and confidential information about Venezuela, which would expose him to torture by the United States, which intends to obtain information to intimidate the Government of President Maduro as a prime enemy of the Administration of President Donald Trump.

300 - He claims that the Applicant also suffered torture on the nights of August 29 and 30, 2020, when four masked men entered his cell to torture

67



him. One of them spoke in English with an accent that the Applicant recognized as an American and demanded that he voluntarily accept extradition and that he slandered President Maduro.

301 - That among the torments inflicted, the Applicant suffered numerous blows. To prevent the other prisoners from finding out what was happening, they covered his mouth so as to muffle his cries of pain and pleas for help.

302 - That the Applicant showed the Attorney General the injuries on his head, arms and wrists. These circumstances were also reported to the Administration, which went to prison without prior notification of the Applicant's Counsel, to query him. As a result, the authorities declared only that the injuries suffered by the Applicant were self-injuries, but that further allegations are unfounded since the Applicant has no history of health problems that lead to self-mutilation.

303 - He added that the Cape-Verdean authorities denied all requests made by the Applicant's Counsel that he have access to an independent doctor who could verify the allegations made by the Applicant and that, to date, the Applicant's Counsel has not been able to obtain a report proving the treatment he suffered while detained in Sal Island.

304 - The Applicant concluded that with such an antecedent it is more than reasonable to expect that if he is extradited to the US not only will he not receive a fair trial with all procedural guarantees but he will also face, predictably, torture.

305 - And that the Republic of Cabo Verde, as a State party to the Charter, would be responsible for exposing the Applicant to such human rights violations, should it decide to extradite him to the USA.

68



*(2) Applicant's exposure to a de facto life imprisonment.*

306 - In support of this second submission, the Applicant asserts that he will be subject to a life imprisonment sentence, since: (1) each of the charges against the Applicant carries a potential maximum sentence of 20 years imprisonment and the judge has statutory authority to impose consecutive sentences for each charge, making his maximum exposure 160 years imprisonment and (2) there is no release on parole in the federal system and the Applicant is unlikely to be eligible for home confinement.

307 - Such a de facto life imprisonment sentence violates Article 5 of the Charter since it constitutes cruel and inhuman punishment.

308 - Predicting that the Applicant's exposure to de facto life imprisonment in the USA would be an obstacle to his extradition by Cabo Verde, the USA proposed the withdrawal of a series of charges against the Applicant.

309 - That in any case, since the withdrawal of the charges was not carried out by means of an official document of the proceedings pending in the United States of America and the competent judicial authorities, the Applicant considers that he is still subject to a life imprisonment sentence.

✓

310 - Extradition is the instrument of international criminal cooperation through which a State delivers to the Justice of another State a person accused of committing crimes or convicted of committing crimes so that he can be tried or to serve the sentence imposed on him.

311 - In the instant case, in the absence of an extradition treaty between Cabo Verde and the United States, the Applicant's extradition is founded on the faculty provided for in paragraph 4 of Article 16 of *United Nations*



*Convention against Transnational Organized Crime,* to which both are States parties.

312 - Pursuant to Article 16 (7) of the same Convention:

*"Extradition shall be subject to the conditions provided for by the domestic law of the requested State Party or by applicable extradition treaties, including, inter alia, conditions in relation to the minimum penalty requirement for extradition and the grounds upon which the requested State Party may refuse extradition."*

313 - And Article 16 (13) of the same Convention provides that:

*"Any person regarding whom proceedings are being carried out in connection with any of the offences to which this article applies shall be guaranteed fair treatment at all stages of the proceedings, including enjoyment of all the rights and guarantees provided by the domestic law of the State Party in the territory of which that person is present."*

314 - The Article 16 (14) further provides that:

*"Nothing in this Convention shall be interpreted as imposing an obligation to extradite if the requested State Party has substantial grounds for believing that the request has been made for the purpose of prosecuting or punishing a person on account of that person's sex, race, religion, nationality, ethnic origin or political opinions or that compliance with the request would cause prejudice to that person's position for any one of these reasons."*

315 - In turn, the domestic law of the Respondent State, regarding extradition, contemplates a protective system of the individual preventing or

70



imposing restrictions or limitations on extradition, in cases where fundamental rights may be violated.

316 - This protection results from the Constitution of the Republic of Cabo Verde in its Article 37 by providing that:

"1. In no case is extradition permitted when requested:

*a) For political, ethnic or religious reasons or for the expression of opinion as on offence;*

*b) For a crime punishable by death penalty in the Requesting State;*

*c) Whenever, fundamentally, it is admitted that the extraditee may be subjected to torture, inhuman, degrading or cruel treatment.*

*2. Nor may Cabo Verde citizens be extradited for crimes which, under the law of the Requesting State, carry a penalty or security measure that deprives or restricts liberty for life or for an indefinite period, unless that State offers guarantees that such penalty or security measure will not be enforced.*

*3. The extradition of Cape-Verdean citizens from the national territory is not admitted, except when the following circumstances are cumulatively verified:*

*a) The Requesting State admits the extradition of its nationals to the State of Cabo Verde and provides guarantees of a fair and equitable trial;*

*b) In cases of terrorism and international organized crime;*

*(...)*

71

*6. Extradition can only be ordered by court order, under the terms of the law."*

317 - Articles 25 and 26 of the same Constitution guarantee the application of these same civic rights and guarantees to any foreigner or stateless person who is in Cabo Verde's territory.

318 - Article 28 of the same Constitution also provides that:

*"1(...)*

*1. No one can be subjected to torture, cruel, degrading or inhuman treatment or punishment, and under no circumstances will there be a death penalty."*

319 - On the other hand, as Article 3 of the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, of which Cabo Verde is a part, "1.*No State Party shall expel, return (refouler) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.*"

2. *For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.*"

320 - In this regard, the *Committee Against Torture* noted in its *General Comment No. 4 (2017)* that "*For the purpose of determining whether there are such grounds (for believing that a person would be in danger of being subjected to torture, if expelled, returned or extradited), the competent authorities shall take into account all relevant considerations including,*

72



*where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights*". (See §27)

321 - In this sense, the European Court of Human Rights also upheld that "*In determining whether substantial grounds have been shown for believing the existence of a real risk of treatment contrary to Article 3 of the Convention the Court will assess the issue in the light of all the material placed before it or, if necessary, material obtained proprio motu. The existence of the risk must be assessed primarily with reference to those facts which were known or ought to have been known to the Contracting State at the time of the expulsion*." (See European Court in the case *VILVARAJAH AND OTHERS v. UNITED KINGDOM, Applications n.°s 13163/87, 13164/87,13165/87, 13447/87 E 13448/87, of 30th October 1991 § 107*)

322 - Further in the case *E.G.M. v. LUXEMBOURG, Application No. 24015/94 of May 20, 1994*, the European Court wrote that "*The extradition of a person to a country where there are serious reasons to believe that he will be subjected to treatment contrary to Article 3 of the Convention may raise an issue under this provision. () This is not the case when the individual's allegations are not supported by any persuasive prima facie evidence.*" (See page 1).

323 - And in the case *SHAMAYEV AND OTHERS v. GEORGIA AND RUSSIA, Application No. 36378/02 of 14 April 2003*, the European Court also noted that: "*Proof of ill-treatment may follow from the coexistence of sufficiently strong, clear and concordant inferences or of similar un-rebutted presumptions of fact. In assessing the credibility of the assurances provided by Russia, it is important that they were issued by the Procurator-General, who, within the Russian system, supervises the activities of all Russian prosecutors, who, in turn, argue the prosecution case before the courts. The*

73



prosecution authorities also fulfill a supervisory role in respect of the rights of prisoners in Russia, and that this role includes the right to visit and supervise places of custody without hindrance. **The applicants' representatives, in alleging the existence of a risk to the applicants in Russia, have also failed to submit sufficient information as to the objective likelihood of the personal risk run by their clients as a result of extradition.** In the absence of other specific information, the evidence submitted to the Court by the applicants' representatives concerning the general context of the conflict in the Chechen Republic does not establish that the applicants' personal situation was likely to expose them to the risk of treatment contrary to Article 3 of the Convention. **A mere possibility of ill-treatment is not in itself sufficient to give rise to a breach of Article 3 of the Convention, especially as the Georgian authorities had obtained assurances from Russia against that possibility.** [Vide paragrs. 338, 344, 350, 352 and 371]

324 - Furthermore, in the case *OLEACHA CAHAVAS v. SPAIN, Application 24668/03 of August 10, 2006*, the same court highlighted that: "*(...) Furthermore the guarantees implied that the applicant would be subject to international standards for the protection of fundamental rights, including the control exercised by the Inter-American Court of Human Rights.*" (See §43)

325- In the same sense, the European Court held in the case of *SALEM v. PORTUGAL, Application No. 26844/04, of 9 May 2006*, when it reiterated that in an extradition case "t*he applicant was required to prove the "flagrant" nature of the denial of justice which he feared.*" (Vide Para. 8)

74



326 - It is on the basis of the jurisprudence cited above that the Court will now examine the Applicant's claim.

327 - First of all, it should be noted that the burden of proof is on the Applicant to prove the existence of the risk that, as a result of possible extradition, he will be exposed to torture or other inhuman treatment (such as de facto life imprisonment) and also to offer all means of proof to make the possibility of such a risk convincing.

328 - Because the allegation of the mere possibility of inhuman treatment is not enough to sustain a violation of Article 5 of the African Charter and Article 3 of the Convention against Torture.

329 - In the instant case, this Court finds that the Applicant's allegation, transcribed above, is not supported by any means of proof, since not even documents referred to in footnotes were attached to the proceedings (See footnote 80).

330 - And although it is stated in the copy of the Red Alert (*See Pg. 2 of Annex 14*) that the maximum possible sentence is 20 years for each crime with which the Applicant is charged, it cannot be concluded from this that there is a real risk that he will be sentenced to a de facto life sentence.

331 - The Applicant's entire allegation is based on assumptions.

332 - Likewise, the Applicant did not prove:

   - That there is a practice of repeated torture in the United States, especially in relation to political prisoners;

   - His quality and value as a politician;



- The public denunciations of torture in Cabo Verde that he says he has been making and that these may have been influenced by the United States;

- Being tortured on the night of 29 to 30 August 2020 as he described;

- That he was denied a request for access to an independent doctor who could have proved the allegations of aggression he alleges.

333 - None of the Applicant's claims that the extradition decision puts him at risk of a violation of his right not to be subjected to torture or inhuman treatment has been proven.

334 - On the other hand, it is evident from the proceedings (See Exhibit 13 to doc. 1, which is Judgment No. 244/2019/2020 of the Barlavento Court of Appeal) that, with the extradition request, the competent authorities of the United States of America offered guarantees with respect to the principle of specialty that it will not detain, prosecute or punish the extraditee for any other offenses than those contained in the request for extradition and that the extraditee will not be re-extradited to a third State.

335 - That the government of the United States provides such other adequate assurances as the Cabo Verde Court may consider necessary in respect of any aspect of this extradition request as set out in pages 37 to 33 of the proceedings, principle of specialty, limitation of sentence and reextradition. (See §15 of the aforementioned Exhibit)

336 - The Applicant further alleged that, anticipating that his de facto being subjected to a life imprisonment sentence in the United States would be an obstacle to his extradition by Cabo Verde, the Requesting State proposed to drop a number of charges against him. With regards to this point, he referred in a footnote (n° 81) to a document that he did not attach to the proceedings.

76



337 - However, this issue appears to be covered by the guarantees given by the requesting State and contained in the extradition decision issued by the Barlavento Court of Appeal. (see §15)

338 - The Applicant seems to be aware that the possibility of being sentenced to a penalty which, when cumulated, represents de facto life imprisonment, has been safeguarded by the Respondent, through guarantees given by the Requesting State, as results from the decision that ordered the extradition, in first instance, and of which the Applicant appealed to the Supreme Court of Justice, and is still pending a decision.

339 - The Applicant pointed out that such assurances were not carried out by means of an official document of the proceedings pending in the USA and the competent judicial authorities, a reason that leads him to consider that he is still subject to life imprisonment.

340 - At least because, as stated in the decision of the Court of Appeal, such a guarantee was given by a "competent authority".

341 - It is the Court's understanding that, even if such guarantees were given by a body binding on the executive branch of government and even if the American courts are independent, in the event that they were to sentence the Applicant to a longer penalty, the executive branch would be bound to use its powers of pardon and commutation of sentence to the extent that extradition would allow. (In this regard, see the aforementioned case *SALEM v. PORTUGAL, Pag. 17*).

342 - In this regard, the European Court recognized in the case *RRAPO v. ALBANIA, Application No. 58555/10 of September 25, 2012,* that "*(...), in extradition matters, diplomatic notes are a standard means for the*

77



*requesting State to provide any assurances which the requested State considers necessary for its consent to extradition. (...), in international relations, diplomatic notes carry a presumption of good faith.* The Court considers that, in extradition cases, it is appropriate that that presumption be applied to a requesting State which has a long history of respect for democracy, human rights and the rule of law, and which has longstanding extradition arrangements with Contracting States. (...) The Court must further attach importance to the fact that, in the context of an extradition request, there have been no reported breaches of an assurance given by the United States Government to a Contracting State. The United States long-term interest in honoring its extradition commitments alone would be sufficient to give rise to a presumption of good faith against any risk of a breach of those assurances. (See Para. *72 e 73).*

343 - In the instant case, this Court finds that the facts submitted to it do not raise any doubt as to the credibility of the guarantees that the de facto life sentence would not be imposed on the Applicant by the requesting State.

344 - Therefore, as it has been demonstrated that among the guarantees given by the State requesting extradition is the guarantee of a limited sentence, that is, that any conviction of the Applicant will not exceed the maximum applicable sentence in the Respondent, which is 35 years' imprisonment as set forth in Article 51 of the Criminal Code in force in the Respondent, the Court considers this guarantee to be acceptable and convincing.

345 - Therefore, this Court finds that it has not been proven that there is a risk that the Applicant will be exposed to a situation of torture or a de facto



life imprisonment in the event of his extradition being confirmed by the national Supreme Court.

346 - Consequently, this Court finds this argument to be unfounded.

## *E. On the application to impose sanctions against the Respondent for failure to fulfill its obligations as an ECOWAS Member State*

347 - The Applicant filled an application (doc.9) requesting this Court to order the ECOWAS Authority of Heads of State and Government to impose a set of sanctions on the Respondent pending compliance with the judgment of this Court issued in 2020 in the instant case.

348 - He further pleads that the Respondent be ordered to pay the Applicant a penalty payment of USD 900,000 for each 24-hour period, counting from the delivery of the Court order of December 2, 2020, case No. ECW/CCJ/APP/43/20 and No. ECW/CCJ/Rul/07/2020, of which the order has not yet been fully complied with.

349 - To substantiate his application, he alleged that in the Judgment delivered by this Court in Case No. ECW/CCJ/APP/43/20, on December 2, 2020, the Respondent was ordered to place the Applicant under permanent house arrest, under the supervision of the Respondent's national judicial authorities, in order to guarantee him better accommodation conditions and access to treatment and medical visits, compatible with his personal situation, at the expense of the Applicant himself, and that the Applicant should not be extradited until a decision is rendered on the merits of the substantive case.

350 - That notwithstanding the issue and service of an Enforcement Order on the Respondent by the Registrar of this Court, the Respondent has deliberately refused to comply with the aforementioned Judgment.



✓

351 - The jurisdiction of this Court is provided under the Article 9 of the Protocol A/P1/7/91 on the Court, as amended by the Supplementary Protocol A/SP.1/01/05.

352 - And paragraph 1(d) of the said Article 9 provides as follows:

"*1 - The Court has competence to adjudicate on any dispute relating to the following:*

*(...) d) The failure by Member States to honor their obligations under the Treaty, Conventions and Protocols, regulations, directives, or decisions of ECOWAS.*"

353 - This Article provides for the monitoring of Member States' compliance with their Community obligations, also called infringement proceedings.

354 - This is a procedural means that allows the Community judge to verify compliance by Member States with the obligations arising from ECOWAS legislation.

355 - The Fortieth Ordinary Session of the ECOWAS Authority of Heads of State and Governments adopted, on February 17, 2012, an additional law, Supplementary Act A/SP.13/02/12, which imposes sanctions on Member States that fail to honor their obligations to ECOWAS.

356 - Article 1 of this text defines the notion of State obligations as follows:

"*Member States shall apply and observe Acts of the Authority and Council of Ministers which include the ECOWAS Treaty, Conventions, Protocols, Supplementary Acts, Regulations, Decisions and Directives of the Community.*"



80

357 - The analysis of the infringement action therefore leads to the existence of the alleged breach of the obligation and, if applicable, the application of a sanction, if the said breach eventually occurs.

358 - It should be noted that it is the Member States and the Commission which have *locus standi* to bring proceedings before the Court in the event of Member States' failure to fulfill their Community obligations (see Article 10(d) of *Protocol A/P1/7/91 on the Court, as amended by Additional Protocol A/SP.1/01/05).*

359 - In this regard, this Court held in the case *KEMI PINHEIRO (SAN) V. THE REPUBLIC OF GHANA, Judgment N° ECW/CCJ/JUD/11/12, of 6th July, 2012, LRCCJ* (2012) Parag. 47, 48 and 49 that "*Therefore, there is no doubt that any Member State that fails to implement its obligations arising from Community texts to which it is bound, can be brought before the ECOWAS Court of Justice.*

*But, **contrary to other situation in which individuals are allowed direct access to the Court... the Protocol on the Court does not empower individuals with the locus standi to sue a Member State for violation of its obligations enshrined in Community texts. According to Article 10 (a), only a Member or the ECOWAS Commission has access to the Court to compel a Member State to fulfill an obligation.***

*Therefore, the Community citizen who has been a victim of an alleged violation of a right enshrined in the Community Protocol by a Member State is provided with two alternatives:*

a) *To ask his own State to take on the defence of his interest and file action before the Community Court of Justice against the defaulting Member State, pursuant to Article 10 (a):*



*Or*

b) *To decide to file an action against the defaulting Member Sate, addressing the domestic jurisdiction of the State where the alleged violation of his rights occurred.*" (Bold is ours)

360 - To these two categories of Applicants should be added the Authority of Heads of State and Government, which, under the terms of paragraph 3, point g), of Article 7 of the Revised Treaty, is also empowered to:

"*refer where it deems necessary any matter to the Community Court of Justice when it confirms that a Member State or institution of the Community has failed to honour any of its Obligations or an institution of the Community has acted beyond the limits of its authority or has abused the powers conferred on it by the provisions of this Treaty, by a decision of the Authority or a regulation of the Council.*"

361 - The Respondent in the infringement proceeding remains a Member State, accused of having infringed Community law.

362 - However, as can be seen, infringement proceedings are a limited remedy that individuals cannot make use of and are brought in an action of their own.

363 - In the instant case, within the scope of this action, the Applicant intends that the Court orders the Authority of the Heads of State and Government to apply the above sanctions to the Respondent, alleging the non-execution of the decision of this Court.

364 - Now, as stated above, the Applicant, being an individual, has no *locus standi* to bring an action against a Member State for breach of its obligations enshrined in Community texts.

82



365 - In this sense, under the terms of the aforementioned Articles, this Court concludes that the Applicant's claim is unfounded and therefore must be dismissed.

## F. On the appointment of the Applicant as Alternate Ambassador to the African Union

366 - The Applicant filled a later pleading (doc. 10) to make known to this Court that he was appointed as Alternate Ambassador of the Bolivarian Republic of Venezuela to the African Union.

367 - In reference, he affirmed and attached 3 documents that demonstrate the following:

- on December 24, 2020, the Ministry of Popular Power of Foreign Affairs, through resolution DM No. 380, designated the Applicant as Alternate Permanent Ambassador of the Bolivarian Republic of Venezuela to the African Union. (Exhibit 1 attached to doc. 10).

- The Embassy of the Bolivarian Republic of Venezuela in Ethiopia, on December 26, 2020 sent a letter to the Protocol Department of the African Union informing the appointment (Exhibit 2 to attached to doc.10); (Attached 2 to doc.10)

- On December 28, 2020, the Minister of Popular Power for Foreign Affairs of the Bolivarian Republic of Venezuela, notified the appointment to the Applicant. (Exhibit 3)

- And The Embassy of the Bolivarian Republic of Venezuela to Senegal on January 5, 2021, informed the Defendant, through a Note Verbale, about the appointment. (See Exhibits 1 to 4 attached to doc. 10).

83



368 - The Applicant further clarified that the Headquarters Agreement between the African Union and Ethiopia contains a provision regarding the privileges and immunities of representatives of third States.

369 - That based on the nomination, the Applicant is entitled to the same privileges and immunities as diplomatic agents of a similar category granted under international law.

370 - He added that in order to enjoy the immunities, the representatives of the African Union are accredited to the Government of Ethiopia under which the rules codified in the Vienna Convention on Diplomatic Relations (1961) apply and this triggers the application of Article 40 of the same Convention, a norm which he maintains is applicable to him.

371 - Furthermore, he noted that the principle of retroactive diplomatic immunity is recognized by the federal courts of the United States of America, having relied on two judgments handed down in the cases *Abdulaziz vs. Condado Metropolitano de Dade*, 741 F.02 1328 (11° Cir.1984) and *EUA v. Khobragade*, 15 F.Sup.3d 383 (S.D.N.Y.2014).

372 - And finally he maintained that the Respondent did not suspend the extradition process in the national jurisdiction, and such was authorized on 4 January 2021 through a decision of the Barlavento Court of Appeal and concluded by requesting that the extradition process be cancelled in the Defendant State due to his appointment.

Court's Analysis,

373 - It should be noted that with this new fact, which occurred after these proceedings were brought before this Court and, obviously, after he was arrested, the Applicant intends to claim it as grounds for the diplomatic

84



immunity and inviolability that he now claims to possess, by application of Article 40 of the Vienna Convention on Diplomatic Relations.

374 - The Applicant claims that the rule contained in Paragraph 1 of that Article is applicable to him by virtue of his appointment as Alternate Ambassador to the African Union, relying on his status as a diplomatic agent.

375 - It is worth recalling the aforementioned legal regime of the 1961 *Vienna Convention on Diplomatic Relations*.

376 - In the instant case, the Applicant stated that in order to enjoy immunities, representatives of the African Union are accredited to the Government of Ethiopia.

377 - Effectively, Article 3 (3) of the said Convention provides that "*A head of mission or any member of the diplomatic staff of the mission may act as representative of the sending State to any international organization.*"

378 - The Convention establishes, as we have already said, the principle whereby accredited diplomatic agents enjoy immunity from criminal jurisdiction of the accrediting State (Articles 29, 30 and 31)

379 - Therefore, only after the accreditation of a diplomatic agent, he will enjoy the immunities and privileges provided for in the aforementioned Convention, provided that the circumstances provided for in Article 39 (1) of the same Convention are met, that is: "*Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its*

85



*territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed."*

380 - The diplomatic agent, with regard to the ambassadors, who are Heads of Diplomatic Missions, are submitted to an accreditation process and, after being chosen by the country of origin, expect an acceptance from the accrediting State, known as *agrément*, under the terms set out in Article 4 of the same Convention.

381 - In the instant case, the Applicant only demonstrates that his appointment has been notified to the African Union, the Respondent State and the person interested in the appointment.

382 - The Applicant has not produced any evidence to show that after he notified the accrediting State, Ethiopia, his appointment as Alternate Ambassador to the African Union took place or that such an appointment was notified to the Government of Ethiopia as an accrediting State.

383 - That is, he has not demonstrated with concrete *argument* positive that he has been accredited to the State of Ethiopia.

384 - For this reason, it is the Court's opinion, therefore, that the Applicant has not demonstrated that, by being accredited to a third State, he is a diplomatic agent.

385 - On the other hand, even though he had demonstrated that he has now been accredited as a diplomatic agent with the State of Ethiopia, the Applicant has failed to demonstrate how a factually (his alleged appointment as ambassador) after his arrest for the purposes of extradition, may grant him retroactive diplomatic immunity and inviolability, under the terms of Article 40 of the said Convention.

86



386 - The result of this rule is that "*if a diplomatic agent passes through or is in the territory of a third State, **which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his own country**, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return*".

387 - For this reason, in the instant case, since the Applicant is not in the territory of the Respondent with a view of crossing it in order to assume his functions (but is rather being held in preventive custody in the light of criminal proceedings), he has not demonstrated that the requirements obliging the Respondent State to grant him the inviolability and immunities which he now claims to enjoy are met.

388 - In this sense, Article 40 of the aforementioned Vienna Convention does not apply to him.

389 - Thus, the Court holds that this claim is also unfounded.

## XI-ON THE ISSUE OF COMPENSATION

390 - The Applicant seeks an order against the Respondent State to compensate him in the amount of 5,000,000.00 USD (five million dollars) as damages for the violation of his human rights.

391 - As we have seen, it has been demonstrated that the Respondent State, through its agents, violated the Applicant's right to liberty by detaining him on 12 June without an arrest warrant or Interpol Red Alert, in violation of

87




Article 3 of the Universal Declaration of Human Rights, Article 9 of the Covenant on Civil and Political Rights and Article 6 of the African Charter on Human and Peoples' Rights.

392 - In the instant case, therefore, the responsibility of the Respondent State is, through the conduct of its agents, in violation of the Applicant's human right, guaranteed by the above-mentioned Conventions, whose moral damages are evident and objective.

393 - And according to the principle of international law, "*every person who is a victim of human rights violations has the right to fair and equitable compensation*", considering that in matters of human rights violations, full reparation is, as a rule, impossible. (*Car. Judgment No. ECW/CCJ/JUD/01/06, rendered in the case DJOT BAYI TALBIA & OTHERS v. FEDERAL REPUBLIC OF NIGERIA & OTHERS).*

394 - In the case *SERAP v. FEDERAL REPUBLIC OF NIGERIA*, Judgment No. ECW/CCJ/JUD/18/12, of December 14th, 2012, this Court stated that: "*...the obligation of granting relief for violation of human rights is a universally accepted principle. The Court acts indeed within the limits of its prerogative when it indicates for every case brought before it the reparation it deems appropriate.*"

395 - Furthermore, in the case *FARIMATA MAHAMADOU & 3 ORS v. REPUBLIC OF MALI, Judgment No. ECW/CCJ/JUD/11/16* the Court stated that "*Attendu que la compétence de la Cour en matière de violation des droits de l'homme lui permet non seulement de constater lesdites violations mais aussi d'ordonner leur réparation s'il y a lieu.*" ***(Car §69)***



396 - As established by the "*Basic Principles and Guidelines on the Right to a Remedy and Reparations for Victims of Gross Violations of International Human Rights Law*...", the compensation can be, among others, by: (1) Restitution, when possible, returning the victim to the situation in which he or she was before the violation of the right occurred; (2) compensation, which shall be awarded for each economic loss, as appropriate and proportionate to the gravity of the violation and the circumstances of each individual case resulting from the gross violation of the international law of human rights. Compensation may fall on *physical or mental damage; missed opportunities, including employment, education or fringe benefits earned, material damage and loss of earnings and moral damages, etc....; (3) Rehabilitation*, which must include medical and psychological treatment or legal or social services; (4) *Satisfaction* which must include, when applicable, any of the measures listed in paragraphs a) to h) of point 22 of the aforementioned document, and (5) *Guarantees* of non-repetition, which should include, when applicable, any of the measures that contribute to prevention, listed in paragraphs a) to h) of number 23 of the same document.(**See No. VII and IX §19 and 20 See No VII).**

397- Such compensation shall, as much as possible, restore the victim to the situation in which s/he was prior to the infringement of his/her right and shall relate only to the damage, for which the causal connection between the unlawful act and the alleged damage is established and which is proportionate to the committed infringement.

398- The type of compensation to be granted by the Court depends on the circumstances of each case and the nature of the claims. (See the case *WOMEN AGAINST VIOLENCE AND EXPLOITATION IN SOCIETY (WAVES) & ANOR v. REPUBLIC OF SIERRA LEONE,* Judgment No.



ECW/CCJ/JUD/22/18, of December 12, 2019, rendered in Suit No. ECW/CCJ/APP/37/10, page 29).

399 - In the instant case, as we have seen, the Applicant, having been detained and kept in arbitrary detention for several months, was consequently deprived of his liberty, with evident suffering of a moral order.

400 - The Applicant seeks damages in the amount of five million dollars, without however indicating how he reached that amount, by way of non-pecuniary loss.

401 – However, this Court understands that, in this case, the appropriate reparation, consists of compensation, which must be proportional to the seriousness of the human right violation that occurred, being certain that the compensation for non-pecuniary loss, does not aim at reestablishing the situation that would exist if the harmful event had not occurred, but rather to compensate or give satisfaction to the injured party, having also a sanctioning function.

402 - So, considering the gravity of the facts and their consequences for the Applicant, it is considered appropriate to fix the compensation due, in the amount of USD 200,000 (two hundred thousand dollars).

## Costs

403 - Neither party has made any claim for costs that needs to be determined here.

404 - Pursuant to Article 66(1) of the Rules of Court, the decision ending the proceedings shall make a decision as to costs.

90



## *XII – OPERATIVE CLAUSE*

405 - Therefore, for the above reasons, this Court declares:

### 406 - **On the merits:**

1. That the detention of the Applicant at Amilcar Cabral Airport, Sal Cabo Verde, on 12 June was unlawful and violated the Applicant's human right to personal liberty guaranteed by Article 6 of the Charter.

2. That the continuous detention of the Applicant by the Respondent in Sal, Cabo Verde from 12 June 2020 until the present moment violates his human right to personal liberty guaranteed by Article 6 of the Charter.

### 407- **Accordingly, the Court:**

a) Orders the Respondent to release the Applicant with immediate effect in restoration of his freedom of movement.

b) Orders the Respondent to discontinue the execution of all procedures and processes to extradite the Applicant to the USA.

c) Orders the Respondent to indemnify the Applicant in the amount of 200,000 USD (two hundred thousand dollars) for the moral damages suffered as a result of his illegal detention.

91



408 - **Dismisses** all other claims, orders and injunctions sought by the Applicant against the Respondent State.

### 409 – Costs

Pursuant to Article 66 (1) of the Court's Rules of Procedure, each party shall bear its own expenses.

### XIII- COMPLIANCE AND COMMUNICATION

410 - Compliance with this decision must be made within a maximum period of six (6) months and communicated to this Court except the release of the Applicant which must be complied with forthwith.

**Signed by:**

Hon. Justice Edward Amoako **ASANTE** - Presiding

Hon. Justice Dupe **ATOKI** - Member

Hon. Justice T.S.M. **COSTA**-Member/Rapporteur

**Assisted by:**

Mr. Tony Anene **MAIDOH** - Chief Registrar

393 – Done in Abuja, on the 15th March 2021, in Portuguese and translated into English.