```
1                        UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF FLORIDA
2
                         CASE NO. 19-20450-CR-SCOLA
3
     UNITED STATES OF AMERICA,
4                                        Miami, Florida
                    Plaintiff(s),
5                                        March 15, 2021
               vs.
6
     ALEX NAIN SAAB MORAN,
7
                    Defendant(s).
8    -----------------------------------------------------------

9                        HEARING HELD VIA ZOOM
                 BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
10                     UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE PLAINTIFF(S):   Alexander J. Kramer, Esquire
                             United States Department of Justice
13                           1400 New York Avenue, NW
                             Washington, D.C. 20005
14
                             Kurt Lunkenheimer, Esquire
15                           United States Attorney's Office
                             99 North East Fourth Street
16                           Miami, Florida 33132

17
     FOR THE DEFENDANT(S):   David B. Rivkin, Jr., Esquire
18                           Baker & Hostetler, LLP
                             1050 Connecticut Avenue, NW
19                           Suite 1100
                             Washington, DC 20036
20


21


22   REPORTED BY:            Tammy Nestor, RMR, CRR
                             Official Court Reporter
23                           400 North Miami Avenue
                             Miami, Florida 33128
24                           tammy_nestor@flsd.uscourts.gov

25
```

1    The following proceedings began at 9:00 a.m.:

2         THE COURT:  This is United States versus Alex Saab

3    Moran.  Who is here on behalf of the government?

4         MR. KRAMER:  Good morning, Your Honor.  Alex Kramer on

5    behalf of the government.  Also with me is Kurt Lunkenheimer.

6         THE COURT:  All right.  Good morning.  Who is here on

7    behalf of the defense?

8         MR. RIVKIN:  Good morning, Your Honor.  David Rivkin

9    on behalf of the defendant.  I'm accompanied by a few

10   colleagues, but I will be the one making the argument.

11        THE COURT:  Okay.  Good morning.

12        MR. RIVKIN:  Good morning.

13        THE COURT:  So this is here for arguments on

14   defendant's motion to vacate order conferring fugitive status

15   and for leave for special appearance to challenge indictment.

16        Before we get to the arguments, the government had

17   filed a motion for a status conference.  Do we need -- what

18   would we discuss at a status conference?

19        I can't hear you, Mr. Lunkenheimer.

20        MR. KRAMER:  Mr. Lunkenheimer was going to cover that

21   and he might be having some quick audio issues if you can bear

22   with us one moment, Your Honor.

23        THE COURT:  Sure.

24        No.  It doesn't appear that you are muted.  It must be

25   something with your hardware.

1          THE COURTROOM DEPUTY:  This is Warren.  There is an

2     update apparently that needs to be installed.

3          MR. LUNKENHEIMER:  Can you hear me now, Your Honor?

4          THE COURT:  Yes.

5          MR. LUNKENHEIMER:  Sorry about that.  This is a new

6     computer, and I apologize, but I will check on that update that

7     Warren referenced.

8          Your Honor, we were just -- based on the defendant's

9     reply to the ex parte facts, we were requesting the status

10    conference to see if the Court would be requiring, I guess,

11    witnesses at the time as they seem to vehemently oppose the

12    facts proffered in there, you know, saying that there is no

13    affidavit or declaration to support them.

14         So we were just trying to make sure for this morning's

15    purposes if they were going to be calling witnesses because

16    they are forcing us or at least it sounded like they were

17    requesting that we provide witness testimony or at least an

18    affidavit or declaration.  So we wanted some clarity on that

19    and that was the reason for the status conference.  It was in

20    no way to delay this hearing going forward.  We were just

21    trying to find some clarity on Friday afternoon.

22         In addition, Your Honor, there are references in there

23    about the ex parte filing.  And as we stated the last time,

24    Your Honor, and I think one of the reasons why you had us

25    provide it to them pursuant to a protective order is that the

1    government's position is that the facts are completely

2    relevant.  They are -- and the facts contained within that

3    ex parte filing are needed as we discussed the fugitive

4    disentitlement doctrine and in some ways whether his diplomatic

5    immunity and the arguments they are making to support that.

6        The protective order you entered, Your Honor,

7    specifically states, nothing in this order shall preclude any

8    party from using the ex parte notice of additional facts in

9    court proceedings or chambers conferences in this action.  And

10   it appeared to the United States that the defense was arguing

11   that because they were filed under seal and ex parte, they can

12   never be argued in these proceedings especially at this stage,

13   that they were kind of almost locked in a box and couldn't be

14   referenced.

15       We just wanted to clarify with the Court that we would

16   be relying on them as we -- you know, to show that he is a

17   fugitive and, therefore, asking the Court to invoke the

18   fugitive disentitlement doctrine.  And also there are some

19   facts in there that I think pertain to this argument about his

20   status as a diplomat.  That's why we were seeking the status

21   conference, Your Honor, again, not for delay of any reason.

22       THE COURT:  Okay.  So, Mr. Rivkin, are there facts in

23   the government's additional facts that, while ex parte, that

24   you are disputing?

25       MR. RIVKIN:  I mean --

1        THE COURT:  It seems like you are disputing the fact

2    that they were -- it was filed ex parte and that there wasn't

3    an affidavit or an FBI 302 also attached.  And it seems like

4    all of those facts are something that Mr. Saab Moran would

5    personally know, himself.  So either he should be in a position

6    or you on his behalf to say we don't dispute the facts, here's

7    why they are not legal or we do dispute the facts.  So are you

8    disputing the facts in the government's additional facts?

9        MR. RIVKIN:  Your Honor, I'm somewhat handicapped by

10   protective order given the nature of today's oral argument, but

11   I would say what's most relevant is we made abundantly clear

12   that none of those facts are legally significant either for

13   purposes of special appearance or for purposes of argument on

14   motion on (unintelligible) indictment.  That's what matters.

15   The reason we mention the other stuff is just because it would

16   be quite common for the government (unintelligible) --

17           (There was an interruption by the court reporter.)

18       THE COURT:  I am trying to understand.  There's

19   nothing about the -- I mean, if the government is correct in at

20   least some of their facts, those would be that Mr. Saab Moran

21   would have personal knowledge of.  There's nothing legally -- I

22   mean, the protective order only says that defense can't use

23   that document outside the parameters of the protective order.

24           If your client is aware of any of those matters, there

25   is no legal bar for him to say yes, I agree with those facts or

1   no, I don't agree with those facts, right, Mr. Rivkin?

2          MR. RIVKIN:  That is correct, Your Honor.  But, again,

3   the government put forward a pretty short summary format

4   description of various events that have transpired.  There

5   would be some nuances as to the details of those events if they

6   were relevant, but we don't think they are, but also it's a

7   question of what interpretation the government ascribes to

8   them.

9          Again, for purposes of this hearing, Your Honor, we

10  think it's absolutely legally irrelevant, any of those facts,

11  even if they were entirely correct.  And we in no way meant to

12  address any of them today again consistent with the protective

13  order plus consistent with our view as to what the law provides

14  relevant to fugitive disentitlement because whatever the

15  government put forward does not go, Your Honor, to the facts,

16  the key facts, diplomatic immunity aside, that animate the

17  relevant fugitive disentitlement jurisprudence.

18         THE COURT:  I have been a judge for 25 years.  I have

19  the same method in every single argument.  First, what are the

20  facts that the parties are relying upon.  That's why last week

21  I asked both of you are you going to put on any additional

22  evidence other than what has been filed.  The government's

23  additional facts were filed.  Okay.  So nobody said I can't

24  consider those.  Nobody said we are disputing those facts and

25  we want an evidentiary hearing.

1          So I am not going to get into any legal arguments

2     until I know what the facts are first.  So if you are disputing

3     those facts and you want the government to put on proof of

4     those facts, then because we came here today thinking that

5     there wasn't going to be any additional evidence, then if you

6     or them want additional time, and again, not a lot of time, if

7     you want additional time to put on support of any facts that

8     are disputed, then we can do that.

9          So do you want the government to put on evidence to

10    support their additional facts that are in that ex parte -- I

11    keep calling it ex parte.  It's not longer ex parte, but since

12    it was filed ex parte, I will refer to it as ex parte.  Do you

13    want them to substantiate that with some kind evidence?

14         MR. RIVKIN:  We do not, Your Honor.  We are not

15    disputing these facts for purposes of this motion.  We are not

16    conceding them, but we are absolutely not disputing them.  I

17    would very much like to proceed, if you don't mind.

18         THE COURT:  Okay.  In light of that, is the government

19    ready to go forward with the legal arguments this morning?

20         MR. LUNKENHEIMER:  Yes, Your Honor, we are ready.

21         THE COURT:  Okay.  So, Mr. Rivkin, this is a defense

22    motion.  Let me hear your argument.  How much time do you want

23    to save for a rebuttal argument?

24         MR. RIVKIN:  I would like to save ten minutes for

25    rebuttal, Your Honor.

```
 1            THE COURT:  All right.  Go ahead.

 2            MR. RIVKIN:  If it may please the Court, I would like

 3    to make two poisons.  First, fugitive disentitlement is

 4    inapplicable here because Mr. Saab did not flee the

 5    jurisdiction, has never resided in the United States, he was

 6    not here during the relevant time as far as events arising in

 7    the context of the indictment are concerned.

 8            Moreover, he has not made a free choice not to

 9    surrender but has been ordered to resist extradition by his

10    government.  And an ability to make a free choice lies at the

11    heart of fugitive disentitlement doctrine (unintelligible) --

12            THE COURT:  Hold on one second.  I don't know whether

13    it's your microphone.  I see that you are in the room with

14    another person.  I don't know if you have it on speaker phone.

15    But I think the sound is not as clear as I think our court

16    reporter would like.  I can hear you and understand you but

17    barely.  I want to make sure we have a good record here, so I

18    don't know if there's --

19            MR. RIVKIN:  I am going to get my technology person.

20    I apologize, Your Honor.  These are the times we live in.

21            THE COURT:  I didn't have my computer on mute.  Maybe

22    if I put it on mute, that will make it better.  Go ahead and

23    see how that works with me on mute.

24            MR. RIVKIN:  I was going to joke and say I would have

25    like to stand, more respectful to the Court, but that's not the
```

1    world we live in.

2            Should I try or just --

3            THE COURT:  Go ahead.  I think it's better now that I

4    put it on mute.

5            MR. RIVKIN:  So applying it to a diplomat, Your Honor,

6    legally bound to obey this country is fundamentally unfair.  To

7    emphasize Mr. Saab's diplomatic immunity, which I will briefly

8    reference in a minute, can only be waived by Venezuela.  He has

9    no say in this matter.  As the restatement heard of the

10   (unintelligible) to license law of United States states

11   diplomatic immunity is (unintelligible) and not personal rights

12   of the --

13           (There was an interruption by the court reporter.)

14           MR. RIVKIN:  I very much apologize.

15           The immunity, therefore, might be waived by that state

16   and ordinarily may not be waived by the individual without the

17   state's consent.  This rule was incorporated into Article 34 of

18   the '61 Vienna Convention.  This fact, in our opinion,

19   dramatizes the extent to which this case is not subject to

20   fugitive disentitlement.

21           Second, even if fugitive disentitlement was

22   applicable, this Court should exercise its discretion of a

23   special appearance to contest the indictment.  Fugitive

24   disentitlement is an equitable doctrine which means it must be

25   applied with a view to what is fair under --

```
 1              (There was an interruption by the court reporter.)

 2              MR. LUNKENHEIMER:  Your Honor, I think there is a

 3   phone number line that's on the conference that was not muted

 4   at first.  I don't know if they are still on.

 5              THE COURT REPORTER:  That is me, the court reporter.

 6              MR. LUNKENHEIMER:  Oh, okay.  Sorry about that.

 7              MR. RIVKIN:  Challenges fugitive disentitlement is an

 8   equitable doctrine which means it must be applied with a view

 9   to what is fair in the totality of circumstances.

10              There are circumstances, Your Honor, where this

11   doctrine cannot be applied at all as reflected in the Supreme

12   Court Degen decision, but there are no circumstances in which

13   it must be applied.  It is not an entitlement of a government

14   but a doctrine for the Court to apply with a view towards

15   advancing the standard fairness considerations.

16              Here it means it should be advanced in view of what's

17   fair to Mr. Saab in his capacity as a diplomat, what's fair to

18   the sending and receiving states to the beneficiaries of his

19   mission, and --

20              (There was an interruption by the court reporter.)

21              THE COURT:  I think one of the problems, because we

22   didn't have any problem hearing you or understanding you the

23   last couple times, is that your -- I guess you are looking at

24   your notes.  And when you are looking down, I think your voice

25   is being projected down as opposed to forward, and that's
```

 1   contributing somewhat.  Also, I don't know if you are in a big

 2   room that is echoy, but the acoustics are not good.

 3          MR. RIVKIN:  All right.  I will try to do my best.

 4          So we believe that the broad equitable interests are

 5   best balanced in the context of the exercise of your discretion

 6   that permits Mr. Saab's special appearance to contest the

 7   indictment.

 8          Now, immunity applies to Mr. Saab because the Eleventh

 9   Circuit held in Abdulaziz case that a special envoy qualifies

10   as a head of a mission under Article 14 of Vienna Convention,

11   qualifies as a diplomatic agent under Section I(e) of the same

12   convention and, therefore, is entitled the rights while in

13   transit conferred by Article 40.

14          Mr. Saab enjoys a right of passage here.  Other

15   authorities including those applying to customary international

16   law have reached the same conclusion, but what most important

17   for purposes of these proceedings is the Eleventh Circuit

18   position in Abdulaziz.

19          While this is an oddly compelling argument, Your

20   Honor, because we are here on a motion for a special

21   appearance, the question today before this Court is not whether

22   definitively diplomatic immunity applies to Mr. Saab.  It is

23   sufficient if we were to make a facially compelling argument

24   immunity due to Vienna Convention Eleventh Circuit precedent

25   construing this convention that he is a special envoy.

1          That is exactly what the Noriega court did in granting

2    the special appearance motion.  So they emphasize this Court

3    does not need to conclude today that Mr. Saab is entitled to

4    immunity in order to grant the motion for special appearance,

5    and the government should be required to show that he has no

6    colorable claim to immunity which is not something that the

7    government can do, we feel.

8          Let me briefly, very briefly, tackle nondiplomatic

9    immunity factors that clearly entitle Mr. Saab's right to a

10   special appearance.

11         The Eleventh Circuit has consistently referred to the

12   doctrine of constructive flight the government accuses Mr. Saab

13   of in terms of a return to United States.  Underlying rationale

14   is that the failure to return is the basis from which intent to

15   flee from prosecution arrest may be inferred.  I'm quoting from

16   Barnette.

17         But DOJ's notion that a mere nonappearance by

18   defendant triggers fugitive disentitlement means that anyone in

19   the world who has been entitled by U.S. grand jury and notice

20   of this indictment is a fugitive, that is an absurd result that

21   is not supported by case law.  Rather, what constitutes a

22   failure to return for purpose of establishing flight is an

23   involved question and the key factor being the extent of ties

24   between the individual and the United States.

25         In analyzing this issue, the Seventh Circuit in Hijazi

focused on such factors as the fact that the defendant was never in this country, has never set foot in Illinois, did not own property here.  So too is here.  Mr. Saab cannot be said to have failed to return to a place he has never been present at any relevant time, never had any reason to travel to.  He cannot be said to be constructively fleeing from a jurisdiction he never had any reason to go to affirmatively.

The Eleventh Circuit Shalhoub decision is not in conflict with Hijazi with respect to the scope of the fugitive disentitlement doctrine.  The defendant there resided in the Southern District of Florida, married a U.S. citizen where the U.S. court granted primary custody arrangement over the child who was abducted and held in Saudi Arabia.

These are precisely types of contacts with United States, Your Honor, that establish an affirmative obligation to travel to the United States to defend in person against prosecution.

That was exactly the same position of the Sixth Circuit in Martirossian which deal with an employer of a higher subsidiary of Rolls Royce who was accused of paying bribes to the Chinese government officials.

I can briefly turn Your Honor to diplomatic immunity to address a couple arguments made by the government on this issue.

The government emphasizes that the state department

1   has not accepted Mr. Saab as a diplomat.  Such acceptance is

2   neither necessary nor even conceivable here because Mr. Saab

3   was not accredited to the United States.  He was a special

4   envoy to Iran.  The state department is -- acceptance is --

5   there is no conceivable context which could have been

6   proffered.

7              Further, the deference that the Court ordinarily would

8   owe the executive in determination of diplomatic status

9   grounded in presidential power to receive ambassadors and other

10  public ministers is also not in play here.  The only

11  question --

12             (There was an interruption by the court reporter.)

13             MR. RIVKIN:  The question, the sole question, here is

14  whether the executive branch, which is bound by the 1961 Vienna

15  Convention, 1978 Diplomatic Relations Act that substantially

16  implements it, can reach out and secure the arrest of a

17  diplomate traveling overseas.  We feel that permitting this

18  behavior would let loose the law of the jungle which they are

19  made to fear with diplomats of other countries anywhere between

20  their home and their posting.

21             Needless to say, the United States, as the world's

22  preeminent diplomatic power, would suffer greatly from such a

23  role because it would expose American diplomats to harm as it

24  would expose harm to diplomats of many others countries.

25             Worth noting here briefly why the United States, as

1    any sovereign, can derogate from customary international law,

2    they are not permitted to ignore their treating obligations.

3    As a result, not only the Court need not be concerned about

4    state department's views in this matter, but it need not defer

5    to those views in construing the Diplomatic Relations Act and

6    the Vienna Convention as, indeed, was done by the court in the

7    Abdulaziz case.

8          A couple other points very briefly.  The government's

9    reliance on the International Organization Immunities Act

10   purporting to limit diplomatic immunity to those persons

11   accepted by the state department is entirely misplaced.  Your

12   Honor --

13          (There was an interruption by the court reporter.)

14          MR. RIVKIN:  That language is directed at persons

15   designated by foreign governments to work for international

16   organizations in the United States.  That language does not

17   appear in the Vienna Convention or the Diplomatic Relations

18   Act.

19          Similarly, the government's claim that there have been

20   a number of foreign officials who have been indicted on

21   extraterritorial basis in this district is irrelevant.  DOJ

22   does not cite any judicial opinions where diplomatic immunity

23   was relevant simply because, to the best of my knowledge, the

24   United States has never tried to interfere in any way with

25   third country diplomat while traveling overseas.  The cases

1    they cite involve foreign government officials who are not

2    subject to diplomatic immunity.

3         The government's position basically amounts to a claim

4    that any diplomat in the world is entitled to immunity unless

5    the state department accepted his diplomatic status.

6         This would limit diplomatic immunity, Your Honor, to

7    those people who have been accredited to the United States.  As

8    I said, that not only is not supported by existing case law,

9    but it would be passing strange.

10        The government's effort to distinguish the Eleventh

11   Circuit ruling in Abdulaziz also misses the mark.  The law

12   requires -- the case requires Mr. Saab's status as a special

13   envoy as designated by the sending state, the point stressed by

14   the Court on Abdulaziz, means he is a diplomatic agent and is

15   entitled to full protections of Article 40.

16        The fact that (unintelligible) Abdulaziz in that case

17   was accredited to the United States does not alter its

18   conclusion, nor can the decision which the government relies on

19   Sissoko alter this point, that courts view the special missions

20   are not immune is consistent with Abdulaziz.  And, frankly, if

21   one looks at this case, it's clear that that observation by the

22   Sissoko court was a dicta.

23        My final point would be that the current state of U.S.

24   relations with Venezuela and Iran is not relevant to the

25   question of Mr. Saab's diplomatic immunity.  What matters is

1  the United States recognizes the sovereign status of both

2  countries, and all three are equally bound by the Vienna

3  Convention and customary international law.

4       The fact that the United States no longer considers

5  Mr. Maduro to be president of Venezuela and there are no formal

6  diplomatic relations of Iran cannot change the nature and

7  extent of the multilateral treaty obligations for both

8  countries.

9       That is all, Your Honor, as far as my prepared remarks

10  are concerned.  I would be delighted to entertain any

11  questions.  I hope the -- I tried to keep my head up, so I hope

12  the quality of sound is a bit better.

13       THE COURT:  Thank you.

14       Mr. Kramer?

15       MR. LUNKENHEIMER:  Your Honor, this is AUSA Kurt

16  Lunkenheimer.  If you would indulge -- with the Court's

17  indulgence, I was going to address briefly the fugitive

18  disentitlement doctrine, and Mr. Kramer was going to address

19  the diplomatic immunity aspect if that is okay.

20       THE COURT:  Okay.

21       MR. LUNKENHEIMER:  Your Honor, clearly this is a case

22  of we think that -- the government feels that the fugitive

23  disentitlement doctrine should be invoked, and it's purely a

24  case of constructive flight, that this defendant became aware,

25  knew of the indictment, as stated in Shalhoub, and refused to

1    surrender himself to the jurisdiction of the court.

2         We feel that it's well established by the facts

3    proffered in both the public response and the ex parte facts

4    that the defendant knew about the indictment and refused to

5    surrender to it.  Publicly we have mentioned all of the press

6    coverage that the indictment and the OFAC sanctions that were

7    issued on the same day had and that one of Mr. Saab's attorneys

8    even publicly responded, while only addressing the OFAC

9    sanctions, it belies belief that he would not have known of

10   both since they occurred on the same day and there was such

11   publicity.

12        Secondly, Your Honor, to show that the defendant knew

13   of the indictment and refused to surrender, I would refer you

14   to the ex parte filing, page 5, the last paragraph, going on to

15   page 6, the first full paragraph.  Clearly those facts as out

16   outlaid in the ex parte filing show that the defendant was

17   aware that charges would be coming, and then he refused to

18   surrender to the United States and he has still refused to

19   surrender to the United States.

20        Your Honor, the defense makes a point of stating that

21   the defendant has been commanded not to surrender or not to

22   come to the United States to face these charges and the only

23   thing in the record that the United States sees was document

24   10-6.  So I believe it's Exhibit F to their filing in that it's

25   a letter from the minister of the People's Power for External

1   Relations from Venezuela Jorge Arreaza, A-R-R-E-A-Z-A.  And

2   while that letter, the translation provided, makes references

3   to the fact of the veiled threat of, you know, criminal charges

4   in Venezuela against the defendant if he violates or provides

5   classified information to the United States or he doesn't

6   maintain strict confidentiality with respect to that

7   information, the letter says, the last full sentence, we,

8   therefore, ask that you take all necessary legal precautions to

9   avoid extradition.  This letter was sent July 1, 2020.

10          So, one, the United States does not feel that it's

11   fair to classify that as a command, an order, from Venezuela to

12   not surrender.  And then again, it's only -- it was only issued

13   after his arrest in Cabo Verde during his extradition

14   proceedings that he was told this.

15          So from the date of his indictment on July 25, 2019,

16   he was refusing to surrender to the United States consistently.

17   And we, therefore, even to this day say that he's refusing to

18   consent -- or refusing to surrender as he fights the

19   extradition, which is his right, and it's being litigated in

20   Cabo Verde and other courts as we speak.

21          Lastly, Your Honor, I think the case that we filed a

22   notice of last night, United States versus De Morales Sante,

23   S-A-N-T-E, 12-20663-Criminal-Zloch, we think that is very --

24   while you are not bound by that decision, we think it's very

25   instructive as to the fugitive disentitlement doctrine in that

1    in that case, initially the Magistrate Judge Patrick Hunt

2    issued a denial of the motion to dismiss the indictment, but

3    then it turned out that the defendant has been arrested in

4    Spain and was pending extradition.  And Judge Zloch asked

5    Mr. -- upon United States objections, Judge Zloch had Judge

6    Hunt redo his report and recommendation and file a separate

7    report and recommendation.  And in that Judge Hunt recommended

8    the enactment or the enforcement of the fugitive disentitlement

9    doctrine because the defendant was pending extradition in

10   Spain, so there is going to be a resolution.

11          In this case the defendant is going to be extradited

12   from Cabo Verde to the United States and be in front of this

13   Court, or it's going to be denied.  And then we might fall into

14   more of a Hijazi situation in which we would never have a

15   resolution because presumably Venezuela would refuse to ever

16   extradite him since there's never any extradition treaty.

17          We filed that last night because we think it's

18   relevant to this case on the facts and the proceedings and the

19   stature.

20          And now I defer to Mr. Kramer as to the diplomatic

21   immunity arguments.

22          THE COURT:  Okay.  Mr. Kramer?

23          MR. KRAMER:  Thank you, Judge.  So here, even if

24   Mr. Saab were considered a fugitive, Mr. Saab argues that the

25   Court should exercise its discretion in allowing him to

specially appear as they stated for a number of reasons, but I
think the main one really is about this immunity issue while
Mr. Saab was purportedly traveling on a special mission to
Iran.

I think as an initial point, the government's position
is that Mr. Saab does not have any immunity in the United
States.  Immunity, diplomatic immunity, is something that is
granted by the host or receiving state as shown by the, I
think, attachment C to our opposition.  Mr. Saab has no such
immunity in the United States and never has had such immunity.

Any diplomatic status he might have in Iran or the
African Union or anywhere else would not protect him from being
held responsible for his conduct in the United States.  Again,
diplomatic immunity and diplomatic status is meant to protect a
person while they are on mission in their host country.  It
does not and cannot be something that provides immunity
globally from all conduct even if it has nothing to do with
their diplomatic role, particularly in a case like this here
where the conduct at issue took place from 2011 to 2015, well
before he was allegedly made a special envoy in 2018.

Separately, in his reply brief, Mr. Saab focuses on
this idea of transportation-based immunity or transit-based
immunity that could theoretically protect an individual, a
diplomat, or someone with some kind of diplomatic status
traveling from one country to another through another country.

```
1    I think the case they cite there is United States versus

2    Bergman.

3         That question of transit-based immunity is being

4    litigated as we speak in Cabo Verde as part of the extradition

5    process.  And the government's belief here is that this Court

6    should give deference to the Cabo Verde court as they hear

7    evidence and as they make their decisions.

8         Mr. Saab is arguing that while he was traveling as a

9    special envoy under special mission immunity, I point out that

10   he in that matter is arguing special mission immunity, not

11   diplomatic immunity, that he should be protected from

12   extradition.

13        I would say here -- and I agree with the point at the

14   beginning of all this that we are not here to address the

15   actual focus of diplomatic immunity, we are here to address

16   whether or not Mr. Saab can specially appear.  I do think it's

17   important to note here though that the government does disagree

18   with the contention that Mr. Saab would be a diplomat under the

19   Vienna Convention.  The Vienna Convention itself addresses

20   permit diplomatic missions, not temporary or special missions.

21   That is governed by the convention on special missions.

22        Here I think the evidence has been presented.  The

23   letters that Mr. Saab has attached to his filings show that he

24   wasn't ever actually sent on a mission to be an embassador or a

25   mission staff to a permanent mission, something like working at
```

1  an embassy where he's constantly there.

2          If~anything, they show the opposite, that Mr. Saab was

3  sent for specific reasons to have specific meetings.  One of

4  the attachments references a four-day meeting in particular in

5  Iran.

6          But what it doesn't talk about is this kind of

7  permanent mission that would place him under the potential

8  protections of the Vienna Convention.  The reason that's

9  relevant is there are different requirements for immunity and

10 especially transit-based immunity for special missions versus a

11 full-time diplomat.

12         Again here, that very same issue, that issue of what

13 kind of immunity he has and whether or not he has that

14 transit-based immunity, is the subject of litigation at the

15 extradition in Cabo Verde, and Cabo Verde is contesting whether

16 or not he has that immunity.

17         The one court to have ruled on this thus far is the

18 appellate court in Cabo Verde, and they have found that, in

19 fact, he did not have such immunity and should be extradited.

20 That matter is on appeal and an opinion from Cabo Verde Supreme

21 Court is expected any day.  But here Mr. Saab is seeking a

22 special appearance so that he can get kind of a second bite at

23 the apple and have this Court make a decision on that same

24 question while that is ongoing in Cabo Verde where they have

25 the ability to deal with the facts and substance because the

1    conduct actually occurred there.

2           And to be sure, that opinion matters a lot, because in

3    Cabo Verde, if they ultimately determine that he has protection

4    under immunity, he's going to be released, and any decision

5    that this Court to make would be moot.  He will be back in

6    Venezuela and he will not be extradited, so any transit-based

7    immunity wouldn't be relevant.

8           If Cabo Verde determines that he is not protected and

9    that he should be extradited, then Mr. Saab will be able to

10   make any arguments about his diplomatic status here once he's

11   actually before the jurisdiction of this Court.

12          As a result, the government believes that it's a

13   better situation, and when looking at whether the Court should

14   exercise discretion, we believe the Court should refuse to do

15   so and allow Cabo Verde to see through the process that is

16   going on in its borders as we speak.

17          Again, United States versus Bergman we don't think is

18   particularly helpful here.  It addresses what the United States

19   would do for an individual traveling through the United States,

20   but again, that's not the case here.  He's not traveling in the

21   United States.  He's traveling through Cabo Verde, and it

22   should be Cabo Verde's view as to whether or not he has

23   immunity that at least as an initial matter is something that

24   the court allows it to consider.

25          There is a few other points that they raised I just

1    wanted to briefly address.

2         If the Court has any questions, I am happy to answer

3    them, but I think I have addressed the issues I was going to.

4         THE COURT:  All right.  Thank you.

5         Mr. Rivkin?

6         MR. RIVKIN:  Thank you, Your Honor.  One quick point

7    as to Mr. Lunkenheimer's observations.  As far as the DOJ seems

8    to be dissecting and applying manner, the language of his

9    command or command addressed to Mr. Saab, we are not suggesting

10   that Mr. Saab is under threat of criminal prosecution.  We are

11   suggesting that given this letter, Dr. Pintos, who is his head

12   Cape Verde lawyer in declaration, and, shall we say, quite

13   strenuous diplomatic efforts by both Venezuela and Iran of

14   which judicial notice can be taken, it's unmistakably clear

15   that he's been given a command to continue -- resume as quickly

16   as possible his diplomatic mission and not to surrender to

17   extradition.  The modalities of that in our view are of no real

18   significance, point number one.

19        Point number two, as I said in my opening remarks,

20   nobody is disputing that Mr. Saab is aware -- was aware of the

21   indictment, but what my DOJ colleagues are doing is basically

22   we do see the entirety of fugitive disentitlement

23   jurisprudence, and I mention sort of the way to reconcile the

24   preleading appellate court decisions Hijazi from the Seventh

25   Circuit, Shalhoub from the Eleventh, and Martirossian from the

1    Sixth.  They do look at, in the context of constructive flight

2    determination, that is it present or not, look at the ties

3    between the individual and the United States.

4         In their book, again, everything depends upon the

5    defendant knowing or not knowing about the indictment.  Under

6    that logic, fugitive disentitlement would always apply.

7    Respect, Your Honor, it is emphatically the case.

8         Now, as to the immunity issue, I am somewhat surprised

9    by the parsing of the -- of both the case law including Bergman

10   and Abdulaziz as well as the parsing of the '61 Convention, so

11   let me speak very briefly.

12        The teaching of Abdulaziz court is that a special

13   envoy is a diplomatic agent who is fully entitled to diplomatic

14   immunity for purposes -- all purposes of Vienna Convention

15   including Article 40, which I will read a quick passage in a

16   second.  It is not up to any other state to inquire into such

17   things as how long the special envoy was supposed to meet, four

18   days or ten days.  I'm puzzled by that.

19        We have a notion now that if you were supposed to be

20   meeting as a special envoy in a foreign country for a week,

21   that maybe you're not entitled to diplomatic inviability, but

22   if it was for six months, you are.  There is absolutely nothing

23   to support that view in case law, any precedent, and that view

24   is manifestly absurd.

25        Now, as far as the fact that Mr. Saab was indicted a

1  long time ago before his diplomatic immunity kicked in, again

2  it's a puzzling assertion, the whole point of diplomatic

3  immunity or diplomatic inviability is you have it, Your Honor,

4  while you have it.  There is no exception based upon the fact

5  that you had done something earlier and, in fact, you lose your

6  diplomatic immunity, you are fully liable for whatever you have

7  done up to that point in time.

8       Again, I mean, if DOJ's position were right, you could

9  go up to any diplomat by indicting him the day before his

10 diplomatic status commenced.  That cannot be true.

11      Now, as to the Cape Verde, what -- United States is a

12 party to multilateral convention, 1961 Vienna Convention and

13 Diplomatic Relations Act.  It has independent obligations, Your

14 Honor, binding upon the United States to respect immunity of

15 third country diplomats while in transit.  I will refer to in

16 one second to Article 40.

17      The notion that any reference is due to a court of

18 another country here, particularly a small country that, quite

19 frankly, is being squeezed very hard from everything we have

20 read in the media, is stunning to me, absolutely stunning.  I

21 mean, if Cape Verde wants to violate its obligations of Vienna

22 Convention, it would be called a de-elect under international

23 law, and it's Cape Verde's responsibility.  The fact that the

24 United States should not do that to me is unmistakably clear.

25      Now, as far as the Vienna Convention is concerned, I

1    can direct Your Honor's attention to Article 40.  If we were in
2    court, I would have passed it forward.  It absolutely states
3    that if diplomatic agent passes through or is in a territory of
4    a preferred country, those proceedings, while proceeding to
5    take up or return to his post, the preferred state should
6    record him in viability in such other immunities.  There are
7    several other passages here that make unmistakably clear, but
8    this obligation is applicable to all countries, very much so
9    with respect to the United States by virtue of being party to
10   this convention.
11        And one final point, as far as the Morales case, which
12   Your Honor as well as us only saw last night, we haven't had a
13   chance to look at the briefs in that case, but looking at what
14   DOJ has put forth, first of all, I think that their opinion by
15   the magistrate in that case with due respect is somewhat
16   idiosyncratic in a sense that I see no evidence in any other
17   cases on fugitive disentitlement instead of a question of,
18   well, are we going to get this person to come here anyway
19   because of extradition as being relevant to the fugitive
20   disentitlement doctrine, so idiosyncratic opinion, point number
21   one.
22        Point number two, Your Honor, because we only seen it
23   last night, it doesn't appear that this person ever came here,
24   the individual in the Morales case who was subject to
25   extradition in Spain, so we don't really know what happened

1    there.

2           Second, very interestingly, we have been informed this

3    morning that the regional court, and I'll pronounce it

4    carefully, the full title is Economic Community in West African

5    States seen in Abuja actually ordered the Cape Verde government

6    to cease extradition and release Mr. Saab.  Now, we don't know

7    if Cape Verde is going to comply with its international

8    obligations.  Again, sovereign statements often or sometimes

9    don't.  But to say that our case is very similar to Morales's

10   case is a tremendous overstretch in our opinion.

11          And by the way, to underscore, I think government

12   acknowledges that because there is no extradition treaty with

13   Cape Verde, this is kind of a freestyle exercise where,

14   frankly, I think Cape Verde is looking to -- look at the

15   diplomatic and other aspects of relationships involved and not

16   just black letter law.  But as I said, I don't know of any

17   principle in international law which says we can subrogate our

18   obligation to comply with our international obligations to a

19   country.

20          And one final point, to go back to Noriega, Noriega's

21   lawyers for purposes of special appearance made a far more

22   aggressive argument than we have here.  The court specifically

23   acknowledged that they are aware of the fact that the state

24   department considered somebody other than Mr. Noriega to be the

25   president of Panama.  But because of the political dimensions

1    in this case and the importance of according respect to even

2    not utterly compelling arguments, because Noriega's lawyers

3    were arguing head of state immunity, the court proceeded with

4    special appearance.

5            We are in a far stronger position on the diplomatic

6    immunity side than was the case in Noriega, and we are in a far

7    stronger position on nondiplomatic immunity factors than was

8    the case in Hijazi.

9            If the judge would enjoy any questions, Your Honor --

10           THE COURT:  I don't have any questions.  Thank you.

11           All right.  So I will take this under advisement.  I

12   will get the order out in the next couple of days.

13           MR. KRAMER:  Your Honor, if the government could just

14   address one of those, I don't want to address every point but

15   just one point in particular on the ECOWAS order, the order

16   that happened in Africa, we are aware of that order.  We have

17   been in contact with our office of foreign litigation.  And

18   while we haven't seen the order itself, I think, while yes, we

19   understand there to be an issue with the extradition, the

20   court, at least it's our understanding, did expressly rule on

21   the issue of the transportation immunity.  And again, that

22   being the one that is relevant, I think, to some extent in our

23   matter here, they ruled that he, in fact, did not have that

24   immunity and was not able to make that claim.

25           Again, that is obviously not binding, not even on

1   Cabo Verde much less Your Honor, but to the extent we are

2   bringing it up as something that errs in our favor, we just

3   want to make sure that the record is clear that our

4   understanding at least is the court rejected the immunity

5   claim.

6           THE COURT:  All right.  Thank you.  I will get the

7   order out in the next couple of days.  Thank you.

8           (The hearing concluded at 9:48 a.m.)

9                             – – –

C E R T I F I C A T E


I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.

Please note: This hearing occurred during the

COVID-19 pandemic and is therefore subject to the technological

limitations of reporting remotely.


5/13/21                    s/ Tammy Nestor
                           Tammy Nestor, RMR, CRR
                           Official Court Reporter
                           400 North Miami Avenue
                           Miami, Florida 33128
                           tammy_nestor@flsd.uscourts