```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                      CASE NO: 1:19-CR-20450
3

4    UNITED STATES OF AMERICA,            Miami, Florida

5         Plaintiff,                      September 13, 2022

6            vs.                          9:30 a.m. - 11:30 a.m.

7    ALEX NAIN SAAB MORAN,

8         Defendant.                      Pages 1 to 65
     _____
9

10                   DEFENDANT'S MOTION TO COMPEL
                        BEFORE THE HONORABLE
11          UNITED STATES DISTRICT JUDGE ROBERT N. SCOLA

12   APPEARANCES:

13
     FOR THE PLAINTIFF:       KURT K. LUNKENHEIMER, ESQ.
14                            US Attorney's Office
                              99 NE 4th Street
15                            Miami, FL  33132
                              Kurt.lunkenheimer@usdoj.gov
16
                              ALEXANDER J. KRAMER, ESQ.
17                            U.S. Department of Justice
                              Criminal Division
18                            Bond Building
                              1400 New York Avenue, N.W.
19                            8th Floor
                              Washington, DC  20005
20                            Alexander.kramer@usdoj.gov

21

22   FOR THE DEFENDANT:       JONATHAN V. NEW, ESQ.
                               Baker & Hostetler, LLP
23                            45 Rockefeller Plaza
                              New York, NY  10111
24                            Jnew@bakerlaw.com
                              PRO HAC VICE
25
```

```
 1

 2    APPEARANCES (Cont'd):

 3

      FOR THE DEFENDANT:
 4                              ELIZABETH PRICE FOLEY, ESQ.
                                Baker & Hostetler, LLP
 5                              45 Rockefeller Plaza
                                New York, NY  10111
 6                              Efoley@bakerlaw.com

 7

                                DAVID B. RIVKIN, JR., ESQ.
 8                              Baker & Hostetler, LLP
                                45 Rockefeller Plaza
 9                              New York, NY  10111
                                Drivkin@bakerlaw.com
10

11                              JOSEPH MICHAEL SCHUSTER, ESQ.
                                Joseph M. Schuster, Esq., P.A.
12                              5750 Collins Avenue
                                Suite 12G
13                              Miami Beach, FL  33140
                                Joe@josephmschuster.com

14

15                              NEIL M. SCHUSTER, ESQ.
                                555 NE 15th Street
16                              Suite 2-C
                                Miami, FL  33132
17                              Neil@neilmschuster.com

18
      STENOGRAPHICALLY REPORTED BY:
19

20                              SHARON VELAZCO, RPR, FPR
                                Official Court Reporter
21                              United States District Court
                                400 North Miami Avenue
22                              Miami, Florida 33128

23

24

25
```

1          (The following proceedings were had:)

2          THE COURT:  All right.  Our next case this morning is

3   the United States of America versus Alex Nain Saab Moran.

4          Who is here for the government?

5          MR. KRAMER:  Good morning, your Honor.  Alexander

6   Kramer on behalf of the United States.  With me at counsel

7   table is AUSA Kurt Lunkenheimer and DEA Special Agent William

8   Callo and Francisco Rincon.

9          THE COURT:  Good morning.

10          And for the defense?

11          MR. NEW:  Good morning your Honor.  Jonathan New on

12   behalf of the defendant.  With me at counsel table this morning

13   are David Rivkin and Elizabeth Foley, Neil Schuster and Joe

14   Schuster.

15          THE COURT:  All right.  Good morning.  If you all want

16   to wear your masks, you may do so.  You don't have to, but you

17   may.

18          Is there anybody that is on the phone that is

19   participating, or they just to listen in?

20          MR. KRAMER:  I believe they are only listening in, your

21   Honor.

22          THE COURT:  All right.  And for the defense, same

23   thing?

24          MR. NEW:  Yes, your Honor.

25          THE COURT:  Okay.  All right.  So, this is -- we're

1    going to take up first the Motion to Compel Production of

2    Discovery Materials.  I know it is the defense motion, and I am

3    going to let you argue.  But, I just have a couple of questions

4    after briefly reviewing the government's --

5            Well, first of all, when did you file this?

6            MR. KRAMER:  I think we filed it yesterday, just after

7    five.

8            THE COURT:  Okay.  When did you guys expect me to read

9    it?

10           Okay.  So, let me ask -- so, the first thing that comes

11   to my mind is you have kind of an ontological argument that

12   because there is no diplomatic immunity, they don't have a

13   right to get information to prove there is no diplomatic

14   immunity.

15           That kind of doesn't make sense.  They are trying to

16   prove that there is no diplomatic immunity.  So, you want me to

17   make the ultimate finding to show that they are not entitled to

18   discovery to disprove that?

19           MR. KRAMER:  I think, your Honor, the argument isn't

20   that -- whether or not they are -- the issue is a matter of law

21   that the executive is in the sole province of declaring a

22   person, whether or not they have diplomatic immunity within the

23   United States.  I can cite a couple of cases.  I will probably

24   butcher the name, but I will give it my best shot.

25           It is Zivotofsky v. Kerry 135 SCT 2076 of -- sorry.

1    The 2015-case.  You know, that holds the determination for a

2    sovereign rests solely with the executive.

3         Here, there is the argument that Mr. Saab Moran is a

4    purported diplomat of the Maduro regime, which is not a

5    government recognized by the United States.  The United States

6    recognizes the Guaido government for Venezuela, not the Maduro

7    regime.

8         So, any diplomatic immunities that actually could exist

9    on the behalf of someone extended those connections by the

10   Maduro regime would not in fact, apply to any immunities here

11   in the United States.

12        So, we are not asking the Court to make any

13   determination or that there needs to be a determination as to

14   whether or not the Maduro regime did declare him a diplomat.

15   But, as a matter of law and as a matter of separation of

16   powers, that position or that power rests with the executive.

17        Separately, we also point to -- and I think what other

18   courts have done, for example, the lower court, the El Chapo

19   case in New York highlighted that the acting state doctrine --

20   as well as, I think, it was U.S. v. Holster in the 11th Circuit

21   -- states that on issues of extradition, to the extent any

22   argument were made, you know, about the extradition and the

23   validity of extradition in a foreign state, the Acting State

24   Doctrine would prelude this Court from reviewing that State --

25   that court's valid exercise of its jurisdiction.

1          And, because -- for those purposes, we are saying as a

2    base level, even before you get to the definition that these

3    materials could not, in fact, be Brady or material under

4    Rule 16, and as such, any requirement that the Court go, excuse

5    me, that the prosecution go looking for documents, even within

6    its own confines, but certainly, outside of its confines, would

7    not be required by Brady or Rule 16.

8          THE COURT:  So, that brings -- the second question is

9    you are arguing the response that because Cabo Verde has

10   already found that he is not entitled to diplomatic immunity,

11   then there is no reason for me to come to a different

12   conclusion.

13         So, let's assume that Court had found that there was

14   diplomatic immunity and they let him go, he went back to

15   somewhere, and was found later in a different place, and was

16   extradited here.  Would you admit, then, that because of the

17   Cabo Verde found that he was entitled to diplomatic immunity,

18   that I am bound by that?

19         MR. KRAMER:  No, your Honor.  I don't think,

20   necessarily, it would.

21         THE COURT:  Well, what is the difference?

22         MR. KRAMER:  I think the issue there would be he

23   wouldn't be before us on the issue of Cabo Verde's case.

24         To the extent he was found in a third-party country, I

25   will call it France, here, for the sake of argument here, and

1    France underwent a legal and judicial process in which they

2    extradite him to the United States, that -- that would be, you

3    know, the Court's position, that it should provide deference to

4    the Acting State Doctrine, whether or not France and how they

5    view Cabo Verde.  But, to the extent the Cabo Verde decision,

6    the Court wouldn't be asked to review --  in that case, make a

7    decision on the other country's decision.  And we would then,

8    of course, ask the Court to provide deference in that situation

9    to France.

10           THE COURT:  All right.  So, this is the defense motion.

11   So, who is going to make the argument for the defense?

12           Mr. New?

13           MR. NEW:  Yes, your Honor.  Thank you.  And I made say

14   at the outset, some of your questions and the government's

15   position with regard to the merits, we don't necessarily

16   believe that they are relevant here, but my colleague,

17   Mr. Rivkin, is prepared to speak to them later.

18           I am going to focus on the evidentiary issues, your

19   Honor.  And, the first thing I would like to point out -- and I

20   think, in light of the colloquy you just had, your Honor, and

21   in light of the government's brief that was filed last night --

22   to the extent I was able to read it on my phone -- it raises

23   the question of -- and I think it is important for me to go

24   over briefly how we got here, what specifically we are asking

25   for, what are the remaining points of dispute between the

1   government and the defense, and what is the relief we are

2   asking.

3        In terms of how we got here, your Honor, I think it

4   goes without saying that, you know, when Mr. Saab was

5   extradited to the U.S., there was already a case pending before

6   the 11th Circuit on this very issue, and the government argued

7   at that time that -- several arguments, but one of their

8   arguments was send it back down to the District Court because

9   there hasn't been a sufficient record, both evidentiary and

10  legal, in order for this Court to review the determination as

11  to whether or not he had diplomatic immunity.

12       And, the 11th Circuit ultimately agreed that that

13  argument did not reach the merits, and said to send it back

14  down to your Honor to make sure there was an evidentiary record

15  created on the facts, that your Honor then apply those facts to

16  the law and make a determination as to whether there was

17  diplomatic immunity.

18       So, the fact that the government now is coming before

19  the Court and saying, "Judge, it is all irrelevant.  The facts

20  don't matter.  As a matter of law, we win, they lose," is a

21  startling turn of events and not something ever raised before,

22  either in the court here or the 11th Circuit.

23       So, when this case was remanded, the parties had

24  discussions about how to proceed.  And, they agreed that there

25  would be a briefing schedule and an evidentiary hearing.

1    Again, no objection from the government that there would be an

2    evidentiary hearing at that point, and the details were laid

3    out in the declaration we submitted in our Motion to Compel.

4    We engaged in a good faith dialogue with the government, and

5    made demands of discovery, both Rule 16 and Brady, and we

6    believed we were entitled to, that related to our absolute

7    defense of diplomatic immunity.

8           In the request that we made to the government, we

9    provided specific categories of documents that we had reason to

10   believe may exist within the government's records.

11          We have also provided specific locations and agencies

12   where we had had a good faith reason to believe those records

13   might exist.  We have had back-and-forth discussions about that

14   with the government.  They disagreed, as they do today, as to

15   whether they actually had a Brady obligation to produce those

16   materials.  But, perhaps recognizing that they may not win that

17   argument, they voluntarily agreed to search for and produce

18   certain records to us.

19          And, what they agreed to do and subsequently told the

20   Court on multiple status conferences was that they would search

21   through their own records at DOJ, the prosecution team, they

22   would search through the DEA and FBI agents and other law

23   enforcement agents that worked on the investigation.

24          They would search, make requests to search through

25   Department of State documents.  They would -- they had made

1    requests to OIA, within the Justice Department, to search for

2    those documents, and they had made requests to the Department

3    of Defense.

4           And, through various updates, they kept us and the

5    Court apprised of the fact that they were actually reviewing

6    tens of thousands of documents.  They received something like

7    40,000 documents from OIA that they were reviewing, some

8    unclassified, your Honor.  Obviously, the classified was for

9    the next proceeding.

10          They told us they had -- perhaps, those numbers were

11   not firm -- a few thousand documents that the State Department

12   was collecting and assembling for them.  And, they also told us

13   repeatedly that the Department of Defense had told them that

14   they were looking for documents and they would make them

15   accessible to DOJ.  And, additionally, they told the Court that

16   that would happen by August 22nd.

17          We all know that didn't happen.

18          And, at one of the status conferences, the Court, after

19   discussing with the parties, set at least one deadline which

20   was August 15th for production of unclassified DOJ materials.

21   Separate and apart from that, that the government would make

22   best efforts to get the documents from OIA by then.

23          Well, as your Honor knows, that day came and went.

24   And, all we got was a one-page letter with a few paragraphs

25   disclosing what the government claims is unclassified material

1    in the possession of DOJ.  That letter was vague.  And so,

2    faced with that, we had no choice but to file this Motion to

3    Compel.

4         And, it really falls into three different categories,

5    what we are asking for.  The first, I actually don't think

6    there is a disagreement anymore between the government and us.

7    And, that is to the extent that they have already received and

8    reviewed documents, specifically, the documents from OIA, the

9    documents from a civil DOJ attorney, and the documents that

10   they have just been given access to at the State Department,

11   that they will, in fact, review and produce those documents to

12   us, assuming there are documents that are not privileged, and

13   that are responsive to our request and material to our defense.

14        And so, with respect to those categories of documents,

15   I think the only dispute, your Honor, is whether or not this

16   Court should set a deadline, a firm deadline for the production

17   of those documents, because we keep drifting and drifting, and

18   not really knowing when we are going to be getting materials.

19        As your Honor pointed out before, we have a date for a

20   an evidentiary hearing.  We don't want to have to take up that

21   time with the Court if we are going to be getting more

22   materials that is going to cause us to ask for more time.  We

23   need to know that now so the Court can set a schedule, so the

24   party can set a schedule.  So, that is the first request we

25   have for those documents.

1            Now, where do we have a dispute?

2            So, the remaining dispute is over documents that we

3    have asked them to search for in the possession of OFAC, the

4    Office of Foreign Asset Control, at Treasury, and, documents in

5    other branches of DOJ, other than the U.S. Attorney's Office

6    here in Florida, I presume the fraud section, and the FBI and

7    DEA, and OIA.

8            And, in particular, we have pointed out to the

9    government that there are other branches of DOJ that clearly

10   had an important role in the prosecution of this case,

11   including the International Security Division.

12           In fact, your Honor, I think it is somewhat ironic that

13   the government asked to allow someone from the National

14   Security Division to listen in today on the call.  I mean, to

15   the extent they were not part of the prosecution team before,

16   they certainly are now.

17           But, as we pointed out in our papers, we have reason to

18   believe that NSD was involved, working with DOJ and the State

19   Department, and perhaps OFAC, in terms of stopping tankers of

20   oil that Mr. Saab was responsible for negotiating for; taking

21   other actions in connection with his diplomatic activities.

22           And so, now, we have also learned through the

23   disclosures that the government has already made to us that the

24   Special Operations Division -- which, I guess, is a part of

25   DEA, but the DOJ website says it's under the control of the

1   DOJ -- was the entity that received information about

2   Mr. Saab's travels.  And, specifically, they received

3   information that he was traveling to Iran, when he was

4   traveling.  They disclosed to us that they knew that he was

5   dealing with an Iranian delegation.  All of that, as your Honor

6   can imagine --

7           THE COURT:  Hold on.  Anybody that is appearing by

8   telephone, mute your phones.

9           If the noise continues, we will disconnect the phone.

10  So, put your phone on mute if you are appearing by phone.

11          Go ahead.

12          MR. NEW:  So, all of that suggests, your Honor, that

13  that information is clearly material and relevant to our

14  defense, that they were working with the prosecution team to

15  effectuate the arrest and extradition of Mr. Saab, and there

16  were materials there, by the government's own admission.

17          None of that has been disclosed to us, and they refuse

18  to provide any more information on that.

19          One surprise for us, your Honor, is that apparently,

20  despite the fact that previously, the government said that they

21  had requested documents from the Department of Defense, that

22  the Department of Defense was working on that, and would

23  provide access for those documents, and at least gave a date

24  when that would happen, and asked -- the government,

25  apparently, now is taking the position that it does not need,

1   is not obligated to search for, review, or produce any of the

2   Department of Defense documents.

3        That's -- that is just remarkable, your Honor, given

4   the fact that we clearly made requests.  They made searches.

5   They have had access to it, are going to have access to it, and

6   they are claiming they don't have an obligation.

7        And, I would just note, your Honor, that to the extent

8   that they have already agreed to produce documents like that,

9   at least one court recently has pointed out -- and this is in

10  the U.S. v. Alshahhi case in the Eastern District of New York,

11  it is related to Mr. Tom Barrack, who was in the news, that

12  even if the documents are arguably not -- not produced --

13  sorry, not subject to Brady, to the extent that the government

14  has agreed to produce documents, they can -- and has access to

15  those documents, they cannot then claim that they are not

16  subject to the same standards of discovery they would if they

17  possessed them previously.

18        So, this is a concern of ours, that we asked for the

19  documents, they told us "You are getting these documents," they

20  told the Court they are looking for the documents, and now they

21  are like, "We don't need to produce them."

22        That is not consistent with the Brady allegation.

23        And, I think -- and I will talk about Brady in a

24  second, your Honor -- there is one other branch of DOJ that we

25  think that have relevant, material documents that was part of

1   the prosecution's investigations case, and that is the National

2   Central Bureau, which is part of Interpol, part of DOJ.

3          And, the reason that we know that there are documents

4   there, your Honor, is because when the Department of Justice

5   learned that Mr. Saab was traveling through Cabo Verde, and

6   they made plans to arrest him, to effectuate and continue in

7   his prosecution, the National Central Bureau, in Washington,

8   the U.S. version of Interpol, sent out a notice to Cabo Verde,

9   and Venezuela, we know, objected to that notice on various

10  grounds, including the fact that he was a diplomat.  That

11  notice necessarily would have been conveyed back to NCP -- NCB,

12  Interpol here in Washington.  I can't imagine the prosecution

13  team wouldn't be consulted or have access to that.

14         The Interpol then issued a red notice.  Venezuela again

15  objected which, again, would have been sent back to them.

16  Again, there necessarily would have been discussions with the

17  prosecution team since this is their arrest.  And, ultimately,

18  the red notice was withdrawn and the proceedings continued to

19  Cabo Verde.

20         So, we have specific knowledge there are documents

21  there that are relevant.  And, we don't know what the U.S.

22  response was, and we don't know what the U.S. consideration of

23  the Venezuelan request was.  All of that will be relevant to

24  our defense.

25         There are documents there that were a part of the

1   prosecution team, and the government should search for them.

2          Now, if I haven't, I would like to take a step back and

3   talk about the Brady allegations for a second, your Honor.  The

4   Fifth Circuit, unlike other circuits, particularly the Second

5   Circuit, which is -- which is quoted by the government a lot,

6   takes a relatively broader view of what is considered part of

7   the prosecution team and what should be subject to production.

8   And, you know, in the Antone case, the Fifth Circuit made it

9   clear that you cannot simply compartmentalize the government

10  when it comes to materials like this.  The DOJ cannot take a

11  very narrow, stovepipe view of what they are required to

12  produce.

13         And, that has been expanded upon in other cases.  And,

14  I think the quote that is most relevant here, your Honor, is

15  for the Martinez case, 621 F2d 184, Fifth Circuit 1980, where

16  the Court said the rule of Brady would be thwarted if a

17  prosecutor were free to ignore specific requests for material,

18  information obtainable by the prosecutor from a related

19  government entity, though unobtainable by the defense.

20         And, that is the situation we have here, your Honor.

21  These are specific requests that we have made of information

22  that we believe -- we have good faith reason to believe that

23  are in possession of government agencies that are working with

24  DOJ on this case.  And the government, in some of those

25  instances, have made requests.  In some of them, they are

1    refusing to.  But, they cannot simply just hide their head,

2    your Honor, in the sand when they are presented with specific

3    requests for material information that is obtainable by them.

4         And, this is somewhat different than some of the cases

5    that the government cites in the Fifth Circuit and the 11th

6    Circuit, where the government made searches for documents prior

7    to trial.  They just didn't happen to come up with the

8    documents that ended up being exculpatory or impeachment

9    materials under Giglio.

10        And then after the trial, the defendant raises an issue

11   on appeal, or district court, that they should have searched

12   for these documents before.

13        THE COURT:  Should have what?

14        MR. NEW:  Searched for the documents before; that even

15   though they did a search, it wasn't sufficient.

16        That is a very different situation from what we have

17   here, your Honor, where we are pretrial, we provided specific

18   requests, we have explained why those requests are material to

19   our defense, and the government has the means and opportunity

20   to talk to their partners to look for those materials.  And, in

21   some cases, they have.

22        So, we submit that in the Fifth Circuit and

23   11th Circuit, that the Brady allegations do extend here to the

24   parties that we have asked them to look for.

25        And, I mentioned some of those parties.  I don't think

1    I explained the reason why we have asked them to search for

2    OFAC documents.  We have some of that in our briefing.

3         And, I think it is very clear that OFAC took actions to

4    sanction Mr. Saab and others.  And, in their pronouncements as

5    to why they did that, it is remarkable, your Honor, some of the

6    allegations seem to mirror the allegations in this case.  The

7    timing of some of those OFAC sanctions coincided with the

8    public release of the indictment in this case.  And, it is

9    quite clear that they have been working with DOJ on some of

10   these matters.  I think, in fact, they thanked the DOJ in at

11   least one press release.

12        So, we think that that is a -- an area where the

13   government should search, given the facts and the press release

14   by OFAC, given the fact that our defense rests, in part, on

15   Mr. Saab's negotiation of the oil that OFAC then sanctioned and

16   seized.  We think that that is all reasonable and not a fishing

17   expedition in any sense of the word.  It is a very specific

18   request for a very specific agency based on very specific

19   facts.

20        Finally, and ending with DOD, your Honor, I just want

21   to re-emphasize the government already seemed to concede that

22   there were relevant documents.  We have submitted excerpts from

23   the book.  It is either out or coming out, by the former

24   Secretary of Defense, in which he made it very clear that DOJ

25   asked the Department of Defense for assistance in connection

1    with the arrest and extradition of Mr. Saab, that he was aware

2    and present at various meetings where Mr. Saab was discussed,

3    and the arrangements for Venezuela to trade for oil with Iran

4    were discussed.

5         And, specifically, he notes on Page 327 of his book

6    that "At Maduro's direction, Saab was reportedly on a special

7    mission to negotiate a deal with Iran for Venezuela to receive

8    more fuel, food, and medical supplies."

9         So, clearly, he had this knowledge and information in

10   his role at the Department of Defense.

11        So, it stands to reason that the Department of Defense

12   would have more information about the special mission he was

13   purportedly on.  That is the nature of our defense.

14        And then I would also note that on Page 328, former

15   Secretary Esper also says that when a Venezuelan foreign

16   minister made comments after Mr. Saab's arrest at Cabo Verde,

17   he, quote, "spooked the officials at State, DOJ, and the NSC

18   who were working on this case."

19        So, it is just very specific and tangible evidence,

20   your Honor, that the State, DOJ, Department of Defense and

21   others, were all working on this case, and, therefor, they

22   should be required to produce the Brady materials.

23        Now, I have been talking for a long time, your Honor.

24        But, the last bucket -- so, for that, we are asking for

25   the Court to order them, to compel them to produce documents in

1    the possession of those entities by a date certain.

2         DOD has already been working on this.  I don't know

3    what the delay can be for that.  Perhaps the government could

4    speak to that.  But, I imagine that would happen in short

5    order, similarly, for other branches of the DOJ.  I don't think

6    that this is a tall ask.  It is something they should have

7    expected a long time ago.

8         Now, the third bucket relates to the -- what we

9    consider to be deficiencies in the production thus far by the

10   government.

11        And, specifically, as we discussed last time, the

12   government produced a one -- three-paragraph disclosure to us

13   of unclassified material at the DOJ.  After the last

14   conference, they supplemented that with additional disclosures

15   about what led them to try to stop Mr. Saab's plane as it was

16   traveling through Cabo Verde.

17        And, with every iteration of the disclosure that we

18   get -- because there are summaries.  They are not actual

19   documents that I -- they are not actually hard records.  The

20   characterizations change somewhat.  They still remain vague.

21   But, we get little bits of more information, with

22   characterizations that ask for -- beg for more questions.

23        So -- for example, they have told us that they got a

24   tip -- well, more specifically, SOD, which is a branch of the

25   U.S. government, gave a tip to the DEA.

1          THE COURT:  Wait.  SOD -- is that different from DOJ?

2          MR. NEW:  Yes.  It is Special Operations Division of

3     DEA, under the aegis of DOJ, passed -- gave a tip to DEA.  We

4     don't know what the information was that SOD had.  We don't

5     know how they got that information.  We don't know what the

6     substance of it was.  All we know is that they gave a tip to

7     DEA that Mr. Saab was traveling -- I believe the vague phrase

8     they used was "for nefarious reasons."

9          Not sure what that means, your Honor.  It could mean a

10    lot of things.  It could be completely irrelevant to our

11    diplomatic immunity defense.  Or, it could be key to our

12    diplomatic immunity defense, depending on what the subjective

13    characterization of nefarious actually means.

14         Similarly, after more pushing, the government told us

15    that they -- that the DEA corroborated.  We don't know how they

16    corroborated -- that Mr. Saab had met with an Iranian

17    delegation in Venezuela, that they believed that they had gone

18    together to a gold mine, and that they would be travelling

19    together after that back to Iran.

20         And, we know that they didn't travel together to Iran,

21    your Honor, because Mr. Saab was taken off the plane and there

22    were no Iranians on the plane.  But, this information is

23    obviously central to our argument, material to our argument,

24    that he was acting as a diplomat, negotiating an exchange of

25    coal for oil and fuel and other things with Iranian diplomats

1    and officials.

2         They refused to give us underlying documents related to

3    that.  I think they said no new documents exist, which I find

4    very hard to believe, your Honor, that nobody took notes,

5    nobody wrote this down, there are absolutely no documents

6    whatsoever.

7         Given a case of this magnitude, quite honestly, given

8    any criminal case where, you know, there is -- there is an

9    obligation by the government to keep records and make sure that

10   all materials is turned over to the defense, that is relevant

11   material and Brady.  But, again, details are lacking.

12   Substance is lacking that can make a difference to us in terms

13   of the presentation we make to this Court.

14        And so, once again, we would ask the Court to order

15   them to turn over not just the summaries of the unclassified

16   materials contained in that letter, but any other like

17   documents related to that.

18        When we were before your Honor last time, we also

19   mentioned that they had told us that there existed a DEA

20   report, DEA 6, of a source information that is summarized for

21   us, in that letter.

22        And, the Court asked, and they agreed to turn over to

23   us a redacted version of that DEA 6 report.  And, they did.

24   And so we are grateful for that, and we are grateful for the

25   Court's encouragement there.  But, they also told us in the

1    letter disclosure that that source of information later

2    essentially changed what he told them, perhaps recanted what he

3    told them about Mr. Saab and what he was doing.

4         They haven't turned over that DEA 6 report to us, your

5    Honor.  All we know is what they told us in the letter.  So, we

6    would ask for that, as well.

7         And then, finally, the government has made clear to us

8    that even within the prosecution team, what they consider to be

9    the prosecution, the narrower confines of, you know, the

10   prosecutors working on this case, the DEA and the FBI, what

11   have you, that they are not searching through emails.  They are

12   not searching through texts.  They asked the lead DEA agent and

13   task force officer to look through their communications and see

14   if there is anything there.  And, there was nothing there,

15   apparently.  But, they have not gone broader with that.  And,

16   that is not sufficient in this day and age.

17        There has been a number of relatively high profile

18   cases out of -- you know, the Southern District of New York

19   where there have been -- and I am not saying this is the case

20   here, your Honor, but there turned out to be significant Brady

21   violations that were revealed when emails among the prosecution

22   team were ultimately turned over.  It simply is not sufficient

23   for the government to look at official reports and memorandum

24   and things like that, and not look at emails and texts and

25   other communications to see if there is Brady material.  Maybe

1    there is nothing.  But, they have to at least do the search,

2    your Honor.  And so, we would again ask the Court to order them

3    to do that as part of their Brady and Rule 16 obligations.

4           Now, I think I have exhausted all my documents that --

5    I was speaking for a long time.  Unless the Court has any more

6    questions, at this point, I would yield to the government.

7           THE COURT:  Okay.  Thank you.

8           And who is going to make the argument for the

9    government?

10          Mr. Kramer?

11          MR. KRAMER:  Yes, your Honor.

12          THE COURT:  I am trying to figure out like why are we

13   here today, this far down the road in these discovery disputes

14   if your position is, "Well, Maduro is not a legitimate

15   government, there's no way the guy could have had diplomatic

16   immunity, the government of Cabo Verde has already decided

17   there is no diplomatic immunity, so the issue is a dead issue."

18          So, several months ago, should you have made that

19   statement then, I would say, "Good, I will deny their motion

20   and there is no reason for anyone to look for any documents."

21          So, why are we even here now?

22          Where did this idea finally come up about -- that the

23   issue is already decided, there is no reason for discovery?

24          MR. KRAMER:  That -- well, part of it, your Honor, is

25   there is no motion before the Court.  Defense counsel has not

1    filed a motion to dismiss.  We would have happily made these

2    arguments in response, if there were any such motion to

3    dismiss.

4         I think it is conveyed in their motion we had

5    previously expressed to them that we did not believe any of

6    these materials would be Brady.  We made those statements to

7    them early on.  They sent us some documents or some emails as

8    to why they thought it would be Brady, but there was not a

9    motion for us to respond to or to provide any brief to the

10   Court before this Motion to Compel was filed.

11        THE COURT:  Yes, but we have had several hearings where

12   we talked about documents that you have to give them.  And, in

13   anticipation of their motion, why wouldn't you say, "Judge, we

14   don't have to give them anything," from the get-go?

15        Why have you agreed, months ago, "Oh, we are going to

16   other agencies for the information."

17        Why would you have agreed to do that if the answer is

18   "There is no reason for us to do it"?

19        Why are we even this far down the road, which we should

20   never have taken one step down, if you are right about that?

21        MR. KRAMER:  And to the extent -- that is a fair

22   critique.  We should have raised it.  Perhaps we should have.

23   We will take that on the chin, if you will.

24        But, I think the point is, when we did have these

25   requests made of us, we looked at them, and we did say we did

1    not believe any of these were Brady.  But, instead, out of an

2    abundance of caution, in an effort to be helpful, we said we

3    would conduct limited searches, which is what we did.

4          We have finished up some searches, and those materials

5    are being reviewed by the stakeholders for any privileged

6    potential claims.  And, we will provide those documents as soon

7    as they are done with that review.  I think our view is that

8    once the Motion to Compel came up, once they continued to push

9    on documents we are not in possession of, custody of, control

10   of, and they filed that motion, at that point in time, the

11   government's position is that these materials, one, are not in

12   the possession, custody, or control of the government, but two,

13   on a broader level, are not Brady and are not material for

14   those reasons.

15         To the extent the government should have raised those

16   with the Court beforehand, we apologize to the extent we wasted

17   its time.  But, being part of what -- due to the fact there was

18   no motion before the Court, there was nothing.  And, as we

19   stood here, it seemed odd to file what seemingly would be an

20   opposition to a motion to dismiss before a motion to dismiss

21   was filed.

22         THE COURT:  Okay.

23         MR. KRAMER:  On the issues, things we can address, I

24   have covered, to some extent, whether or not there is a Brady

25   or Rule 16 here.  And, the first questions -- I am happy to

1    answer questions of the Court there, but I do think that the

2    main argument to that, that the government has is the fact that

3    the types of immunity that Mr. Saab, at this point in time, can

4    claim, the ways he can say it is material is in some way,

5    shape, or form Brady-discoverable are, one, that extradition

6    from Cabo Verde was somehow invalid.  And, as we put before the

7    Court before, we believe that the Court is precluded from

8    making that analysis based on the Acting State Doctrine.

9             And, to the extent the Court were to look at that, we

10   are really under more of an extradition-type analysis, or the,

11   you know, various doctrines that arise from that.  There is no

12   conduct here that is even alleged that could be so shocking to

13   the conscience when compared with forceable abductions that

14   have been upheld and stayed by the Court that says due process

15   is afforded to the defendant if he is allowed to litigate and

16   defend his claims here in the United States, regardless of how

17   it is that he came into the United States and the Court's

18   jurisdiction.

19            And then to the extent that he is claiming immunity

20   while here in the United States, whether it is in transit or

21   any other type of immunity, I know Mr. Saab has, at various

22   times in his proceedings in Cabo Verde, before this Court, as

23   -- seeking entitlement doctrine argument is whether they could

24   specially appear in court in the 11th Circuit and argue as to

25   the various different types of immunity he may have.

 1          The full stop answer to some of those questions as to

 2    whether or not they exist here in the United States is that the

 3    United States does not recognize the Maduro regime and,

 4    therefore, any immunity of an individual provided -- or excuse

 5    me, any immunities for a diplomat that existed by that Maduro

 6    regime would not exist here in the United States because we --

 7    as a matter of the executive, do not recognize the Maduro

 8    regime.  We recognize the Guaido government of Venezuela.  And

 9    therefore, that person, in this case, Mr. Saab Moran, even if

10    he were to have any kind of diplomatic immunities -- excuse me,

11    any kind of diplomatic status for the Maduro regime would not

12    have diplomatic immunity protection here in the United States.

13          Defense raised an issue as to why we set the 11th

14    Circuit first we felt that he needed it a building the record

15    here in this proceeding, and we did not think that there was

16    any material that could show he was a diplomat.  I think the

17    reason for that is -- a number of different factors, your

18    Honor.  For one, when this Court had the case on the motion to

19    specially appear, which it dismissed -- and I'm repeating --

20    the disentitlement doctrine, the courts of Cabo Verde had not

21    finally ruled on the extradition.  So, we wanted to put

22    materials related to their decision so the Court could have all

23    those opinions, final orders from the court.  We were also

24    seeking to potentially call, and are still going to try to -- I

25    don't know if we were having a difficult time maybe getting the

1    witnesses to be able to show up here in the United States.

2         And, my colleague, Mr. Lunkenheimer, will speak about

3    that at a later time.  But, we intend to put on witnesses to

4    discuss those rulings and also to discuss some of the facts

5    that those rulings were based off of to give additional

6    information to the Court regarding the documents Mr. Saab had

7    on him at his arrest, the fact that he was not traveling on a

8    diplomatic passport, things of that nature.

9         And, I have provided some of the analysis basis for the

10   Cabo Verde court's decisions.

11        So, to say that we weren't going to provide -- and I

12   don't think there was information to put forth to the Court, to

13   put on the record -- I don't think is entirely accurate, even

14   if you did not believe this issue of him being a diplomat was,

15   in fact the -- you know, the matter that the Court could

16   dismiss or should rule on.

17        And, I think the next thing we really want to focus on

18   here, your Honor, regardless of those -- there is also this

19   issue of the prosecution team and the expansive nature --

20        THE COURT:  The what?

21        MR. KRAMER:  The prosecution team, and the expansive

22   nature of what Mr. Saab Moran's counsel is asking us to look at

23   here.

24        First, we all know that we did, earlier on, say we

25   would look at materials from the Office of International

1    Affairs within the Department of Justice.  There is a civil

2    division attorney that assisted with some of their analysis,

3    and have looked at that person's documents, as well; as well,

4    we requested unclassified documents from the State Department,

5    which we are now in possession of, and the government's

6    position is we are in custody and control of those documents.

7    So, we are not here to dispute whether or not those are in

8    custody and control of the prosecution team.  But, once we get

9    outside that, I think, you know --

10          THE COURT:  So, let's start with those.

11          When are those going to be produced?

12          MR. KRAMER:  So, the documents from OIA and the civil

13   litigation attorney have been reviewed by the prosecution team.

14   We have provided those to the stakeholders to make any

15   privilege claims, and have been told by them that they will be

16   able to provide either the documents and/or privilege log with

17   any potential redactions by the end of this week, by Friday.

18          THE COURT:  That being the 16th?

19          MR. KRAMER:  Correct.

20          THE COURT:  Okay.

21          MR. KRAMER:  With the Department of State materials, we

22   have just received --

23          THE COURT:  So, that means by Friday, you are going to

24   get them, and you will give the nonprivileged claim documents

25   to the defense when?

1          MR. KRAMER:  Presumably, on Friday, as well.  I think

2     that is a relatively small subset of documents.  If there is

3     any redaction, I would say Monday, at the latest.  But, we

4     would endeavor to get those very quickly.

5          THE COURT:  Okay.

6          MR. KRAMER:  With the State Department documents, we

7     only just obtained access to them on Thursday of last week, so

8     it was just a couple of days ago.

9          THE COURT:  How many pages?

10         MR. KRAMER:  So, we are still trying to assess.

11    Mr. Lunkenheimer has looked at some of them, believes we

12    received an initial estimate of over two thousand documents.

13    We have gone over the files we received, and it looks --

14    actually, there's 600 or so, or just -- so, I don't want to

15    commit to an actual number, but it is in that range, your

16    Honor.

17         They are currently on a platform that is not reviewable

18    by -- only reviewable by Mr. Lunkenheimer and I, not viewable

19    by the greater group of contract attorneys we discussed at the

20    last hearing to help us get through the materials more quickly.

21    We are trying to see how to get you the documents in a quick

22    manner.  But, right now, it is -- without knowing what we are

23    going to do, it is hard to estimate exactly when we believe we

24    will be able to have that done by.

25         THE COURT:  Give me an estimate.

1        I mean, you obviously think I can read 24 pages plus

2    300 pages of attachments within a few hours.

3        MR. KRAMER:  To be fair, your Honor --

4        THE COURT:  I am asking you to rely on your abilities

5    to read the same amount of material in the same amount of time.

6        MR. KRAMER:  Your Honor, as you know, the Court gave us

7    until Monday to respond, and we would have asked defense

8    counsel if they wanted to reply, or whether or not they just

9    wanted to have the hearing and we could set it the next day.

10       We, of course, would have preferred some time for the

11   court to digest our filing.  But, you know -- and we recognized

12   fully, because we were -- the clock was ticking down yesterday,

13   and the longer it went, the less likely the Court would have to

14   fully dive into it.  So, as you know, we recognize that.

15       THE COURT:  Okay.

16       MR. KRAMER:  Your Honor, you know, and estimating right

17   now, if it remains that only Mr. Lunkenheimer and I are able to

18   go over these documents, recognizing there is a relatively good

19   range as to what could be in there, I think it would take us

20   two to three weeks to review those materials.  The hope, again,

21   is that we would be able to get them onto a platform so we

22   could do so more quickly.

23       THE COURT:  Seriously, how could it take two to three

24   weeks?

25       You can read it.  You can go through and see what's in

1    there, generally.  Okay?

2         You can probably, very quickly, a day or two days, see

3    if there is stuff that has nothing to do with any of the issues

4    that might be Brady.  Or, oh, there are some things that might

5    be, but now we are aware if it is privileged or classified.

6    But, two weeks just to look at the stuff to see if there might

7    be something there seems like a lot.

8         MR. KRAMER:  It is 600 to two thousand in documents,

9    not pages, your Honor.  I agree, if it were pages, we could get

10   through that.  But, there are documents with various lengths.

11        THE COURT:  But, that is what my question was.  How

12   much stuff is there?

13        MR. KRAMER:  And, based on the platform it is in, your

14   Honor, it is -- I mean, Mr. Lunkenheimer has had more access to

15   it, so I will just let him speak.

16        MR. LUNKENHEIMER:  Your Honor, I've been reviewing

17   these since we got them.  There are approximately 600 documents

18   or files.  They can be either PDFs, that some range from four

19   pages, some range up to 22 to 25 pages.  There are also emails.

20        And so, in this platform, we are looking through those

21   pages to find any reference to Mr. Saab.  I think I have been

22   able recently, last night, to find a way to be able to search

23   for his name in some of those documents.

24        We are just trying to give you a realistic timeframe

25   with everything else we have going on in other cases, in this

1   matter, there is -- if the motion to dismiss was filed, and any

2   other reviews we have.

3        But, it's -- the platform is -- it is web-based.  We

4   have to go in -- it is not something that I can just click to

5   the next document.  I have to pull out that document to keep --

6   to keep track of what I am reviewing because there is no

7   tagging system.  I then have to copy the name of the document

8   into a -- keep track of it so we are not -- so Mr. Kramer and I

9   are not wasting time reviewing the same documents.  That is

10  where the estimate came from, your Honor.

11       As we said, we would like it to be sooner.  We will

12  work with State, as he said, to transfer that to an easier

13  platform to provide access to our contractors with that.  But,

14  that is the issue.  It is just not as user-friendly as some of

15  the other documents we reviewed, databases.

16       THE COURT:  Okay.

17       MR. KRAMER:  That is what we have, the documents we

18  have.  And, as we move forward, I think it is this -- again,

19  this issue of the very expansive nature of what they are asking

20  us to get.

21       THE COURT:  You say it is very expansive.  But, this is

22  one trip this guy took, and the question is whether that trip

23  was part of some diplomatic mission.  So, there might be a

24  world of investigation of, you know, Maduro, whatever is going

25  on.  But, Mr. Saab's role within that, and whether it is a

1    diplomatic role -- it can't be that hard to, like, ferret out

2    this information from among all these others documents.

3         MR. KRAMER:  Mr. Saab, in his discussions with us and

4    his counsel asked us to review materials of any potential trips

5    or records toward Mr. Saab acting as a diplomat from April of

6    2018 until his extradition in October of 2021.  So, this isn't

7    simply a request of materials related to his information just

8    on this July -- excuse me, June 12, 2020, trip.

9         It is related to any and all knowledge of Mr. Saab

10   acting as a purported diplomat or doing any kind of conduct on

11   behalf of the Maduro regime related to Iran, China, Russia --

12   or any of the countries they highlighted -- related to oil,

13   food, any reasonable program.

14        So this is not a very small, discrete request.

15        And, they are asking us to do that across the

16   Department of Defense, the Department of Treasury, the

17   Department of State, at some point in time, in one of the

18   letters, they asked for the Coast Guard.  They have now added

19   the National Security Division.

20        Obviously, we have already looked at OIA.  They added

21   Interpol.  They added the Special Operations Division of the

22   DEA, which is a multi-agency division, which has participation

23   from over 30 state, federal, foreign law enforcement and

24   intelligence agencies.

25        I mean, these are not -- the requests here are said as

1    though it is just one thing we can look at, is Mr. Saab a

2    diplomat?

3         But, anyway, your Honor, that is not how it works.

4    They are asking for a wide cast of a fishing net; any

5    information about Mr. Saab acting in any way, shape, or form as

6    a diplomat, and they are asking for agencies that have had

7    nothing to do with Mr. Saab's actual prosecution or the

8    investigation into Mr. Saab.

9         I mean, these agencies were not controlled, were not,

10   you know, the prosecution team, the fraud section, the Southern

11   District of Florida, US Attorney's Office for the Southern

12   District of Florida had no role in overseeing, you know --

13   excuse me, these agencies were not part of our investigation.

14        To the extent they were, to the extent the DEA, FBI,

15   ICE and HSI were groups that happened to have involvement, we

16   have searched those materials.  We have looked at those

17   documents.  But, that related to the actual --

18        THE COURT:  Those are all part of the executive branch?

19        MR. KRAMER:  Yes, your Honor.  All part of the

20   executive branch.

21        THE COURT:  So, you want me to rely on the executive

22   branch's decision and say, "Well, they say they don't recognize

23   the Maduro regime.  Therefore, you don't have to do anything,

24   Judge.  But, don't look at all these other documents or

25   information within the executive branch that may have some

1    indication of what Mr. Saab's diplomatic status is"?

2          MR. KRAMER:  I think, your Honor, those are two

3    different issues.  One is providing deference to the executive

4    in deciding which sovereign government entity they can formally

5    recognize, which is a very different question than whether or

6    not the entirety of the executive and all of the different arms

7    of executive may have had information about Alex Saab.

8          And, the question is simply whether or not the Maduro

9    regime is recognized as a foreign sovereign, which this country

10   presented to the executive, it is not.  And, that is, I think,

11   a very different question as to whether or not that is, is one

12   piece versus do we look under every single arm of the executive

13   for information, potentially related to Alex Saab, with, you

14   know -- other than some relatively far stretches in motions

15   saying that they had some involvement with -- involvement with

16   the prosecution team, and -- which I just don't think are

17   supported, even in their own motion.

18         I mean, if we look to the different items or the

19   different focuses of their case, the DOD is above where Mark

20   Esper, the former Secretary of Defense, said that, you know,

21   Mr. Saab was reportedly a diplomat.  He wrote this book some

22   23 months after Mr. Saab was, you know, extradited and calling

23   himself, purportedly, a diplomat.

24         I don't think that necessarily indicates any

25   significant knowledge or involvement by the Department of

1    Defense in the prosecution team, or involved by the Department

2    of Defense in investigating him for claims that were indicted

3    in 2019.  The fact that two boats were sent, or a couple of

4    boats were sent to potentially prevent what was feared as a --

5         THE COURT:  So, your position is that there is a branch

6    of the government -- and we have one United States government

7    -- so, if there is a branch of the government that has Brady

8    material that absolutely exculpates the defense, if they are

9    not part of the prosecution team, that you don't have an

10   obligation to turn it over to the defense?

11        MR. KRAMER:  If we were to know about it, we, of

12   course, would.

13        If we were to absolutely know the document existed, I

14   think that would be a different question.

15        But, to the extent we have to search materials

16   contained in every other agency of the executive, no, I do

17   not -- it is the government's position that we do not have

18   custody, possession, or control over those documents, and that

19   we are not obligated to conduct that search across the entirety

20   of the executive, and every potential agency thereunder.

21        It would be limited to that of the prosecution team.

22   And, to that end, you know, we cite a number of cases, and a

23   number are within the Fifth Circuit and 11th.

24        Rule 16A applies only to materials within the

25   possession, custody, or control of the government, and that --

1    courts have found possession, custody, or control of the

2    government entity requirement to produce materials on hand or

3    in the custody of the governmental agency closely connected to

4    the prosecutor -- that is United States versus Scruggs, 583 F2d

5    238, Fifth Circuit --

6         THE INTERPRETER:  Counsel, for the sake of the

7    interpreter, could you please slow down.

8         MR. KRAMER:  The Fifth Circuit has held that Brady and

9    its progeny applies to evidence possessed by the District

10   prosecution team.  And that is United States versus Antone, 603

11   F2d 566, also Fifth Circuit.

12        And, then the 11th Circuit held, in the United States

13   versus Meros, the same approach in identifying that Brady

14   applies only to information possessed by the prosecutor or

15   information over whom he has authority.

16        Cases cited in this district do certainly give --

17   expanding on the idea of the prosecution team, in the New York,

18   2nd Circuit, United States versus Locascio, "One government

19   entity's possession of favorable information should not

20   necessarily be imputed to another.

21        "The prosecutor's knowledge, simply because some other

22   government agency -- excuse me -- we will not infer prosecutor

23   knowledge simply because the government agents knew -- because

24   some other, excuse me, government agents knew about

25   information."

1          And --

2          THE COURT:  But isn't that -- we don't have that here

3     because you have things like Esper's book.  So, now we know

4     that there may be information in that department.

5          It is not like you don't know.  I'd understand if you

6     had no information that these other departments had anything to

7     do with Mr. Saab, or any information.  But, it appears from

8     press releases of those agencies, themselves, that they have

9     information, and now you are aware that they have it.  So, that

10    principle really doesn't apply.

11         MR. KRAMER:  I don't think it does, your Honor.  We are

12    not aware that they have any information.  There are press

13    releases and press reports and books out there that say those

14    departments had some knowledge of Mr. Saab.  But, certainly not

15    related -- it doesn't put them in the confines of the

16    prosecution team for having any involvement in the prosecution.

17    That -- Mr. Esper's book talks about Mr. Saab in Venezuela,

18    Iran.  But, certainly, there are no indications that there was

19    any discussion or communication or control by the prosecution

20    team in -- you know, in the investigation steps to qualify

21    Brady.

22         And when -- you know, as for Mr. Esper's book, as to

23    OFAC, there is simply a reference that in OFAC, there was

24    sanctions on Iranian oil that were around the same time.  OFAC

25    is a separate agency.  A separate, you know, standard in order

1    to produce sanctions or create sanctions.  They obtain

2    information from other investigative agencies.  But, I don't

3    believe there is anything in those press releases that say they

4    work with the Department of Justice Fraud Section or Southern

5    District of Florida.

6              THE COURT:  Let's assume the fact that he is charged

7    with a crime.  His defense is, "I couldn't have" -- and the

8    crime happened in Miami, in the Southern District of Florida.

9    And the defense is, "I could not have committed that crime

10   because I was in Venezuela during that time."

11             And the defendant had to be physically present in the

12   United States to commit the crime.  Okay?

13             And then you hear from the Department of Defense and

14   Department of State and the Department of Treasury that they

15   have press releases, they have books written by the heads of

16   those departments, they have other information saying that it

17   is correct, "Oh, this defendant was in Venezuela at the time of

18   the crime."

19             You are telling me the government would have no

20   obligation to turn that over to the defense because it is not

21   part of the prosecution team?

22             MR. KRAMER:  To the extent the defense is claiming that

23   that information is already out there in this book, that they

24   have access to that book -- what they are saying is that

25   because there is this book by a former secretary of Defense,

1    therefore, there must be a litany of information contained

2    within the files of the Department of Defense, as well.  And,

3    we have to go searching through the Department of Defense.

4          With OFAC and the Treasury, they said that because they

5    were -- because OFAC made sanctions against Mr. Saab,

6    therefore, they must have the documents related to his

7    diplomatic immunity.  I mean, those things -- yes, there was a

8    seizure --

9          THE COURT:  But, all the discussions of him in those --

10   in those agencies relate to his status as some kind of --

11   whether the word 'diplomat' is used, he is doing work on behalf

12   of the government of Venezuela.

13         So, it certainly relates to that issue.  It is not some

14   fishing expedition or, you know, this, "Oh, Mr. Saab was in

15   Venezuela.  Oh, he must be -- then we want all of the records

16   from the Department of Defense saying, 'We know he was in

17   Venezuela.'"

18         It goes to a lot more specific information related to

19   issues that are in contention here.

20         MR. KRAMER:  To the extent that the Department of

21   Defense's book or Mr. Esper's book talks about his role as a

22   Venezuelan democrat may be one thing.

23         But, if you look at the other agencies, in particular,

24   your Honor --

25         THE COURT REPORTER:  I am sorry, counsel.  If you could

1    please slow down --

2            MR. KRAMER:  Sure.

3            When you look at the other agencies, that is not

4    necessarily true.  With the National Security Division, the

5    insinuation is that because the NSD was involved in seizing

6    Iranian oil tankers, and they worked with the U.S. Attorney's

7    Office in D.C., that because Iranian oil tankers, in the

8    defense's view, relate to Alex Saab because there was some

9    amount of time, you know, contemporary -- that happened four

10   months after Mr. Saab was detained in Cabo Verde, that

11   therefor, they must also have material related to Mr. Saab,

12   even though he was not a part of any of the press releases or

13   information about the seizure of those oil tankers --

14           THE COURT:  Well, the defense's motion is -- on

15   Page 17, it says, "OFAC has confirmed in other instances that

16   when increasing pressure on Mr. Saab and his network, it

17   closely thwarted actions with the DEA and CET, among other U.S.

18   government departments."

19           So, it is not just mentioning oil seizures.  It's as to

20   Mr. Saab's involvement.

21           MR. KRAMER:  I was referencing the NSD section of the

22   National Security Division -- Section.  There are a lot of

23   differences, I agree.  But, in the NSD Division, there is not

24   -- but yes, the OFAC press release references Alex Saab and

25   that the sanctions related to --

1         THE COURT:  So, let's get to the bottom line.

2         What is it you think I should rule on in the Motion to

3    Compel?

4         What is the specific ruling I should make?

5         MR. KRAMER:  Your Honor, the government believes

6    that -- the position is that one, material that they sought is

7    not necessarily Brady or Rule 16.  So, it is not material, and

8    therefore, we should not cover it.

9         But, what's more, that the Court should not expand the

10   prosecution team and, therefore, deny an order compelling us to

11   look for materials within the National Security Division, OFAC,

12   the Department of Defense, the SOD, the Interpol -- and I am

13   trying to remember the exact last one they stated, your Honor.

14        So the -- yeah.  NSD, Treasury, OFAC, Department of

15   Defense and Interpol and Special Operations Division should not

16   be compelled to search outside the prosecution team for

17   materials that the defense requests.

18        THE COURT:  Okay.  Thank you.

19        Mr. New, what is the specific language for your order

20   that you want me to give if I rule in your favor on this

21   motion?

22        MR. NEW:  Thank you, your Honor.

23        It would be a two-part order; in essence, one would be

24   to set specific deadlines for them to produce the documents

25   they have agreed to produce, which are the remaining DOJ

1    documents, including OIA, and the civil division attorney and

2    State Department documents.  So, a firm deadline for those.

3           And then we would also ask the Court to compel them to

4    search for documents relevant and material to our diplomatic

5    immunity defense in the possession of DOD, OFAC, and then

6    within DOJ, the National Security Division, Interpol and NCP is

7    one entity, and SOD.

8           And, if I may, your Honor, make one brief comment on

9    something that Mr. Kramer was talking about in response to your

10   question.

11          We did also, in terms of the breadth of the search they

12   need to do, we met with the government and discussed with them

13   potential search terms that I believe they ultimately used to

14   try to narrow down the focus on these documents.  So, it wasn't

15   so wide-range.

16          We continually offer to do more to work with them to

17   make that happen quickly, refine the search terms.  So, we are

18   still open to doing that.

19          This should not be a wide-ranging, voluminous search.

20   Yes, there are a lot of agencies here.  But, this is a unique

21   case.  And, it is such a high profile case that has touched on

22   so many agencies, and we -- although they touched on these

23   agencies because it is public knowledge and press releases and

24   whatnot, but, that doesn't mean that the search has to be

25   wide-ranging.  It can be narrower.

1          We have offered search terms.  It has clearly narrowed

2     down their search for OIA documents as well as State Department

3     documents.  We think similar things can happen with regard to

4     the other agencies, as well.

5          THE COURT:  All right.  One second.

6          MR. RIVKIN:  If I can speak briefly, your Honor --

7     really, relative to the 16 pages of DOJ's filing in opposition

8     that came in last night, on your Honor's questions, a lot of it

9     goes to the merits, which I don't think was the right time to

10    do it.  But, just to be helpful to the Court, I wanted to

11    correct a couple of misstatements.

12         First of all, we have never sought, your Honor, any

13    relief pertaining to the extradition, as such.  This is both

14    because we fully appreciate that there are serious issues with

15    the Cabo Verde court decision --

16         THE COURT REPORTER:  Counsel -- counsel, if you could

17    please speak closer to the mic.

18         MR. RIVKIN:  Our position has been consistent, both

19    before your Honor, in special appearance mode, we seek to quash

20    the indictment.  Obviously, the DOJ knows perfectly well we are

21    going to file, in the opening brief, a motion to quash the

22    indictment.

23         That is sort of Point No. One.

24         Point Number Two, the significance of the Capo Verde

25    decision, actually, taking into account your Honor's question,

1    our view of the significance of the Capo Verde decision is

2    zero.  We know of no deference doctrine that would compel this

3    Court to, even assuming that Capo Verde was decided on the

4    merits -- immunity, which is far acting -- but, even if that is

5    the case, we know of no document that would compel this Court

6    to take this into account since Capo Verde was obviously

7    applying its law, interpreting its international obligations.

8            U.S. obligations -- and I want to stress this point

9    very clearly.  U.S. obligations and its reading of a 1961

10   Convention under the Diplomatic Relations Act, under the

11   binding precedent in the 11th Circuit are entirely so -- they

12   are not derivative of and not contingent upon the Cabo Verde

13   court's finding.

14           So, we find this argument strange.  And, frankly, the

15   Acting State Doctrine is completely an option here.

16           And, two other quick points.  We understand what the

17   DOJ is saying about the recognition policy, and there is no

18   reason to get into the finer distinction between your

19   recognition and de facto recognition.  But, suffice it to say

20   that, recognizing the presence and plenary power, recognition

21   of foreign governments, it matters in the context of the

22   diplomatic credit to the United States.

23           It is an undisputed fact that Venezuela, the sending

24   state, and Iran, the receiving state, not only recognize each

25   other's government, they recognize that Mr. Saab is a special

1    envoy.  U.S. obligations, in that context, accord him interim

2    or diplomatic immunity, are completely independent upon the

3    U.S. position as to which government of Venezuela they

4    recognize.  To hold otherwise would completely distort and rob

5    of any meaning both the U.S. obligations and the Vienna

6    Convention and the Diplomatic Relations Act.

7           And, as we argued before, it would be devastating to

8    the diplomatic world.

9           One final point:  The DOJ is making an argument --

10   which I think is strange -- that even if Mr. Saab, accepting of

11   everything you say, his diplomatic immunity was -- somehow has

12   lapsed, diplomatic immunity, Your Honor, accrues from the date

13   the diplomat leaves a sending state, goes to the receiving

14   state and conducts his business, and comes back.

15          To hold otherwise, basically, would say you can

16   interrupt someone's diplomatic mission, pull this person out of

17   a process and say, "Well, he is no longer going to be a

18   diplomat.  He is not carrying out his mission."

19          That would be an absolutely bizarre reading of the law.

20          Thank you, your Honor.

21          THE COURT:  Okay.  So, let's take a 20-minute recess

22   and we will come back and do the CIPA section.

23          So, see everybody in 20 minutes.

24          (Brief recess.)

25

```
1              THE COURT:  Thank you.  Be seated.
2              MR. NEW:  Your Honor, I apologize.  The defendant is
3    not present for this.
4              THE COURT:  No?  He should be.
5              They are getting him.
6              MR. NEW:  Thank you.
7              THE COURT:  Back on the record.
8              So, we are back on Mr. Saab Moran's case, the hearing
9    and pretrial conference for Section 2 regarding the Classified
10   Information Procedures Act.
11             So, I guess the first question is does the government
12   intend to use any classified information in the case?
13             And we will start with that.
14             MR. KRAMER:  Your Honor, sure.
15             At this point, your Honor, the reason -- in our Section
16   2 notice, we said we did not necessarily know if we needed to
17   have a hearing yet.
18             At this point, we do believe that we may engage in the
19   CIPA process, and that we may be seeking to substitute or
20   delete from discovery under Section 4 at a later time.  But, at
21   this juncture, we do not believe the government will be using
22   nor will we necessarily be producing any classified materials
23   in the case --
24             THE COURT:  Okay.
25             MR. KRAMER:  -- to the defense.
```

1          THE COURT:  All right.

2          And does the defense believe that it has classified

3     materials that it intends to use?

4          MR. NEW:  Your Honor, at this time, the defense is not

5     in possession of any classified materials.  Again, the

6     government is -- we hope, is going to be engaging in discovery

7     on the topics that we believe are material to our defense, and

8     we may receive classified materials in some form.

9          At this point, your Honor, I think until we know what

10    the schedule is the government is going to abide by, when it is

11    likely to turn over materials to us, what the nature of those

12    materials are, all the reasons to have this hearing today, your

13    Honor, I don't think we can definitively say what we intend to

14    do at the hearing.

15         But, at this point in time, we are not in possession of

16    any classified materials, so we cannot use any classified

17    materials.

18         THE COURT:  And, if the government, eventually, is

19    going to use classified information, do you know, at this time,

20    whether those are only going to be presented to the Court ex

21    parte, or are you going to share them with the defense?

22         MR. KRAMER:  Thank you, your Honor.

23         Because from where we are at this point in time, we

24    believe that we will be seeking to either substitute or delete

25    the materials, via Section 4, that would mean that to the

1    extent there is any materials provided, at this point, that

2    would be rather unclassified or substituted, so it would not

3    result in any kind of classified discovery to the defense.

4         If, obviously, that changes through the course, then

5    you know, we would go down that process then.  But, at this

6    point in time, we do not believe there will be classified

7    discovery, or have no reason to believe there would classified

8    discovery in the matter.

9         THE COURT:  Okay.  And for general planning purposes,

10   if there is classified information and it is shared with you,

11   either the government or by -- or by -- either by the

12   government or -- it takes -- I was just meeting with one of the

13   people in the securities section.  So, it takes 60 to 90 days

14   to do an expedited clearance.  Obviously, the more people that

15   are involved, the more expensive it is for the government, and

16   the more time-consuming, so that if you identify, like, a

17   smaller number of your team that -- one or two lawyers, and a

18   paralegal or something that would be part of the classified

19   information team, to get to that --

20        MR. NEW:  Yes, your Honor.  We have had some brief

21   discussions about this.  And Mr. Schuster, Joseph Schuster has

22   left the U.S. Attorney's Office less than two years ago.  It is

23   my understanding that because of that, a full background check

24   would not be necessary to reinstate his security clearance, and

25   that could be done on an expedited basis.

 1          So, at this point, I think, by default, Mr. Schuster

 2   would be our primary person to review the classified materials.

 3          THE COURT:  So -- I am still trying to understand.

 4          So, the government's position is right now, you are not

 5   intending to use any, depending on what my ruling is on the

 6   Motion to Compel.  If that compels you to find other documents,

 7   and you later learn that some of those are classified and you

 8   may either -- they are subject to my review, or you use them,

 9   yourself, you will notify me, at that point?

10          MR. KRAMER:  Correct, your Honor.

11          And, I do think it is important for the Court to know

12   we are engaged in prudential searches at this time; regardless

13   of the prior discovery point, the government has started to

14   conduct prudential searches across --

15          THE COURT:  What, credential?

16          MR. KRAMER:  Prudential.  Prudential searches in the

17   way in which we look across the different agencies within the

18   intelligence community at this time.  We are still in that

19   process.  And, the best estimate, we have talked with folks who

20   have more experience in this.  I think this may -- their

21   suggestion is that there be another hearing like this in

22   approximately 45 days where we could provide the Court, at that

23   point, a more perhaps detailed idea as to when we would be in a

24   position to file a -- anything pursuant to Section 4 to receive

25   them.  And, obviously, to the extent we identify that we can do

1    that earlier, we would, of course, notify the Court so we can

2    speed that process up.

3            THE COURT:  You have a hearing in 45 days?

4            MR. KRAMER:  I understand that the hearing is on

5    October 31st, your Honor.  This just comes down to we have made

6    these requests, we are in the process of receiving information

7    and, once we receive that information, reviewing the

8    information, and then dealing with the stakeholders as to what,

9    if any, potential, you know, issues we may need to deal with as

10   part of the potential Section 4 -- to the extent we identify

11   anything that is relevant.

12           MR. NEW:  Your Honor, I apologize.  I was just -- you

13   know, I am curious about the government's position.  At one

14   point, weeks ago, I may have misunderstood, but I believe they

15   told us that they had, at least, the prosecution team had

16   completed the review or was about to complete the review of one

17   agency's documents, and that they would then have to obviously

18   go back to the stakeholder to decide what to do.  That's why at

19   the last conference -- your Honor initially scheduled an ex

20   parte hearing for yesterday.  I don't understand, if that is

21   the case, why the government can't get a partial report sooner

22   than 45 days as to the timing for its disclosure or Section 4

23   practice with regard to the agency that it has even reviewed or

24   is close to reviewing?

25           THE COURT:  Was that the Department of State?

 1         MR. KRAMER:  No, your Honor.  It was another agency in

 2    the intelligence community that they requested to not speak, to

 3    share more details than necessary in open court.

 4         However, regarding that issue, not just regarding the

 5    name of the agency, but the reason why we do not believe we are

 6    in a position to move forward on that, is any Section 4 related

 7    to this agency, we are happy to provide information to the

 8    Court.  But, in order to do so, we would need to do so in an ex

 9    parte hearing where there was more security so we could provide

10    that.

11         THE COURT:  Okay.  So, let's start with the government.

12         What does the government want me to do now, since there

13    is no classified information as of right now.

14         MR. KRAMER:  Yes, your Honor.

15         At this point, I think having anyone on the defense

16    team get any kind of classification status or filing any kind

17    of protective order or setting potential deadlines for how

18    discovery that is classified might be used via Section 5 or

19    Section 6 is premature because we just aren't in that boat yet.

20         And, as it relates to whether or not we are before the

21    Court on Section 4, which we do anticipate to be, we would

22    request the Court set another status conference under Section 2

23    for 45 days from now so that we would apprise the Court of our

24    timelines regarding our review.  In two days -- and, obviously,

25    if we are able to complete that review in advance of that

1  45 days, we would notice the Court and try to do that more

2  quickly.

3          THE COURT:  Wouldn't that automatically cause a

4  continuation of the hearing?

5          MR. KRAMER:  To the extent, your Honor, that the

6  hearing is predicated on having all potential materials under

7  CIPA completed prior to that hearing, I -- from my

8  understanding, in discussing this with people who have done

9  this much more than we have, there is realistically almost no

10 way we would complete all this information prior to

11 October 31st.

12         THE COURT:  All right.  So, that's -- so, you are

13 saying there's a good likelihood that you are going to use

14 classified information at the hearing?

15         MR. KRAMER:  No, your Honor.  Your Honor, the

16 government, at this point, does not believe we will be

17 attempting to put in any classified material at the hearing.

18         What we are saying is to the extent the defense

19 believes they need to either receive all of the materials that

20 has been unclassified or substituted via Section 4, or to the

21 extent there was material that does wind up being discoverable

22 as classified material, that the process to get there would

23 occur after October 31st.  The government is not intending to

24 put in any classified material as part of the evidentiary

25 hearing.

1          THE COURT:  And, do you have any information now

2    whether there is any classified material that might be Brady

3    material?

4          MR. KRAMER:  Your Honor, I think, based on our view,

5    that we would be seeking to either substitute or delete

6    information that is irrelevant or otherwise unusable under

7    Section 4.  I think that is the most I can say regarding the

8    contents of any documents or information.  We can provide that

9    to the Court in an ex parte hearing where appropriate security

10   is in place.  Or, we are happy to do that at the Court's

11   leisure.  But, we are not in a place to do so now.

12         THE COURT:  All right.

13         What does the defendant want me to order with regard to

14   that issue?

15         MR. NEW:  Well, your Honor, I do think that, as we put

16   in our papers, it is quite common and appropriate for the Court

17   to set a schedule with regard to when the government has to

18   notify the Court and the defendant that it is going to have a

19   Section 4 ex parte hearing, provide information about what the

20   schedule for disclosure would be, and, ultimately, set a

21   schedule for Section 5 or Section 6 notice before the pretrial

22   hearing.

23         In this case, I think the immediate issue is whether or

24   not we can set a schedule for the government to have the

25   Section 4 ex parte hearings.  They have asked for 45 days to

1    tell you whether or not they can schedule that.  I think, your

2    Honor, they can -- they can probably decide now whether or not

3    they are going to have a Section 4 hearing in a month, or two

4    months, or whatever it is.

5           Second, I don't believe that they are correct that they

6    cannot even advise the Court in open court as to the

7    anticipated volume of documents we are talking about.

8           I would note that another judge in this district, in a

9    high profile case, just had to deal with classified

10   information, and it was publically released; not only the

11   number of classified documents involved, but actually, the

12   levels of classification.

13          And so, I don't think that there is any prohibition in

14   discussing right now with the Court what they anticipate it is

15   liable to be.  And, it is important for scheduling purposes,

16   because if they are talking about a handful of documents that

17   are going to be at issue under Section 4, that should be

18   accomplished relatively quickly.

19          If they are talking about thousands and thousands of

20   pages for the Court to review, that, obviously, would take some

21   more time.

22          The other point I would make, your Honor, is to the

23   extent that your Honor is inclined to help expedite the process

24   for renewing the security clearance for Mr. Schuster, we would

25   think that is appropriate at this time so that there are no

1   delays in the future.  It would be unfortunate if there arose a

2   situation 45 days from now, 60 days from now where the

3   government decided that they were actually going to allow for

4   access to the classified materials, and only then would we have

5   to start the process of getting a security clearance renewed.

6   So, we would urge the Court to do that now.

7          The final note I would make, your Honor, is obviously,

8   we want to keep the hearing date if at all possible.  However,

9   if, as it now appears likely, the government is going to be

10  producing unclassified material to us within the next two

11  weeks, regardless of the Court's motion to -- order on the

12  Motion to Compel and whether or not we can get Section 4

13  hearings done shortly after October 31st, I think -- you know,

14  I have to speak to my client, but I think we would be amenable

15  to pushing everything by a month or so, if we were going to be

16  getting materials in advance of the hearing.

17         Obviously, if we are not going to be getting any

18  classified or unclassified, we think that's wrong, and not a

19  proper result, but we would then not have a reason to move the

20  hearing date.  So, it is a little bit of a chicken/egg problem,

21  Your Honor.

22         I was just signaling for the Court that we have

23  flexibility in terms of the hearing date, if the Court is open

24  to it, if the government can commit to a schedule.

25         THE COURT:  Is the government -- is there any way,

1   realistically and reasonably, that you can let me know in

2   30 days about the classified information and how extensive it

3   is, and that way, we can do the Section 4 hearing, and still

4   have the possibility of going forward with the evidentiary

5   hearing, so -- if I am not going to have it turned over?

6        I am suggesting -- I don't want to do something that is

7   not practical.  So, if it is not, let me know.  But, if it is,

8   we can try to keep that date.  I would like to do that.

9        MR. KRAMER:  Your Honor -- and I just want to make sure

10  I understand the question.  So, I think in the first instance,

11  we can absolutely make every one of our best efforts to, within

12  30 days, give you an update as to where we are and hope that

13  would provide you a schedule as to when we think that we could

14  engage in the Section 4 process.

15       However, in terms of still maintaining that October 3rd

16  deadline and doing all the Section 4 process, our understanding

17  is that that engages the intelligence community and the

18  stakeholders in requiring a due process that, realistically,

19  would not be prior to October 31, even if we were able to get

20  access to everything and fully review everything within

21  30 days.

22       And, because there is overlap in the agencies and the

23  information there, it is not so simple as saying one person can

24  decide necessarily on what documents, when they may have --

25       THE COURT:  What is the process, like, 60 days?

1          MR. KRAMER:  That is what?

2          THE COURT:  So that will put us into November.

3    Again -- so it would -- if we do that, if we know, as of

4    November, then I can do a Section 4 hearing sometime in the

5    next couple of weeks after that.

6          If we do move the hearings to December 12th --

7          MR. KRAMER:  That week of December 12th -- I have trial

8    the following week.  But, I can do a hearing for the

9    evidentiary hearing on the week of the 12th, if need be, your

10   Honor, and certainly, if Mr. Lunkenheimer is available, as

11   well.

12         THE COURT:  All right.

13         Mr. New?

14         MR. NEW:  Your Honor, if I may have one moment with my

15   client?

16         THE COURT:  Yes, yes.

17         MR. NEW:  Thank you, your Honor.

18         I think we are amenable to having the hearing pushed to

19   December 12th, with the understanding there would be a

20   corresponding delay in the briefing, as well, that would allow

21   us to incorporate in our briefing any unclassified materials

22   that the government, hopefully, will be providing in the next

23   few weeks.

24         THE COURT:  What is the briefing schedule?

25         So, let's set the evidentiary hearing on December 12th.

1        MR. NEW:  I guess it depends, your Honor.  I know you

2   have not ruled on our Motion to Compel yet.

3        THE COURT:  I will get the order out in the next couple

4   of days.  So -- because I have not fully reviewed the

5   government's response.

6        But, I anticipate that I am going to order them to do

7   something.  I am not -- to produce something, if not everything

8   that you are asking.  So, you will be getting something else --

9        MR. NEW:  Thank you, your Honor.

10       THE COURT:  -- somewhere between what they said they

11   are going to -- already agreed to give you and what you are

12   asking for.

13       MR. NEW:  I appreciate that.

14       And, I am not pushing you for a ruling.  I am just

15   thinking in terms of the timing, if we are talking about

16   classified disclosure within two to three weeks, then we would

17   probably want to push the briefing out by maybe four weeks so

18   that we can incorporate that.  So, that would move it from

19   September 16th to October 16th for our opening brief.

20       THE COURT:  Okay.  So, the opening brief for the

21   defense will be due -- so, opening brief -- so the opening

22   brief is due November -- let's see.  October 16th is a Sunday.

23   So, we will say October 17th is the opening brief, and the

24   government's response --

25       MR. KRAMER:  Sorry.  I apologize, your Honor.  I didn't

 1    mean to be speaking over you.

 2        THE COURT:  So, if they are filing a brief

 3    October 17th, I don't know, off the top of my head, what you

 4    all gave each other for the response and the reply, the last

 5    time.

 6        MR. KRAMER:  I think the last -- at one point in time,

 7    we had four weeks.  But, I think our ruling -- the last

 8    schedule was we had three weeks to respond, your Honor.

 9        MR. RIVKIN:  If I may, your Honor, we can stick with

10    the same interval.

11        THE COURT:  That is what I am asking, what the interval

12    was.  I don't remember.

13        MR. RIVKIN:  I think it was three weeks, your Honor.

14        THE COURT:  So, three weeks would be November 7th, is

15    the government's response.

16        And the reply?

17        MR. RIVKIN:  I believe we had chosen one week, again,

18    to move things along.

19        THE COURT:  Okay.  So, November 14th.

20        MR. NEW:  And your Honor, just to clarify, I don't

21    think the government would object to this.  But, to the extent

22    that materials are disclosed to us after our opening brief, I

23    would ask the Court to allow us to supplement or to add to our

24    reply more than we ordinarily would be allowed to amend our

25    replies, to include those materials.

1            MR. KRAMER:  We do not object to that.

2            THE COURT:  And then, if there is like a reply that had

3    issues that weren't initially there, then the government can

4    have until the 21st for any sur-reply.  That is only if there

5    is new issues raised in their reply.

6            Okay.  So, I will take the issue of the Motion to

7    Compel under advisement, and I will get the order out in the

8    next couple of days.

9            And, as soon as the government knows the status of the

10   information, classified information, let me know so I can set

11   aside time to set up the Section 4 hearing.

12           MR. KRAMER:  Yes, your Honor.

13           THE COURT:  Okay.

14           Anything else we can do this morning?

15           MR. LUNKENHEIMER:  Your Honor, the defense had filed a

16   motion for video testimony.  The Court had ordered us to reply

17   today.  I don't know if you -- we replied yesterday, responded

18   yesterday.  That was the only other pending matter.  I don't

19   know if the Court wants to bring it up --

20           THE COURT:  I am not prepared to discuss that this

21   morning.  Do you want me to set it for hearing?

22           MR. NEW:  We might as well, while we are all here, your

23   Honor.

24           THE COURT:  So, you are anticipating that -- if they

25   file a response, are you going to file a reply?

```
1              MR. NEW:  Yes, your Honor.  We will file a reply within

2      a week.

3              THE COURT:  All right.  That will be the 19th.

4              Do you want to do this on the 22nd of September?

5              MR. LUNKENHEIMER:  I have a hearing in West Palm Beach

6      that morning, your Honor.

7              THE COURT:  The 23rd?

8              MR. LUNKENHEIMER:  Is it possible for the 21st, your

9      Honor?

10             THE COURT:  Yes.

11             Is the defense available?

12             MR. NEW:  Yes, your Honor.  That should be fine.

13             THE COURT:  And what is the name of the motion so I

14     know?

15             MR. NEW:  It is a motion to allow remote testimony, but

16     I don't have the exact --

17             MR. KRAMER:  It is docket -- Defendant's Motion to

18     Permit Witness Testimony By Video Conference.  The initial

19     motion was docket entry 127.

20             THE COURT:  Okay.  We will have a hearing on that

21     motion on September 21st at 9 o'clock.  All right?

22             Thank you again.

23             We will be in recess.

24

25
```

```
 1                        C E R T I F I C A T E
 2
 3
             I hereby certify that the foregoing is an
 4
    accurate transcription of the proceedings in the
 5
    above-entitled matter.
 6
 7
    September 14, 2022        /s/Sharon Velazco
 8  DATE                      SHARON VELAZCO, RPR, FPR
                              Official Court Reporter
 9                            United States District Court
                              400 North Miami Avenue
10                            8th Floor
                              Miami, Florida 33128
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```