IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALEX NAIN SAAB MORAN, *et al.*,<br><br>Defendants. | Case No. 19-20450-CR-Scola |

**DEFENDANT ALEX NAIN SAAB MORAN'S LIMITED MOTION
TO RECONSIDER ORDER ON MOTION TO COMPEL DISCOVERY**

Pursuant to Fed. R. Civ. P. 59(e), as made applicable in this criminal case, Defendant Alex Nain Saab Moran ("Mr. Saab") respectfully submits this motion for reconsideration of this Court's September 15, 2022 Order (ECF No. 138, hereinafter "the Order") granting in part and denying in part Defendant's Motion to Compel Production of Discovery Materials. ECF No. 123. As detailed below, reconsideration is sought solely with respect to that portion of the Order implicating the Department of State ("State").

## INTRODUCTION

On August 25, 2022, Mr. Saab filed a motion pursuant to Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny seeking to compel discovery and production of materials in the possession of, *inter alia*, the Department of Justice ("DOJ") and State. Specifically, Mr. Saab sought seven categories of documents including those: related to his service as a special envoy or other diplomatic role on behalf of Venezuela; his role in State-to-State activities with Iran; and knowledge by U.S. government personnel of Mr. Saab's diplomatic status, appointment as a special envoy, or activities taken on behalf of the Venezuelan government. The motion itself followed months of discussions between the Parties in an effort to resolve the dispute without the need for Court intervention. In relevant part, the government agreed during those discussions to voluntarily search for and produce responsive documents at State. Further, it had received access to a tranche of such State documents, but had not made a timely production of any such documents before argument was heard on the motion to compel.

On September 15, 2022, this Court granted in part and denied in part Mr. Saab's motion to compel. Mr. Saab now respectfully moves for reconsideration of one portion of the Court's Order,

including on the basis of intervening developments and new (to Mr. Saab and the Court) evidence recently uncovered through the government's limited productions to date.

This motion for reconsideration is a limited one, focused on those portions of the Order denying Mr. Saab's *Brady/Giglio* requests as to State. It is premised upon new evidence recently received in government productions, which supports Mr. Saab's prior motion. This could not have been considered by the Court previously, warranting reconsideration. Further, there is a need to prevent manifest injustice by requiring production of potential impeachment material relevant to the certification/declaration State previously submitted in this criminal action declaring that the Office of Foreign Missions "is not aware of a basis for Alex Nain SAAB MORAN to enjoy immunity from the criminal or civil jurisdiction of the United States." *See* ECF No. 24-3.

## CONCISE STATEMENT OF MATERIAL FACTS

Mr. Saab filed his motion to compel discovery and production of documents in the possession of various government entities, including State, on August 25, 2022. This followed months of negotiation with the government. Indeed, in that filing, the numerous telephonic meetings, letters, emails, and other negotiations between the Parties were detailed thoroughly. *See* ECF No. 123 at 2-9. The motion to compel also followed this Court's order that the government use its "best efforts" to obtain and produce State documents by August 15, 2022.

As relevant to State, on July 12, 2022, the government advised counsel that it had requested materials from State (and other entities) on an expedited basis, though it did not believe it was legally required to do so. *See* ECF No. 123-1 ¶ 9. The next substantive update with respect to State was on August 24, 2022, at which time the government advised that State had completed its internal review and pull of documents and was in the process of transferring the unclassified emails/documents to the DOJ review platform. *Id.* ¶ 21. Although counsel for the government did not yet know the specific volume of documents, they understood from preliminary estimates that there would be about 2,200 unclassified State records for review and perhaps an equal amount on the classified side. *Id.*

At the hearing on September 13, the government then advised the Court that it had "requested unclassified documents from the State Department, which we are now in possession of, and the government's position is we are in custody and control of those documents." *See* ECF No. 139, Tr. at 30:4-6. The government further explained to the Court that it had "been reviewing these" documents and there were "approximately 600 documents or files." *Id.* at 33:16-18. In

2

response to questioning from the Court, the government estimated that it would take it another two to three weeks to complete its review. *Id.* at 32:19-22.

The Court ruled on Mr. Saab's motion to compel on September 15, 2022, granting the motion in part and denying the motion in part. *See* Order, ECF No. 138. The Court denied the motion for production of documents from State in part based upon on its determination that State was not a part of the "prosecution team." *See id.* at 6-7. However, in making its ruling, the Court did not address Mr. Saab's argument that the government has already filed with this Court, and seemingly intends to rely upon at the upcoming hearing, certain statements provided by State in an attempt to counter Mr. Saab's diplomatic immunity defense. *See* ECF No. 123 at 15. Specifically, during this litigation, the government filed and relied upon a certification/declaration by State that "the Office of Foreign Missions is not aware of a basis for Alex Nain SAAB MORAN to enjoy immunity from the criminal or civil jurisdiction of the United States." ECF No. 24-3. In essence, the government has chosen to use State as a witness for the prosecution related to Mr. Saab's diplomatic immunity defense. The government's election to utilize State as a witness for the prosecution triggered its corresponding duty under *Giglio v. United States*, 405 U.S. 150, 154 (1972) to search for and produce to the defendant all evidence relevant to impeachment of its witness.

Although the Order denied Mr. Saab's motion to compel with respect to documents at State, the Order granted his motion in part and required the government to "search for all responsive materials and produce to Saab Moran by October 18, 2022 all unclassified responsive materials in the possession, custody, or control of the 'prosecution team.'" Order, ECF No. 138 at 7. Accordingly, on September 23, 2022, counsel for Mr. Saab asked the government for an update as to the anticipated date for production of the materials it had received from State that it had already conceded were within its possession, custody and control. *See* Declaration of Kendall Wangsgard ("Wangsgard Decl."), filed herewith, ¶ 11. The government responded that it "still intends to produce potentially responsive materials 'upon the Government's own volition,'" by October 10th. *Id.* ¶ 12.

However, the government did not make any production of State documents until October 12, 2022, and even then only produced heavily redacted (sometimes completely redacted) versions

of seventeen documents.[1] The government characterized the production as: "documents that the government, per the Court's Order issued on September 15, 2022, is producing upon its own volition, namely unclassified materials from the Department of State." *See* Ex. B (Oct. 12, 2022 email Kramer to Counsel).[2]

As explained in greater detail below, some of the recently produced documents appear to be highly relevant impeachment evidence related to the declaration submitted by State. For example, one of the OIA documents highlights communications between high-level officials within the DOJ and State, concerning immunity claims by Mr. Saab wherein then-Secretary of State Pompeo pondered over the difficulties that might exist if Mr. Saab had been appointed as an envoy before January 2019, during a time when the United States recognized the Maduro administration:

> To: Swartz, Bruce (CRM)
> From: Abrams, Elliot
> Sent: Sun 6/14/2020 9:00:35 PM (UTC)
> Subject: Saab
>
> Tidbits about Saab below: he seems to have Antiguan and Dominican passports, perhaps dip passports, as well as Colombian and Venezuelan
> Sec Pompeo wonders if we can argue that his Venezuelan dip passport is illicit because awarded by criminals not President Guaido, but if it had been issued before January 2019 we too recognized Maduro ( and anyway CV probably follows the UN in recognizing Maduro). Pompeo also noted that in any event he was not accredited to CV nor was he in a diplomatic mission: he was involved arguably in a mission designed to violate UN sanctions on Iran.

---

[1] Previously, on the evening of September 19, 2022, the government produced to counsel "materials relating to the summary of information in our prior August 15, 2022, letter and materials possessed by entities beyond the 'prosecution team' that the government is providing upon its own volition, namely unclassified materials from the Department of Justice Office of International Affairs ('OIA') and a Department of Justice Civil attorney that assisted OIA with the extradition." *See* Ex. A (Sept. 19, 2022 Ltr. Lunkenheimer to Counsel) (references to "Exhibits" herein are those attached to the Wangsgard Decl.). Many of the 34 documents produced were heavily redacted. Further, a privilege log provided with the production reflects redactions for, among other things, "lack of relevance" and "deliberative process privilege."

[2] Despite identifying these documents as responsive to Mr. Saab's *Brady* and Rule 16 requests, making them clearly relevant to this litigation, the government redacted every word of multiple documents based upon "lack of relevance" and an unexplained assertion of deliberative process privilege. Similarly, the government redacted large portions of many of the other documents based upon "lack of relevance" and/or an unsupported assertion of "deliberative process." The government provided a privilege log. However, the log fails to adequately "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). Counsel has discussed these deficiencies with the government and the Parties will continue confer. If the issues cannot be timely resolved, Mr. Saab will have no choice but to file another motion to compel.

*See* Ex. C. Notably, as the government is aware, Mr. Saab was appointed as a Special Envoy in April 2018.

Further, the government has produced emails obtained from custodians in the DOJ that include correspondence with individuals at State. However, the government's production of State documents does not include any emails from those email strings or any related internal emails among the State participants in those emails. Indeed, as best as can be determined from the heavily redacted documents, there do not appear to be any emails produced from any of the State department custodians who communicated with DOJ about the topics relevant to Mr. Saab's *Brady* and Rule 16 requests.[3] This demonstrates the significant need for an Order compelling a thorough search and prompt production of State documents responsive to Mr. Saab's Rule 16, *Brady*, and *Giglio* requests.

## ARGUMENT

The Court should grant Mr. Saab's limited motion for reconsideration on three grounds. First, the government's recent productions raise significant questions under *Giglio v. United States*, 405 U.S. 150, 154 (1972). The government has now produced evidence which impeaches a prior declaration by State filed in support of the government's efforts to argue that Mr. Saab is not a diplomat. Therefore, reconsideration is necessary to avoid manifest injustice. Second, when the government has voluntarily agreed to provide a criminal defendant certain disclosures, it cannot then shirk its obligations. It must undertake its searches and production with the same diligence that is otherwise mandated. Finally, even in their limited form, the government's productions to date reflect new evidence supporting Mr. Saab's motion to compel documents from State (on the basis that State played an essential role in a key prosecutorial decision). This evidence was not available to the Court previously when it made its initial decision, and it calls into substantial question the scope of the Court's prior determination

  A. <u>Standard for Reconsideration</u>

Federal Rules of Civil Procedure 59(e) and 60 govern motions for reconsideration. *Ludwig v. Liberty Mut. Fire Ins. Co.*, Case No. 8:03-cv-2378, 2005 WL 1053691 (M.D. Fla. Mar. 30, 2005). The time when the party files the motion determines whether the motion will be evaluated

---

[3] Defense counsel has raised this issue with the government. The government was not able to confirm whether or not State had searched for documents retained by the relevant custodians, but stated that it would look into the reason for the discrepancies.

under Rule 59(e) or Rule 60. *Beach Terrace Condo. Ass'n, Inc. v. Goldring Invs.*, No. 8:15 cv-1117, 2015 WL 4548721, at *1 (M.D. Fla. July 28, 2015). Here, the motion is filed within 28 days of the Order and thus the motion is analyzed under Rule 59(e). *Id. See also Guevara v. NCL (Bahamas) Ltd.*, No. 15-24294-civ, 2017 WL 6597978, at *1 (S.D. Fla. Apr. 13, 2017); *Blackmon v. Jones*, No. 16-60901-civ, 2019 WL 8752279, at *1 (S.D. Fla. Jan. 11, 2019) ("Petitioner does not specify the legal mechanism underpinning his Motion, but because it was filed within 28 days of the Court's Judgment, the Court construes it as one under Rule 59(e).") (citing *Barr v. One Touch Direct*, No. 8:15-cv-2391, 2016 WL 6037535, at *2 (M.D. Fla. Oct. 14, 2016)).

Of course, the Federal Rules of *Criminal* Procedure do not specifically authorize motions for reconsideration. However, "both the Supreme Court and [the Eleventh Circuit Court of Appeals] have permitted parties to file such motions in criminal cases." *Serrano v. United States*, 411 F. App'x 253, 254-55 (11th Cir. 2011) (citing *United States v. Phillips*, 597 F.3d 1190, 1199-1200 (11th Cir 2010)). *See also United States v. Brown*, No. 3:18-cr-89, 2019 WL 7067091, at *1 (M.D. Fla. Dec. 23, 2019). When "adjudicating motions for reconsideration in criminal cases, district courts have relied on the standards applicable to motions for reconsideration filed in civil cases pursuant to Rule 59. . . ." *Brown*, 2019 WL 7067091 at *1 (citing *United States v. Hammoud*, Case No. 8:04-cr-2, 2012 WL 13176320, at *1 (M.D. Fla. Sept. 13, 2012); *United States v. Sabooni*, No. 09-20298-cr, 2014 WL 4385446, at *1 (S.D. Fla. Sept. 4, 2014)).

The grounds for granting a Rule 59 motion "are newly discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007). These parameters have been interpreted to include at least *one* of the following: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or [prevent] manifest injustice." *Lamar Advertising of Mobile, Inc. v. City of Lakeland, Fla.*, 189 F.R.D. 480, 489 (M.D. Fla. 1999). *See also United States v. Okonkwo*, No. 6:14-cr-5, 2020 WL 5264914, at *1 (M.D. Fla. Aug. 10, 2020); *Sneed v. Pan Am. Hosp.*, No. 08-21415-civ, 2009 WL 10674781, at * 1 (S.D. Fla. Aug. 28, 2009) ("Rule 59(e) does not set forth specific criteria to be applied, but courts have delineated three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice.").

Reconsideration is warranted both in light of new evidence and to prevent manifest injustice.

### B. *There is a Significant* Giglio *Question that Warrants Reconsideration*

In support of his motion to compel, Mr. Saab argued, in part, that the government was obligated under *Brady/Giglio* to search for and produce relevant documents in the possession of State because the government had affirmatively relied upon, and continues to rely upon, statements and a declaration made by State. *See* ECF No. 123 at 15. The Court did not address this specific argument in its Order but instead focused upon the government's argument that State, "was only involved in Saab Moran's extradition." ECF No. 138 at 6 ("The same applies to the Department of State, which the Government represents was only involved in Saab's extradition."). New evidence produced by the government since the Court's Order adds further support to defendant's *Giglio* argument.

Indeed, State is a key witness offered by the government in support of this continued prosecution. *See* ECF No. 24-3. The submission of a declaration from State, alone, warrants consideration of State materials under *Giglio*. *See* ECF No. 123 at 15-16; Transcript, ECF No. 122 at 14:16-19 ("because of . . . that declaration we submitted, we thought it was prudent that we go beyond the prosecution team for that instance. . . .").[4] As detailed above, the State certification/declaration asserts that "the Office of Foreign Missions is not aware of a basis" for Mr. Saab to "enjoy immunity from the criminal or civil jurisdiction of the United States." ECF No. 24-3. The government attached this document as an exhibit to its briefing and heavily relied on State's statements in support of its arguments. Based on new evidence, and items produced to date, it seems clear that there exists *Giglio* material that could be used to impeach or contradict the State testimony.

For instance, following the Court's entry of the Order on September 15, 2022, the government produced documents from DOJ's files that establish that people at the highest level at State and DOJ were aware of facts that might support Mr. Saab's claim of diplomatic immunity, which impeaches the declaration submitted by State and provides evidence supporting Mr. Saab's diplomatic immunity defense. Indeed, the September 19, 2022, production contains several emails that directly support Mr. Saab's status as a Special Envoy on behalf of Venezuela who was

---

[4] There are also strong indications of State's involvement beyond what has been disclosed. Given the importance of diplomatic immunity, and that State has institutional jurisdiction in this area, it by definition must have played a leading role in decisions leading to, among other things, the issuance and withdrawal of the INTERPOL Red Notice.

traveling on a diplomatic mission to Iran when he was detained and arrested *in transitu* in Cape Verde. These emails, of course, were not available to Mr. Saab or the Court previously. One of these emails involves high-level officials within the DOJ and State:

> To: Swartz, Bruce (CRM)
> From: Abrams, Elliot
> Sent: Sun 6/14/2020 9:00:35 PM (UTC)
> Subject: Saab
>
> Tidbits about Saab below: he seems to have Antiguan and Dominican passports, perhaps dip passports, as well as Colombian and Venezuelan
> Sec Pompeo wonders if we can argue that his Venezuelan dip passport is illicit because awarded by criminals not President Guaido, but if it had been issued before January 2019 we too recognized Maduro ( and anyway CV probably follows the UN in recognizing Maduro). Pompeo also noted that in any event he was not accredited to CV nor was he in a diplomatic mission: he was involved arguably in a mission designed to violate UN sanctions on Iran.

*See* Ex. C. In this crucial email, the U.S. Special Representative for Venezuela, Elliott Abrams, wrote to Deputy Assistant Attorney General Bruce Swartz in the days following Mr. Saab's detention at the behest of the United States. Therein, he was conveying sentiments expressed by then-Secretary of State Mike Pompeo. Apparently, recognizing Mr. Saab's diplomatic status (evidenced by "dip passports"), Secretary Pompeo suggested arguments that could be utilized to deny Mr. Saab's status as a diplomat. Further, the email also previewed the Maduro/Guaidó recognition argument that the government has featured in its very papers filed in opposition to the motion to compel. *Cf.* ECF No. 135 at 6-7, 9. Secretary Pompeo appears to express concerns about the merits of such an argument if Saab had been appointed a special envoy before January 2019 when the United States still recognized the Maduro government. This is newly discovered evidence recounting consideration by the Secretary of State and his Principal Deputy on Venezuela regarding the exact issue before the Court on the pending motion to dismiss and impeaches State's submitted declaration. Accordingly, this evidence by itself should prompt the Court to reconsider its ruling on Mr. Saab's motion to compel and order a thorough search and production of all responsive documents.

Other new evidence similarly supports the motion to compel and is also directed at the heart of the immunity issue. In an email produced by the government, authored prior to Mr. Saab's detention in Cape Verde, Special Representative Abrams observed that the Secretary of State wanted "to talk about Alex Saab, who is brokering the Iran/VZ deals . . . .":



*See* Ex. D. Included on the correspondence were DAAG Swartz, Brian Hook, State Department Special Representative for Iran, and Matt McInnis, Deputy Special Representative for Iran. Moreover, the reference to brokering the Iran/Venezuela deals reflects knowledge by senior officials at DOJ and State that Mr. Saab was negotiating an agreement between Iran and Venezuela. It also demonstrates that State was working closely on Mr. Saab's prosecution and there was knowledge of such prior diplomatic missions as Special Envoy.

In another instance, a reporter for the New York Times reached out to State Department Press Officer Daniel Binder with questions related to the USS *San Jacinto* that was on station near Cape Verde. *Cf.* ECF No. 123 at 16. Mr. Binder then passed this information along, observing that the reporter already had "a good amount" of information "presumably from DoD" and that Special Representative Abrams would speak to the reporter to "guide his story and give the background on Saab and his role in the Maduro organization." Crucially, Special Representative Abrams was "VERY aware of DOJ concerns":

> From: Binder, Daniel R
> Sent: Wednesday, December 16, 2020 7:22 AM
> To: Navas, Nicole (OPA)
> Subject: Fw: NYTimes questions -- Re: Embassy Cabo Verde spox
>
> Good morning Nicole,
>
> I wanted to flag this for you. As he has a good amount on this story already (presumably from DoD) S/R Abrams plans on speaking with him off the record, to help guide his story and give the background on Saab and his role in the Maduro organization. S/R Abrams is VERY aware of DoJ concerns and will try not to discuss the case.
>
> V/r, Daniel

*See* Ex. E. Later in the chain, Press Officer Binder sought approval for use of a quote, attributed to Special Representative Abrams, that "Saab is one of the two most important money guys in the Maduro government, and he's the middle man with Iran." *Id.*

9

Moreover, based upon the brief descriptions contained in the privilege logs, the government has withheld State documents that appear to be *Brady*/*Giglio*. Indeed, at least two documents (one undated and one predating Mr. Saab's arrest) are titled "evidentiary" summaries, which include "references [to] Saab as involved in brokering sale of PDVSA crude oil and being sent to Iran by Maduro to negotiate purchase of gasoline per sources and public reporting." *See* Ex. F. These documents further reveal State's knowledge of Mr. Saab's diplomatic activities and impeach the statements from State that the government relies upon.

It is logical to conclude that State possesses substantially more evidence concerning Mr. Saab's status—and impeachment of its statements in its prior certification/declaration with the Court—than it has provided to date. This Court should reconsider and order production of such materials.

    C.    *The Government's Actions to Date Have Been Inadequate*

Where, as here, the government voluntarily agrees to undertake *Brady* searches, the Due Process Clause mandates that it exercise the same diligence as any other search. *United States v. Alshahhi*, 21-cr-371, 2022 WL 2239624 (E.D.N.Y. June 22, 2022) ("However, the Government has represented that it would voluntarily search the files of some other agencies. When it does that, it is held to the same standard that applies to information found in its own files."). Here, the government has maintained that State (and other government agencies) are not part of the prosecution team, but it is "trying to be helpful" and alleviate any concerns," and thus made prudential search requests. *See* ECF No. 123 at 4. Further, the government "agreed to search its own records and to request the Department of State, Department of Defense and the Central Intelligence Agency to search their records for documents responsive to many of the Defendant's requests." *See* ECF No. 113. Likewise, the Court had ordered the government to "make its best efforts" to obtain and produce "unclassified *Brady* or *Giglio* material in the possession, custody, or control of [OIA] and/or [State] no later than August 15, 2022." ECF No. 116.

As the Eleventh Circuit has recognized, the "purpose of Rule 16 is to promote the fair administration of justice[.]" *United States v. White*, 846 F.2d 678, 692 (11th Cir. 1988). Rule 16 is the minimum requirement for discovery, and a District Court can order additional discovery in the interest of fairness. *See, e.g., United States v. Jordan*, 316 F.3d 1215, 1249 n.69 (11th Cir. 2003); *United States v. Thomas,* 548 F. Supp. 3d 1212, 1221 (M.D. Fla. 2021).

It appears clear that relevant documents from State have not been produced, because emails from DOJ custodians include correspondence with State custodians that have not been produced by State. And, as best as can be determined from heavily redacted documents, there do not appear to be internal State emails produced that would likely have occurred before the emails between State and DOJ.

Further, the production is demonstrably incomplete. Attached hereto as Exhibits G and H are two diplomatic *notes verbale* **sent to State** by the Venezuelan Ministry of Popular Power for Foreign Affairs in the form of Minister's Dispatches. The government has previously stipulated to the authenticity of these documents. In one, Venezuela described to State that:

> **The Ministry of People's Power for Foreign Affairs of the Bolivarian Republic of Venezuela,** addresses the Department of State of the United States of America, in the opportunity and occasion to report that the Government of the Bolivarian Republic of Venezuela appointed the **Venezuelan citizen Alex Nain Saab Morán**, holder of Venezuelan I.D. No. V - 21,495,350, as **Special Envoy** "... *with broad powers to carry out negotiations on behalf of the Bolivarian Republic of Venezuela, aimed at guaranteeing the commercial and humanitarian procurement of essential goods and services, intended for the social assistance programmes of the National Executive* ... ", as shown in the attached Credential, dated 9 April 2018, signed by the Minister of People's Power for Foreign Affairs of the Bolivarian Republic of Venezuela.

*See* Ex. G. In another: "**The Ministry of Popular Power for Foreign Affairs of the Bolivarian Republic of Venezuela**, categorically demands respect for the diplomatic immunity and inviolability and the immediate release of Ambassador Alex Naín Saab Morán, in accordance with the provisions of Article 29 of the 1961 Vienna Convention on Diplomatic Relations." *See* Ex. H. Neither the diplomatic notes nor their enclosures have been produced in discovery, let alone the likely internal emails that would have followed. Likewise, documents produced from DOJ (quoted above) were not produced by State, and there is no indication why certain *Brady* materials are in the DOJ files but not also those of State.

    D.    <u>New Evidence Warrants Reconsideration</u>

Mr. Saab has, since as early as November 2021, sought from the government *Brady* and Rule 16 materials that are "material . . . to the preparation of the Diplomatic Immunity defense . . . ." *See* ECF No. 123 at 2. *See also* Fed. R. Crim. P. 16(a)(1)(E) (focusing on items "material to preparing the defense[.]"). In its Order, the Court observed that "Saab Moran's diplomatic status is exactly what he seeks out to prove by way of his discovery requests." Order,

ECF No. 138 at 4. And further, "[f]oreclosing that defense now—before Saab Moran has had an opportunity to establish it—would simply be unjust." *Id.* However, the Court went on to analyze the "prosecution team" through the lens of the indictment as contrasted with his extradition. In this respect, the Court observed that "OIA worked with State to achieve Saab Moran's extradition, but that does not mean that it was part of the investigation leading to his indictment." *Id.* at 6. As a result, the Court denied the motion to compel with respect to State.

Under the unique circumstances of this case, and in light of new evidence (detailed herein) not available to the defense or the Court at the time the Order was issued, reconsideration is warranted. Mr. Saab's diplomatic immunity is an absolute defense, mandating dismissal of this prosecution. *See generally* ECF No. 123 at 12-13. Therefore, evidence possessed by the government that is material to that defense *must* fall under Rule 16 and *Brady*. This is particularly the case where State has acted as a witness for the government and has evidence that could be used to impeach the information it has provided, even if the government inexplicably argues that State only participated in this matter in the context of extradition. A narrower view would permit the government to bypass disclosure of required *Giglio* material and documents that go to the very heart of the immunity or, as the Court observed, "exactly what he seeks out to prove." Order, ECF No. 138 at 4.

Detailed above are various emails among the highest levels of the United States Government apparatus that support Mr. Saab's diplomatic immunity defense. Most significantly, the government has now disclosed that State possessed at least two "evidentiary" memoranda, *see* Ex. F (privilege log), including one that is dated prior to Mr. Saab's arrest and extradition. Apparently, as noted above, these reference Mr. Saab as being involved in the sale of PDVSA crude oil and being sent to Iran by Maduro "to negotiate purchase of gasoline." Unfortunately, they are completely redacted, in part on the basis of "deliberative process." The nature and timing of these "evidentiary" memoranda suggest that State played a role in the prosecution of Mr. Saab—not merely in his extradition.

Furthermore, the new evidence described above establishes that State had deep concern, interest, and involvement in DOJ's prosecution of Mr. Saab, including with regard to arguments against his immunity defense. Indeed, to the extent that State was involved in determining whether or not to recognize Mr. Saab's diplomatic immunity, it was an integral part of the "prosecution team." If immunity were recognized, the prosecution would not and could not proceed. The

recognition or non-recognition of immunity is fundamentally a prosecutorial decision in the unique context of this case.

State was an active participant. Moreover, the new evidence leads to a presumption that additional material evidence of Mr. Saab's diplomatic work is located in files of, at a minimum, State. Reconsideration is warranted on this ground.

## CONCLUSION

For the foregoing reasons, and those which will be argued in Reply and at oral argument, Mr. Saab respectfully requests that his motion for reconsideration be granted.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9

Counsel has conferred with Counsel for the government pursuant to Local Rule 88.9 in a good faith effort to resolve the issues raised in this motion and has been unable to do so.

Date: October 13, 2022                                   Respectfully submitted,

BAKER & HOSTETLER LLP

/s/ *Lindy K. Keown*
Lindy K. Keown (FL: 117888)
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801
Tel: (407) 649-4000
lkeown@bakerlaw.com

/s/ *David B. Rivkin, Jr.*
David B. Rivkin, Jr. (*pro hac vice*)
Elizabeth Price Foley (FL: 92380)
Jonathan R. Barr (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
drivkin@bakerlaw.com
efoley@bakerlaw.com
jbarr@bakerlaw.com

Jonathan B. New (*pro hac vice*)
45 Rockefeller Plaza
11th Floor
New York, New York 10111

Tel: (212) 589-4200<br>
jnew@bakerlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 13, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<em><u>/s/  Lindy K. Keown</u></em><br>
Lindy K. Keown