IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

     v.

ALEX NAIN SAAB MORAN, *et al.*,

    Defendants.

Case No. 19-20450-CR-Scola

**DEFENDANT ALEX NAIN SAAB MORAN'S MOTION
<u>TO DISMISS THE INDICTMENT</u>**

**BAKER & HOSTETLER LLP**
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801

1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

45 Rockefeller Plaza
11th Floor
New York, New York 10111

## Table of Contents

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND AND CONCISE STATEMENT OF FACTS ...................................2

A.    Mr. Saab's Appointment as Venezuelan Special Envoy and Concomitant Missions to Iran ..........................................................................................................2

B.    The First and Second Diplomatic Missions to Iran ...........................................4

C.    The Third—Interrupted—Diplomatic Mission to Iran ......................................4

D.    The Arrest and Detention of Mr. Saab ..............................................................6

E.    Venezuela, Mr. Saab, and Iran Have Repeatedly Confirmed Mr. Saab's Diplomatic Status ...........................................................................................................7

    1.    Venezuela and Mr. Saab ......................................................................7

    2.    Iran ....................................................................................................11

F.    Observation of Mr. Saab's Status in the Context of the United Nations ..........12

G.    Observation of Mr. Saab's Status by United States Officials ...........................13

LEGAL STANDARD ............................................................................................16

ARGUMENT ........................................................................................................16

A.    The VCDR and DRA Guarantee Mr. Saab's Diplomatic Immunity ................17

    1.    As a Special Envoy, Mr. Saab is a Protected Diplomatic Agent ...........17

    2.    The Government Cannot Establish that Mr. Saab was not a Diplomat .......18

B.    Customary International Law Also Guarantees Mr. Saab's Diplomatic Immunity..........19

C.    U.S. Denial That Maduro is Venezuela's President does not Deprive Mr. Saab of Immunity...................................................................................................21

    1.    States Cannot Avoid Treaty Obligations Based on Foreign Policy Choices .........21

    2.    The United States Continues to Recognize the Venezuelan Foreign Ministry in Performing its Treaty Obligations .......................................................23

D.    Mr. Saab's Diplomatic Immunity Includes Personal Inviolability and *In Transitu* Immunity from Arrest and Detention ................................................................26

    1.    Inviolability........................................................................................26

    2.    In Transitu Immunity .........................................................................27

        (a)    U.S. Courts Recognize *In Transitu* Immunity .............................28

        (b)    The Executive Branch Demands *In Transitu* Immunity for U.S. Diplomats...........................................................................................29

        (c)    Immunity is Fully Supported by Art. 40.4 (Force Majeure).....................30

i

(d)    In Detaining Mr. Saab, the United States Violates the Right of Legation ...................................................................................................31

E.    The Government Is Not Entitled to Deference .................................................32

F.    The Actions of Cape Verde and The Act of State Doctrine are Irrelevant ........................33

CONCLUSION ...........................................................................................................35

## INTRODUCTION

The Eleventh Circuit remanded this case "to fully develop the record" concerning the entitlement of Defendant Alex Nain Saab Moran ("Mr. Saab") to diplomatic immunity. *United States v. Saab Moran*, No. 21-11083, 2022 WL 1297807, at *2 (11th Cir. May 2, 2022). As detailed herein, this factual development confirms that Mr. Saab is a Venezuelan Special Envoy, and the United States Government was aware of Mr. Saab's ongoing negotiations with Iranian officials in that capacity. Likewise, the United States Government either received or was made aware of multiple assertions of immunity through diplomatic channels and INTERPOL. The facts show unequivocally that Mr. Saab was a Special Envoy to Iran on behalf of Venezuela, and the only remaining question is legal, not factual—namely: Was Mr. Saab entitled to diplomatic immunity when he was traveling to Iran on June 12, 2020? The answer to this question is indisputably "yes."

Under the Diplomatic Relations Act, 22 U.S.C. §§ 254a-258a ("DRA"), the 1961 Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502 ("VCDR"), the 1969 Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331 ("VCLT") and customary international law, the United States is obligated to respect Mr. Saab's personal inviolability—and thus, immunity from arrest, detention and prosecution—during his transit from Venezuela to Iran. Pursuant to these domestic and international legal obligations, Mr. Saab's entitlement to diplomatic immunity while *"in transitu"* requires proof of only three things: (1) he was appointed as a Special Envoy by the sending State, Venezuela; (2) he was accepted as a Special Envoy by the receiving State, Iran; and (3) he was traveling on a diplomatic mission between the sending and receiving States when he was detained in Cape Verde (at the behest of the United States).

The evidence adduced during discovery and the evidence presented by the Defendant in this motion amply demonstrate that each element of *in transitu* immunity exists. This mandates dismissal. Indeed, in the face of such strong evidence of Mr. Saab's diplomatic status, the government's position in this case is unprecedented. It is predicated on two legally flawed and dangerous arguments. First, the government asks this Court to impermissibly delegate its obligation to interpret United States law to Cape Verdean courts and officials. Second, it attempts to conflate State/government *recognition* with diplomatic *immunity* by arguing that *in transitu* immunity is narrowly applicable only to those diplomats working on behalf of a government whose

1

head is formally recognized by the U.S. Executive Branch, rather than more broadly to those diplomats working on behalf of *sovereign states*.[1]

Regarding the first argument, any Cape Verdean court determination would not bind U.S. courts, nor relieve the United States of its own independent obligation to abide by U.S. domestic law (the DRA), and international law (the VCDR and VCLT and customary international law).[2] On the second question, the United States' recognition of Juan Guaidó, rather than Nicolás Maduro, as President of Venezuela does not alter the longstanding law on *in transitu* diplomatic immunity afforded to diplomats of sovereign states. If it did, as the United States itself has recognized in prior litigation, such "a deviation from the international consensus on the broad scope of diplomatic immunity from the jurisdiction of United States courts 'would create an acute risk of reciprocation by other States, potentially subjecting U.S. diplomats to controversial litigation in foreign jurisdictions.'" *Devi v. Silva*, 861 F. Supp. 2d 135, 142 (S.D.N.Y. 2012) (quoting U.S. Statement of Interest in *Sabbithi v. Al Saleh*, No. 1:07-cv-115-EGS (D.D.C.), ECF No. 48 at 21). Accepting the government's position here would place U.S. diplomats at risk around the world; any third country could simply "de-recognize" the current U.S. President and our sovereign diplomats would lose their inviolability when transiting to/from their diplomatic posts around the world. This would thrust diplomatic relations into a state of chaos and conflict.

## BACKGROUND AND CONCISE STATEMENT OF FACTS

A.  *Mr. Saab's Appointment as Venezuelan Special Envoy and Concomitant Missions to Iran*

From April 9, 2018, to the present Mr. Saab has **at all times** been an accredited diplomatic agent of Venezuela. On that date, Jorge Arreaza Montserrat, then-Venezuelan Minister of Foreign Affairs ("Minister Arreaza"), duly appointed Mr. Saab:

> **Special Envoy** of the Government of the Bolivarian Republic of Venezuela, with broad powers to take steps on behalf of the Bolivarian Republic of Venezuela, aimed at guaranteeing the commercial and humanitarian procurement of basic necessities for social assistance programmes of the National Executive, especially foodstuffs, supplies, machinery and medical equipment giving authorisation to hold meetings with government authorities, representatives of institutions and companies of public or private ownership, in the search for practical solutions to the complex situations that affect the Bolivarian Republic of Venezuela as a result

---

[1] The United States, of course, continues to recognize Venezuela as a sovereign state.
[2] In any event, the country's judiciary has made recognition of immunity dependent on an act of Cape Verde's executive branch.

> *of the commercial and financial blockade to which it has been subjected since 2015.*
> *. . . the respective authorities are requested to recognise this appointment and to*
> *allow him to freely carry out his functions, to grant him the favour and assistance*
> *he may need, and to maintain the prerogatives that correspond to him as an Agent*
> *in the Service of the Government of the Bolivarian Republic of Venezuela that Alex*
> *Nain Saab Moran holds, in accordance with the terms established under*
> *international law.*

*See* Declaration of Maria Gonzalez ¶¶ 8-10 & Ex. A (Diplomatic Credential dated April 9, 2018). Thereafter—and thus at all times during this prosecution—Mr. Saab was entitled to diplomatic immunity (including immunity from prosecution and arrest) while in transit on a diplomatic mission: when the indictment was returned on July 25, 2019; when Mr. Saab was detained in Cape Verde on June 12, 2020; at all times during his detention in Cape Verde over the ensuing months; when he was forcibly transferred to this district on October 16, 2021; and for the past twelve months he has spent in U.S. custody.

For the two years following his appointment in April 2018, Mr. Saab fulfilled his role as a Venezuelan Special Envoy. To that end, he was issued a diplomatic passport that specifically identified him as a Special Envoy ("Enviado Especial"). *See* Exhibit 1.[3] This activity culminated in spring 2020, in response to the global COVID-19 pandemic that shattered Venezuela's already fragile social and economic condition when there was a need for Mr. Saab to negotiate for gasoline, food, and medical supplies.[4] Even before the pandemic, Venezuela was facing an emergency shortage of gasoline and medicine due to crippling external economic sanctions.

The Venezuelan government tasked Mr. Saab with three official diplomatic missions to Iran, in March, April, and June 2020, to procure equipment to maintain and repair Venezuela's oil refineries, as well as to obtain gasoline, goods, foodstuffs, and medicine that the country desperately needed. Mr. Saab also met with an Iranian diplomatic delegation in Venezuela. He was

---

[3] Unless otherwise noted, reference to "Exhibit" or "Ex." refer to the exhibits attached to the declaration of Kendall Wangsgard filed herewith and are designated with numbers. There are five additional declarations accompanying this motion (Gonzalez, Ashenoff, Arrieche, Mandl, and Pinto).

[4] There is no doubt that the United States viewed Venezuela's campaign to counteract U.S. economic sanctions in general, and Mr. Saab's role in these efforts in particular, with disfavor. There is, of course, no principle of international law that disqualifies the conduct of diplomatic negotiations by one sovereign state and the entitlement of diplomatic agents of that state to immunity, based upon what another sovereign state thinks about its merit.

Head of Mission on each trip. Two missions were successfully completed, but the third was interrupted by Mr. Saab's interception and detention while he was in transit through Cape Verde.

B.       *The First and Second Diplomatic Missions to Iran*

Mr. Saab's first mission to Iran was from March 8 through March 15, 2020. Iran, the receiving state, described Mr. Saab's first mission in a diplomatic *nota verbal*: "Special Envoy Saab met with various Iranian authorities to discuss strategic humanitarian supplies to Venezuela at the time of the COVID emergency." *See* Exhibit 2, NV N° 7041/1206193 (June 8, 2022). Photographs from this mission show Mr. Saab meeting with, *inter alia*, National Iranian Oil Productions Distribution Company officials as well as officials from the Iranian Foreign Ministry. *See* Declaration of Richard L. Ashenoff, Exs. A-C. Of crucial importance, Mr. Saab negotiated the exchange of Venezuelan gold for gasoline. Mr. Saab also secured an agreement for transport of oil refinery equipment to Venezuela.

Mr. Saab's second mission was from April 14 through April 21, 2020, following the success of the first. Minister Arreaza entrusted Mr. Saab to procure additional necessary resources to fight the COVID-19 pandemic and ongoing food shortages caused by sanctions. By letter dated April 1, 2020, Minister Arreaza charged Mr. Saab with delivering documents to Iranian officials requesting "humanitarian resources of which our country has great need during this period of the COVID-19 pandemic." *See* Exhibit 3, DM N° 000319 (Apr. 1, 2020). Mr. Saab met with Iranian officials in charge of Iran's food production. Iran has confirmed these details: "Special Envoy Saab met with different Iranian authorities in the areas of food, medicine and opening an Iranian supermarket in Venezuela." *See* Ex. 2, *supra*.

C.       *The Third—Interrupted—Diplomatic Mission to Iran*

Mr. Saab's third mission to Iran was scheduled to last from June 12 through June 16, 2020. He never reached Iran. On June 11, Mr. Saab attended a meeting at the Venezuelan presidential residence, with representatives of the Iranian embassy. *See* Declaration of Juan Carlos Arrieche Granadillo ("Arrieche Decl.") ¶ 6. Specifically, in attendance was the Iranian Ambassador and his staff, as well as President Maduro and First Lady Flores. *Id*. ¶¶ 6-7. This June 11, 2020, meeting lasted approximately two hours in the late afternoon. *Id*. ¶ 8. Later that evening, the head of Mr. Saab's security team returned to the Presidential Palace to collect three official sealed envelopes containing documents from the Presidency and Vice Presidency of Venezuela. *Id*. ¶¶ 9-10. These

were taken to Mr. Saab for delivery to officials in Iran. Mr. Saab then departed Venezuela the following morning, with the letters in his luggage. *Id.* ¶¶ 11-14.

Mr. Saab was accredited to Ayatollah Ali Khamenei, Supreme Leader of the Islamic Republic of Iran. Venezuela sought fuel, medical supplies, and food from Iran, and, to that end, Mr. Saab carried with him official diplomatic correspondence from Venezuela to Iran:

- A two-page letter in Spanish, dated June 11, 2020, from Nicolás Maduro Moros, President of Venezuela, to Ayatollah Ali Khamenei, Supreme Leader of Iran, "through the bearer of this letter, [invoking] your intervention in order to guarantee a new urgent shipment of five million barrels of petroleum. . . . In the same way, [requesting] your valuable support to finalize and fulfill the monthly and periodic shipment of petroleum to Venezuela for a year."

- A one-page letter in Spanish dated June 1, 2020, with the notation VP-2020 and stamped number 000101, from Delcy Rodríguez Gómez, Executive Vice President of Venezuela, to Kazam Khavazi, Minister of Agriculture of Iran, *and* a one-page letter in Spanish dated June 1, 2020, with the notation VP-2020 and stamped number 000106, from Delcy Rodríguez Gómez to Sadegh Kharazi, Senior Adviser to the Vice President of Iran, each "expressing our deepest words of solidarity in the midst of this pandemic that has affected humanity" and expressing "our interest and keenness in inviting you to the Bolivarian Republic of Venezuela, in order to consolidate relations of cooperation and friendship between both Nations."[5]

*See* Declaration of Dr. Floriano Mandl ("Mandl Decl.") ¶¶ 23-26 and Exs. A-C; Declaration of Dr. José Manuel Pinto Monteiro ("Pinto Decl.") ¶¶ 6, 10-12.[6]

Moreover, in advance of Mr. Saab's third mission to Iran, Minister Arreaza advised the Iranian Ambassador to Venezuela that Mr. Saab would travel to Iran in his capacity as Special Envoy, for meetings with the Ministries of Health, Industry, and Petroleum for acquisition of medicines, food, and fuel required by Venezuela. *See* Exhibit 6, DM N° 000789 (June 3, 2020). Iran, in turn, approved the Mission, confirming that food and medicine export meetings had been arranged "in consideration of the official visit of the envoy of the Government of the Bolivarian Republic of Venezuela to our country, the Distinguished Mr. Alex Nain Saab Moran." *See* Exhibit

---

[5] Each of these three letters, among other possessions and documents, were seized by the judicial police in Cape Verde upon Mr. Saab's detention. They were held at the Cape Verde prison where Mr. Saab was housed, and returned to Mr. Saab, through counsel, on July 22, 2020. *See* Mandl Decl. ¶¶ 16-23. These letters were also produced in pre-trial discovery by the government in this matter.

[6] Additional copies are included as Exhibits 4 and 5 to the Wangsgard Decl.

7, Note Verbal N° 610/458732 (June 8, 2020) (with reference by I.DVAMOO No. 000120-A (June 8, 2020)).

Mr. Saab's diplomatic, humanitarian mission remains interrupted.

D.     *The Arrest and Detention of Mr. Saab*

Mr. Saab departed Venezuela for Iran on the morning of June 12, 2020. His flight arrived in Cape Verde that evening for a scheduled refueling stopover. However, Cape Verdean authorities refused permission for his plane to depart and Mr. Saab was detained, purportedly pursuant to an INTERPOL "Red Notice" request by the United States, predicated on the indictment in this case.[7]

Prior to his departure for Iran on the third mission, the U.S. government had detailed intelligence of Mr. Saab's diplomatic activities on behalf of Venezuela negotiating the trade of Venezuela's primary resources—gold and oil—for goods needed by the Venezuelan people. Specifically, the government has disclosed that it was aware that Mr. Saab was involve in the refining of Venezuelan gold and the use of that gold to purchase goods, and that he had toured a Venezuelan gold mind with an "Iranian delegation." *See* Exhibit 12. *See also* Exhibit 13 (a May 2020 report in the possession of the State Department describing his Missions to Iran and negotiations); Exhibit 14.

Mr. Saab's specific diplomatic activities vis-à-vis Iran were also well known to the government prior to departure for his third diplomatic mission. Specifically, the government disclosed that on June 11, 2020, "Miami FD EG 10 received a tip from the Special Operations Division (SOD)" that Mr. Saab would be flying from Venezuela to Iran the following day and "would have to stop for fuel somewhere in northwest Africa." Ex. 12  at 1. Once the government

---

[7] Mr. Saab's plane landed in Cape Verde at 8:09pm (local time) on June 12 and the Cape Verdean police detained him at approximately 9:00pm when his plane was prevented from departing. At that time, only a "Wanted Person Diffusion" notice was then-outstanding, while the United States Government was scrambling to get a Red Notice issued and keep Mr. Saab's plane grounded. The Red Notice did not issue until 9:37pm, which is *after* Mr. Saab was detained. *See* Exhibit 8. Within a few hours of his arrest, Venezuela invoked Mr. Saab's immunity both to the Cape Verdean authorities and, in addition, through NCB Caracas in a communication to the Secretary General of INTERPOL seeking to invoke Article 135 of the IRPD informing it that Mr. Saab was acting as representative of Venezuela. *See* Exhibit 9 (June 15, 2020). However, this was not acted on substantively because NCB Washington withdrew its request for the Red Notice. *See* Exhibit 10 (June 25, 2020); Exhibit 11 (June 30, 2020).

knew that Mr. Saab would stopover in Cape Verde, "Miami FD EG 10 and prosecutors began to work to execute a capture operation in Cape Verde." *Id.*

Importantly, the government's disclosure reveals that it was well aware that immediately prior to departing for Iran, Mr. Saab held meetings in Venezuela with an "Iranian delegation," ostensibly relating to the Iranian delegation's interest in Venezuelan gold. *Id.* The government's disclosure further states that, "[i]t was believed that they would [fly] to Tehran, Iran" but "[w]hen the plane was stopped in Cabo Verde with Saab Moran and his son on board, there was no Iranian delegation on the plane." *Id.* The government's limited disclosure confirms that it knew with whom Mr. Saab had meetings in Venezuela. It further reveals that the government knew Mr. Saab was engaged in diplomacy with Iran and that his travels were connected to that diplomacy.

As noted above, Cape Verdean authorities seized Mr. Saab's belongings at the time of his detention, including the diplomatic correspondence from President Maduro and Vice President Rodríguez Gómez. Mr. Saab also carried, and the Cape Verde authorities also seized, documents of an economic nature. *See* Mandl Decl. ¶¶ 24, 27 & Ex. D; Pinto Decl. ¶ 13. These were ***produced by the government in pre-trial discovery*** and include an authorization by the Central Bank of Venezuela for the export of 80 bars of gold, *see* Exhibit 15, and a delivery certificate of $53,542,951.51 of gold for the acquisition of gasoline. *See* Exhibit 16.

E.      *Venezuela, Mr. Saab, and Iran Have Repeatedly Confirmed Mr. Saab's Diplomatic Status*

1.      Venezuela and Mr. Saab

Venezuela has vehemently objected to this prosecution from the outset—as has Mr. Saab— in light of his diplomatic status. On June 13, 2020, the day after the arrest, Minister Arreaza wrote to the Minister for Foreign Affairs, Communities and Defense of Cape Verde, Luís Filipe Lopes Tavares emphasizing that Mr. Saab was acting as a representative of the Venezuelan government to "guarantee the humanitarian provision of medical supplies, medicines and urgent foodstuffs for our country in the context of the COVID-19 pandemic. . . ." *See* Exhibit 17, Ltr. 000811 (June 13, 2020). Mr. Saab's immunity under international law was again invoked, by Minister's Dispatch, that same day. *See* Exhibit 18, DM N° 000810 (June 13, 2020).[8]

---

[8] Venezuela also protested contemporaneously to INTERPOL. In a June 15, 2020, letter to the INTERPOL Secretary General, the Venezuelan National Central Bureau (NCB) protested that

Likewise, on June 14, 2020, Venezuela's Embassy in Senegal, which is also accredited to Cape Verde, advised the Cape Verde Ministry of Foreign Affairs, Communities and Defense that Mr. Saab was illegally detained and that he enjoys immunity as Venezuela's diplomatic agent. *See* Exhibit 19, No. 00277/2020 (June 14, 2020) (stating that "we wish to confirm that Mr. Saab enjoys immunity in international law, since he acts as an agent of the Government of the Bolivarian Republic of Venezuela.").

For his own part, Mr. Saab raised his diplomatic status in the Cape Verdean courts from the outset. As the Court of the Judicial District of Sal, Cape Verde, observed on June 14, 2020, Mr. Saab "came on a plane from Venezuela bound for Iran. He confirmed that he was in the country only in passing and that he was traveling as a diplomatic agent of the Bolivarian Republic of Venezuela." *See* Pinto Decl. Ex. A at 2. Likewise, the Barlavento Court in Mindelo, Cape Verde observed in a decision dated June 18, 2020, that Mr. Saab when arrested confirmed "that he was traveling as a representative of the Government of Venezuela . . . on his way to Iran to get essential goods for the Government of Venezuela." *See* ECF No. 24-2 at *9 (June 18, 2020).[9]

This is consistent with Mr. Saab's legal petitions in Cape Verde including a *habeas corpus* petition dated June 17, 2020, in which Mr. Saab, through counsel, asserted that he was traveling from Caracas to Tehran on a special mission, accepted by the Islamic Republic of Iran. *See* Pinto Decl. Ex. B ¶ 3. That petition further cited Mr. Saab's April 9, 2018, appointment as Special Envoy authorized to find solutions to situations affecting the welfare of Venezuela. *Id.* ¶ 6.

Venezuela, and Mr. Saab, have continued to press his immunity. On July 1, 2020, Mr. Saab received correspondence from the Ministry of People's Power for External Relations instructing that, "given [his] position as Special Representative" he must resist extradition to the United States. *See* Exhibit 20, DM N° 000860 (July 1, 2020).

On September 25, 2020, Minister Arreaza again wrote to Cape Verde Minister Tavares:

---

"NCB of Venezuela stresses that Mr. Alex Nain SAAB MORÁN is currently acting as representative of the Government of the Bolivarian Republic of Venezuela, which grants him immunity, in accordance with international law and with the principles of common law." *See supra* n.7, Ex. 9, ¶¶ 3-4, 12 (June 15, 2020).

[9] The Court of Justice of the Economic Community of West African States (ECOWAS) issued a judgment on March 15, 2021, holding that Cape Verde's arrest of Mr. Saab was illegal and "violated [his] human right to personal liberty" and likewise that his continued detention was an ongoing violation. *See* ECF No. 43-1 at 91.

On 9 April 2018, Mr. Alex Nain Saab Morán was nominated as Special Envoy to the Bolivarian Republic of Venezuela in humanitarian matters and in particular as Envoy to the Islamic Republic of Iran, in accordance with Venezuelan legislation and international law. The objective of his special mission was to obtain medical supplies, food and fuel to meet the needs of the people, within the context of the worsening of the situation due to the Covid-19 pandemic.

To carry out his Mission, under orders issued by the Venezuelan National Executive, on 12 June 2020 the plane that was carrying him needed to refuel in Cape Verde in order to continue its journey. At that point, Special Envoy Alex Nain Saab was arrested by the Cape Verdean authorities, who alleged that the United States of America had issued an extradition request. We have sent numerous official communications from this Ministry of Foreign Affairs and from the Embassy of the Bolivarian Republic of Venezuela to Cape Verde to the competent Cape Verdean authorities explaining that Special Envoy Alex N. Saab enjoys sovereign and diplomatic immunity, both in his capacity as Special Envoy and under international and common law.

*       *       *

Considering the historically good relationship between Cape Verde and Venezuela, I respectfully request that the competent authorities respect the position of Special Envoy Alex Saab as a diplomatic representative, under Government orders, through this Ministry of Foreign Affairs, to immediately continue with his activities in the service of the Republic, so that the humanitarian mission is not completely paralyzed, causing suffering to the Venezuelan people and damage to the Country.

*See* Exhibit 21, DM N° 001158 (Sept. 25, 2020).

Likewise, on March 15, 2021, Minister Arreaza issued a Minister's Dispatch to the Cape Verde Deputy Prime Minister and Minister of Regional Integration, Foreign and Community Relations, and Defense requesting that Cape Verde comply with the ECOWAS judgment that ordered the authorities of Cape Verde to release Mr. Saab and terminate the extradition process. *See* Exhibit 22, DM N° 000269 (Mar. 15, 2021). Minister Arreaza repeated this request by Minister's Dispatch dated March 19, 2021, stating:

[T]he State of Venezuela intends to exercise its diplomatic protection prerogatives and bring before the State of Cape Verde the case of one of its citizens, Mr. Alex Saab, who has been arbitrarily detained . . . [T]he arrest and detention of Mr. Saab on 12th June at Amílcar Cabral airport, on the Island of Sal (Cape Verde), and his continued detention since that date, are illegitimate and arbitrary, and violate Mr. Saab's right to personal freedom . . . the State of Venezuela requests full collaboration of the State of Cape Verde to guarantee the absolute and total execution of the judgment of the Court of Justice of ECOWAS dated 15th March 2021 . . . Likewise, it also requests the State of Cape Verde to take all necessary measures to put an end to the violations found by the Court of Justice, in

> guaranteeing the full application of the judgment of the ECOWAS Court of Justice dated 15th March 2021, to release Mr. Saab and fully guarantee his freedom of movement, including his right to leave the territory of Cape Verde, and to cancel all extradition procedures that pertain to him.

*See* Exhibit 23, DM No. 000323 (Mar. 19, 2021).

And by Minister's Dispatch dated August 3, 2021, Minister Arreaza wrote to the Cape Verde Minister of Foreign Business, Cooperation and Regional Integration requesting a dialogue and, *inter alia*, "reiterating to the Government of Cape Verde our strongest and most emphatic condemnation and opposition to the treatment granted to the case of the Venezuelan citizen and diplomat Special Envoy Alex Saab" and "its demand for the immediate and unconditional release of Special Envoy Saab." *See* Exhibit 24, DM No. 000711 (Aug. 3, 2021, as transmitted by the Venezuelan embassy in Senegal on Aug. 5, 2021).[10]

Venezuela has also protested directly to the United States. The Venezuelan Ministry of People's Power for External Relations addressed the U.S. Department of State by Minister's Dispatch dated October 22, 2021, confirming that Venezuela had designated Mr. Saab as a Special Envoy, by credential dated April 9, 2018, with broad powers for commercial and humanitarian procurement of goods. *See* Exhibit 25, DM N° 000170 (Oct. 22, 2021).

The following day the Venezuelan Ministry of People's Power for External Relations advised the Department of State by Minister's Dispatch that Mr. Saab had, on September 14, 2021, been incorporated as a member of the Venezuelan delegation in the dialogue in Mexico City between the Government of Venezuela and the Unitary Platform of Venezuela. *See* Exhibit 26, DM N° 000171 (Oct. 23, 2021). In that Dispatch, Venezuela also advised the Department of State that Mr. Saab is a member of the National Round Table on Social Care and demanded "respect for the diplomatic immunity and inviolability, and the immediate release of Ambassador Alex Nain Saab Moran." *Id*.

Venezuela also communicated Mr. Saab's diplomatic status to the Department of Justice. By Minister's Dispatch dated March 21, 2022, the Venezuelan Ministry of Popular Power for

---

[10] Ultimately, Cape Verde assented to Mr. Saab's extradition, albeit without a judicial determination of his right to diplomatic immunity. Importantly, in a tacit acknowledgment of his position, Cape Verde *did* issue diplomatic visas to Mr. Saab's family to enable them to visit while he was detained. Those diplomatic visas were based on diplomatic passports held by his family on the basis of his status.

Foreign Affairs confirmed to the Department of Justice that Venezuela had designated Mr. Saab as a Special Envoy, by credential dated April 9, 2018, with broad powers for commercial and humanitarian procurement of goods. *See* Exhibit 27, DM No. 000187 (Mar. 21, 2022).

        2.     Iran

As the "receiving" State, to which Mr. Saab is accredited, Iran has also confirmed his diplomatic status, both before and following his travel in June 2020. *See, e.g.,* Exs. 2, 6, 7, *supra*. In addition, after Mr. Saab's detention in Cape Verde, Iran repeatedly affirmed that it had assented to receive him as a Venezuelan Special Envoy. On January 27, 2021, the Iranian Embassy in Dakar, Senegal confirmed to the Cape Verde Ministry for Foreign Affairs and Communities and the Cape Verdean Embassy that "Mr. Alex Saab, Special Envoy of the Bolivarian Government of Venezuela . . . is considered . . . an official figure by the Government of the Islamic Republic of Iran. . . ." *See* Exhibits 28, No. 3436, 3438 (Jan. 27, 2021).

The Embassy of Iran in Dakar also wrote to the Cape Verde Ministry of Foreign Affairs and Communities on May 12, 2021:

> We again reaffirm that according to the information available, Mr. Alex Saab had been appointed Special Envoy of the Bolivarian Republic of Venezuela and had been tasked with sourcing the human resources necessary for the Venezuelan people and to negotiate with companies from the Islamic Republic of Iran in this regard. On this basis, he was expected to hold meetings and official engagements with the ministers of oil, industry and health of the Islamic Republic of Iran and to negotiate the purchase of legitimate and humanitarian items, particularly medicines, food and fuel. Consequently, he is considered by the Government of the Islamic Republic of Iran as an official figure and special envoy of the Bolivarian Republic of Venezuela.
>
>            \*      \*      \*
>
> The Islamic Republic of Iran is of the conviction that Mr. Saab, in his capacity as Special Envoy of the Venezuelan Government, was on a special mission and that the Iranian authorities were awaiting his arrival in Iran to initiate bilateral cooperation. In order to go about his mission, he only crossed the territory of Cape Verde for technical reasons as he was still in the process of pursuing his mission.

*See* Exhibit 29, No. 3584/05/AID (May 12, 2021).

And on August 6, 2021, the Embassy of Iran in Dakar sent a Note Verbale to the Embassy of Cape Verde in Dakar as "Amicus Curiae" confirming:

- "According to all available information, Mr. Alex Saab was appointed Special Envoy of the Government of the Bolivarian Republic of Venezuela. . . . Consequently, he was to hold official meetings with the Ministers for Oil, Industry and Healthcare in the

Islamic Republic of Iran and to discuss the purchase of legal and humanitarian articles, notably medication, foodstuffs and fuel."

- "Mr. Alex Saab was arrested on 12th June 2020 at the airport on Sal Island in the Republic of Cape Verde when his plane had landed to refuel en route towards the Islamic Republic of Iran, whilst however benefitting from special diplomatic immunity when travelling through a third country as Special Envoy of Venezuela."

- "Whilst the Iranian authorities were expecting the arrival of Mr. Alex Saab in Iran for his bilateral cooperation assignment, the infringement of his diplomatic immunity in Cape Verde has disturbed cooperation and international relations between the two countries, which has had unacceptable consequences."

- "Consequently, the Islamic Republic of Iran calls upon the Government of Cape Verde to take all necessary measures so as to draw the attention of its official authorities to the inalienable principles of international law in this regard, and given the immunity of Mr. Alex Saab as special envoy on a vital diplomatic mission, by favoring dialogue and other means to immediately resolve this dispute and in a peaceful manner."

*See* Exhibit 30, Note No. 3710/08/AID (Aug. 6, 2021).

  F. *Observation of Mr. Saab's Status in the Context of the United Nations*

  United Nations personnel have also recognized Mr. Saab's status. In early 2021, the UN Special Rapporteur on the "negative impact of the unilateral coercive measures on the enjoyment of human rights" traveled to Venezuela to assess the impact of sanctions on the human rights of Venezuelans. Thereafter, she issued a Report dated October 4, 2021, to the U.N. General Assembly in which (at 15, ¶ 88) she states:

> The Special Rapporteur also expresses concern about the request for the extradition of Alex Saab Morán, the Permanent Representative ad interim of the Bolivarian Republic of Venezuela to the African Union. Mr. Morán, who . . . was arrested in Cape Verde in 2020 during the refuelling of an airplane on which he was travelling and has been detained since, **in flagrant violation of diplomatic immunities** and without any clear charges. Repeated requests from international organizations and institutions for his release have been ignored.

A/HRC/48/59/Add.2, *United Nations Human Rights Office of the High Commissioner* (emphasis added).[11] Notably, in referring to the "repeated requests . . . that have been ignored," the Special Rapporteur cited a detailed United Nations letter, pursuant to Human Rights Committee

---

[11] https://www.ohchr.org/en/documents/country-reports/ahrc4859add2-visit-bolivarian-republic-venezuela-report-special

resolutions, which "express[ed] our serious misgivings as to the allegations of arbitrary arrest, detention and extradition against Ambassador Saab." *See* AL CPV 2/2021 (July 19, 2021).[12]

This is consistent with statements made by Venezuela to United Nations bodies, including a recent speech by President Maduro at the 49th Ordinary Session of the Human Rights Council: "Ambassador Alex Saab was illegally abducted in June 2020 in Cabo Verde, when he was taking part in an official mission to bring and food and medicines to Venezuela . . . His diplomatic immunity, his human rights, and his own physical integrity were cruelly and systematically violated." *See* https://media.un.org/en/asset/k1z/k1zlvemxg8 (beginning at 8:34).

G.   *Observation of Mr. Saab's Status by United States Officials*

The Trump Administration took several concrete steps to effect "regime change" in Venezuela, including harsh economic sanctions. Former Trump Administration officials have been clear about this, including the recent publication of *A Sacred Oath: Memoirs of a Secretary of Defense During Extraordinary Times* (2022), wherein former Defense Secretary Mark T. Esper details how "[b]eginning in March 2020, the NSC put Venezuela back on the interagency table for discussion" including the possibility of U.S. military action "to cut off Caracas's access to goods and cash." ECF No. 123-3 at 303. Actions against Venezuela included "interdicting ships that are carrying Venezuelan oil. . . ." *Id.* Specifically, in May 2020, the U.S. government became aware that Venezuela had begun trading its gold for Iranian oil, since Venezuela lacked current ability to refine (and thus use) its own oil. *Id.* at 318-19. In this oil-for-gold exchange between Iran and Venezuela, moreover, the U.S. understood that "approximately nine tons of gold valued at around half a billion dollars was payment for Iran's help in repairing Venezuela's refineries and providing gas additives." *Id.* at 319. The oil-for-gold diplomatic exchange between the two countries was mutually beneficial. Due to sanctions and the reduced demand for oil precipitated by the COVID-19 pandemic, "Tehran was looking for new sources of revenue." *Id.* Venezuelan gold provided that revenue. In return for its gold, Venezuela received gasoline from Iran, alleviating the "[l]ong lines at gas stations" that were "provoking daily protests" and other potential violence in Venezuela. *Id.*

---

[12] https://spcommreports.ohchr.org/TMResultsBase/
DownLoadPublicCommunicationFile?gId=26527

As former Secretary Esper observes, the highest levels of the Trump Administration considered a variety of options, including military intervention, to stop the oil-for-gold exchange. More pertinent to Mr. Saab, however, is the observation that "[a]t Maduro's direction, Saab was reportedly on a special mission to negotiate a deal with Iran for Venezuela to receive more fuel, food and medical supplies." *Id*. at 327. Esper understood that "Saab was Maduro's long-standing point man when it came to crafting the economic deals and other transactions that were keeping the regime afloat." *Id*.

As noted above, disclosure by the government evidences knowledge, *prior* to Mr. Saab's June 2020 travel, of the "oil-for-gold" diplomatic exchanges between Venezuela and Iran. *See* Ex. 12. The U.S. intelligence and law enforcement communities were well aware of the "oil-for-gold" program, in which Mr. Saab served as Special Envoy.[13] *See also* Exs. 15, 16, *supra*.

Moreover, on June 11, 2020, Elliott Abrams, U.S. Special Representative for Venezuela, wrote to a Deputy Assistant Attorney General whose portfolio included overseeing the OIA and serving as Counselor for Internal Affairs ("DAAG – International") and State Department Special Representative for Iran, Brian Hook, stating that "Sec. Pompeo wants to talk about Alex Saab, *who is brokering the Iran/VZ deals*, next week at podium." Exhibit 31 (emphasis added). Even before then, government personnel recognized on May 8, 2020, that "Alex Saab is linked to the exchange of Venezuelan gold for refinery repair, according to sources quoted by Bloomberg . . . Saab helped negotiate the Iran deal with Maduro's new Oil Minister . . . [t]he two had previously worked together to strengthen Venezuela's relationship with Turkey." Exhibit 32.[14] Sources quoted by the employee also observed that Mr. Saab "traveled to Tehran last month" and that "U.S. authorities consider [him] one of the most powerful men supporting Nicolas Maduro's regime." *Id.* Also before Mr. Saab's arrest, on June 4, 2020, in a 28-page email/attachment (each page fully redacted) "REDACTED" provided to "REDACTED" a "Designation_Evidentiary.doc" that apparently

---

[13] Indeed, the Department of Justice seized four tankers carrying Iranian oil to Venezuela in August 2020, an effort involving extensive cooperation by Homeland Security, the FBI, and DOJ. *See* Press Release, U.S. Dep't of Just., Largest U.S. Seizure of Iranian Fuel from Four Tankers (Aug. 14, 2020), available at https://www.justice.gov/opa/pr/largest-us-seizure-iranian-fuel-four-tankers.

[14] This is a fourteen-page document designated as "State_08," with all but one paragraph redacted. The recipient and subject are also withheld, *see* ECF No. 146-7, making it impossible to assess the context of this email sent more than a month before Mr. Saab's arrest.

"references Saab as involved in brokering sale of PDVSA crude oil and being sent to Iran by Maduro to negotiate purchase of gasoline per sources and public reporting." *See* ECF No. 146-7 (entry 7).

Continuing after Mr. Saab's arrest, U.S. Government officials—including Secretary Pompeo—remained acutely aware of Mr. Saab's diplomatic status. On Sunday, June 14, 2020, at 5:00 pm, Mr. Abrams, sent an email to the DAAG – International, with a simple subject line "Saab": "Tidbits about Saab below: he seems to have Antiguan and Dominican passports, perhaps dip passports, as well as Colombian and Venezuelan." Exhibit 33. Mr. Abrams then continued, "Sec Pompeo ***wonders if we can argue that his Venezuelan dip passport is illicit*** because awarded by criminals not President Guaido . . ." *Id.* (emphasis added). However, Secretary Pompeo also apparently acknowledged the legal deficiency in this argument respective to events—such as Mr. Saab's April 2018 appointment—that occurred during the recognition of Maduro.

In another instance, a reporter for the *New York Times* reached out to a State Department Press Officer with questions related to the USS *San Jacinto* that was on station near Cape Verde. Exhibit 34. *Cf.* ECF No. 123 at 16. The Press Officer then passed this information along, observing that the reporter already had "a good amount" of information "presumably from DoD," and that Special Representative Abrams would speak to the reporter to "guide his story and give the background on Saab and his role in the Maduro organization." *Id.* Crucially, Special Representative Abrams was "VERY aware of DOJ concerns." *Id.* Later in the chain, the Press Officer sought approval for use of a quote, attributed to Special Representative Abrams, that "Saab is one of the two most important money guys in the Maduro government, and he's the middle man with Iran." *Id*.

As the evidence adduced in discovery irrefutably shows, the government was well aware of Mr. Saab's diplomatic activities as a Special Envoy on behalf of Venezuela. It knew that he was working on behalf of Venezuela to exchange that country's natural resources—oil and gold—for basic supplies such as refined gasoline, medical supplies and food. It knew, in particular, that Mr. Saab's journey from Venezuela to Iran on June 12, 2020—during the height of the COVID-19

pandemic—was in furtherance of Mr. Saab's diplomatic negotiations with Iran to obtain these humanitarian supplies on behalf of the Venezuelan people.

## LEGAL STANDARD

The DRA provides: "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under section 254b or 254c of this title, or under any other laws extending diplomatic privileges and immunities, shall be dismissed." 22 U.S.C. § 254d. "Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure." *Id.* Because diplomatic immunity deprives federal courts of subject matter jurisdiction, courts have "an affirmative obligation to consider" assertions of immunity and their factual bases. *United States v. Al Sharaf*, 183 F. Supp. 3d 45, 47, 49 (D.D.C. 2016) (reviewing facts outside the indictment to adjudicate assertion of immunity).

Principles of diplomatic immunity under both domestic and international law must be given a "broad and liberal interpretation" by courts. *United States v. Rosal*, 191 F. Supp. 663, 664 (S.D.N.Y. 1960); *accord United States v. Melekh*, 190 F. Supp. 67, 89 (S.D.N.Y. 1960). This is necessary to effectuate the purpose of diplomatic immunity itself. As explained by former Secretary of State Elihu Root, "[t]he reason of the immunity of diplomatic agents is clear, namely: that Governments may not be hampered in their foreign relations by the arrest or forcible prevention of the exercise of a duty in the person of a governmental agent or representative." Letter from U.S. Sec'y of State to U.S. Sec'y of Commerce (Mar. 16, 1906), *in* 4 Digest of Int'l Law 513-14 (Green Haywood Hackworth ed. 1942) ("Hackworth") (*see* Exhibit 41, *infra*).

## ARGUMENT

Mr. Saab is a diplomatic agent of Venezuela who was, and remains, on mission to Iran. As such, he is entitled to immunity—from arrest, detention, and other actions impeding his mission— under the VCDR, customary international law, and the DRA.[15] As detailed below, the United

---

[15] The DRA binds federal courts to apply the VCDR. *See Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328, 1330 (11th Cir. 1984) ("The controlling statute on diplomatic immunity is the Diplomatic Relations Act of 1978, which incorporated the 1961 Vienna Convention on Diplomatic Relations."). The Convention also "codified longstanding principles of customary international law with respect to diplomatic relations," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 441 (2d Cir. 2019) (quoting *767 Third Ave. Assocs. v. Permanent Mission of the Republic of Zaire to*

States' obligation to honor Mr. Saab's immunity is not a policy matter. It is required by binding legal obligations that cannot be evaded or avoided because the United States does not recognize Nicolás Maduro as Venezuela's president or the "Maduro regime," a term the government has not defined.

**A.     The VCDR and DRA Guarantee Mr. Saab's Diplomatic Immunity**

1.     As a Special Envoy, Mr. Saab is a Protected Diplomatic Agent

Under the Eleventh Circuit's analysis in *Abdulaziz* a Special Envoy like Mr. Saab qualifies as a "diplomatic agent" who "shall not be liable to any form of arrest or detention" under the VCDR. 23 U.S.T. at 3240, Art. 29; *see also id.*, Art. 31. That case involved claims brought against a Saudi prince who was designated a "special envoy" during the litigation, but was not attached to Saudi Arabia's permanent embassy in the United States. Finding this designation dispositive, the court reasoned that "[t]he broadness in the language of the Vienna Convention is necessary, *since it is the foreign country that actually ranks its envoys, not the State Department*." 741 F.3d at 1331. (emphasis added) The court also noted that "Article 14 of the Vienna Convention classifies 'envoys' as Heads of Missions" and that "Heads of Missions are defined in § 254a of the Diplomatic Relations Act, and are protected by the Act." *Id.*; *see* 22 U.S.C. § 254a(1)(A). On that basis, the court found immunity and affirmed dismissal of the claims.

*Abdulaziz* controls here and demands dismissal for the same reasons. Mr. Saab's status as a "special envoy," rather than a permanent diplomatic representative, does not disqualify him from diplomatic-agent status. The *Abdulaziz* Court flatly rejected the argument that a defendant's "classification as 'special envoy' is not protected by the [DRA]." 741 F.2d at 1331. *See also United States v. Khobragade*, 15 F. Supp. 3d 383, 388 (S.D.N.Y. 2014) (noting that "*Abdulaziz* is persuasive precedent given that the standard for dismissing criminal and civil cases based on diplomatic immunity is the same." (footnote omitted)).

In addition, "the Vienna Convention premises diplomatic immunity upon recognition by the receiving state, which requires notification from the sending state." *Ali v. Dist. Dir., Miami Dist., U.S. CIS*, 743 F. App'x 354, 358 (11th Cir. 2018) (internal edits and quotation marks omitted). Both elements are met here. Venezuela's then-foreign minister, Mr. Jorge Arreaza

---

*the United Nations*, 988 F.2d 295, 300 (2d Cir. 1993)), and binds even non-signatories. *Swarna v. Al-Awadi*, 622 F.3d 123, 135 (2d Cir. 2010); *United States v. Enger*, 472 F. Supp. 490, 505 (D.N.J. 1978). Immunity therefore bars this case on its own force, with or without the DRA.

Montserrat, appointed Mr. Saab as Special Envoy in April 2018, conferring on him "broad powers to take steps on behalf of the Bolivarian Republic of Venezuela aimed at guaranteeing the commercial and humanitarian procurement of basic necessities for social assistance programmes of the national Executive . . . ." *See* Gonzalez Decl. Ex. A.[16]

2.     The Government Cannot Establish that Mr. Saab was not a Diplomat

In 2020, Mr. Saab was charged as Special Envoy with undertaking additional missions to Iran designed to obtain economic and humanitarian assistance needed due to the Covid-19 pandemic and harsh U.S. sanctions against Venezuela. Specifically, Mr. Saab undertook and successfully completed missions to Iran in March and April of 2020 and was on his way in June for his third mission when he was detained in Cape Verde. *See* Ex. 3 (April 1, 2020).

In connection with his missions, Mr. Saab was accredited to Ayatollah Ali Khamenei, Supreme Leader of the Islamic Republic of Iran, and carried numerous letters asking for Iranian assistance and documenting various agreements between Iran and Venezuela that he negotiated and helped to implement. *See* Mandl Decl. Exs. A-C. Iran, in turn, approved the missions and facilitated, through the Iranian Embassy in Caracas, Mr. Saab's meetings with senior Iranian officials. *See* Ex. 7. *See also* Ex. 12 ("[O]n June 12, 2020, DEA was able to corroborate that an Iranian delegation toured a Venezuelan owned gold mine with Saab-Moran . . ."). Mr. Saab qualifies as a diplomatic agent under the VCDR because he was recognized as such by Venezuela and Iran.

The government has never afforded this or any Court a basis to disagree with this conclusion. Although it persuaded the Eleventh Circuit to remand this case for further record development, *Saab Moran*, 2022 WL 1297807, at *2, the government has yet to cite the factual basis for claiming that Mr. Saab was not Venezuela's Special Envoy at all relevant times. Additionally, the record now confirms that Venezuela asserted immunity as to Mr. Saab through diplomatic channels to the United States. *See* Exs. 25, 26, 27. Because diplomatic immunity "belongs to the foreign state," *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d

---

[16] Thus Mr. Saab's appointment predated U.S. "de-recognition" of Maduro (January 23, 2019), and that appointment remains in full force and effect. *See Koch Minerals Sari v. Venezuela*, 514 F. Supp. 3d 20, 37 (D.D.C. 2020) (recognizing that service made on Venezuela's ministry of foreign affairs before January 23, 2019, remained valid afterwards).

1279, 1296 n.41 (11th Cir. 1999), neither the government nor a federal court can disagree with Venezuela's choice of diplomatic agents to third countries.

The record also confirms that Mr. Saab himself asserted his immunity at all relevant times, as he is entitled to do. *See United States v. Al Sharaf*, 183 F. Supp. 3d 45, 51 (D.D.C. 2016) (discussing 22 U.S.C. § 254d). Moreover, the record confirms that the government *knew* Mr. Saab was a diplomat when it arranged his arrest: it knew he was travelling to Iran for diplomatic purposes and that he was negotiating a gasoline-for-gold exchange. The record supports no conclusion other than that Mr. Saab is Venezuela's diplomatic agent.

### B.    Customary International Law Also Guarantees Mr. Saab's Diplomatic Immunity

Mr. Saab is independently entitled to immunity under customary international law. As the United Nations Secretariat explained, quoted in Michael Wood, "The Immunity of Official Visitors," 16 *Max Planck UNYB* 35, 40 (2012): "[t]he custom of sending a special envoy on mission from one State to another, in order to mark the dignity or importance of a particular occasion, is probably the oldest of all means by which diplomatic relations may be conducted.'" Indeed, in the early United States, special envoys were common, if not the predominant, diplomatic agents dispatched by Presidents to handle the Nation's interactions with foreign states. *See* Ryan M. Scolville, "Ad Hoc Diplomats," 68 *Duke L.J.* 907, 956-980 (2019) (examining the frequent and continuing use of special envoys by American Presidents from Washington to Trump). As the world's preeminent military and diplomatic power, the U.S. routinely employs numerous Special Envoys to undertake country-, region-, and issue-specific assignments, supplementing its cadre of regular ambassadors. *See* CRS *State Department Special Envoy, Representative, and Coordinator Positions: The Background and Congressional Actions* at 6-8 (Sept. 15, 2017), available at https://sgp.fas.org/crs/row/R44946.pdf.[17]

The customary international law immunity of Special Envoys also has been recognized in a United Nations-sponsored Convention on Special Missions ("UNCSM"), Dec. 8, 1969, G.A.

---

[17] One recent example of a United States mission headed by a Special Envoy is the ill-fated mission to Benghazi, Libya, initially headed by J. Christopher Stevens as Special Envoy, before his later appointment as ambassador. *See United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 121 (D.D.C. 2015). By way of further example, John Kerry was appointed by President Biden as a Special Presidential Envoy for climate, Bill Richardson served as a Special Envoy under President Clinton on numerous sensitive missions, and so on.

Res. 2530, 24 U.N. GAOR Supp. No. 30, at 99 *et seq.*, which recognizes that "persons of the representatives of the sending State in the special mission and of the members of its diplomatic staff shall be inviolable. They shall not be liable to any form of arrest or detention" and are immune "from criminal jurisdiction of the receiving State." *Id.* at 102, Art. 29, 103, Art. 31. Although the United States has not ratified this treaty, as the Court of Appeal of England and Wales (Civil Division) recently held, the UNCSM codifies the "core" immunities of "personal inviolability (that is, freedom from arrest or detention)" for diplomats on special missions. *R. (on the application of Freedom and Justice Party) v. Secretary of State for Foreign and Commonwealth Affairs*, [2018] EWCA Civ 1719, [5], 2018 WL 03459145 ("*FJP*").

The courts there (both the Court of Appeal and Divisional Court) recognized the immunity of an Egyptian official, allegedly responsible for atrocities committed during a 2013 coup, who planned a special mission to the United Kingdom. The Court of Appeal explained that "a rule of customary international law has been identified which now obliges a state to grant to the members of a special mission, which the state accepts and recognizes as such, immunity from arrest or detention (*i.e.*, personal inviolability)." *Id.* at [136].

The British courts reached this conclusion partially based on United States practice and, in particular, the 2007 statement of Department of State Legal Advisor John B. Bellinger III that "special mission immunity" should "be accorded to foreign officials" because it is "grounded in customary international law" and recognized in United States judicial precedents. *R (on the application of Hamed) and Others v. Secretary of State For Foreign and Commonwealth Affairs and Others*, [2016] EWHC 2010 (Admin) [127] (quoting John B. Bellinger III, *Immunities*, OpinioJuris (Jan. 18, 2007), http://opiniojuris.org/2007/01/18/immunities/); *see also FJP*, EWCA Civ 1719, at [32] (approving the Divisional Court's reliance on this statement). *See also* Wood, *supra*, at 72-73 (concluding that customary law provides special missions with "immunity from criminal jurisdiction and inviolability of the person.").

Accordingly, Mr. Saab is also entitled to immunity as a Special Envoy and Head of Mission under customary international law, which is equally binding on the United States. *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."); *Enger*, 472 F. Supp. at 504 ("The United States has long recognized the responsibilities imposed upon individual nations by force of international custom and treats the Law of Nations as the law of the land.").

C.      **U.S. Denial That Maduro is Venezuela's President does not Deprive Saab of Immunity**

1.      States Cannot Avoid Treaty Obligations Based on Foreign Policy Choices

The United States' refusal to recognize Nicolás Maduro as Venezuela's president is wholly insufficient to deny Mr. Saab's diplomatic status and entitlement to immunity. As the Supreme Court recognized in *In re Baiz*, 135 U.S. 403 (1890), the President's constitutional power to "receive ambassadors and other public ministers," U.S. Const. Art. II, § 3, is a power of diplomatic recognition that extends to diplomats "accredited by the United States to a foreign power or by a foreign power to the United States" but no further. 135 U.S. at 419. Mr. Saab was accredited to Iran, not to the United States. Moreover, as explained in the foundational treatise *Satow's Diplomatic Practice* 288-289 (7th ed. 2018), "[a] diplomatic agent is entitled to the[] limited immunities [of inviolability and *in transitu* immunity] irrespective of the relations between his sending and receiving State on the one hand and the third State on the other."

Notably, the VCDR's text does not contemplate that a state-party can ignore its obligations to other states parties because of foreign policy or political differences, or even upon a complete break in diplomatic relations. Nor does it suggest that, so long as two state parties (as sending and receiving states) recognize an individual as a diplomatic agent, that individual can be deprived of immunity because a third state does not recognize the government of one or both.

In fact, under both customary international law and treaty, neither a treaty partner's change in government, nor a break in diplomatic relations, relieves a state of its legal obligations to that partner. As stated in a leading treatise, "[a]s treaties are binding upon the contracting states, changes in the government, or even in the form of government, of one of the parties do not, as a rule, affect the binding force of treaties." 1 *Oppenheim's International Law*, part II, at § 623, p. 1253 (9th ed. 1996).[18] This is consistent with the Supreme Court's holding in *The Sapphire*, 78 U.S. (11 Wall.) 164, 168 (1870), that a change in head-of-state (through the deposition of Napoleon III there) does not affect the rights of the relevant state (France) to continue a suit for damages in U.S. courts: "The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty. A change in such representative works no change in the national sovereignty or its rights." As another court noted: "Since the notable precedent of *The Sapphire*, the principle is firmly established in our courts that

_____

[18] Attached as Exhibit 35.

the rights and liabilities of a state are unaffected by a change either in the form or personnel of its government, however accomplished, whether by revolution or otherwise." *Agency of Canadian Car & Foundry Co. v. American Can Co*., 253 F. 152, 157 (S.D.N.Y. 1918) (internal citation omitted), *rev'd on other grounds*, 258 F. 363 (2d Cir.1919). *Accord Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 731 F. Supp. 619, 622-23 (S.D.N.Y. 1990) (citing cases).

The principle that a change in government does not legally alter a state's contractual rights and responsibilities is thus widely accepted. This rule necessarily extends to a state's rights and responsibilities under a *treaty* which is a *contract* of much greater significance among nations. *BG Grp, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014); *Trans World Airlines, Inc. v. Franklin Mint Corp*., 466 U.S. 243, 253 (1984); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021). Thus, the basis for not allowing a mere regime change to vitiate treaty rights is even stronger.

Accordingly, even if the United States no longer "recognizes" Nicolás Maduro as president, Venezuela undoubtedly continues to exist as a sovereign nation and the United States' obligations under the VCDR and the DRA to respect Mr. Saab's immunity as Venezuela's Special Envoy is unchanged. "No other doctrine is thinkable, at least among nations which have any conception of international honor." *Agency of Canadian Car & Foundry Co.,* 253 F. at 157.[19]

The same rule applies to a break in diplomatic relations. As noted by a leading international law scholar and judge of the International Court of Justice: "[t]he following grounds in particular can never *in themselves* . . . justify [a state's] repudiation of its obligations . . . (iii) *By reason of the principle pacta sunt servanda* (a) That there is a dispute or disagreement between the parties, or a state of strained relations, or that diplomatic relations have been broken off." *See* G.G.

---

[19] The government identified one contrary commentator, *see* Eileen Denza, *Diplomatic Law 4E: Commentary on the Vienna Convention on Diplomatic Relations*, at 371 (2016), who asserts that third party states will not regard themselves bound to respect the VCDR immunities of diplomats whose governments they do not recognize. She provides no authority for this claim and offers only the example of U.S. authorities refusing to recognize the diplomatic status of the Taliban's former ambassador to Pakistan. But this situation was unique. The United States had *never* recognized the Taliban and the "diplomat" was expelled from Pakistan and handed over to U.S. or allied forces effectively functioning as the *sending state's* (Afghanistan) government. Returning a diplomat to his sending state does not violate his immunity. It is impossible to draw any general principles from this example. Denza also does not consider the treaty rights of a *receiving* state.

Fitzmaurice, Special Rapporteur, Second Report on the Law of Treaties, Doc. A/AN.4/107, (Extract) Yearbook of the International Law Comm., 1957, vol. II, at 23.

This fundamental principle was incorporated into the Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331 (1969) ("VCLT"), at Art. 63, which provides that "[t]he severance of diplomatic or consular relations between parties to a treaty does not affect the legal relations established between them by the treaty except insofar as the existence of diplomatic or consular relations is indispensable for the application of the treaty."[20] Significantly, a proposal made during the treaty negotiations to exclude the VCDR from this rule was flatly rejected. *See* Olivier Corten & Pierre Klein, 1 *The Vienna Convention on the Law of Treaties: A Commentary* 1191, 1194 (2011). "Ultimately, therefore, Art 63 excepts no treaty types. . . . Rather, all treaty types are treated alike: they are all covered by both the general rule and the [impossibility of performance] exception, provided that they meet the latter's strict conditions." *Id.* at 1194. It is not impossible for the United States to respect the immunities of Venezuelan diplomats accredited to third states regardless of the relations between the two countries.

Thus, the United States has binding obligations under the VCDR, DRA, and customary law to respect Mr. Saab's diplomatic immunity regardless of its position vis-à-vis Maduro. That immunity is based on his appointment as Special Envoy by Venezuela and the acceptance of that status by Iran. Both states were exercising their rights under the VCDR, and other treaty parties like the United States must respect that status so far as the treaty imposes obligations on third-party states—as it does, particularly with respect to the immunity of diplomats *in transitu* to and from their sending and receiving states, a form of immunity discussed at length below.

      2.    The United States Continues to Recognize the Venezuelan Foreign Ministry in Performing its Treaty Obligations

The U.S.-Venezuela diplomatic relationship also is quite different from what the government suggests. The United States continues to recognize the government of Venezuela. It has taken the position that, because of an allegedly fraudulent election, President Maduro's term of office ended in January 2019. It then recognized Juan Guaidó, President of the Venezuelan National Assembly, as Interim President of Venezuela because this is what the Venezuelan constitution requires upon a presidential vacancy. *See* Statement from Donald J. Trump

---

[20] The United States has not ratified the VCLT but recognizes it as a statement of customary international law. *See Aquamar, S.A.*, 179 F.3d at 1296 n.40.

Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela (Jan. 23, 2019), *available at* https://br.usembassy.gov/statement-from-president-trump-recognizing-juan-guaido-as-the-interim-president-of-venezuela/.

President Trump's statement also indicated that the National Assembly was "the only legitimate branch of government duly elected by the Venezuelan people," but said nothing regarding other, non-elected elements of the Venezuelan government—including Venezuela's ministry of foreign affairs ("MFA"). In fact, the United States continues to recognize that agency in carrying out its treaty obligations, as it did before action was taken against Nicolás Maduro.[21] Thus, in *Uribe v. Luque*, No. 8:21-cv-934, 2021 WL 3518154 (M.D. Fla. May 3, 2021), both the Department of State and the court accepted and implemented a request made by a Venezuelan national through the MFA, acting as "Central Authority" pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980) ("Hague Child Abduction Convention"). *See Zaoral v. Meza*, No. H-20-1700, 2020 WL 5036521, at *10 (S.D. Tex. Aug. 26, 2020) (noting Venezuela's MFA is its Central Authority).

Like a number of multi-lateral treaties, under the Hague Child Abduction Convention state parties "designate a Central Authority to discharge the duties which are imposed by the Convention on such authorities." Art. 6. In particular, a Central Authority receives requests for assistance from individuals whose children have been abducted and forwards these to the Central Authority of the country where the child is believed to be present. Art. 8. That country must then "take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child." Art. 10. Failing such voluntary return, recourse may be had to the courts of the requested state for an order requiring the child's return.

---

[21] The U.S. also continues to negotiate with what it calls the Maduro "regime." *See* Patricia Garip, Vivian Salama and Kejal Vyas, "U.S. Looks to Ease Venezuela Sanctions, Enabling Chevron to Pump Oil," *WSJ*, Oct. 5, 2022. *See also,* Anatoly Kurmansev, Natalie Kitroeff and Kenneth P. Vogel, "U.S. Officials Travel to Venezuela, a Russian Ally, as the West Isolates Putin," *The N.Y. Times*, Mar. 5, 2022. Most recently, in fact, the U.S. negotiated with the Maduro government for the release of several Americans held in Venezuela in exchange for Venezuelan nationals held in the United States. *See* AP, "Venezuela Releases 7 Jailed Americans in Prisoner Swap," *USA Today*, World (Oct. 1, 2022) *available at* https://www.usatoday.com/story/news/world/2022/10/01/venezuela-releases-american-prisoners-swap-maduro-relatives/8153344001/.

In *Uribe*, the child's mother absconded from Venezuela to Florida (in 2020), taking the child without the father's consent. The father submitted a petition to the MFA, which was duly forwarded to the State Department as the U.S. Central Authority under the treaty. Clearly recognizing the MFA's authority to invoke the United States' treaty obligations, the State Department forwarded a letter (dated Feb. 9, 2021) to the child's mother, asking whether she was willing to work with the father and other professionals "to facilitate the resolution of your family's conflict without engaging in litigation." *See* Exhibit 36.

This Court properly took a similar approach in *Isaac Indus., Inc. v. Petroquimica de Venezuela, S.A. et al.*, No. 19-23113-CIV-Scola/Goodman, 2022 WL 820376 (S.D. Fla. Mar. 1, 2022), *adopted by* 2022 WL 1203004 (Apr. 22, 2022), which involved the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, 20 U.S.T. 361 (Nov. 15, 1965) ("Hague Service Convention"), for which the MFA is also Venezuela's Central Authority. *Isaac Industries* brought a contract claim against the Venezuelan national oil company ("PDVSA"), among others, and service was contested. The summons and complaint were first delivered to the MFA in September 2019, nine months *after* the United States' action against Maduro. *See* Exhibit 37.

When plaintiffs moved for default, Judge Goodman held that service on the MFA was properly completed under Art. 15, ¶ 2 of the Hague Service Convention, *see* 2022 WL 820376 at *12, although he denied the motion because plaintiffs had failed to invoke the court's jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). He recommended, however, that plaintiffs be given an opportunity to replead under FSIA, but that defendants should not "be permitted to challenge service of process since Plaintiff has met the requirements of Article 15, paragraph 2." *Id.* at *14. The Court affirmed and adopted "Judge Goodman's report and recommendations in its entirety," prohibiting defendants "from re-asserting a challenge to service of process." 2022 WL 1203004, *1 (S.D. Fla. Apr. 22, 2022). *See also Lindsayca USA, Inc. v. Petroleos de Venezuela, S.A.*, No. 4:21-cv-00037 (S.D. Tex. Aug. 22, 2022) (delivery of complaint and summons to Central Authority in Caracas (on Oct. 6, 2021), in addition to meeting the three requirements of Art. 15 ¶ 2, properly effected service).

Thus, the United States clearly continues to recognize the MFA as a legitimate organ of the Venezuelan government for purposes of meeting the treaty obligations both states have undertaken. And, as the United States continues to recognize the MFA for the purposes of

implementing the Hague Service Convention and the Hague Child Abduction Convention, there is no basis in law or logic to deny recognition of the MFA for purposes of implementing the VCDR's provisions.

> ### D. Mr. Saab's Diplomatic Immunity Includes Personal Inviolability and *In Transitu* Immunity from Arrest and Detention

>> #### 1. Inviolability

By virtue of the VCDR, the DRA and customary international law, Mr. Saab is entitled to the highest levels of diplomatic immunity. Chief among them is "[p]ersonal inviolability," including immunity from arrest and detention, which is "of all the privileges and immunities of missions and diplomats the oldest established and the most universally recognized." *Tachiona v. United States*, 386 F.3d 205, 223 (2d Cir. 2004) (quoting *Satow's Guide to Diplomatic Practice* 120 (Lord Gore-Booth ed., 5th ed. 1979)); *see also 767 Third Ave.*, 988 F.2d at 299–300. As the renowned international law scholar Vattel put it: "Whoever offers any violence to an ambassador, or any other public minister, not only injures the sovereign whom this minister represents, but he also hurts the common safety and well-being of nations: he becomes guilty of an atrocious crime towards the whole world." Emmerich de Vattel, The Law of Nations or Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns § 81, p. 680 (Luke White ed. 1792).[22]

U.S. domestic law similarly recognizes the principle of diplomatic inviolability. Indeed, the first Congress enacted a law to ensure diplomats' safe-conduct, making it a felony to "assault, strike, wound, imprison or in any other matter infract the law of nations by offering violence to the person of an Ambassador or other public Minister." *See* Act of April 39, 1790, ch.9, § 28, 1 Stat. 112 (1790). *See also Bergman v. De Sieyes*, 71 F. Supp. 334, 335 (S.D.N.Y. 1946), *aff'd* 170 F.2d 360 (2d Cir. 1948) (1790 Act was "merely declaratory of the common law, of which the law of nations is a part."). The DRA replaced the 1790 Act in 1978. It is now a felony, punishable by up to ten years' imprisonment, to attempt or to "make[] a[] violent attack upon the[] person or liberty" of an "internationally protected person" or their "means of transport[.]" 18 U.S.C.

---

[22] Attached as Exhibit 38.

§ 112(a).[23] This statute also makes it a felony to "willfully . . . intimidate[], coerce[], threaten[] or harass[] a foreign official or an official guest or obstruct[] a foreign official in the performance of his duties" or attempt to do so, including foreign ministers and ambassadors, among other high-ranking officials. 18 U.S.C. §§ 112 (b)(1)–(2), (c), § 1116(b).

Because a diplomatic agent like Mr. Saab "shall not be liable to any form of arrest or detention," VCDR, 23 U.S.T. at 3240, Art. 29, the government's orchestrating of his arrest, obtaining his extradition from Cape Verde to the United States, and detaining him to this day are all unlawful violations of the longstanding, fundamental principle of diplomatic inviolability.

2.    *In Transitu* Immunity

Diplomatic inviolability extends to diplomats who are traveling through third states on their way to or from their sending/receiving states. *See* 23 U.S.T. 3227, at 3246, Art. 40. This, too, is among the most basic and ancient requirements of international law. As Vattel stated long ago, "that prince alone to whom the minister is sent, is under a particular obligation that he shall enjoy all the rights annexed to his character: yet the others through whose dominions he passes, are not to deny him those regards to which the minister of a sovereign is intitled, and which nations reciprocally own to each other." Vattel, *supra,* at 23, § 55, p. 664. Elliot's treatise likewise affirms that a third country "is not to maltreat him [a diplomat *in transitu*], nor suffer any insult to be offered to his person." Jonathan Elliot, A Concise Diplomatic Manual, Containing a Summary of the Law of Nations, in 2 Am. Diplomatic Code 398, ¶ 60 (1834).[24] This right has been codified in the VCDR, Art. 40, which requires third-party states to accord a diplomat in transit, as was Mr. Saab, "inviolability and such other immunities as may be required to ensure his transit or return,"

---

[23] The statute contains express extraterritoriality language, declaring "[i]f the victim of an offense under subsection (a) is an international protected person outside the United Sates, the United States may exercise jurisdiction over the offense if . . . (2) the offender is a national of the United States . . . ." 18 U.S.C. § 112(e).

[24] *Accord* H.W. Halleck, 1 *Int'l Law, or Rules Regulating the Intercourse of States in Peace & War*, 362 § 32 (3d ed. 1893) ("In passing through the territory of a friendly state, other than that of the government to which he is accredited, a public minister, or other diplomatic agent, is entitled to the respect and protection due to his official character . . . . He has a right of innocent passage through the dominions of all States friendly to his own country, and to the honors and protection which nations reciprocally owe to each other's diplomatic agents, according to the dignity of their rank and official character.") (attached as Exhibit 39).

and that these obligations also apply to states where a diplomat's presence was unplanned and/or the result of main force. *See* 23 U.S.T. 3227, at 3246, Art. 40(1), (4).

(a)     *U.S. Courts Recognize In Transitu Immunity*

"*In transitu*" immunity has long been accepted, promoted, and demanded by the United States, and is fully recognized by its courts. The leading case is *Bergman v. De Sieyes*, which involved a French diplomat's claim of immunity from civil suit, after having been served in New York while *in transitu* to his post in Bolivia. The district court, after extensively examining existing precedent, State Department practice and that of other countries, as well as customary international law treatises, concluded: (1) that a foreign minister is immune from civil and criminal jurisdiction in the country to which he is accredited because he is his sovereign's alter ego and because subjection to such jurisdiction would interfere with the performance of his duties; and (2) that a foreign minister en route, either to or from his post in another country, is entitled to innocent passage through a third country and is also entitled, on the same grounds to the same immunity while in that state that he would have if permanently posted there. 741 F. Supp. at 341.

The Second Circuit unanimously affirmed. Indeed, Judge Learned Hand concluded that "there are better reasons for favoring the immunity of a diplomat *in transitu*" than that of those posted to permanent missions and thus, "the courts of New York would today hold that a diplomat *in transitu* would be entitled to the same immunity as a diplomat *in situ*." 170 F.2d at 363.[25] Like Mr. Saab, the diplomat in *Bergman* was not accredited to the United States and had not yet reached his destination. Judge Hand found that "[i]t is scarcely necessary to add that immunity would be altogether frustrated, in the case of all diplomats seeking their posts for the first time, if it were limited to those already accepted by the sovereign to whom they are accredited." *Id.* Similarly, in *Rosal*, the district court held that "under the common law of nations, diplomats-in-transit (although not accredited to the United States) are entitled to immunity when they are in the United States en route between their diplomatic posts and their respective home countries." 191 F. Supp. at 664 (citing *United States v. Melekh*, 190 F. Supp. at 85-86 and authorities cited therein).

These rules are rooted in the Supreme Court's foundational ruling in *The Schooner Exchange v. M'Faddon*, 11 U.S. (Cranch) 116 (1812), where, in ruling that U.S. courts lacked

---

[25] Although technically construing New York law, the Circuit clearly indicated that the state's view of customary international law on this point was correct.

jurisdiction to adjudicate a civil claim against a French warship under customary international law, Chief Justice Marshall specifically noted the related rule that there is an "immunity which all civilized nations allow to foreign ministers," *i.e.*, diplomats. *Id*. at 138. This diplomatic immunity "is implied from the consideration that, without such exemption, every sovereign would hazard his own dignity by employing a public minister abroad. His minister would owe temporary and local allegiance to a foreign prince, and would be less competent to the objects of his mission." *Id*. at 139.

Like a warship, a diplomat "acts under the immediate and direct command of the sovereign; is employed by him in national objects." *Id*. at 144. And, as with warships, the sovereign "has many and powerful motives for preventing those objects from being defeated by the interference of a foreign state" and "[s]uch interference cannot take place without affecting his power and dignity." *Id*.[26]

    (b)    *The Executive Branch Demands in Transitu Immunity for U.S. Diplomats*

The Executive Branch has long taken a broad view of *in transitu* immunity as being grounded in the fundamental right of all states to send and receive diplomats (the right of "legation" or "embassy"). The State Department has demanded this immunity not only for American diplomats,[27] but also for foreign diplomats traveling to take up their posts in the United States—even in times of war. Thus, during World War I, the State Department demanded *in transitu* immunity for an Austro-Hungarian diplomat, accredited to the United States, to pass through sea lanes controlled by Britain and France. 4 Hackworth, *supra,* at § 388 at 462–63 (attached as Exhibit 41). Despite their status of belligerents vis-à-vis Austria-Hungary, this was granted after the State

---

[26] Moreover, under the *The Schooner Exchange*'s logic, pursuant to customary law, a sovereign can refuse *in transitu* immunity to a diplomat only if expressed prior to the commencement of the passage "in a manner not to be misunderstood"; otherwise, international law implies the sovereign's right to safe passage and its corresponding diplomatic immunity. *Id*. at 146.

[27] The State Department acknowledged and demanded *jus transitus innoxii* for an American diplomat as early as 1854 during the "Soulé affair." The U.S. minister to Spain, Pierre Soulé, was detained while traveling through France to Madrid. *See* Moore, 4 *A Digest of Int'l Law* 557 (1906) (attached as Exhibit 40). The U.S. Minister to France "immediately addressed a protest to the French Government, not only against the interruption of Mr. Soulé's journey, but also against the refusal, as he supposed, of the French Government to permit Mr. Soulé to pass through that country." *Id*. France considered Soulé a subversive, but nevertheless recognized his *in transitu* rights and sent him on to Spain. *Id*. at 558.

Department informed the Allies that the United States had "an *undisputed* right to maintain diplomatic relations through accredited representatives with any nation, and that it could not believe that the British and French Governments intended to interfere with the exercise of this sovereign right." *Id*. at 463. (emphasis added).

The Department of State similarly expressed its unequivocal intent to honor the *in transitu* immunity of third country diplomats in 1924, when Charles Evans Hughes (then Secretary of State, later Chief Justice) wrote to the U.S. Minister to Panama regarding the customary international law obligation to allow third country diplomats—*i.e.*, those not accredited to Panama or the U.S.— to transit the U.S. controlled Canal Zone on their diplomatic missions. Hughes advised that, while such diplomats' "status in the territory of the canal zone" was uncertain, "[i]t would seem . . . that their status might be regarded as analogous to that of a diplomatic envoy traveling through the territory of a third state en route to his post." *Id.* at 461–62. Thus, because the "institution of legation" is necessary for diplomacy to exist, "there ought to be no doubt whatever that such a third state must grant the right of innocent passage (*jus transitus innoxii*) to the envoy, provided that it is not at war with the sending or receiving state. The United States asserts that according to the law of nations a diplomatic officer is entitled to a right of transit to his post by sea, or through the national domain, whether land or water, of a state other than that to which he is accredited." *Id.* at 461.

Accordingly, Mr. Saab is fully entitled to diplomatic immunity, including personal inviolability, even though he is not accredited to the United States and not recognized as a diplomatic agent by the Secretary of State on that account. The United States has never conceded that its *in transitu* diplomats lack the most basic immunities of personal inviolability, including immunity to arrest and detention, and it would not concede as much today. The purpose of diplomatic immunity is "to protect the interests of comity and diplomacy among nations, and, not incidentally, to ensure the protection of our own diplomats abroad." *Devi v. Silva*, 861 F. Supp. 2d 135, 143 (S.D.N.Y. 2012). There is no room for the government to deny immunity to Mr. Saab when it has consistently demanded that same immunity for its own diplomats.

(c)     *Immunity is Fully Supported by Art. 40.4 (Force Majeure)*

VCDR Article 40.1 codifies *in transitu* immunity, providing that "[i]f a diplomatic agent passes through or is in the territory of a third state, which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his

own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return." It is unclear whether a visa was necessary in the case of the refueling stop Mr. Saab's plane made in Cape Verde but he was in fact issued a visa at the Cape Verde airport. With respect to the United States, it sought Mr. Saab's extradition and brought him to this country *knowing* that he was a diplomat *in transitu* and immune from arrest and detention. No further notification was necessary, and by forcibly bringing Mr. Saab to the United States the government waived any visa requirement that might otherwise apply. As a matter of law, therefore, he fully complied with Art. 40.1 requirements for recognition of his immunity, and also with the Special Mission Convention Art.42.4 notification requirements.

In addition, VCDR Article 40.4 directly addresses the situation where a diplomat *in transitu* finds himself in a state, through which he had not planned to travel, whether by chance or by force. The text is framed in terms of the diplomat's presence being the result of "force majeure," which is "a superior force" from the French, and describes "[a]n event or effect that can be neither anticipated nor controlled." Black's Law Dictionary 718 (9th ed. 2009). *See also* 6 Oxford English Dictionary 1989 (2d ed. 1989) (force majeure defined as "[i]rresistible force or overwhelming power."). Significantly, "force majeure covers human as well as natural causes." 1978 Yearbook of the International Law Commission, Vol. II, part 1, at p. 68. It is also to be distinguished from the concept of emergency or necessity: "Force majeure, on the other hand, is an external and irresistible force which operates independently of the will of the agent." *Id.* at p. 73. (The UNCSM also guarantees force majeure immunity at Art. 42.5).

That is this case. Mr. Saab was forcibly and unlawfully detained by Cape Verde authorities during a routine refueling stop and unlawfully imprisoned there for sixteen months. He was then, without notice and while his judicial challenges were still pending in the Cape Verde courts, seized by government paramilitaries, handcuffed, and taken to a waiting plane where American agents forcibly took custody and brought Mr. Saab to the United States against his will and that of his sending state. Mr. Saab is, therefore, also entitled to *in transitu* immunity on the basis of force majeure.

(d)     *In Detaining Mr. Saab, the United States Violates the Right of Legation*

The government's failure to accord Mr. Saab diplomatic immunity also violates the sovereignty and core international law rights of Venezuela and Iran. As noted by Chief Justice Hughes above, these include the "right of legation," *see* Hackworth, *supra*, at 461. One leading

publicist describes the right as follows: "Every independent State has a right to send public ministers to, and receive ministers from, any other sovereign State with which it desires to maintain the relations of peace and amity." Henry Wheaton, *Elements of International Law* 374 (3d ed. 1863).[28] Since the United States has at all relevant times recognized Venezuela's sovereignty, and the right of legation is a core attribute of sovereignty, the key provision of the U.N Charter— Article 2(1) which requires adherence to the principle of the sovereign equality of all U.N. member states—unquestionably mandates that the United States cannot impair the right of legation of either Venezuela or Iran to exchange special envoys endowed with diplomatic immunity.

### E.   The Government Is Not Entitled to Deference

The government is not entitled to deference on the question of Mr. Saab's immunity. He is not accredited to the United States and the Executive Branch's authority to recognize or reject a diplomat's status is grounded in the Constitution's "Reception Clause," Article II, § 3. *See Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) ("The Reception Clause recognizes the President's authority to determine the status of diplomats, a fact long confirmed by all three branches"). But the Reception Clause authorizes the President to "*receive* Ambassadors and other public Ministers," (emphasis added), and therefore applies only where the United States is the receiving state. It cannot be construed to authorize the State Department to issue authoritative rulings, either on the diplomatic relations between other nations or on the United States' obligations under the VCDR. Through the DRA, Congress vested that authority in the courts.[29]

Nor is there any determination meriting deference. The State Department's Office of Foreign Missions ("OFM") certification that Mr. Saab does not appear on the listing of diplomats accredited to the United States, and its perfunctory statement that it "is not aware of a basis for [Mr. Saab] to enjoy immunity from the criminal or civil jurisdiction of the United States," is

---

[28] Attached as Exhibit 42.

[29] In an instructive case, *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002), the Court considered what "citizens or subjects of a foreign state" means for purposes of determining alienage diversity jurisdiction under 28 U.S.C. § 1332(a)(2). It rejected the Second Circuit's position in *Matimak Trading Co. v. Khalily*, 118 F.3d 76 (2d Cir. 1997), which looked to whether the Executive Branch had recognized the relevant state as such. Instead, the Court focused on Congressional intent and the statute's underlying purpose—there, to satisfy foreign governments by opening the federal courts to claims by their citizen creditors. Because the British Virgin Island was sufficiently a state (although a British dependency unrecognized by the U.S. as such) for those purposes, the Court concluded that the statute applied. *Id.* at 96.

meaningless. ECF 24-3.[30] The bare assertion of unawareness is neither conclusive nor even informative on the relevant factual predicates to immunity, and it offers no legal analysis to which the Court could defer.

Moreover, any deference the State Department enjoys vis-à-vis diplomats accredited to the United States concerns the *fact* of diplomatic status, not the *legal significance* of that status. The State Department's certification "is . . . evidence to prove the diplomatic character of a person accredited" as a factual matter, *In re Baiz*, 135 U.S. at 421, but the federal courts still "must ensure that the State Department's certification was not based on an impermissible interpretation of the Vienna Convention." *United States v. Al-Hamdi*, 356 F.3d 564, 570 (4th Cir. 2004). Thus, the *Abdulaziz* Court concluded that State Department recognition of a Saudi prince as a Special Envoy was unreviewable, but this deference concerned the recognition itself, not its legal effect. *See* 741 F.2d at 1330–31. The Court itself determined *that category of diplomat* is entitled to immunity under the VCDR and the DRA. As shown above, a Special Envoy is entitled to immunity under the Convention, and the government has no authority to declare otherwise.

F.     **The Actions of Cape Verde and The Act of State Doctrine are Irrelevant**

The government's bald assertion that "[a]ny transit immunity to which SAAB MORAN could possibly enjoy in the United States must be an extension of the transit immunity he enjoyed when transiting Cape Verde," ECF No. 135 at 9, is unsupported by authority and is plainly wrong. Nothing in the VCDR suggests that one state's decision to recognize or not recognize an *in transitu* diplomat's immunity is in any way binding on any other state party. That treaty imposes equal and independent obligations on the United States and Cape Verde to comply with its terms. And, as a matter of U.S. law, the United States' treaty obligations are in no way derivative of Cape Verde's obligations. They are governed by the treaty as well as the DRA and the Eleventh Circuit's controlling opinion in *Abdulaziz*. Consequently, the government's reliance on the "act of state" doctrine is misdirected and meritless. Mr. Saab does not ask this Court to review Cape Verde's extradition decision, but to enforce the *United States'* indisputable international law obligations

---

[30] The government's reliance on OFM's statement is misplaced. Moreover, OFM's statement should be subject to substantial scrutiny as detailed in Mr. Saab's pending motion for reconsideration, *see* ECF No. 146, particularly in light of the documents identified to date that call into question the representations made by OFM. *Id.*

by recognizing Mr. Saab's diplomatic immunity as Special Envoy from Venezuela to Iran. The act of state doctrine simply has no application here.[31]

Similarly, the government's misguided collateral estoppel claim, asserting that Mr. Saab's immunity was already adjudicated in the Cape Verde courts, is without merit. *See* ECF 135 at 11. This argument is specious for three independent reasons. First, that country's judiciary made the recognition of immunity dependent on an act of the Cape Verde's executive branch rather than a judicial analysis of whether Mr. Saab was entitled to immunity. It was a political question. The Cape Verde Attorney General informed that country's Constitutional Court as follows: "The competence to recognize the quality of special envoy belongs to the Executive Branch and not to the Judiciary Branch." *See* Exhibit 43 (Letter dated 28 June 2021) at 28. The Constitutional Court unequivocally agreed. *See* ECF 135-3 at 193.

Second, even had Cape Verde courts ruled on the question of immunity, this would not and could not bind a U.S. court in applying the VCDR and DRA. As the Supreme Court has found, "[i]f treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law 'is emphatically the province and duty of the judicial department,' headed by the 'one supreme Court' established by the Constitution." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 353-354 (2006) (quoting *Marbury v. Madison*, 1 U.S. (Cranch) 137, 177 (1803)). And, of course, the rulings of foreign courts do not bind the courts of the United States. *See Medellin v. Texas*, 552 U.S. 491, 518 (2008) ("A [foreign court] judgment is binding only if there is a rule of law that makes it so.").

Third, the Cape Verde courts considered only Mr. Saab's claim to immunity under the UNCSM. Under Eleventh Circuit law, however, his claim to immunity is principally grounded in the VCDR, and those instruments are not identical. As noted above, VCDR Art. 40.1 requires a

---

[31] The *Ker-Frisbie* doctrine is equally inapposite. *See Ker v. Illinois*, 199 U.S. 426, 444 (1886); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952). Those cases establish that the Due Process Clause is not offended where a defendant is brought within the court's jurisdiction through improper, even illegal, means. *See also United States v. Alvarez-Machain*, 504 U.S. 655 (1992) (reaffirming the *Kerr-Frisbie* doctrine). By contrast, Mr. Saab is immune from the Court's jurisdiction as an *in transitu* diplomatic agent who is not subject to arrest or detention, and is also entitled to "such other immunities as may be required to ensure his transit or return." VCDR, at Art. 40.1. There can be no question that continuance of these proceedings impedes performance of Mr. Saab's diplomatic duties and his diplomatic immunity prohibits this Court from exercising jurisdiction over him.

visa only if "necessary," whereas Art. 42.4 of the UNCSM, requires that the third party State "has been informed in advance . . . of the transit."[32] Moreover, the Cape Verde court also did not opine on Mr. Saab's claims under VCDR Art. 40.4 or UNCSM Art. 42.5 (force majeure).

## CONCLUSION

From time immemorial, it has been recognized that diplomats must enjoy immunity from arrest, detention, or any type of violence or harassment in order to fulfil their critical role. As the International Court of Justice stated in its Order of 15 December 1979, taking provisional measures against Iran after its occupation of the United States Embassy in Tehran: "there is no more fundamental prerequisite for the conduct of relations between States than the inviolability of diplomatic envoys and embassies . . . the obligations thus assumed . . . assuring the personal safety of diplomats and their freedom from prosecution, are essential, unqualified, and inherent in their representative character and their diplomatic function." *See* Case Concerning United States Diplomatic and Consular Staff in Tehran (U.S. v. Iran), Order Indicating Provisional Measures, ¶ 38 (Dec. 15, 1979) available at https://www.icj-cij.org/public/files/case-related/64/064-19791215-ORD-01-00-EN.pdf.

This is especially the case today, where the dangers of global war are real and immediate. As a global power, with diplomats traveling the world, the United States necessarily has a strong interest in the integrity and consistent vindication of the most basic diplomatic immunities, including and especially the personal inviolability that protects its diplomats from arrest and detention and criminal prosecution. And it is legally required to comply with the VCDR, DRA, customary international law, and caselaw.

The Court should dismiss the Indictment and order Mr. Saab's immediate release so that he can continue his Mission to Iran or return to Venezuela for additional instruction on that mission.

---

[32] Ignoring Mr. Saab's diplomatic immunity, Cape Verde nevertheless accorded immunity to his family during their visits to him in that country, even though their immunity is necessarily derivative of his. *See* UNCSM Art. 42.4. In any event, it is also important that Cape Verde never objected to Mr. Saab's transit through that country.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9</u>

Counsel has conferred with Counsel for the government pursuant to Local Rule 88.9 in a good faith effort to resolve the issues raised in this motion and has been unable to do so.

Date: October 17, 2022

Respectfully submitted,

BAKER & HOSTETLER LLP

/s/ *Lindy K. Keown*
Lindy K. Keown (FL: 117888)
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801
Tel: (407) 649-4000
lkeown@bakerlaw.com

/s/ *David B. Rivkin, Jr.*
David B. Rivkin, Jr. (*pro hac vice*)
Elizabeth Price Foley (FL: 92380)
Jonathan R. Barr (*pro hac vice*)
Lee A. Casey (*pro hac vice*)
Richard Raile (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
drivkin@bakerlaw.com
efoley@bakerlaw.com
jbarr@bakerlaw.com
rraile@bakerlaw.com

Jonathan B. New (*pro hac vice*)
45 Rockefeller Plaza
11th Floor
New York, New York 10111
Tel: (212) 589-4200
jnew@bakerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 17, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/  *Lindy K. Keown*
Lindy K. Keown

36