IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEX NAIN SAAB MORAN, and
ALVARO PULIDO VARGAS, a/k/a
"German Enrique Rubio Salas,"

Defendants.

Case No. 19-20450-CR-Scola

## DECLARATION OF DR. JOSÉ MANUEL PINTO MONTEIRO

1.      I, **JOSÉ MANUEL PINTO MONTEIRO**, am a member of the Bar

Associations of the Republic of Cape Verde and the Republic of Portugal, with respective

membership numbers 15/01 and 16146L. I have been practicing constitutional and criminal

law since 1985.

2.      I have personal knowledge of the facts set forth in this declaration. I am above

the age of eighteen and would be competent to testify at trial to the information contained

herein. I am fluent in Portuguese, English, and French and have a good understanding of

Spanish.

3.      From April 1991 to March 1992, I was appointed Secretary of State for

Emigration and Communities of Cape Verde.[1] My responsibilities as Secretary of State were

principally related to dealing with the needs of overseas Cape Verdean communities. This,

among other responsibilities, required extensive coordination with the Ministry of Foreign

Affairs in relation to consular policy.

---

[1] In Portuguese, Secretário de Estado da Emigração e das Comunidades. The "Secretary of
State" position in Cape Verde is the equivalent of an "Under-Secretary" or "Vice-Minister"
position in other countries, hence the use of the "Vice-Minister" nomenclature in my previous
declaration.



4.      I am lead counsel to Mr. Alex Nain Saab Moran ("Mr. Saab") in Cape Verde and have in this role been since 13 June 2020, following his detention in Cape Verde on 12 June 2020.

5.      I have previously submitted a declaration in this matter, filed at Docket No. 29-1 (1 Mar. 2021). I hereby repeat and reaffirm the statements in my previous declaration and incorporate them as if fully set forth herein.

6.      In particular, as I detailed previously, prior to commencing his Special Mission to Iran in June 2020, Mr. Saab was provided with three letters, issued by the Bolivarian Republic of Venezuela and addressed to senior government officials of the Islamic Republic of Iran ("the Letters"). The Letters, dated 1 and 11 June 2020, were seized by the judicial police of Cape Verde on 12 June 2020, the day of his detention.

7.      Following his arrest, Mr. Saab was primarily held in prison on the island of Sal (except for a short transfer to the island of São Vicente and back for a court appearance before the Barlavento Court of Appeal, which handles extradition matters). I, however, am based in Praia, on the island of Santiago. At that time, due to strict COVID-19 lockdowns, I was unable to travel to Sal until 24 July 2020.

8.      Consequently, an attorney colleague of mine who has a law firm on Sal was engaged to also assist in representation of Mr. Saab. His name is Dr. Floriano Mandl.

9.      Dr. Mandl was able to visit Mr. Saab in prison, liaise with the local authorities, and otherwise be physically present on Sal to assist with the representation while I was still on Santiago.

10.     I am aware that Dr. Mandl collected Mr. Saab's suitcase and belongings from Sal prison. I understand that on 22 July 2020, he then brought the letters and other documents to another member of Mr. Saab's legal team at the hotel Odjo d'Agua. They were then given

to me upon my arrival at the hotel on 24 July 2020.[2] The other belongings were delivered to the hotel at a later date.

11.      I have no doubt that the letters are authentic as I detailed in my prior declaration (at paragraph 5). In summary, from my experience as a Secretary of State and having worked closely with the Cape Verde Ministry of Foreign Affairs, I have seen formal official and diplomatic communications. The size and "feel" of the paper, the embossed coats of arms, and the way that each letter was presented in its individual folder and labeled, are each distinctive characteristics. Further, the content of the letters is consistent with public statements made by the Venezuelan State and State-to-State communications between Venezuela and Cape Verde that I have reviewed. Finally, I also spoke to Venezuelan Ambassador, H.E. Alejandro Israel Correa Ortega, to authenticate the original signatures on the Letters of President Nicolas Maduro and the Executive Vice President, Delcy Rodrigez Gomez.

12.      In detail, I describe the Letters as:

(1) A white envelope with a colored crest with the caption "República Bolivariana de Venezuela Presidente" containing a folder with crest and title "Presidencia de la República Bolivariana de Venezuela" in gold text. Inside the folder was a two-page letter in Spanish, dated June 11, 2020, from Nicolas Maduro Moros addressed to the Supreme Leader of the Islamic Republic of Iran, Ayatolá Ali Jamenei.

(2) A white envelope with gold crest with the caption "República Bolivariana de Venezuela Vicepresidencia de la República Despacho" with a label "Para" (for): Kazam Khavazi, Ministro de Agricultura de la República Islámica de Íran and "De" (from): Delcy Rodríguez Gómez, Vicepresidenta Ejecutiva de la República Bolivariana de Venezuela, in turn containing a folder with crest and title "República Bolivariana de Venezuela Vicepresidencia de la República Despacho" in gold text. Inside the folder was a one-page letter in Spanish dated June 1, 2020, with the notation VP-2020 and stamped number 000101, from Delcy Rodríguez Gómez to Kazam khavazi.

(3) A white envelope with gold crest with the caption "República Bolivariana de Venezuela Vicepresidencia de la República Despacho" with a label "Para" (for):

---

[2] My prior declaration incorrectly stated that I received the letters on 23 July 2020. I have subsequently confirmed that it was the following day.

Sadegh Kharazi, Senior Adviser to the Vicepresident and "De" (from): Delcy Rodríguez Gómez, Vicepresidenta Ejecutiva de la República Bolivariana de Venezuela, in turn containing a folder with crest and title "República Bolivariana de Venezuela Vicepresidencia de la República Despacho" in gold text. Inside the folder was a one-page letter in Spanish dated June 1, 2020 with the notation VP-2020 and stamped number 000106, from Delcy Rodríguez Gómez to Sadegh Kharazi.

13.    In addition to the Letters, there was also a separate, brown folder that contained substantial documentation that appeared to be of an economic nature. There were various loose documents and folders, and the stack in total was about ¾ to 1 inch thick.

14.    As I noted in my previous declaration (at paragraph 6), I lodged a criminal complaint on behalf of Mr. Saab against the judiciary police on 8 September 2020 for concealing the Letters from the prosecutor. That complaint remains unanswered.

15.    After Mr. Saab was detained on Sal, his first court appearance was before the Criminal Court of the Judicial District of Sal. That Court issued a decision on 14 June 2020 regarding Mr. Saab's continued detention, which I have attached as **Exhibit A**. There, the Court observed, among other things:

> The accused or formal suspect came on a plane from Venezuela bound for Iran. He confirmed that he was in the country only in passing and that he was traveling as a diplomatic agent of the Bolivarian Republic of Venezuela.

16.    This confirms that Mr. Saab raised the issue of his diplomatic immunity from the very first court appearance.

17.    Further, the Barlavento Relations Court in Mindelo, Cape Verde observed in a decision dated June 18, 2020, that Mr. Saab when arrested confirmed "that he was traveling as a representative of the Government of Venezuela . . . on his way to Iran for essential goods." *See* ECF No. 24-2 (June 18, 2020).

18.    Both decisions are consistent with legal petitions asserted by Mr. Saab in Cape Verde from the beginning including a *habeas corpus* petition dated June 17, 2020, in which Mr. Saab, through counsel, confirmed that he was traveling from Caracas to Tehran on a

special mission, accepted by the Islamic Republic of Iran. A copy is attached hereto as

**Exhibit B**. This document was prepared, signed, and submitted by me to the Cape Verde

Supreme Court of Justice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on September 30, 2022
Lisbon, Portugal

J.M. Pinto Monteiro

# EXHIBIT A

*[Emblem: Republic of Cape Verde]*
**REPUBLIC OF CAPE VERDE**
**COURT OF THE JUDICIAL DISTRICT OF SAL**
**CRIMINAL COURT**
**Tel/Fax: 2411209**

**Decision**

The Public Prosecutor's Office came, through the learned support and furtherance of page 1, to promote the judicial hearing and the decision to validate and maintain the detention, in conjunction and combined with Articles 4/2, 29, 38, 39, 53/5, 62.64 of Law No. 6 / VIII / 2011 dated 29th August (Law of International Judicial Co-operation on Criminal Matters - LCJIMP) and 78, 259, 262, 272 and 274 all from the CPP of ALEX NAIN SAAB MORAN, claiming the constant in that promotion which is here fully reproduced.

It is clear from the provisional detention process, the letter sent to the District Attorney of this District by the Attorney General of the Republic (PGR), the order issued by the PGR of provisional detention for extradition, the referral by the National Director of the Judicial Police to the PGR Office of the international arrest warrant for the aforementioned citizen, the red alert arrest warrant issued by INTERPOL against the citizen Alex Nain Saab Moran, the certificate of his detention, the arrest report, the copy of his passport, the health declaration with details of the crew and passengers issued by the General Directorate of Emigration of the Bolivarian Republic of Venezuela, the communication made by the INTERPOL Office with the PGR Office, the arrest warrant issued by the Florida Court, indictment and photographs, whose contents are fully reproduced here.

The Law of International Judicial Co-operation on Criminal Matters – LCJIMP, determines that there should be mutual legal assistance and reciprocity in criminal matters and that Cape Verde is bound not only by its domestic laws but also by the international treaties, conventions and agreements of which it is a party and has ratified (Articles 1, 3 and 4).

The aforementioned accused or formal suspect has international arrest warrants pending against him, due to an accusation against him in the Florida Court. In his statements, he said that he learned from the news of these accusations that when he was arrested, he was explained the reason for the arrest, which is because there is an arrest warrant issued by INTERPOL.

The Law of International Judicial Co-operation on Criminal Matters – LCJIMP, establishes that, in the event of an emergency (Article 38) and as a prior act of a formal request for extradition, provisional detention of the person to be extradited may be requested.

Before the existing international warrant against the accused or formal suspect due to charges for facts that constitute a crime both in the USA and in Cape Verde, facts that have in our country, a penal framework of up to 12 years in prison, the national authorities have been informed that the accused would be on a flight that would be charged on this island, in view of such information, as well as the previously existing warrant, he would be detained by the authorities who had jurisdiction, presented in due time to the court, heard in the presence of the Public Prosecutor, constituted agent and interpreter, under the combined terms of Articles 6, 8, 78 and 88 of the Code of Criminal Procedure - CPP.

1
*(initials – illegible)*

*[Emblem: Republic of Cape Verde]*
**REPUBLIC OF CAPE VERDE**
**COURT OF THE JUDICIAL DISTRICT OF SAL**
**CRIMINAL COURT**
**Tel/Fax: 2411209**

It follows from the aforementioned law that the accused or formal suspect shall be heard by the Court of Appeal, *in casu* of Barlavento, however, due to the current situation, it would not be possible within the legally prescribed period to submit it to the Court of Appeal, which is why the provisions in Article 53/5 and 6 of the aforementioned law was implemented. Therefore, I declare his detention valid.

Let us now look at his maintenance, because the question that arises is whether until the accused or formal suspect is present at the Court of Appeal, his detention should be maintained or another enforcement measure applied (Articles 38/6 and 39 of the LCJIMP - Law of International Judicial Co-operation on Criminal Matters).

The accused or formal suspect came on a plane from Venezuela bound for Iran. He confirmed that he was in the country only in passing and that he was traveling as a diplomatic agent of the Bolivarian Republic of Venezuela. Were it not for the information and the international warrant issued, the accused or formal suspect would continue his journey normally, because he admits he was aware of such charges against him. Given the accused or formal suspect's way of traveling, it is clear that he has the knowledge and the means to travel / transport smoothly and at any time internationally, as the aforementioned plane does not belong to commercial flights and, not even the current situation of the Pandemic kept him in his country of origin or in his country of residence.

The formal suspect is accused of having committed crimes of money laundering and corruption, and given the seriousness of the accusation, the way the accused was detained and the existing international warrant against him, we believe that there is no justification to change the provisional detention measure, as nothing to date has been added to the records in that sense. Despite the defense alleging that he has health problems, no document was in the file to attest to this proposition, and even were it so, the local authorities have to ensure his physical well-being.

Thus, in the combined terms of the aforementioned articles of the International Judicial Cooperation Law on Criminal Matters, I determine that the defendant's provisional detention be maintained, under the terms and time frames established in that Law (Articles 29, 38, 39, 53/5 and 6, 62 and 64). That is why I order him to be taken to the prison establishment of this local island where he must wait until it is possible to take him to the São Vicente Court of Appeal, under the legal terms.

I also order the Public Prosecutor to arrange for transport and presentation to the Court with the utmost urgency.

Issue conduct warrants.

Refer these records to the Public Prosecutor.

Notify.

Espargos, 14th June 2020

The Judge
*(Signature)*
Adalgiza *(illegible)* dos Santos

2



**REPÚBLICA DE CABO VERDE**
**TRIBUNAL JUDICIAL DA COMARCA DO SAL**
**JUÍZO CRIMINAL**
Telefone/fax: 2411209

**Despacho**

Veio o Ministério Público, através da douta promoção de fls. 1, promover a audição judicial e decisão de validação e manutenção da detenção, nos termos conjugados dos arts. 4º/2, 29º, 38º, 39º, 53º/5, 62º e 64º da Lei de nº 6/VIII/2011 de 29 de agosto (Lei de cooperação judiciária internacional em matéria penal - LCJIMP) e 78º, 259º, 262º, 272º e 274º todos do CPP de ALEX NAIN SAAB MORAN, alegando o constante da referida promoção que aqui se dá por plenamente reproduzido.

Resulta do processo de detenção provisória, o ofício enviado ao Procurador de turno desta Comarca pelo Procurador Geral da República (PGR), o despacho proferido pelo PGR de detenção provisória para extradição, a remessa pelo Diretor Nacional da Polícia Judiciária para o Gabinete do PGR do mandado de detenção internacional do cidadão supra referido, o mandado de detenção com alerta vermelho emitido pela INTERPOL contra o cidadão Alex Nain Saab Moran, a certidão de sua detenção, o auto de notícia de sua detenção, a cópia do seu passaporte, a declaração sanitária com dados da tripulação e dos passageiros emitido pela Direção Geral de Emigração da Republica Bolivariana da Venezuela, a comunicação feita pelo Gabinete da INTERPOL com o Gabinete do PGR, o mandado de detenção emitido pelo Tribunal da Florida, acusação e fotografias, cujos conteúdos aqui se dão plenamente reproduzidos.

Determina a LCJIMP que deve haver auxílio judiciário mútuo e reciprocidade em matéria penal e que Cabo Verde está vinculado não só por suas leis internas como também pelos tratados, convenções e acordos internacionais de que faça parte e tenha ratificado (arts.1º, 3º e 4º).

O arguido acima mencionado tem pendente contra si mandados de detenção internacionais, devido a acusação contra ele no Tribunal da Florida, em suas declarações disse que soube através das notícias dessas acusações, que aquando de sua detenção foi-lhe explicado o motivo da mesma, que é porque há um mandado de detenção emitido pela INTERPOL.

Estabelece a LCJIMP que, em caso de urgência (art. 38º) e como ato prévio de um pedido formal de extradição pode solicitar-se a detenção provisória da pessoa a extraditar.

Ante ao mandado internacional existente contra o arguido devido a acusação por factos que constituem crime quer nos EUA, quer em Cabo Verde, factos esses que têm em nosso país, uma moldura penal de até 12 anos de prisão, foi comunicado as autoridades nacionais de que o arguido estaria num voo que iria abastecer-se nesta ilha, ante a tal informação, bem como ao mandado previamente existente o mesmo foi detido, por autoridades competentes, apresentado atempadamente a juízo, ouvido na presença do MP, mandatário constituído e intérprete, nos termos conjugados dos arts. 6º, 8º, 78º e 88º CPP.

1



REPÚBLICA DE CABO VERDE
TRIBUNAL JUDICIAL DA COMARCA DO SAL
JUÍZO CRIMINAL
Telefone/fax: 2411209

Resulta da citada lei que o mesmo deverá ser ouvido pelo Tribunal da Relação, in casu de Barlavento, todavia, devido a conjuntura atual, não seria possível dentro do prazo legalmente prescrito apresentá-lo ao Tribunal da Relação, razão pela qual deu-se cumprimento ao disposto no art. 53º/5 e 6 da citada lei. Sendo assim, declaro válida a sua detenção.

Vejamos agora sobre a manutenção da mesma, pois, a questão que se coloca é se até o arguido ser presente ao Tribunal da Relação deverá ser mantido sua detenção ou aplicar-lhe outra medida de coação (art. 38º/6 e 39º da LCJIMP).

O arguido veio num avião proveniente da Venezuela com destino ao Irão, o mesmo confirmou que estava no país somente de passagem e que viajava enquanto agente diplomático da República Bolivariana da Venezuela, se não fosse pela informação e pelo mandado internacional emitido, o arguido seguiria viagem normalmente, porquanto admite que tinha conhecimento de tais acusações contra si. Ante a forma o arguido como se deslocou, é evidente que o mesmo tem conhecimentos e meios para se deslocar/transportar sem problemas e a qualquer hora a nível internacional, pois o citado avião não pertence aos voos comerciais e, nem mesmo a conjuntura atual da Pandemia serviu para o manter no seu país de origem ou no seu país de residência.

O arguido é acusado de ter cometido crimes de lavagem de capital e corrupção, ante a gravidade da acusação, a forma como o arguido foi detido, ao mandado internacional existente contra ele, cremos que não se justifica proceder a alteração da medida de detenção provisória, porquanto nada até o momento junta aos autos abona nesse sentido. Não obstante a defesa alegar que o mesmo tem problemas de saúde, nenhum documento foi junto aos autos que atestasse tal tese, e ainda que assim fosse, as autoridades locais têm como assegurar o seu bem-estar físico.

Deste modo, nos termos conjugados dos artigos acima mencionados da Lei cooperação Judiciária Internacional em Matéria Penal, determino que se mantenha a detenção provisória do arguido, nos termos e prazos estabelecidos na referida lei (arts. 29º, 38º, 39º, 53º/5 e 6, 62º e 64º). Razão pela qual ordeno que o mesmo seja conduzido ao estabelecimento prisional desta ilha local onde deverá aguardar até que seja possível conduzi-lo ao Tribunal da Relação de São Vicente, nos termos legais.

Ordeno ainda que o MP diligencie com urgência máxima o seu transporte e apresentação no aludido Tribunal.

Passe mandados de condução.

Remeta-se estes autos ao MP.

Notifique-se.

Espargos, 14 de junho de 2020.

A Juíza de Direito

Adalgiza Milton da Rosa Vilhua dos Santos

2

# EXHIBIT B

Proceedings: **Habeas Corpus**
Plaintiff: Alex Naim Moran Saab
Court: Supreme Court of Justice


MOST HONORABLE MADAM
PRESIDENT OF THE SUPREME COURT OF JUSTICE

YOUR HONOR,

PRAIA, 17 June 2020

**ALEX NAIM MORAN SAAB**, id, in the proceedings, currently held at the Central Prison at Ribeirinha, Mindelo, S. Vicente, hereby and in the terms of articles 18.c) and following of the CPP (Code of Penal Procedure), requests **HABEAS CORPUS**, under the following terms and for the following reasons:

1. The Plaintiff was detained on 12 June 2020 at 19 hours and 28 minutes, on the Island of Sal, Cape Verde, hereinafter the RCV [Republic of Cape Verde],
2. allegedly on the grounds of the existence, on 13 June 2020 (cf. Doc. 1), of an Interpol red alert relating to the Plaintiff and actioned by the United States of America, hereinafter the USA, delivered to the Plaintiff at 19 hours and 28 minutes.
3. The Plaintiff was travelling from Caracas, Venezuela, to Tehran, Islamic Republic of Iran, the IRI or Iran, on a special service mission for the Bolivarian Republic of Venezuela, hereinafter the BRV or Venezuela.
4. The BRV mission order was issued and accepted by the Islamic Republic of Iran (cf. Doc. 2).
5. The plane that transported the Plaintiff was authorized by RCV's competent bodies to land at Sal airport in order to refuel the plane so that it could continue its journey to Iran.
6. On 9 April 2018, the Plaintiff was named as Special Envoy of the Government of Venezuela (cf. Doc. 3).
7. having been given broad powers on behalf of the BRV to take measures aimed at acquiring basic goods and services for national social welfare programs, including food, equipment to produce and process food, medicine and medical equipment.
8. The Plaintiff was authorized to deal with government authorities, representatives of institutions and companies, both public and private, in order to find practical solutions to complex situations affecting Venezuela.
9. On 1 April 2020, and in the context of the COVID-19 pandemic, the Venezuelan Minister for Foreign Affairs charged the Plaintiff with the duty of acquiring much-needed humanitarian resources for Venezuela.
10. With this aim, the Venezuelan Minister for Foreign Affairs informed the Plaintiff that, as well as his normal efforts to obtain food and medicines, he was charged, in this specific case, with negotiating with organizations in the IRI.
11. On 8 June 2020, the IRI Embassy in the BRV sent a Verbal Note to the Venezuelan Minister for Foreign Affairs (cf. Doc. 4).
12. The Verbal Note was sent prior to the visit of the Plaintiff to the IRI and contained confirmation of the Plaintiff's meetings between 13 and 16 June 2020, regarding the purchase of the food and medicines Venezuela needed as a matter of urgency.
13. On 8 June 2020, the Venezuelan Minister for Foreign Affairs confirmed receipt of the Verbal Note that had been sent on the same day by the Iranian Embassy in Venezuela (cf. Doc. 5).
14. On 12 June 2020, the Plaintiff was detained at the airport on the island of Sal, in Cape Verde, during a technical stop for refueling, supposedly at the request of the USA.

[initial]
2

15. On 13 June 2020, the Venezuelan Minister for Foreign Affairs sent a communication to the Cape Verdean Minister for Foreign Business, Communities and Defense, in which he invoked immunity of [sic] in accordance with international law. He confirmed that, at the time he was imprisoned, the Plaintiff was acting on behalf of Venezuela, with the objective of obtaining medical supplies, medicines and food of which Venezuela had urgent need in the context of the COVID-19 pandemic (cf. Doc. 6).

16. On the same day, 13 June 2020, the Venezuelan Minister for Foreign Affairs sent an additional communication to the Cape Verdean Minister for Foreign Business, Communities and Defense, in which he again invoked immunity of the Plaintiff in accordance with international law (cf. Doc. 7).

17. On 14 June 2020, the Ambassador of Venezuela in the Republic of Senegal (accredited before Cape Verde, the Republic of Gambia, the Republic of Guiné-Bissau and the Islamic Republic of Mauritania) sent a communication to the Minister of Foreign Affairs in Cape Verde (cf. Doc. 8).

18. The Ambassador explained that the Plaintiff had travelled as a representative of the President of Venezuela, Nicolás Maduro Moros, who could not leave Venezuela whilst he was guiding and leading the country in the fight against the COVID-19 pandemic.

19. The Ambassador also explained that the Plaintiff enjoyed, nevertheless, the same ratione personae immunity as the President of Venezuela would have if he had travelled to Cape Verde, and that this immunity has not been renounced by Venezuela.

20. However, the BRV protested before the Government of Cape Verde in relation to the detention of the Plaintiff,

21. by means of written notes sent by the Embassy of the BRV to the Embassy of Cape Verde in Dakar,

22. and by means of letters to the Venezuelan Minister for Foreign Affairs.

23. The Venezuelan Minister for Foreign Affairs responded to the written note from the Embassy of the BRV as per the document annexed.

24. The detention of the Plaintiff is illegal because it constitutes interference and intrusion into affairs of the RBC on the part of the RCV and the USA.

25. The United Nations Charter (the "**UN Charter**") is a treaty. As a member of the UN, Cape Verde is a part of this UN Charter. Article 103 of the United Nations Charter establishes that *"[i]n the case of conflict between the obligations of the Members of the United Nations arising from this Charter and its obligations arising from any other international treaty, its obligations arising from this Charter shall prevail"*. The consequence generated by Article 103 of the UN Charter is that, for example, in the case of conflict between the obligations of Cape Verde according to the UN Charter and its obligations according to the 2003 United Nations Convention against Corruption (the "**UNCAC**"),[1] the 2000 United Nations Convention against Transnational Organized Crime (the "**UNTC**")[2] or an ad hoc extradition treaty, the obligations of Cape Verde according to the UN Charter prevail.

26. Article 2(1) of the United Nations Charter provides for sovereign equality of Countries.[3] In fact, both conventions establish that the Member Countries should fulfil their obligations under these conventions in a way that is consistent with the principles of sovereign equality and territorial

---

[1] Cape Verde signed the UNCAC on 23 April 2008. The USA signed the UNCAC on 30 October 2006. We observe that at the moment of depositing its instrument of ratification, the USA did not inform the Secretary-General of the UN, as per Article 44(6)(a) of the UNCAC, as to whether it would consider the UNCAC to be legal grounds for cooperation in extradition processes with other countries that were part of the UNCAC.

[2] Cape Verde signed the UNTC on 15 July 2004. The USA signed the UNTC on 3 November 2005. We observe that at the moment of depositing its instrument of ratification, the USA did not inform the Secretary-General of the UN, as per Article 16(5)(a) of the UNCAC, as to whether it would consider the UNCAC to be legal grounds for cooperation in extradition processes with other countries that were part of the UNCAC.

[3] UN Charter, Article 2(1).

integrity of the Countries and with non-intervention in internal matters of other Countries.[4]

27. The principle of sovereign equality is one of the basic principles of international Law. One of the corollaries of sovereign equality of the Countries is the basic duty of each Country to not interfere in internal affairs of other Countries.

28. In dealing with the principle of non-intervention, the International Court of Justice (the "**ICJ**") declared that *"[the] principle of non-intervention is the sovereign right of each Country to conduct its affairs without outside interference; … The Court considers that this is an integral part of common international Law"*.[5]

29. For example, on 11 June 2020 (one day before the imprisonment and detention of the Plaintiff), the USA declared that its sovereignty was under threat due to an investigation by the International Criminal Court (the "**ICC**") into employees of the US Government in connection with supposed crimes in a territory over which the ICC has jurisdiction.[6]

30. Clearly, imprisonment and extradition of employees of a foreign Government violates the sovereignty of that Country. Neither the state of emergency or the existence of an INTERPOL request for pre-trial detention pending extradition (that is, the Red Alert) releases CV [Cape Verde] from its obligations arising from international law, in particular the obligation to not interfere in matters of other sovereign Countries. Venezuela invokes its own rights of sovereignty as a Country. Nevertheless, the fact that Mr. Saab recommended a local attorney does not change the fact that Venezuela has the right to oppose the violation of its sovereign rights and to insist that interference in its affairs be quickly brought to an end. As such, it cannot be said that the extradition procedures will be continued. Neither Country can invoke its own internal law to justify non-observance with its international obligations. Furthermore, CV cannot place its confidence in the Red Alert because it has been formally contested by Venezuela under the terms of article 135 of the INTERPOL Standards on Data Handling. In any case, by its own definition in the INTERPOL Rules on Data Handling, a Red Alert is not a prison mandate, but a request from INTERPOL to its member countries. In responding to this request, each member country is responsible for doing so in accordance with its own international obligations.

31. Cape Verde has an obligation not to interfere in the internal affairs of Venezuela.

32. By arresting and subsequently detaining the Plaintiff, Cape Verde interfered in internal affairs of Venezuela: it obstructed the Plaintiff in executing his humanitarian mission on behalf of Venezuela, the objective of which was to obtain medical supplies, medicines and food which Venezuela had urgent need of in the context of the COVID-19 pandemic.

33. The interference of Cape Verde in the internal affairs of Venezuela also violates article 11.1 of the CRCV by means of which Cape Verde is guided "*by the principles … of equality between Countries [and] non-interference in internal affairs of other Countries*".

34. The rules of common international Law contained in these treaties do not allow, in any way, for Cape Verde interfering in Venezuela's affairs.

35. As set out above, Article 2.1 of the UN Charter and the rule of non-intervention, corollary of common international law, prohibit such intervention.

36. The detention of the Plaintiff is also illegal because:
    a) it constitutes violation of the immunity granted to the special envoy of a country travelling to another country,
    b) and it affects his personal inviolability.

37. Common international law consecrates personal immunity (ratione personae) and the inviolability of the special envoy whilst in a high position within the BRV,

38. Therefore, he cannot be criminally prosecuted by a Third Country, which the RCV is in this case.

39. Immunity is, thus, a rule well-established in International Law and that, in one of its less contested

---

[4] Article 4 of the UNTC; Article 4 of the **UNCAC**.
[5] Military and Paramilitary Activities in and against Nicaragua (Nicaragua v United States of America) (Substantial Part, Ruling) [1986] ICJ Rep 14, para. 202.

2/3 [initial]



CERTIFIED TRANSLATION
19/06/2020
REG.07635166
LANGUAGE REACH

aspects, consists of personal inviolability that protects governors against coercive measures when visiting foreign countries (prison or detention, for example) and against offenses to their person and to their dignity, allowing the beneficiary of this immunity to be exempt from a legal proceedings in the courts of a foreign Country.

40. The recognition of immunity aims precisely to guarantee the independence of Countries from each other and for officials of each Country to effectively carry out their functions.

41. Thus, there is no doubt that to subject an acting official of a foreign Country to detention, hearings, measures or acts aimed at gathering evidence, or to notification of the charges brought against them, interferes or can interfere with the carrying out of their function.

42. Immunity from criminal jurisdiction and inviolability are absolute, being justified by the need to allow the government officials to carry out their functions without being the object of coercive measures.

43. Furthermore, we add that the President of Venezuela, Nicolás Maduro Moros, enjoys ratione personae immunity.

44. If the President of Venezuela were to travel to Cape Verde, the Cape Verdean authorities would be obliged not to practice any act of authority at all against him.

45. The President of Venezuela cannot leave Venezuela whilst he is guiding and leading the country in the fight against the COVID-19 pandemic.

46. In his place, the President of Venezuela authorized and sent the Plaintiff to represent him in foreign affairs relating to Venezuela.

47. In this way, the Plaintiff enjoys enjoys ratione personae immunity that the President of Venezuela would have enjoyed had he traveled to Cape Verde on 12 June 2020, and this immunity has not been renounced by Venezuela.[7]

48. In effect, and as set out above, the Government of Venezuela informed the Government of Cape Verde that the Plaintiff enjoyed immunity,

49. following the Advisory Opinion of the International Court of Justice (the "**ICJ**") in *Cumaraswamy*, the Government of Cape Verde should now make the courts of Cape Verde aware of the immunity of the Plaintiff.

50. What precedes means that, upon arresting and detaining the Plaintiff, the authorities of Cape Verde took coercive measures that obstructed the Plaintiff in the carrying out of his functions as a special envoy of the BRV and took action in a situation over which no body or entity in Cape Verde had jurisdiction or competence.

51. The ratione personae immunity of the Plaintiff has been violated.

52. Finally, the detention of the Plaintiff is illegal because it is based on a Red Alert issued on 13 June 2020, when the detention occurred on 12 June 2020.

53. If, on 12 June 2020 there was no red alert in the Interpol data handling system,

54. this means that the alert does not exist under which the Attorney-General of the RCV ordered the detention of the Plaintiff under article 39 of the LCJIMP (Law n.° 66/VIII/2001, of 29 August),

55. With information relating to the Plaintiff being quickly entered into the Interpol processing system to justify his arrest on 13 June.

56. Also, the red alert is not an international detention mandate, merely a request for identification and localization of a person aimed at pre-trial detention and extradition.

57. Interpol can certainly not oblige any of the member countries to detain any person referred to in a red alert,

58. and any person who is the object of this alert is considered to be presumably innocent until their guilt can be reasonably demonstrated by a due and fair legal proceedings.

59. There being no valid red alert relating to the Plaintiff there is no jurisdiction for the courts of Cape Verde to carry out the request for pre-trial detention, based on article 39 of the LCJIMP.

60. From an illegal act of international law by the Country of Cape Verde, which is the detention of the Plaintiff in his capacity as special envoy of the BRV, there arises no jurisdiction for the RCV and its Courts to uphold an illegal detention carried out by its police authorities.



CERTIFIED TRANSLATION
19/06/2020
REG.07635166
LANGUAGE REACH

61. The result of that set out is that the imprisonment of the Plaintiff, whilst a beneficiary of diplomatic immunity and personal inviolability granted by common international law, was a detainment that was ordered by an incompetent body, because the Cape Verde courts have no jurisdiction over the Plaintiff.

In these terms, and in others of applicable law, we request that the detention of the Plaintiff be considered illegal on the grounds invoked and, under line b) of article 18 of the Criminal Code, we request the immediate release of the Plaintiff, **ALEX NAIM MORAN SAAB**.

We expect and await JUSTICE.

The Attorney, with authority in the proceedings,

[signature]
José Manuel Pinto Monteiro
C.P. n.° 15/01
NIF [taxpayer number] 103135243

[stamp:]
JOSÉ MANUEL PINTO MONTEIRO
ATTORNEY
Tel.:(238) 291 6363
Fax: (238) 291 3745
C.P. 158-C – [illegible] – CAPE VERDE



Processo: **Habeas Corpus**
Requerente: Alex Naim Moran Saab
Instância: STJ


EXCELENTÍSSIMA SENHORA
PRESIDENTE DO SUPREMO TRIBUNAL DE JUSTIÇA

EXCELÊNCIA,


PRAIA, 17 de Junho de 2020


**ALEX NAIM MORAN SAAB**, id. nos autos, ora detido na Cadeia Central de Ribeirinha, Mindelo, S. Vicente, vem, por este meio e ao abrigo dos artigos 18.c) e ss do CPP, requerer a providência de **HABEAS CORPUS**, o que faz nos termos e pelos motivos seguintes:

1.  O Requerente foi detido no dia 12 de Junho de 2020, pelas 19 h 28 m, na ilha do Sal, Cabo Verde, doravante RCV,
2.  alegadamente com base na existência, à data de 13 de Junho de 2020 (V. Doc. 1), de um alerta vermelho da Interpol referente ao Requerente e colocado pelos Estados Unidos da América, doravante USA, entregue ao Requerente às 19h:28m.
3.  O Requerente viajava de Caracas, Venezuela, para Teerão, República Islâmica do Irão, RII ou Irão, em missão especial de serviço da República Bolivariana de Venezuela, doravante RBV ou Venezuela.
4.  A ordem de missão da RBV foi emitida e aceite pela República Islâmica do Irão (V. Doc. 2).
5.  O avião que transportava o Requerente foi autorizado pelas entidades competentes da aeronáutica civil de RCV a aterrar no aeroporto do Sal e com a finalidade de abastecimento do avião em combustível e seguir viagem para o Irão.
6.  Em 9 de abril de 2018, o Requerente foi nomeado como Enviado Especial do Governo da Venezuela (V. Doc. 3).
7.  tendo recebido amplos poderes em nome da RBV para tomar providências destinadas à aquisição de bens e serviços básicos para programas nacionais de assistência social, incluindo alimentos, equipamentos para a produção e processamento de alimentos, medicamentos e equipamentos médicos.
8.  O Requerente foi autorizado a lidar com autoridades governamentais, representantes de instituições e empresas, tanto públicas quanto privadas, a fim de encontrar soluções práticas para situações complexas que afetam a Venezuela.
9.  Em 1 de abril de 2020, e no contexto da pandemia de COVID-19, o Ministro das Relações Exteriores da Venezuela encarregou o Requerente da responsabilidade de adquirir recursos humanitários de grande necessidade na Venezuela.
10. Com esse objetivo, o Ministro das Relações Exteriores da Venezuela informou o Requerente de que, além de seus esforços habituais para obter alimentos e remédios, havia sido encarregado, neste caso específico, de negociar com organizações na RII.
11. Em 8 de junho de 2020, a Embaixada da RII na RBV enviou uma Nota Verbal ao Ministério das Relações Exteriores da Venezuela (V. Doc. 4).
12. A Nota Verbal foi enviada anteriormente à visita do Requerente à RII e continha uma confirmação das reuniões do Requerente entre 13 e 16 de junho de 2020 relacionadas à compra de alimentos e medicamentos necessitados com urgência pela Venezuela.
13. Em 8 de junho de 2020, o Ministério das Relações Exteriores da Venezuela acusou o recebimento da Nota Verbal que havia sido enviada no mesmo dia pela Embaixada do Irã na Venezuela (V. Doc. 5).
14. Em 12 de junho de 2020, o Requerente foi detido no aeroporto da ilha do Sal, em Cabo Verde, durante uma escala técnica para reabastecimento, supostamente a pedido dos EUA.

2

19/06/2020
REG.07635166

15. Em 13 de junho de 2020, o Ministro das Relações Exteriores da Venezuela enviou uma correspondência ao Ministro dos Negócios Estrangeiros, Comunidades e Defesa de Cabo Verde, no qual invocou a imunidade do em conformidade com o direito internacional. Ele afirmou ainda que, no momento de sua prisão, o Requerente estava atuando em nome da Venezuela com o objetivo de obter suprimentos médicos, remédios e alimentos necessitados com urgência pela Venezuela no contexto da pandemia de COVID-19 (V. Doc. 6).

16. No mesmo dia, 13 de junho de 2020, o Ministro das Relações Exteriores da Venezuela enviou uma correspondência adicional ao Ministro dos Negócios Estrangeiros, Comunidades e Defesa de Cabo Verde, na qual novamente invocou a imunidade do Requerente em conformidade com o Direito internacional (V. Doc. 7).

17. Em 14 de junho de 2020, o Embaixador da Venezuela na República do Senegal (acreditado perante Cabo Verde, a República da Gâmbia, a República da Guiné-Bissau e a República Islâmica da Mauritânia) enviou uma correspondência ao Ministério das Relações Exteriores em Cabo Verde (V. Doc. 8).

18. O Embaixador explicou que o Requerente viajou como representante do Presidente da Venezuela, Nicolás Maduro Moros, que não pode deixar a Venezuela enquanto guia e conduz no país no combate à pandemia de COVID-19.

19. O Embaixador explicou ainda que o Requerente goza, portanto, da mesma imunidade *ratione personae* de que o Presidente da Venezuela teria desfrutado se tivesse viajado por Cabo Verde, e essa imunidade não foi renunciada pela Venezuela.

20. Portanto, a RBV protestou perante o Governo de Cabo Verde em relação à detenção do Requerente,

21. com notas escritas enviadas pela Embaixada da RBV à Embaixada de Cabo Verde em Dakar,

22. e por cartas do Ministro do Poder Popular e das Relações Exteriores da RBV enviadas ao Ministro dos Negócios Estrangeiro da RCV.

23. O Ministro dos Negócios Estrangeiros da RCV respondeu à nota escrita da Embaixada da RCV conforme documento em anexo.

24. A detenção do Requerente é ilegal por constituir interferência e ingerência nos assuntos da RBC por parte da RCV e dos USA.

25. A Carta das Nações Unidas (a "**Carta da ONU**") é um tratado. Como membro da ONU, Cabo Verde está vinculado à Carta da ONU. O Artigo 103 da Carta das Nações Unidas estabelece que "*[e]m caso de conflito entre as obrigações dos Membros das Nações Unidas decorrentes da presente Carta e suas obrigações decorrentes de qualquer outro acordo internacional, suas obrigações decorrentes da presente Carta prevalecerão*". A consequência gerada pelo Artigo 103 da Carta da ONU é que, por exemplo, em caso de conflito entre as obrigações de Cabo Verde segundo a Carta da ONU e suas obrigações segundo a Convenção das Nações Unidas contra a Corrupção de 2003 (a "**CNUCC**"),[1] a Convenção das Nações Unidas contra o Crime Organizado Transnacional de 2000 (o "**CNUCCOT**")[2] ou um tratado de extradição *ad hoc*, prevalecem as obrigações de Cabo Verde segundo a Carta da ONU.

26. O Artigo 2(1) da Carta das Nações Unidas prevê a igualdade soberana dos Estados.[3] De fato, ambas as convenções estabelecem que os Estados Partes devem cumprir suas obrigações sob essas convenções de maneira consistente com os princípios de igualdade

---

[1] Cabo Verde ratificou a CNUCC em 23 de abril de 2008. Os EUA ratificaram a CNUCC em 30 de outubro de 2006. Observamos que no momento do depósito de seu instrumento de ratificação, os EUA não informaram o Secretário-Geral da ONU, como no Artigo 44(6)(a) da CNUCC, se considerariam a CNUCC como base legal para a cooperação em processos de extradição com outros Estados Parte da CNUCC.

[2] Cabo Verde ratificou a CNUCCOT em 15 de julho de 2004. Os EUA ratificaram a CNUCCOT em 3 de novembro de 2005. Observamos que no momento do depósito de seu instrumento de ratificação, os EUA não informaram o Secretário-Geral da ONU, como disposto no Artigo 16(5)(a) da CNUCCOT, se considerariam a CNUCCOT como base legal para a cooperação em processos de extradição com outros Estados Partes da CNUCCOT.

[3] Carta da ONU, Artigo 2(1).

soberana e integridade territorial dos Estados e de não intervenção nos assuntos internos de outros Estados[4].

27. O princípio da igualdade soberana é um dos princípios básicos do Direito internacional. Um dos corolários da igualdade soberana dos Estados é o dever de cada Estado de não intervir nos assuntos internos de outro Estado.

28. Ao abordar o princípio da não-intervenção, o Tribunal Internacional de Justiça (o **"TIJ"**) declarou que "*[o] princípio da não-intervenção envolve o direito de todo Estado soberano de conduzir seus negócios sem interferência externa; ... O Tribunal considera que ele é parte integrante do Direito internacional consuetudinário*".[5]

29. Por exemplo, em 11 de junho de 2020 (um dia antes da prisão e detenção do Requerente), os EUA declararam que sua soberania estava ameaçada por uma investigação do Tribunal Penal Internacional (o **"TPI"**) contra funcionários do Governo dos EUA em conexão com supostos crimes em um território sobre o qual o TPI tem jurisdição.[6]

30. Claramente, a prisão e extradição de funcionários de um Governo estrangeiro viola a soberania desse Estado. Nem o estado de calamidade nem a existência de um pedido de prisão provisória da INTERPOL pendente de extradição (isto é, o Aviso Vermelho) liberam o CV de suas obrigações decorrentes do direito internacional, em particular a obrigação de não interferir nos assuntos de outros Estados soberanos. A Venezuela invoca seus próprios direitos como soberana como Estado. Portanto, o fato de o Sr. Saab ter indicado um advogado local não diminui o fato de que a Venezuela tem o direito de se opor à violação de seus direitos soberanos e insiste em que a interferência em seus negócios seja cessada rapidamente. Como tal, não se pode dizer que os procedimentos de extradição serão continuados. Nenhum Estado pode invocar sua própria lei interna para justificar a não observância de suas obrigações internacionais. Além disso, a CV não pode confiar no Aviso Vermelho porque foi formalmente contestado pela Venezuela nos termos do artigo 135 das Normas da INTERPOL sobre o tratamento de dados. De qualquer forma, por sua própria definição nas Regras da INTERPOL para o Tratamento de Dados, um Aviso Vermelho não é um mandado de prisão, mas uma solicitação da INTERPOL aos seus países membros. Ao responder a essa solicitação, cada país membro permanece responsável por fazê-lo de acordo com suas próprias obrigações internacionais.

31. Cabo Verde tem a obrigação de não interferir nos assuntos internos da Venezuela.

32. Ao prender e subsequentemente deter o Requerente, Cabo Verde interferiu nos assuntos internos da Venezuela: impediu o Requerente de executar sua missão humanitária em nome da Venezuela, cujo objetivo era obter suprimentos médicos, remédios e alimentos necessitados com urgência pela Venezuela no contexto da pandemia de COVID-19.

33. A interferência nos assuntos internos da Venezuela também viola o artigo 11.1 da CRCV e segundo a qual Cabo Verde se guia "*pelos princípios ... da igualdade entre os Estados [e] da não ingerência nos assuntos internos dos outros Estados*".

34. As regras Direito internacional consuetudinário contidas nesses tratados, não permite, de forma alguma, que Cabo Verde interferir nos assuntos da Venezuela.

35. Como detalhado acima, o Artigo 2.1 da Carta da ONU e a regra de não-intervenção, corolário do Direito internacional consuetudinário, proíbem tal intervenção.

36. A detenção do Requerente é ainda ilegal por:
a) constituir violação da imunidade concedida ao enviado especial de um país em trânsito por um outro país,

b) e por afectar a sua inviolabilidade pessoal.

37. O direito internacional consuetudinário consagra a imunidade pessoal (ratione personae) e a inviolabilidade do enviado especial, enquanto ocupante de um alto cargo na RBV,

38. Que, por isso, não pode ser perseguido penalmente por um Estado Terceiro, como é a RCV neste caso.

39. A imunidade é, assim, uma regra bem estabelecida no Direito Internacional, e que, num dos aspectos, menos contestados, consiste na inviolabilidade pessoal que protege os governantes em visita ao estrangeiro contra medidas coercitivas (a prisão ou detenção, por exemplo) e contra ofensas à sua pessoa e à sua dignidade, permitindo ao beneficiário

---

[4] Artigo 4 CNUCCOT; Artigo 4 **CNUCC.**

[5] *Atividades Militares e Paramilitares em e contra a Nicarágua (Nicarágua v Estados Unidos da América)* (Parte substantiva, Acórdão) [1986] ICJ Rep 14, para. 202.

dessa imunidade subtrair-se a um processo judicial diante dos tribunais de um Estado estrangeiro.

40. O reconhecimento da imunidade visa precisamente garantir a independência dos Estados uns dos outros e a eficácia no exercício das funções dos responsáveis de cada Estado.

41. Assim, não há dúvidas que sujeitar um responsável de um Estado estrangeiro em funções a detenção, a medida de coacção, a medida ou acto destinado a recolha de prova, ou a notificação da acusação deduzida contra ele, interfere ou pode interferir no exercício das funções.

42. A imunidade de jurisdição penal e a inviolabilidade são absolutas, justificando-se pela necessidade de permitir aos governantes o desempenho de suas funções sem que eles sejam objeto de medidas coercitivas.

43. Acresce ainda que o Presidente da Venezuela, Nicolás Maduro Moros, goza de imunidade *ratione personae*.

44. Caso o Presidente da Venezuela viajasse para Cabo Verde, as autoridades de Cabo Verde seriam obrigadas a não praticar <u>nenhum</u> ato de autoridade contra ele.

45. O Presidente da Venezuela não pode deixar a Venezuela enquanto conduz e guia o país no combate à pandemia causada pelo COVID-19.

46. Em seu lugar, o Presidente da Venezuela autorizou e enviou o Requerente para representá-lo na condução de assuntos externos referentes à Venezuela.

47. Dessa forma, o Requerente goza da mesma imunidade *ratione personae* que o Presidente da Venezuela teria desfrutado caso houvesse transitado por Cabo Verde em 12 de junho de 2020, e essa imunidade não foi renunciada pela Venezuela. [7]

48. Com efeito, e como detalhado supra, o Governo da Venezuela informou o Governo de Cabo Verde de que o Requerente gozava de imunidade,

49. seguindo a Opinião Consultiva do Tribunal Internacional de Justiça (o "TIJ") em *Cumaraswamy*, o Governo de Cabo Verde deve agora levar a imunidade do Requerente ao conhecimento dos tribunais em Cabo Verde.

50. O que precede significa que, ao prender e deter o Requerente, as autoridades de Cabo Verde adotaram medidas coercitivas que prejudicam o Requerente no desempenho das suas funções enquanto enviado especial da RBV e agiram numa situação em relação nenhum órgão ou entidade de Cabo Verde tinha jurisdição e competência.

51. A imunidade *ratione personae* do Requerente foi violada.

52. Por último, a detenção do Requerente é ilegal por se basear num Red Alert emitido no dia 13 de Junho de 2020, quando a ocorreu no dia 12 de Junho de 2020.

53. Ora, se no dia 12 de Junho de 2020 não havia qualquer alerta vermelho no sistema de processamento de dados da Interpol,

54. significa que inexiste o pressuposto ao abrigo do qual a Procuradoria-Geral da RCV de ordenar a detenção do Requerente ao abrigo do artigo 39.º da LCJIMP (Lei n.º 66/VIII/2001, de 29 de Agosto),

55. tendo sido à pressa introduzido dados no sistema de processamento da Interpol referentes ao Requerente e para justificar a sua detenção em 13 de Junho.

56. Por outro, o alerta vermelho não constitui um mandato de detenção internacional, mas apenas um pedido de identificação e localização de uma pessoa com vista à sua detenção provisória e de sua extradição.

57. É seguro que a Interpol não pode obrigar qualquer dos países membros a deter qualquer pessoa referenciada num alerta vermelho,

58. e qualquer pessoa objecto desse alerta é considerada presumivelmente inocente até que a sua culpabilidade seja razoavelmente demonstrada por um devido processo legal e equitativo.

59. Não havendo alerta vermelho válido em relação ao Requerente falha e falta a jurisdição dos tribunais de Cabo Verde para dar sequência ao pedido de detenção provisória, com base no artigo 39.º da LCJIMP.

60. De um acto ilícito em direito internacional do Estado de Cabo Verde, que é a detenção do Requerente na sua qualidade de enviado especial da RBV, não pode derivar qualquer jurisdição da RCV e competência dos seus Tribunais para a manter uma detenção ilícita efectuada pelas suas autoridades policiais.

61.   Resulta, pelo exposto, que a prisão do Requerente, enquanto beneficiário da imunidade diplomática e da inviolabilidade pessoal conferida pelo direito internacional consuetudinário, configura-se como detenção ordenada por entidade incompetente já que os tribunais de cabo verde não têm qualquer jurisdição sobre o Requerente.

Nestes termos e nos mais de direito, requer que a detenção do Requerente seja considerada ilegal pelos fundamentos invocados e, ao abrigo da al. b) do artigo 18.º do Código Penal, se requer seja imediatamente restituído o corpo e posto liberdade o Requerente, **ALEX NAIM MORAN SAAB.**

Espera e aguarda JUSTIÇA.

O Advogado, com procuração nos autos,

José Manuel Pinto Monteiro
C.P. n.º 15/01
NIF 103135243



19th June 2020

Dear Sirs,

**Re: Portuguese into English Certified Translation**

Language Reach Limited is a UK-registered professional translation and interpreting company and a fully qualified registered member of The Association of Translation Companies (Member No. 2018ATCR1238). We hereby confirm that we have translated the enclosed document(s) from Portuguese into English.

As a responsible translation agency we only employ certified linguists to work with us. We are satisfied with the linguistic accuracy and hereby confirm that the English written translation of the Portuguese document(s) represents its fair and accurate linguistic message as intended in the original file(s).

We hereby confirm that this is a true and correct translation and certify the linguistic accuracy.

For more information, please contact Language Reach Limited on +44 (0) 208 677 3775.

Yours sincerely,



**Maria Bello**
Senior Project Manager

