# EXHIBIT 39

-20450-RNS  Document 149-39  Entered on FLSD Docket 10/17/2022

bassador are found in the arrest of Richard I. of England (he having no safe-conduct) by the Duke of Austria in 1192; the arrest of the English ambassador to Venice while passing through Austria; the case of the Earl of Holdernesse, 1744;[1] the arrest of the ambassador from the Court of Brittany to England while passing through France in 1464; the arrest of the plenipotentiaries from France to Switzerland and Naples while passing through Austria in 1793.

**Passing through other States**

§ 32. In passing through the territory of a friendly State, other than that of the government to which he is accredited, a public minister, or other diplomatic agent, is entitled to the respect and protection due to his official character, though not invested with all the privileges and immunities which he enjoys in the country to whose government he is sent. He has a right of innocent passage through the dominions of all States friendly to his own country, and to the honours and protection which nations reciprocally owe to each other's diplomatic agents, according to the dignity of their rank and official character.[2] If the State through which he purposes to pass has just reason to suspect his object to be unfriendly, or to apprehend that he will abuse this right by inciting its people to insurrection, furnishing intelligence to its enemies, or plotting against the safety of the government, it may very properly, and without just offence, refuse such innocent passage. But if an innocent passage is granted (and it is always presumed to be by a friendly power, unless specially denied), he is entitled to respect and protection, and any insult or injury to him is regarded as an insult or injury, both to the State which sends him, and that to which he is sent. The following remarks of Vattel on the assassination of the French ministers, on the Po, are both appropriate and just:—' Francis I., king of France, had all the reason in the world to complain of the murder of his ambassadors, Rincon and Fregose, as a horrible crime against public faith and the law of nations. These two persons, destined, the one to Constantinople and the other to Venice, having embarked on the Po, were stopped and murdered, in appearance by order of the governor of Milan. The negligence of the Emperor Charles V. to discover the author of the murder, gave room to think that he

---

[1] De Martens, *C. C.*, ii. App., 479.
[2] For the case of the 'Trent,' see *post.*, ch. xxvi.

Digitized by Google

r-20450-RNS   DOCUMENT 149-39   ENTERED on FLSD Docket 10/17/2022

had ordered it, or, at least, that he had tacitly approved of the act. And as he did not give suitable satisfaction concerning it, Francis I. had a very just cause for declaring war against him, and even for demanding the assistance of all other nations. For an affair of this nature is not a particular difference, or a litigious question, in which each party wrests the law over to his side; it is a quarrel of all nations who are concerned to maintain, as sacred, the right and means of communicating together, and treating of their affairs.' In time of general war or public danger, and when peculiar caution is necessary to be observed in the admission of strangers within a country, although an innocent passage is not often refused to a foreign minister, or other diplomatic agent, yet it is not unusual or improper in such cases to restrict it within very narrow limits by prescribing the particular route he must travel. Thus, at the famous congress of Westphalia, whilst peace was negotiating amidst the dangers of war and the noise of arms, the routes of the several couriers sent or received by the plenipotentiaries were marked, and out of such limits their passports were of no protection. The Spaniards found similar maxims to prevail even in Mexico and the neighbouring countries. The ambassadors were respected all along the road, but if they went out of the highway they were to forfeit their rights. Such reservations are sometimes necessary to guard against spies being sent into a country, under the guise of diplomatic agents.[1]

§ 33. The public mission of a minister may be terminated in various ways, as, for example, by his death, by the expiration of the period of his appointment, by the termination of the special negotiation or object of the mission, by his recall, by the death of his sovereign, or a radical change in the sovereignty or government of his State, by a change in his diplomatic rank, by his own withdrawal, and termination of his mission, or by his dismissal by the government to which he is accredited. Custom has established particular forms of proceedings applicable to each case, which forms are followed *Termination of public missions*

---

[1] Vattel, *Droit des Gens*, liv. iv. ch. vii. §§ 84, 85; Martens, *Causes Célèbres*, tome i. p. 310; Phillimore, *On Int. Law*, vol. ii. §§ 172-175; Garden, *De la Diplomatie*, liv. v. § 26; Heffter, *Droit International*, §§ 204, 212; Rayneval, *Institutions*, &c., Appen. No. 2; Wicquefort, *De l'Ambassadeur*, liv. i. § 29; Grotius, *De Jure Bel. ac Pac.*, lib. iv. cap. xviii. § 5; Miruss, *Das Europ. Gesandtschaftsrecht*, § 365.

Digitized by Google