# EXHIBIT 41

# DIPLOMATIC IMMUNITIES

## EXEMPTION FROM JUDICIAL PROCESS

### IN GENERAL

§400

In a letter of March 16, 1906 to the Secretary of Commerce and Labor, Secretary Root said:

> There are many and various reasons why diplomatic agents, whether accredited or not to the United States, should be exempt from the operation of the municipal law at [sic] this country. The first and fundamental reason is the fact that diplomatic agents are universally exempt by well recognized usage incorporated into the Common law of nations, and this nation, bound as it is to observe International Law in its municipal as well as its foreign policy, cannot, if it would, vary a law common to all. If such a law were passed by the proper authority such law would be binding upon Government, courts and people within our jurisdiction, but foreign nations would not be bound to admit its validity in a case properly involving their rights and privileges or duties and obligations. If authority be needed for this assertion it will be found alike in decisions of courts and in works of authority.
>
> . . . . . . .
>
> The reason of the immunity of diplomatic agents is clear, namely: that Governments may not be hampered in their foreign relations by the arrest or forcible prevention of the exercise of a duty in the person of a governmental agent or representative. If such agent be offensive and his conduct is unacceptable to the accredited nation it is proper to request his recall; if the request be not honored he may be in extreme cases escorted to the boundary and thus removed from the country. And rightly, because self-preservation is a matter peculiarly within the province of the injured state, without which its existence is insecure. Of this fact it must be the sole judge: it cannot delegate this discretion or right to any nation however friendly or competent. It likewise follows from the necessity of the case, that the diplomatic agent must have full access to the accrediting state, else he cannot enter upon the performance of his specific duty, and it is equally clear that he must be permitted to return to the home country in the fulfillment of official duty. As to the means best fitted to fulfil these duties the agent must necessarily judge: and of the time required in entering and departing, as well as in the delay necessary to wind up the duties of office after recall, he must likewise judge.
>
> For these universally accepted principles no authority need be cited.
>
> . . . . . . .
>
> It would appear therefore abundantly clear that the immunities of diplomatic agents exist by virtue of the law of nations which

*[marginal note: Reasons for immunity]*

is a part of the law of the land, and that such provisions [sections 4062–4065 of the Revised Statutes] are merely declarative and punitive in their nature.

MS. Department of State, 288 Domestic Letters 554, 555, 557, 559.

Sections 252 through 254 of title 22 of the United States Code provide:

§252. *Suits against ministers and their domestics prohibited.* Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, or of a State, or by any judge or justice, whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by the President, or any domestic or domestic servant of any such minister, is arrested or imprisoned, or his goods or chattels are distrained, seized, or attached, such writ or process shall be deemed void. (R.S. §4063.)

§253. *Penalty for wrongful suit.* Whenever any writ or process is sued out in violation of section 252 of this title, every person by whom the same is obtained or prosecuted, whether as party or as attorney or solicitor, and every officer concerned in executing it, shall be deemed a violator of the laws of nations and a disturber of the public repose, and shall be imprisoned for not more than three years, and fined at the discretion of the court. (R.S. §4064.)

§254. *Exceptions as to suits against servants, etc., of minister; listing servants.* Sections 252 and 253 of this title shall not apply to any case where the person against whom the process is issued is a citizen or inhabitant of the United States in the service of an ambassador or a public minister and the process is founded upon a debt contracted before he entered upon such service; nor shall section 253 of this title apply to any case where the person against whom the process is issued is a domestic servant of an ambassador or a public minister, unless the name of the servant has, before the issuing thereof, been registered in the Department of State and transmitted by the Secretary of State to the marshal of the District of Columbia, who shall upon receipt thereof post the same in some public place in his office. All persons shall have resort to the list of names so posted in the marshal's office and may take copies without fee. (R.S. §§ 4065, 4066.)

" . . . In the United States a foreign diplomatic representative is accorded all the immunities, privileges, and exemptions to which he may be entitled by international law. He is immune from the criminal and civil jurisdiction of the United States and cannot be sued, arrested, or punished by the laws thereof; he is exempt from testifying before any tribunal whatever; his dwelling house and goods and the archives of his mission cannot be entered, searched, or detained under process of law or by the local authorities; but real or personal property held by him aside from that which pertains to him as a public minister is subject to the local laws. The personal immunity of a diplomatic representative extends to

the land as is a Statute. Nor is the Statute interpreted in relation to International Law, as is the rule of construction in such cases.

. . . . . . .

And it should be observed that the law of nations should not be repealed or modified by implication and it is submitted that a mere omission from a statute of a right or privilege does not repeal a right or privilege based upon International Law. Otherwise the privileges of ambassadors might be impugned as there is no saving clause in the section of the act in question. The provision of the act should be specific and inconsistent with the right or privilege conferred by International Law and if the law in question be construed with International Law it will be seen that an exception does and should exist in the case of diplomatic agents. Had the attention of the Attorney General been called to the fact that diplomatic immunity does not rest upon the wording of any statute, but is independent thereof, except as to punishment of a violation of such immunity, he would doubtless have held that the question of immunity was untouched by the Statute and not necessarily involved in it.

25 Op. Att. Gen. 870 (1906); the Secretary of State (Root) to the Secretary of Commerce and Labor (Metcalf), Mar. 16, 1900, MS. Department of State, 288 Domestic Letters 554, 559-560, 563-564.

On Mar. 26, 1906 the Department of Commerce and Labor transmitted to the Department of State a circular which was about to be issued to the officers of the Immigration Service, stating that the provisions of section 1 of the immigration law approved Mar. 3, 1903 in respect to the head tax did not apply to the diplomatic and consular officers of foreign governments entering the United States across the land boundaries from foreign contiguous countries, whether they were accredited to the United States or to some other country. Mr. Metcalf to Mr. Root, Mar. 26, 1906, MS. Department of State, Miscellaneous Letters, Mar. 1906, pt. V.

Respecting diplomatic officers of foreign governments accredited near the Government of Panama you are informed that a review of the authorities on international law has failed to reveal a satisfactory definition of their status in the territory of the Canal Zone. It would seem, however that their status might be regarded as analogous to that of a diplomatic envoy traveling through the territory of a third state en route to his post. In the latter case, since the institution of legation is a necessary one for the intercourse of states and is firmly established by international law, there ought to be no doubt whatever that such a third state must grant the right of innocent passage (*jus transitus innoxii*) to the envoy, provided that it is not at war with the sending or receiving state. The United States asserts that, according to the law of nations a diplomatic officer is entitled to a right of transit to his post by sea, or through the national domain, whether land or water, of a state other than that to which he is accredited. It is not contended, however, that this right embraces one of sojourn in such state, or that the sovereign thereof may not prescribe the route of transit. While evidence is wanting that states generally have as yet agreed to yield rights of jurisdiction over diplomatic officers not accredited to them and passing through their terri-

tories, it is not unreasonable to claim for such individuals freedom from petty annoyance whether in the form of criminal prosecution for minor offenses or of civil suits of trivial importance.

The Secretary of State (Hughes) to the Minister to Panama (South), no. 181, Apr. 29, 1924, MS. Department of State, file 702.0011f/10; 1925 For. Rel., vol. II, pp. 653, 654.

**Extent of immunity**

While the American Minister to Costa Rica, Nicaragua, and El Salvador was waiting at Corinto in 1907 to take a ship to Puntarenas an American vessel arrived, and the Nicaraguan Minister of War went on board and demanded to see the manifest, stating that he was informed that there were arms on board for Honduras. The captain replied that the manifest was in a sealed envelop in the ship's safe and that he had no knowledge of its contents. As he could obtain no information the Minister of War left and the American Minister promptly transferred his baggage to the steamer and hoisted the "Legation flag", advising the captain that he "should not permit a search of the steamer, which had left Panama when Honduras and Nicaragua were at peace". No effort was made to search the steamer. With respect to the action of the Minister in going on board, hoisting the "Legation flag", and making the ship his Legation *pro tem*, the Department of State observed:

> As no actual effort appears to have been made to search the steamer, it does not seem necessary at present to comment on the incident further than to remark that the right of Legation while recognized in some instances for the vehicle in which a minister and his belongings are transported, has not so far as the Department is aware, been claimed to cover the ship on which a minister may be a passenger and to operate to convert the vessel, cargo, passengers and crew of whatever nationality into the official belongings and personnel of a legation. Diplomatic immunity necessarily attaches to an envoy's person, household and property, as well as to the archives and public property of the Government he represents, for the specific purpose of securing inviolability for all that pertains to the conduct of the mission. As a converse proposition, the separation of the mission proper from all commercial and municipal ventures is proper and necessary. Had any question arisen, the Department might have found embarrassment in upholding your position and making it clear (to state a hypothetical example) that a ship carrying an envoy as a passenger, would enjoy extraterritorial immunity any more than a public hotel in which an envoy might have a night's lodging.

Minister Merry to Secretary Root, no. 1242, Feb. 23, 1907, and Mr. Root to Mr. Merry, Mar. 23, 1907, MS. Department of State, file 5040.

The Austro-Hungarian Government, on November 9, 1916, announced the appointment of Count Tarnowski as its Ambassador at

Washington. The Department of State, on November 14, instructed the American Embassies in London and Paris that the appointed Ambassador and his suite would embark for the United States on a vessel of the Holland-America Line at Rotterdam and that the Austro-Hungarian Government requested that safe-conducts be procured from the British and French Governments. Both Governments at first refused on the ground that Austro-Hungarian Embassies in neutral countries had engaged in activities outside of their diplomatic functions. The Department instructed the Embassies in London and Paris to inform the Foreign Offices that it was surprised to learn of the refusal, that the Government of the United States had an undisputed right to maintain diplomatic relations through accredited representatives with any nation, and that it could not believe that the British and French Governments intended to interfere with the exercise of this sovereign right. It said that it expected those Governments to reconsider their action and to assure Count Tarnowski and his suite that they would be unmolested in their passage to this country. The British Foreign Office replied on December 15 that, since the Government of the United States had now applied in its own name for the safe-conduct, it would be granted. The French Government, on December 18, indicated that it would take similar action. *Safe-conduct in time of war*

> The Secretary of State (Lansing) to the Ambassador to Great Britain (Page), telegram 4044, Nov. 14, 1916, MS. Department of State, file 701.6311/229; Mr. Page to Mr. Lansing, telegram 5218, Nov. 27, 1916, ibid. /233; the Ambassador to France (Sharp) to Mr. Lansing, telegram 1712, Nov. 27, 1916, ibid. /234; Mr. Lansing to Mr. Page, telegram 4097, Nov. 28, 1916, ibid. /238; Mr. Page to Mr. Lansing, telegram 5321, Dec. 15, 1916, ibid. /250; Mr. Sharp to Mr. Lansing, telegram 1749, Dec. 18, 1916, ibid. /251; 1916 For. Rel. Supp. 802-806.

After the severance of diplomatic relations between the United States and Germany in February 1917, arrangements were made for the departure from the United States of the German Ambassador and his wife, the Embassy staff, and all the German Consuls in the United States on a Scandinavian steamer. Permits were secured from the French and British Governments for the safe-conduct of the party from New York to Christiania. *Safe-conduct after severance of relations*

> Secretary Lansing to the Ambassador to Spain (Willard), telegram 218, Feb. 5, 1917, MS. Department of State, file 701.6211/406a; the Ambassador to France (Sharp) to Mr. Lansing, telegram 1854, Feb. 7, 1917, ibid. /408; the Ambassador to Great Britain (Page) to Mr. Lansing, telegram 5843, Feb. 8, 1917, ibid. /410; 1917 For. Rel., Supp. 1, pp. 591, 592, 593.
>
> The Swiss Minister in Washington in Apr. 1917 transmitted to the Department of State a communication from the Imperial German Foreign Office regarding the treatment to which the German Ambassador and his party were alleged to have been subjected by officials at Halifax, Nova Scotia.

The Department replied that after their departure from the territorial waters of the United States the German Ambassador and his party "were travelling under safe-conducts granted by the British and French Governments, and that consequently any complaint by the German Government arising from the treatment of those persons after such departure should be made to the British and French Governments and not to the Government of the United States". Secretary Lansing to Minister Ritter, no. 460, Apr. 30, 1917, MS. Department of State, file 701.6211/432; 1917 For. Rel., Supp. 1, p. 504.

After diplomatic relations had been broken off between the United States and Germany in Feb. 1917, the German Foreign Office informed the American Ambassador in Germany that he and his staff would not be permitted to leave Germany until definite information was received regarding arrangements made for the departure of the German Ambassador and his staff from the United States. The Government of the United States expressed surprise at the attitude of the German Government and informed the departing American Ambassador through the American Ambassador in Spain that complete arrangements had been made for the departure of the German Ambassador and his wife, the Embassy staff, and all German Consuls in the United States. Ambassador Gerard to Secretary Lansing, telegram 5002, Feb. 5, 1917, MS. Department of State, file 124.62/21; Mr. Lansing to Ambassador Willard, telegram 222, Feb. 8, 1917, ibid. 701.6211/413a; 1917 For. Rel., Supp. 1, p. 587

Upon the departure of the former German Minister to Brazil from that country in Apr. 1917, instructions were issued to the American naval forces not to molest him and his suite during their voyage. Upon learning that the Minister would proceed to Germany via the United States on a Dutch vessel, the Department of State instructed the American Ambassador in Argentina, where the Minister had proceeded from Brazil, to grant a safe-conduct to him and the persons accompanying him. The Department also instructed the American Ambassador in Brazil to issue a safe-conduct to other members of the former German Minister's official party embarking at Rio de Janeiro, saying that the right of search was reserved by the American authorities. Secretary Lansing to the Chargé d'Affaires in Brazil (Benson), telegram of Apr. 14, 1917, MS. Department of State, file 701.6232/3; Mr. Lansing to the Ambassador to Argentina (Stimson), telegram of June 2, 1917, ibid. /8; Mr. Lansing to the Ambassador to Brazil (Morgan), telegram of June 6, 1917, ibid. /10; 1917 For. Rel., Supp 1, pp. 607, 608.

**Right of search**

In authorizing the American Legation at Guatemala, in May 1917, to issue a safe-conduct for passage through the United States to the former German Minister to Guatemala, the Department of State said that the Government of the United States reserved the right of search.

Secretary Lansing to the Legation in Guatemala, telegram of May 2, 1917, MS. Department of State, file 800.111/571a.

British officers at Halifax seized certain funds in the possession of Countess Matuschka while she was returning to Germany in 1917 in the party of Count von Bernstorff, the former German Ambassador to the United States. Inquiry was made of the Department of State as to whether the reservation as to the right of search made by the British Government in granting a safe-conduct to Count von Bernstorff and his party, gave it the right to seize the funds. The Department replied that it appeared that