# EXHIBIT 43



| |
| --- |
| Entry nº 143/2021<br>28/06/2021<br>The Official<br>[Illegible signature] |

**PUBLIC PROSECUTOR'S OFFICE**

**ATTORNEY GENERAL'S OFFICE**

**Director of Cabinet**

The Honourable
Judicial Secretary of the
Constitutional Court
**Praia**

Letter No. **1112**/70.07/2020/2021

Praia, 28 June 2021

Subject: Subject: Remittance of missive - Concrete Inspection of Constitutionality No. 2/2021, in which Alex Nain Saab Moran is appellant and the Supreme Court of Justice is appealed

It is incumbent upon us His Excellency the Attorney General of the Republic to send the letter together, regarding the Concrete Inspection of Constitutionality No. 2/2021, in which appellant Alex Nain Saab Morane appealed to the Supreme Court of Justice, accompanied by 02 (two ) documents (Doc. No. 1 and Doc. No. 2), which are attached, requesting and thanking them to be brought to the attention of the Venerable Judge President of the Constitutional Court.

With best regards,

PP Cabinet Director

[Illegible signature]

[Circular stamp]
Public Prosecutor
Attorney-General
Cabinet of the Attorney General

Adilson Marques

UAP-PGR Coordinator

*Post Code No. 268. Praia, Cape Verde, Telephone +238 2615748; Fax: +238 2616884*
*www.ministeriopublico.cv*

CERTIFIED TRANSLATION LANGUAGE REACH 02/07/2021 REG.07635166



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

**Proceedings in respect of concrete review of constitutionality No. 2/2021**

**Appellant:** *Alex Nain Saab Moran*

**Respondent:** Supreme Court of Justice

In view of this attitude, in which it is evident that the strategy involves arguing the unconstitutionality of all the applied rules, that is, "shooting in all directions" in order to lead the court to adjudicate on matters of merit, it is appropriate to define some key concepts:

*Alex Nain Saab Moran,* the extraditee, better identified in the records, presents an appeal for the concrete inspection of the constitutionality of Judgment No. 28/2021, of March 16, 2021, alleging in summary that the constitutionality issues raised in the articles of the extradition process were not sufficiently analyzed and in the decision of the STJ.

*

I argued the unconstitutionality of the interpretative sense of practically all the rules of Law No. 6/VIII/2011, of 29 August - Law on international judicial cooperation (LCJJ) applied, some of which are irrelevant to the decision of the case. It is also verified that, what is placed in crisis, more than the constitutionality of the meaning of the interpretation of the constitutional norms or principles, the decisions on the merits are challenged, in relation to all the raised questions. Thus, the Public Ministry's response, in addition to focusing on the essential question of constitutionality, did not fail to refute the arguments raised against the decision on the merits.

In view of this attitude, in which it is evident that the strategy involves arguing the unconstitutionality of all the applied rules, that is, "*shooting in all directions*" in order to lead the court to adjudicate on matters of merit, it is appropriate to define some key concepts.

*Gomes Canotilho e Vital Moreira[1]* teach that, the appeal for concrete inspection of constitutionality is restricted to the question of constitutionality, not having as its object the

---

[1] Gomes Canothilo and Vital Moreira – Constitution of the Portuguese Republic – Annotated 4th Ed. Reviewed

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

judicial decision itself, but only in the part in which it did not apply a norm owing to a reason of unconstitutionality or else applied a norm which was allegedly unconstitutional. The purpose of the appeal is not the judicial decision itself, but only that part of it which is considered a certain rule applicable to the case under consideration in the court to be unconstitutional (or not).

The restriction of resources to the question of unconstitutionality also delimits the limits of knowledge of the Constitutional Court. According to the principle of congruence, the decision of the appeal on the issue of unconstitutionality must be limited to verifying the conformity questioned in the appealed decision and cannot extend to the assessment of others. The court can only pronounce on the norms in relation to which the incident of unconstitutionality has been raised, but it can do so on grounds of violation of constitutional norms or principles other than those whose violation was invoked - arts. 91 and 62 °/2 of Law No. 56/VI/2005, of February 28 - Law of the Constitutional Court (LTC).

The appeal to the Constitutional Court, being limited to the question of unconstitutionality, and this being always an incidental question, can never directly involve the decision of the end question in itself. Therefore, the Constitutional Court cannot substitute itself for the appealed court, but only revoke, in whole or in part, the appealed decision on the issue of unconstitutionality, ordering the appealed court to carry out the immediate reform, to comply with the TC's decision regarding the question of unconstitutionality (article 93/3 LTC).

Therefore, the amendment by the Constitutional Court of the appealed decisions in matters of unconstitutionality, always leads to the necessary reform, it does not always have to imply an alteration of the substantive decision, when the appealed court reaches the same conclusion, despite the alteration of the court of unconstitutionality about the norm.

It is also worth mentioning the concept of *extradition proceedings*, often confused with *criminal proceedings.*

As JOSÉ MIGUEL FIGUEIREDO[2] mentions, the extradition integrates one of the two maximum exponents of cooperation between States, bearing in mind the significance of the coercive displacement of a person to pursue criminal proceedings or serve a sentence in another State and what this represents in terms of trust in the respective political and institutional relations.

---

[2] Active extradition in the Law on legal cooperation in criminal matters in "*Temas de extradicao e entrega*", Livraria Almedina

CERTIFIED TRANSLATION
LANGUAGE REACH
02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

Furthermore, the configuration, regime and procedure of an extradition application constitutes a paradigm for the other forms of cooperation, they constitute a paradigm for the other forms of cooperation, thus justifying their detailed study - *sic*.

The extradition process, due to its urgent nature and specificities, is swift, with limited deadlines, and cannot be understood or labelled a *"criminal extradition process"*, as the appellant often refers, when he understands that there is a criminal prosecution for part of Cape Verde, as the requested State. In passive extradition proceedings, the sanctioning jurisdiction rests with the requesting State. It is not a question of criminal prosecution, but merely the performance of a law in the context of international judicial cooperation.

As the extradition process is not a criminal process, the law provides for a special procedure, with clear rules of subsidiarity in the application of the legal diplomas involved.

It follows from article 4 of the LCJI that, "*The forms of cooperation referred to in article 1 (among which, extradition) are governed by the norms of international <u>treaties, conventions and agreements</u> that bind the State of Cape Verde and, in its absence or insufficiency, by the <u>provisions of the present diploma</u>". It further establishes that "the <u>provisions of the Code of Criminal Procedure are subsidiarily applicable</u>*" (emphasis added).

It is clear from the outset that the subsidiary application of the CPP must always be made with the necessary adaptations, taking into account the provisions of international treaties, conventions and agreements that bind the Cape Verdean State and the Law on International Judicial Cooperation in Criminal Matters - LCJI.

In the *sub judice* case, the extradition request has as its legal basis the United Nations Convention against Transnational Organized Crime - UNTOC, meaning that, in order of preference, UNTOC is first applied, in its absence or insufficiency, the LCJI and, in the absence or insufficiency of both, the provisions of the Code of Criminal Procedure - CPP.

Therefore, it is not correct to pretend to apply the Code of Criminal Procedure, in the first instance, to the extradition process, as if it were a simple criminal process.

*Article 16/8* of the United National Convention on Transnational Crime - UNTOC[3], seeks to eliminate the barriers to extradition and calls on Member States to *accelerate the extradition*

---

[3] Approved by Resolution No. 92/VI/2004, of 31 May

CERTIFIED TRANSLATION
02/07/2021
LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

*Process and simplify requests in relation* to the proof relates to them, nevertheless respecting their domestic law.

**

**ISSUES OF UNCONSTITUTIONALITY**

In a very extensive application, running to 122 pages, the appellant presents the grounds of this appeal for the concrete review of constitutionality, grouped into twelve points, as detailed below.

1. **Personal notification of the extradited person of the request for extradition and of the order admitting it.**

It claims that the interpretation that there is no legal provision requiring that the extradition request be formally notified to the extradited person is unconstitutional, much less that it is personally notified.

It concludes that, "A fair decision and in accordance with the constitutional guarantees is the one that decides on the personal notification of the extradited person of any decision that affects him personally in respect of the adversarial and defence principle embodied in the constitution (...) and in the Code of Criminal Procedure (...) The rules that were applied in the decisions are those of the article(s) (...) and with the interpretative sense of "(... ) *there is no LCJ provision imposing that the request for extradition is formally notified to the Extraditing Person, much less that he is notified in person*", in the sense that in the case of an unauthorized detention, the extradited person, without having been notified whether there is a warrant, was aware of the action of the Public Prosecutor, through a notification made to his lawyers only, and in this dimension and extension violate the constitutional norms of articles 30(1) and 35(6) of the Constitution and thus the rights, freedoms and guarantees, of the right of defence in any other sanctioning process, thereby violating the guarantees to the adversary principle and of the appeal and respect for the dignity of the human person, therefore, there is an unconstitutionality that must be declared."

The appellant is not right. With regard to the interventions of the extraditee, there are specific rules, with the CPP not being applicable *tout court*, without jeopardizing its right of defence, without violating the constitution. Only the lack of personal notification of the defendant can be given sufficient relevance in an extreme situation, such as the trial in the absence and without representation by a defender (lawyer).

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

In the case in question, the extraditee person is represented by a lawyer, which sufficiently assures the constitutional principles associated with the defence guarantees, not requiring notification directly to the extradited person. Moreover, as is clear from the excerpt of the transcribed appeal, the extradited person acknowledges having learned of the Public Prosecutor's actions through his lawyers.

*The defence guarantees (...) are violated whenever the accused is not effectively guaranteed the possibility of organizing his/her own defence. And this is, as we have seen, what happens when, in situations like the ones described, not even a defender is appointed. "This principle, «translating itself, at least, into a right to defence, a right to be heard" (...) it can only be effectively ensured through an adequate functioning of the procedural dialectic - which, of course, requires that the "parties" (Prosecutor's Office and defendant) be placed in a position of perfect equality.[4]*

The only situation of violation of the right of defence, which occurred in the decision of the Court of Appeal of Barlavento, was annulled by the Supreme Court of Justice, having been corrected.

On the other hand, as Gomes Canotilho and Vital Moreira[5] teach, in negative decisions of unconstitutionality, that is, when the court has applied a rule, despite having been accused of its unconstitutionality, there is no appeal when the claim of unconstitutionality has been made in relation to a **law irrelevant to the case**, to the solution of the concrete case (Ac.TC No. 12/87). The unconstitutionality can only be invoked through an incident, in the course of an action, of the norms that are relevant to the solution of the specific case.

However, the applicant's failure to be notified personally, in addition to not being imposed by law, was not relevant to the decision to order extradition. The extradited person was aware of everything he alleges that he was not personally notified, through his lawyer, as required by law, exercised his right of defence, without any conditioning, presenting all legally admissible evidence, during all procedural stages.

Consequently, no law or constitutional principle was violated with the interpretation and application of the LCJI.

---

[4] <u>Judgement of the CC No. 49/1986</u> (tribunalconstitucional.pt)
[5] Op. cit.


CERTIFIED TRANSLATION
LANGUAGE REACH
02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

2. **No trial in person, with the hearing of the extradites, despite the fact that he has required steps to produce evidence.**

It alleges that the interpretation in the sense that the processing of the passive extradition process is unconstitutional does not require the judgment in courts of 1st court to be made in a hearing, but in a conference, it being understood that the law does not require the extraditee to be heard at a second hearing before the judge.

It concludes that, "The rules that were applied in the decisions are those of the articles (...) and with the interpretative sense that "(... ) the law does not impose, neither directly nor indirectly, that the extradited person be heard in a second hearing before the judge" when in fact he had been heard at the time of his arrest, before the beginning of the judicial phase or the order of the PRG that promotes it, that is, the hearing of the extradited person is not mandatory before the decision of extradition, in an oral public hearing, contradictory, when it has requested the carrying out of evidence, namely the examination of witnesses, and in this dimension and extent violate the constitutional norms of articles 32(4), 35(6, 7 and 9) and 21(4) (...) the rights of hearing and defence, and the principle of orality and publicity."

The appellant again has not grounds. The rule challenged is clear in not requiring the hearing of the extraditee for the second time, and such interpretation does not violate any constitutional rule or principle.

The Portuguese Constitutional Court decided in the same sense, whose rules on extradition are identical to those of Cape Verde. "*In the extradition process, there is no hearing for discussion and trial: the evidence, although produced with the intervention of the extradited person, his lawyer, and the Public Prosecutor's Office - therefore, in compliance with the rule of the contradictory -, not the silo in a hearing; the decision is taken in conference (see article 34 of the aforementioned Decree-Law No. 437/75), as, moreover, it happens whenever it falls to a collective court (see articles 25, 26 and 43 of Law No. 82/77, of 6 December; and also Article 653(1) of the Code of Civil Procedure)"*[6]

*The Agreement of the mentioned CC, although not dealing directly with this issue, recognizes that there is no place for the hearing in the extradition process, as well as recognizing that the respective decision is taken in conference, not stipulating out any reservation to this procedural structure.*

---

[6] CC Judgement No. 192/1985

CERTIFIED TRANSLATION
02/07/2021
LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

Therefore, there is no obstacle to not holding a trial in person and, consequently, not hearing the extraditee

The understanding of the Cape Verdean Supreme Court of Justice is also identical[7] • There is no unconstitutionality in the court's position.

3.   **Failure to carry out the measures of evidence required by the extraditee; The interpretation of the norm insists on article 1550. of the CPP, "in the sense that the extraditee proceeds by complaint and not by appeal, that is, uses the appropriate means in view of the failure to carry out a requested diligence with the lower court, in other words, to demand the hearing of evidence after a decision that an ordinary appeal may be made to the SCJ".**

It understands that, by not carrying out the required steps of evidence and the interpretation that the extradited person should proceed by complaint and not by appeal, the right of access to the courts and effective judicial protection, the principle of ne bis in idem, was called into question and the contradictory principle.

It concludes that "The rules that were applied in the decisions are those of articles 55, no. 2 (2.3 part) of the LCJ, with the interpretative sense that "from this provision without the need for recourse to another element, it is that the extradited person attends the right to deduce opposition, but it can only be centred on two sets of arguments tending to demonstrate the following:
(i) either it is not the person claimed, or (ii) the conditions for extradition are not met" despite the requirement of due diligence of testimonial evidence and interpretation of the law mentioned in article 15 of the CPP "in the sense that it was up to the extradited person to proceed by complaint and not by appeal" to another decision that rejected the appellant's request to carry out the due diligence and the appellant's personal notification, and in this dimension and extent violate the constitutional norms of articles 32(4) 35(6 and 7), 22(3), 31(2), 209 of the CRCV and the right to appeal, therefore, there is an unconstitutionality that must be declared."

Regarding the issue of rejection of the due diligence, there is no constitutional inconsistency of article 55(2), of the LCJI. Indeed, even in the context of criminal proceedings, the law grants the judge the power to direct the process that allows him to reject useless steps and this does not violate the defence guarantees of the Extraditee. This power to direct the proceedings is, moreover, co-natural to the exercising of the jurisdictional function constitutionally enshrined in article 211, as

---

[7] Judgement No. 58/2017, 01 August and Judgement No. 26/2021, of 16 March.



CERTIFIED TRANSLATION
02/07/2021
LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

the administration of justice is absolutely indispensable, and the effective fulfilment of the purposes contained in that constitutional precept.

In the extradition process, the law expressly excludes the possibility of carrying out certain steps of evidence, "prohibiting" the judge himself from doing so. And this was the basis for the refusal of the request.

This is settled jurisprudence of the Supreme Court of Justice[8].

There is also abundant jurisprudence of the Portuguese courts (courts of appeal and STJ)[9] on such a norm, all in the sense that the extradition process is not appropriate for the accused to defend the crimes of which he is accused by the requesting State, as he will have the opportunity to do so before the courts of that State. This reality is commonly accepted by the legal systems of other countries and is not exclusive to Portugal and Cape Verde.

As for the question of the appropriate procedural means to react to the rejection of the evidence (namely, by complaint or by appeal), it should be noted that there is no constitutional problem here, namely the lack of effective judicial protection - there is an adequate procedural means to react to a certain court decision; simply, the extraditee did not use this means, but another one. The position of the extradited person is protected by the right, but the latter did not exercise it correctly.

First, the defence alleges that the rule of article 55(2), of the Law on International Judicial Cooperation in Criminal Matters (LCJI), Law No. 6/VIII/2011, of August 29, which limits the opposition to the extradition request to the circumstance that the detainee is not the person sought or that the extradition requirements are not met, is unconstitutional because it violates the right to a fair and equitable process, the right to the adversarial principle, and the right to present a defence, which arise, respectively, from articles 22(1), 35(6) and 22(3) and 35(7) of the Constitution of Cape Verde. In addition to the alleged violations of the rights constitutionally foreseen, the invocation of violations of the Universal Declaration of Human Rights, namely the provisions of article 11(1), of the International Covenant on Civil and Political Rights, in particular what is provided for in subparagraphs b) and e) of No. 3 of article 14, and also the African Charter on Human Rights,

---

[8] Judgement No. 58/2017, of 1 August and Judgement No. 26/2021, of 16 March.

[9] It is noteworthy that, according to the Portuguese Constitution (also Cape Verdean) the ordinary courts have the burden of assessing the constitutional compliance of the rules they apply, and must refuse their application when they understand this violates an unconstitutional rule (cf. article 204 of the Constitution), even though this unconstitutionality has never before been declared by the Constitutional Court (see, for all, Jorge Miranda "O Regime de Fiscalizacao Concreta da Constitucionalidade em Portugal", available at 1119-2440.pdf (icjp.pt)

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

specifically, article 7 of this this law.
However, these violations have not been verified, since none of the three international instruments mentioned contain any provisions on the extradition process, which is why they are not applicable.

The defence of the extraditee invokes the argument that he should be authorized to present evidence to defend his procedural position, within the scope of his right to adversarial proceedings.

However, this defence argument is based on a wrong assumption as to the object and purpose of the extradition process.[10] The extradition processes are not intended to be a "*small point trial*", that is, they are not intended to assess the assumptions of attributing crimes to the agent targeted by the extradition process, in order to decide whether he is guilty or not guilty.[11]

The object and purpose of the extradition process is rather to ensure that sufficient evidence exists, under the law of the requesting State or a treaty, to enable the accused to be surrendered to the requesting State, so that it can try the extradited by the facts for which he is accused and, therefore, assess his guilt or innocence. Only at this stage, after the surrender of the extraditee to the requesting State and the latter being on trial in that State, can the adversary proceedings be exercised and the accused's defence presented, in accordance with the principles mentioned above, which are in force at both the national and the international level.

The fact that the requested State is not authorized to carry out the trial as to the attribution of the crimes to the extraditee, deciding on his conviction or acquittal, is based on different and valid grounds.

In the first place, the consideration of this question by the requested State would lead to the sovereignty of the requesting State, responsible for the charges brought against the extradited person, being called into question or, at the very least, restricted.

Secondly, the assessment of the presuppositions for attributing the criminal facts to the extraditee requires a broad understanding of the criminal law of the requesting State, whose interpretation by the requested State would always be risky, insofar as it is a question of interpreting foreign law, with their inevitable specifics.

---

[10] In this regard, see what is provided for in the United Nations Draft Law on Extradition, Section 23.1 No. 31, Section 23.4 (2004), available on https://www.un.org/ruleoflaw.blog/document/model-law-on-extradition/.
[11] Extradition may also make it possible to hand over a person to serve a sentence for a crime for which they have already been convicted.

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

Thirdly, there is also the fact that requests for extradition do not, as a rule, specify all the grounds on which the accusation is directed at the extradited person. Therefore, the court of the requested State would be trying to assess the guilt of an accused on the basis of an incomplete record of the requesting State, which would, on the one hand, be contrary to the rights of defence of the extraditing himself and, on the other hand, would imply that the Requested State to call into question the rules that bind criminal proceedings, and in particular those relating to prosecution, of the requesting State, preventing it from conducting the criminal proceedings in the way it deems most appropriate. Otherwise, it would also be unreasonable to require the requesting State to present the entire file to the requested State, in order to allow its analysis and consequent decision on the case.

A fourth plea is related to the circumstance that the reassessment of the assumptions of imputation of the facts to the accused would place a significant burden on the requested State, implying a thorough analysis of all the evidence presented by both parties, which is not possible. is justified insofar as what is at issue in the criminal proceedings does not correspond to a breach of the law of the requested State, but to a possible breach of the law of the requesting State.

In this way, it is necessary to conclude that it is impossible for the accused to produce evidence to support his position, opposing the accusation presented by the requesting State. However, contrary to what the defence would have us believe, the defendant does not lose the opportunity to exercise this defence, through the presentation of all the evidence deemed necessary; it will only have to do so before the requesting State, in accordance with the procedural law of that State. Rather than presenting his defence during the extradition process, the accused will have a full opportunity to frame a defence and assert his innocence, as well as fully invoke his constitutional rights during the trial that takes place in the jurisdiction of the Requesting State after the end of the extradition process.

This is also the understanding advocated by Portuguese jurisprudence[12] which is, as is known, an important example for the jurisprudential exercise of the Courts in Cape Verde given the

---

[12] The purpose of the extradition process is constantly and undoubtedly affirmed by the jurisprudence of the Portuguese Courts, namely by the jurisprudence of the Supreme Court of Justice, as exemplified by the Judgment of the Supreme Court of Justice to (dgsi.pt) of 13.02.2019 , in the scope of Case No. 65/14.8YREVR.S2, which reads that "*the extradition process is a special and urgent process, regulated in the first hand by L 144/00 and only subsidiarily by the CPP (art. 3, No. 2 cit. Law), with an administrative phase and a judicial phase, where it is not possible to discuss the facts imputed therein (arts. 46 (1) and 3 of L. 144/99) and in which the opposition can only take place on two grounds (the detainee is not the defendant or the presuppositions of the extradition are not verified) (art. 55 of cit. L. 144), where, in principle, supervening evidence cannot be invoked at the appeal stage.*" In a complementary sense, see the Judgment of the Supreme Court of Justice to (dgsi.pt) of 11.12.2008, in the context of case No. . 08P3982, where it was stated that "this extradition process is not responsible for prosecuting the veracity of the facts alleged by the Brazilian authorities. It does matter to ascertain whether the facts presented, in terms of date, place and circumstances, have the minimum consistency so that one can be considered to be facing a suitably instructed request (...)».

In the same sense, see the Judgment of the Lisbon Court of Appeal (dgsi.pt). of 28.03.2019, in the context of case No. 334/19.0YRSLB.Ll-9, "*extradition is one of the forms of international cooperation in criminal matters, by which one State (applicant) requests another State (defendant) the surrender of a person who is in its territory, for the purposes of criminal proceedings or to serve a sentence or security measure depriving liberty, for a crime whose judgment is*



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

similarity of the laws of international judicial cooperation in Portuguese and Cape Verdean criminal matters. The constitutional provisions of Cape Verde's Fundamental Law, such as Article 22 and Article 35, invoked by the defence are similarly similar to the provisions of Articles 20 and 22 enshrined in the Portuguese Constitution and, in turn, , article 55, no. 2, of the Portuguese and Cape Verdean LCJI has the same content. It is therefore difficult to understand how these provisions can be interpreted in such different ways, since, in Portugal, the prohibition of the extradited person to present his/her criminal defence during the extradition process does not represent a constitutional violation[13]

The defense also claims that the prohibition of the presentation of a defense limits the possibility of objections being presented to the principle of specialty and prohibition of double criminality, which are important pillars of the extradition process. These are legal issues that can and should be analysed in light of the facts that support the extradition request. In fact, according to the *principle of specialty*, the requesting State may only pursue a criminal proceeding against the extradited for the reasons invoked in the extradition request[14] and, on the other hand, the prohibition of double criminality implies that it cannot proceed in the Requested State prosecutes crime against

---

*within the jurisdiction of the courts of the requesting State. The extradition procedure is not a criminal proceeding against the extradited person, being concerned only the obtaining of a decision by the requested State on the verification of the material presuppositions of the extradition, being of an urgent nature".*

[13] There is no notice of the Portuguese Constitutional Court having been called upon to assess the constitutional conformity of the rule set forth in article 55(2), of the Portuguese LCJI. The question of the rights of defence of the extraditee, in particular, with regard to the opposition of the extraditee to the facts of the prosecution and not only regarding the extradition itself was, in fact, addressed in Judgment No. 35/2000, of the Constitutional Court, but by reference to the corresponding norm of the legal diploma prior to the law currently in force (Article 57, n.2, of Decree-Law No. 43/91, of January 22), but with the same wording. However, in this judgment, the Constitutional Court does not rule on the (un)constitutionality of the rule, as it decides not to hear the appeal, based on the fact that the rule was not effectively applied in the decision in crisis , in the sense deemed unconstitutional by the appellant. The court, however, ends up rehearsing how the issue should be addressed, opening the door for consideration, in light of the principle of proportionality, admitting the possibility of restriction to the right of defense, provided for in article 32 of the Portuguese Constitution, in given the specificities of the extradition process.

[14] Cf. the already cited Judgement of the Lisbon Court of Appeal (dgsi.pt), of 28.03.2019, within the ambit of Case No. 334/19.0YRSLB.L1-9

02/07/2021
LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

the extraditee for the same facts that support the extradition request and enable the delivery of the extraditee to the requesting State[15] However, these principles do not imply an analysis of the evidence relating to the facts supporting the accusation in the requesting State, but not only the analysis of the facts underlying the request for extradition.

Finally, the defense uses quotes from the case law of the United States, in order to support your argument[16] However, once again, there is an incorrect interpretation of this jurisprudence which, contrary to what is suggested, does nothing more than be in line with the legal provisions of the LCJI of Cape Verde, in the sense of limitations to the presentation of evidence of criminal defense during the extradition process.

In effect, US courts have consistently ruled that, since extradition proceedings are not intended to be a "mini-trial", the defendant is not able to introduce evidence to support his defense against the charges against him. are directed, which is fully in accordance with the legal interpretation that we set out above.[17] Thus, instead of what is advocated by the defense, according

---

[15] In this regard also the aforementioned Judgment of the Supreme Court of Justice (dgsi.pt) of 11.12.2008, in the scope of case No. 08P3982

[16] Using a doctrinal citation, Saab's defense cites American jurisprudence and, although it does so correctly, it incorrectly interpreted its meaning, since the aforementioned jurisprudence does not support its position. The argument would have been clearer if the defense had presented the citation in full:
*"the question of admissibility of evidence is intertwined with the question of determining what kind of evidence can be presented at a trial hearing. The question does not extend to the weight or sufficiency of the evidence presented. It is established in jurisprudence that an extradition proceeding is not a criminal trial in which the guilt or innocence of the person concerned is judged. As the purpose of the trial hearing, in the context of an extradition proceeding, is simply to determine whether evidence of the subject's criminal conduct is sufficient to justify his extradition under an appropriate treaty, the Federal Rules of Criminal Procedure are not fully applicable. . The criterion to be observed is whether the statements in question are true or are not reliable, contradictory, coerced, not supported by other evidence or are not the result of torture. Since the defences at the disposal of a subject in extradition proceedings are severely limited, the courts argue that the subject of the extradition proceeding will only have to consider the evidence that makes it possible to clarify the request presented by the requesting State"* (cf. M. Cherif Bassiouni, International Extradition: United States Law and Practice, page 901 (6.ed 2014)).

[17] Let us see, by way of example, some decisions of the American jurisprudence that support this understanding. The Collins v. Loisel, 259 US 309, 316 (1922), in which the US Court ruled that "*the function of the magistrate in the extradition process is to determine whether there is competent evidence to justify the arrest of the accused pending trial and not to determine whether the evidence is sufficient to justify a conviction.*"

On the other side, the Charlton v. Kelly Case, 229, U.S. 447, 461 (1913), in which it was decided that the extradition judge did not err in excluding: *"testimony produced to contradict the prosecution evidence", because this "objection (…) should be presented before or at the time of its judgement for the crime and heard by the court with jurisdiction over the crime".*

Another example is the Hooker v. case. Klein, 573 F.2d 1360, 1368 (9th Cir. 1978), in which it was stated that "the extradition court may exclude evidence of adversary, of Jactas contradicting the government's evidence, or of a defense that invokes the non-imputability of the agent (...) Due to the limited function of an extradition process and the

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

to American law, the courts of extradition generally accept as true all statements and means of evidence submitted by the requesting State, reserving their analysis to the Courts of that State.[18]

Although US law may allow an accused to file, at the judge's discretion, and limited form, evidence to explain the charges against him (as, for example, United States vs. Fernandez-Morris, 99 F. Sup. 2d 1358, 1366 (S.D. Fla. 1999)), this is not what happens in the present case. The defense specifically requires the possibility of directly oppose the facts supporting the accusation, "*alleging falsehoods or untruths and/or the impossibility for the acts to occur until the day, place and time indicated in the request for extradition and presentation of documents that demonstrate that the person to be extradited found elsewhere*", which is directly contrary to American and Cape Verdean jurisprudence, consistent with the normal practice of an extradition process.

Even if the accused were allowed to present contradictory evidence, such as requests, it is not clear why this would help in this case. The request for extradition by the United States is based on a panoply of electronic bank transfers for which it is not required that the accused has been in a specific place, at a specific time, on a specific day.[19] In addition, the defence's request proves to be particularly curious, since the United States in part based the request for extradition on the confessions of the extraditee.

---

limited participation of the fugitive allowed, the decision of the court does not reflect a consideration of all the fundamentals that support the merits of the case." See also Charlton, 229 U.S., 461-62, where the refusal of a magistrate to hear evidence of the insanity claim of an extradited person in the extradition process is defended.

Finally, see also the case Bovio v. United States, 989 F.2 d 255, 259 (73 Cir. 1993), in which it was expressed that "*the fugitive has no right to attack the credibility of witnesses at a hearing in an extradition case, since the issues of credibility must be determined in judgment*". In the same vein, Shapiro v. Ferrandina, 478 F.2d 894, 905 (2nd Cir. 1973), where it was decided that evidence against credibility "*should await trial in Israel*".

[18] This happened in the extradition process of Martinelli Berrocal, Case No. 17-22197-Civ (S.D. Fla. August 31, 2017), in the Collins case, 259 U.S. in 316, as well as in the Ahmad v. Wigen, 726 F. Sup. 389, 399-400 (EDNY 1989), where the Court even stated that "*the main source of evidence for the decision in the extradition proceeding is the extradition request and any evidence presented therein is considered true for the purposes of this decision*".

[19] This is a reason for which the importance conferred by the accused in the case United States v. Hunte, Case No. 04-M-0721 (E.D.N.Y.), 4 January 2006, is neither understandable nor adequate. In that case, the Court was to consider if the extradition request contained sufficient proof relating to "probably cause", as required under the terms of the bilateral treaty which governed that extradition process. In relation to this question, the Court considered the evidence that the defendant alleged has harmed the conclusions contained in the extradition request, related with the time and place the offences occurred.



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

It is concluded that the procedural regime of extradition ensures the constitutionally protected guarantees of defense, namely the right to a double degree of jurisdiction.

Nor is it clear to what extend the violation of the ne bis in idem principle is at stake.

4. **The illegality of the detention of the extraditee, based on an informal request from a police agency of conventional origin (Interpol), without due ratification, promulgation and publication.**

It understands that the application of these norms is unconstitutional in the sense that it is legally irrelevant that the acts referring to Interpol have not, eventually, been ratified by the Republic of Cape Verde, nor published in the internal order.

It alleges that, "*The rules that were applied in the decisions are those of the articles (...) and with the interpretative meaning of "It is lawful for the criminal police authorities to carry out, under the terms of the current criminal procedural law, the detention of individuals who, according to official information, namely from Interpol ( ... )", "( ... ) it is legally irrelevant that the acts referring to Interpol have not possibly been ratified by the Republic of Cape Verde, nor published in the Cape Verdean internal order ( ... )" "( ... ) the use made of the information received via this system is a national law (... )", in casu the LCJ, all segments or parts where the law makes references to Interpol, and where its norms have a decision-making or command norm character; considering that the Interpol texts were not published in the official bulletin, moreover the Interpol texts were never previously declared unconstitutional, they were never confirmed by the Government and approved by the National Assembly by a majority of 2/3 of the deputies in this dimension and extension violate the constitutional norms of articles 3, n. 3, 12, n. 2, 14, 262 and 269; n.1 paragraph c) and 277, n. 2 of the Constitution and, therefore, there is an unconstitutionality that must be declared.*"

As noted in the introductory part of this response, this is one of the rules irrelevant to the determination of the case. The situation of Cape Verde in relation to Interpol is irrelevant, given the provisions of article 39 of the LCJI - "*It is legal for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information , namely from INTERPOL, are sought by competent foreign authorities: for the purpose of proceeding or for the purpose of a penalty for facts that notoriously justify extradition*".

From the simple reading of this legal provision, it is concluded that the criminal police, and not





**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
Cabinet of the Attorney General

necessarily, the International Cabinet of Interpol, can make the arrest, using official information from Interpol. In other words, regardless of membership of this police organization, the criminal police may detain, pursuant to article 39 of the LCJI.

And, in this case, the arrest was carried out by the criminal police of Cape Verde.

The interpretation in the terms set out, therefore, does not violate any provision or constitutional principle. For a better understanding of the position that the Public Prosecutor defended throughout the entire extradition process, an opinion is attached (*document No. 1*).

5. **The illegality of the Appellant's detention (Detention not directly requested in violation of the Principle of Proportionality)**

Interpretation of the meaning that it is enough for a warrant to be presented after the arrest, with no time limit.

The defense alleges that, "The rules that were applied in the decisions are those of articles 39 of the LCJ and 269 no. 3 of the CPP, and with the interpretative sense that" "information", for the detention of a person "may come to their knowledge by any means admitted by Cape Verdean law, including, "in case there is urgency and danger in the delay" "any means of telecommunications", as follows from article 269(3) of the CPP, followed arrest by warrant", in the sense that the adverb "immediately", contained in the legal provision, which the Judge does not quote, as he finds it irrelevant; it is enough that a warrant is presented after the arrest, without a time limit, to the detainee, which totally deprives the legal meaning of law, nullifies the constitutional limits to unsolicited arrests by police entities with restriction of rights and deprivation of liberty, violating the principle of proportionality and in this dimension and extension the constitutional provisions of articles 9(2), of the ICCPR and also article 9 of the UDHR and 17(2), 244(2) of the Constitution."

Whenever there is an arrest not directly requested, pursuant to LCJI 39th, the authority that made it must present the detainee within 48 hours to the District Attorney at the competent Court of Appeal, for the court hearing of the extraditee (articles 53, 54 and 64).

Detention "not directly requested" can only take place, is only legitimate, when the authorities have official foreign or official international information that a given individual is sought by crimes in our country and pursued for offences that specifically justify extradition. If to these "assumptions" of the lawfulness of such a detention it is added that, confirmed by the court, it will be communicated immediately by the Attorney General, by the fastest way, to the foreign authority to whom it is

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

interested so that it can be informed urgently and by the same means, whether or not the request for extradition will be made' (Article 64, paragraph 2); that the detention may not last for more than eighteen days (from the date of arrest), if, however, this information is not received, or for more than forty days, "if, having received positive information, the request for extradition is not received within that period (article 64, paragraph 3); *and even though, since the extradition process is urgent, if all this is added to the aforementioned assumptions*, it will then be concluded, in turn, that the arrest in question and its legal regime also do not deserve any reservations, considered under the perspective of the requirement that, in general, all the restrictions of rights must comply with, under the terms of the Constitution. In other words: it must be concluded that this is a legal solution and regime that respects the principle of proportionality (*lato sensu*) enshrined therein, as it does not go beyond what is necessary to safeguard other constitutionally protected rights or interests.

All to conclude that the possibility of detention of a presumed extraditee, "not directly requested, provided for in the Extradition Law." should not be considered contrary to the Constitution.

By way of comparison, it should be noted that the regime of unsolicited detention for extradition purposes has already been assessed and the CC has not found any violation of the · Portuguese Constitution[20].

### 6. The illegality of the detention of the extradited person (no arrest warrant).

Interpretation in the sense that official information that legitimizes the detention is not required to take the form of a request, much less a warrant, for the Cape Verdean authorities, but rather information.

The defense alleges that, "The rules that were applied in the decisions are those of articles 39 of the LCJ and with the interpretative sense that "just being in possession of official information that legitimizes the detention, and that this official information, which is not required to take the form of a request to the Cape Verdean authorities, not to mention a warrant, but rather information, which can arrive by any means admitted by Cape Verdean law (...) followed by confirmation by warrant", without a warrant, without a deadline, and without ever being attached thereto, and that this violates the constitutional norms of the articles 17(1)1 and 2(4)4, 244(2) and 7 al b) and d) of the Constitution and also (...), so there is an unconstitutionality that must be upheld."

---

[20] Judgement of the CC No. 325/1986: CC Judgement No. 228/1997: CC Judgement No. 505/1997 (tribunalconstitucional.pt)

CERTIFIED TRANSLATION   02/07/2021   LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

There is no unconstitutionality in the interpretative sense given to the norms in question. The only difference between provisional detention following a request for prior detention and detention not directly requested is that, in the latter case, the State of origin of the citizen in question is unaware of his presence in the country: the basis of detention are the information from the criminal police authorities that a foreign citizen is being sought, for the purpose of serving a sentence or for criminal proceedings, information that may or may not be accompanied by the existence of international arrest warrants. It seems, therefore, safe to argue that, if the country of origin had disseminated such information, it would certainly have made a request for the extradition of that citizen, had it known the place where he may be found.

The request for placement of red news is made by the Interpol national offices (GNI) to the General Secretariat of Interpol. The placement has to fulfil a series of requirements, among which the delivery of an international arrest warrant and goes through the scrutiny of a commission of experts (article 77, 82, 86 of the Interpol Regulations). It can, therefore, be understood that the red news contains an arrest warrant.

It is noted, however, that the file contains the international arrest warrant against the appellant, issued by the US judicial authorities. At this point, it took the opportunity to request the rectification of the manifest lapse which consisted in the junction of a warrant in the name of Alvaro Enrique Pulido-Vargas. As stated in the extradition request, namely, in the indictment, in the same criminal proceeding for money laundering, Alvaro Enrique Pulido-Vargas and Alex Nain Saab Moran were indicted, and international arrest warrants were issued against both. However, by mistake, in the extradition request sent to Cape Verde, the requesting State attached the first page of the original warrant in the name of Alvaro Enrique Pulido-Vargas. However, the following pages of the warrant as well as the translations into Portuguese and Spanish are in the name of ALEX SAAB. This is a mere lapse in joining the correct warrant, as there are no doubts that ALEX SAAB is also addressed in the case in question and equally there is no doubt that there is a court order against him, as only based on that document, INTERPOL issues red notice against a person. On the other hand, the red news contains the photograph and data of Alex Saab.

For the information of the Constitutional Court, a copy of the correct warrant is attached (*document No. 2*)[21].

---

[21] The corrected order was requested by the Constitutional Court on 30/4/2021, in the meantime returned by letter of 9/6/2021. The originals are with the CC.

CERTIFIED TRANSLATION
LANGUAGE REACH
02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

It is thus concluded that article 39 of the LCJI, by providing for detention not directly requested in advance by the criminal police authorities, based on official information regarding individuals sought by the competent foreign authorities, for the purposes of proceedings or compliance with penalty for offences that clearly justify extradition, does not violate any constitutional provision or principle.

7. **The illegality of the detention of the extradited person (failure to communicate the reasons for the detention to the extradited person).**

Interpretation of the meaning that it is enough to inform the accused that he is being extradited, without the need to indicate the exact different facts.

The defense alleges that, "The rules that were applied in the decisions are similar to those of the articles (...) and with the interpretative sense of "that it is enough to inform the accused who is being extradited, without indicating the "exact distinct facts" been notified of the warrant and discover with the notification of the accusation made to his representative that he is being charged with 8 counts and nil 7 counts as advanced on the day of ratification of his arrest and in that dimension and extent violate the rules provisions of articles 17(1)1 and 2, 12 and 3(1 and 4) of the CRCV (...) and therefore there is an unconstitutionality that must be declared."

This question of constitutionality is not independent of the previous one and is therefore affected by it. In fact, there is no unconstitutionality in the not directly requested detention regime, which can occur without the existence of an arrest warrant. In the absence of a warrant at the time of arrest, it is natural that the accusations that justify the arrest are not communicated, in complete and absolutely rigorous terms, and it is sufficient that the potential extraditee is informed, at that time, that this is an arrest for the purposes of extradition.

8. **Violation of the Principle of Reciprocity**

Interpretation in the sense that it is possible to dispense with reciprocity.

The defense alleges that "The rules that were applied in the decisions are those of articles 3(3) and 6(3)(...) and with the interpretative sense that" (...) It is finally added that due to its systematic placement, the waiver of reciprocity is possible in any form of international legal cooperation, consequently, the extradition and in this dimension

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

and extension they violate the constitutional norms contained in articles 7 al. 1), 11, no. 1, 25, no. 1 of the CRCV and, therefore, there is an unconstitutionality and that must be declared."

The general extradition regime provides that the lack of reciprocity does not prevent satisfaction of a request for international judicial cooperation in criminal matters (one of the forms of what is the extradition). International cooperation in criminal matters falls under the principle of reciprocity" and, a request for cooperation may be refused when the reciprocity. However, the lack of reciprocity does not prevent the satisfaction of a request for cooperation", in particular when "It is advisable due to the nature of the fact or of the need to fight certain serious forms of crime", such as those mentioned in the present request for extradition (article 3/3. LCJI).

Among the arguments presented against his extradition, in particular on pp. 28-33 (and also addressed on pp. 88-89) of the appeal filed at the Court of Appeal of the Barlavento on January 14, 2021, the extradited person pleads that the extradition request formulated by the United States of America must be rejected due to the alleged lack of reciprocity.

However, there is no reason to extradite him.

First, contrary to the reading taken in the appeal, the United States of America does not refuse to extradite in identical situation. What is said in the diplomatic note that is referenced by the extradited person is that, in this case, the United States of America does not may grant - due to limitations of their domestic legal system - an absolute guarantee in this regard, being able to respond to a similar request from Cape Verde, pursuant to a case-by-case assessment. Under US law, Title 18 of the US Code Section 3181(b), if certain conditions are met, the United States may proceed with the delivery of the extraditing, provided they are *"persons who are not citizens, nationals or residents US permanent staff who have committed crimes of violence against nationals of the United States in foreign countries, regardless of the existence of any extradition treaty ... "*.

Secondly, because the legal basis for the extradition request of Alex Saab at the United Nations Convention against Organized Crime Transnational[22]. In fact, even if the presidential decree of ratification of this convention has not been published, Cape Verde adhered to it this internationally

---

[22] Approved for ratification by Resolution No. 92/VI/2004, of 31 May, published in the Official Bulletin, Series I, No. 16, 31 May, pp. 306-372.

CERTIFIED TRANSLATION
02/07/2021
LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

and also approved with the domestic constitutional dictates[23]. And, even if it is understood that the lack of ratification makes it not valid in the domestic legal order, this does not mean that it is innocuous, as it reveals the international link of Cape Verde to a set of principles and rules in this domain[24]

But, above all, and even if the two previous points were not considered, the argument is unfounded because there is no obligation to refuse the extradition request for lack of reciprocity.

In fact, on the one hand, the Constitution of Cape Verde does not require it except in the case of the extradition of Cape Verdean citizens (cf. article 38, n. 3, paragraph a) of the Constitution). And, on the other hand, Cape Verde's Law on International Judiciary Cooperation in Criminal Matters, Law No. 6/VIII/2011, of 29 August (LCJI), states that the lack of reciprocity does not prevent satisfaction. of a request for cooperation (cf. article 3, paragraph 3, in conjunction with article 6.0(4)[25], under certain conditions that will be analysed below.

Even in Portugal, the legal system closest to Cape Verde with regard to laws on international judicial cooperation in criminal matters, the absence of reciprocity is only a condition for refusing cooperation for extradition. of national citizens[26/27] for the participation of the requesting State in the extradition process[28] and, to a certain extent, for extradition for crimes corresponding, according

---

[23] Recently, and even incidentally, the Constitutional Court stated that, among other conventions entered into within that international organization, the United Nations Convention against Transnational Organized Crime establishes obligations to which the State of Cape Verde is bound, by what constitutes Cape Verdean internal law - cf. Judgment No. 30/2019 of the Constitutional Court, published in the Official Bulletin, Series I, No. 110, 29 October 2019, pp. 1766-1789.

[24] See, by way of example, the Judgment of the Supreme Court of Justice (dgsi.pt) of Portugal, of 02.18.2006, issued in the scope of case No. 05S3279, where the court orders to comply with the content of the Basel Convention on the immunity of the States of 10.05.1979, which, despite being signed by Portugal, was never ratified, based on the fact that it evidenced principles and rules that were useful to solve the concrete case. In the same sense, and also with regard to the United Nations Convention on State Immunities, of 2 December, 2004 (which Portugal signed, but which is also not in force), see the Judgment of the Court of Appeal of Lisbon ( dgsi.pt). of 16.01.2019, rendered under case No. 12515/16.4T8LSB.2.Ll-4.

[25] Law No. 144/99, of 31 August, Portuguese law on international judicial cooperation, contains identical rules, in articles 4.(3), and 6(14)

[26] 26 Cf. article 33(3); of the Portuguese Constitution, which will enshrine a norm similar to article 38, no. 3, of the Cape Verdean Constitution

[27] Moreover, although this is not clear from the allegation of the appeal, it is precisely in view of the specific condition of appeal of domestic citizens which refers to the Portuguese doctrine mentioned in points 231-232 of the appeal.

28 Cf. article 47, No. 3, of Law No. 144/99, of 31 August, which appeals identically in article 47, No. 3 of the LCJI of Cape Verde.

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

to the law of the requesting State, to a penalty or measure depriving of restrictive freedom of a perpetual or indefinite period[29].

Pursuant to article 3(3), subparagraph a), of the LCJI, the lack of reciprocity does not prevent the satisfaction of a request for cooperation, provided that such cooperation is advisable due to the nature of the fact or the need to fight certain serious forms of crime. However, since the extradited person is sought by the requesting State to be tried for the practice of serious crimes, namely money laundering, it is evident that the request for extradition must be granted due to the need to combat this form of particularly serious crime.

There is no doubt that money laundering is considered by the international and national community to be a serious form of criminality. In Cape Verde, money laundering is a crime provided for and punished by article 39.0 of Law No. 38/VII/2009, of April 27, amended and republished by Law No. 120/VIII/2016, of 24 March, which is punishable by a penalty of four to twelve years of imprisonment, liable to aggravation in the circumstances provided for in article 40 of the same law[30]. This law, moreover, also provides for a complex preventive system for this form of crime, as happens in most countries, following the recommendations of the International Financial Action Group (GAFI). By the way, Cape Verde is a member of the Intergovernmental Action Group against Money Laundering in West Africa (GIABA), created by the Authority of Heads of States and Governments of the Economic Community of West African States (ECOWAS) in the year 2000 and which, in turn, is an Associate Member of FATF. There are several international conventions that include in their object the fight against money laundering, including three conventions entered into within the United Nations Organization (UN) to which Cape Verde has adhered or which Cape Verde has subscribed to[31] It is unequivocal, therefore, that money laundering is a particularly serious

---

[29] See article 33, No. 4, of the Portuguese Constitution, which provides, in these situations, the need for the requesting State to be a party to an international convention to which Portugal is bound and to offer guarantees that such penalty or security measure will not be applied or executed. For crimes corresponding to this same type of punishment, article 38, paragraph 2, of the Constitution of Cape Verde only makes similar requirements, even though it refers to the need for the existence of an international convention, in the case of extradition of citizens of Cape Verde.

[30] In Portugal, the corresponding crime was introduced into the Criminal Code in 2004 (previously only being provided for in the Drug Law), and today it is provided for and punished by article 368 A of the Penal Code (which designates it as "money laundering"), along the lines of, and with penalties similar to those of Cape Verdean legislation. Conduct punished under the crime of money laundering in Portugal are part of the legal concept of highly organized crime (cf. article 1.0, paragraph m), of the Portuguese Code of Criminal Procedure, which means that, among other things, when they have an international connection, they can constitute grounds for extradition of national citizens, under the terms of article 33(3) of the Portuguese constitution.

[31] The United Nations Convention against illicit Traffic in Narcotic Drugs and Psychotropic Substances (Vienna, 20.12.1998) approved for accession by resolution No. 71/IV/94 of 19 October, the United National Convention against Transnational Organised Crime (Palermo, 15.11.2000), and the United Nations Convention against Corruption (New York, 31.10.2004, approved for ratification by Resolution No. 31/VII/2007, of 2 March.

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

form of criminality that the international community and Cape Verde are committed to fighting. Thus, the condition provided for in article 3, no. 3, subparagraph a), of the LCJI is clearly satisfied.

There is, therefore, no legal obstacle to satisfying the request for extradition made by the United States of America; the obstacle that could exist would be political, but this is already overcome by the favourable decision of the Minister of Justice, at the end of the administrative phase of this extradition process, and in view of the guarantees and clarifications then provided by the USA.

In effect, the principle of reciprocity "*works differently depending on whether or not there is an international convention binding the requesting and requested States: if there is, reciprocity is inherently guaranteed; if not, the way to ensure reciprocity is to make cooperation (based on domestic law) conditional on the provision of guarantees by the requesting State on a case-by-case basis.*"[32] Reciprocity is "*a principle according to which the requested State will only agree to cooperate with the requesting State if it offers guarantees that, in the future, in the capacity of defendant and in the same circumstances, he/she will be the same.*"[33] However, it should be understood that the "*attribution to the Ministry of Justice of the possibility of demanding and providing guarantees of reciprocity on a case-by-case basis highlights the political character of the principle of reciprocity*"[34] This resulted from the Preamble of Decree-Law No. 43/91, of 22 January[35], which approved the Portuguese law on international legal cooperation prior to the one currently in force, and where the legal solution that we find today in article 4 of the Portuguese law was provided for the first time[36] In fact, in the preambular text of this decree-law, it was left in place, as a form of justification of the power conferred on the Ministry of Justice in this regard, that reciprocity "*is conceived as a unilateral political act of the Government, as an instrument of international legal cooperation. Being a condition of application of any treaty, the reciprocity here regulated applies especially to the cases of absence of the same; and, since it reflects the principle of equality between States, it is justified to attribute its weighting to the Government, as responsible*

---

[32] Miguel Joâo Costa, Dedere aut Judicare? The decision to extradite or try under Portuguese, European and international law, p. 79, Master's dissertation submitted to the Faculty of Law of the University of Coimbra, available <u>here</u>.
[33] Idem, ibidem, footnote 204.
[34] Idem, p. 80
[35] Published in the Official Journal No. 18/1991, Series I-A of 22.02.1991, an accessible online <u>here.</u>
[36] Law that has not been amended between Decree-Law No. 43/91 and Law No. 144/99, the law currently in force and which also fully corresponds to the wording of article 3 of the LCJI



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

*for conducting the country's general policy and for the negotiation and adjustment of international conventions».* In other words, the decision to demand or waive reciprocity as a condition for satisfying the request for cooperation is, in the Portuguese and Cape Verdean legal systems, and in view of the aforementioned legal provisions, a purely political decision, which is not even subject to judgment of the courts[37]. We are not, therefore, before any delegation of powers by the National Assembly or the President of the Republic to the Minister of Justice, as the extradited party claims in his appeal, but simply before a political, valid and effective act, legitimized by the provisions of the article 3 of the LCJI and, for the rest, of the exclusive competence of the executive power and not unionized by the courts.

Thus, and in conclusion, even if it is understood that there is a lack of reciprocity in the specific case, not only is this absence not a reason for mandatory refusal of the extradition request, as the assessment of this cause of refusal is excluded from the Cape Verdean courts, by virtue of the decision of the Minister of Justice.

It is not seen how this provision of the LCJI could violate the constitution.

**9.   Violation of the Principle of Specialty and extradition for political reasons**

Interpretation in the sense that extradition is authorized to be subject to criminal prosecution for only one of the crimes with which he is charged, in accordance with the guarantee offered by the requesting State, without specification, which makes defense in the USA difficult.

The defense alleges that, "The rule that was applied in the decisions is that of article 17 of the LCJI and with the interpretative sense of "the appellant's extradition is authorized so that he is subject to criminal proceedings for one of the crimes with which he is charged, in accordance with

---

[37] In this sense, see the aforementioned Miguel Joâo Costa, op. cit., p. 80, which states that "*we can safely conclude that the judgment on the cause of refusal "absence of reciprocity" belongs exclusively to the Executive - thus establishing an exception to the rule that the causes of compulsory refusal are subject to judicial review*", with the author also citing another doctrine and also jurisprudence in this regard. In Portuguese jurisprudence, the Judgment of the <u>Court of Appeal of Lisbon (dgsi.pt)</u>, of 02.04.2004, issued in the scope of case No. 3880/2003, where it was stated that "as flows from paragraph 3 of article 4 of Law 144/99 of 31 August, the requirement of reciprocity can be waived by the Ministry of Justice in the situations set out in the three paragraphs of this same precept. In these cases, namely when the political power believes that there is a need to fight against certain forms of criminality, the Portuguese State ma, nonetheless, cooperate with a foreign state. Hence, even in this case, were His Excellency the Minister of Justice, to accept the extradition request presented by the Indian Union, it would not be the inexistence of reciprocity that would impede its admissibility.

02/07/2021 LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

the guarantee offered by the Requesting State, unlike the diplomatic note that clearly determined the crime or "count" to which the appellant would be accused, if extradited, thus making his defense in the US more difficult, making it more expensive, in short, the decision made the appellant's situation more burdensome, and in this dimension and extension, they violate the constitutional norms of articles 15, 17(4 and 5), and 18 of the CRCV and, therefore, there is an unconstitutionality that must be declared."

Although this "ninth question of constitutionality" includes "*violation of the Principle of Specialty and extradition for political reasons*", the fact is that the appellant only invokes the unconstitutionality of the interpretation of the *Principle of Speciality*, which shows that he finally accepts that, political reasons are not the basis for the extradition request. On the other hand, it should be noted that the appellant attacks the decision on the merits itself, which he seeks to see altered, and not the interpretation given to the applicable legal provisions.

The principle of specialty, according to which the extraditee may not be persecuted, detained, tried or subject to any other restriction of liberty for a fact or prior convictions other than those determined in the extradition request (Article 17 LJCI), is an internationally recognized principle through which the sovereignty of the requested State is protected and the protection of the extradited person is guaranteed.

The formal request for extradition made by the United States contains an express guarantee of compliance with the principle of specialty. The guarantees in the context of international judicial cooperation emerge from the trust that exists between the requesting State and the requested State, in terms of political-diplomatic relations. Who decides on the sufficiency or insufficiency of the guarantee of the principle of specialty is the Court with jurisdiction in matters of extradition, the Constitutional Court limiting itself to analysing the conformity of the rule applied with the Constitution.

The appellant raises the hypothetical question of non-compliance with the guarantee of the principle of specialty by the USA. A similar issue was analysed and decided by the Portuguese Constitutional Court in the sense that this task was the responsibility of the State, in the context of political-diplomatic relations[38].

Contrary to what is argued by the defence, the formal guarantees given by the United States to Cape Verde in relation to the charges and the potential maximum penalty that he will face, at the time of extradition, are sufficient to justify granting the extradition.

---

[38] CC Judgement No. 360/2012 (tribunalconstitucional.pt)





**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

The US assured Cape Verde through two diplomatic notes, that i) will not detain, prosecute or punish the extradited person for any other crimes that are not reflected in the extradition request; and that ii) the extradited person shall not be sentenced to life imprisonment or the death penalty.

The defense does not dispute that these guarantees are binding on the entire US executive, including the Department of State and the Department of Justice. In fact, both of the above-mentioned diplomatic notes, dated June 29, 2020 and September 7, 2020, state that the guarantees given therein are assumed "*on behalf of the entire United States Government, including the departments of State and of Justice*". Thus, the defense does not raise any issue related to the fulfilment of guarantees that have been provided by any of these US departments and, in fact, there is no reason to believe that either the Department of State or the Department of US courts, do not comply with these guarantees. In effect, the USA, like any country that intends to meet, internationally, people who are on the run, has an increased incentive to honour its diplomatic agreements and guarantees, in order to be able, under reciprocal conditions, to demand compliance with them by other States.

Instead, the defense argues that the Cape Verdean court should refuse extradition because the aforementioned diplomatic notes do not determine whether the US courts would or would not be linked to the guarantees provided[39]. However, this argument denotes a lack of understanding of the defense in relation to the role of the American courts, in the context of their extradition process and, in general, in the face of the accusation brought against the extradited person in the USA. Courts can only consider criminal charges brought to them by the Public Ministry, i.e. the US Department of Justice in this case. Furthermore, the punitive power of the Courts is limited to crimes charged to the accused in the indictment. Under Rule 48(a) of the *Federal Rule of Criminal Procedure*, the prosecutor will request the dismissal of the seven counts and the Court must grant the request when it results from an extradition. In addition, under Rule 14 of the Federal Rules of

---

[39] The defense also suggests that guarantees should come from the US Senate taking into account "*its important force in the political system and in the US constitution*". However, the American Senate, which is a federal legislative body, does not play any role in the extradition process or in Saab's criminal case. Instead, the function of the Senate, as well as the US House of Representatives, is to decree laws, including those which govern extradition, including Title 18, Section 3192 of the USA Code, which confers on the executive power the authority and the responsibility to protect the accused,. Alex Saab faces charges which are made against him by the Department of Justice, which is part of the executive power.

02/07/2021
LANGUAGE REACH



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

Criminal Procedure, the Court may order any "*measure of mitigation that justice may require*"[40]if the joining of charges would be detrimental to an accused.

The defense argues that the Court should have "*verified that this guarantee was given by the Department of Justice*," which is not understood, since the diplomatic notes themselves confirm that the Department of Justice is bound by the guarantees given. According to the *Department of Justice Manual*, section 9-15.240, "*the request for extradition is made by diplomatic note prepared by the Department of State and transmitted to the foreign government through diplomatic channels*"[41]

In this case, the United States, through its diplomatic note of 29 June 2020, has guaranteed that the Department of Justice will only prosecute the charges enumerated in the extradition request. In addition, the guarantee provided in the diplomatic note of 7 September 2020, through which the United States ensured that the extraditee would face trial for only one of the charges described in the indictment and included in the extradition request, in order to ensure that the penalty maximum imprisonment to apply may not exceed 20 years. This being the position adopted by the US Department of Justice, the Courts are necessarily bound by these limits. In this way, the guarantees provided by the United States make it possible to justify and sustain the extradition of Saab, confirming that the principle of specialty is duly ensured.

Furthermore, the LCJI and Portuguese jurisprudence cited by Saab's defense do not alter the conclusions we reached. On the contrary, they prove the importance of complying with the principle of specialty and demonstrate the strict binding of the courts to this principle[42].

---

[40] Free translation "relief that justice requires".

[41] Free translation of "[t]he request for extradition is made by diplomatic note prepared by the Department of State and transmitted to the foreign government through diplomatic channels".

[42] See, by way of example, the Judgment of the Portuguese Supreme Court of Justice, mentioned by Saab's defense, under which a violation of the principle of specialty was recognized and gave the Portuguese State the possibility of deciding on the best form of react to this violation.

According to the aforementioned Judgment of the Supreme Court of Justice (dgsi.pt), of 01.11.2012, issued in the scope of Case No. 111/11.7YFLSB "*the principle of specialty is one of the structuring principles of the entire process of international cooperation and which is not limited only to extradition, under the terms of the scope extended to other forms of cooperation defined in art. 1.0 of Law 144/99, of 31-08. This principle is part of that set of axioms imposed by the simple relevant coexistence of the international community in the sense that the delivery for extradition of an offender obliges the requesting State to contain its procedure, its criminal prosecution, within the precise limits of the specific prosecution for the predefined crime and not for any other. To which he also adds, "the violation of the specialty clause by the State that saw its claim satisfied will be part of an illegal act, as such, reprehensible at the level of relations between the States*". The specific case in question in this decision of the Supreme Court of Justice has nothing to do with this case, since what was discussed there was the recognition of a violation of the principle of specialization subsequent to extradition, because the requesting State had been bringing additional charges against the extradited person, compared to those that were contained in the extradition authorization. Moreover, and after the appeal of this decision of the Supreme Court of Justice, the Constitutional Court, through Decision 360/2012 (tribunalconstitucional.pt), came to express the understanding according to which the consequences to be drawn from a court decision that finds the violation of the principle of specialty are located in a political-diplomatic plan, being the responsibility of the requested State "*to politically consider[ing] the attitude to be taken in terms of relations with the requesting State*". An understanding that, moreover, had already been affirmed in the Judgment of the Supreme Court



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

There is no disagreement in the interpretation of the standard with the CRCV.

**10.  On the perpetual character of the penalty**

Interpretation in the sense that a "commitment" document is a valid and sufficient guarantee.

"The norms that were applied in the decisions are those of the articles (... ) and with the interpretative sense of "*it brought to the process, through the PP, a document in which it was committed (...). This guarantee cannot fail to be considered valid and sufficient*", that is, the lower court decision grants the extradition of the extradited person, claimed by a State, where the penalty of life imprisonment is applied or in that country there is the risk of irreversible damage to physical integrity, and not by the International Criminal Court, to be tried, not for serving a sentence, for crimes that do not qualify as terrorism or heinous crimes and in this dimension and extent violate the constitutional norms of articles 1(1 and 2), 24, 25(1), 33, 38(2) of the CRCV."

The appellant is not right. Even in situations where the crime is punishable by a life sentence of imprisonment or a security measure, this would not necessarily imply a legal impossibility of extradition, but rather would oblige the requesting State to formulate a valid guarantee that such penalty would not be applied or executed, a guarantee that can take various forms, as long as it is legally binding in the requesting State, as is the case in the specific case (article 6, no. 1, al. f) and 2, al. b) of the LCJI). It turns out, however, that the crimes for which the extradited person was

---

of Justice (dgsi.pt). of 13.12.2007, rendered in a previous phase of the same case, and which was also expressed by Judge Santos Cabral in a vote in the aforementioned Judgment of the Supreme Court of Justice (dgsi.pt). of 11.01.2012. See also the Judgment of the Lisbon Court of Appeal (dgsi.pt). of 03.28.2019, rendered in the scope of case No. 334/19.0YRLSB.L1.9, where it was stated that *"[the] principle of specialty, innate to the traditional institute of extradition, which reflects the substantive limitation of the criminal scope of the order, whose coverage was fences and circumscribed by motivating facts of the extradition order, appears as a guarantee for the person sought and as a limit on the criminal action or execution of a punishment or security measure and represents a legal safety net that he will not be judged for a crime other than the one set out in the Extradition Order, this principle seeks to rule out so-called "fraudulent requests" in which a fact is invoked as a ground for extradition and then the extraditee for an is actually judged for other that is not invoked".*

02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

accused are not one which carry a penalty of life imprisonment. On the other hand, the US gave guarantees to charge only one of the crimes, as mentioned in the extradition request, it has experiences of commuting sentences in its history in the context of international judicial cooperation, which was accepted by the court.

And this, once again, does not violate the Constitution.

### 11. Immunity

Interpretation in the sense that the absolute incompetence of the courts results from a prior assessment or political position; non-recognition of Special Envoy Status.

The defense alleges that, "the norms that were applied in the decisions are those of the articles (...) and with the interpretative sense that "the absolute incompetence of Cape Verdean courts to hear a matter related to immunity, in international law public, results from a previous assessment or political position, that is, the recognition of the Applicant with the Status of Special Envoy is the responsibility of the State of Cape Verde and, without such consent, the Cabo-Verdean Courts cannot recognize this quality to the applicant." .and in this dimension and extent, they violate the principles of separation or interdependence of powers, the independence of the judiciary and the principle of non-interference in the internal affairs of other States provided for in Articles 119(2) and 211(1) and 11(1) of the CRCV, because the lower court has not ruled on the Appellant's Special Envoy Status or its objection, after two previous States have recognized the appellant as a special envoy and still violate the constitutional norms of articles 2(2), 7 , 12 and (...)".

The competence to recognize the quality of special envoy belongs to the Executive Branch and not to the Judiciary Branch. It is a political act, not unionized by the courts. In fact, the various requests made by Venezuela, through several letters sent to the Government of Cape Verde -MNEC, demonstrate this.

Once again, it appears that the appellant attacks the decision on the merits and not the norm or interpretation that he understands to be contrary to the Constitution. The status of special envoy, when it does not result from an obligation assumed by the State through an international agreement or convention, always lacks political appreciation. There is no question of separation of powers, or otherwise. It is not the internal courts that bind the State to its obligations d ; public international law. The binding to treaties and international obligations always depends on the political will and the attitude towards the exercise of jurisdictional power that is limited, at a later stage, to apply the law that results, among other things, from those obligations to which the State has been bound at the international level. Therefore, once again, the question of constitutionality is incorrectly raised.



CERTIFIED TRANSLATION
LANGUAGE REACH
02/07/2021



**PUBLIC PROSECUTOR**
**ATTORNEY GENERAL**
**Cabinet of the Attorney General**

### 12. ECOWAS

Interpretation in the sense that the automatic entry into force, in the internal legal order, of the acts of ECOWAS, reduces the sovereignty of Cape Verde.

The defense alleges that, "The norms that were not applied in the decisions are those of the articles (...) because they violate the sovereignty of the country under the terms of article 3.0 of the Constitution and with the interpretative sense"(... ) o Recognition that the Cape Verdean Courts would become part of ECOWAS, as a supranational organization, in the sense that their acts automatically enter into force in the internal legal order without any mediation act, would entail the risk of reducing Cape's sovereignty to ashes. Green (...), and in this dimension and extension, it violates the constitutional norms of articles 3, 12, n. 1 and 3 and 210, n. 2 of the CRCV."

Again, the question of constitutionality is not correctly formulated. In this case, by the way, the appeal seems to place the assessment of constitutionality on the rules of the ECOWAS Treaty and similar, which does not seem to make much sense, since, in principle, the constitutionality of rules of domestic law can only be assessed. It should be noted that the question raised has nothing to do with the assessment of constitutionality, but rather with the interpretation and application of public international law, which, in our understanding, is beyond the competence of the Constitutional Court.

Under the above terms, the present appeal for concrete inspection of constitutionality is unfounded, taking into account that none of the LCJI norms was applied or interpreted in violation of any constitutional norm or principle.

Opinion and document are attached.

*Attorney General's Office, 25 June 2021*

The Attorney General

[Illegible signature]

*/Luis José Tavares Landim/*

[Circular stamp]

Public Prosecutor

Attorney-General

Cabinet of the Attorney General

02/07/2021

Page **29** of **29**



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Diretor de Gabinete

Exmo. Senhor
Secretário Judicial do
Tribunal Constitucional
**Praia**

Ofício nº **1112**/70.07/2020/2021
Praia, 28 de junho de 2021

Assunto: Remessa de missiva - Autos de Fiscalização Concreta de Constitucionalidade nº 2/2021, em que é recorrente Alex Nain Saab Moran e recorrido o Supremo Tribunal de Justiça

Incumbe-nos Sua Excelência o Procurador-Geral da República de junto enviar a missiva, relativamente aos Autos de Fiscalização Concreta de Constitucionalidade nº 2/2021, em que recorrente Alex Nain Saab Moran e recorrido o Supremo Tribunal de Justiça, acompanhada de 02 (dois) documentos (Doc. nº 1 e Doc. nº 2), que seguem em anexo, solicitando e agradecendo que sejam levados ao conhecimento do Venerando Juiz Presidente do Tribunal Constitucional.

Com os melhores cumprimentos.

P' A Directora de Gabinete,

/Adilson Marques/
Coordenador da UAP-PGR



C.P. n.º 268, Praia, Cabo Verde – Telef: +238 2615748; Fax: +238 2616884
*www.ministeriopublico.cv*



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

**Autos de Fiscalização concreta de constitucionalidade Nº 2/2021**

**Recorrente:** *Alex Nain Saab Moran*
**Recorrido**: Supremo Tribunal de Justiça

Notificado para responder ao recurso de fiscalização concreta da constitucionalidade, o Ministério Público diz o seguinte:

*Alex Nain Saab Moran*, extraditando, melhor identificado nos autos, apresenta recurso de fiscalização concreta da constitucionalidade do Acórdão nº 28/2021, de 16 de Março de 2021, alegando em resumo que, não foram analisadas suficientemente as questões de constitucionalidade levantadas nos articulados do processo de extradição e na decisão do STJ.

\*

Argui a inconstitucionalidade do sentido interpretativo de, praticamente, todas as normas da *Lei n.º 6/VIII/2011, de 29 de agosto-* Lei da cooperação judiciária internacional *(LCJI)* aplicadas, algumas das quais, irrelevantes para a decisão do caso. Constata-se também que, o que se coloca em crise, mais do que a constitucionalidade do sentido da interpretação das normas ou princípios constitucionais, impugna-se as decisões de mérito, relativamente a todas as questões levantadas. Assim a resposta do Ministério Público, para além de focar na questão essencial da constitucionalidade, não deixará de rebater os argumentos aduzidos contra a decisão de mérito.

Perante esta atitude, em que fica evidente que a estratégia passa por arguir a inconstitucionalidade de todas as normas aplicadas, ou seja, *"atirar em todas as direções"* por forma levar o tribunal *ad quem* a se pronunciar sobre questões de mérito, convém definir alguns conceitos chave.

Ensinam *Gomes Canotilho e Vital Moreira*[1] que, o recurso de fiscalização concreta da constitucionalidade restringe-se à questão da constitucionalidade, não tendo por objeto a *decisão judicial* em si mesma, mas apenas na parte em que ela não aplicou uma norma por motivo de inconstitucionalidade ou aplicou uma norma alegadamente inconstitucional. O objecto do recurso não é a própria decisão judicial, por ela supostamente ser ou não

---

[1] Gomes Canotilho e Vital Moreira- Constituição da República Portuguesa Anotada- 4ª ed. Revista

Página **1** de 29



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

inconstitucional. Mas apenas a parte dela em que considerou inconstitucional (ou não) uma determinada norma aplicável à causa em apreço no tribunal.

A restrição dos recursos à questão da inconstitucionalidade delimita também os limites de conhecimento do Tribunal Constitucional. De acordo com o *princípio da congruência*, a decisão do recurso sobre a questão da inconstitucionalidade deve limitar-se a verificar a conformidade questionada na decisão recorrida, não podendo estender-se à apreciação de outras. O tribunal só pode pronunciar-se sobre as normas em relação às quais se tenha suscitado o incidente de inconstitucionalidade, mas pode fazê-lo com fundamento em violação de normas ou princípios constitucionais diversos daqueles cuja violação foi invocada- art.º 91º e 62º/2 da *Lei nº 56/VI/2005, de 28 de fevereiro*- Lei do Tribunal Constitucional (LTC).

O recurso para o Tribunal Constitucional, sendo limitado à questão da inconstitucionalidade, e sendo esta sempre uma questão incidental, nunca pode envolver diretamente a decisão da *questão de fundo* em si mesma. Por isso, o Tribunal Constitucional não se pode substituir ao tribunal recorrido, mas apenas revogar total ou parcialmente a decisão recorrida quanto à questão de inconstitucionalidade, ordenando que o tribunal recorrido proceda à *reforma* desta, para se conformar com a decisão do TC quanto à questão de inconstitucionalidade (art.º 93º/3 LTC).

Portanto, a alteração pelo Tribunal Constitucional das decisões recorridas em matéria de inconstitucionalidade, se conduz sempre à necessária reforma destas, nem sempre tem de implicar alteração da decisão de fundo, quando o tribunal recorrido chegue à mesma conclusão, apesar da alteração do juízo de inconstitucionalidade sobre a norma.

Convém também referir o conceito de *processo de extradição*, amiúde confundido com o *processo penal*.

Como refere JOSÉ MIGUEL FIGUEIREDO[2], a extradição integra um dos expoentes máximos da cooperação entre Estados, atento o significado da deslocação coerciva de uma pessoa para prosseguimento  de processo penal ou cumprimento de sentença condenatória num outro Estado e o que isso representa em termos de confiança nas respetivas relações políticas e institucionais. Acresce que a configuração, o regime e a tramitação de um pedido

---

[2] "A extradição activa na Lei da cooperação judiciária em matéria penal" in *Temas de extradição e entrega*", Livraria Almedina.

02/07/2021



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

de extradição constituem um paradigma para as demais formas de cooperação, justificando-se também por isso o seu estudo pormenorizado- *sic*.

O processo de extradição, pela sua natureza urgente e especificidades próprias, é célere, com prazos limitados, e não pode ser entendido ou rotulado de "*processo penal de extradição*", como amiúde refere o recorrente, ao entender que existe uma perseguição criminal por parte de Cabo Verde, enquanto Estado requerido. No processo de extradição passiva, a jurisdição sancionatória compete ao Estado requerente. Não se trata de perseguição criminal, mas, apenas do cumprimento de um dever no âmbito da cooperação judiciária internacional.

Não sendo o processo de extradição um processo penal, a lei prevê procedimento especial, com regras claras de subsidiariedade na aplicação dos diplomas legais envolvidos.

Decorre do art.º 4º da LCJI que, "*As formas de cooperação a que se refere o artigo 1º (entre as quais, a extradição), regem-se pelas normas dos <u>tratados, convenções e acordos internacionais</u> que vinculem o Estado cabo-verdiano e, na sua falta ou insuficiência, pelas <u>disposições do presente diploma</u>*". Estabelece ainda que, "*são subsidiariamente aplicáveis as <u>disposições do Código de Processo Penal</u>*" (sublinhados nosso).

Resulta desde logo claro que, a aplicação subsidiária do CPP deve ser feita, sempre, com as necessárias adaptações, tendo em conta, o disposto nos tratados, convenções e acordos internacionais que vinculem o Estado cabo-verdiano e na Lei de Cooperação Judiciária Internacional em Matéria Penal- LCJI.

No caso *sub judice*, o pedido de extradição, tem por base legal a Convenção das Nações Unidas contra a Criminalidade Organizada Transnacional -UNTOC, significando com isto que, por ordem de preferência, em primeiro lugar aplica-se a UNTOC, na sua falta ou insuficiência, a LCJI e, na falta ou insuficiência de ambas, as disposições do Código de Processo Penal- CPP.

Não é, pois, correto pretender-se a aplicação do Código de Processo Penal, em primeira linha, ao processo de extradição, como se de um processo penal, *tout court,* se tratasse.

O *art.º 16%8* da Convenção das Nações Unidas contra a Criminalidade Organizada Transnacional- UNTOC[3], pretende eliminar as barreiras à extradição, recomendando os

---

[3] Aprovada por Resolução nº 92/VI/2004, de 31 de maio



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Estados-Membros a *acelerar os processos de extradição e simplificar os requisitos* em matéria de prova com eles relacionados, respeitando sempre, o seu direito interno.

**\*\***

**QUESTÕES DE INCONSTITUCIONALIDADE**

Em requerimento bastante extenso, de 122 páginas, apresenta o recorrente os fundamentos do presente recurso de fiscalização concreta da constitucionalidade, agrupados em doze pontos, a seguir discriminados.

1. **Notificação pessoal do extraditando do pedido de extradição e do despacho que o admite.**

Alega ser inconstitucional a interpretação no sentido de que não existe disposição legal que imponha que o pedido de extradição seja formalmente notificado ao extraditando, muito menos que lhe seja notificado pessoalmente.

Conclui que, "A decisão justa e em conformidade com as garantias constitucionais é aquela que decide pela notificação pessoal do extraditando de qualquer decisão que lhe afete pessoalmente em respeito ao princípio do contraditório e de defesa plasmados na constituição (…) e no Código de Processo Penal (…). As normas que foram aplicadas nas decisões são as do(s) artigos(s) (…) e com o sentido interpretativo de "(…) *não existe disposição da LCJ a impor que o pedido de extradição seja formalmente notificado ao Extraditando, muito menos que lhe seja notificado pessoalmente*", no sentido em que no caso de uma detenção não autorizada, o extraditando, sem que lhe tenha sido notificado ou que exista um mandado, conheça a promoção do Ministério Público, através da notificação feita aos seus advogados apenas, e nessa dimensão e extensão violam as normas constitucionais dos artigos 30.º, n.º 1 e 35.º, n.º 6 da Constituição e bem assim os direitos, liberdades e garantias, o direito de defesa em qualquer outro processo sancionatório, violando as garantias ao contraditório e ao recurso e o respeito pela dignidade da pessoa humana, por isso, existe uma inconstitucionalidade e que deve ser declarada."

Não assiste razão ao recorrente. No que se refere às intervenções do extraditando, existem regras próprias, não sendo aplicável, *tout court*, o CPP, sem pôr em perigo o seu direito de defesa, sem violar a constituição. Apenas se pode conferir relevância suficiente à falta de notificação pessoal do arguido numa situação limite, como é a do julgamento na ausência e



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

sem representação por defensor (advogado). No caso em apreço, o extraditando encontra-se representado por advogado, o que assegura suficientemente os princípios constitucionais associados às garantias de defesa, não sendo exigível a notificação diretamente ao extraditando. De resto, como resulta do próprio excerto do recurso transcrito, o extraditando reconhece ter tomado conhecimento da promoção do Ministério Público através dos seus advogados.

*As garantias de defesa (...) são violadas toda a vez que ao arguido se não assegura, de modo efectivo, a possibilidade de organizar a sua defesa. E isto é, como se viu, o que acontece quando, em situações como as descritas, não se lhe nomeia, sequer, um defensor."* "*Este principio, «traduzindo-se, ao menos, num direito à defesa, num direito a ser ouvido» (...) só pode, com efeito, ser eficazmente assegurado mediante um adequado funcionamento da dialéctica processual – o que, como é óbvio, exige que as «partes» (Ministério Público e arguido) se encontrem colocadas em posição de perfeita igualdade.*[4]

A única situação de violação do direito de defesa, ocorrida no acórdão do Tribunal de Relação de Barlavento, foi anulada pelo Supremo Tribunal de Justiça, tendo sido corrigida.

Por outro lado, como ensinam Gomes Canotilho e Vital Moreira[5], nas decisões negativas de inconstitucionalidade, ou seja, quando o tribunal tenha aplicado uma norma, apesar de ter sido arguida a sua inconstitucionalidade, não há lugar a recurso quando a arguição da inconstitucionalidade tenha sido feita em relação a uma **norma irrelevante para a causa**, para a solução do caso concreto (Ac.TC nº 12/87). Só se pode invocar a inconstitucionalidade por via de incidente, no decurso de uma acção, das normas que sejam relevantes para a solução do caso concreto.

Ora, a não notificação pessoal do recorrente, para além de não ser imposta por lei, não foi relevante para a decisão de decretar a extradição. O extraditando teve conhecimento de tudo o que alega não lhe ter sido pessoalmente notificado, por intermédio do seu advogado, como obriga a lei, exerceu o seu direito de defesa, sem qualquer condicionamento, apresentando todos os meios de prova legalmente admissíveis, durante todas as fases processuais.

Por conseguinte, nenhuma norma ou princípio constitucional foi violado com a interpretação e a aplicação da LCJI.

---

[4] Acórdão do TC n.º 49/1986. (tribunalconstitucional.pt)
[5] Obra citada

CERTIFIED TRANSLATION · LANGUAGE REACH · 02/07/2021 · REG.07635166



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

2. **Não julgamento presencial, com audição do extraditando, apesar de ele ter requerido diligências de produção de provas.**

Alega ser inconstitucional a interpretação no sentido de que, a tramitação do processo de extradição passiva não impõe que o julgamento no tribunal de 1.ª instância seja efetuado em audiência, mas sim em conferência, entendendo-se que a lei não impõe que o extraditando seja ouvido numa segunda audiência perante o juiz.

Conclui que, "As normas que foram aplicadas nas decisões são as dos artigos (…) e com o sentido interpretativo de que "(…) a lei não impõe, nem direta nem indiretamente, que o extraditando seja ouvido numa segunda audiência perante o juiz" quando na verdade tinha sido ouvido no momento da sua detenção, antes do início da fase judicial ou do despacho do PRG que o promove, ou seja, de não ser obrigatória a audição do extraditando antes de ser proferida a decisão de extradição, em audiência pública oral, contraditória, quando tiver requerido a realização de diligências de prova, designadamente a inquirição de testemunhas, e nessa dimensão e extensão violam as normas constitucionais dos artigos 32.º, n.º 4, 35.º, n.º 6, 7 e 9 e 211.º, n.º 4 (…) os direitos de audiência e defesa, e do princípio da oralidade e publicidade."

Também não assiste razão ao recorrente. A norma posta em crise é clara em não exigir a audição do extraditando em audiência, pela segunda vez e, tal interpretação não viola nenhuma norma ou princípio constitucional.

No mesmo sentido decidiu o Tribunal constitucional português, cujas normas relativas à extradição são idênticas às cabo-verdianas. "*No processo de extradição, não há lugar a audiência de discussão e julgamento: as provas, sendo embora produzidas com intervenção do extraditando, do seu advogado ou defensor, e do Ministério Público — por conseguinte, com observância da regra do contraditório —, não o são numa audiência; a decisão, essa é tomada em conferência (v. artigo 34.º do citado Decreto-Lei n.º 437/75), como, de resto, acontece, sempre que ela caiba a um tribunal colectivo (v. artigos 25.º, 26.º e 43.º da Lei n.º 82/77, de 6 de Dezembro; e ainda o artigo 653.º, n.º 1, do Código de Processo Civil)*"[6].

o Acórdão do TC assinalado, embora não verse diretamente sobre esta questão, reconhece que não há lugar a audiência no processo de extradição, bem como reconhece que a respetiva decisão é tomada em conferência, não apontando qualquer reserva a essa estrutura processual.

---

[6] Ac.TC. n.º 192/1985

02/07/2021



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Não se coloca, portanto, qualquer obstáculo à não realização de um julgamento presencial e, consequentemente, à não audição do extraditando.

É também idêntico o entendimento do Supremo tribunal de Justiça cabo-verdiano[7]. Não existe qualquer inconstitucionalidade no posicionamento do tribunal.

3. **A não realização das diligências de prova requeridas pelo extraditando; a interpretação da norma ínsita no artigo 155.º do CPP, "no sentido de que cabia ao extraditando proceder por reclamação e não por recurso, ou seja não usou o meio adequado face à não realização de uma diligência requerida junto do tribunal a quo, dito de outra forma como exigir a arguição de diligências de provas depois de decisão que cabe um recurso ordinário para o STJ".**

Entende que, através da não realização de diligências de prova requeridas e da interpretação de que o extraditando deveria proceder por reclamação e não por recurso, foram colocados em causa o direito de acesso aos tribunais e tutela jurisdicional efetiva, o princípio de *ne bis in idem* e o princípio do contraditório.

Conclui que "As normas que foram aplicadas nas decisões são as dos artigos 55.º, n.º 2 (2.ª parte) da LCJ, com o sentido interpretativo de que "dessa disposição sem necessidade de recurso a outro elemento, é de que ao extraditando assiste o direito de deduzir oposição, mas ela só pode ser centrada em dois conjuntos de argumentos tendentes a demonstrar o seguinte: (i) ou não é a pessoa reclamada, ou (ii) não se verificam os pressupostos para extradição" malgrado o requerimento de diligência de provas testemunhais e interpretação da norma ínsita no artigo 155.º do CPP "no sentido que cabia ao extraditando proceder por reclamação e não por recurso" a uma outra decisão que indeferia o pedido do recorrente da realização da diligência à prova e a notificação pessoal do recorrente, e nessa dimensão e extensão violam as normas constitucionais dos artigos 32.º n.º 4, 35 n.º 6 e 7, 22 n.º 3, 31.º n.º 2, 209.º da CRCV e o direito ao recurso, por isso, existe uma inconstitucionalidade e que deve ser declarada."

Quanto à questão da rejeição das diligências de prova, não se verifica qualquer desconformidade constitucional do artigo 55.º, n.º 2, da LCJI. Com efeito, mesmo no âmbito do processo penal, a lei atribui ao juiz o poder de direção do processo que lhe permite rejeitar diligências inúteis e tal não viola as garantias de defesa do extraditando. Este poder de direcção do processo, é, aliás, co-natural à própria natureza e exercício da função jurisdicional constitucionalmente consagrada no artigo 211º, por se afigurar de todo indis-

---

[7] Ac. n.º 58/2017, de 01 de agosto e Ac. n.º 26/2021, de 16 de março.



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

pensável à administração da justiça e à efectiva realização dos fins constantes daquele preceito constitucional.

No processo de extradição, a lei, expressamente, afasta a possibilidade de realização de certas diligências de prova, "proibindo" ao próprio juiz, que o faça. E foi este o fundamento da recusa do pedido.

É jurisprudência assente do Supremo Tribunal de Justiça[8].

Existe também abundante jurisprudência dos tribunais portugueses (tribunais da relação e STJ)[9] sobre tal norma, toda no sentido de que o processo de extradição não é o apropriado para o arguido exercer a sua defesa quanto aos crimes de que é acusado pelo Estado requerente, uma vez que terá a devida oportunidade para o efeito perante os tribunais desse Estado. Tal realidade é comummente aceite pelos ordenamentos jurídicos de outros países, não sendo exclusiva de Portugal e Cabo Verde.

Quanto à questão do meio processual adequado para reagir à rejeição das diligências de prova (designadamente, por reclamação ou por recurso), importa assinalar que não existe aqui qualquer problema constitucional, designadamente de falta de tutela jurisdicional efetiva – existe um meio processual adequado para reagir a uma determinada decisão judicial; simplesmente, o extraditando não utilizou esse meio, mas sim um outro. A posição do extraditando tem a tutela do direito, mas este não a exerceu corretamente.

Em primeiro lugar, a defesa alega que a norma do artigo 55.º, n.º 2, da Lei da Cooperação Judiciária Internacional em Matéria Penal (LCJI), Lei n.º 6/VIII/2011, de 29 de agosto, que limita a oposição ao pedido de extradição à circunstância de a pessoa detida não ser a pessoa reclamada ou de não estarem verificados os pressupostos da extradição, é inconstitucional porque viola o direito a um processo justo e equitativo, o direito ao contraditório, e o direito de apresentar defesa, que resultam, respetivamente, dos artigos 22.º, n.º 1, 35.º, n.º 6 e 22.º, n.º 3 e 35.º, n.º 7, da Constituição de Cabo Verde. Acresce às alegadas violações de direitos constitucionalmente previstos, a invocação de violações à Declaração Universal dos Direitos do Homem, nomeadamente ao disposto no seu artigo 11.º, n.º 1, ao Pacto Internacional sobre Direitos Civis e Políticos, em particular ao que se encontra previsto nas alíneas b) e e) do n.º 3

---

[8] Ac. n.º 58/2017, de 01 de agosto e Ac. nº 26/2021, de 16 de março.

[9] É de realçar que, de acordo com a Constituição portuguesa (também a cabo-verdiana), os tribunais ordinários têm o ónus de apreciar a conformidade constitucional das normas que aplicam, devendo recusar a sua aplicação quando entenderem estar perante norma inconstitucional (cf. artigo 204.º da Constituição), mesmo que essa inconstitucionalidade nunca antes tenha sido declarada pelo Tribunal Constitucional (v., por todos, Jorge Miranda, «O Regime de Fiscalização Concreta da Constitucionalidade em Portugal», disponível em 1119 2440.pdf (icjp.pt)).



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

do artigo 14.º e, ainda, à Carta Africana dos Direitos do Homem, concretamente o artigo 7.º deste diploma legal.

Contudo, as referidas violações não se encontram verificadas, desde logo porque nenhum dos três instrumentos internacionais mencionados contém qualquer disposição sobre o processo de extradição, razão pela qual não são aplicáveis.

A defesa do extraditando invoca o argumento de que este deveria ser autorizado a apresentar provas que defendam a sua posição processual, no âmbito do seu direito ao contraditório.

No entanto, tal argumento de defesa parte de um pressuposto errado quanto ao objeto e finalidade do processo de extradição. [10] Os processos de extradição não se destinam a ser um *"julgamento em ponto pequeno"*, isto é, não têm por objeto avaliar os pressupostos da imputação dos crimes ao agente alvo do processo de extradição, de modo a decidir se este é culpado ou inocente.[11]

O objeto e finalidade do processo de extradição é antes o de assegurar a existência de provas suficientes, nos termos da lei do Estado requerente ou de um tratado, para permitir a entrega do acusado ao Estado requerente, de modo que este possa julgar o extraditando pelos factos pelos quais se encontre acusado e, por conseguinte, aferir da sua culpa ou inocência. Só nessa fase, após a entrega do extraditando ao Estado requerente e encontrando-se este em julgamento nesse Estado, pode ser exercido o contraditório e apresentada a defesa do acusado, de acordo com os princípios mencionados *supra*, que vigoram quer ao nível nacional, quer ao nível internacional.

O facto de o Estado requerido não estar habilitado para levar a cabo o julgamento quanto à imputação dos crimes ao extraditando, decidindo sobre a sua condenação ou absolvição, tem por base fundamentos diversos e válidos.

Em primeiro lugar, a apreciação desta questão por parte do Estado requerido levaria a que a soberania do Estado requerente, responsável pelas acusações dirigidas ao extraditando, fosse posta em causa ou, pelo menos, coartada.

Em segundo lugar, a avaliação dos pressupostos de imputação dos factos criminosos ao extraditando, exige uma ampla compreensão da lei penal do Estado requerente, cuja interpretação feita pelo Estado requerido seria sempre arriscada, na medida em que se trata de interpretação de lei estrangeira, com as suas necessárias especificidades.

---

[10] Quanto a este aspeto, veja-se o que se encontra previsto no Modelo de Lei de Extradição das Nações Unidas, Secção 23.1 n.31, Secção 23.4 (2004), disponível em https://www.un.org/ruleoflaw/blog/document/model-law-on-extradition/ .

[11] A extradição pode também viabilizar a entrega de uma pessoa para cumprimento de pena por um crime pelo qual já tenha sido condenada.

Página **9** de **29**



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Acresce, em terceiro lugar, a circunstância de os pedidos de extradição não especificarem, em regra, a totalidade dos fundamentos que estão na base da acusação dirigida ao extraditando. Por conseguinte, o tribunal do Estado requerido estaria a tentar avaliar a culpa de um arguido com base num registo incompleto do Estado requerente, o que seria, por um lado, contrário aos direitos de defesa do próprio extraditando e, por outro, implicaria que o Estado requerido colocasse em causa as regras que vinculam os processos criminais e, em particular, as relativas à acusação, do Estado requerente, impedindo-o de conduzir o processo criminal da forma como considera mais adequada. De outro modo, também não seria razoável exigir ao Estado requerente que apresentasse ao Estado requerido todo o processo, de forma a permitir a sua análise e consequente decisão da causa.

Um quarto fundamento encontra-se relacionado com a circunstância de que a reavaliação dos pressupostos de imputação dos factos ao acusado colocaria um ónus significativo ao Estado requerido, implicando uma análise minuciosa de toda a prova que fosse apresentada por ambas as partes, o que não se encontra justificado, na medida em que o que está em causa no processo-crime não corresponde a uma violação da lei do Estado requerido, mas sim a uma eventual violação da lei do Estado requerente.

Deste modo, é forçoso concluir pela impossibilidade de o arguido produzir provas que permitam sustentar a sua posição, opondo-se-se à acusação apresentada pelo Estado requerente. No entanto, ao contrário do que a defesa pretende fazer crer, o arguido não perde a oportunidade de exercer essa defesa, mediante a apresentação de todas as provas que considere necessárias; apenas terá de o fazer perante o Estado requerente, nos termos estabelecidos pela lei processual desse Estado. Ao invés de apresentar a sua contestação durante o processo de extradição, o arguido terá uma oportunidade plena de delinear uma defesa e afirmar a sua inocência, assim como invocar plenamente os seus direitos constitucionais no decurso do julgamento que ocorra na jurisdição do Estado Requerente após o termo do processo de extradição.

Este é, também, o entendimento propugnado pela jurisprudência portuguesa[12], que é, conforme se sabe, um exemplo importante para o exercício jurisprudencial dos Tribunais

---

[12] A finalidade do processo de extradição é afirmada, de modo constante e indubitável, pela jurisprudência dos Tribunais Portugueses, nomeadamente pela jurisprudência do Supremo Tribunal de Justiça, conforme se exemplifica pelo Acórdão do Supremo Tribunal de Justiça (dgsi.pt), de 13.02.2019, no âmbito do processo n.º 65/14.8YREVR.S2, onde se lê que «o processo de extradição é um processo especial e urgente, regulado em primeira mão pela L 144/99 e só subsidiariamente pelo CPP (art. 3.º, n.º 2 cit. Lei), com uma fase administrativa e uma fase judicial, onde não é possível discutir os factos imputados ao extraditado (arts. 46.º, n.º 1 e 3 da L 144/99) e em que a oposição apenas pode ter lugar com dois fundamentos (não ser o detido a pessoa reclamada ou não se verificarem os pressupostos da extradição) (art. 55.º da cit. L (§4), onde, em princípio, não se pode invocar prova superveniente em fase de recurso». Em sentido complementar, veja-se o Acórdão do Supremo Tribunal de Justiça (dgsi.pt) de 11.12.2008, no âmbito de processo n.º 08P3982, onde se



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

cabo-verdianos, atendendo à similitude das leis de cooperação judiciária internacional em matéria penal portuguesa e cabo-verdiana. As disposições constitucionais da Lei Fundamental de Cabo-Verde, como é o caso do artigo 22.º e do artigo 35.º, invocadas pela defesa são, igualmente, semelhantes às disposições dos artigos 20.º e 22.º plasmados na Constituição Portuguesa e, por sua vez, o artigo 55.º, n.º 2, da LCJI portuguesa e cabo-verdiana tem o mesmo conteúdo. Não se compreende, por conseguinte, como podem estas disposições sofrer interpretações tão distintas, uma vez que, em Portugal, a proibição do extraditando apresentar a sua defesa criminal durante o processo de extradição não representa uma violação constitucional[13].

A defesa invoca, ainda, que a proibição de apresentação de defesa limita a possibilidade de serem apresentadas objeções ao princípio da especialidade e proibição de dupla incriminação que são pilares importantes do processo de extradição. Estas são questões jurídicas que podem e devem ser analisadas à luz dos factos que sustentam o pedido de extradição. De facto, de acordo com o *princípio da especialidade* impõe-se que o Estado requerente apenas possa prosseguir um processo crime contra o extraditando pelos motivos invocados no pedido de extradição[14] e, por outro lado, a *proibição de dupla incriminação* implica que não possa prosseguir no Estado requerido processo crime contra o extraditando,

---

deixou vertido que «*não compete a este processo* de extradição *sindicar a veracidade dos factos imputados pelas autoridades brasileiras. Interessa sim apurar se os factos apresentados, quanto a data, local e circunstâncias, têm o mínimo de consistência para que se possa considerar estar perante um pedido suficientemente instruído (…)*».

No mesmo sentido, veja-se o <u>Acórdão do Tribunal da Relação de Lisboa (dgsi.pt)</u>, de 28.03.2019, no âmbito do processo n.º 334/19.0YRSLB.L1-9, «*a extradição constitui uma das formas de cooperação internacional em matéria penal, mediante a qual um Estado (requerente) solicita a outro Estado (requerido) a entrega de uma pessoa que se encontre no território deste, para efeitos de procedimento penal ou para cumprimento de pena ou de medida de segurança privativas de liberdade, por crime cujo julgamento seja da competência dos tribunais do Estado requerente. O procedimento extradicional não é um processo crime contra o extraditando, estando em causa apenas a obtenção de uma decisão por parte do Estado requerido sobre a verificação dos pressupostos materiais da extradição, revestindo natureza urgente*».

[13] Não existe notícia de o Tribunal Constitucional português ter sido chamado a apreciar a conformidade constitucional da norma ínsita no artigo 55.º, n.º 2, da LCJI portuguesa. A questão dos direitos de defesa do extraditando, em particular, no que respeita à oposição do extraditando relativamente aos factos da acusação e não apenas quanto à própria extradição foi, de facto, abordada no <u>Acórdão n.º 35/2000</u>, do Tribunal Constitucional, mas por referência à norma correspondente do diploma legal anterior à lei atualmente em vigor (artigo 57.º, n.º 2, do Decreto-Lei n.º 43/91, de 22 de janeiro), mas com a mesma redação. No entanto, nesse acórdão, o Tribunal Constitucional não chega a pronunciar-se sobre a (in)constitucionalidade da norma, na medida em que decide não conhecer do recurso, com fundamento na circunstância de a norma não ter sido efetivamente aplicada na decisão em crise, no sentido julgado inconstitucional pelo requerente. O Tribunal, porém, acaba por ensaiar a forma como a questão deveria ser abordada, abrindo a porta para uma ponderação, à luz do princípio da proporcionalidade, admitindo a possibilidade de restrição ao direito de defesa, previsto no artigo 32.º da Constituição portuguesa, em face das especificidades do processo de extradição.

[14] Cf. o já citado <u>Acórdão do Tribunal da Relação de Lisboa (dgsi.pt)</u>, de 28.03.2019, no âmbito do processo n.º 334/19.0YRSLB.L1-9.



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

pelos mesmos factos que sustentam o pedido de extradição e viabilizam a entrega do extraditando ao Estado requerente[15]. No entanto, estes princípios não implicam uma análise da prova relativa aos factos que sustentam a acusação no Estado requerente, mas tão só, a análise dos factos que fundamentam o pedido de extradição.

Por fim, a defesa socorre-se de citações da jurisprudência dos Estados Unidos, de forma a sustentar o seu argumento[16]. No entanto, uma vez mais, verifica-se uma incorreta interpretação dessa jurisprudência que, ao contrário do que é sugerido, mais não faz do que estar em consonância com as disposições legais da LCJI de Cabo Verde, no sentido das limitações à apresentação de prova de defesa criminal ao longo do processo de extradição.

Com efeito, os tribunais dos EUA têm consistentemente decidido que, uma vez que os processos de extradição não se destinam a ser um "*mini-julgamento*", o arguido não tem a possibilidade de introduzir provas que sustentem a sua defesa face às acusações que lhe são dirigidas, o que se encontra plenamente de acordo com a interpretação legal que expusemos *supra*.[17] Assim, ao invés do propugnado pela defesa, segundo a lei americana, os tribunais de

---

[15] Neste sentido também o já citado <u>Acórdão do Supremo Tribunal de Justiça (dgsi.pt)</u> de 11.12.2008, no âmbito do processo n.º 08P3982.

[16] Com recurso a uma citação doutrinária, a defesa de Saab cita a jurisprudência americana e, embora o faça corretamente, interpretou incorretamente o seu significado, uma vez que a mencionada jurisprudência não sustenta a sua posição. O argumento teria ficado mais claro se a defesa tivesse apresentado a citação na integra: «*a questão da admissibilidade da prova interliga-se com a questão de determinar que tipo de prova pode ser apresentada numa audiência de julgamento. A questão não se estende até ao peso ou suficiência das provas apresentadas. Está estabelecido na jurisprudência que um processo de extradição não é um julgamento criminal no qual a culpa ou inocência do visado seja julgada. Como o objetivo da audiência de julgamento, no âmbito de um processo de extradição, é simplesmente determinar se a prova da conduta criminal do visado é suficiente para justificar a sua extradição ao abrigo de um tratado apropriado, as Regras Federais de Processo Penal não são inteiramente aplicáveis. O critério a observar é o de se as declarações em questão são verdadeiras ou se não são fiáveis, contraditórias, coagidas, não corroboradas por outras provas ou são resultado de tortura. Uma vez que as defesas à disposição de um visado num processo de extradição são fortemente limitadas, os tribunais propugnam que o visado do processo de extradição apenas terá de atender às provas que permitam clarificar o pedido apresentado pelo Estado requerente*» (cf. M. Cherif Bassiouni, International Extradition: United States Law and Practice, página 901 (6.ed 2014)).

[17] Vejamos, a título de exemplo, algumas decisões da jurisprudência americana que permitem fundamentar este entendimento. O caso Collins v. Loisel, 259 U.S. 309, 316 (1922), em que o Tribunal americano se pronunciou no sentido de que "*a função do magistrado do processo de extradição é determinar se existe prova competente para justificar a detenção do arguido para aguardar julgamento e não determinar se a prova é suficiente para justificar uma condenação*".

Por outro lado, o caso Charlton v. Kelly, 229 U.S. 447, 461 (1913), em que se decidiu que o juiz de extradição não errou ao excluir "*testemunhas produzidas para contradizer o depoimento da acusação*", porque tal "*objeção (...) deveria ser apresentada antes ou no momento do seu julgamento pelo crime e ouvida pelo tribunal com jurisdição sobre o crime*".



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

extradição geralmente aceitam como verdadeiras todas as declarações e meios de provas apresentados pelo Estado requerente, reservando a análise das mesmas para os Tribunais desse Estado.[18]

Embora a lei dos EUA possa permitir que um arguido apresente, a critério do juiz, e de forma limitada, provas que visem explicar as acusações contra ele proferidas (como, por exemplo, Estados Unidos vs. Fernandez-Morris, 99 F. Sup. 2d 1358, 1366 (S.D. Fla. 1999)), não é isso que ocorre, no presente caso. A defesa requer especificamente a possibilidade de se opor diretamente aos factos que sustentam a acusação, "*alegando as falsidades ou inverdades e/ou a impossibilidade de os atos ocorrerem até ao dia, local e hora indicados no pedido de extradição e apresentação de documentos que demonstram que a pessoa a ser extraditada se encontrava noutro lugar*", o que contraria, frontalmente, a jurisprudência americana e cabo-verdiana, consistente com a prática normal de um processo de extradição.

Mesmo que o acusado fosse autorizado a apresentar provas contraditórias, tal como solicita, não é claro por que razão isso o ajudaria neste caso. O pedido de extradição dos Estados Unidos baseia-se numa panóplia de transferências bancárias electrónicas, pelo que não se exige que o acusado tenha estado num lugar específico, a uma hora específica, num determinado dia.[19] Além disso, o pedido da defesa não deixa de se revelar particularmente curioso, uma vez que os Estados Unidos alicerçaram, em parte, o pedido de extradição nas próprias confissões do extraditando.

---

Outro exemplo é o do caso Hooker v. Klein, 573 F.2d 1360, 1368 (9th Cir. 1978), em que se afirmou que "*o tribunal de extradição pode excluir provas de contraditório, de factos que contradigam a prova do governo ou de uma defesa que invoque a inimputabilidade do agente (...) Devido à função limitada de um processo de extradição e à participação limitada permitida do fugitivo, a decisão do tribunal não reflete uma consideração de todos os fundamentos que sustentam o mérito da causa*". Veja-se também *Charlton*, 229 U.S., 461-62, onde se defende a recusa de um magistrado judicial de ouvir prova da alegação de inimputabilidade por insanidade de um extraditando no processo de extradição.

Por último, veja-se também o caso Bovio v. Estados Unidos, 989 F.2 d 255, 259 (7ª Cir. 1993), no qual ficou expresso que "*o fugitivo não tem o direito de atacar a credibilidade das testemunhas numa audiência de um processo de extradição, uma vez que as questões de credibilidade devem ser determinadas em sede de julgamento*". No mesmo sentido, *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2° Cir. 1973), onde se decidiu que provas contra a credibilidade "*deveriam aguardar pelo julgamento em Israel*".

[18] Assim sucedeu no processo de extradição de Martinelli Berrocal, Processo N.° 17-22197-Civ (S.D. Fla. 31 de agosto de 2017), no caso Collins, 259 U.S. em 316, assim como no caso Ahmad v. Wigen, 726 F. Sup. 389, 399-400 (E.D.N.Y. 1989), onde o Tribunal chegou mesmo a afirmar que "*a principal fonte de prova para a decisão do processo de extradição é o pedido de extradição e qualquer prova apresentada no mesmo é considerada verdadeira para efeitos desta decisão*".

[19] Esta é também uma razão pela qual a importância conferida pelo acusado no caso Estados Unidos vs. Hunte, Processo n.° 04-M-0721 (E.D.N.Y. 4 de janeiro de 2006), não é compreensível nem adequada. Nesse caso, o tribunal estava a considerar se o pedido de extradição continha provas suficientes relativas a "*causa provável*" tal como exigido nos termos do tratado bilateral de extradição que regia aquele processo de extradição. Em relação a essa questão, o tribunal considerou as provas que a arguida alegava terem prejudicado as conclusões contidas no pedido de extradição, relacionadas com o local e a data da ocorrência dos factos.



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Conclui-se que o regime processual da extradição assegura as garantias de defesa constitucionalmente protegidas, designadamente o direito a um duplo grau de jurisdição.

Também não se alcança em que medida possa estar em causa a violação do princípio do *ne bis in idem*.

4. **Da ilegalidade da detenção do extraditando, com fundamento num pedido informal de órgão policial de origem convencional (Interpol), sem a devida ratificação, promulgação e publicação.**

Entende que é inconstitucional a aplicação das normas com o sentido de que é juridicamente irrelevante que os atos referentes à Interpol não tenham, eventualmente, sido ratificados pela República de Cabo Verde, nem publicados na ordem interna.

Alega que, "As normas que foram aplicadas nas decisões são as dos artigos (…) e com o sentido interpretativo de "É lícito às autoridades de polícia criminal efetuar nos termos da lei processual penal vigente, a detenção de indivíduos que, segundo informações oficiais, designadamente da Interpol (…)", "(…) é juridicamente irrelevante que os atos referentes à Interpol não tenham, eventualmente, sido ratificados pela República de Cabo Verde, nem publicados na ordem interna cabo-verdiana (…)" "(…) uso que é feito das informações recebidas via esse sistema é uma lei nacional (…)", in casu a LCJ, todos os segmentos ou parte onde a lei faz referências a Interpol, e onde as suas normas têm caráter decisório ou de norma de comando; tendo em consideração que os textos da Interpol não foram publicados no boletim oficial, ademais nunca os textos da Interpol foram previamente declarados inconstitucionais, nunca foram confirmados pelo Governo e aprovados pela Assembleia Nacional por maioria de 2/3 dos deputados nessa dimensão e extensão violam as normas constitucionais dos artigos 3.º, n.º 3, 12.º, n.º 2, 14.º, 262.º e 269.º, n.º 1 al. c) e 277.º, n.º 2 da Constituição e, por isso, existe uma inconstitucionalidade e que deve ser declarada."

Conforme referido na parte introdutória desta resposta, esta é uma das normas irrelevantes para a decisão da causa. A situação de Cabo Verde relativamente à Interpol é irrelevante, face ao que dispõe o *art.º 39º* da LCJI - *"É lícito às autoridades de polícia criminal efetuar nos termos da lei processual vigente, a detenção de indivíduos que, segundo informações oficiais, designadamente da INTERPOL, sejam procurados por autoridades competentes estrangeiras para efeito de procedimento ou de cumprimento de pena por factos que notoriamente justifiquem a extradição"*.

Da simples leitura desta disposição legal, conclui-se que, a polícia criminal, e não necessariamente, o Gabinete Nacional da Interpol, pode efetuar a detenção, perante

Página **14** de 29



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

informações oficiais da Interpol. Dito de outro modo, independentemente da qualidade de membro desta organização policial, a polícia criminal pode deter, nos termos do *art.º 39º* da LCJI.

E, no caso concreto, quem procedeu à detenção, foi a polícia criminal de Cabo Verde-Polícia Judiciária.

A interpretação nos termos expostos, não viola, por conseguinte, qualquer disposição ou princípio constitucional. Para melhor apreensão da posição que o Ministério Público defendeu ao longo de todo o processo de extradição, junta-se um parecer *(documento nº 1)*.

5. **Da ilegalidade da detenção do Recorrente (Da Detenção não diretamente Solicitada em Violação do Princípio da Proporcionalidade)**

Interpretação do sentido de que, basta que um mandado seja apresentado após a detenção, sem prazo temporal.

Alega a defesa que, "As normas que foram aplicadas nas decisões são as dos artigos 39.º da LCJ e 269.º n.º 3 do CPP, e com o sentido interpretativo de que " "informações", para a detenção de uma pessoa "podem chegar ao seu conhecimento por qualquer meio admitido pela lei Cabo-Verdiana, incluindo, "caso haja urgência e perigo na demora" "qualquer meio de telecomunicação", como decorre do artigo 269.º, n.º 3 do CPP, seguindo-se confirmação por mandado", no sentido que o advérbio "imediatamente", constante da disposição legal, que o Juiz não cita, por o achar ser irrelevante; bastando após a detenção que um mandado seja apresentado, sem prazo temporal, ao detido, que esvazia totalmente o sentido legal da norma, anula os limites constitucionais a detenções não solicitadas entidades policiais de restrição de direitos e privação da liberdade, violando o princípio da proporcionalidade e nessa dimensão e extensão as normas constitucionais dos artigos 9.º, n.º 2, do PIDCP e ainda o artigo 9.º da DUDH e 17.º, n.º 2, 244.º, n.º 2 da Constituição."

Sempre que ocorra uma detenção não diretamente solicitada, nos termos do 39º da LCJI, deve a autoridade que a efectuou, apresentar o detido no prazo de 48 horas ao Procurador da República de Círculo junto do tribunal da Relação competente, para promover a audição judicial do extraditando (art.º 53, 54 e 64º).

A detenção «não diretamente solicitada» só pode ter lugar, só é legítima, quando as autoridades disponham de informações oficiais estrangeiras ou internacionais de que determinado indivíduo é perseguido criminalmente noutro país, e perseguido por factos que notoriamente justifiquem a extradição. Se a estes «pressupostos» da licitude de tal detenção se acrescentar que ela, confirmada pelo tribunal, será comunicada imediatamente, pela Procuradoria Geral da República, pela via mais rápida, à autoridade estrangeira a quem



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

interessar para que lhe informe, urgentemente e pela mesma via, se irá ou não ser formulado o pedido de extradição» (artigo 64°n° 2); que a detenção não poderá prolongar-se por mais de dezoito dias (desde a data da captura), se, entretanto, não for recebida tal informação, ou por mais de quarenta dias, «se, tendo havido informação positiva, o pedido de extradição não for recebido nesse prazo (artigo 64° n° 3); *e ainda que, tendo o processo de extradição carácter urgente, se se acrescentar tudo isto aos referidos pressupostos*, haverá então de concluir-se, por sua vez, que a detenção em apreço e o seu regime legal também não merecem quaisquer reservas, considerados sob a perspectiva da exigência a que, em geral, deverão obedecer todas as restrições de direitos, nos termos da Constituição. Ou seja: haverá de concluir-se que se está perante uma solução e um regime legais que respeitam o princípio da proporcionalidade (*lato sensu*) aí consignado, pois que não vão além do necessário para salvaguardar outros direitos ou interesses constitucionalmente protegidos.

Tudo para concluir que não deva considerar-se contrária à Constituição, a possibilidade de detenção «não diretamente solicitada» de um presumível extraditando, prevista na Lei da Extradição."

A título comparativo, refira-se que, o regime da detenção não solicitada para efeitos de extradição já foi apreciado e o TC não encontrou qualquer violação da Constituição portuguesa[20].

### 6. Da ilegalidade da detenção do extraditando (inexistência de mandado de detenção).

Interpretação no sentido em que, não se exige que as informações oficiais que legitimam a detenção assumam para as autoridades cabo-verdianas a forma de um pedido, muito menos de um mandado, mas sim informações.

Alega a defesa que, "As normas que foram aplicadas nas decisões são as dos artigos 39° da LCJ e com o sentido interpretativo de que "bastando que se esteja na posse de informações oficiais que legitimam a detenção, e que, tais informações oficiais, que não se exige que assumam para as autoridades cabo-verdianas a forma de um pedido, muito menos de um mandado, mas sim informações, podem chegar ao seu conhecimento por qualquer meio admitido pela lei cabo-verdiana (…) seguindo-se confirmação por mandado", inexistindo mandado, sem prazo, e sem que nunca o mesmo seja juntado até ao presente, e nessa dimensão e extensão violam as normas constitucionais dos artigos 17.°, n.° 1 e 2, 30.°, n.° 4, 244.°, n.° 2 e 7 al b) e d) da Constituição e ainda (…), por isso existe uma inconstitucionalidade e que deve ser declarada."

---

[20] Acórdão do TC n.° 325/1986[20] ; Acórdão do TC n.° 228/1997; Acórdão do TC n.° 02/1997 (tribunalconstitucional.pt)



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Não existe inconstitucionalidade no sentido interpretativo dado às normas em questão. A *única* diferença entre a detenção provisória subsequente a um pedido de detenção prévia e a detenção não diretamente solicitada é a de que, neste último caso, o Estado de origem do cidadão em causa desconhece a sua presença no país: a base da detenção são as informações existentes nas autoridades de polícia criminal de que certo cidadão estrangeiro é procurado, para o cumprimento de alguma pena ou para procedimento criminal, informações que podem ser ou não acompanhadas da existência de mandados de captura internacionais. Parece, pois, seguro argumentar que, se o país de origem difundiu tais informações, teria certamente diligenciado pela formulação de um pedido a extradição do referido cidadão, se conhecesse o local onde ele porventura se encontra.

O pedido colocação de notícia vermelha é feito pelos gabinetes nacionais da Interpol (GNI), ao Secretariado Geral da Interpol. A colocação tem que preencher uma série de requisitos, entre os quais a entrega de um mandado de detenção internacional e passa pelo crivo de uma comissão de experts (art.º 77º, 82º, 86º do Regulamento da Interpol). Pode-se, por conseguinte, entender que, a notícia vermelha contém ínsito, um mandado de detenção.

Refira-se, porém, que, dos autos, consta o mandado de detenção internacional contra o recorrente, emitido pelas autoridades judiciárias dos EUA. Neste ponto aproveita-se para solicitar a ratificação do lapso manifesto que consistiu na junção de mandado em nome de *Alvaro Enrique Pulido-Vargas.* Como consta do pedido de extradição, nomeadamente, da acusação, no mesmo processo-crime por lavagem de capitais, foram acusados Alvaro Enrique Pulido-Vargas e Alex Nain Saab Moran, tendo sido emitido, contra ambos, mandados de detenção internacional. Porém, por lapso, no pedido de extradição remetido a Cabo Verde, o Estado requerente juntou a primeira folha do mandado original em nome de Alvaro Enrique Pulido-Vargas. Entretanto, as folhas seguintes do mandado bem como as traduções para o português e o espanhol, estão em nome de ALEX SAAB. Trata-se de mero lapso na junção do mandado correto, pois que dúvidas não existem de que ALEX SAAB é também visado no processo em causa e igualmente não há dúvidas de que existe mandado judicial contra ele, pois só com base nesse documento, a INTERPOL emite notícia vermelha contra uma pessoa. Por outro lado, a notícia vermelha contém a fotografia e os dados de Alex Saab.

Para conhecimento do Tribunal Constitucional, junta-se cópia do mandado correcto- *(documento nº 2)[21].*

---

[21] O pedido de retificação fora solicitado ao Tribunal Constitucional em 30/4/2021, entretanto devolvido por despacho de 9/6/2021. Os originais estão no TC.

Página 17 de 29



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Conclui-se, assim, que o artigo 39º da LCJI, ao prever a detenção não diretamente solicitada previamente pelas autoridades de polícia criminal, com base em informações oficiais, de indivíduos procurados pelas autoridades competentes estrangeiras, para efeitos de procedimento ou de cumprimento de pena por factos que notoriamente justifiquem a extradição, não viola a nenhuma disposição ou princípio constitucional.

**7. Da ilegalidade da detenção do extraditando (não comunicação ao extraditando das razões da detenção).**

Interpretação do sentido de que, basta informar o arguido que está a ser extraditado, sem necessidade de indicação dos exatos factos distintos.

Alega a defesa que, "As normas que foram aplicadas nas decisões são as dos artigos (…) e com o sentido interpretativo de "que basta informar o arguido que está sendo extraditado, sem indicar os "exatos factos distintos" não lhe tendo sido notificado do mandado e descobrir com a notificação da acusação feita ao seu mandatário que está sendo acusado de 8 "*counts*" e não de 7 "*counts*" conforme avançado no dia da ratificação da sua detenção e nessa dimensão e extensão violam as normas constitucionais dos artigos 17.º, n.º 1 e 2, 12.º e 30.º, n.º 1 e 4 da CRCV (…) e por isso existe uma inconstitucionalidade e que deve ser declarada."

Esta questão de constitucionalidade não é autónoma da anterior e vê-se, portanto, prejudicada por ela. De facto, não existe qualquer inconstitucionalidade no regime de detenção não diretamente solicitada, a qual pode ocorrer sem a existência de um mandado de detenção. Inexistindo um mandado no momento da detenção, é natural que não sejam comunicadas, em termos completos e absolutamente rigorosos, as acusações que justificam a detenção, sendo suficiente que o potencial extraditando seja informado, naquele momento, que se trata de uma detenção para efeitos de extradição.

**8. Violação do Princípio da Reciprocidade**

Interpretação no sentido de que é possível a dispensa de reciprocidade.

Alega a defesa que "As normas que foram aplicadas nas decisões são as dos artigos 3º, nº 3 e 6º. nº 3 (…) e com o sentido interpretativo de que " (…) Acresce finalmente que, pela sua colocação sistemática, a dispensa de reciprocidade é possível em qualquer forma de cooperação judiciária internacional, incluindo, por conseguinte, a extradição" e nessa dimensão e extensão violam as

02/07/2021



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

normas constitucionais constantes nos artigos 7.º al. l), 11.º, n.º 1, 25.º, n.º 1 da CRCV e, por isso, existe uma inconstitucionalidade e que deve ser declarada."

O regime geral da extradição prevê que a falta de reciprocidade não impede a satisfação de um pedido de cooperação judiciária internacional em matéria penal (uma das formas da qual é a extradição). A cooperação internacional em matéria penal releva do princípio da reciprocidade" e, um pedido de cooperação pode ser recusado quando não estiver garantida a reciprocidade. Entretanto, a falta de reciprocidade não impede a satisfação de um pedido de cooperação", em especial quando "Se mostre aconselhável em razão da natureza do facto ou da necessidade de lutar contra certas formas graves de criminalidade", como os em causa no presente pedido de Extradição (art.º 3º/3. LCJI).

De entre os argumentos apresentados contra a sua extradição, em particular nas pp. 28-33 (e também abordado nas pp. 88-89) do recurso que deu entrada no Tribunal da Relação do Barlavento em 14 de janeiro de 2021, o extraditando invoca que o pedido de extradição formulado pelos Estados Unidos da América deve ser rejeitado por alegada ausência de reciprocidade.

Porém, não assiste razão ao extraditando.

Em primeiro lugar, ao contrário da leitura retirada no recurso, os Estados Unidos da América não recusam extraditar em situação idêntica. O que é dito na nota diplomática que é referenciada pelo extraditando é que, no caso concreto, os Estados Unidos da América não podem conceder – por limitações do seu sistema jurídico interno – uma garantia absoluta nesse sentido, podendo atender a um pedido semelhante de Cabo Verde, de acordo com uma apreciação casuística. Segundo a lei dos EUA, Título 18 do Código dos EUA Secção 3181(b), se certas condições forem satisfeitas, os Estados Unidos podem proceder à entrega do extraditando, desde que se trate de *"pessoas que não sejam cidadãos, nacionais ou residentes permanentes dos Estados Unidos, que tenham cometido crimes de violência contra nacionais dos Estados Unidos em países estrangeiros, independentemente da existência de qualquer tratado de extradição ..."*.

Em segundo lugar, porque pode ser encontrada base legal para o pedido de extradição de Alex Saab na Convenção das Nações Unidas contra a Criminalidade Organizada Transnacional[22]. De facto, mesmo que não tenha sido publicado o decreto presidencial de ratificação desta convenção, Cabo Verde aderiu à mesma internacionalmente e também a

---

[22] Aprovada para ratificação pela Resolução nº 92/VI/2004, de 31 de maio, publicada no Boletim Oficial, I série, n.º 16, 31 de maio, pp. 306-372.

Página 19 de 29



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

aprovou de acordo com os ditames constitucionais internos[23]. E, mesmo que se entenda que a falta de ratificação faz com que a mesma não vigore na ordem jurídica interna, tal não significa que a mesma seja inócua, pois revela a vinculação internacional de Cabo Verde a um conjunto de princípios e regras neste domínio[24].

Mas, principalmente, e mesmo que não se considerassem os dois pontos anteriores, o argumento não é procedente porque não existe qualquer obrigatoriedade de recusa do pedido de extradição por ausência de reciprocidade.

De facto, por um lado, a Constituição de Cabo Verde não o exige a não ser para o caso da extradição de cidadãos cabo-verdianos (cf. artigo 38.º, n.º 3, alínea a), da Constituição). E, por outro, a própria Lei da Cooperação Judiciária Internacional em Matéria Penal de Cabo Verde, a Lei n.º 6/VIII/2011, de 29 de agosto (LCJI), refere que a falta de reciprocidade não impede a satisfação de um pedido de cooperação (cf. artigo 3.º, n.º 3, em conjugação com o artigo 6.º , n.º 4)[25], mediante certas condições que serão abaixo analisadas.

Mesmo em Portugal, o sistema jurídico mais próximo do cabo-verdiano no que respeita às leis de cooperação judiciária internacional em matéria penal, a ausência de reciprocidade só constitui condição de recusa da cooperação para a extradição de cidadãos nacionais[26][27], para a participação do Estado requerente no processo de extradição[28] e, em certa medida, para a extradição por crimes a que corresponda, segundo o direito do Estado requisitante, pena ou

---

[23] Recentemente, e ainda que a título incidental, o Tribunal Constitucional afirmou que, entre outras convenções celebradas no seio daquela organização internacional, a Convenção das Nações Unidas contra a Criminalidade Organizada Transnacional estabelece obrigações a que o Estado de Cabo Verde se vinculou, pelo que constitui direito interno cabo-verdiano – cf. Acórdão n.º 30/2019 do Tribunal Constitucional, publicado no Boletim Oficial, I Série, n.º 110, 29 de outubro de 2019, pp. 1766-1789.

[24] Veja-se, a título exemplificativo, o Acórdão do Supremo Tribunal de Justiça (dgsi.pt) de Portugal, de 18.02.2006, proferido no âmbito do processo n.º 05S3279, onde o tribunal manda atender ao conteúdo da Convenção de Basileia sobre a imunidade dos Estados de 10.05.1979, que, apesar de assinada por Portugal, nunca foi ratificada, com fundamento no facto de que evidenciava princípios e regras que eram úteis para dar a solução ao caso concreto. No mesmo sentido, e também relativamente à Convenção das Nações Unidas sobre Imunidades dos Estados, de 2 de Dezembro de 2004 (que Portugal subscreveu, mas que também não se encontra em vigor), veja-se o Acórdão do Tribunal da Relação de Lisboa (dgsi.pt), de 16.01.2019, proferido no âmbito do processo n.º 12515/16.4T8LSB.2.L1-4.

[25] A Lei n.º 144/99, de 31 de agosto, lei portuguesa da cooperação judiciária internacional, contém normas idênticas, nos seus artigos 4.º, n.º 3 e 6.º, n.º 4.

[26] Cf. artigo 33.º, n.º 3, da Constituição portuguesa, que consagra uma norma semelhante ao artigo 38.º, n.º 3, da Constituição de Cabo Verde.

[27] Aliás, embora tal não resulte claro da alegação do recurso, é precisamente a respeito desta específica condição de recusa de cidadãos nacionais que se refere a doutrina portuguesa mencionada nos pontos 231-232 do recurso.

[28] Cf. artigo 47.º, n.º 3, da Lei n.º 144/99, de 31 de agosto, que tem conteúdo idêntico ao artigo 47.º, n.º 3, da LCJI de Cabo Verde.

CERTIFIED TRANSLATION   02/07/2021   LANGUAGE REACH



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

medida de segurança privativa ou restritiva da liberdade com carácter perpétuo ou de duração indefinida[29].

De acordo com o artigo 3.º, n.º 3, alínea a), da LCJI, a falta de reciprocidade não impede a satisfação de um pedido de cooperação, desde que essa cooperação se mostre aconselhável em razão da natureza do facto ou da necessidade de lutar contra certas formas graves de criminalidade. Ora, sendo o extraditando pretendido pelo Estado requerente para ser julgado pela prática de crimes graves, designadamente de lavagem de dinheiro, é evidente que o pedido de extradição deve ser atendido em função da necessidade de combate a esta forma de criminalidade particularmente grave.

Não suscita dúvidas que a lavagem de capitais é considerada pela comunidade internacional e nacional como uma forma grave de criminalidade. Em Cabo Verde, a lavagem de capitais constitui crime previsto e punido pelo artigo 39.º da Lei n.º 38/VII/2009, de 27 de abril, alterada e republicada pela Lei n.º 120/VIII/2016, de 24 de março, ao qual corresponde uma pena de quatro a doze anos de prisão, passível de agravação nas circunstâncias previstas no artigo 40.º da mesma lei[30]. Esta lei, de resto, prevê também um complexo sistema preventivo desta forma de criminalidade, como acontece na generalidade dos países, seguindo as recomendações do Grupo de Ação Financeira Internacional (GAFI). Aliás, Cabo Verde é membro do Grupo Intergovernamental de Acção contra o Branqueamento de Capitais na África Ocidental (GIABA), criado pela Autoridade dos Chefes de Estados e Governos da Comunidade Económica dos Estados da África Ocidental (CEDEAO) no ano de 2000 e que, por sua vez, é um Membro Associado do GAFI. Existem diversas convenções internacionais que incluem no seu objeto o combate ao branqueamento de capitais, incluindo três convenções celebradas no seio da Organização das Nações Unidas (ONU) às quais Cabo Verde aderiu ou que Cabo Verde subscreveu[31]. É inequívoco, portanto, que a lavagem de

---

[29] Cf. artigo 33.º, n.º 4, da Constituição portuguesa, onde se prevê, para essas situações, a necessidade de o Estado requisitante ser parte de convenção internacional a que Portugal esteja vinculado e oferecer garantias de que tal pena ou medida de segurança não será aplicada ou executada. Para crimes a que corresponda este mesmo tipo de punição, o artigo 38.º, n.º 2, da Constituição de Cabo Verde apenas forma exigências semelhantes, ainda que se refira à necessidade da existência de uma convenção internacional, quando se trate da extradição de cidadãos cabo-verdianos.

[30] Em Portugal o crime correspondente foi introduzido no Código Penal em 2004 (estando anteriormente a isso previsto apenas na Lei da Droga), sendo hoje previsto e punido pelo artigo 368.º-A do Código Penal (que o designa por "branqueamento"), em moldes e com penas semelhantes aos da legislação cabo-verdiana. As condutas punidas no âmbito do crime de branqueamento em Portugal integram o conceito jurídico de criminalidade altamente organizada (cf. artigo 1.º, alínea m), do Código de Processo Penal português), o que faz com que, entre o mais, quando tenham conexão internacional, possam constituir fundamento da extradição de cidadãos nacionais, nos termos do artigo 33.º, n.º 3, da Constituição portuguesa.

[31] A Convenção das Nações Unidas contra o Tráfico Ilícito de Estupefacientes e Substâncias Psicotrópicas (Viena, 20.12.1988), aprovada para adesão pela Resolução n.º 71/IV/94, de 19 de outubro, a Convenção das Nações Unidas contra a Criminalidade Organizada Transnacional (Palermo, 15.11.2000), já mencionada, e a



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

capitais é uma forma de criminalidade particularmente grave que a comunidade internacional e Cabo Verde estão empenhados em combater. Encontra-se, assim, manifestamente preenchida a condição prevista no artigo 3.º, n.º 3, alínea a), da LCJI.

Não existe, portanto, obstáculo legal à satisfação do pedido de extradição formulado pelos Estados Unidos da América; o obstáculo que poderia haver seria político, mas esse encontra-se já ultrapassado pela decisão favorável da Ministra da Justiça, ao final da fase administrativa deste processo de extradição, e perante as garantias e os esclarecimentos então prestados pelos Estados Unidos da América.

Com efeito, o princípio da reciprocidade *«funciona de modo diverso consoante haja ou não convenção internacional a ligar os Estados requerente e requerido: se houver, a reciprocidade está, inerentemente, garantida; se não houver, o modo de assegurar a reciprocidade passa por condicionar a cooperação (baseada no direito interno) à prestação casuística de garantias por parte do Estado requerente»*[32]. A reciprocidade é *«um princípio segundo o qual o Estado requerido só acederá a cooperar com o Estado requerente se este lhe oferecer garantias de que, de futuro, encontrando-se na qualidade de requerido e em identidade de circunstâncias, fará o mesmo»*[33]. Porém, deve entender-se que a *«atribuição ao Ministério da Justiça da possibilidade de exigir e prestar garantias de reciprocidade de modo casuístico evidencia o carácter político do princípio da reciprocidade»*[34]. Já isso resultava do Preâmbulo do Decreto-Lei n.º 43/91, de 22 de janeiro[35], que aprovou a lei da cooperação judiciária internacional portuguesa anterior à atualmente em vigor, e onde se veio a prever pela primeira vez a solução legal que hoje encontramos no artigo 4.º da lei portuguesa[36]. De facto, no texto preambular desse decreto-lei deixou-se vertido, como forma de justificação do poder atribuído ao Ministério da Justiça a este respeito, que a reciprocidade *«é concebida como um acto político unilateral do Governo, enquanto instrumento de cooperação jurídica internacional. Sendo condição de aplicação de qualquer tratado, a reciprocidade aqui regulada vale especialmente para os casos de ausência do mesmo; e, uma vez que reflecte o princípio da igualdade entre os Estados, justificado está que se atribua a sua ponderação ao*

---

Convenção das Nações Unidas contra a Corrupção (Nova Iorque, 31.10.2003), aprovada para ratificação pela Resolução n.º 31/VII/2007, de 2 de março.

[32] Miguel João Costa, *Dedere aut Judicare? A decisão de extraditar ou julgar à luz do direito português, europeu e internacional*, p. 79, dissertação de mestrado submetida à Faculdade de Direito da Universidade de Coimbra, disponível aqui.

[33] Idem, ibidem, nota de rodapé 204.

[34] Idem, p. 80.

[35] Publicado no Diário da República n.º 18/1991, Série I-A de 22.02.1991, e hoje acessível online aqui.

[36] Norma que não sofreu qualquer alteração entre o Decreto-Lei n.º 43/91 e a Lei n.º 144/99, a lei atualmente em vigor e que, também, corresponde inteiramente à redação do artigo 3.º da LCJI.



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

*Governo, como responsável pela condução da política geral do País e pela negociação e ajuste das convenções internacionais*». Ou seja, a decisão sobre exigir ou prescindir da reciprocidade como condição de satisfação do pedido de cooperação é, nos ordenamentos jurídicos português e cabo-verdiano, e em face das disposições legais mencionadas, uma decisão puramente política, e que não está sequer sujeita à apreciação dos tribunais[37]. Não estamos, portanto, perante qualquer delegação de competências da Assembleia Nacional ou do Presidente da República na Ministra da Justiça, como alega o extraditando no seu recurso, mas simplesmente perante um ato político, válido e eficaz, legitimado pelo disposto no artigo 3.º da LCJI e, de resto, da exclusiva competência do poder executivo e não sindicável pelos tribunais.

Assim, e concluindo, mesmo que se entenda haver ausência de reciprocidade no caso concreto, não só essa ausência não constitui motivo de recusa obrigatória do pedido de extradição, como a apreciação dessa causa de recusa se encontra subtraída aos tribunais cabo-verdianos, por força da decisão da Ministra da Justiça.

Não se vê como esta disposição da LCJI pode violar a constituição.

## 9. Da violação do Princípio da Especialidade e extradição por motivos políticos

Interpretação no sentido de que, autoriza-se a extradição para que seja sujeito a procedimento criminal por um único dos crimes que lhe são imputados, de acordo com a garantia oferecida pelo Estado requerente, sem especificação, o que dificulta a defesa nos EUA.

Alega a defesa que, "A norma que foi aplicada nas decisões é a do artigo 17º da LCJI e com o sentido interpretativo de "autoriza-se a extradição do recorrente para que seja sujeito a procedimento criminal por um único dos crimes que lhe são imputados, de acordo em conformidade com a garantia

---

[37] Neste sentido, v. o já citado Miguel João Costa, op. cit., p. 80, que afirma «*podemos concluir com segurança que o juízo acerca da causa de recusa "ausência de reciprocidade" pertence exclusivamente ao Executivo – deixando assim firmada a excepção à regra de que as causas de recusa obrigatórias são passíveis de apreciação judicial*», citando também o autor outra doutrina e também jurisprudência nesse sentido. Na jurisprudência portuguesa, destaca-se o Acórdão do Tribunal da Relação de Lisboa (dgsi.pt), de 04.02.2004, proferido no âmbito do processo n.º 3880/2003-3, onde se deixou vertido que «*como flui do nº 3 do artigo 4º da Lei nº 144/99, de 31 de Agosto, a exigência de reciprocidade pode ser dispensada pelo Ministro da Justiça nas situações enunciadas nas três alíneas desse mesmo preceito. Nesses casos, nomeadamente quando o poder político entenda que existe a necessidade de lutar contra determinadas formas de criminalidade, o Estado Português pode, mesmo assim, cooperar com o Estado estrangeiro. Daí que, mesmo nesse caso, tendo Sua Excelência a Ministra da Justiça aceite o pedido de extradição apresentado pela União Indian* [...] *a inexistência de reciprocidade que obstaria à sua admissibilidade*».

Página 23 de 29



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

oferecida pelo Estado requerente", diferentemente da nota diplomática que determinou de forma clara o crime ou "count" a que o recorrente seria acusado, caso fosse extraditado, dificultando assim a sua defesa nos EUA, tornando-a mais cara, in suma, a decisão tornou a situação do recorrente mais gravosa, e nessa dimensão e extensão violam as normas constitucionais dos artigos 15.º, 17.º, n.º 4 e 5, e 18.º da CRCV e, por isso, existe uma inconstitucionalidade e que deve ser declarada."

Apesar de incluídos nesta "nona questão de constitucionalidade" "*a violação do Princípio da Especialidade e extradição por motivos políticos*", o certo é que, o recorrente apenas invoca a inconstitucionalidade da interpretação do *Princípio da Especialidade*, o que demostra que, finalmente aceita que, motivos políticos não estão na base do pedido de extradição. Por outro lado, nota-se que o recorrente ataca a decisão de mérito, em si, que pretende ver alterada, e não, a interpretação dada às disposições legais aplicadas.

O princípio da especialidade, segundo o qual o extraditando não pode ser perseguido, detido, julgado ou sujeito a qualquer outra restrição da liberdade por facto ou condenações anteriores diferentes dos determinados no pedido de extradição (artigo 17º LJCI), é um princípio internacionalmente reconhecido mediante o qual se protege a soberania do Estado requerido e se garante a proteção do extraditando.

Consta do pedido formal de extradição formulado pelos Estados Unidos, a garantia expressa do cumprimento do princípio da especialidade. As garantias no âmbito de cooperação judiciária internacional, emergem da confiança existente entre o Estado requerente e o Estado requerido, nos termos das relações político-diplomáticas. Quem decide da suficiência ou insuficiência da garantia do princípio da especialidade é o Tribunal com competência em matéria de extradição, limitando-se o Tribunal Constitucional a analisar a conformidade da norma aplicada com a Constituição.

Levanta o recorrente a questão hipotética de incumprimento da garantia do princípio da especialidade pelos EUA. Questão semelhante foi analisada e decidia pelo Tribunal Constitucional português no sentido de que, tal tarefa competirá ao Estado, no âmbito das relações político-diplomáticos[38].

Contrariamente aos argumentos da defesa, as garantias formais dadas pelos Estados Unidos a Cabo Verde relativamente às acusações e à potencial pena máxima que aquele enfrentará, aquando da extradição, são suficientes para justificar a concessão da extradição.

---

[38] Acórdão do TC n.º 360/2012 (tribunalconstitucional.pt)

Página 24 de 29



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Através de duas notas diplomáticas, os EUA garantiram a Cabo Verde que *i*) não irão deter, processar ou punir o extraditando por quaisquer outros crimes que não se encontrem refletidos no pedido de extradição; e que *ii*) o extraditando não será condenado a pena de prisão perpétua ou a pena de morte.

A defesa não contesta que estas garantias vinculam todo o executivo dos EUA, incluindo o Departamento de Estado e o Departamento de Justiça. De facto, ambas as notas diplomáticas acima mencionadas, datadas de 29 de junho de 2020 e de 7 de setembro de 2020, referem que as garantias ali concedidas são assumidas "*em nome de todo o Governo dos Estados Unidos, incluindo os departamentos de Estado e da Justiça*". Deste modo, a defesa não levanta qualquer questão relacionada com o cumprimento das garantias que foram prestadas por parte de algum destes departamentos dos EUA e, de facto, não há qualquer motivo para crer que, quer o Departamento de Estado, quer o Departamento de Justiça dos EUA, não cumpram as referidas garantias. Com efeito, os EUA, como qualquer país que pretenda encontrar, a nível internacional, pessoas que se encontrem em fuga, tem um incentivo acrescido no sentido de honrar os seus acordos e garantias diplomáticas, de modo a poder, em condições de reciprocidade, exigir o cumprimento dos mesmos por parte de outros Estados.

Ao invés, a defesa argumenta que o tribunal de Cabo Verde deve recusar a extradição, porque as notas diplomáticas já mencionadas não determinam se os tribunais americanos estariam ou não vinculados às garantias fornecidas[39]. No entanto, este argumento denota uma incompreensão da defesa face ao papel dos tribunais americanos, no âmbito do seu processo de extradição e, de um modo geral, face à acusação deduzida contra o extraditando, nos EUA. Os Tribunais apenas podem considerar as acusações criminais que lhes são apresentadas pelo Ministério Público, ou seja, o Departamento de Justiça dos Estados Unidos, neste caso. Além disso, o poder punitivo dos Tribunais está limitado aos crimes imputados ao arguido na acusação. Nos termos da regra 48(a) do Regulamento Federal de Processo Penal (*Federal Rule of Criminal Procedure*), o procurador solicitará a rejeição das sete acusações e o Tribunal deverá deferir o pedido quando este resultar de uma extradição. Além disso, ao abrigo da Regra 14 do Regulamento Federal de Processo Penal, o Tribunal pode ordenar

---

[39] A defesa sugere também que as garantias deveriam provir do Senado dos Estados Unidos tendo em conta "*a sua importante força no sistema político e na constituição dos EUA*". No entanto, o Senado americano, que é um órgão legislativo federal, não desempenha qualquer papel no processo de extradição e no processo penal da Saab. Em vez disso, o Senado, bem como a Câmara dos Representantes dos EUA, tem a função de decretar leis, entre as quais, as que regem a extradição, incluindo o Título 18, Secção 3192 do Código dos EUA, que confere ao poder executivo a autoridade e a responsabilidade de proteger o acusado. Alex Saab enfrenta acusações que lhe são imputadas pelo Departamento de Justiça, que forma parte do poder executivo.



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

qualquer "*medida de atenuação que a justiça exija*"[40] se a junção de acusações for prejudicial a um arguido.

A defesa argumenta que o Tribunal deveria ter "*verificado que esta garantia foi dada pelo Departamento de Justiça*", o que não se percebe, uma vez que as próprias notas diplomáticas confirmam que o Departamento de Justiça se encontra vinculado às garantias prestadas. Segundo o Manual do Departamento de Justiça (*Department of Justice Manual*), secção 9-15.240, "*o pedido de extradição é feito por nota diplomática preparada pelo Departamento de Estado e transmitida ao governo estrangeiro através dos canais diplomáticos*"[41].

Neste caso, os Estados Unidos, através da sua nota diplomática de 29 de junho de 2020, garantiram que o Departamento de Justiça apenas deduzirá as acusações enumeradas no pedido de extradição. Ao que acresce a garantia prestada na nota diplomática de 7 de setembro de 2020, através da qual os Estados Unidos asseguraram que o extraditando enfrentaria julgamento por apenas uma das imputações descritas na acusação e vertidas no pedido de extradição, de modo a garantir que a pena máxima de prisão a aplicar não possa ultrapassar os 20 anos. Tendo sido esta a posição adotada pelo Departamento de Justiça dos Estados Unidos, os Tribunais encontram-se necessariamente vinculados a estes limites. Deste modo, as garantias fornecidas pelos Estados Unidos permitem justificar e sustentar a extradição da Saab, confirmando que o princípio da especialidade se encontra devidamente assegurado.

Acresce, ainda, que a LCJI e a jurisprudência portuguesas citadas pela defesa de Saab não alteram as conclusões a que chegamos. Pelo contrário, provam a importância do cumprimento do princípio da especialidade e demonstram a estrita vinculação dos tribunais a esse princípio[42].

---

[40] Tradução livre de "relief that justice requires".

[41] Tradução livre de "[t]he request for extradition is made by diplomatic note prepared by the Department of State and transmitted to the foreign government through diplomatic channels.".

[42] Veja-se, a título de exemplo, o Acórdão do Supremo Tribunal de Justiça português, mencionado pela defesa de Saab, nos termos do qual se reconheceu uma violação do princípio da especialidade e conferiu ao Estado português a possibilidade de decidir qual a melhor forma de reagir a esta violação.

De acordo com o referido Acórdão do Supremo Tribunal de Justiça (dgsi.pt), de 11.01.2012, proferido no âmbito do processo n.º 111/11.7YFLSB «*o princípio da especialidade é um dos princípios estruturantes de todo o processo de cooperação internacional e que não se limita, apenas, à extradição, nos termos da abrangência alargada a outras formas de cooperação definidas no art. 1.º da Lei 144/99, de 31-08. Esse princípio faz parte daquele conjunto de axiomas impostos pela simples coexistência relevante da comunidade internacional no sentido de que a entrega por extradição de um delinquente obriga o Estado requerente a conter o seu procedimento, a sua perseguição penal, nos precisos limites da acusação específica pelo crime predefinido e não por qualquer outro*». Ao que acrescenta ainda, «*a violação da cláusula da especialidade por parte do Estado que viu a sua pretensão satisfeita integrará um ilícito, como tal censurável ao nível das relações entre Estados*». O caso concreto em questão nesta decisão do Supremo Tribunal de Justiça nada tem que ver com o



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

Não existe qualquer desconformidade na interpretação da norma com a CRCV.

**10. Do carácter perpétuo da pena**

Interpretação no sentido de que, um documento "em que se compromete" é uma garantia válida e suficiente.

"As normas que foram aplicadas nas decisões são as dos artigos (…) e com o sentido interpretativo de "*fez chegar ao processo, por intermédio do MP um documento em que se compromete (…). Essa garantia não pode deixar de ser considerada válida e suficiente*", ou seja, a decisão a quo, concede a extradição do extraditando, reclamado por um Estado, onde se aplica pena de prisão perpétua ou de naquele país corra o risco de lesão irreversível de integridade física, e não pelo Tribunal Penal Internacional, para ser julgado, não para o cumprimento de pena, de crimes que não são qualificados de terrorismo ou crimes hediondos e nessa dimensão e extensão violam as normas constitucionais dos artigos 1.º, n.º 1 e 2, 24.º, 25.º, n.º 1, 33.º, 38.º, n.º 2 da CRCV."

Não assiste razão ao recorrente. Mesmo nas situações em que o crime seja punido com pena de prisão ou medida de segurança de carácter perpétuo, isso não implicaria necessariamente uma impossibilidade jurídica da extradição, mas antes obrigaria o Estado requerente a formular uma garantia válida de que tal pena não seria aplicada ou executada, garantia essa que pode assumir várias formas, desde que seja juridicamente vinculativa no Estado requerente, como sucede no caso concreto (art.º 6º, n.º 1, al. f) e 2, al. b) da LCJI). Acontece, porém, que os crimes por que o extraditando foi acusado, não são de carácter

caso vertente, pois do que aí se tratou foi o reconhecimento de uma violação do princípio da especialidade posterior à extradição, por o Estado requerente ter vindo a deduzir acusações adicionais contra o extraditado, face àquelas que constavam da autorização de extradição. De resto, e após recurso desta decisão do Supremo Tribunal de Justiça, o Tribunal Constitucional, através do Acórdão 360/2012 (tribunalconstitucional.pt), veio a deixar expresso o entendimento segundo o qual as consequências a retirar de uma decisão judicial que constate a violação do princípio da especialidade situam-se num plano político-diplomático, cabendo ao Estado requerido «*pondera*[r] *politicamente a atitude a tomar no plano das relações com o Estado requerente*». Um entendimento que, de resto, já havia sido afirmado no Acórdão do Supremo Tribunal de Justiça (dgsi.pt), de 13.12.2007, proferido numa fase anterior do mesmo caso, e que também foi expresso pelo Conselheiro Santos Cabral em voto vertido no já referido Acórdão do Supremo Tribunal de Justiça (dgsi.pt), de 11.01.2012.

Veja-se ainda o Acórdão do Tribunal da Relação de Lisboa (dgsi.pt), de 28.03.2019, proferido no âmbito do processo n.º 334/19.0YRLSB.L1.9, onde se deixou vertido que «[o] *princípio da especialidade, inato ao instituto tradicional da extradição, que traduz a limitação do âmbito penal substantivo do pedido, cuja abrangência se encontrava vedada e circunscrita aos factos motivadores do pedido de extradição, surge como uma garantia da pessoa procurada e como limite da acção penal ou da execução da pena ou da medida de segurança e representa uma segurança jurídica de que não será julgada por crime diverso do que fundamenta o Mandado de extradição, este princípio pretende afastar os chamados «pedidos fraudulentos», em que se invoca um facto para fundamento da extradição e se acaba por julgar o extraditado por outro que se não invoca*».



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

perpétuo. Por outro lado, os EUA deram garantias de acusar apenas por um dos crimes, conforme referido no pedido de extradição, tem experiências de comutação de penas no seu historial no âmbito de cooperação judiciária internacional, o que foi aceite pelo tribunal.

E isto, uma vez mais, não viola a Constituição.

### 11. Imunidade

Interpretação no sentido de que a incompetência absoluta dos tribunais decorre de uma prévia apreciação ou posição política; não reconhecimento do Estatuto de Enviado Especial.

Alega a defesa que, "as normas que foram aplicadas nas decisões são as dos artigos (…) e com o sentido interpretativo de que "a incompetência absoluta dos tribunais cabo-verdianos para conhecer de um assunto relativo à imunidade, no direito internacional público, decorre de uma prévia apreciação ou posição política, ou seja, que o reconhecimento do Requerente com o Estatuto de Enviado Especial cabe ao Estado de Cabo Verde e, sem esse consentimento, os Tribunais Cabo-Verdianos não podem reconhecer esta qualidade ao requerente" ,e nessa dimensão e extensão violam os princípios de separação ou de interdependência de poderes, da independência do poder judicial e o princípio da não ingerência nos assuntos internos de outros Estados previsto nos artigos 119.º, n.º 2 e 211.º, n.º 1 e 11.º, n.º 1 da CRCV, por o tribunal a quo não se ter pronunciado sobre o Estatuto de Enviado especial do Recorrente ou sua objeção, após dois anteriores Estados terem reconhecido o recorrente como enviado especial e ainda violam as normas constitucionais dos artigo 2.º, 2, 7.º, 12.º e (…)".

A competência para reconhecer a qualidade de enviado especial pertence ao Poder Executivo e não ao Poder Judicial. Trata-se de um ato político, não sindicável pelos tribunais. Aliás, os vários pedidos feitos pela Venezuela, através de várias cartas enviadas, ao Governo de Cabo Verde -MNEC, demonstram isto mesmo.

Uma vez mais se constata que o recorrente ataca a decisão de mérito e não a norma ou interpretação que entende ser contrária à Constituição. O estatuto de enviado especial, quando não resulte de uma obrigação assumida pelo Estado através de um acordo ou convenção internacional, carece sempre de uma apreciação política. Não existe qualquer problema de separação de poderes, ou outro. Não são os tribunais internos que vinculam o Estado às suas obrigações de direito internacional público. A vinculação a tratados e as obrigações internacionais depende sempre da vontade política e nada tem que ver com o exercício do poder jurisdicional que se limita, numa fase posterior, a aplicar o direito que resulte, entre o mais, dessas obrigações a que o Estado se tenha vinculado ao nível internacional. Portanto, mais uma vez, a questão de constitucionalidade é colocada de forma incorreta.



**MINISTÉRIO PÚBLICO**
PROCURADORIA GERAL DA REPÚBLICA
Gabinete do Procurador Geral da República

**12. CEDEAO**

Interpretação no sentido de que o a entrada automática em vigor, na ordem jurídica interna, dos atos da CEDEAO, reduz a soberania de Cabo Verde.

Alega a defesa que, "Das normas que não foram aplicadas nas decisões são dos artigos (…) porque violam a soberania do país nos termos do art.º 3.º da Constituição e com o sentido interpretativo "(…) o reconhecimento que os Tribunais cabo-verdianos viessem a fazer parte da CEDEAO, como uma organização supranacional, no sentido se dos seus atos entrem automaticamente em vigor na ordem jurídica interna sem qualquer ato de mediação, comportaria o risco de reduzir a cinzas a soberania de Cabo Verde (…), e nessa dimensão e extensão viola as normas constitucionais dos artigos 3.º, 12.º, n.º 1 e 3 e 210.º, n.º 2 da CRCV."

Novamente, a questão de constitucionalidade não se encontra corretamente formulada. No caso, aliás, o recurso parece colocar a apreciação de constitucionalidade sobre normas do Tratado da CEDEAO e similares, o que não parece fazer muito sentido, pois, em princípio, só se pode apreciar a constitucionalidade de normas de direito interno. Deve salientar-se que a questão colocada nada tem que ver com a apreciação da constitucionalidade, mas antes com a interpretação e aplicação do direito internacional público, o que, em nosso entendimento, escapa à competência do Tribunal Constitucional.

Nos termos expostos, o presente recurso de fiscalização concreta da constitucionalidade não merece provimento, tendo em conta que, nenhuma das normas da LCJI foi aplicada ou interpretada em violação de qualquer norma ou princípio constitucional.

Junta um parecer e um documento

*Procuradoria-Geral da República, 25 de junho de 2021*

O Procurador-Geral da República

*/Luís José Tavares Landim/*

02/07/2021
REG.07635166



02nd July 2021

Dear Sirs,

**Re: Portuguese into English (UK) Certified Translation**

Language Reach Limited is a UK-registered professional translation and interpreting company and a fully qualified registered member of The Association of Translation Companies (Member No. 2018ATCR1238). We hereby confirm that we have translated the enclosed document(s) from Portuguese into English (UK).

As a responsible translation agency we only employ certified linguists to work with us. We are satisfied with the linguistic accuracy and hereby confirm that the English (UK) written translation of the Portuguese document(s) represents its fair and accurate linguistic message as intended in the original file(s).

We hereby confirm that this is a true and correct translation and certify the linguistic accuracy.

For more information, please contact Language Reach Limited on +44 (0) 208 677 3775.

Yours sincerely,

**Lucia Petrulli**
Project Manager

ACCREDITED MEMBER
**ATC** 2021
Association of Translation Companies
Member No 2021ATCAC1238

**EUATC**
N E T W O R K
M E M B E R

CERTIFIED TRANSLATION
LANGUAGE REACH
02/07/2021
REG:07635166