**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case Number: <u>19-cr-20450-SCOLA</u>**

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**
        **v.**

**ALEX NAIN SAAB MORAN,**

                    **Defendant.**
_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S**
**<u>MOTION TO DISMISS THE INDICTMENT</u>**

# Table of Contents

**Introduction** ................................................................................................................1

**Factual Background** .....................................................................................................2

    SAAB MORAN's Various Claims of Immunity ...........................................................5

**Immunity Under The VCDR And Customary International Law** ...............................7

    Diplomatic Immunity ....................................................................................................7

    Special Mission Immunity ...........................................................................................10

**Argument** ....................................................................................................................13

    1.    SAAB MORAN Has No Diplomatic Status in the United States and Does Not Benefit from Diplomatic Immunity while in the United States ............................................14

        A. Non-Recognition of the Maduro Regime .........................................................14

        B. Lack of State Department Certification .............................................................16

        C. Lack of Status Under VCDR ............................................................................18

        D. Lack of Transit Immunity under VCDR ............................................................22

    2.    SAAB MORAN Does Not Qualify for Transit Immunity Under Customary International Law ....................................................................................................................23

        A. Convention on Special Missions and Customary International Law.................24

        B. Force Majeure ..................................................................................................25

    3.    The Act-of-State Doctrine Bars the Court from Reviewing a Foreign Country's Extradition Decision .................................................................................................26

    4.    SAAB MORAN's Extradition from Cabo Verde Did Not Violate His Due Process .......30

    5.    SAAB MORAN Has Not Put Forth Reliable Evidence That He Was A Diplomatic Agent or Special Envoy ...................................................................................................31

**Conclusion** ................................................................................................................35

## INTRODUCTION

The United States of America, by and through the undersigned counsel, hereby opposes Defendant Alex Nain SAAB MORAN's ("SAAB MORAN") Motion To Dismiss The Indictment, Docket Entry 147 (hereinafter the "Motion"). SAAB MORAN requests that the Indictment filed against him be dismissed on the basis that he is immune from arrest, detention, and prosecution under the Diplomatic Relations Act, 22 U.S.C. §§ 254a-254e ("DRA"), the 1961 Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502 ("VCDR"), the 1969 Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331 ("VCLT"), and customary international law. SAAB MORAN does not enjoy diplomatic immunity and his Motion should be denied.

SAAB MORAN's motion is predicated on the erroneous claim that he is a diplomat protected by diplomatic immunity under the VCDR, specifically the provision concerning transit immunity. This is not correct, even if the Court were to accept the factual premises of SAAB MORAN's Motion as true, which this Court should reject. The word diplomat has a broad definition in the English language: one employed or skilled in diplomacy, which can be defined as the art and practice of conducting negotiations between nations. Merriam-Webster Online Dictionary,  https://www.merriam-webster.com/dictionary/diplomacy). However, the VCDR provides immunities and privileges only for a specific category of diplomats, namely accredited members of a sending state's permanent mission to the receiving state. If one is not a member of the permanent mission, then one is not entitled to any of the VCDR immunities. As a factual matter, SAAB MORAN was not a member of Venezuela's permanent diplomatic mission to Iran and therefore was not on his way to take up or return to his permanent post when he traveled to the Republic of Cabo Verde ("Cabo Verde") on June 12, 2020, from Venezuela. According to the very documents he cites in his Motion, SAAB MORAN was, at best, on a short-term mission to negotiate a business deal between the Maduro regime and Iran. Such a role does not make him an accredited member of Venezuela's permanent diplomatic mission to Iran, and without that status

under the VCDR, he would not be covered by any privileges or immunities derived from said convention.

SAAB MORAN claims that customary international law also warrants dismissal of the Indictment. He relies on the Convention on Special Missions, which covers short-term missions of diplomats and also has a transit immunity provision. However, the United States is not a party to the Convention on Special Missions and regardless, he does not meet the requirements for transit immunity under that convention or customary international law because Cabo Verde was not informed in advance of, and did not consent to, his transit as a member of a special mission. The transit regimes for diplomatic immunity and special mission immunity are different. Recognizing this, SAAB MORAN conflates the protections provided to "diplomats" on special missions with diplomats under the VCDR. The Court should reject SAAB MORAN's attempts to do so.

Regardless, SAAB MORAN is not currently transiting to or from a permanent or temporary post. SAAB MORAN is here, in the Southern District of Florida, following a 16-months long extradition process from Cabo Verde. As a result, neither the VCDR nor customary international law would afford him any immunity here in the United States.

Finally, this Court should not depart from Eleventh Circuit precedent and second guess the legitimacy of a foreign country's decision to extradite an individual. *United States v. Knowles*, 390 Fed.Appx. 915, 928 (11th Cir. 2010). With no diplomatic protection, the appropriate analysis for the Court is whether SAAB MORAN's extradition violated his due process. It did not. *See United States v. Alvarez-Machain*, 504 U.S. 655, 662, 670 (1992). For these reasons, set forth fully below, the Court should deny SAAB MORAN's Motion.

## FACTUAL BACKGROUND

Beginning in August 2016, SAAB MORAN began meeting with and cooperating with U.S. law enforcement and providing them information concerning bribe payments to high level Venezuelan government officials in connection with contracts he was awarded to allegedly build housing for and provide food and medicine to the people of Venezuela. SAAB MORAN personally

met with U.S. law enforcement officials in August and September 2016, November 2017, June and July 2018, and April 2019; he also exchanged electronic communications with U.S. law enforcement officials throughout that same time. In fact, on June 27, 2018, SAAB MORAN entered into a cooperating source agreement with the Drug Enforcement Administration. SAAB MORAN also agreed to and did make payments to bank accounts controlled by the DEA in order to disgorge profits he received from the contracts he obtained through bribe payments. From August 2018 to February 2019, SAAB MORAN made four payments totaling over $12.5 million to these accounts. During his meetings with U.S. law enforcement, SAAB MORAN never claimed that he was a diplomat of Nicolas Maduro or Maduro's purported government in Venezuela. [1]

On July 25, 2019, SAAB MORAN was indicted by a federal grand jury in the Southern District Court of Florida, along with co-defendant Alvaro Pulido Vargas, with one count of conspiracy to commit money laundering and seven substantive counts of laundering monetary instruments.[2] On June 12, 2020, SAAB MORAN was detained in Cabo Verde, an island nation west of continental Africa, at the request of the United States. The United States thereafter submitted a formal extradition request, which SAAB MORAN opposed in the courts of Cabo Verde. After sixteen months of litigation in Cabo Verde, SAAB MORAN was extradited to the United States on October 16, 2021. Exhibits 1 and 2 are decisions of the Cabo Verdean courts ordering the extradition of SAAB MORAN and translations of the decisions. During those extradition proceedings, SAAB MORAN argued, in part, that he was immune from extradition to the United States due to his purported diplomatic status with Venezuela. *Id.* Those arguments were not persuasive, and both the Supreme Court and Constitutional Court of Cabo Verde found that

---

[1] As of the date of this filing, the United States does not recognize the Maduro regime as the government of Venezuela. Nor has the United States recognized the Maduro regime at any time during the course of this litigation nor at any point during the Cabo Verdean detention or extradition proceedings.

[2] On November 1, 2021, the United States moved this Court to dismiss counts two through eight of the indictment consistent with assurances made to Cabo Verde during the extradition process. The Court dismissed these counts the same day. [DE 63-4].

while SAAB MORAN was a special envoy for Venezuela to Iran, he was not immune from extradition during his transit through Cabo Verde on his travels to Iran, and therefore, he could be extradited. *Id.*

The Supreme Court of Justice of Cabo Verde found the following as to SAAB MORAN's claim of being a special envoy transiting through Cabo Verde on June 12, 2020:

> What is reiterated is that there is no evidence in the record to date that the State of Cabo Verde has consented to the Appellant's transit through its territory with the status of special envoy.
>
> And, without such consent, the Cabo Verdean Courts cannot recognize the status of Special Envoy to the Appellant, which means that he does not enjoy the inviolability and immunities to which he claims, based on the 1969 UN Convention on Special Missions.

Exhibit 1, Judgment No. 28/2021 at 33. The Constitutional Court upheld the application of the rules applied by the Supreme Court of Justice. Exhibit 2. Ruling No. 39/2021 at 106.

Following these rulings and the issuance of a Certificate of Final Judgement by the Constitutional Court, the Minister of Justice for Cabo Verde formally ordered SAAB MORAN's extradition to the United States.

While those extradition proceedings were ongoing, SAAB MORAN's counsel filed in this Court a motion to vacate the order conferring fugitive status and for leave for a special appearance to challenge the Indictment. [DE 10.]  After briefing on the motion, the Court denied the motion to specially appear to challenge the Indictment, pursuant to the fugitive disentitlement doctrine. [DE 46.]  SAAB MORAN appealed that ruling to the Eleventh Circuit Court of Appeals. During the pendency of the appeal, however, SAAB MORAN was extradited to the United States from Cabo Verde and made his appearance before this Court. After full briefing and oral argument on the appeal, the Eleventh Circuit found that, because SAAB MORAN was no longer a fugitive, the issue of fugitive disentitlement was moot. With respect to SAAB MORAN's claim that he was a foreign diplomat and immune from prosecution, the Eleventh Circuit determined that the parties had not had the opportunity to fully develop the record on that issue, and this Court did not have

the opportunity to weigh the evidence. Therefore, on June 2, 2022, the Eleventh Circuit remanded the case to this Court in order to consider in the first instance whether SAAB MORAN is a foreign diplomat and immune from prosecution. [DE 102.]

*SAAB MORAN's Various Claims of Immunity*

SAAB MORAN's Motion argues that "the facts show unequivocally that Mr. Saab was a Special Envoy to Iran on behalf of Venezuela."  Motion at 1. While SAAB MORAN now claims this status is so clear and obvious, in the course of this litigation here and in Cabo Verde, SAAB MORAN has at one time or another claimed five different types of immunity. No such title was claimed by the Maduro regime in their first three letters to Cabo Verde protesting SAAB MORAN's arrest. *See* [DE 149-17, 18, and 19]. Indeed, the day after SAAB MORAN was arrested in Cabo Verde, the Maduro regime Minister of Foreign Affairs, Jorge Arreaza ("Arreaza"), submitted two letters to Cabo Verde protesting his arrest and requesting SAAB MORAN's release. In those letters, Arreaza made no reference to SAAB MORAN as a special envoy or as a diplomat. The passport referenced in the letters was not a diplomatic passport. *Compare* SAAB MORAN [DE 149-17, 18] and Exhibit 3 (composite exhibit of passports) *with* [DE 149-1]. The letters also gave no indication that any prior notice of the transit had been provided to Cabo Verde. Instead, the letters referred to SAAB MORAN as "acting as an agent" or "representative" of Venezuela and that he was protected by "sovereign immunity."[3] [DE 149-17 and 18].

One day later, the Maduro regime sent another letter to Cabo Verde. [DE 149-19]. That letter also referenced SAAB MORAN as holding a non-diplomatic passport. *Id*. The letter referenced SAAB MORAN as an "agent for the Government" who was travelling as a "representative" of Maduro. That letter argued that SAAB MORAN enjoyed "the same immunity *rationae personae* (by reason of the person), that the President of the Bolivarian Republic of

---

[3] A foreign state has certain immunity from a domestic court, which is recognized in the United States under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. Saab, not being a state, is not entitled to such immunity.

Venezuela would have enjoyed had he travelled through Cape Verde."[4]  *Id*. Notably, no reference was made to SAAB MORAN as a "Special Envoy" or having any immunity under the VCDR or Convention on Special Missions, calling into question whether the Maduro regime itself considered him a special envoy at the time.

On June 17, 2020, SAAB MORAN told the Barlavento Court in Mindelo, Cabo Verde that "that he was traveling as a representative of the Government of Venezuela, although bearing regular passports since the diplomatic passport remained in Venezuela."  This is the first time that arguably the issue of diplomatic immunity had been raised.[5]  [DE 24-2]. Further, on June 17, 2020, in its filing before the Supreme Court, SAAB MORAN raised the issue of head of state immunity. He also raised a new litigation strategy of deeming himself a "special envoy."  SAAB MORAN claims that he was appointed a "special envoy" of Venezuela by Arreaza, Minister of Popular Power for Foreign Relations, on April 9, 2018.[6]  [DE 148-1].

SAAB MORAN continued this strategy in the Cabo Verdean proceedings, although he supplemented it with an additional claim of being immune – his fifth claim of immunity – when he was purportedly appointed (while he was being detained in Cabo Verde) the Alternate Permanent Representative of the Bolivarian Republic of Venezuela to the African Union on December 24, 2020.[7]  [DE 10-5].

---

[4] A visiting head of state of a country is normally immune from the jurisdiction of U.S. courts. See United States v. Noriega, 117 F.3d 1206 (11th Cir. 1997). Saab, not being the head of state, is not entitled to this second immunity he claimed.

[5] The possession of a diplomatic passport does not entitle one to diplomatic immunity. *United States v. Ferroni-Carli*, 322 F. App'x 779 (11th Cir. 2009) (diplomat, who was not accredited, was convicted for falsely assuming to be a duly accredited foreign diplomat by among other things, presenting a diplomatic passport and claiming diplomatic immunity).

[6] The United States recognizes that customary international law can provide immunity to individuals on a special mission in certain circumstances, *Weixum v. Xilai*, 568 F. Supp.2d 35, 38 (D.D.C 2008), but, as argued below, it is not applicable here.

[7] The United States recognizes that a representative to an international organization may also be eligible for certain immunities. 22 U.S.C. § 288e(a) but those do not apply here.

During oral argument before the Eleventh Circuit (as well as in representations to undersigned counsel), counsel for SAAB MORAN also claimed that SAAB MORAN was purportedly named a "special envoy" of Venezuela by Nicolas Maduro on April 26, 2018, in the Official Gaceta in Venezuela, No. 6,373 Extraordinare. Oral Argument, United States v. Alex Saab Moran, at 29 minutes, 44 seconds (April 6, 2022), available at: https://www.ca11.uscourts.gov/oral-argument-recordings?title=&field_oar_case_name_value=saab&field_oral_argument_date_value%5Bvalue%5D%5Byear%5D=&field_oral_argument_date_value%5Bvalue%5D%5Bmonth%5D=.. However, the paper version of Official Gaceta No. 6,373 Extraordinaire acquired by the Library of Congress in Washington, D.C. on June 27, 2018 (Exhibit 4[8]), contains no reference to SAAB MORAN or his alleged appointment as a "special envoy." *Id.*[9] This fact calls into significant question whether the Maduro regime actually appointed SAAB MORAN as its special envoy, and instead suggests that this was a fabricated story generated to help him avoid extradition.

**IMMUNITY UNDER THE VCDR AND CUSTOMARY INTERNATIONAL LAW**

A.  <u>Diplomatic Immunity</u>

U.S. law recognizes diplomatic immunity for members of a permanent diplomatic mission based on the Vienna Convention on Diplomatic Relations ("VCDR"). Although many individuals may be called diplomats or engaged in diplomacy, the VCDR is an international treaty that sets forth, inter alia, the basis upon which privileges and immunities are to be accorded to diplomatic agents and other members of a foreign state's permanent diplomatic mission in the receiving state. Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 28 U.S.T. 3227, 500 U.N.T.S. 95. In

---

[8] The United States has not provided an official translation of this document as the import of the document is merely the absence of any reference to SAAB MORAN.

[9] The government notes that the documents cited to by SAAB MORAN in support of his purported status as a "special envoy" all came into the public sphere following SAAB MORAN's eventual claim of diplomatic immunity as a "special envoy."  Given the circumstantial evidence that the Maduro regime modified an online version of the Official Gaceta, No. 6,373 Extraordinaire to support SAAB MORAN's claim, the government questions the veracity of these documents.

other words, one must be a member of a foreign state's permanent diplomatic mission, as set forth in the VCDR, in order to benefit from the immunities afforded by the VCDR. Not all diplomats engaged in diplomacy are entitled to immunity under the VCDR. The VCDR's immunity provisions are given domestic effect in the United States under the Diplomatic Relations Act, 22 U.S.C. §§ 254a to 254e.

The VCDR only addresses staff assigned to permanent diplomatic missions, not temporary/special missions, as noted in Article 2: "[t]he establishment of diplomatic relations between States, and of *permanent diplomatic missions*, takes place by mutual consent."  Although the VCDR does not expressly define the term "mission," the Diplomatic Relations Act defines the term "mission" as including "missions within the meaning of the [VCDR] and any missions representing foreign governments, individually or collectively, which are extended the same privileges and immunities, pursuant to law, as are enjoyed by missions under the Vienna Convention." 22 U.S.C. § 254a(3). In addition, a reading of Article 20 of the VCDR helps clarify that the term mission would be a permanent embassy or consulate in a foreign country – "[t]he mission and its head shall have the right to use the flag and emblem of the sending State on the premises of the mission, including the residence of the head of the mission, and on his means of transport."  VCDR, Art. 20.

The VCDR provides diplomatic privileges and immunities to "diplomatic agents" which the VCDR defines as "the head of the mission or a member of the diplomatic staff of the mission." VCDR, Art. 1(e), *see also* U.S. Department of State, Office of Foreign Missions, Diplomatic and Consular Immunity, Guidance for Law Enforcement and Judicial Authorities at 6 (defining "members of diplomatic missions" as "the staffs of diplomatic missions (embassies)"). A "diplomatic agent" is the term used to refer to ambassadors and other diplomatic staff who generally have the function of dealing directly with host country officials while posted at a diplomatic mission (generally an Embassy). U.S. Department of State, Office of Foreign Missions, Diplomatic and Consular Immunity, Guidance for Law Enforcement and Judicial Authorities 7

(2019)                           (https://www.state.gov/wp-content/uploads/2019/09/19-04499-DipConImm_v2_web.pdf).

With regard to permanent diplomatic missions, the head of the mission is defined as "the person charged by the sending State with the duty of acting in that capacity." VCDR at Art. 1(a). These heads of missions may fall within one of three classes: ambassadors (or nuncios), envoys (or ministers or internuncios), or chargés d'affaires. *Id.* at 14. The sending state can determine the title, but the only significance between them concerns precedence and etiquette.

Diplomatic agents, including heads of missions, must be accredited. A sending state cannot unilaterally accredit an individual, but must accredit to a particular state or states and the receiving state(s) must accept the accreditation in order for it be valid. VCDR, art. 4, 7, 9, 10. *See* https://www.state.gov/about-us-accreditation/ ("In accordance with VCDR Article 9, the acceptance of accreditation requests for personnel at foreign missions is solely within the discretion of the Department of State[.]").

The immunities afforded to diplomatic agents under the VCDR are intended for the benefit of the sovereign, not the individual officials on whose behalf immunity may be asserted. VCDR, preamble, cl. 4 ("[T]he purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States."). Accredited diplomatic agents of the sending state are entitled to immunity from civil jurisdiction (with certain limited exceptions) and from criminal jurisdiction only in the receiving state. Id. at Art. 31.

In addition to providing for immunity from civil and criminal jurisdiction in the receiving state, Article 40(1) and (4) of the VCDR provides for transit immunity for accredited diplomatic agents taking up or returning to their "post," when returning to their own country or if forced to be in a third country due to "*force majeure.*"

> 1. If a diplomatic agent passes through or is in the territory of a third State, which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his own country, the third State

shall accord him inviolability and such other immunities as may be required to ensure his transit or return. …

…

4. The obligations of third States under paragraphs 1, 2 and 3 of this Article shall also apply to the persons mentioned respectively in those paragraphs, and to official communications and diplomatic bags, whose presence in the territory of the third State is due to force majeure.

VCDR, Art. 40.

B.   Special Mission Immunity

In addition to the privileges and immunities afforded under the VCDR to members of a permanent diplomatic mission, international law also recognizes special mission immunity, that is, immunity for senior foreign officials who travel on a temporary mission for the purpose of dealing with specific questions or performing specific tasks. *See* Suggestion of Immunity by the United States, *In Re Matter of the Application of Mikhail B. Khodorkovsky*, 1:09-mc-00205-RWR, ECF 21, at 9 (D.D.C. May 29, 2009) ("The VCDR codifies the rules governing the immunities of diplomatic agents stationed at the permanent diplomatic mission of their respective sending States. But non-codified diplomatic immunities remain available to high-level visitors engaged in special missions of shorter duration to further the intercourse between nations."). Although there is a convention that addresses special mission immunity, Convention on Special Missions, opened for signature December 16, 1969, 1400 U.N.T.S. 231, it has not been widely ratified and its provisions are not necessarily reflective of customary international law. *United States v. Sissoko*, 995 F. Supp. 1469, 1470 (S.D. Fla. 1997) ("The Court does not find that the U.N. Convention on Special Missions is 'customary international law' that binds this Court."). The United States is not a party to this Convention and is not bound by its provisions. Venezuela and Cabo Verde are also not parties to the Convention. *See* United Nations Treaty Collection, Status of Convention on Special Missions (Oct. 31, 2022), https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=III-9&chapter=3&clang=_en.

The Convention defines the term "special mission" as "a temporary mission, representing the State, which is sent by one State to another State with the consent of the latter for the purpose of dealing with it on specific questions or of performing in relation to it a specific task." Convention on Special Missions, Art. 1(a). The Convention also distinguishes a "special mission" from a "permanent diplomatic mission" which is defined as "a diplomatic mission within the meaning of the Vienna Convention on Diplomatic Relations." *Id.* at 1(b).

Even though the Convention on Special Missions does not fully reflect customary international law, customary international law does provide certain immunities for high-level officials traveling on a special mission in the receiving state, so long as the receiving state consents to the special mission. Such immunities may not be unilaterally established by the sending state, but instead must be granted by the receiving state. *Weixum v. Xilai*, 568 F. Supp.2d 35, 38 (D.D.C 2008) ("According due deference to the Executive Branch, the Court will therefore defer to the Executive's determination that Minister Bo was immune from service of process for the duration of the special diplomatic mission."); *R (Freedom and Justice Party) v Secretary of State for Foreign and Commonwealth Affairs (Amnesty International intervening)*, [2018] EWCA Civ 1719 ¶ 135 (U.K.) (after the UK government approved a visiting Egyptian general and provided him immunity, the court ruled, in challenge to such immunity, that if a state accepts a member of a special mission, then they are obligated to grant them "immunity from arrest or detention (i.e. personal inviolability) and immunity from criminal proceedings for the duration of the special mission's visit."); *Khurts Bat v. Investigating Judge of the German Federal Court*, [2011] EWHC 2029 (Admin), [2013] QB 349 (Eng.) (Bat was the Head of the Office of National Security for the Mongolian government who visited the United Kingdom with the latter's knowledge; nonetheless, the court found that there was no formal or informal consent to Bat's visit as a special mission and as a result, he did not receive any immunities and it approved his extradition to Germany).

Customary international law also permits a transiting state to provide protections to a member of a special mission while transiting that state while proceeding to take up the functions

of the special mission or upon returning to the sending state. As is the case with the establishment of a special mission, there must be some form of consent from the transiting state to provide this transit immunity. Although there is generally a paucity of state practice relating to special missions travelling through third States, a decision of the UK courts on special mission transit immunity emphasizes the necessity of consent of the transit state. In *R v Governor of Pentonville Prison, Ex parte Teja* [1971] 2 QB 274 (U.K.), a purported diplomat on special mission was detained for extradition to India during transit through the United Kingdom. The representative was in transit through the United Kingdom when he was detained for extradition to India. The court, in ruling that extradition was permissible, found the representative was not accredited to the United Kingdom and noted "immunity depends on mutual agreement ...." *Ex parte Teja*, 2 QB at 282.

There are two noteworthy aspects of this transit immunity that flow from the requirement of consent. First, the transit immunity right for a member of a special mission is different from the transit immunity under the VCDR for diplomatic agents of permanent diplomatic missions. The former requires the consent of the transiting state; the latter does not (unless a passport visa was necessary). Second, while Article 42 of the Convention on Special Missions imposes more requirements than the VCDR to establish transit immunity (e.g. the transiting state must be (1) informed in advance of the transit and (2) not object), that provision does not fully reflect customary international law. There was a substantive debate within the International Law Commission as to whether consent had to be explicit or could be inferred, reflecting considerable disagreement as to the specific language of Article 42. Immunities of Special Missions, 65-66 (Michael Wood, Andrew Sanger, and the Council of Europe eds., 2019 (noting that an amendment by the United Kingdom to add a requirement that the transit state consent to the travel was rejected by 34 votes to 30, with 20 abstentions). The importance of consent was emphasized by the Commission's acknowledgment in its commentary that "a third State is not obliged to give its consent to the transit of special missions and their members through its territory."  Int'l Law Comm'n, Rep. on the Work of Its Nineteenth Session, U.N. Doc. A/6709/Rev. 1 at 22 (1967).

Given the disagreement between states as to the specific formulation of Article 42 in the Special Missions Convention, the specific provision cannot be viewed as reflecting customary international law. *See* Michael Wood, The Immunity of Official Visitors, 16 Max Planck U.N.Y.B. 35, 60 (noting that not all, or even most, of the provisions of the Special Missions Convention reflected customary international law at the time of the Convention's adoption). At most, customary international law reflects the principle that a transit State must consent to the transit of a member of a special mission through its territory.

## ARGUMENT

SAAB MORAN's claims of immunity have already been fully litigated and denied in Cabo Verde, where he was initially detained. During those proceedings, the Cabo Verdean courts considered and rejected SAAB MORAN's claims of immunity, including his argument that he was entitled to immunity because he was in Cabo Verde in transit to Iran as a purported diplomat for the Maduro regime. As previously briefed to this Court in the government's Response in Opposition to Defendant's Motion to Vacate Order Conferring Fugitive Status and for Leave for Special Appearance to Challenge Indictment [DE 24], SAAB MORAN has no diplomatic status in the United States. Nor should this Court depart from Eleventh Circuit precedent and second guess the legitimacy of a foreign country's decision to extradite an individual which would be contrary to the Act of State Doctrine. *Knowles*, 390 Fed.Appx. at 928.

The appropriate analysis for the Court at this juncture is whether its exercise of jurisdiction over SAAB MORAN would violate his due process. The government submits that there is no set of facts related to SAAB MORAN's purported diplomatic status that could give rise to such a violation. *See Alvarez-Machain*, 504 U.S. at 662, 670. In addition, there is no reliable evidence to prove SAAB MORAN was officially named a "special envoy" by Jorge Arreaza Montserrat or Nicolas Maduro based on the documents submitted by SAAB MORAN that were attached to his Motion. His purported diplomatic passport was never presented to the Cabo Verde authorities during his transit through the country. The online Gaceta that his counsel had previously provided

13

to the government stating SAAB MORAN had been named a special envoy by Maduro is directly refuted by the same numbered edition of that Gaceta housed at the Library of Congress, which does not reference SAAB MORAN in any way. Not only does he lack any reliable evidence to prove that he was a "special envoy" or "diplomatic agent" on a diplomatic mission from Venezuela to Iran, but SAAB MORAN has not satisfied the elements for transit immunity under either the VCDR or customary international law.

1. _SAAB MORAN Has No Diplomatic Status in the United States and Does Not Benefit from Diplomatic Immunity while in the United States_

Even if the Court were to find that SAAB MORAN was a head of mission or "special envoy" to Iran for the Maduro regime of Venezuela, which as argued further below, it should not, SAAB MORAN cannot claim any valid diplomatic immunity in the United States.

A.   Non-Recognition of the Maduro Regime

As an initial matter, the United States does not recognize the Maduro regime as the government of Venezuela and does not recognize members of the Maduro regime as diplomatic representatives of Venezuela.  *See* U.S. Department of State, U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaido, https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido (recognizing Guaido as interim President of Venezuela). Nor is the United States required to change its recognition policy to provide in transit immunity to an individual allegedly appointed as a "special envoy" by the Maduro regime. *See Petroleos De Venez. S.A. v. Mufg Union Bank, N.A.*, 495 F. Supp. 3d 257, 272-73 (S.D.N.Y. 2020) (holding that Executive branch has authority to recognize a foreign government that binds the courts and that recognition of "Guaido as legitimate necessarily means that the Maduro regime is and was illegitimate."). These facts alone are dispositive of SAAB MORAN's meritless claim of transit immunity while in the United States. As a leading authority on the VCDR has noted, "where the transit State...does not recognize as a government the authorities who accredited the diplomat, it will in consequence not regard that person as a

diplomatic agent at all, so that it will not regard itself as bound by the duties in Article 40 so far as he is concerned."  Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations,* 370-371 (4th ed. 2016). If the Court were to decide that SAAB MORAN is a diplomatic agent, it would intrude on the President's exclusive authority to recognize a foreign government. *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2089 (2015).

SAAB MORAN argues that the United States' non-recognition of the Maduro regime as the government of Venezuela does not deprive SAAB MORAN of immunity. Motion at 21-26. In support of this position, SAAB MORAN argues that neither a "change in government, nor a break in diplomatic relations, relieves a state of its legal obligations" under a treaty. *Id*. at 21 (citations omitted).[10] This argument is irrelevant. The United States does not argue that it has no obligations under the VCDR generally or that it no longer has diplomatic relations with Venezuela. In fact, the United States recognizes the Guaido government of Venezuela, Venezuela continues to maintain an Embassy in the United States, and the United States continues to have obligations under the VCDR with respect to the accredited members of that diplomatic mission. It does not, however, recognize the Maduro regime or members of the Maduro regime. SAAB MORAN's claim that he was sent on a special mission as a special envoy to Iran to negotiate specific transactions on behalf of the Maduro regime accords him no diplomatic immunity in the United

---

[10] SAAB MORAN's Motion cites to a few cases in support of its argument that the United States continues to recognize the Maduro regime and its Ministry of Foreign Affairs. Motion at 18, fn 16, *id.* at 24-25; *see, e.g., Isaac Indus., Inc. v. Petroquimica de Venezuela, S.A. et al.*, No. 19-23113-CIV-Scola/Goodman, 2022 WL 820376 (S.D. Fla. Mar. 1, 2022); *Uribe v. Luque*, No. 8:21-cv-934, 2021 WL 3518154 (M.D. Fla. May 3, 2021); *Koch Minerals Sari v. Venezuela*, 514 F. Supp. 3d 20, 37 (D.D.C. 2020). Two of these cases relate to Venezuela's designation of the Ministry of Foreign Affairs as the "central authority" under the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (and the third similarly concerns the Ministry's designation as the "central authority" under another Hague Convention pertaining to international child abduction). The cases do not indicate that the United States has recognized the Maduro regime as the government of Venezuela. Notably, in recent instances where service of process on Venezuela has occurred through *diplomatic channels* pursuant to 28 U.S.C. 1608(a)(4), the Department of State has executed service by sending a diplomatic note to the Embassy of Venezuela in the United States. *See, e.g.*, Return of Service/Affidavit, *ConocoPhillips Petrozuata B.V. v. Bolivarian Republic of Venez.*, No. 19-cv-683 (D.D.C. Jan. 16, 2020).

States because he was not doing so as a special envoy of the Venezuelan government recognized by the United States. *See, e.g.*, *United States v. Cordones*, 2022 WL 815229, \*4-7 (S.D.N.Y. 2022) (holding an official of the Maduro regime was not entitled to foreign official immunity because the Executive does not recognize the Maduro regime and "the Executive Branch has manifested its intent that no immunity applies.").

    B.  <u>Lack of State Department Certification</u>

    Moreover, merely being a diplomat from one country to another (non-U.S. country) does not afford any immunity from prosecution by the United States for violating the laws of the United States, let alone immunity for crimes committed prior to SAAB MORAN's alleged appointment as "special envoy," or any other alleged immunity. Despite his claims that he is a diplomat or "special envoy," SAAB MORAN does not enjoy immunity in the United States under the Diplomatic Relations Act, 22 U.S.C. §§ 254a-254e. The Diplomatic Relations Act requires dismissal of actions brought against individuals entitled to diplomatic immunity. 22 U.S.C. §§ 254d ("Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under sections 254b or 254c of this title, or under any other laws extending diplomatic privileges and immunities, shall be dismissed. Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure").

    However, SAAB MORAN has never been entitled to such immunity. As noted by the attached Exhibit 5, SAAB MORAN has never been notified to the Department of State as a member of any foreign mission in the United States, including Venezuela's bilateral mission, the Delegation of the African Union Mission at Washington, DC, or the Office of the Permanent Observer for the African Union to the United Nations, or as a representative in or to any designated international organization. Exhibit 5. As such, the Department of State "Office of Foreign Missions is not aware of a basis for Alex Nain SAAB MORAN to enjoy immunity from the criminal or civil jurisdiction of the United States." *Id.* "[C]ourts have generally accepted as conclusive the views

of the State Department as to the fact of diplomatic status." *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328, 1331 (11th Cir. 1984) (citing *Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949)); *see also In re Baiz*, 135 U.S. 403, 432 (1890) (The Court noted that it does "not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister, and therefore have the right to accept the certificate of the State Department that a party is or is not a privileged person ...."); 22 U.S.C. § 2656 (Secretary of State's responsibility to manage foreign affairs). Courts generally defer to the "Executive Branch's suggestion of immunity" as it is "influenced by the longstanding reluctance of the Judicial Branch to intrude into the conduct of foreign affairs, a matter exclusively vested in the Executive Branch by our Founding Fathers."   *Weixum*, 568 F. Supp.2d at 38 (*citing Mexico v. Hoffman*, 324 U.S. 30, 35, 65 S.Ct. 530, 89 L.Ed. 729 (1945)).

Whether SAAB MORAN is a special envoy with diplomatic immunity protections is a factual question. SAAB MORAN's Motion argues that the United States view on this factual question is irrelevant because it is neither the sending nor the receiving state. The United States is, crucially, the state from which SAAB MORAN seeks immunity. Further, SAAB MORAN's Motion concedes that the State Department deserves deference in the *fact* of diplomatic status. *See* Motion at 33 (*citing In re Baiz*, 135 U.S. at 421). Indeed, the very cases cited by SAAB MORAN make clear that where there is a factual question of diplomatic status, the State Department's recognition (or lack thereof) is unreviewable. *See In re Baiz*, 135 U.S. at ("the certificate of the secretary of state…is the best evidence to prove the diplomatic character of a person accredited"); *Id.* at 432 ("we do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister"); *United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004) (holding the "State Department's certification…is conclusive evidence as to the diplomatic status of an individual" and the Court "will not review the State Department's factual determination"); *Abdulaziz*, 741 F.2d at 1331 ("[C]ourts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status."); *see*

*also Weixum*, 568 F. Supp.2d at 37-38 (according the Executive branch deference in determining whether an individual was protected by immunity); *Sissoko*, 995 F. Supp. at 1471 (finding an individual was not protected by diplomatic immunity in the absence of certification by the State Department).

    C.   <u>Lack of Status Under VCDR</u>

Even if the Court were to find that SAAB MORAN was a "special envoy," the term itself does not grant protection under the VCDR. The VCDR only applies to accredited members of a foreign state's permanent diplomatic mission. It is clear as a factual matter that SAAB MORAN was not an accredited member of Venezuela's permanent diplomatic mission and therefore would not be entitled to the immunities afforded by the VCDR. Instead, he travelled on a temporary visit to Iran, in whatever role he travelled in for the Maduro regime, and not "to take up or return to his post" in Iran as required by Article 40 of the VCDR in order to benefit from transit immunity. *See* [DE 149-2] (referencing two prior trips to Iran by SAAB MORAN, two seven-day trips, and a third trip for SAAB MORAN in June 2020); [DE 149-6] (referencing SAAB MORAN's "stay in Iran"); and [DE 149-7] (confirming "the dates of 13 to 16 June for" SAAB MORAN's visit to Iran). By his own admission, his travel from Venezuela to Iran was a short visit to purportedly meet with Iranian government officials to discuss the sale of oil and potential assistance in the Maduro regime's efforts to combat COVID-19. [DE 149-6, 149-7].

SAAB MORAN attempts to confuse the court by noting that he was designated as a "special envoy" and "envoy" is a term used under the VCDR. Article 14 of the VCDR does reference "envoys" accredited to Heads of State as one of three classes of "heads of missions." However, SAAB MORAN's travel for a discrete meeting for a specific purpose does not accord him status as the head of a permanent post or mission under Article 14 of the VCDR. In addition, the Maduro Regime already had appointed an Ambassador to Iran at the time of SAAB MORAN's detention, *see* Exhibit 6 Venezuela Official Gaceta No. 41.527 (Nov. 19, 2018) (naming Carlos Antonio Alcata Cordonea Maduro regime Ambassador to the Islamic Republic of Iran). Further,

SAAB MORAN was never notified as a member of the permanent diplomatic mission to Iran. Therefore, he could not have been taking up or returning to his "post" and the VCDR does not provide SAAB MORAN with any transit immunity during his temporary travel to Iran.

"Post" as used in the VCDR must refer to a foreign state's permanent diplomatic mission in a country, not short trips or "special missions."  The term "diplomatic agent" under the VCDR includes the head of the mission and members of the diplomatic staff of that mission. VCRD Art. 1(e), *see also* U.S. Department of State, Office of Foreign Missions, Diplomatic and Consular Immunity, Guidance for Law Enforcement and Judicial Authorities at 6 (defining "members of diplomatic missions" as "the staffs of diplomatic missions (embassies)"). And while the VCDR does not expressly define the term "mission," the context of the treaty makes clear that it is addressing permanent diplomatic missions. *See* Article 2 ("The establishment of diplomatic relations between States, and of permanent diplomatic missions, takes place by mutual consent."). In addition, a reading of Article 20 of the VCDR helps clarify that the term mission would be a permanent embassy or consulate in a foreign country – "[t]he mission and its head shall have the right to use the flag and emblem of the sending State on the premises of the mission, including the residence of the head of the mission, and on his means of transport."  VCDR, Art. 20.

The Convention on Special Missions also confirms that the VCDR addresses permanent diplomatic missions and not the temporary missions covered by the Special Missions Convention. The definition of "post" as a permanent mission in a country is supported by the fact that the Convention on Special Missions was drafted to specifically address temporary diplomatic missions not covered by the VCDR. Convention on Special Missions Preamble ("<u>Believing</u> that an international convention on special missions would complement those two Conventions [VCDR and the Vienna Convention on Consular Relations] and would contribute to the development of friendly relations among nations, whatever their constitutional and social systems.") (emphasis in original). Article 1 of the Convention on Special Missions specifically distinguishes between a "special mission," which is a temporary mission, and a "permanent diplomatic mission" which the

Convention defines as "a diplomatic mission within the meaning of the Vienna Convention on Diplomatic Relations."

This definition of "post" is also clear from a straightforward reading of cases cited by SAAB MORAN. *See Bergman v. De Sieyes*, 170 F.2d 360 (2d Cir. 1948); *see also United States v. Rosal*, 191 F. Supp. 663, 664 (S.D.N.Y. 1960)("Furthermore, under the common law of nations, diplomats-in-transit (although not accredited to the United States) are entitled to immunity when they are in the United States en route between their diplomatic posts and their respective home countries."); *United States v. Melekh*, 190 F. Supp. 67 (S.D.N.Y. 1960) (holding that the defendant did not have diplomatic status and did not qualify as a diplomatic agent as he was an employee of the United Nations and not a representative of his country).

SAAB MORAN's Motion also incorrectly argues that the Eleventh Circuit has held the title of "special envoy" qualifies an individual as a diplomatic agent under the VCDR. Motion at 17 (*citing Abdulaziz*, 741 F.2d at 1331). This mischaracterizes the Eleventh Circuit's opinion. *Abdulaziz* does not hold that anyone with the title "special envoy" is entitled to protection under the VCDR. It merely holds that the phrase itself is not dispositive and simply "reflects the designation provided by the sending state." *Abdulaziz*, 741 F.2d at 1331. "[T]he State Department has broad discretion to classify diplomats. The broadness in the language of the Vienna Convention is necessary, since it is the foreign country that actually ranks its envoys, not the State Department." *Id*. In determining the appropriate protection to provide to the particular "special envoy" in that case, the court looked to the certification of the State Department. *Id*. The State Department certified that Prince Abdulaziz, a member of the ruling family of Saudi Arabia, "was entitled to immunity." *Id*. The court, therefore, appropriately held he was, as a "special envoy" entitled to immunity under the VCDR.[11]  SAAB MORAN also cites *United States v. Khobragade*,

---

[11] SAAB MORAN's Motion states that Prince Abdulaziz was not attached to Saudi Arabia's permanent embassy in the United States but that does not appear clear from the text of the opinion. The opinion merely states Prince Abdulaziz was eligible for but had not been granted diplomatic status at one point and the Embassy of Saudi Arabia later notified the State Department of his

15 F. Supp. 3d 383 (S.D.N.Y. 2014). In that case the court made clear that Khobragade enjoyed immunity under the UN Convention on Privileges and Immunities as a "diplomatic envoy" (a term used by that convention and the VCDR) by "virtue of her assignment as Counselor at the Permanent Mission of India." *Id.* at 386, n. 20.

Further, the government notes that SAAB MORAN claims privileges and immunities under the VCDR in circumstances where similarly situated United States diplomats, including special envoys, do not necessarily enjoy privileges and immunities under the VCDR. In order to benefit from privileges and immunities under the VCDR, U.S. diplomats must be accredited as members of a permanent U.S. diplomatic mission to a foreign state. 2 Foreign Affairs Manual 221.1, *available at* https://fam.state.gov/fam/02fam/02fam0220.html. Further, U.S. policy is to seek privileges and immunities under the VCDR only for those diplomats who are assigned to official duty at the U.S. diplomatic mission for at least 90 days consecutive duration; physically reside at post; and generally, work on the premises of the diplomatic mission. *Id.*

Appointing a diplomat as a "special envoy" does not automatically mean that the diplomat benefits from privileges and immunities under the VCDR. Instead, whether an individual benefits from privileges and immunities as a diplomatic agent under the VCDR turns on whether that individual is accredited as a member of a permanent diplomatic mission. The United States has on many occasions appointed individuals as "Special Envoys" with responsibility for some specific region or foreign policy issue and those special envoys are usually not assigned to a U.S. diplomatic mission abroad, but are based out of the United States. A U.S. Special Envoy based in Washington, D.C., for example, who was not accredited at a permanent U.S. diplomatic mission, would not benefit from privileges and immunities under the VCDR, even when that Special Envoy temporarily traveled on a diplomatic passport to a foreign state in connection with the Special Envoy's diplomatic assignment.

---

diplomatic status, which was granted by the State Department. *Compare* Motion at 17 *with Abdulaziz*, 741 F.2d at 1331.

The same documents SAAB MORAN cites in support of his Motion make clear he was not an accredited member of Venezuela's permanent diplomatic mission to Iran. At best, he was on a short-term special mission. Consequently, he is not afforded any immunity under the VCDR.

D.  Lack of Transit Immunity under VCDR

Unable to establish that he has any diplomatic status in the United States, SAAB MORAN instead incorrectly asserts that he is entitled to transit immunity under the DRA, the VCDR, and the VCLT. Def.'s Motion to Dismiss, at 4. We note at the outset that even where Article 40 of the VCDR does apply, the transit state is only required to accord a diplomatic agent "inviolability and such other immunities as may be required to ensure his transit or return."[12]  Article 40 does not provide for full criminal immunity in the transit state, require that the transit state dismiss (or not bring) criminal charges against the diplomatic agent, or speak at all to the diplomatic agent's guilt, innocence, or punishment. Article 40 is simply designed to facilitate the travel of a diplomat to and from the diplomat's home country and diplomatic posting.

Even if this Court failed to follow the well-established precedent that U.S. Courts do not review a foreign state's decision concerning its own obligations to afford diplomatic immunity, argued more fully below, and if the Court then recognized a diplomatic agent appointed by a regime that the United States does not recognize as the government of a foreign state, Article 40 of the VCDR still would not provide transit immunity to SAAB MORAN in this case. SAAB MORAN cannot in any meaningful sense be considered for purposes of Article 40 to be passing through the United States while proceeding to take up a purported diplomatic post in Iran. He is in the United States not as part of his travel to Iran, but because he was extradited to the United States by Cabo Verde for criminal violations of U.S. law after being accorded extensive judicial process

---

[12] Article 40 of the VCDR provides in pertinent part that "[i]f a diplomatic agent passes through or is in the territory of a third State, which has granted him a passport visa if such visa was necessary, ***while proceeding to take up or to return to his post, or when returning to his own country***, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return." (emphasis added.)

including an exhaustive appeal process. To the extent SAAB MORAN argues that his extradition to face criminal proceedings in the United States was as a mere detour in his transit to his purported diplomatic posting in Iran, the transit protections afforded by Article 40 only apply if the transit State (here the United States) has granted the diplomatic agent "a passport visa if such visa was necessary." SAAB MORAN has not obtained such a visa for transit through the United States and as a citizen of Colombia and Venezuela, he would need a visa to transit through the United States. SAAB MORAN argues the United States waived this requirement by extraditing SAAB MORAN. Motion at 31. He cites no law or facts to support this waiver claim. No such waiver occurred. SAAB MORAN's immunity argument is therefore not supported by the very provision of the VCDR which he relies upon for his immunity claim.

2. *SAAB MORAN Does Not Qualify for Transit Immunity Under Customary International Law*

As discussed in greater detail below, the Cabo Verdean courts have already considered SAAB MORAN's diplomatic immunity claims as part of the extradition process. Any transit immunity to which SAAB MORAN could possibly enjoy in the United States must be an extension of the transit immunity he enjoyed when transiting Cabo Verde. Yet, the Cabo Verde courts did not find that Cabo Verde had an obligation under international law to afford SAAB MORAN the immunity which he now seeks in the United States.[13] For a U.S. court to now determine that SAAB MORAN is entitled to transit immunity under international law would necessarily involve the U.S. court second guessing Cabo Verde's own determinations about whether Cabo Verde had any international obligations to afford immunity to SAAB MORAN.

---

[13] SAAB MORAN asserts that "the Cape Verde courts considered only Mr. Saab's claim to immunity under the [Convention on Special Missions]." Motion at 37. To the extent that SAAB MORAN did not even advance an argument before Cabo Verde's courts that he was that he was entitled to transit immunity under the VCDR, this court should be particularly skeptical of his attempt to assert, post-extradition, VCDR protections.

Moreover, SAAB MORAN was, at best, on some type of short-term mission for Venezuela. But not all agents of the government qualify for immunities under customary international law and SAAB MORAN also would not benefit from transit immunity under customary international law.

A.   Convention on Special Missions and Customary International Law

As SAAB MORAN concedes, the United States is not a party to the Convention on Special Missions. [DE 147 at 20]. In support of his position that the Court should, nevertheless, follow the Convention on Special Missions as customary international law, SAAB MORAN searches across the Atlantic and cites to a single case from the Court of Appeal of England and Wales (civil division) that does not even address the issue of transit immunity.[14]  Motion at 20. In doing so, he completely ignores a case directly on point from within the Southern District of Florida. In *United States v. Sissoko*, 995 F.Supp. 1469 (S.D. Fla. 1997) (Moore, J.), the court did "not find that the U.N. Convention on Special Missions is 'customary international law' that binds this Court." *Id.* at 1471. The court reasoned that "[n]either the United States nor The Gambia are signatories to the convention." *Id*. Nor had any "of the members of the U.N. Security Council" signed the convention. *Id*.[15] While certain provisions of the Convention may reflect customary international law, it is clear that the Convention in its entirety does not constitute customary international law. *Sissoko*, 995 F.Supp. at 1471 (noting "resistance to the tenets of the convention such that it is not yet 'customary international law.'" (citations omitted)). And specifically concerning the Convention on Special Missions provision on transit immunity, that provision was subject to

---

[14]  SAAB MORAN's Motion generally conflates the protections under the VCDR and the Convention on Special Missions. The Motion's arguments and citations generally relate to protections for diplomats under the VCDR, which is inapplicable to SAAB MORAN. His arguments and citations regarding transit immunity are similarly predicated on VCDR based immunity. Consequently, these arguments and citations are largely irrelevant and do nothing to support the position that SAAB MORAN would be protected by any immunity.

[15] More than twenty years after *Sissoko* was decided, no members of the U.N. Security Council have yet to sign on to the convention. *See* Status of Convention on Special Missions, *supra* at pg. 10.

significant disagreement during negotiations of the Convention and cannot be viewed as fully reflecting customary international law. *Supra* at pg. 10.

Not only is the Convention on Special Missions not considered customary international law for determining if special missions transit immunity applies to diplomats on a special mission, but in any case, the transit State must be "informed in advance, either in the visa application or by notification, of the transit of those persons as members of the special mission, members of their families or couriers, and has raised no objection to it." Convention on Special Missions, Art. 42(4).

As argued below, there is serious question as to whether SAAB MORAN was a "special envoy" or diplomat for the Maduro regime on a special mission as of June 12, 2020. Regardless, he cannot qualify for transit immunity under customary international law because the Cabo Verdean Supreme Court of Justice found that "there is no evidence in the record to date that the State of Cabo Verde has consented to the Appellant's transit through its territory with the status of special envoy," and did not "recognize the status of Special Envoy to the Appellant," and found that SAAB MORAN did "not enjoy the inviolability and immunities to which he claims, based on the 1969 UN Convention on Special Missions."[16] Exhibit 1, Judgment No. 28/2021 at 33. In fact, Cabo Verde has submitted a Certificate of No Record for any notice by the Maduro regime of SAAB MORAN's transit through Cabo Verde for his transit to Iran. *See* Exhibit 7. Therefore, he would not have any transit immunity under customary international law.

B.  Force Majeure

SAAB MORAN argues, alternatively, that he should be protected via transit immunity under the *force majeure* provisions of the VCDR or Convention on Special Mission because he made a refueling stop in Cabo Verde and was extradited against his will. Motion at 31. First, this argument is meritless as the VCDR does not apply to SAAB MORAN and the United States is not

---

[16]  SAAB MORAN argues that he was "issued a visa at the Cape Verde airport" but provides no evidence of this visa. Further, since SAAB MORAN was not travelling on a diplomatic or official passport at the time of his capture, it seems implausible that any such visa would contemplate any relevant immunity.

bound by the Convention on Special Missions. Further, even if any of these protections did apply, SAAB MORAN would not be protected by any force majeure provision. Force majeure describes "[a]n event or effect that can be neither anticipated nor controlled." Black's Law Dictionary 718 (9th ed. 2009). The refueling stop that led to SAAB MORAN's arrest in Cabo Verde was a planned refueling stop. SAAB MORAN could have provided notice of his travel but choose not to. His aircraft could have chosen another destination for the stop.

SAAB MORAN's extradition was based on an indictment made public in July 2019, after which SAAB MORAN was declared a fugitive and a reward was made public for his arrest. SAAB MORAN's argument that his eventual arrest and extradition to the United States was an unanticipated event is false. SAAB MORAN may have hoped he could evade the law but that does not bring his extradition under the gambit of force majeure. Force Majeure does not apply.

3.  *The Act-of-State Doctrine Bars the Court from Reviewing a Foreign Country's Extradition Decision*

Following his arrest in Cabo Verde, SAAB MORAN fully litigated his diplomatic immunity claims throughout an approximately 16-months long extradition process before the Cabo Verde judicial system. This included appeals to Cabo Verde's highest court. During the process, SAAB MORAN was assisted by his choice of counsel and the resources of the Maduro regime. At the conclusion of the 16-month process, the Constitutional Court of Cabo Verde denied the last of SAAB MORAN's appeals and certified the completion of the proceedings regarding his extradition to the United States. *See* Exhibit 2, *Alex Nain Saab Moran v. Supreme Court of Justice*, No. 39/2021, Ruling of Constitutional Court on Extradition of Alex Nain Saab Moran (Cabo Verde Sept. 7, 2021); *see also* Exhibit 1, *Alex Nain Saab Moran v. Barlavento Court of Appeal*, No. 28/2021, Judgment of Supreme Court of Justice on the Extradition of Alex Nain Saab Moran (Cabo Verde Mar. 17, 2021). The Cabo Verde Minister of Justice then ordered his extradition, resulting in SAAB MORAN's arrival in the United States on October 16, 2021. This Court should reject

SAAB MORAN's invitation to second guess Cabo Verde's analysis of its own laws and ultimate decision to execute his extradition.

"The act of state doctrine, which 'rests at last upon the highest considerations of international comity and expediency,' 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *Knowles*, 390 Fed.Appx. at 928 (*quoting Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 417–18, 84 S.Ct. 923, 926, 935, 11 L.Ed.2d 804 (1964)). "Under the doctrine, an official act of a foreign sovereign performed within its own territory thus 'must be accepted by our courts as a rule for their decision.'" *Knowles*, 390 Fed.Appx. at 928 (*quoting Ricaud v. Amer. Metal Co*., 246 U.S. 304, 309, 38 S.Ct. 312, 314, 62 L.Ed. 733 (1918)).

The decision to extradite an individual from a country is an official act by a foreign sovereign. *See Knowles*, 390 Fed.Appx. at 928 ("we conclude that the Ministry of Foreign Affairs' consent to Knowles' extradition in Case 524 was an 'official act of a foreign sovereign'"); *see also United States v. Trabelsi*, 28 F.4th 1291, 1299-1300 (D.C. Cir. 2022) ("the final decision in terms of extradition is taken solely by the Government; this is a sovereign act"); *Reyes-Vasquez v. U.S. Atty. Gen.*, 304 Fed. Appx. 33, 36 (3d Cir. 2008) (presidential decree extraditing individual is an "official act of a foreign sovereign"). Courts must abstain from questioning the validity of "official acts of a foreign sovereign" under the dictates of the act of state doctrine. *Knowles*, 390 Fed.Appx. at 928 (*citing W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 405, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990).

In *Knowles*, the Eleventh Circuit refused to second guess Bahamian authorities in authorizing an extradition, holding that doing so "would ... require a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory," and that "the act of state doctrine applies and prohibits us from evaluating the legitimacy of Knowles' extradition." *Knowles*, 390 Fed.Appx. at 928 (*citing W.S. Kirkpatrick*, 493 U.S. at 405, 110 S.Ct. at 706 (quotation marks omitted). "Accordingly, Knowles' challenge to his extradition must fail."

*Id.* Similarly, any challenge SAAB MORAN makes to his extradition or consequent legal status in the United States must also fail.

Courts across the country have held the act of state doctrine precludes courts from reviewing a foreign sovereign's extradition decision. *See United States v. Trabelsi*, 28 F.4th at 1299-1300 (giving deference to Belgian executive's extradition order pursuant to act-of-state doctrine); *Graham v. Young*, 886 F.3d 700, 704-05 (8th Cir. 2018) (stating, in dicta, that review of a foreign country's dual criminality determination would violate the act-of-state doctrine); *Reyes-Vasquez*, 304 F. App'x at 36 (holding that decree by President of the Dominican Republic granting extradition is not reviewable as a "public act[] a recognized sovereign power committed within its own territory" within the meaning of the act-of-state doctrine); *United States v. Merit*, 962 F.2d 917, 921 (9th Cir. 1992) (relying on act-of-state doctrine to reject defendant's argument that extradition was procedurally improper because South Africa's executive surrendered him without issuing a warrant).

To the extent the act of state doctrine does not apply to a particular extradition challenge, courts still generally defer to a foreign government's decision to extradite a defendant to the United States. *See Garcia-Godos v. Warden*, 853 F. App'x 404, 407 (11th Cir. 2021) (noting that: "In *Johnson* [*v. Browne*, 205 U.S. 309 (1907)], the Supreme Court stated that the decision as to whether the extradited defendant's crime was an extraditable offense under the extradition treaty between the United States and Canada "was a matter for the decision of the [Canadian] authorities." 205 U.S. at 316); *United States v. Garavito-Garcia*, 827 F.3d 242, 247 (2d Cir. 2016) (recognizing that "[i]t is well established that, 'although courts of the United States have authority to determine . . . whether an accused should be extradited from the United States, . . . our courts cannot second-guess another country's grant of extradition to the United States'") (citation omitted); *United States v. Campbell*, 300 F.3d 202, 209-10 (2d Cir. 2002) ("interpret[ing] *Johnson v. Browne* to mean that our courts cannot second-guess another country's grant of extradition to the United States,"); *Casey v. Dep't of State*, 980 F.2d 1472, 1476-78 (D.C. Cir. 1992) (concluding

that "it seems clear to us that, at a minimum, *Johnson* means that an American court must give great deference to the determination of the foreign court in an extradition proceeding,"); *United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir. 1987) ("defer[ring] to the Swiss Federal Tribunal's decision as to Van Cauwenberghe's extraditability under the Treaty"); *McGann v. U.S. Bd. Of Parole*, 488 F.2d 39, 40 (3d Cir. 1973) ("The holding of *Johnson v. Browne* . . . precludes any review of the Jamaican court's decision as to the extraditable nature of the offense . . . .").

Here, where SAAB MORAN was extradited pursuant to Cabo Verdean law, as opposed to a treaty between the United States and Cabo Verde, there is particularly salient cause to defer to Cabo Verde's analysis of its own laws. *See* Exhibits 1 and 2; *see also Grin v. Shine,* 187 U.S. 181, 185, 190 (1902) ("[I]t can hardly be expected of us that we should become conversant with the criminal laws of [the requesting country], or with the forms of warrants of arrest used [in that country] for the apprehension of criminals."); *Cornea v. U.S. Att'y Gen.,* 771 F. App'x 944, 947 (11th Cir. 2019) (relying on the "authoritative statement" provided by the Greek government regarding its criminal procedure law to conclude that extradition was not barred under the relevant treaty's lapse-of-time provision); *Basic v. Steck,* 819 F.3d 897, 901 (6th Cir. 2016) (in an extradition case, refusing to "second guess [Bosnia's] determination" that documents amounted to valid warrant); *Skaftouros v. United States,* 667 F.3d 144, 156, 160 n.20 (2d Cir. 2011) (in an extradition case, noting that "[a]ny argument[s] regarding the [foreign] country's compliance with its own laws . . . are properly reserved for the courts of that country," and that "we defer to the Greek courts, which may consider whether Skaftouros or the Greek prosecutors have the better of the argument" regarding whether a Greek arrest warrant was invalid as a matter of Greek law); *Spatola v. United States,* 925 F.2d 615, 618 (2d Cir. 1991) (when reviewing a foreign court's judgment of conviction in an extradition case, noting that, "when possible, the decisions of foreign tribunals should be given effect in domestic courts") (citation omitted); *In re Assarsson,* 635 F.2d 1237, 1244 (7th Cir. 1980) ("refus[ing] to review [Sweden's] compliance with [its] criminal procedure").

Similarly here, SAAB MORAN's attempt to relitigate his extradition must fail. Regardless of his self-professed role as a diplomat, head of mission, or special envoy, SAAB MORAN was extradited from Cabo Verde to the United States following a process that Cabo Verdean courts affirmed were appropriate under applicable law. This process was approved by the Cabo Verde lower and appellate courts and finalized through action taken by the Cabo Verde Foreign Minister. *See* Exhibits 1 and 2.

The Cabo Verdean Supreme Court of Justice, in ruling on SAAB MORAN's claim of being a special envoy transiting through Cabo Verde on June 12, 2020 and his claim of transit immunity per customary international law and the Convention of Special Missions, held:

> What is reiterated is that there is no evidence in the record to date that the State of Cabo Verde has consented to the Appellant's transit through its territory with the status of special envoy.

> And, without such consent, the Cabo Verdean Courts cannot recognize the status of Special Envoy to the Appellant, which means that he does not enjoy the inviolability and immunities to which he claims, based on the 1969 UN Convention on Special Missions.

Exhibit 1, Judgment No. 28/2021 at 33. The Cabo Verdean Constitutional Court found that the Supreme Court of Justice did not violate the Cabo Verdean Constitution in ruling as such. Exhibit 2. Ruling No. 39/2021 at 106. The act of state doctrine precludes the Court from overturning these valid public acts of a foreign sovereign.

    4.   *SAAB MORAN's Extradition from Cabo Verde Did Not Violate His Due Process*

SAAB MORAN thoroughly litigated his sixteen-month extradition judicial process in Cabo Verde prior to his arrival in the United States, where he enjoys no immunity, *see* Exhibits 1 and 2, and cannot legitimately challenge his presence before the Court to face the criminal charge against him by claiming he did not receive proper due process. *See United States v. Alvarez-Machain*, 504 U.S. at 670 (concluding that, where there is no violation of an extradition treaty, "the court need not inquire as to how respondent came before it," and even a defendant's "forcible

abduction does not . . . prohibit his trial in a court in the United States for violations of the criminal laws of the United States").

SAAB MORAN's presence before the Court clearly falls within the *Ker-Frisbie* doctrine set by the United States Supreme Court and therefore, he has no legal challenge to his presence before the Court. *See United States v. Darby*, 744 F.2d 1508, 1530-31 (11th Cir. 1984) ("[T]he *Ker-Frisbie* doctrine…holds that a defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence."). The United States Supreme Court, in *Ker v. Illinois*, held that "forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offence, and presents no valid objection to his trial in such court." 119 U.S. 436, 444 (1886). In *Frisbie v. Collins*, the Supreme Court held that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction,'" and that "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." 342 U.S. 519, 522 (1952).

As SAAB MORAN went through an extensive judicial extradition process in Cabo Verde to arrive in the United States and appear before this Court, there is nothing that can be said to "shock the judicial conscience" or consist of outrageous government conduct that would require the Court to release him. *See United States v. Noriega*, 117 F.3d 1206, 1214 (11th Cir. 1997). Therefore, the Motion should be denied.

### 5. *SAAB MORAN Has Not Put Forth Reliable Evidence That He Was A Diplomatic Agent or Special Envoy*

Even if, *arguendo,* it were possible for an agent of the Maduro regime to enjoy immunity in the United States without the U.S. government's consent or recognition of the regime as the government of Venezuela, SAAB MORAN has failed to put forth sufficient, reliable evidence that he was in fact a "special envoy" or a "diplomatic agent" qualifying for immunity under the VCDR

or customary international law, and that his travel to Iran on June 12, 2020 qualified for such immunity. In support of his Motion's claim that he was a "special envoy," SAAB MORAN attaches his purported, **_expired_** diplomatic passport, [DE 149-1], which admittedly he was not traveling with on June 12, 2020, an accreditation letter from Jorge Arreazea Montserret naming him a "special envoy," [DE 148-1, Exhibit A], and several letters written by Maduro regime officials after his detention in Cabo Verde. *See e.g.*, [DE 149-9, 149-17, 149-18, 149-19].

First, SAAB MORAN's purported Venezuelan diplomatic passport has indicia of forgery. *Compare* [DE 149-1] *with* Exhibit 3. The picture of SAAB MORAN contained in the purported Venezuelan diplomatic passport is the same picture in the Venezuelan passport SAAB MORAN had in his possession upon his detention in Cabo Verde, despite the Venezuelan passport in SAAB MORAN's possession being issued one year and seven months prior to the issuance of the purported Venezuelan diplomatic passport. The signature for SAAB MORAN also appears to be exactly the same. *Compare* [DE 149-1] *with* Exhibit 3 (signatures on Colombian and Venezuelan passports vary slightly whereas signatures on SAAB MORAN's purported diplomatic passport [DE 149-1] and Venezuelan passport (Exhibit 3) appear identical). In light of the Motion's assertion that he had just traveled to Iran twice already in 2020, it is striking that he still had not been traveling with his diplomatic passport when he was detained by Cabo Verde.

Second, as noted above, SAAB MORAN has previously argued before the Eleventh Circuit, in support of his claim that he is a legitimately appointed special envoy entitled to immunity, that he was named as a "special envoy" in the official Venezuela Gaceta on April 26, 2018. *See* Oral Argument, United States v. Alex Saab Moran, at 29 minutes, 44 seconds, *supra* pg. 7. The undersigned counsel for the government requested counsel for SAAB MORAN provide the basis for this statement. Following multiple requests for the same, counsel for SAAB MORAN sent an email to the government on June 23, 2022, stating the relevant Gaceta could be found at: http://spgoin.imprentanacional.gob.ve/cgi-

win/be_alex.cgi?Documento=T028700024419/0&Nombrebd=spgoin&CodAsocDoc=2866&t04

=1&t05=png&Sesion=803364951. That online version of the Gaceta identifies SAAB MORAN as being appointed a Special Envoy. The government, however, became aware of another online version of that same Gaceta (No. 6.373 Extraordinario) that included no reference to SAAB MORAN but was otherwise exactly the same. *See* http://historico.tsj.gob.ve/gaceta_ext/abril/2642018/E-2642018-5246.pdf#page=1. Because of this discrepancy, the government sought out a copy of Official Gaceta No. 6,373 that was obtained or created close in time to April 26, 2018. A paper version of the Official Gaceta, No. 6,373 Extraordinaire was received by the Library of Congress in Washington, D.C. on June 27, 2018. Exhibit 4. The Official Gaceta does not mention SAAB MORAN. *Id*. The absence of any reference to SAAB MORAN's name or appointment as a "special envoy" in the contemporaneous paper copy of the Gaceta located in the Library of Congress casts serious doubt on SAAB MORAN's claim that he was validly appointed as a "special envoy" in April 2018. Further, it is evidence of an attempt by SAAB MORAN and the Maduro regime to *create* support for SAAB MORAN's alleged diplomatic status *after* he was arrested in Cabo Verde.

In his Motion, SAAB MORAN does not cite to that online link for the National Gaceta from April 26, 2018, which purportedly announced Maduro had named SAAB MORAN a "special envoy," that they have put forth to undersigned counsel and the Eleventh Circuit as evidence of SAAB MORAN's diplomatic stats. *See* Oral Argument, United States v. Alex Saab Moran, at 29 minutes, 44 seconds, *supra* pg. 7; Exhibit 8.[17] SAAB MORAN does not reference that Gaceta, because the government has proven that the online version of that Gaceta is contradicted by the reliable version of the same Gaceta found in the Library of Congress. Contrary to SAAB MORAN's insinuation that the government has never provided any reason to question SAAB MORAN's designation as a "special envoy" (Motion at 18), the government has provided counsel for SAAB MORAN other versions of that same Gaceta that include no reference to SAAB MORAN, and certainly no reference to his alleged appointment as a "special envoy." *See* Email

---

[17] Only relevant portions (referring to SAAB MORAN) translated into English.

to Counsel for SAAB MORAN dated June 24, 2022 attached as Exhibit 9[18] (including link to Gaceta and attaching Library of Congress Gaceta, neither of which include any reference to SAAB MORAN).

Third, most of the letters offered in support of his "special envoy" or diplomatic agent status, also support the government's argument that SAAB MORAN was not an appointed "special envoy" at the time of his arrest in Cabo Verde. None of the initial letters sent to Cabo Verde or INTERPOL in response to SAAB MORAN's detention in Cabo Verde refer to his as a "special envoy," including a letter written on June 13, 2020, hours after SAAB MORAN's detention in Cabo Verde, by Arreaza, Maduro's Minister of Popular Power for Foreign Relations, who allegedly accredited SAAB MORAN as a "special envoy" on April 8, 2019. *See* [DE 149-9, 149-17, 149-18, 149-19]; *see also* [DE 149-7] (June 8, 2020, verbal note from Iran regarding SAAB MORAN's upcoming travel refers to SAAB MORAN as "Distinguished Mr. Alex Nain Saab Moran" with no reference to "special envoy"). Arreaza, the very same Maduro regime official who supposedly accredited SAAB MORAN as a "special enjoy," did not refer to SAAB MORAN by that title, or supply his diplomatic passport number, or reference the accreditation letter hours after his supposed unlawful detention. *Compare* [DE 149-17] *with* [DE 148-1, Exhibit A]. These facts refute SAAB MORAN's claim that he was accredited as a "special envoy". These facts instead prove that the claim of accreditation as "special envoy" is a fabrication employed to support SAAB MORAN's litigation during his extradition.

Another letter from Arreaza to the Cabo Verdean Minister of Foreign Affairs hours after SAAB MORAN's detention in Cabo Verde refers to SAAB MORAN as a representative of the Maduro regime, not a "special envoy." [DE 149-18] (referring to SAAB MORAN as a "representative of the Government of the Bolivarian Republic of Venezuela"). A letter to INTERPOL concerning SAAB MORAN's detention in Cabo Verde dated June 15, 2020, by a Maduro regime official, days after SAAB MORAN's detention also did not refer to him as a

---

[18] Redacting irrelevant communications between counsel regarding separate issue.

"special envoy." [DE 149-9] (referring to SAAB MORAN as a "representative of the Government of the Bolivarian Republic of Venezuela").

If SAAB MORAN was in fact a "special envoy" of the Maduro regime, Arreaza and others in the Maduro regime would have immediately referred to him with that title upon his detention. They would have referred to his diplomatic passport as opposed to a general Venezuelan passport number. Yet none of these letters did. Nor did SAAB MORAN ever inform the DEA of his purported status as a "special envoy" during his various meetings with law enforcement. It was only after SAAB MORAN and the Maduro regime determined that special mission immunity and the title of "special envoy" gave SAAB MORAN the only possibility of success in fighting his extradition that this term began to be used publicly. All other references of "special envoy," whether purportedly "dated" before or after his arrest on June 12, 2020, only came to light following SAAB MORAN's eventual strategic litigation decision to claim diplomatic status. They are mere evidence of the echo chamber created by SAAB MORAN himself, not reliable evidence as to the true nature of his actual diplomatic status.

## CONCLUSION

SAAB MORAN has no diplomatic status in the United States. His claims of immunity have been fully litigated and denied in Cabo Verde. He has not even put forth any reliable evidence to prove he was officially named a "special envoy" by the Maduro regime at the time of his arrest in Cabo Verde. Regardless, he has not satisfied the elements for transit immunity under either the VCDR or customary international law. Based on the above stated facts and law, the United States respectfully asks that the Court deny the Motion to Dismiss.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By: /s/ *Kurt K. Lunkenheimer*
    Kurt K. Lunkenheimer
    Assistant U.S. Attorney
    Court ID No. A5501535
    99 N.E. 4th Street
    Miami, Florida 33132-2111
    TEL (305) 961-9008
    Kurt.Lunkenheimer@usdoj.gov

GLENN S. LEON
CHIEF, FRAUD SECTION
Criminal Division
U.S. Department of Justice

By: /s/ *Alexander Kramer*
    Alexander Kramer
    Trial Attorney
    Criminal Division, Fraud Section
    U.S. Department of Justice
    Court ID No. A5502240
    1400 New York Ave. NW
    Washington, DC 20005
    TEL (202) 768-1919
    alexander.kramer@usdoj.gov