DEFENDANT
EXHIBIT

CASE
NO.   19-20450-CR-Scola
EXHIBIT
NO.   W

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 82-0422-Civ-JWK

H.R.H. PRINCE TURKI BIN          )
ABDULAZIZ, PRINCESS HEND         )
AL-FASSI, his wife, and          )
SHEIKHA FAIZA ALI HELMI,         )
                                 )
        Plaintiffs,              )
                                 )
vs-                              )
                                 )
METROPOLITAN DADE COUNTY,        )       MOTION TO DISMISS
a political subdivision          )
of the State of Florida,         )
TOM PETERSON, J. COLLINS,        )
and JOHN DOES 1 THROUGH          )
11,                              )
                                 )
        Defendants.              )
                                 )
_____)

FILED BY _____ M ____ DC

'82 JUN -4 AM 9 02

JOSEPH I BOGART
CLERK US DIST. CT.
SD OF FLA.-MIAMI

        The Plaintiffs, H.R.H. PRINCE TURKI BIN ABDULAZIZ, PRINCESS

HEND AL-FASSI, his wife, and SHEIKHA FAIZA ALI HELMI, move this

Court for the entry of an Order dismissing all pending claims and

counter-claims filed herein based upon the provisions of the

Vienna Convention on Diplomatic Relations, April 18,1961, 23 U.S.T.

3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (ratified by U.S. Senate,

September 14, 1965, ratification deposited, November 13, 1972).

In support hereof the Plaintiffs incorporate by reference and rely

upon the Affidavit in Support of Motion to Dismiss filed herein as

well as their Memorandum of Law in Support of their Motion to Dismiss.

                        LEE, SCHULTE, MURPHY & COE, P.A.
                        200 S.E. First Street
                        Suite 800
                        Miami, Florida 33131
                        Telephone: (305) 371-7300

                        RICHARD BEN-VENISTE, ESQ.
                        Ben-Veniste & Shernoff
                        4801 Massachusetts Avenue, N.W.
                        Washington, D.C. 20016

                        RUBIN AND RUBINCHIK, P.A.
                        500 Center Court Building
                        2450 Hollywood Boulevard
                        Hollywood, Florida  33020
                        Telephone: (305) 921-7283 or 947-1919
                        Attorneys for Plaintiffs

                        By _____
                           ALLAN M. RUBIN

457

RECD   TO JUDGE
6-V    6?
BY

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _____4th_____ day of June, 1982 to:


Ralph C. Rocheteau, III,
Assistant County Attorney
1626 Courthouse Building
73 West Flagler Street
Miami, Florida 33130

Steven D. Ginsburg, Esq.
1501 N.W. 14th Street
Suite 100
Miami, Florida 33125

Kent A. Zaiser,
Assistant Attorney General
Department of Legal Affairs
Civil Division
The Capitol
Suite 1501
Tallahassee, Florida 32301

Jerry B. Katzen, Esq.
Rash, Katzen, Key & Pintado
7900 Red Road
Suite 25
South Miami, Florida 33143

Norman Malinski, Esq.
City National Bank Building
25 West Flagler Street
Miami, Florida 33130

Ellis Rubin, Esq.
Rubin and Young
265 N.E. 26th Terrace
Miami, Florida 33137


ALLAN M. RUBIN

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

458

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 82-0422-Civ-JWK

H.R.H. PRINCE TURKI BIN      :
ABDULAZIZ, PRINCESS HEND     :
AL-FASSI, his wife, and      :
SHEIKHA FAIZA ALI HELMI,     :
                             :
     Plaintiffs,             :
                             :
v.                           :      MEMORANDUM OF LAW IN SUPPORT OF
                             :      PLAINTIFFS' MOTION TO DISMISS
METROPOLITAN DADE COUNTY,    :
a political subdivision      :
of the State of Florida,     :
TOM PETERSON, J. COLLINS,    :
and JOHN DOES 1 THROUGH      :
11,                          :
                             :
     Defendants.             :
_____:

FILED BY __ M __ DC

'82 JUN -4 AM 9:03

JOSEPH B BOGARD
CLERK US DIST. CT.
) OF FLA.-MIAMI

     The Plaintiffs, H.R.H. PRINCE TURKI BIN ABDULAZIZ,
PRINCESS HEND AL-FASSI, his wife, and SHEIKHA FAIZA ALI HELMI,
submit herewith their Memorandum of Law in Support of the Motion
to Dismiss filed in their behalf and state as follows:

### SUMMARY OF FACTS

    1.  This lawsuit was filed on or about March 2, 1982,
under those provisions of the Civil Rights Act, 42 U.S.C.A. 1983
et. seq., to redress a deprivation of the Plaintiffs' civil rights
which occurred on February 26, 1982, when the Defendants invaded
the home of the Plaintiffs under the ostensible authority of a
search warrant seeking the production of a certain household
employee said to be held against her will by Plaintiffs.  The
said warrant was based solely upon an uncorroborated affidavit
sworn to by a former employee of the Plaintiffs.

    2.  That following the commencement of these proceedings,
various parties claiming to be among the JOHN DOE defendants, as
well as Defendant, COLLINS, filed counter-claims in this action.

    3.  That on April 2, 1982, the Plaintiffs were informed

-1-



459

that the U.S. Department of State had recognized their entitlement
to diplomatic immunity, and on April 20, 1982, the U.S. Department
of State, through Richard Gookin, Associate Chief of Protocol,
certified in writing that the Plaintiff, H.R.H. PRINCE TURKI BIN
ABDULAZIZ, was entitled to diplomatic immunity as defined by
Article 31 of the Vienna Convention on Diplomatic Relations.
Attached hereto and made a part hereof as Exhibit "A" is a true
and correct copy of said certificate.

　　　4.　That on April 27, 1982, this Court abated all
proceedings herein for a period of thirty (30) days, pursuant to
Plaintiffs' Motion to Abate, in order to enable the Plaintiffs to
determine the effect of the U.S. State Department's recognition
of the Plaintiffs' entitlement to diplomatic immunity.

　　　5.　That the Plaintiffs have this date filed an Affidavit
in Support of Motion to Dismiss in which they, through one of their
counsel of record, ALLAN M. RUBIN, ESQUIRE, seek a dismissal of all
pending claims and counter-claims based upon the provisions of the
Diplomatic Relations Act and the Vienna Convention on Diplomatic
Relations as well as upon those other reasons set forth in said
affidavit, a copy of which is attached hereto as Exhibit "B" and by
reference made a part hereof.

<u>ARGUMENT</u>

> THE PLAINTIFFS ARE ENTITLED TO A
> DISMISSAL OF ALL PENDING CLAIMS
> AND COUNTER-CLAIMS BASED UPON THE
> PROVISIONS OF THE DIPLOMATIC
> RELATIONS ACT AND THE VIENNA
> CONVENTION ON DIPLOMATIC RELATIONS.

　　　1.　The <u>Diplomatic Relations Act</u>, Pub.L. No. 95-393, 92
Stat. 808 (1978), 22 U.S.C. Sec.254 (a-e), hereinafter referred to
as Diplomatic Relations Act, is the sole United States Statute on
diplomatic privileges and immunities.  This legislation enacted in
1978, repealed the <u>1790 Immunities Act</u>. Act of Apr.30, 1790, ch. 9,

-2-

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

460

Sections 25-27, 1 Stat. 112, as amended, 22 U.S.C. Section 252-254
(1976) (repealed 1978), and implements the provisions of the Vienna
Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227,
T.I.A.S. No. 7502, 500 U.N.T.S. 95 (ratified by U.S. Senate,
September 14, 1965, ratification deposited, November 13, 1972),
hereinafter referred to as Vienna Convention, a copy of which is
attached hereto and made a part hereof as Exhibit "C."

    2.   Section 1 of Article 31 of the Vienna Convention
provides in part that a diplomatic agent shall enjoy immunity from
the civil and administrative jurisdiction of the receiving state
except in the case of real actions relating to private immovable
property, actions relating to testate and intestate proceedings
and actions relating to professional or commercial activities
of the diplomatic agent which are outside of his official functions.

    3.   Section 1 of Article 37 extends the privileges and
immunities specified in Articles 29 to 36 of the Vienna Convention,
including immunity from civil and administrative jurisdiction, to
the members of the family of the diplomatic agent forming a part of
his household.

    4.   Section 1 of Article 39 of the Vienna Convention
provides that every person who is entitled to the privileges and
immunities conferred under the provisions of the Vienna Convention
shall enjoy them from the moment he enters the territory of the
receiving state, or, if already in the territory of the receiving
state, from the moment when his appointment is notified to the
Ministry for Foreign Affairs or such other ministry as may be
agreed.

    5.   The Diplomatic Relations Act provides that:

> "Any action or proceeding brought against
> an individual who is entitled to immunity
> with respect to such action or proceeding
> under the Vienna Convention on Diplomatic
> Relations, under Section 254d or 254c of
> this title, or under any other laws
> extending diplomatic privileges and
> immunities, shall be dismissed.  Such
> immunity may be established upon motion
> or suggestion by or on behalf of the
> individual, or as otherwise permitted by
> law or applicable rules of procedure."

-3-

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

461

6.   Based upon the foregoing authority, there can be little doubt that the Plaintiffs in this action are entitled to a dismissal of all of the claims and counter-claims asserted in this litigation.

7.   While it is true that the Plaintiffs were recognized as being entitled to diplomatic immunity by the U.S. Department of State after the commencement of these proceedings, the authority set forth above, particularly the provisions of the Diplomatic Relations Act and Section 1 of Article 39 of the Vienna Convention (a copy of which is attached for the Court's convenience), mandates a dismissal.  While no United States case has dealt squarely with the issue of whether the immunity granted after the commencement of proceedings may nevertheless be invoked to terminate such proceedings, at least one English Court has dealt with the issue.

8.   In the English Court of Appeals decision in Ghosh v. d'Rozario (1962) 2 All. E.R. 640, a copy of which is attached hereto and made a part hereof as Exhibit "D," an individual was sued for slander prior to obtaining diplomatic immunity.  Upon the Defendant's assertion of his immunity, the Court held that under the English statute on immunity and under general principles of international law, "the general principles that confer diplomatic immunity against the initiation of proceedings confer an equal immunity against the continuation of preexisting and hitherto properly constituted proceedings." (See Ghosh v. d'Rozario, supra, at page 644).

9.   Eileen Denza, in her Diplomatic Law, Commentary on the Vienna Convention on Diplomat Relations (1976), notes that:

> "There is no exception to immunity
> in regard to offenses committed,
> contracts entered into or acts done
> before immunity began.  This was in
> general established before the Vienna
> Convention, and it remains true.  A

-4-

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

462

> defendant who becomes entitled to
> immunity after civil or criminal
> proceedings have been started against
> him, but while the actual prosecution
> is still pending, is entitled to have
> the proceedings stayed.  This right
> is not affected by the fact that he
> may have taken steps in the proceedings
> before he was entitled to immunity, for
> such steps cannot be construed as a
> waiver,..."
> (Emphasis supplied)

Denza, supra, at page 247.

10.  Section 1 of Article 39 of the Vienna Convention,
which is the only provision in the Vienna Convention dealing with
the question of when immunity attaches, appears totally consistent
with the holding in Ghosh v. d'Rozario, supra, as well as Denza,
supra, in that this section specifies that the privileges and
immunities conferred by the Vienna Convention are to be enjoyed
"...from the moment he enters the territory of the receiving
state..." or, if already in its territory, from the moment when
his appointment is notified to the Ministry of Foreign Affairs
or such other ministry as may be agreed.  Moreover, the Diplomatic
Relations Act does not speak to actions or proceedings brought
subsequent to the granting of diplomatic privileges and immunities,
but, rather, mandates that any action or proceeding brought against
an individual entitled to immunity shall be dismissed upon motion
or suggestion by or on behalf of the individual.

### CONCLUSION

For the foregoing reasons, and for those reasons set forth in
the Affidavit in Support of the Motion to Dismiss, this proceeding,
including all claims and counter-claims filed herein, should be
dismissed based upon the diplomatic immunity conferred upon the
Plaintiffs.

I HEREBY CERTIFY THAT a true and correct copy of the
above and foregoing was mailed this _4th_ day of June, 1982 to:

-5-

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

463

Ralph C. Rocheteau, III, Esq.
Assistant County Attorney
1626 Courthouse Building
73 West Flagler Street
Miami, Florida 33130

Steven D. Ginsburg, Esq.
1501 N. W. 14th Street
Suite 100
Miami, Florida 33125

Kent A. Zaider, Esq.
Assistant Attorney General
Department of Legal Affairs
Civil Division
The Capitol
Suite 1501
Tallahassee, Florida 32301

Jerry B. Katzen, Esq.
Rash, Katzen, Key & Pintado
Suite 25
7900 Red Road
South Miami, Florida 33143

Norman Malinski, Esq.
City National Bank Building
25 West Flagler Street
Miami, Florida 33130

Ellis Rubin, Esq.
Rubin and Young
265 N. E. 26th Terrace
Miami, Florida 33137

LEE, SCHULTE, MURPHY & COE, P.A.
800 Peninsula Federal Building
200 S. E. 1st Street
Miami, Florida 33131
Telephone: (305) 371-7300

RICHARD BEN-VENISTE, ESQ.
Ben-Veniste & Shernoff
4801 Massachusetts Avenue, N.W.
Washington, D.C. 20016

RUBIN AND RUBINCHIK, P.A.
500 Center Court Building
2450 Hollywood Boulevard
Hollywood, Florida 33020
Telephone: (305) 921-7283 or 947-1919
Attorneys for Plaintiffs

By: _____
        ALLAN M. RUBIN

No. 82/8520

# United States of America



## DEPARTMENT OF STATE

### To all to whom these presents shall come, Greeting:

I Certify That ------Richard Gookin--------,

whose name is subscribed to the document hereunto annexed, was at the time of subscribing the same------Associate Chief of Protocol------ ----------
--------------------------------------------, Department of State, United States America, and that full faith and credit are due to his acts as such.

In testimony whereof, I, Alexander M. Haig, Jr.,

Secretary of State, have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Authentication Officer of the said Department, at the city of Washington, in the District of Columbia, this ___twentieth___

day of ___April___, 19 82.

*Alexander M. Haig Jr.*
Secretary of State.

By *Annie R. Maddox*
Authentication Officer, Department of State.

certificate is not valid if it is removed or altered in any way whatsoever

U.S. GOVERNMENT PRINTING OFFICE

EXHIBIT "A"   465

TO WHOM IT MAY CONCERN:

This is to certify that I, Richard Gookin, Associate Chief of Protocol of the United States Department of State, am responsible for registering and maintaining the official records of diplomatic and consular officers and other employees of foreign governments in the United States and its territories.

The official records of the Department of State indicate that His Royal Highness Prince Turki Bin Abdulaziz was duly notified to the Department of State as Special Envoy for matters concerning the Government of Saudi Arabia.  The date of the notification from the Embassy of Saudi Arabia was April 1, 1982.

Pursuant to Public Law 95-393, the Diplomatic Relations Act (92 Stat. 808; Sections 254a-254e, Title 22, United States Code), His Royal Highness Prince Turki Bin Abdulaziz is entitled to diplomatic immunity as defined by Article 31 of the Vienna Convention on Diplomatic Relations (23 USTS 3227; TIAS 7502; 500 UNTS 95).

Richard Gookin
Associate Chief of Protocol

Department of State,
    Washington, April 20, 1982.

466

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 82-0422-Civ-JWK

H.R.H. PRINCE TURKI BIN          )
ABDULAZIZ, PRINCESS HEND         )
AL-FASSI, his wife, and          )
SHEIKHA FAIZA ALI HELMI,         )
                                 )
          Plaintiffs,            )
                                 )
vs-                              )
                                 )
METROPOLITAN DADE COUNTY,        )        AFFIDAVIT IN SUPPORT OF MOTION
a political subdivision          )               TO DISMISS
of the State of Florida,         )        _____
TOM PETERSON, J. COLLINS,        )
and JOHN DOES 1 THROUGH          )
11,                              )
                                 )
          Defendants.            )
_____  )

STATE OF FLORIDA     )
                     ) SS:
COUNTY OF BROWARD    )

    BEFORE ME, the undersigned authority, duly authorized to
administer oaths and take acknowledgements, personally appeared,
ALLAN M. RUBIN, who, having been duly cautioned and sworn,
deposes and states as follows:

    1.   That this Affidavit is made in support of a Motion to
Dismiss filed on behalf of the Plaintiffs herein.

    2.   That this lawsuit was filed to redress those wrongs
committed by the Defendants on February 26, 1982, when, based
solely upon an uncorroborated affidavit of a former employee of
the Plaintiffs, the Defendants invaded the home of the Plaintiffs,
ostensibly in search of a household employee said to be held
against her will, as is more fully described in the Complaint
filed herein.

    3.   That subsequent to the commencement of this proceeding
the Plaintiffs were informed that the State Department of the
United States had recognized their entitlement to diplomatic
immunity.

    4.   That on or about April 14, 1982, the Plaintiffs sought
and subsequently received, an abatement of these proceedings for
a period of thirty (30) days so that they could determine the

*Exhibit "B"*

467

implications upon this proceeding of the U.S. State Department's recognition of their diplomatic immunity in that the further prosecution of this cause may have been deemed to constitute a waiver of the Plaintiffs' diplomatic immunity.

5.   That on Sunday, May 30, 1982, the Miami Herald's Tropic Magazine in an article entitled "The Snitch" reported the following:

A.   That the sole source relied upon by the Defendants in connection with the issuance of the search warrant which was executed on February 26, 1982, one Abdelmejid Daifi, had voluntarily submitted to a polygraph test administered by a noted polygraph expert, Warren D. Holmes, who does considerable work for the State Attorney's Office.

B.   That the results of the polygraph test demonstrated that Abdelmejid Daifi had lied about the facts contained in his sworn affidavit upon which the search warrant was predicated, including the fact that a certain household employee was being held against her will.

6.   That inasmuch as Plaintiffs' position maintained throughout this lawsuit has been vindicated through the proven falsity of Daifi's underlying allegations, and, inasmuch as the pursuit  of the claims contained in the Complaint would serve no further useful purpose, and, inasmuch as the continued maintenance of this action might be interpreted as a waiver of the diplomatic immunity conferred upon H.R.H. PRINCE TURKI BIN ABDULAZIZ and the members of his family on April 2, 1982, the Plaintiffs hereby seek a dismissal of all pending claims and counterclaims under the provisions of the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (ratified by U.S. Senate, September 14, 1965, ratification deposited, November 13, 1972; entered into force for the United States, December 13, 1972), and under the Diplomatic Relations Act, Pub.L. No. 95-393, 92 Stat. 808 (1978), 22 U.S.C. Sec. 254 (a-e).

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

FURTHER YOUR AFFIANT SAYETH NOT.

ALLAN M. RUBIN

SWORN TO and SUBSCRIBED TO before me this 3rd day of June, 1982.

NOTARY PUBLIC
State of Florida

My Commission Expires: NOTARY PUBLIC STATE OF FLORIDA AT LARGE
MY COMMISSION EXPIRES OCT 9 1982
BONDED THRU GENERAL INS. UNDERWRITERS

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was mailed this 4th day of June, 1982, to:

Ralph C. Rocheteau, III, Esq.
Assistant County Attorney
1626 Courthouse Building
73 West Flagler Street
Miami, Florida 33130

Steven D. Ginsburg, Esq.
1501 N. W. 14th Street
Suite 100
Miami, Florida 33125

Kent A. Zaiser, Esq.
Assistant Attorney General
Department of Legal Affairs
Civil Division
The Capitol
Suite 1501
Tallahassee, Florida 32301

Jerry B. Katzen, Esq.
Rash, Katzen, Key & Pintado
7900 Red Road
Suite 25
South Miami, Florida 33143

Norman Malinski, Esq.
City National Bank Building
25 West Flagler Street
Miami, Florida 33130

Ellis Rubin, Esq.
Rubin and Young
165 N. E. 26th Terrace
Miami, Florida 33137

-3-

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

LEE, SCHULTE, MURPHY & COE, P.A.
200 S. E. First Street
Suite 800
Miami, Florida 33131
Telephone: (305) 371-7300

RICHARD BEN-VENISTE, ESQ.
Ben-Veniste & Shernoff
4801 Massachusetts Avenue, N.W.
Washington, D.C. 20016

RUBIN AND RUBINCHIK, P.A.
500 Center Court Building
2450 Hollywood Boulevard
Hollywood, Florida 33020
Telephone: (305) 921-7283 or 947-1919
Attorneys for Plaintiffs

By: _____
    ALLAN M. RUBIN

-4-       470

*The Indonesian Minister of Foreign Affairs to the
American Ambassador*

MINISTER FOR FOREIGN AFFAIRS
REPUBLIC OF INDONESIA

No. D. 1033/72/01/I.      JAKARTA, *October 27, 1972*

EXCELLENCY:

I have the honour to acknowledge receipt of Your Excellency's Note of to-day's date which reads as follows:

"I have the honor to refer to the Agricultural Commodities Agreement signed by representatives of our two Governments on May 26, 1972, as amended, and propose that Part II, Particular Provisions, be further amended to increase the bulgur component of the Agreement as follows:

Item I, Commodity Table: On line titled "Bulgur" and under the appropriate column headings: delete "10,000" and insert "50,000," delete ".9" and insert "4.3." For the total: delete "60.5" and insert "63.9."

All other terms and conditions of the May 26, 1972 Agreement, as amended, remain the same.

If the foregoing is acceptable to your Government, I have the honor to propose that this note and your reply thereto constitute an Agreement between our two Governments effective on the date of your note in reply."

I have the honour to confirm that the proposed arrangements as described in your Note are acceptable to my Government and to agree that Your Excellency's Note and this reply shall be regarded as constituting an agreement between our two Governments with effect from the date of this Note.

Please, Excellency, accept the renewed assurances of my highest consideration.

[SEAL]      ADAM MALIK

Adam Malik
*Minister of Foreign Affairs*

His Excellency
FRANCIS J. GALBRAITH
*Ambassador Extraordinary and Plenipotentiary
of the United States of America
Jakarta.—*

---

# MULTILATERAL

## Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes

*Done at Vienna April 18, 1961;*
*Ratification advised by the Senate of the United States of America
September 14, 1965;*
*Ratified by the President of the United States of America November 8, 1972;*
*Ratification of the United States of America deposited with the
Secretary-General of the United Nations November 13, 1972;*
*Proclaimed by the President of the United States of America
November 24, 1972;*
*Entered into force with respect to the United States of America
December 13, 1972.*

———

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

### A PROCLAMATION

CONSIDERING THAT:

The Vienna Convention on Diplomatic Relations and the Optional Protocol Concerning the Compulsory Settlement of Disputes were opened for signature on April 18, 1961 and were signed on behalf of the United States of America on June 29, 1961, certified copies of which are hereto annexed;

The Senate of the United States of America by its resolution of September 14, 1965, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Convention and the Optional Protocol;

On November 8, 1972 the President of the United States of America ratified the Convention and the Optional Protocol, in pursuance of the advice and consent of the Senate;

The United States of America deposited its instrument of ratification of the Convention and the Optional Protocol on November 13, 1972, in accordance with the provisions of Article 49 of the Convention and Article VI of the Optional Protocol;

EXHIBIT "C" 471

Pursuant to the provisions of Article 51 of the Convention and Article VIII of the Optional Protocol, the Convention and the Optional Protocol will enter into force for the United States of America on December 13, 1972, the thirtieth day after deposit of the instrument of ratification;

Now, THEREFORE, I, Richard Nixon, President of the United States of America, proclaim and make public the Convention and the Optional Protocol to the end that they shall be observed and fulfilled with good faith on and after December 13, 1972 by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twenty-fourth day of November in the year of our Lord one thousand nine hundred seventy-two and of the Independence of the United States of America the one hundred ninety-seventh.

[SEAL]

RICHARD NIXON

By the President:
WILLIAM P ROGERS
*Secretary of State*

# UNITED NATIONS CONFERENCE
## ON DIPLOMATIC INTERCOURSE AND IMMUNITIES

---

# VIENNA CONVENTION
# ON
# DIPLOMATIC RELATIONS



*UNITED NATIONS*

*1961*

## VIENNA CONVENTION ON DIPLOMATIC RELATIONS

The States Parties to the present Convention,

*Recalling* that peoples of all nations from ancient times have recognized the status of diplomatic agents,

*Having in mind* the purposes and principles of the Charter of the United Nations[1] concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations,

*Believing* that an international convention on diplomatic intercourse, privileges and immunities would contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,

*Realizing* that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States,

*Affirming* that the rules of customary international law should continue to govern questions not expressly regulated by the provisions of the present Convention.

*Have agreed* as follows:

### Article 1

For the purpose of the present Convention, the following expressions shall have the meanings hereunder assigned to them:

(a) the "head of the mission" is the person charged by the sending State with the duty of acting in that capacity;

(b) the "members of the mission" are the head of the mission and the members of the staff of the mission;

(c) the "members of the staff of the mission" are the members of the diplomatic staff, of the administrative and technical staff and of the service staff of the mission;

(d) the "members of the diplomatic staff" are the members of the staff of the mission having diplomatic rank;

(e) a "diplomatic agent" is the head of the mission or a member of the diplomatic staff of the mission;

(f) the "members of the administrative and technical staff" are the members of the staff of the mission employed in the administrative and technical service of the mission;

(g) the "members of the service staff" are the members of the staff of the mission in the domestic service of the mission;

(h) a "private servant" is a person who is in the domestic service of a member of the mission and who is not an employee of the sending State;

(i) the "premises of the mission" are the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission.

### Article 2

The establishment of diplomatic relations between States, and of permanent diplomatic missions, takes place by mutual consent.

### Article 3

1. The functions of a diplomatic mission consist *inter alia* in:

(a) representing the sending State in the receiving State;

---

[1] TS 993; 59 Stat. 1031.

(b) protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) negotiating with the Government of the receiving State;

(d) ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(e) promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

2. Nothing in the present Convention shall be construed as preventing the performance of consular functions by a diplomatic mission.

### Article 4

1. The sending State must make certain that the agrément of the receiving State has been given for the person it proposes to accredit as head of the mission to that State.

2. The receiving State is not obliged to give reasons to the sending State for a refusal of agrément.

### Article 5

1. The sending State may, after it has given due notification to the receiving States concerned, accredit a head of mission or assign any member of the diplomatic staff, as the case may be, to more than one State, unless there is express objection by any of the receiving States.

2. If the sending State accredits a head of mission to one or more other States it may establish a diplomatic mission headed by a chargé d'affaires ad interim in each State where the head of mission has not his permanent seat.

3. A head of mission or any member of the diplomatic staff of the mission may act as representative of the sending State to any international organization.

### Article 6

Two or more States may accredit the same person as head of mission to another State, unless objection is offered by the receiving State.

### Article 7

Subject to the provisions of Articles 5, 8, 9 and 11, the sending State may freely appoint the members of the staff of the mission. In the case of military, naval or air attachés, the receiving State may require their names to be submitted beforehand, for its approval.

### Article 8

1. Members of the diplomatic staff of the mission should in principle be of the nationality of the sending State.

2. Members of the diplomatic staff of the mission may not be appointed from among persons having the nationality of the receiving State, except with the consent of that State which may be withdrawn at any time.

3. The receiving State may reserve the same right with regard to nationals of a third State who are not also nationals of the sending State.

### Article 9

1. The receiving State may at any time and without having to explain its decision, notify the sending State that the head of the mission or any member of the diplomatic staff of the mission is persona

non grata or that any other member of the staff of the mission is not acceptable. In any such case, the sending State shall, as appropriate, either recall the person concerned or terminate his functions with the mission. A person may be declared non grata or not acceptable before arriving in the territory of the receiving State.

2. If the sending State refuses or fails within a reasonable period to carry out its obligations under paragraph 1 of this Article, the receiving State may refuse to recognise the person concerned as a member of the mission.

### Article 10

1. The Ministry for Foreign Affairs of the receiving State, or such other ministry as may be agreed, shall be notified of:

(a) the appointment of members of the mission, their arrival and their final departure or the termination of their functions with the mission;

(b) the arrival and final departure of a person belonging to the family of a member of the mission and, where appropriate, the fact that a person becomes or ceases to be a member of the family of a member of the mission;

(c) the arrival and final departure of private servants in the employ of persons referred to in sub-paragraph (a) of this paragraph and, where appropriate, the fact that they are leaving the employ of such persons;

(d) the engagement and discharge of persons resident in the receiving State as members of the mission or private servants entitled to privileges and immunities.

2. Where possible, prior notification of arrival and final departure shall also be given.

### Article 11

1. In the absence of specific agreement as to the size of the mission, the receiving State may require that the size of a mission be

kept within limits considered by it to be reasonable and normal, having regard to circumstances and conditions in the receiving State and to the needs of the particular mission.

2. The receiving State may equally, within similar bounds and on a non-discriminatory basis, refuse to accept officials of a particular category.

### Article 12

The sending State may not, without the prior express consent of the receiving State, establish offices forming part of the mission in localities other than those in which the mission itself is established.

### Article 13

1. The head of the mission is considered as having taken up his functions in the receiving State either when he has presented his credentials or when he has notified his arrival and a true copy of his credentials has been presented to the Ministry for Foreign Affairs of the receiving State, or such other ministry as may be agreed, in accordance with the practice prevailing in the receiving State which shall be applied in a uniform manner.

2. The order of presentation of credentials or of a true copy thereof will be determined by the date and time of the arrival of the head of the mission.

### Article 14

1. Heads of mission are divided into three classes, namely:

(a) that of ambassadors or nuncios accredited to Heads of State, and other heads of mission of equivalent rank;

(b) that of envoys, ministers and internuncios accredited to Heads of State;

(c) that of chargés d'affaires accredited to Ministers for Foreign Affairs.

2. Except as concerns precedence and etiquette, there shall be no differentiation between heads of mission by reason of their class.

### Article 15

The class to which the heads of their missions are to be assigned shall be agreed between States.

### Article 16

1. Heads of mission shall take precedence in their respective classes in the order of the date and time of taking up their functions in accordance with Article 13.

2. Alterations in the credentials of a head of mission not involving any change of class shall not affect his precedence.

3. This article is without prejudice to any practice accepted by the receiving State regarding the precedence of the representative of the Holy See.

### Article 17

The precedence of the members of the diplomatic staff of the mission shall be notified by the head of the mission to the Ministry for Foreign Affairs or such other ministry as may be agreed.

### Article 18

The procedure to be observed in each State for the reception of heads of mission shall be uniform in respect of each class.

### Article 19

1. If the post of head of the mission is vacant, or if the head of the mission is unable to perform his functions, a chargé d'affaires ad

interim shall act provisionally as head of the mission.  The name of the chargé d'affaires ad interim shall be notified, either by the head of the mission or, in case he is unable to do so, by the Ministry for Foreign Affairs of the sending State to the Ministry for Foreign Affairs of the receiving State or such other ministry as may be agreed.

2. In cases where no member of the diplomatic staff of the mission is present in the receiving State, a member of the administrative and technical staff may, with the consent of the receiving State, be designated by the sending State to be in charge of the current administrative affairs of the mission.

### Article 20

The mission and its head shall have the right to use the flag and emblem of the sending State on the premises of the mission, including the residence of the head of the mission, and on his means of transport.

### Article 21

1. The receiving State shall either facilitate the acquisition on its territory, in accordance with its laws, by the sending State of premises necessary for its mission or assist the latter in obtaining accommodation in some other way.

2. It shall also, where necessary, assist missions in obtaining suitable accommodation for their members.

### Article 22

1. The premises of the mission shall be inviolable.  The agents of the receiving State may not enter them, except with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

476

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

### Article 23

1. The sending State and the head of the mission shall be exempt from all national, regional or municipal dues and taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered.

2. The exemption from taxation referred to in this Article shall not apply to such dues and taxes payable under the law of the receiving State by persons contracting with the sending State or the head of the mission.

### Article 24

The archives and documents of the mission shall be inviolable at any time and wherever they may be.

### Article 25

The receiving State shall accord full facilities for the performance of the functions of the mission.

### Article 26

Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory.

### Article 27

1. The receiving State shall permit and protect free communication on the part of the mission for all official purposes. In communicating with the Government and the other missions and consulates of the sending State, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher. However, the mission may install and use a wireless transmitter only with the consent of the receiving State.

2. The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions.

3. The diplomatic bag shall not be opened or detained.

4. The packages constituting the diplomatic bag must bear visible external marks of their character and may contain only diplomatic documents or articles intended for official use.

5. The diplomatic courier, who shall be provided with an official document indicating his status and the number of packages constituting the diplomatic bag, shall be protected by the receiving State in the performance of his functions. He shall enjoy personal inviolability and shall not be liable to any form of arrest or detention.

6. The sending State or the mission may designate diplomatic couriers *ad hoc*. In such cases the provisions of paragraph 5 of this Article shall also apply, except that the immunities therein mentioned shall cease to apply when such a courier has delivered to the consignee the diplomatic bag in his charge.

7. A diplomatic bag may be entrusted to the captain of a commercial aircraft scheduled to land at an authorized port of entry. He shall be provided with an official document indicating the number of packages constituting the bag but he shall not be considered to be a diplomatic courier. The mission may send one of its members to take possession of the diplomatic bag directly and freely from the captain of the aircraft.

### Article 28

The fees and charges levied by the mission in the course of its official duties shall be exempt from all dues and taxes.

### Article 29

The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

### Article 30

1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.

2. His papers, correspondence and, except as provided in paragraph 3 of Article 31, his property, shall likewise enjoy inviolability.

### Article 31

1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

(a) a real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(b) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(c) an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

2. A diplomatic agent is not obliged to give evidence as a witness.

3. No measures of execution may be taken in respect of a diplomatic agent except in the cases coming under sub-paragraphs (a), (b) and (c) of paragraph 1 of this Article, and provided that the measures concerned can be taken without infringing the inviolability of his person or of his residence.

4. The immunity of a diplomatic agent from the jurisdiction of the receiving State does not exempt him from the jurisdiction of the sending State.

### Article 32

1. The immunity from jurisdiction of diplomatic agents and of persons enjoying immunity under Article 37 may be waived by the sending State.

2. Waiver must always be express.

3. The initiation of proceedings by a diplomatic agent or by a person enjoying immunity from jurisdiction under Article 37 shall preclude him from invoking immunity from jurisdiction in respect of any counter-claim directly connected with the principal claim.

4. Waiver of immunity from jurisdiction in respect of civil or administrative proceedings shall not be held to imply waiver of immunity in respect of the execution of the judgment, for which a separate waiver shall be necessary.

### Article 33

1. Subject to the provisions of paragraph 3 of this Article, a diplomatic agent shall with respect to services rendered for the sending State be exempt from social security provisions which may be in force in the receiving State.

478

2. The exemption provided for in paragraph 1 of this Article shall also apply to private servants who are in the sole employ of a diplomatic agent, on condition:

(a) that they are not nationals of or permanently resident in the receiving State; and

(b) that they are covered by the social security provisions which may be in force in the sending State or a third State.

3. A diplomatic agent who employs persons to whom the exemption provided for in paragraph 2 of this Article does not apply shall observe the obligations which the social security provisions of the receiving State impose upon employers.

4. The exemption provided for in paragraphs 1 and 2 of this Article shall not preclude voluntary participation in the social security system of the receiving State provided that such participation is permitted by that State.

5. The provisions of this Article shall not affect bilateral or multilateral agreements concerning social security concluded previously and shall not prevent the conclusion of such agreements in the future.

### Article 34

A diplomatic agent shall be exempt from all dues and taxes, personal or real, national, regional or municipal, except:

(a) indirect taxes of a kind which are normally incorporated in the price of goods or services;

(b) dues and taxes on private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(c) estate, succession or inheritance duties levied by the receiving State, subject to the provisions of paragraph 4 of Article 39;

(d) dues and taxes on private income having its source in the receiving State and capital taxes on investments made in commercial undertakings in the receiving State;

(e) charges levied for specific services rendered;

(f) registration, court or record fees, mortgage dues and stamp duty, with respect to immovable property, subject to the provisions of Article 23.

### Article 35

The receiving State shall exempt diplomatic agents from all personal services, from all public service of any kind whatsoever, and from military obligations such as those connected with requisitioning, military contributions and billeting.

### Article 36

1. The receiving State shall, in accordance with such laws and regulations as it may adopt, permit entry of and grant exemption from all customs duties, taxes, and related charges other than charges for storage, cartage and similar services, on:

(a) articles for the official use of the mission;

(b) articles for the personal use of a diplomatic agent or members of his family forming part of his household, including articles intended for his establishment.

2. The personal baggage of a diplomatic agent shall be exempt from inspection, unless there are serious grounds for presuming that it contains articles not covered by the exemptions mentioned in paragraph 1 of this Article, or articles the import or export of which is prohibited by the law or controlled by the quarantine regulations of the receiving

479

State.  Such inspection shall be conducted only in the presence of the diplomatic agent or of his authorized representative.

### Article 37

1.  The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36.

2.  Members of the administrative and technical staff of the mission, together with members of their families forming part of their respective households, shall, if they are not nationals of or permanently resident in the receiving State, enjoy the privileges and immunities specified in Articles 29 to 35, except that the immunity from civil and administrative jurisdiction of the receiving State specified in paragraph 1 of Article 31 shall not extend to acts performed outside the course of their duties.  They shall also enjoy the privileges specified in Article 36, paragraph 1, in respect of articles imported at the time of first installation.

3.  Members of the service staff of the mission who are not nationals of or permanently resident in the receiving State shall enjoy immunity in respect of acts performed in the course of their duties, exemption from dues and taxes on the emoluments they receive by reason of their employment and the exemption contained in Article 33.

4.  Private servants of members of the mission shall, if they are not nationals of or permanently resident in the receiving State, be exempt from dues and taxes on the emoluments they receive by reason of their employment.  In other respects, they may enjoy privileges and immunities only to the extent admitted by the receiving State.  However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.

### Article 38

1.  Except insofar as additional privileges and immunities may be granted by the receiving State, a diplomatic agent who is a national of or permanently resident in that State shall enjoy only immunity from jurisdiction, and inviolability, in respect of official acts performed in the exercise of his functions.

2.  Other members of the staff of the mission and private servants who are nationals of or permanently resident in the receiving State shall enjoy privileges and immunities only to the extent admitted by the receiving State.  However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.

### Article 39

1.  Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed.

2.  When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict.  However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

3.  In case of the death of a member of the mission, the members of his family shall continue to enjoy the privileges and immunities to which they are entitled until the expiry of a reasonable period in which to leave the country.

4.  In the event of the death of a member of the mission not a national of or permanently resident in the receiving State or a member of

his family forming part of his household, the receiving State shall permit the withdrawal of the movable property of the deceased, with the exception of any property acquired in the country the export of which was prohibited at the time of his death. Estate, succession and inheritance duties shall not be levied on movable property the presence of which in the receiving State was due solely to the presence there of the deceased as a member of the mission or as a member of the family of a member of the mission.

### Article 40

1.  If a diplomatic agent passes through or is in the territory of a third State, which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return. The same shall apply in the case of any members of his family enjoying privileges or immunities who are accompanying the diplomatic agent, or travelling separately to join him or to return to their country.

2.  In circumstances similar to those specified in paragraph 1 of this Article, third States shall not hinder the passage of members of the administrative and technical or service staff of a mission, and of members of their families, through their territories.

3.  Third States shall accord to official correspondence and other official communications in transit, including messages in code or cipher, the same freedom and protection as is accorded by the receiving State. They shall accord to diplomatic couriers, who have been granted a passport visa if such visa was necessary, and diplomatic bags in transit the same inviolability and protection as the receiving State is bound to accord.

4.  The obligations of third States under paragraphs 1, 2 and 3 of this Article shall also apply to the persons mentioned respectively in those paragraphs, and to official communications and diplomatic bags, whose presence in the territory of the third State is due to _force majeure_.

### Article 41

1.  Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State. They also have a duty not to interfere in the internal affairs of that State.

2.  All official business with the receiving State entrusted to the mission by the sending State shall be conducted with or through the Ministry for Foreign Affairs of the receiving State or such other ministry as may be agreed.

3.  The premises of the mission must not be used in any manner incompatible with the functions of the mission as laid down in the present Convention or by other rules of general international law or by any special agreements in force between the sending and the receiving State.

### Article 42

A diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity.

### Article 43

The function of a diplomatic agent comes to an end, _inter alia_:

(a)  on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end;

(b)  on notification by the receiving State to the sending State that, in accordance with paragraph 2 of Article 9, it refuses to recognise the diplomatic agent as a member of the mission.

### Article 44

The receiving State must, even in case of armed conflict, grant facilities in order to enable persons enjoying privileges and immunities, other than nationals of the receiving State, and members of the families of such persons irrespective of their nationality, to leave at the earliest possible moment. It must, in particular, in case of need, place at their disposal the necessary means of transport for themselves and their property.

### Article 45

If diplomatic relations are broken off between two States, or if a mission is permanently or temporarily recalled:

(a)  the receiving State must, even in case of armed conflict, respect and protect the premises of the mission, together with its property and archives;

(b)  the sending State may entrust the custody of the premises of the mission, together with its property and archives, to a third State acceptable to the receiving State;

(c)  the sending State may entrust the protection of its interests and those of its nationals to a third State acceptable to the receiving State.

### Article 46

A sending State may with the prior consent of a receiving State, and at the request of a third State not represented in the receiving State, undertake the temporary protection of the interests of the third State and of its nationals.

### Article 47

1.  In the application of the provisions of the present Convention, the receiving State shall not discriminate as between States.

2.  However, discrimination shall not be regarded as taking place:

(a)  where the receiving State applies any of the provisions of the present Convention restrictively because of a restrictive application of that provision to its mission in the sending State;

(b)  where by custom or agreement States extend to each other more favourable treatment than is required by the provisions of the present Convention.

### Article 48

The present Convention shall be open for signature by all States Members of the United Nations or of any of the specialized agencies or Parties to the Statute of the International Court of Justice, [1] and by any other State invited by the General Assembly of the United Nations to become a Party to the Convention, as follows: until 31 October 1961 at the Federal Ministry for Foreign Affairs of Austria and subsequently, until 31 March 1962, at the United Nations Headquarters in New York.

### Article 49

The present Convention is subject to ratification. The instruments of ratification shall be deposited with the Secretary-General of the United Nations.

### Article 50

The present Convention shall remain open for accession by any State belonging to any of the four categories mentioned in Article 48. The instruments of accession shall be deposited with the Secretary-General of the United Nations.

### Article 51

1.  The present Convention shall enter into force on the thirtieth day following the date of deposit of the twenty-second instrument of ratification or accession with the Secretary-General of the United Nations.

---

[1] TS 993; 59 Stat. 1055.

2. For each State ratifying or acceding to the Convention after the deposit of the twenty-second instrument of ratification or accession, the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

### Article 52

The Secretary-General of the United Nations shall inform all States belonging to any of the four categories mentioned in Article 48:

(a) of signatures to the present Convention and of the deposit of instruments of ratification or accession, in accordance with Articles 48, 49 and 50;

(b) of the date on which the present Convention will enter into force, in accordance with Article 51.

### Article 53

The original of the present Convention, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations, who shall send certified copies thereof to all States belonging to any of the four categories mentioned in Article 48.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorised thereto by their respective Governments, have signed the present Convention.

DONE AT VIENNA, this eighteenth day of April one thousand nine hundred and sixty-one.

---

# CONFERENCE DES NATIONS UNIES
## SUR LES RELATIONS ET IMMUNITES DIPLOMATIQUES

---

# CONVENTION DE VIENNE
## SUR
## LES RELATIONS DIPLOMATIQUES



**NATIONS UNIES**

*1961*



640                    ALL ENGLAND LAW REPORTS                    [1962] 2 All E.R.

was in possession of the car, even though he did not get the keys from the owner, and did not acquire the registration book, except by some highly improper conduct on his part. But the mercantile agent, Palmer, did not come into possession of the registration book with the consent of the owner. The county court judge found that the owner intended to control the sale, and, when he put the registration book in the locked glove compartment, on the judge's further finding, it seems clear to me that he did not intend Palmer to have possession of the registration book.

In these circumstances, was the sale by Palmer to the plaintiff company a sale made by Palmer when acting in the ordinary course of his business as a mercantile agent? I think that the sale to the plaintiffs for the purposes of a hire-purchase agreement, without the car key and without the registration book, was not such a sale; and this, in my opinion, is fatal to the claim of the plaintiffs against the true owner. The presumption provided for by s. 2 (4) of the Factors Act, 1889, that "... the consent of the owner shall be presumed in the absence of evidence to the contrary", in my opinion, is rebutted in the present case by the evidence that: (i) the owner intended to control the sale, (ii) he retained the car key, and (iii) he did not really intend Palmer to have possession of the registration book. In these circumstances, that provision in the Act of 1889 does not help the plaintiffs.

On the question of notice, I agree with the opinions expressed by my Lords. I agree that the appeal must be dismissed.

*Appeal dismissed. Leave to appeal to the House of Lords granted.*

Solicitors: *A. E. Samuels & Co.* (for the plaintiffs); *Tringhams* (for the defendant).

[*Reported by* F. A. AMIES, ESQ., *Barrister-at-Law.*]

---

## GHOSH v. D'ROZARIO.

[COURT OF APPEAL (Holroyd Pearce and Davies, L.JJ., and Wilberforce, J.), April 11, 12, 1962.]

*Constitutional Law—Diplomatic privilege—Immunity from legal process—Defendant becoming entitled to immunity after commencement of action against him and after having taken steps therein—Right to stay of action—Diplomatic Privileges Act, 1708 (7 Anne c. 12), preamble, s. 3—Diplomatic Immunities (Commonwealth Countries and Republic of Ireland) Act, 1952 (15 & 16 Geo. 6 & 1 Eliz. 2 c. 18), s. 1 (4).*

A defendant who becomes entitled to diplomatic immunity after a civil action has been started against him, but while the action is still pending, is entitled to have the proceedings against him stayed even though he took steps in the action when he had no diplomatic immunity.

*Appeal dismissed.*

[As to diplomatic immunity from legal process, see 7 HALSBURY'S LAWS (3rd Edn.) 269, 270, para. 574; and for cases on the subject, see 11 DIGEST (Repl.) 628-633, *512-571.*

For the Diplomatic Immunities (Commonwealth Countries and Republic of Ireland) Act, 1952, s. 1, see 32 HALSBURY'S STATUTES (2nd Edn.) 45; and for the Diplomatic Privileges Act, 1708, preamble, s. 3, see 4 ibid., pp. 591, 592.]

Cases referred to:

*Compania Naviera Vascongado v. Cristina S.S.,* [1938] 1 All E.R. 719; [1938] A.C. 485; 107 L.J.P. 1; 159 L.T. 394; 19 Asp. M.L.C. 159; 1 Digest (Repl.) 129, *154.*

*Dickinson v. Del Solar,* [1929] All E.R. Rep. 139; [1930] 1 K.B. 376; 99 L.J.K.B. 162; 142 L.T. 66; 11 Digest (Repl.) 635, *595.*

UNIVERSITY OF MINN
LAW LIBRARY

EXHIBIT "D"

CA:

GHOSH v. D'ROZARIO (HOLROYD PEARCE, L.J.)   641

*Engelke* v. *Musmann*, [1928] All E.R. Rep. 18; [1928] A.C. 433; 97 L.J.K.B. 789; 139 L.T. 586; 11 Digest (Repl.) 631, *543*.

*Magdalena Steam Navigation Co.* v. *Martin*, (1859), 2 E. & E. 94; 28 L.J.Q.B. 310; 34 L.T.O.S. 30; 121 E.R. 36; 11 Digest (Repl.) 628, *513*.

*Rahimtoola* v. *Hyderabad (H.E.H. The Nizam of)*, [1957] 3 All E.R. 441; [1958] A.C. 379; [1957] 3 W.L.R. 884; 1 Digest (Repl.) 59, *434*.

*Triquet* v. *Bath*, (1764), 3 Burr. 1478; 1 Wm. Bl. 471; 97 E.R. 936; 11 Digest (Repl.) 632, *555*.

**Interlocutory Appeal.**

The plaintiff appealed against an order of THOMPSON, J., in chambers, dated Feb. 8, 1962, confirming an order of the master, and staying his two consolidated actions for slander against the defendant on the ground that the defendant had, since the actions were brought, become entitled to diplomatic immunity. The facts are set out in the judgment of HOLROYD PEARCE, L.J.

*E. L. Gardner, Q.C.,* and *R. Millner* for the plaintiff.

*T. O. Kellock* for the defendant.

**HOLROYD PEARCE, L.J.:** The plaintiff is an Indian doctor living in this country who was connected with an Indian government hostel for Indian students. The defendant was a counsellor for education on the official staff of the High Commissioner for India in this country from 1951 to November, 1957. During that period, his name was on the list prepared pursuant to s. 1 (4) of the Diplomatic Immunities (Commonwealth Countries and Republic of Ireland) Act, 1952. In 1956, the defendant, it is alleged, uttered slanders of and concerning the plaintiff in the way of his profession in connexion with the hostel. The defendant then returned to India, and there continued his educational work for the Indian government. In the summer of 1959, the defendant came temporarily to this country. His name was not then on the list prepared pursuant to s. 1 (4) of the Act of 1952. On July 14, 1959, the plaintiff's solicitors issued and served on the defendant a writ for damages for the slanders uttered in 1956. When the writ was served, the defendant, it is alleged, uttered a further slander. A second writ was immediately issued and served in respect of the further slander. On July 24, 1959, the defendant entered a conditional appearance to the first writ without prejudice to an application to set it aside on the ground that the defendant was entitled to diplomatic immunity. He apparently thought that his immunity in 1956 protected him against liability for the slanders uttered in that year. He found that he was not so protected; see *Dickinson* v. *Del Solar* (1), and the appearance became unconditional. During the autumn of 1959, pleadings in both actions were delivered and the defendant requested certain particulars in the first action. In January, 1960, the actions were consolidated by consent, and various other appropriate orders were made on the summons for directions. In February, 1960, the defendant (who had by now returned to India) asked that his evidence should be taken in that country. He supported his application by an affidavit in which he swore that he did not expect to visit this country during the next two years, and that the duties attached to his office as joint secretary in the Ministry of Scientific Research and Cultural Affairs in the Government of India were too heavy to permit of any visit to the United Kingdom. However, in July, 1960, he did come to this country, and from July 12, 1960, onwards he has served as scientific adviser on the official staff of the High Commissioner for India. On July 12, 1960, a summons was issued by the defendant's advisers to stay the consolidated actions on the ground of the defendant's diplomatic immunity. On July 22, 1960, a certificate was issued by the Commonwealth Relations Office to show that his name would be included in the list under s. 1 (4) of the Diplomatic Immunities Act of 1952, due to be published in August. For over a year the summons remained in abeyance.

(1) [1929] All E.R. Rep. 139; [1930] 1 K.B. 376.

Y

In January, 1962, a further certificate was issued to show that the defendant's name continued to be on the list under s. 1 (4) of the Act of 1952, and that he was still a member of the official staff of the High Commissioner, and that, as such member,

"he performs functions substantially corresponding to those performed by members of the official staff of an envoy of a foreign sovereign power."

On Jan. 29, 1962, the master ordered a stay, and the judge upheld the order.

Counsel for the plaintiff contends that, when an action is actually in existence and pursuing its normal course, the hardship on a plaintiff and the immolation evasion of a defendant create a special situation in which the court should not allow to a defendant the normal protection of diplomatic immunity. I cannot accept this contention. There is always a hardship on any plaintiff who cannot obtain redress from a defendant who is protected by diplomatic immunity. I see no difference, so far as merits are concerned, whether the facts which are the basis of that protection occur before the writ is served, or while the action is in existence. Nor can I accept the suggestion that there is here shown to be a lack of bona fides on the defendant's part. There is nothing in the evidence to show that he engineered his transfer to this country so that he might enjoy an immunity which he could not have while he was serving his government in India. Therefore, the particular merits do not help the plaintiff, however much he may be entitled to sympathy.

Counsel for the plaintiff further contends that this is a purely personal action and, as such, is unaffected by diplomatic immunity. He cannot refer us to any decided case which supports this proposition. He seeks support from a dictum of LORD DENNING in *Rahimtoola* v. *H.E.H. The Nizam of Hyderabad* (2), as tending to show that diplomatic immunity does not apply in cases of a commercial nature which have no element of government or sovereignty about them. I doubt, however, whether this action can be said to be wholly personal, since the slander arose out of, and was linked to, the defendant's duty in respect to the hostel. Moreover, the dictum of LORD DENNING is obiter, and not, I respectfully think, wholly in accord with the opinions of the other noble Lords. The Report on Diplomatic Immunity (Cmd. 8460 of 1952) throws some light on the practical aspects of the immunity. The state of a potential defendant will usually in practice waive its immunity or make arbitration arrangements wherever it seems to be proper in the interest of individual justice, and can be done without detriment to the state concerned. If it declines to do so, the Foreign Office or the Commonwealth Relations Office, in the interests of the subjects of this country, may refuse to continue to accept the offending potential defendant as possessing diplomatic status.

The real point in the case is whether, as a matter of principle, a defendant's diplomatic immunity which comes into existence after an action has been started, and while it is pending, necessitates a stay of those proceedings. It is conceded that, had the defendant's diplomatic immunity existed when the writ was issued, the proceedings would not be maintainable. Further, it is conceded that the steps taken by the defendant earlier in the action when he had no diplomatic immunity cannot constitute any waiver or voluntary acceptance of jurisdiction by the defendant. For he had then no right of immunity which he could waive and, having been duly served, he was bound to submit to the jurisdiction. But it is argued that, once this court has taken jurisdiction between the litigants, it will not relax its grasp even though facts occur thereafter which would create diplomatic immunity. In 1708, the Diplomatic Privileges Act (7 Anne c. 12) was passed with the preamble:

"Reasons for passing this Act:—Whereas several turbulent and disorderly persons having in a most outragious manner insulted the person of his

_____

(2) [1957] 3 All E.R. at p. 461; [1958] A.C. at pp. 417, 418.

UNIVERSITY OF MIAMI LAW LIBRARY

486

A  excellency Andrew Artemonowitz Matueof ambassador extraordinary of his
Czarist Majesty Emperor of Great Russia Her Majesties good friend and
ally by arresting him and taking him by violence out of his coach in the pub-
lick street and detaining him in custody for several hours in contempt of
the protection granted by Her Majesty contrary to the law of nations and in
B  prejudice of the rights and privileges which ambassadors and other publick
ministers authorised and received as such have at all times been thereby
possessed of and ought to be kept sacred and inviolable.''

Section 3 reads:

" And to prevent the like insolences for the future be it further declared
by the authority aforesaid that all writs and processes that shall at any
C  time hereafter be sued forth or prosecuted whereby the person of any
ambassador or other publick minister of any foreign prince or state autho-
rized and received as such by Her Majesty her heirs or successors or the
domestick or domestick servant of any such ambassador or other publick
minister may be arrested or imprisoned or his or their goods or chattels
may be distrained seized or attached shall be deemed and adjudged to be
D  utterly null and void to all intents constructions and purposes whatsoever.''

Section 4 sets out pains and penalties against any person who shall presume to
sue for or prosecute any such writ or process and deems them violaters of the law
of nations and disturbers of the public repose.   By s. 6, servants of ambassadors
shall not be privileged unless registered in the office of a secretary of state and
duly published as such.  Lord Mansfield, C.J., said, in *Triquet* v. *Bath* (3):

E  " This privilege of foreign ministers and their domestic servants depends
upon the law of nations.   The Act of Parliament of 7 Anne c. 12, is declaratory
of it.''

The Diplomatic Immunities (Commonwealth Countries and Republic of Ireland)
Act, 1952, s. 1 (1) (b), provides:

F  " such members of the official staff of a chief representative as are per-
forming duties substantially corresponding to those performed by members
of the official staff of an envoy of a foreign sovereign power shall be entitled
to the like immunity from suit and legal process as is accorded to members
of the official staff of such an envoy.''

Section 1 (3) provides that a certificate of the Secretary of State shall be final;
G  and s. 1 (5) provides that a chief representative and a state representative may
waive any immunity.

The immunity is derived from the rules of international law and from the legal
maxim par in parem non habet imperium;  see Dicey's Conflict of Laws
(7th Edn.), p. 132.   This rule of international law has been " engrafted onto our
domestic law '';  per Lord Atkin in *Compania Naviera Vascongado* v. *Cristina*
H  S.S. (4).   In *Magdalena Steam Navigation Co.* v. *Martin* (5), it was held that
the accredited public minister of a foreign state cannot be sued in a civil action,
even though the action arose out of commercial transactions by him here, and
although neither his person nor his goods be touched by the suit.   Lord Camp-
bell, C.J., in delivering the judgment of the court, said (6):

" The great principle is to be found in Grotius de Jure Belli et Pacis,
lib. 2, c. 18, s. 9, ' Omnis coactio abesse a legato debet '.   He is to be left at
liberty to devote himself body and soul to the business of his embassy.   He
does not owe even a temporary allegiance to the sovereign to whom he is
accredited, and he has at least as great privileges from suits as the sovereign
whom he represents.   He is not supposed even to live within the territory

(3) (1764), 3 Burr. at p. 1480.
(4) [1938] 1 All E.R. at p. 720;  [1938] A.C. at p. 490.        (5) (1859), 2 E. & E. 94.
(6) (1859), 2 E. & E. at p. 111.

of the sovereign to whom he is accredited, and, if he has done nothing to forfeit or to waive his privilege, he is for all juridical purposes supposed still to be in his own country. For these reasons, the rule laid down by all jurists of authority who have written upon the subject is, that an ambassador is exempt from the jurisdiction of the courts of the country in which he resides as ambassador."

In *Engelke* v. *Musmann* (7), LORD PHILLIMORE said:

"The object to be attained is immunity from the vexation of litigation with its impediments to the discharge of the functions of the domestic or domestic servant, as illustrated in the case which I have already quoted of *Magdalena Steam Navigation Co.* v. *Martin* (8)."

Diplomatic immunity is likely to create individual hardship; but this hardship must bow to a general overriding principle of comity between conflicting jurisdictions. An ambassador must live in a foreign land. And, if he could be summoned before the tribunals of that foreign land, or coerced by its legal process, it would be an affront to his sovereign, and an interference with his work. For the same reasons, it is necessary that the embassy staff, as well as the ambassador, should be immune. The immunity belongs to the state, and not to its representatives individually. There is no difference in principle between the ambassador and the humbler members of his staff, providing that they are properly accredited, and on the necessary list. The statute of 1708, by using the word "prosecute", may well have intended to prevent the continuation of any pre-existing action that arose before the defendant had immunity. But I prefer to decide the matter on a broader ground. It would be no less an affront and an interference to subject an ambassador to actions that were in existence before he acquired his diplomatic status and immunity than it would be to allow a writ to be served on him. Moreover, if a pre-existing action were allowed to proceed against an ambassador, it would create undesirable practical difficulties. The court could not order him or impose any sanction on his conduct. He could with impunity be a most unruly litigant. The mischief which the general rule is intended to avoid at the cost of some individual hardship, would inevitably arise.

In my judgment, the general principles that confer diplomatic immunity against the initiation of proceedings confer an equal immunity against the continuation of pre-existing and hitherto properly constituted proceedings. I would, therefore, dismiss the appeal.

**DAVIES, L.J.:** I agree. Of the principles which underlie the law of diplomatic immunity, that which perhaps applies most closely to the facts of this case—that is, to the question of the continuation of legal proceedings as opposed to their institution—is that a person entitled to such immunity is to be permitted to perform his duties as a diplomat or other accredited person without interference from the courts of this country. If this action were allowed to proceed, the defendant would be under the necessity of instructing solicitors and counsel and of attending court to give evidence. To expose him to this possibility would be contrary to the law as laid down in the authorities referred to by HOLROYD PEARCE, L.J. But the matter does not stop there. It may be that, at the stage which the action has reached, there would probably be no occasion for the court to make any order on the defendant before trial, though one can never be sure that some interlocutory order might not be necessary. But at the end of it all, if the plaintiff were successful, the result would be a judgment against the defendant for damages, and, no doubt, an order for the payment of costs. Counsel for the plaintiff does not shrink from the proposition that his argument would apply equally if, in the circumstances of this case, the defendant had been appointed to be not a member of the high commissioner's staff, but the high commissioner himself, or (if of a different nationality) an ambassador. The proposition that the

(7) [1928] All E.R. Rep. at p. 25; [1928] A.C. at p. 454.     (8) (1859). 2 E. & E. 94.

UNIVERSITY OF MIAMI
LAW LIBRARY

C.A.  GHOSH v. D'ROZARIO (DAVIES, L.J.)  645

A court could give a judgment for damages and make an order for the payment of costs—quite apart from any question of execution—against a high commissioner or an ambassador contains, in my view, its own refutation.

It is, in some senses, an unfortunate case. I suppose that most of these cases are; but we know nothing at all about the merits of the action. Still less is it any part of our province to consider whether the Indian government acted wisely or diplomatically in re-appointing to a diplomatic post in this country one who at the time of that re-appointment was a defendant in an action validly instituted and properly carried on and pending in the courts here. However, the action is not at an end, but merely stayed; and, should the defendant at any time cease to enjoy diplomatic immunity, it will be able to proceed.

**WILBERFORCE, J.:** I agree, and I will only add a few words on what HOLROYD PEARCE, L.J., has described as the real point of principle in this case. There is no doubt that the defendant now holds an appointment under the High Commissioner for India of such a character as would make it impossible for a writ effectively to be served on him unless the High Commissioner were to waive the immunity which the latter possesses. The question is whether the position is altered in law by reason of the fact that the defendant, before the appointment was assumed, had been validly served with the writ, had not taken steps to set it aside, and had submitted to the jurisdiction of this court. In order to maintain a proposition of this nature, the plaintiff must, in effect, contend that the high commissioner, to whom this privilege belongs, was, at the date when the defendant assumed his appointment, and is, at the present time, bound by the submission to the jurisdiction of the defendant, made at a time when the defendant himself had no immunity, and when the high commissioner had no interest in the defendant's immunity, and no means of asserting it. This, if accepted, involves the consequence that the high commissioner, although he does not waive the immunity of his officer, must accept a position in which that officer absents himself from his duties in order to defend himself against a claim which, if established, or left to go by default, may present him in an unfavourable light to the public of this country. It seems to me impossible to say—however much it be assumed that the court would adapt its procedure to suit the convenience of the high commissioner—that to place him in this situation might not both interfere with the proper functioning of his organisation, and affect his dignity as the representative of a sovereign state. It may be answered to this that the high commissioner was under no obligation to employ the defendant and so, if I may adapt a catch phrase, to employ a law suit; but so to contend involves a limitation on the freedom of a representative of a foreign state to choose his officials which, though perhaps possible by diplomatic representation, should not be imposed by the court.

To distinguish this from the normal case, where immunity from process is claimed for the member of the staff of an ambassador or a high commissioner, on the ground that the critical act is the issue of the writ containing the sovereign's formal command, would, to my mind, be an unduly technical approach, and one inconsistent with the principles underlying claims to immunity which are general principles of public policy, requiring that the effectiveness and dignity of the representatives of foreign states should not be impaired. It would be as contrary to those principles to let this action go on, as it would be to permit an action commenced against a private individual to continue against him after he had been appointed and accepted as an ambassador in this country.

For these reasons, as well as those given by my Lord, though regretting the hardship which this involves for the plaintiff, I agree that the action should be stayed.

*Appeal dismissed. Leave to appeal to the House of Lords refused.*

Solicitors: *Cree, Godfrey & Wood* (for the plaintiff); *T. L. Wilson & Co.* (for the defendant).

[*Reported by* HENRY SUMMERFIELD, Esq., *Barrister-at-Law.*]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 82-0422-Civ-JWK

H.R.H. PRINCE TURKI BIN          )
ABDULAZIZ, PRINCESS HEND         )
AL-FASSI, his wife, and          )
SHEIKHA FAIZA ALI HELMI,         )
                                 )
        Plaintiffs,              )
                                 )
vs-                              )
                                 )
METROPOLITAN DADE COUNTY,        )      AFFIDAVIT IN SUPPORT OF MOTION
a political subdivision          )              TO DISMISS
of the State of Florida,         )      _____
TOM PETERSON, J. COLLINS,        )
and JOHN DOES 1 THROUGH          )
11,                              )
                                 )      FILED BY _____ DC
        Defendants.              )
_____)      '82 JUN -4 AM 9 03

                                        JOSEPH I BOGART
                                        CLERK US DIST. CT.
                                        S.D. OF FLA.-MIAMI

STATE OF FLORIDA    )
                    ) SS:
COUNTY OF BROWARD   )

     BEFORE ME, the undersigned authority, duly authorized to
administer oaths and take acknowledgements, personally appeared,
ALLAN M. RUBIN, who, having been duly cautioned and sworn,
deposes and states as follows:

     1.   That this Affidavit is made in support of a Motion to
Dismiss filed on behalf of the Plaintiffs herein.

     2.   That this lawsuit was filed to redress those wrongs
committed by the Defendants on February 26, 1982, when, based
solely upon an uncorroborated affidavit of a former employee of
the Plaintiffs, the Defendants invaded the home of the Plaintiffs,
ostensibly in search of a household employee said to be held
against her will, as is more fully described in the Complaint
filed herein.

     3.   That subsequent to the commencement of this proceeding
the Plaintiffs were informed that the State Department of the
United States had recognized their entitlement to diplomatic
immunity.

     4.   That on or about April 14, 1982, the Plaintiffs sought
and subsequently received, an abatement of these proceedings for
a period of thirty (30) days so that they could determine the

-1-

implications upon this proceeding of the U.S. State Department's recognition of their diplomatic immunity in that the further prosecution of this cause may have been deemed to constitute a waiver of the Plaintiffs' diplomatic immunity.

5.   That on Sunday, May 30, 1982, the Miami Herald's Tropic Magazine in an article entitled "The Snitch" reported the following:

A.   That the sole source relied upon by the Defendants in connection with the issuance of the search warrant which was executed on February 26, 1982, one Abdelmejid Daifi, had voluntarily submitted to a polygraph test administered by a noted polygraph expert, Warren D. Holmes, who does considerable work for the State Attorney's Office.

B.   That the results of the polygraph test demonstrated that Abdelmejid Daifi had lied about the facts contained in his sworn affidavit upon which the search warrant was predicated, including the fact that a certain household employee was being held against her will.

6.   That inasmuch as Plaintiffs' position maintained throughout this lawsuit has been vindicated through the proven falsity of Daifi's underlying allegations, and, inasmuch as the pursuit  of the claims contained in the Complaint would serve no further useful purpose, and, inasmuch as the continued maintenance of this action might be interpreted as a waiver of the diplomatic immunity conferred upon H.R.H. PRINCE TURKI BIN ABDULAZIZ and the members of his family on April 2, 1982, the Plaintiffs hereby seek a dismissal of all pending claims and counterclaims under the provisions of the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (ratified by U.S. Senate, September 14, 1965, ratification deposited, November 13, 1972; entered into force for the United States, December 13, 1972), and under the Diplomatic Relations Act, Pub.L. No. 95-393, 92 Stat. 808 (1978), 22 U.S.C. Sec. 254 (a-e).

RUBIN AND RUBINCHIK, P.A., ATTORNEYS AT LAW, 500 CENTER COURT BUILDING, 2450 HOLLYWOOD BOULEVARD, HOLLYWOOD, FLORIDA 33020

491

FURTHER YOUR AFFIANT SAYETH NOT.

ALLAN M. RUBIN

SWORN TO and SUBSCRIBED TO before me this 3rd day of June, 1982.

NOTARY PUBLIC
State of Florida

My Commission Expires: NOTARY PUBLIC STATE OF FLORIDA AT LARGE
MY COMMISSION EXPIRES OCT. 9 1982
BONDED THRU GENERAL INS. UNDERWRITERS

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was mailed this 4th day of June, 1982, to:

Ralph C. Rocheteau, III, Esq.
Assistant County Attorney
1626 Courthouse Building
73 West Flagler Street
Miami, Florida 33130

Steven D. Ginsburg, Esq.
1501 N. W. 14th Street
Suite 100
Miami, Florida 33125

Kent A. Zaiser, Esq.
Assistant Attorney General
Department of Legal Affairs
Civil Division
The Capitol
Suite 1501
Tallahassee, Florida 32301

Jerry B. Katzen, Esq.
Rash, Katzen, Key & Pintado
7900 Red Road
Suite 25
South Miami, Florida 33143

Norman Malinski, Esq.
City National Bank Building
25 West Flagler Street
Miami, Florida 33130

Ellis Rubin, Esq.
Rubin and Young
165 N. E. 26th Terrace
Miami, Florida 33137

-3-

492

LEE, SCHULTE, MURPHY & COE, P.A.
200 S. E. First Street
Suite 800
Miami, Florida 33131
Telephone: (305) 371-7300

RICHARD BEN-VENISTE, ESQ.
Ben-Veniste & Shernoff
4801 Massachusetts Avenue, N.W.
Washington, D.C. 20016

RUBIN AND RUBINCHIK, P.A.
500 Center Court Building
2450 Hollywood Boulevard
Hollywood, Florida 33020
Telephone: (305) 921-7283 or 947-1919
Attorneys for Plaintiffs

By: _____
    ALLAN M. RUBIN

-4-

493