**DEFENDANT EXHIBIT**
CASE NO. 19-20450-CR-Scola
EXHIBIT NO. X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 82-0422-CIV-JWK

H.R.H. PRINCE TURKI BEN :
ABDULAZIZ, PRINCESS HEND
AL-FASSI, his wife, and
SHEIKHA FAIZA ALI HELM, :

    Plaintiffs,

vs.

METROPOLITAN DADE COUNTY,
a political subdivision
of the State of Florida,
TOM PETERSON, et al.,

    Defendants,

JOINT RESPONSE TO
MOTION TO DISMISS FILED BY
:PLAINTIFFS/COUNTERDEFENDANTS

FILED BY _____

'82 JUN 14 PM 1 31

JOSEPH I BOGART
CLERK US DIST CT
SD OF FLA-MIAMI

---

    The Defendants/Counterplaintiffs KUBIK, PITTS, SOMMERHOFF, FALCON, FISTEN, FANDREY, JANSEN and MURRAY hereby jointly respond to the Motion to Dismiss filed in this action on June 4, 1982.

    The Motion seeks dismissal of the <u>entire</u> action: while no objection is hereby interposed to the Plaintiffs' attempt to dismiss their own Complaint, by separate document filed simultaneously herewith the abovenoted parties have, pursuant to Federal Rules of Civil Procedure 41, objected to dismissal of their counterclaims.

    The grounds on which the Plaintiffs request this Court to terminate all litigation is, from examination of the motion papers (referring to Paragraph 5 of the Motion) based on two (2) grounds: (a) an assertion of diplomatic immunity from civil claims, and (b) vindication of the Plaintiffs by an article in the Miami Herald. The second point mentioned has about as much legal merit as the first: since it is capable of briefer response, it will be dealt with first.

    The Affidavit filed by counsel in support of this Motion incredibly enough, and apparently wholly ignorant of the requirements for sufficiency of affidavits (<u>e.g.</u>, Federal Rules

CASE No. 82-0422-CIV-JWK

of Civil Procedure 56(e)) refers to a newspaper article (Miami Herald, Tropic Magazine, May 30, 1982) for the proposition that the Plaintiffs' position in these proceedings has been vindicated, the "Affidavit" then concluding that no further litigation is therefore necessary. Mr. Rubin must believe that his Affidavit possesses the properties of a magic wand: his clients think they have made their point and now wish the lawsuit would disappear. To adopt Mr. Rubin's proposition could well solve the Court's problem with overcrowded dockets: a party could declare himself the winner of a lawsuit by filing an affidavit to that effect. Fortunately, neither the document nor a newspaper/magazine article can serve to supplant the fact-finding and adjudicatory powers of the Federal District Court. Accordingly, these Defendant/Counterplaintiff's move this Court to strike said Affidavit as being incompetent, immaterial and irrelevant to the issues subjudice. See also Local Rule 16(f)(7) Federal Rules of Civil Procedure.

The Motion to Dismiss travels principally on the theory that the Plaintiffs are beyond the jurisdiction of this Court by virtue of a grant of diplomatic immunity. To this assertion there are two (2) responses:

> A) The face of the statutes and documents relied on indicate that no such immunity exists; and
>
> B) The protection of diplomatic immunity rests on a _factual_ finding of entitlement to such immunity, a finding which this Court has not made.

This Court most assuredly has the right, and the duty to inquire into the granting of diplomatic status to the Plaintiffs - this defense has traditionally been scrutinized by the Courts and rejected when found improper. See National City Bank of New York v. Republic of China, 348 U.S. 356 (1955); In Re Baiz, 135 U.S. 403 (1890); Vulcan Iron Works, Inc. v. Polish American Machinery

CASE No. 82-0422-CIV-JWK

Corporation 479 F.Supp 1060 (S.D.N.Y. 1979).

The document filed in this action and relied on by the Plaintiffs to establish diplomatic immunity states that

> His Royal Highness Prince Turki Bin Abdulaziz was duly notified to the Department of State as Special Envoy for matters concerning the Government of Saudi Arabia.
> (emphasis added)

The State Department document then follows with the legal conclusion that, pursuant to applicable statutes,

> His Royal Highness Prince Turki Bin Abdulaziz is entitled to diplomatic immunity as defined by Article 31 of the Vienna Convention on Diplomatic Relations.

Plainly, the State Department conclusion of law is incorrect notwithstanding the Department's invasion of a province exclusively that of the judiciary. U.S. v. Enger, 472 F.Supp 490,501,503,506,545 (D.N.J. 1978). Article 31 of the Vienna Convention describes immunity from civil jurisdiction afforded "diplomatic agents", and goes on to state exceptions to that immunity, including excepting the grant of immunity in

> an action relating to any professional or commerical activity exercised by the diplomatic agent in the receiving State outside his official functions.
> Vienna Convention on Diplomatic Relations, Article 31(1)(c) (emphasis added).

The subject matter of this litigation, abuse of process and assault and battery, cannot be said to be within anyone's diplomatic functions.

Further, the Act protects "diplomatic agents", defined in Article 1(e) as "... the head of the mission or a member of the diplomatic staff of the mission." The Plaintiff, on the other hand is characterized as a "Special Envoy", with no mission or function being defined. The Act does not, therefore, apply to the Plaintiffs. (Historically, the Vienna Convention was meant to exclude envoys from its operation. See II Yearbook of the

CASE No. 82-0422-CIV-JWK

International Law Commission (1957), 131-133.) Thus, on its face the Plaintiffs' claim to immunity must fail. U.S. v. Melekh, 190 F.Supp 67, 77, 85, 87 fn.2, 88 (S.D.N.Y. 1960).

Moreover as a matter of law as well, the Plaintiffs cannot claim the benefit of diplomatic immunity, having expressly waived that right by filing this lawsuit. The Supreme Court of the United States (somewhat sarcastically) rejected a claimant's assertion of immunity from counterclaims in National City Bank of New York v. Republic of China, supra, stating at pages 361-362:

> We have a foreign government invoking our law, but resisting a claim against it which fairly would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice.

The Court proceeds, in a subsequent part of this opinion, (page 364) to express the following maxim, directly applicable to the instant action:

> It is recognized that a counterclaim based on the subject matter of a sovereign's suit is allowed to cut into the doctrine of immunity.

This decision is parallelled in the Vienna Convention, at Article 32(3), enacted into law in 1977, some twenty (20) years after the National City Bank case (Diplomatic Relations Act of 1977, 22 U.S.C. Section 254b):

> The initiation of proceedings by a diplomatic agent or by a person enjoying immunity from jurisdiction under Article 37 shall preclude him from invoking immunity from jurisdiction in respect of any counterclaim directly connected with the principal claim

In all events, this Court is requested by the Plaintiffs to accept the State Department's document and its conclusions promulgated by an individual in charge of maintaining records, the Affidavit of its lawyer, and thereon to dismiss all pending proceedings. The duty of the Court to satisfy itself as to the validity of the diplomatic immunity claim is not mentioned.

- 4 -

519

CASE No. 82-0422-CIV-JWK

Without belaboring the issue, comprehensive factual development must take place before this issue can be disposed of - it may well be likened to an affirmative defense of estoppel. The factual matters are presented in a variety of issues, among them:

> A) <u>The correctness of action taken by the State Department</u>. The Plaintiffs cannot claim that the document furnished by the state department is beyond judicial scrutiny. This court must make a determination as to whether the claimed immunity was requested and conferred in accordance with the appropriate statutes. <u>Vulcan Iron Works, Inc. v. Polish American Machinery Corp.</u>, 479 F.Supp 1060 (S.D.N.Y. 1979).
>
> B) <u>Whether a "diplomatic mission" exists at the Cricket Club, Miami, Florida</u>. The Vienna Convention protects foreign government functions at its place of business - the existence of such an official place of business requires judicial determination. <u>U.S. v. Rosal</u>, 191 F.Supp. 613, 664 (S.D.N.Y. 1960)
>
> C) <u>Whether the Plaintiffs are "diplomatic agents" or family members of "diplomatic agents"</u>. The existence of an official function is a <u>sine qua non</u> of diplomatic immunity. On the face of the papers submitted the Plaintiffs do not qualify as "agents" and family. The Counterdefendants submit they are hiding behind this alleged "diplomatic status" for the purposes of conducting non-immune commercial activities and to protect themselves from criminal prosecution. (<u>See</u> letter from Janet Reno to State Department, Exhibit "A" hereto, especially page 4). This requires judicial examination.

This list is by no means comprehensive.

It does illustrate, however, the necessity for greater development of the factual issues relating to the claim of diplomatic immunity. For this reason, if the Court should choose to look beyond the obvious facial defects of the claimed diplomatic immunity, and the clearwaiver of the alleged immunity under Article 32(3) Diplomatic Relations Act, discovery should be allowed to proceed for the purpose of presenting evidence as to the merit of this defense.

CASE No. 82-0422-CIV-JWK

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed on this \_14th\_ day of \_June\_, 1982 to the addressees noted below:

> LAW OFFICES OF STEVEN D. GINSBURG, P.A.
> 1501 N.W. 14th Street
> Suite 100
> Miami, Florida 33125
>
> By: _/s/ Steven D. Ginsburg_
>     STEVEN D. GINSBURG
>
>
> JERRY B. KATZEN, ESQUIRE
> RASH, KATZEN, KEY & PINTADO
> 7900 Red Road
> Suite 25
> South Miami, Florida 33143
>
> By: _/s/ Jerry Katzen_
>     JERRY B. KATZEN
>
>
> LAW OFFICES OF NORMAN MALINSKI, P.A.
> 933 City National Bank Building
> 25 West Flagler Street
> Miami, Florida 33130
> Telephone: (305) 371-6060
>
> By: _/s/ Norman Malinski_
>     NORMAN MALINSKI

Thomas E. Lee, Esquire
Lee, Shulte, Murphy & Coe, P.A.
800 Peninsula Federal Building
200 Southeast First Street
Miami, Florida 33131

Allan M. Rubin, Esquire
Rubin and Rubinchik, P.A.
500 Center Court Building
2450 Hollywood Boulevard
Hollywood, Florida 33020

Richard Ben-Veniste, Esquire
Ben-Veniste & Shernoff
4801 Massachusetts Avenue N.W.
Washington, D.C. 20016

Ellis Rubin, Esquire
265 Northeast 26th Terrace
Miami, Florida 33137

CASE No. 82-0422-CIV-JWK

Tom Peterson
Chief Assistant State Attorney
1351 N.W. 12th Street
Miami, Florida  33125

Ralph C. Rocheteau, Esquire
Assistant County Attorney
73 West Flagler Street
Miami, Florida  33130

Kent A. Zaiser
Assistant Attorney General
Department of Legal Affiars
Civil Division
The Capitol
Suite 1501
Tallahassee, Florida 32301

522

- 7 -



# State Attorney

METROPOLITAN JUSTICE BUILDING
MIAMI, FLORIDA 33125

JANET RENO
STATE ATTORNEY

May 26, 1982

TELEPHONE (305) 547-5200

Ambassador Joseph W. Twinam
Deputy Assistant Secretary
  of State for Near Eastern
  and Southeast Asian Affairs
Department of State
2201 C Street, N.W.
Washington, D.C.  20520



Dear Ambassador Twinam

     We have reviewed your letter of April 19, 1982, the Diplomatic Relations Act of 1978, and applicable law. We find no basis for the State Department conferring diplomatic immunity on His Royal Highness Prince Turki Biu Abdul-Aziz.

     I set forth the history of this matter as we know it so that you will understand our position.

     In January, 1982, Commander Arthur Nehrbass of the Organized Crime Bureau of the Metro Dade County Police Department made inquiry through the Bureau of Alcohol Tobacco and Firearms as to whether the Prince enjoyed diplomatic immunity. The Bureau has confirmed that it was advised by the State Department, and that the Bureau in turn advised Commander Nehrbass that the Prince did not enjoy diplomatic immunity.

     Chief Assistant State Attorney Thomas K. Petersen confirmed this information by inquiry to Mr. David Patterson of the State Department in February, 1982. Mr. Patterson advised Mr. Petersen that the Prince did not enjoy diplomatic immunity and there was no reason why a search warrant could not be executed on the residence of the Prince here in Miami.

     On February 26, 1982, the Prince was living with his family in an apartment in the Cricket Club here in Miami. We understand that he was engaged in private investment enterprises in the United States, particularly with one Alvin Malnik. We refer you to the Department of Justice for information concerning Mr. Malnik's enterprises.

Exhibit "A"

Ambassador Joseph W. Twinam
May 26, 1982
Page 2

There is no evidence whatsoever that the Cricket Club or any part of it has been a diplomatic mission or that the Prince has or is engaged in any diplomatic activity here in Dade County.

A search warrant was executed against the residence of the Prince on February 26, 1982. The Prince, his family, and his servants or employees interferred with the execution of the warrant.

On March 2, 1982, the Prince filed suit here in Dade County against the police officers who attempted to serve this warrant; my Chief Assistant, Tom Petersen, who directed its preparation; and Dade County. The filing of his lawsuit which is still pending contradicts any claim the Prince might now want to make to diplomatic immunity. He did not proceed through diplomatic channels, but through a private lawyer seeking money damages in a spurious claim against the defendants including a county government.

The State Department was aware of these circumstances and even after this incident confirmed that the Prince did not enjoy diplomatic immunity.

From February 26th to March 17th the State Department engaged in many discussions with the government of Saudi Arabia concerning the attempted execution of the search warrant and the fact that criminal charges might be filed against the Prince. At no time during this period were we advised of any conversation between the two governments concerning the fact that the Prince might be appointed a special envoy.

Additional time elasped until you advised me by telephone on April 2, 1982, that the Prince was considered to have diplomatic immunity. You then asked me to stop any criminal proceedings against the Prince or his family and treat him as a diplomatic representative and deal with him and his family as one would deal with diplomats. You referred me to Philip Shamwell of the State Department for further information. When I asked on what basis immunity was conferred, Mr. Shamwell verbally advised me that immunity was based on a letter of March 17, 1982, from the Saudi Government plus oral assurances made on April 1st,

524

that the Prince was appointed special envoy with economic advisory responsibilities. Yet, according to Mr. Shamwell, as of April 14th, no forms had been filled out. To implement this assurance and the State Department had received no written confirmation from the Saudi Ambassador. Mr. Shamwell, at first told me that I might have a copy of the March 17th letter and later said it might be privileged but he would check to see if that were so. I have heard nothing further from him.

On April 22, 1982, we received your letter of April 19th, in which you state:

> "On March 17, 1982, the Embassy of Saudi Arabia formally notified the Department of State that Prince Turki is entitled to be accorded diplomatic immunity based upon his position as a senior member of the ruling family Saudi Arabia. The Department was subsequently advised that Prince Turki had been vested with specific diplomatic functions in the United States and that he had been accorded the title of Special Envoy for matters of interest to the Government of Saudi Arabia. In addition to having a diplomatic title, the Prince also meets the requirement that he possess a diplomatic passport from the sending State (Saudi Arabia) and a diplomatic ("A-1") visa from the United States. Therefore, the Department, in accordance with standard procedures, accorded Prince Turki diplomatic status and attendant privileges and immunites."

At the time the State Department advised us that the Prince did not have diplomatic immunity, you knew he was a senior member of the Royal Family, and that he possessed a diplomatic passport from Saudi Arabia and a diplomatic visa from the United States. The only fact that changed before you conferred diplomatic immunity was some designation by the Saudi Government that he was a special envoy of some kind.

525

We cannot believe the State Department would suddenly accept a special diplmatic envoy, expect him to form legitimate diplomatic missions and confer diplomatic immunity, knowing that local law enforcement officials were prepared to charge him with a crime.

In short, all the evidence indicates the State Department conferred diplomatic immunity on Prince Turki solely to prevent him from being charged by this office and not because he was on any special diplomatic mission. All the evidence indicates that the State Department took that action in response to pressure from the Saudi Government who wanted to keep one of the members of the Royal Family of Saudi Arabi from being embarrassed.

I understand that the State Department may be concerned about serious diplomatic implications if charges were filed against Prince Turki. I understand that the State Department may conclude that the consequences of filing charges might have such a serious international impact that it would be better that charges not be filed, but that is not what Mr. Shamwell told me or what you are telling me in your letter of April 19, 1982. Instead, we are being told that the Prince is on some special diplomatic mission for which he has been given diplomatic immunity. That story does not appear to be true.

Diplomatic immunity was not meant to be used to protect individual foreigners from embarrassment. The Preamble to the Vienna Convention provides that the purpose of diplomatic immunity is "not to benefit individuals, but to ensure the efficient performance of the diplomatic missions as representing States." The Diplomatic Relations Act of 1978 which incorporates the Convention appears to base diplomatic immunity on the theory of "functional necessity." As we understand it, this theory is based on the proposition that the diplomat must be shielded from the receiving State in order to permit him to function effectively as a diplomat.

We respectfully submit that the Prince has not and is not functioning as a diplomat and there is no need to shield him. The Prince may claim he is a special economic envoy on a diplomatic mission because he is "promoting friendly relations between the sending State and the receiving State, and developing

Ambassador Joseph W. Twinam
May 26, 1982
Page 5

their economic cultural and scientific relations." (Article 3 (1)(e) of the Vienna Convention). We suggest that possibility because we note from the Miami Herald that since receiving diplomatic immunity, the Prince has retained a public relations counselor to advise him on the charitable donations he should make to improve his image in Dade County. We regularly pick up the papers to read of some new contribution the Prince or his family has made. We trust the State Department has not and will not permit the Prince to buy his immunity. We also trust the State Department is not so gullible as to accept the fact that after all that happened that the Prince is suddenly in Dade County on a diplomatic mission to promote friendly relations.

We respectfully submit that the State Department erred in conferring diplomatic immunity on the Prince. It placed us all in an untenable position for the future.

We do not wish to meddle in international affairs or second-guess your diplomatic decisions. If international considerations outweigh the local interest in filing charges then tell us so and get the Prince and his family out of the country. You should not solve the problem by conferring diplomatic immunity on the basis of an elaborate sham and, in so doing, permit the Prince to remain in the country and to act with immunity. To confer immunity in this manner and in this case impairs public confidence in our government, creates an unhealthy situation in Dade County and strikes a serious blow at federalism.

The implications are great. The position taken by the State Department would permit someone of tremendous wealth to pressure his way to a status of immunity, invest and act as he wants without check by law enforcement authorities and, in effect, place himself above the law. He could use that wealth for corrupt purposes knowing that law enforcement officials stand helpless.

We would ask the State Department to review the immunity conferred upon the Prince and reconsider its position and its ultimate implications.

Sincerely,

JANET RENO
State Attorney

JR/mb
cc: Director Arthur Nehrbass
    Steven D. Ginsburg, Esquire
    Bruce Zagaris, Esquire

527