Case 1:19-cr-20450-RNS Document 192-8 Entered on FLSD Docket 08/22/2022 Page 2 of 22

DEFENDANT EXHIBIT

CASE NO. 19-20450-CR-Scola

EXHIBIT NO. B1

proceeded with the full-speed implementation of the National Defense Strategy, and its clarion call to modernize the military, strengthen our alliances, and reform the DoD. We did all of this while also sharing medical professionals, supplies, knowledge, and assistance with many of our foreign partners.

Finally, we stepped forward when the nation called, from the earliest days of the pandemic in January to the present day, to assist the American people in fighting the scourge of COVID in all fifty states and territories. We built health-care facilities across the country, deployed hospital ships, and augmented civilian doctors and nurses across the land with our own uniformed professionals. We brought medical supplies and U.S. citizens back to the States, caring for many of them on our bases while they quarantined. And we worked with HHS to develop, test, manufacture, and distribute vaccines as part of Operation Warp Speed.

Over the course of the year, the DoD committed more than sixty thousand service members to the front lines of the pandemic. Many of them left their homes, their families, and their communities on short notice, unsure of what the future would bring, and they often risked their own lives to help their fellow Americans. We should all be proud of their integrity, their professionalism, and their dedication to duty. I certainly am.

## CHAPTER 11

## DESPERATE MEASURES

"We have many options for Venezuela, and by the way, I'm not going to rule out a military option," President Trump declared in 2017.[1]

Though Venezuela was on President Trump's mind since my confirmation as secretary of defense in July 2019, it remained on the back burner as tensions continued with Iran through the rest of the year. The operations in Iraq from late December 2019 through early January 2020 seemed to sate Trump's appetite for military action for a while longer. However, talk about acting against Caracas resurfaced not long thereafter as interactions between the oil-rich South American country and Iran deepened. Both countries were evading U.S. sanctions as we looked for ways to shut those activities down.

In 1998, the breakdown in Venezuela's political system brought Hugo Chavez, a charismatic military officer, to power. Chavez promised

to end corruption and eradicate poverty, two themes that appealed to the millions of poor and working-class people he considered his base. His socialist policies to improve health care, housing, and economic equality saw temporary success early on, but inevitably resulted in massive poverty, high inflation, and other economic woes. Chavez dismantled the country's democracy during this period, while also suppressing critics, clamping down on the press, and manipulating electoral laws, among other things.

Upon Chavez's death in 2013, Nicolás Maduro, a former bus driver, trade union leader, and member of the National Assembly who had become part of Chavez's inner circle, succeeded him as president. Under Maduro, Venezuela fell into even greater social, economic, and political disrepair. Mass protests resulted the year following his inauguration, prompting Maduro to press down even harder on dissent by using lethal force against protesters, arbitrary imprisonment, and extrajudicial killings, all of which would force millions of Venezuelans to flee the country.[2]

On January 23, 2019, less than two weeks after Maduro began his second term as president, Juan Guaidó—the head of the opposition-controlled National Assembly—declared himself interim president in accordance with the nation's constitution. Maduro quickly denounced this move as a coup sponsored by the United States. Meanwhile, over fifty governments worldwide, including the Trump administration, formally recognized Guaidó as the legitimate head of Venezuela. Russia, China, Iran, Syria, Cuba, and other countries, however, continued to regard Maduro as the nation's leader.

Trump had been fixated on Venezuela since the early days of his administration, with an eye toward using military force to oust Maduro. It was August 11, 2017, when he spoke about the "many options for Venezuela," including military ones, that I cited up front.[3] In his book *The Room Where It Happened,* John Bolton recalls Trump telling him at the White House a year later to "get it done." To Bolton, this meant "get rid of the Maduro regime." Bolton goes on to recount Trump saying, "'This is the fifth time I've asked for it.'"[4]

On April 30, 2019, a little more than six weeks before Trump named me acting secretary of defense, Guaidó led a group of Venezuelan military officials and civilian personnel in an uprising to remove Maduro. It failed due to insufficient support from senior military officers, with dozens of people injured and several killed in the clashes that followed.[5] Maduro blamed Trump for the uprising. Bolton and Pompeo took to the airwaves to praise Guaidó's efforts, condemn Maduro, and criticize Russia for its support, with Pompeo saying, "If that's [military action] what's required, that's what the United States will do."[6]

The failure of Guaidó and his fellow plotters marked the end of a critical phase in the Trump administration's attempts to rid the Venezuelan people of Maduro. This setback seemed to take the wind out of the sails of those who had worked to restore democracy in Venezuela and end the humanitarian disaster. Pompeo and Bolton would occasionally talk about "how close we came" to freeing the Venezuelan people. For Trump, it hardened his view that Maduro was "strong" and Guaidó was "weak." He couldn't see Guaidó as president of the country, let alone able to overthrow Maduro, which dampened his enthusiasm to support him.

That said, getting rid of Maduro still seemed to be a bucket list item for Trump. I never heard him articulate why it was so important, though he did speak at times of the suffering of the Venezuelan people. He would dip his head, shake it slowly, and say in a plaintive tone, "How terrible it must be for those poor people" to live there. It seemed sincere, but knowing Trump as I came to

do, I hardly felt this was his main motivation. In his book, Bolton mentions the president's interest in gaining access to Venezuela's oil reserves.[7] I heard Trump talk about this a couple of times myself. He once said "we should get the oil" when military action was discussed, and on other occasions wanted to make sure the United States had "full access"—unfettered as well by any previous agreements with Russia or China—to the country's resources if Maduro was dislodged by us. It was consistent with the view he took about the United States gaining control of the oil fields in eastern Syria when we were dealing with the issue of American support to the Syrian Democratic Forces in the fall of 2019.

Trump simply seemed to view these things as opportunities to make money, which didn't surprise me, given his business background and view of wealth as a metric of success. Such actions were, however, at odds with long-standing U.S. policies and practices and, in most cases, international law.

Bolton once shared with me his view that "it's all about the votes for him [Trump]; there's no principle behind it." John was correct. I recalled from my time as the national policy director on Fred Thompson's presidential campaign in 2007 that Cuban Americans and other pro-democracy groups—in this case, Venezuelan Americans—could really deliver come election time. Trump wouldn't be the first presidential candidate to cater to political groups such as these, especially in vote-rich Florida. There were, however, very good humanitarian and strategic reasons for supporting Guaidó and the opposition in Venezuela.

Maduro was a dictator, and what he and Chavez did to the Venezuelan people was horrific. Furthermore, allowing countries like Russia, China, and Iran to gain, or strengthen, a foothold in the Western Hemisphere was of great concern. However, none of these reasons justified risking the lives of American service members, a

view I believe Pompeo and Bolton shared. There were other ways to address these issues. Yet again and again, Trump would ask for military options.

On December 12, 2019, I hosted the weekly breakfast for Mike Pompeo and Robert O'Brien at my office in the Pentagon. O'Brien had replaced Bolton in mid-September, so he was relatively new and eager to learn. These meetings were a good opportunity to discuss a wide range of issues privately, and to make sure we were coordinated. Over time, unfortunately, they would end.

Venezuela hadn't come up in months, but near the end of the meeting O'Brien said his team was working on several items that would be coming our way at some point, one of which was "next steps on Venezuela." I jotted it down as we all stood to depart.

I flew to Europe on December 15 to celebrate the seventy-fifth anniversary of the Battle of the Bulge, sharing the experience with my old unit—the 101st Airborne Division "Screaming Eagles"—in Bastogne, Belgium. On the way home a few days later, my staff informed me that the National Security Council had held a meeting to discuss military options for Venezuela. While the NSC wasn't seeking the kinetic measures that concerned me most, one idea—the interdiction of ships carrying Venezuelan oil—had the potential to escalate into conflict. The second option, a plan to organize a naval show of force in the Caribbean, presented a host of other questions. Pompeo and I had our weekly call on Tuesday morning, the day after my return, so I raised this issue with him. He wasn't tracking these developments, which wasn't unusual—news usually travels fastest in the department most affected—but was going to follow up with his staff.

We shouldn't have been too surprised that the NSC was working on something, however. At the time of the Venezuelan opposition's uprising against Maduro, Trump threatened a "full and complete

embargo, together with highest-level sanctions" if Cuba didn't immediately end its support for Maduro.[8] Trump had also pressed in the past for military options to stop the flow of oil between Venezuela and Cuba.[9] Oil was the currency by which Caracas compensated Havana for its support. We would eventually learn that Mauricio Claver-Carone, the NSC senior director for the Western Hemisphere, was pushing a hard line in the White House, and he found a sympathetic ear for military options in O'Brien.

Claver-Carone was a sharp staffer who knew Latin American issues well, especially Cuba and Venezuela. I respected his knowledge and passion for his work, but I was concerned that it seemed too personal for him, given how he spoke about the issues and the references he made to growing up in Miami's Cuban American community.

Nearly two months later, on February 5, 2020, Trump met with Guaidó in the Oval Office. At Trump's invitation, Guaidó had attended the State of the Union address the previous evening. During his remarks on Capitol Hill, Trump praised the interim Venezuelan president and offered the United States' support for him and his people, stating "Mr. President . . . please take this message back that all Americans are united with the Venezuelan people in their righteous struggle for freedom"; this was viewed by many as a personal endorsement as well.[10] This notion was mistaken.

I spoke with Trump for a few minutes right before his Oval Office session with Guaidó on the fifth. He still had serious doubts about the young leader, saying he looked "weak," especially compared to how "tough" and "strong" Maduro seemed. Trump doubted Guaidó's ability to overthrow Maduro. He then pivoted quickly and spoke admiringly of Guaidó's wife, Fabiana Rosales, whom Trump had met at the White House in March 2019. He described her as "very young" and mentioned that she didn't wear a wedding ring.

This seemed to puzzle the president, the curiosity visible on his face, but overall Trump seemed more impressed by Rosales than her husband. I had met neither of them, so I had no insights to offer. I was mainly trying to learn if the NSC had put any outlandish ideas in Trump's head.

Soon enough, Guaidó and his entourage entered the Oval Office, shook hands with Trump and the rest of us, and sat down in the large yellow chairs positioned just a few feet in front of the fireplace. Above the white mantelpiece, hanging on the wall, was a large, gold-framed portrait of George Washington. An interpreter sat between both men, and a foot or so behind them, ready to take notes with a pen and pad.

Three members of Guaidó's delegation sat on the large, pale gold embroidered sofa to the right of the Venezuelan leader. I sat on the couch opposite them, across the dark brown rectangular table that divided us, to Trump's immediate left. Seated next to me on the couch were Commerce Secretary Wilbur Ross, and then Robert O'Brien on the far end. A few White House staffers sat in chairs situated at the ends of both sofas. It was a tight circle, but it was an intimate way to take in and contribute to the conversation.

Guaidó was young and intelligent, with a happy-go-lucky way about him. I didn't see the weakness that Trump did, but Maduro certainly had the stout, blue-collar look that came "straight from central casting," as Trump would often say.

President Trump leaned forward to talk, his long red tie dangling between his legs as he did. He would occasionally look at Guaidó, but mostly scanned the small group around him. The Venezuelan leader sat back in his chair, legs crossed, comfortably taking in what the U.S. president had to say. The interpreter would murmur into Guaidó's left ear, but he didn't need her assistance.

Trump and Guaidó said all the right things about each other and

Case 1:19-cr-20450-RNS Document 193-8 Entered on FLSD Docket 08/23/2022 Page 6 of 22

their mutual aims, with the Venezuelan expressing his "thanks to you, Mr. President, and the United States" for supporting "the people of Venezuela and me." Trump nodded his acknowledgment and began asking the young leader a series of questions about the stability of the regime, the state of the economy, and the status of his opposition movement. Guaidó was a good interlocutor who was able to answer Trump's questions, with occasional input from his staff seated on the couch.

At one point, Trump raised the possibility of using military force to oust Maduro, saying something along the lines of "What if the U.S. military went down there and got rid of Maduro?" This made me wince, though my sense was that he was testing Guaidó. The interim president shifted uncomfortably in his chair, caught off guard by the question but doing his best to disguise it. I took a deep breath, focused on Guaidó's face, and awaited his response. How he answered could change the course of history.

Thankfully, his answer wasn't as clear or forward leaning as I feared. "Of course we would always welcome U.S. assistance," Guaidó said, but he went on to emphasize that the Venezuelan people—especially those now living next door in Colombia—"want to take back their country themselves." That sounded good to me. I jumped in and pressed him further on this point, asking, "Mr. President, would your people really be willing to organize, train, and fight?" After all, the U.S. military had experience training foreign forces, and this was a far better solution than using American troops against Maduro. Guaidó gave a roundabout answer that concluded with him saying that "yes, they would." It didn't sound reassuring.

The meeting started running long, so Trump thanked Guaidó and then invited us all to "please go into the Cabinet Room and continue the discussion." I had another appointment at the Pentagon I was running late for, but I knew I had to spend some time in

this follow-on session. The president remained interested in military options, and the NSC team was even more enthusiastic about them, so I wanted to steer any conversation on this topic in a different direction. They were all in an echo chamber hearing one another's reinforcing messages. And now Guaidó wasn't really pushing back on the idea. As I said to the president sarcastically before the meeting, I was confident the Venezuelan opposition "would fight to the last American" if we offered them.

We all filed into the Cabinet Room, with Guaidó and his delegation on one side, and our team on the other, with our backs to the Rose Garden. Since I couldn't stay too long, I decided to press Guaidó and his colleagues a little bit harder about their ability to organize an expatriate force in Colombia. Around 4.5 million Venezuelans had reportedly fled the country, and many of them crossed the Colombian border to the west and south to find sanctuary there.

"If some of them could be trained and equipped by the U.S.," I asked, "would they really be willing to fight?" I never heard a solid answer. Rather, they told me such a plan would take a lot of time, would be complicated, and so on. I wasn't looking to take on this mission, but I thought it was more viable and palatable than some of the options proposed by O'Brien and the NSC. In my mind, of course, I was thinking that their real answer was "It would be so much easier and quicker if the U.S. would do this for us." "Okay," I said, "I get it. But setting that aside, Mr. President, would your people fight?" Again, they offered no answer that gave me a high degree of confidence. The failed uprising the previous April kept coming to my mind.

The conversation pivoted from a discussion about some type of large-scale operation to something more akin to a smaller, special operation targeted directly at Maduro. Then, out of the blue, one of Guaidó's colleagues looked at me from across the table and said

something like "We have some plans you [the U.S. government] know we are working on, they're just not ready yet." There was some quick reference to Florida too. As he finished the sentence, he smiled, looked away from me, and made eye contact with Claver-Carone, the NSC senior director who was pressing the hardest for military action. Claver-Carone smiled and nodded back. I looked directly at him about fifteen feet away from me, down the table to my left. He turned to me, and as our eyes met, his face immediately went blank. Something was up.

Now wasn't the time or place to dig into this issue and besides, I was definitely late for my next meeting at the Pentagon. So, I thanked Guaidó and his team, stood up, and made my way to the door. The folks remaining in the room stayed for quite some time, I learned later. I probably should have too.

At some point in the days (or couple of weeks) following that meeting, I called Gina Haspel at the CIA and recounted this story. I told her my folks were not aware of any plans under development by the Venezuelan opposition, and asked if she knew of any. She wasn't tracking anything either, but would dig a little further. If she and I weren't knowledgeable of any special operation by the opposition, then who was?

In early May 2020, approximately three months after Guaidó's visit to the White House, two former U.S. Special Forces soldiers led a group of nearly sixty Venezuelan dissidents in a failed attempt to infiltrate the country by small boats, move to the capital of Caracas, seize Maduro, and overthrow the government. Guaidó reportedly approved the operation.

Both the retired American soldier and former Venezuelan military officer tagged as the leaders of the group lived in Florida.[11] Despite the participation of former U.S. service members, and accusations by the Maduro regime that the Trump administration was behind the failed assault, the U.S. government was not involved in this operation, to the best of my knowledge. However, I often wondered if this was the plan referred to by Guaidó's team at the White House back in February and, if so, to what degree was the NSC aware and involved.

Beginning in March 2020, the NSC put Venezuela back on the interagency table for discussion. Over a few meetings during the spring and early summer, O'Brien and his team were pushing hard for some type of military action against Cuba and Venezuela to cut off Caracas's access to goods and cash.

In one of the early meetings, which typically included Pompeo, Attorney General Bill Barr, Gina Haspel, Robert O'Brien, General Milley, NSC legal adviser John Eisenberg, and me, NSC staff pushed the idea of a blockade. I couldn't believe they proposed this. I thought the notion of blockading Cuba died in the Kennedy administration nearly sixty years earlier. I quickly pointed out that "blockades are considered an act of war under international law." I understood that the purpose was to shut off Venezuela's oil revenue, but "we need to find a legal and credible way to do it," I added. Debate went back and forth for a few minutes, but the legal, political, and strategic considerations raised overwhelmed this proposal and it died under the weight of its own absurdity.

Next up was the idea of "interdicting ships that are carrying Venezuelan oil," according to O'Brien. ████ proposed that the U.S. Navy and Coast Guard identify these ships, stop them, and seize them. This would be the best way to shut off these shipments once and for all, they argued. It was frustrating that every one of these NSC meetings, it seemed, always began with the consideration of military options, rather than on the other end of the

Case 1:19-cr-20450-RNS   Document 192-8   Entered on FLSD Docket 08/28/2022   Page 8 of 22

spectrum—diplomacy. In all fairness to the State Department, they had done a lot of good work to ensure dozens of other countries recognized Guaidó as the legitimate president of Venezuela, to get the Organization of American States on the right side of the issue, and to apply a wide range of sanctions. Nevertheless, I needed them to explore, or reexplore, other diplomatic initiatives that might further move the needle, and be more of a brake on bad ideas too.

It was fairly common that, prior to these meetings, the DoD would be tasked to "deliver military options to be reviewed" first at the deputies level. This was a complete nonstarter, and something we never agreed to do. In fact, I gave my team orders to *never* deliver military options, and to not even discuss them. This really upset the NSC, but these were important decisions—ones that often involved the lives of American service members—and thus demanded the tightest of operational security. Security was also important to preserving the president's decision-making space at the political, policy, and strategic levels. Too much leaking went on in the U.S. government, especially at the Trump White House, and it was harmful on many levels.

It irked the NSC staff and others, but withholding our slate of options was a long-standing practice of the Pentagon that I was committed to restoring. I did feel it important to prebrief the secretary of state, national security adviser, and CIA director before we went to the president, as well as the vice president and the White House chief of staff if they expressed interest. They were all principals who had important roles to play, and I welcomed their outside perspectives. Moreover, it was helpful if we were all aligned when the chairman and I presented recommendations on the use of military force to the commander in chief.

In the case of interdicting ships on the high seas, this required no "options brief." The U.S. Navy had been doing this for more than

two hundred years. The tactics weren't hard, but that didn't mean these operations weren't complex or dangerous. "The bigger issues are ones of legality, risk, and logistics," I would say. The NSC had a blind spot on these considerations time and time again. They often didn't think beyond the first step. So, I would immediately raise the inconvenient questions and issues that few in the room wanted to hear.

I didn't like being the skunk at these parties. I also wanted to see Maduro ousted. However, we had to do it the right way, the smart way. Just the same, I knew this was how White House staff would start branding others—especially us at the DoD—as "foot draggers" who "don't support the president." This was why, I suppose, some people seemed to sit silently on the sidelines of these discussions, reluctant to raise their voices.

I had worked on interdiction operations before as a deputy assistant secretary of defense during the George W. Bush administration, and I knew the issues and challenges. The problem then was the maritime interdiction of weapons of mass destruction. In close collaboration with our allies, we had begun working to detect, track, and stop the proliferation of these systems and components by every mode they moved.[12]

An early opportunity presented itself in 2002, when a Spanish frigate off the coast of Yemen, at our request, stopped and boarded a freighter suspected of carrying Scud missiles from North Korea. The Spanish warship discovered the illicit shipment but had to let the vessel proceed because there was no legal basis under international law for preventing the delivery of the missiles.[13] This episode was an embarrassing setback to our efforts to stop proliferation, but we learned a good deal from the incident, and concluded that diplomatic and law enforcement approaches were usually more effective.

Back in the Situation Room, I decided to open up the discussion

Case 1:19-cr-20450-RNS    Document 193-8    Entered on FLSD Docket 08/29/2022    Page 9 of 22

in the hope of getting us on a better path. "Okay," I said, "we know how to do interdictions. We can come back at a future meeting and show a framework of how the Navy would do this, but there are some things we need answered up front to aid our planning. First, what will be the legal basis for stopping the ship?"

After a long pause, someone said, "we can figure that out."

"Okay. Next question," I said, "what if they deny us boarding rights?" Again, no firm answer. I kept going. "If we don't get permission to board, are we recommending this be a forced boarding?" I asked. "And if so," I added, "what are the rules of engagement if they oppose us?" I went down this path for a while, asking whether we want to risk U.S. service members being shot? killed? captured? I didn't believe these contingencies were likely, but we would plan for them regardless. These were important issues that everyone, especially the president, needed to understand and weigh.

I then delved into the logistics of the NSC proposal: "Once we have control of this ship, what do we do with it? Where do we take it and who's responsible?" No answer. "Who will captain the ship?" "What are the plans for the oil we seize?" More silence. Also, what will it mean for the United States' long-standing support for "freedom of commerce and navigation on the high seas," and our present policy of condemning Iranian interdictions in the Persian Gulf, if we turn around and do something similar? I'm sure the NSC staff wasn't happy with me, but this is the type of rigorous examination and discussion that these matters demanded. By the end of the meeting, all agreed these issues would go back to their respective departments for work.

In a follow-on meeting that spring of 2020, the president joined his national security team for an update brief on Venezuela. Trump

entered briskly. He had a busy day ahead, so O'Brien quickly stated the purpose of the meeting. He then turned it over quickly to his staff, which was unusual. Mauricio Claver-Carone stood up from his seat against the wall in the cramped Situation Room and started laying out the ideas discussed in a previous meeting. He spoke in machine-gun fashion as he focused on the president. At some point, though, he went from a recitation of facts to outright advocacy for aggressive action as he gestured with his hands and paced back and forth behind O'Brien's seat.

I thought he went too far, however, when he said, "Failure to take down the Maduro administration would hurt the nation's security," and then added, speaking directly to Trump, "I don't think you want to see a story in the *Wall Street Journal,* Mr. President, that this happened on your watch."

I thought his comment was inappropriate, bordering on a soft threat. O'Brien doubled down on his staff's pitch and foot-stomped the "urgency" of the United States taking action. It was over-the-top, and all advocacy for what the NSC wanted. Any pretense of the NSC being a coordinating body that represented the departments' views and the best collective judgment of the cabinet completely went out the door that day. None of this was ever agreed to.

Worse yet, the NSC's arguments were resonating with the president before he had a chance to hear from everyone else. You could see it in his head nods. This was dangerous.

Barr, Pompeo, Milley, and I—the president's cabinet members and principal military adviser—sat there waiting for our opportunity to speak. This was not how the NSC should run a national security team meeting; it didn't serve the president or the country well. From my seat in the middle of the table, I lost my patience and blurted, "That's ridiculous" when O'Brien and Claver-Carone uttered their dire warnings. Trump gave me a quick glance. Someone to my left

Case 1:19-cr-20459-RNS Document 192-3 Entered on FLSD Docket 08/25/2022 Page 9 of 22

closer to the president (Bill Barr, I thought) voiced an objection as well. Meanwhile, Milley rolled his eyes and shook his head.

The president's head nods and comments put me on edge that we might be stuck with a really bad idea—one that could lead to conflict in South America. The president felt the Pentagon wasn't doing enough on this issue—he had been saying it for over three years, others told me—and I had every reason to believe that the NSC and others kept pushing this notion in his head. So, when the president turned to me and asked, "Mark, what do you think?" I started by listing all that Defense was doing in the region to advance the administration's policy and back up our diplomatic efforts.

"Mr. President," I said, "I know not everyone in the room is aware of what DoD is doing in the region, so let me begin with a quick summary." With that, I started down my list: "The Navy is running freedom of navigation operations off the coast of Venezuela. Air Force B-52 bomber training flights are being flown out of Louisiana and partnering with allied air forces in the region as a show of force." I ticked off a few other items on my list. Meanwhile, I added, "SOUTHCOM and my Policy team have developed plans with others in the interagency—consistent with the strategy developed by the State Department—to address the 'day after' events once Maduro is gone," such as "providing humanitarian relief to the people of Venezuela," I said.[14]

I spoke quickly, anxious to lay down a solid baseline before anyone—especially the president—interrupted me. I finished by stating that the DoD was doing a good deal, but noting that "we have many more nonmilitary cards to play" before we—the national security team seated around the table—started considering more aggressive actions.

Bill Barr, who was looking at me as I spoke, swiveled his chair back 90 degrees toward the president, and leaned back. In an easy manner, he took the conversation in a more positive direction by stating, "We should focus on stopping the flow of drugs into the United States" from South America, and not get distracted by military operations.

Drug enforcement was a topic that Barr seemed passionate about as he cited some important statistics regarding the amount of drugs coming into the country, from where they were coming, and how many Americans were dying as a result of this nefarious trade. All of this resonated with Trump, who leaned in toward Barr and nodded his head in agreement as the attorney general spoke. He listened intently as Bill continued.

There was a "direct connection to Maduro and his regime," Barr argued, with the Department of Justice separately preparing to indict Maduro and members of his inner circle on drug trafficking, money laundering, and narcoterrorism charges. According to Justice, Maduro had turned Venezuela into a transshipment point for moving cocaine out of Colombia and north to the United States. This was the regime's way of collecting hard cash, thus presenting an avenue for the United States to apply pressure.

In Barr's view, Maduro had "weaponized" cocaine to undermine the United States. Illicit drugs were "killing millions of Americans" and harming communities across the country. It was hard to find a family who didn't have a friend or relative somehow affected by this scourge. "Stopping the flow of drugs, and specifically out of Venezuela, is what we should focus on," Barr argued. This really had an impact on the president, and indeed most of us. I recalled friends from high school who became addicted to drugs, and the damage it did to them and their families. Most parents do everything they can to keep their kids away from drugs and the wrong crowd that can lead them astray. This was probably the biggest concern Leah and I had as we raised our sons and daughter.

Case 1:19-cr-20450-RNS   Document 192-8   Entered on FLSD Docket 08/22/2022   Page 10 of 21

The attorney general's pitch was a success. The president really liked it. Still looking at Barr, he thanked him, and then scanned the room as he said, "Great points. Good. Good. I like it." O'Brien and the NSC staff sat quietly. Thank goodness we were now talking about enhanced drug interdiction efforts in the Caribbean and eastern Pacific, off the coast of California, instead of something far more dubious. This made a whole lot more sense to me. It was something tangible that could really make a difference, and not solely in terms of putting pressure on Maduro and his cronies, and denying them revenue, but also in terms of keeping drugs out of the country. It also didn't bring all of the legal, political, military, and logistical baggage that the ill-conceived NSC ideas carried. It would take away some from my focus on China and the National Defense Strategy, but the commitment was minimal and saving American lives from illicit drugs was worth it.

I thanked Bill for his idea as well, told him and the president I supported it, and then said, "DoD will quickly work up some plans to get more Navy ships and Coast Guard cutters to the area, and look at some other ways to support this initiative." I would then come back to the White House and brief the president and my fellow cabinet members, I added. We should aim to "announce something in late March or early April," I suggested. Everyone else in the room also seemed to be supportive of Barr's idea, and the fact that we coalesced around something. The NSC still wanted more—and the idea of military interdictions would raise its head again months later—but for now they seemed satisfied that we were all looking to do something bigger "after years of inaction," as I'm sure they would say.

The flow of illegal drugs coming into the country really did trouble the president. It wasn't an issue that came up as often as Germany's

unwillingness to spend more on defense, or the presence of U.S. forces in Africa, but he'd often make the case that "drugs are killing more Americans than the terrorists." Trump became very animated when he spoke about this matter, showing a good deal of passion and authenticity. It was a hard issue to ignore when so many communities and families across the country were personally affected.

The White House discussions in February and March resulted in a plan announced in early April to beef up our presence in the Gulf of Mexico and the eastern Pacific. Our goal was to increase interdiction efforts through a 65 percent increase in Navy ships, Coast Guard vessels, and airborne reconnaissance, with more than one thousand additional military personnel to bolster the counternarcotics mission.

Southern Command, under Admiral Craig Faller, did a superb job developing and implementing the plan, enlisting many of our partners in the region to join us. The president visited SOUTH-COM headquarters in Miami on July 10, 2020—a little over thirteen weeks after we launched the initiative—to get an update, celebrate our progress, and thank the troops. In his public remarks, Trump noted the increased results, notably the seizure of more than 250,000 pounds of illegal drugs and the arrest of 1,000 drug traffickers in three months. The president said, "We're determined to keep dangerous drugs out of the country and away from our children," adding that "this is a new operation [that has] not been done before. And this operation has been incredibly successful."[15] Trump was genuinely pleased.

However, despite these accomplishments, the president's frustration with drug trafficking festered. It could take him to extremes. Mexico was his particular focus. The U.S. government estimated that most of the drugs entering the United States were coming across the southern border, with everything from methamphetamines and

cocaine to heroin and fentanyl, shipped through our ports of entry. On several occasions, the president would point the finger at Mexico for not doing enough and would threaten them with one type of action or another for failing to deal with the trafficking.[16]

In November 2019, Trump announced plans to label drug cartels in Mexico as "foreign terrorist organizations" after the horrific killing of nine adults and children with dual U.S.-Mexican nationality. When asked about Trump's comments, Mexican president Andrés Manuel López Obrador said, "Cooperation, yes, intervention, no." Mexican foreign minister Marcelo Ebrard, whom López Obrador tasked to lead the talks, expressed concern that applying the terrorist label to drug cartels could enable the United States to take direct action against them, and that he intended to defend Mexico's sovereignty.[17] Ebrard's comments were prescient.

On at least two occasions in the summer of 2020—once in the Oval Office and a second time in his private room just off the Oval—the president approached me about a sensitive issue. Slightly hunched over, with his hands motioning in front of him like a quarterback gesturing for a long snap, he asked me if the military could "shoot missiles into Mexico to destroy the drug labs" and take out the cartels. Standing close to me as he spoke, the president complained that the Mexican government "isn't doing enough," getting irritated as he spoke and adding, "They don't have control of their own country." "If we could just knock them [the drug labs] out," he said, this would do the trick. "What do you think?" he asked.

These conversations were quite troubling, to say the least. On one hand, I shared his concern about illicit drugs being trafficked into our country and respected his passion for wanting to stop this dangerous trade, but asking the U.S. military to shoot missiles into a sovereign country and worse yet, our friend and neighbor, definitely wasn't the way to go about it.

Working hard to conceal my shock at this idea, I said, "Mr. President, we *could* do that, and as much as I want to stop these drugs too, shooting missiles into Mexico would be illegal. It would also be an act of war." I recommended that "we look for more ways to help the Mexican government deal with the problem, such as increasing the training, intelligence, and equipment we are providing them." We should also take another look at ideas that were tabled in the past. But to simply launch air or missile strikes into Mexico "would not only violate international law, it would also destroy our relationship with Mexico and damage our global standing," I said.

Trump took these objections in, pursing his lips as he listened. He then suggested, "We could just shoot some Patriot missiles* and take out the labs, quietly," adding preposterously that "no one would know it was us." He would simply deny we had launched them. I had seen Trump spin his own reality before, so I had no doubt he was confident in his ability to persuade people we had not launched the attacks. However, we didn't live in a world where the United States could strike another country and no one would believe the missiles weren't ours. I also couldn't imagine the president would resist taking credit for the attack anyway. It was nonsense, plain and simple.

If I hadn't seen the look on the president's face, I would have thought it was all a joke. He wanted to get this planned and done by Labor Day—"around then," he said—just a few months away. I was speechless. Trump thought this was the only way we would really stop this terrible trade.

I took a long pause, and then said, again, "This would be an act of war, Mr. President, and there would be no way to keep it quiet."

---

* The president often mistook Patriot missiles for Tomahawk missiles. Patriot missiles are air-defense weapons designed to destroy aircraft and ballistic missiles. Tomahawk missiles are used for land attack, such as he was suggesting in this scenario.

Case 1:19-cr-20450-RNS   Document 192-8   Entered on FLSD Docket 08/22/2022   Page 13 of 22

I quickly added, "We can't keep our discussions in this room from finding their way into the press." He nodded in silent agreement, not looking at me but into the air as he thought. I further parried by offering to raise this issue with Haspel and Pompeo, who I knew would agree with me, adding,—"I'll speak with Mike and Gina, and see if they have any good ideas." That seemed to satisfy him and, as would happen so predictably, he bounced to another topic, and I immediately made my way to the door.

Fortunately, nothing further ever came of these conversations. Still, I was troubled. This was not rational thinking. Moreover, it only underscored in my mind later how important it was for me to stay in my post. What if another secretary of defense, my replacement, went along with this? Lord knows there were plenty of people in the mix who thought the president's outlandish ideas made sense.

Indeed, taking issues to the extreme wasn't a behavior unique to the president in the Trump White House by any means. He had surrounded himself with staff who would amplify his ideas or come up with their own preposterous ones, and both their aggressiveness and presence around him would increase through the spring and summer. This all seemed to exacerbate the craziness increasingly emanating from the White House as the November elections inched closer.

The flow of illegal narcotics wasn't the only southern-border issue the president and others focused on; the other was illegal immigration. The Department of Homeland Security (DHS) was making steady progress erecting barriers along the southwest border, yet despite this effort and others, there was a hard-core element in the administration for whom illegal immigration seemed to be the only

issue the United States faced. In their minds, no holds were barred, and several of them had direct access to Trump.

I was attending an Oval Office meeting during this same time frame when Stephen Miller, Trump's point man on immigration, approached me about security on the border. I barely knew Miller. He was a slight, unremarkable person with a deadpan gaze that suggested a real lack of humor or warmth. When it came to immigration issues, he was very serious, and, as ridiculous as some of his ideas were, he could often back up his game with selective facts, figures, and arguments to supplement his hyperbole.

He was also a capable speechwriter and well liked by the president, so he had both Trump's ear and his voice. As a result, most gave him far more deference than his actual position and qualifications warranted, and many suspected he would involve himself in personnel issues if someone crossed him. Despite any formal authority, Miller threw his weight around when it came to immigration matters. He also had close ties with equally hard-line professionals throughout DHS and the White House who would enable him.

Standing just a few feet away from the Resolute desk as we waited for the president, and without any pretense of a personal greeting or chitchat, Miller said to me from behind, "We need to get a quarter million troops to the border soon. There is another caravan coming up from the south, and we need to stop it." I turned slightly, looked at him, and chuckled. I thought he was joking. He wasn't. His face never moved.

I paused and then, playing along, said, "I haven't seen any reports about another caravan, and I'm confident DHS can handle it as they've done in the past."

As I started to turn back around, he parried with "This is a big one. CBP [Customs and Border Protection] can't do it. We need to deploy the military. I'm already talking to folks at DHS." In any

Case 1:19-cr-20450-RNS Document 193-8 Entered on FLSD Docket 08/23/2022 Page 13 of 22

other White House, someone like Stephen Miller plotting administration actions with a separate federal department would have been fanciful and out of bounds. In the Trump White House, it was just another day at the office.

This was now serious. I turned away from the Resolute desk and toward Miller—who as far as I knew had almost no working knowledge of the military or any experience in uniform—and told him some basic facts. "The U.S. armed forces," I said as I stared into his vacant eyes, "don't have two hundred and fifty thousand troops to send to the border for such nonsense." With that, I turned and walked away.

It was one thing to support DHS at the border by deploying a few thousand folks to provide logistical and other support. The DoD had done this in the past, in Republican and Democrat administrations alike. Even President Biden would extend this mission once he came into office. However, the thought of deploying a quarter million troops—combat units, that is—to conduct an active defense on the U.S. border against civilian migrants was simply outrageous, unless you're Stephen Miller.

General Milley would later remind me of the time we gathered in the Situation Room in October 2019, with other members of the national security team, to watch the live video feed of the successful special operations raid that killed Abu Bakr al-Baghdadi in Syria. Stephen Miller suggested later in the evening that U.S. forces try to locate the ISIS leader's head so that we could dip it in pig's blood—which Muslims consider to be unholy—and parade it around (or some barbarous idea along those lines) to deter other terrorists. Milley and I quickly snapped back at him, stating that doing such a thing was a "war crime," and that "the U.S. military will never do that." Miller didn't respond. Everyone else seated around the

large rectangular desk, which was crowded with phones and laptops, sat silently, continuing to watch events unfold on the large screen before us. Were they unalarmed by this macabre comment, supportive, or just quietly pleased we swatted it down so quickly?

I returned to the Pentagon after my short conversation with Stephen Miller, and at some point in the following days, passed along the story about him wanting to send a quarter million troops to the border to Jen Stewart and General Milley. The idea was so outrageous, they couldn't believe someone conceived it. I also recounted Miller's comment that he was actually working on this idea with DHS. With that, I paused, turned to Milley, and said, "Chairman, I know this sounds crazy, but please check the Joint Staff and NORTHCOM to see if they've heard anything about this. I want to be safe about it."

Northern Command is the combatant command responsible for North America, from Mexico to Canada, and is specifically charged with the defense of the country's borders. It provides DoD support to civilian authorities in the United States for hurricanes, floods, wildfires, and other natural disasters. NORTHCOM is also responsible for providing military support for civilian authorities, whether the nation was facing a pandemic, civil unrest, or problems at the border.

Milley returned a day or so later. He entered my office, shaking a batch of papers at me as he said, "Secretary, you aren't going to believe this." Oh no, I thought. The chairman went on to describe how a planning team at NORTHCOM had actually begun work on "a concept to deploy a couple hundred thousand plus troops to the border." They had been meeting with DHS about it, had the basics down on the papers he held, and were moving forward with their plans.

Case 1:19-cr-20450-RNS Document 192-8 Entered on FLSD Docket 08/23/2022 Page 15 of 22

I was shocked. I asked questions no one had good answers for: Who approved this? When did this begin? Why weren't we informed? How far along were they? The best we knew at that moment was that NORTHCOM staff was told by DHS staffers—likely, Customs and Border Protection—that the White House (probably Miller) had directed this, and that DHS understood formal orders from the president were forthcoming.

While I was not surprised Miller was working this, I was frustrated that no one senior at NORTHCOM thought to let us, or anyone at the Pentagon for that matter, know. Why didn't the command appreciate the dynamics of this misbegotten project and immediately press the pause button until they received guidance from *their* DoD leadership? The political ramifications were off the charts, and the impact on the military would be enormous. Imagining the reaction from Congress and the public was unfathomable.

I told Milley to get hold of NORTHCOM immediately, tell them to "shut down the planning, and let them know there was to be no further engagement with DHS on this matter." I added, "If anyone at Homeland Security has an issue with my order, then they are welcome to call me direct."

My phone never rang, and the issue never raised its ugly head again. Thank goodness. We had not reached the dark days of June 2020, but issues and ideas like these factored heavily into my personal calculations after opposing the president's use of the Insurrection Act, and the many months that followed.

Meanwhile, we weren't done with Venezuela, not by a long shot. The issue of interdicting ships raised its head again in May 2020, when the United States learned that Iranian tankers were carrying oil to Venezuela, ironic as that was, in exchange for gold. Venezuela was historically one of the largest oil-producing nations in the world, but it was now months away from ending its oil exploration for the first time in one hundred years because of Maduro's socialist policies, mismanagement, and international sanctions.[18]

It was estimated that approximately nine tons of gold valued at around half a billion dollars was payment for Iran's help in repairing Venezuela's refineries and providing gas additives. The global pandemic had a devastating impact on the oil market, and when coupled with the sanctions placed on both countries, Tehran was looking for new sources of revenue. Meanwhile, Caracas wanted to ensure its supply of gasoline didn't run out. Long lines at gas stations and the other effects of scarcity on its broken economy were provoking daily protests and risked leading to more violent outcomes.[19]

The pair of countries had a relationship dating back at least two decades. In 2007, Venezuelan president Chavez and Iranian president Mahmoud Ahmadinejad declared an "axis of unity" against U.S. "imperialism."[20] The relationship between these pariah states would deepen under increasing pressure from the Trump administration. By 2020, with neither regime on the verge of collapse, the thought that both countries now seemed to be working together more closely than ever before was troubling. There was good cause for concern about this deepening collaboration between them, and with Russia and China as well, especially when it involved a country in our hemisphere. For Trump personally, this was like waving red flags in front of an enraged bull.

We needed to keep the pressure on, and find new ways to advance our policy aims. But we also had to be smart about it. By mid-May, however, with Iranian ships plying the waters of the Atlantic en route to Venezuela with fuel and supplies, the NSC was once again pushing interdiction by the U.S. Navy as the best way forward. This potential use of the U.S. military, with little sense of the consequences, was frustrating.

...

M A R K  E S P E R

A SACRED OATH

The NSC scheduled a principals meeting by secure video for June 9 to discuss Venezuela again. Many of the same people from the earlier meetings—Pompeo, Barr, O'Brien, Milley, and me—were in the room or on the line, and most of the same questions I raised earlier remained unanswered. However, there was now a fresh twist to this cooperation between Tehran and Caracas. John Ratcliffe, the new Director of National Intelligence (DNI), kicked off the discussion with an overview of the recent developments.

Ratcliffe had just become the DNI on May 26, only a couple of weeks prior. He was a lawyer who had worked in both the private sector and in government. He was elected to Congress in 2014, was reelected in 2016 and 2018, and was regarded as one of the most conservative House members. He was also a Trump acolyte.

Trump announced his intent to nominate Ratcliffe for DNI in July 2019 to succeed Dan Coats, but it was withdrawn, due to objections from lawmakers of both parties who were concerned Ratcliffe might politicize the intelligence community. Trump pressed again in February 2020, this time using the leverage of having installed Ric Grenell—his über-loyal ambassador to Germany—as the acting DNI a couple of weeks earlier to help get Ratcliffe confirmed.

The president often bragged about installing Grenell as the acting DNI. In an Oval Office meeting once, as a few of us sat across from him, Trump leaned back in his chair, clasped his hands behind his head, and with a huge smile on his face said that "installing Ric as DNI was one of the best personnel moves I ever made." As his chair tilted forward again toward the Resolute desk, the president added that members of Congress "are so concerned about what he [Grenell] will do, they're now jumping at the chance to quickly get him out of the DNI office." It's crazy, he said. "They used to have concerns about John Ratcliffe," he said. "Now they don't," as he

leaned back in his chair again, entertaining the small group with his legerdemain.

What really grabbed my attention, though, was when Trump said aloud to himself, "I should do this again in the future when I face pushback from a department." I never forgot this comment, and the seriousness with which he said it.

Much of the overview delivered by Ratcliffe, and followed up by the CIA, remained unchanged. Regime elites and senior military officers were still loyal to Maduro, while Guaidó was weaker and losing popularity with the people. Regarding the fuel that Tehran was delivering, the CIA explained that many countries were providing oil to Venezuela. This was the Agency's way of not only presenting all the facts and showing the full contours of the problem but also trying to get folks to think more broadly. Milley and I would often push for the Agency to do this summary up front to baseline everyone, before people around the table started laying down their own "facts" to justify their solution.

The new information was that Venezuela was actively seeking to buy arms from Iran. Tehran had not approved anything specific yet, but the list of items apparently ranged from light arms and small boats to long-range missiles that could reach the United States. The last item was the red flag for most of us on the call. However, the fact that Iran had not approved the sale, let alone prepared the shipment, meant we had time to work this problem. Nevertheless, the NSC proposed again that we pursue a military operation ▬▬▬▬

Like the previous time, though, key questions about authorities, what to do with the cargo, rules of engagement, and others, remained unanswered. Plus, there was always the possibility that Iranian military personnel could be on board the ships, helping

to provide security, which added an entirely different dynamic to the NSC's preferred option. State mentioned the possibility of engaging the countries whose ships were transporting the goods, or under whose flags the vessels were sailing. These were great ideas, and one of the same strategies we used in the past, so I weighed in behind this initiative.

As the arms sales issue cycled back around, General Milley jumped in to note that *if* Tehran decided to sell weapons to Caracas, they wouldn't be the only ones. "Russia and China," he pointed out, "are the top sellers of arms to Venezuela. Are we prepared to interdict their shipments as well?" And if we weren't, someone else piped in, "what prevents the Venezuelans from asking the Russians to transport oil and other goods for them?"

I followed up, adding that we should better understand the intent behind Caracas's purchase of these arms, and the capabilities of what they were aiming to procure. "We shouldn't overreact to small arms and other equipment that can't threaten the U.S., but ballistic missiles are totally different. That's where our focus should be," I said. We need to develop a policy approach that is more discriminating, can pass the common-sense test, and will hold up under scrutiny from Congress, our regional partners, and others, I stated. In my view, we had to maintain our primacy in the Western Hemisphere and protect our partners throughout the region. This meant preventing any arm sales that would threaten such a policy and create a bad precedent. That said, it didn't mean we should immediately pursue the military option either.

I suppose my question was too strategic for the moment; the NSC was still at the tactical level. O'Brien went straight for the jugular, proposing a military strike on ████████, a seaport in northeastern Venezuela, where a large complex for loading and unloading petroleum products on and off ships is located. "If the ships are too difficult to interdict, then we should look at disrupting the port where they offload their cargo," he argued. This would further disrupt their energy supplies and provoke more unrest, the NSA said.

The means could be either an air strike or the use of Navy SEALs, he added. From my perspective, we were now clearly in the "no war" category of the redlines I had established in early June, just a few days earlier. I pushed back on this, joined by Milley, and tried to elevate the discussion again—"What are we trying to do here? Stop the shipments? Force regime collapse? Start a war?" The group was losing focus once again. Mike Pompeo often didn't say much in these types of meetings, but he piped up now. "We know what our goal is. It's been our policy for some time now," he said, as he proceeded to outline its main elements.

He was right, we all understood the end state we wanted—the departure of Maduro and the installation of Guaidó as the legitimate president—but somehow we started with interdicting Iranian oil on the high seas and were now discussing a military assault on Venezuela, which had little chance of achieving that goal.

Milley coyly asked the CIA, "What do you think Venezuela would do if we attacked a port?" He was trying to elicit an answer from the CIA for which we knew the answer—which most certainly was a strong reaction that could escalate into a conflict and likely rally the Venezuelan people behind Maduro. The response by the Agency helped pull the discussion away from talk of kinetic action. We pivoted to less direct options, such as cyber operations, or ████████ activities supported by the United States but conducted by the opposition.

General Milley also thought we should look at irregular warfare options, such as the U.S. training and arming of Venezuelan expatriates ████████████████████████

███████████████████████

███████████████████. The United States had a long history with these types of operations. It was an idea worth developing. Milley and I had discussed this several times before, which was why I raised it during the White House meeting with Guaidó in February 2020. But again this day, as it had four months before, the idea didn't get much traction.

After every principals committee meeting, the NSC would distribute a Summary of Conclusions memo in the days following the session. What we discussed, what we agreed upon, and the path forward were all captured in this document, which also served as the basis for the next principals meeting. The summaries coming out of the NSC, however, were often inaccurate. They sometimes reflected what the NSC wanted to do, as compared to what we all agreed upon. The DoD and the CIA started calling them out on this. This time was no different, but dangerously so.

My Policy team received the summary late Friday, June 19, and according to it, the group agreed to develop kinetic and nonkinetic options, both overt and ████, that could disrupt Venezuela's oil and arms shipments. Options would need to include actions that would have a material impact on key industrial and other high-value targets. Furthermore, the NSC directed us to prepare these options by June 23—four days away—and be ready to brief them to the president in early July. What? Where the hell did this come from?

My notes read that we, and all the departments and agencies present, were supposed to develop ideas to interdict the shipments, and that these would *not* be kinetic. Moreover, the deadline was ninety days away, around September 9.

I couldn't believe the NSC was pushing such an agenda. We had

to keep this train on the tracks, but it was getting increasingly difficult to do so. And we still had several months to go until the election.

I picked up the secure line and called Mark Meadows. I knew where he stood on this issue, but I wanted to confirm it before I called O'Brien. The chief of staff's mission was getting the president reelected, so he understood that the political downsides of military action in the weeks before an election outweighed the upside in most cases. That was particularly true when the president had been promising for four years to get the United States out of "endless wars"—not start new ones. Much of the base wouldn't like this. I needed to leverage this to walk back the NSC memo and momentum. Meadows was consistent on this topic and responded as I expected, agreeing with me. He was going to talk to O'Brien about getting the summary right. I told him I'd reach out to O'Brien as well. I spoke with the NSA around 6:40 P.M. and put things back on track.

On August 14, a little over two months after this Venezuela-Iran principals meeting, news broke that the United States intercepted four tankers and seized 1.1 million barrels of fuel they were ferrying from Iran to Venezuela. The United States did not employ military force. Rather, diplomatic action under a warrant issued by the U.S. District Court in early July was used to seize the shipments.

This was a great initiative by Justice and State. It achieved everything that we were originally trying to do—stop the shipments—without any of the downsides that military action would have brought. The U.S. government exercised its leverage to persuade the ships' owners, insurers, and captains to hand over their cargo.[21] Barr and Pompeo did a great job. I hoped this success would beget others to explore nonmilitary options first in the future.

While this action was a big win when it came to maintaining

pressure on the Iranian and Venezuelan regimes, the U.S. campaign suffered a major setback at the United Nations. Later that day, the U.N. Security Council voted down a U.S. resolution to extend an arms embargo against Iran that was set to expire in October. The embargo prohibiting Tehran from buying and selling conventional weapons had been in place for thirteen years, but was permitted to sunset in 2020 as part of the 2015 nuclear deal with Iran. Many considered this another fundamental flaw of the nuclear deal, and a main reason Trump opposed it.[22] The U.S. position was to maintain the embargo as long as Iran continued to support terrorist organizations such as Hezbollah. This always seemed eminently reasonable and prudent to me. Now, the sunsetting of the embargo would limit our nonmilitary options when it came to Venezuela.

The issue of preparing military options to strike Venezuela didn't raise its head again that summer. State and Justice's successful seizure played a positive role in suppressing this urge coming out of the White House. Other matters—namely, civil unrest—were consuming the president's attention.

Meanwhile, I continued my weekly NDS implementation meetings throughout June—we had to keep pressing forward. Moreover, with all of the craziness going on in Washington, D.C., I needed to keep the Pentagon focused on more productive things and not get distracted. As such, I held a series of meetings on issues ranging from the reassignment of joint forces around the world, an update to our directed force readiness tables, COVID, and Operation Warp Speed to another iteration of the China war plan and a discussion on the structure of the Space Force.

This newest armed service—Space Force—was responsible for the organizing, manning, training, and equipping of U.S. military capabilities focused on this new domain of warfare. It was a bold initiative that would fundamentally change, in a positive way, the

DoD's approach to protecting space, and our ability to operate there. This was so vitally important to our security, economy, and way of life, given that the Chinese and Russians were weaponizing space as an asymmetric counter to our conventional dominance. I was proud to establish the Space Force in December 2019 and play an active role in its development. It was a historic accomplishment for the Air Force, the DoD, and the country. All of these matters were the issues I really enjoyed working on, and the ones that would make an enduring difference for the nation's security.

One issue did arise in July that caught the attention of the Venezuela hawks, and it would eventually create more friction with the Pentagon. In early June, the government of Cape Verde arrested a Colombian businessman by the name of Alex Saab at the request of the United States on money laundering charges, which he denied. They did so during a layover he had in the archipelago, which is located in the Atlantic Ocean hundreds of miles off the coast of West Africa.

At Maduro's direction, Saab was reportedly on a special mission to negotiate a deal with Iran for Venezuela to receive more fuel, food, and medical supplies. Saab was Maduro's long-standing point man when it came to crafting the economic deals and other transactions that were keeping the regime afloat. The U.S. government was seeking his extradition. As such, this small island country detained Saab as judicial proceedings began.[23]

Saab was a very important player, and access to him could really help explain how Maduro and his regime worked. It was important to get custody of him. This could provide a real road map for the U.S. government to unravel the Venezuelan government's illicit schemes and bring them to justice. Maduro knew this as well, so a full court press was under way by Caracas to get Saab released.

Case 1:19-cr-20450-RNS Document 192-8 Entered on FLSD Docket 08/26/2022 Page 20 of 22

Jorge Arreaza, Venezuela's foreign minister, said at the time that Cape Verde's detention of Saab was "violating international norms and law" and promised to do everything possible to protect him. Comments like this really spooked the officials at State, Justice, and the NSC who were working this case. By mid-July, a variety of rumors were circulating in the interagency: Maduro persuaded President Putin to send Russian special forces to spring Saab from jail; Russian mercenaries in Libya were going to travel hundreds of miles in small boats to either rescue or kill Saab; Venezuelan intelligence was chartering a special plane to fly to Cape Verde to repatriate Saab; and, Iranian Revolutionary Guard troops were preparing similar rescue missions. It seemed that somebody was watching too many *Mission: Impossible* movies on the weekend. I never saw intelligence that backed any of it up.

But as night follows day, these rumors prompted a request for action from the DoD, which I was told came from the State Department. I couldn't believe State was requesting an Amphibious Readiness Group-Marine Expeditionary Unit (ARG-MEU) be dispatched immediately from the Mediterranean to Cape Verde to protect Saab and deter intervention from the Russians, Iranians, and anyone else interested in disrupting the judicial proceedings.

I also felt it was important to extradite Saab back to the United States. However, if there was ever an example of the old saying "swatting a fly with a sledgehammer," this was it. Except that . . . there was no proof that the fly even existed, and the hammer was as large as a carnival mallet.

Most troubling was that nobody could answer the most basic questions. How would the expeditionary unit protect Saab? How would it deter action? Did we have permission to put Marines ashore to safeguard him? Did we have permission to intercept any Russian, Iranian, or Venezuelan aircraft or ships that looked suspicious? How would Cape Verde react to such a large military presence? The questions went on and on and on.

As I was preparing for the June 2020 NATO Defense Ministerial, I asked my senior military assistant, Lieutenant General Bryan Fenton, to track this action down and update me. In my mind, this was not simply another case of using the DoD "easy button"; it was misuse of the armed forces, another one of my new redlines. I picked up the phone and called O'Brien. He was obviously aware of Saab's detention and some of the rumors floating around, but not about the ARG-MEU request. "Robert," I said, "what's being proposed by State is ridiculous. Pulling thirty-five-hundred-plus Marines and sailors, and several ships out of the Mediterranean to sail around an island in circles is a major waste of scarce capabilities."

"You're right, Mark," he replied, and then asked, "What can we do to help here?" Before I could respond, he added, "By the way, DOJ is asking about deploying U.S. military special operators to Cape Verde to protect Saab." How equally fatuous. I went through many of the same questions I had with my team: "Will Cape Verde support the deployment of U.S. forces? Will they allow our people to carry weapons? What is their authority once they arrive?" These and more were all critical questions, yet we had not even asked Cape Verde any of them yet, let alone had answers to them. To his credit, O'Brien got it.

I then said, "Why we are even talking about military options? This is a law enforcement and diplomatic action. We should be engaging on those tracks, and at the highest levels. Why not inform Cape Verde of what we're hearing, and ask them to beef up their own security?" If they can't do it, I suggested, "then maybe we can provide federal marshals, DEA agents, State Department diplomatic security, or whatever law enforcement or civilian security teams are more appropriate to the task." O'Brien listened patiently.

Case 1:19-cr-20480-RNS   Document 123-8   Entered on FLSD Docket 08/23/2022   Page 20 of 22

I kept up my line of reasoning, trying to maneuver us into a better approach: "If for some reason we truly assessed the need for a naval presence, I said, why not get the U.S. Coast Guard to support? They have a law enforcement role, after all." These were all reasonable and straightforward questions, I thought. However, with fundamentally different views regarding the nature and scope of the problem, the various departments had developed wildly different solutions.

When I was done, O'Brien said State and Justice were "really concerned, and some in Cape Verde are as well." He heard that the government in the capital of Praia "doesn't want this hot potato" and was doing everything they could to keep a low profile. This meant "limiting the U.S. presence" in Cape Verde, which buttressed my position. According to him, "they would appreciate any assistance we can provide to help them improve their own capabilities," beginning with "assistance to repair a couple of their own coastal patrol ships."

This started making more sense, but the U.S. Coast Guard said they couldn't do it—"no cutters are available right now" was what we were told—so I committed to get my folks at U.S. Africa Command on the mission. I also tasked AFRICOM to look at ways "to help the country improve its domain awareness," which was another concern of Cape Verde. In August 2020, a Coast Guard ship eventually performed a joint patrol with the Cape Verdean Coast Guard to ostensibly monitor and enforce fishing rights.

Within a couple of days, this issue died down, but it wouldn't be the end of it. By mid-October, it was back, with reporting coming out of Cape Verde that the government might soon release Saab or move him to house arrest. State was pushing again for a U.S. Navy ship to patrol around Cape Verde and deter any outside intervention. The Coast Guard once again couldn't provide any cutters in a

timely manner. I raised this with Pompeo during a call on October 19, but he said he wasn't aware of this latest issue. Mike was always reasonable on these things, so I didn't believe he supported this idea, but he probably wouldn't oppose it if the DoD agreed to move forward. I made it clear that I opposed deploying a Navy warship.

When James Anderson, my Policy head, came to brief me on this issue before the NSC deputies committee meeting he was attending that week, I told him, "I don't support the proposed action. They first have to show me some evidence that Russia, Iran, or Venezuela is planning to grab Saab, and if so, how the presence of a U.S. Navy ship in the waters around Cape Verde will deter or stop that from happening." There weren't enough warships to go around as it was, and I needed these vessels on patrol in the Mediterranean. General Hyten, the vice chairman of the Joint Chiefs, said that he and Milley completely agreed. Anderson conveyed this message back to the NSC, to which they responded: "Is the secretary of defense saying he will ignore a presidential directive?" I disregarded this taunt, and with that, the issue went away again.

The president fired me a few weeks later. With me out of the way, the Venezuela hawks pressed my successor for a warship, which he quickly approved. Not long after that, the USS *San Jacinto* deployed from Norfolk, Virginia, en route to Cape Verde to keep an eye—somehow—on Saab while supposedly deterring outside intervention. These tasks were still undefined, I was told.

The *New York Times* reported in December that the daily operating cost to keep the *San Jacinto* on station was $52,000. A week before Christmas, the crew of 393 sailors received orders to return home for the holidays. A smart call by the uniformed military, I learned, looking to take care of its service members and their families. Nevertheless, it was also a decision that put into stark contrast the unseriousness of this mission in the first place.

Case 1:19-cr-20450-RNS   Document 193-8   Entered on FLSD Docket 08/23/2022   Page 22 of 22

In other words, if Saab was so important (and he was) and the threat of taking him from Cape Verde so real (it wasn't) and the impact of the warship's presence so effective (it also wasn't), the *San Jacinto* should have been kept on station regardless of the holiday. Back in 1990, I had spent Thanksgiving and Christmas in the deserts of Saudi Arabia with my fellow soldiers during Operation Desert Shield. Military personnel from all the armed services have missed holidays at home since the American Revolution. They recognize that if duty calls, and it's that important, then they will answer the nation's call. This mission, however, clearly didn't merit it.

The *Times* described this deployment as another example of "the administration's capricious use of the armed forces," and they were right. They also reported that my worst fear—"an inadvertent Navy clash with Iranian or Venezuelan operatives in a matter best suited for diplomats and international lawyers to resolve"—never happened.[24] But that wasn't my concern at all, because I never thought the threat was real in the first place. I was tired of the DoD being the easy button for somebody's tough problem. All this did was militarize our foreign policy, pull the armed forces away from their core mission, and result in suboptimal solutions.

Finally, to close out this story, it is important to note that Alex Saab was extradited to the United States from Cape Verde in October 2021—nearly eighteen months after this entire drama began.[25] It appears no Russian, Iranian, or Venezuelan commandos ever invaded the central Atlantic archipelago to rescue him.

CHAPTER 12

## THE REPUBLIC WOBBLES

On Sunday, May 31, 2020, numerous civil disturbances, some violent, were occurring in multiple cities across the United States. It was unlike anything seen in generations. In the District of Columbia, protesters clashed with law enforcement in Lafayette Park, north of the White House, and pushed down multiple security barricades. According to the Secret Service, between the evening of May 29 and into the early hours of May 31, more than sixty Secret Service officers and special agents sustained minor to severe injuries from the violence (eleven were taken to the hospital), and six of their vehicles were vandalized.

Protesters reportedly broke through a barrier near a line of police and National Guard personnel at Lafayette Square. Multiple fires were set within blocks of the White House. St. John's Episcopal Church, across the street from the White House and Lafayette Park, was set ablaze. A U.S. National Park Service building in the