Courses : Calendar : Global Faculty : Students : The Lighter Side : Meet Rita & Gus Hauser

[Search field] [Search]

# UPDATE: An Introduction to Venezuelan Governmental Institutions and Primary Legal Sources

*By Luis Bergolla*

[Luis Bergolla](#) is currently a J.S.D. candidate Stanford Law School and Visiting Scholar at the Max Planck Institute Luxembourg for Procedural Law. He holds a first degree in law from the *Universidad Católica Andrés Bello* (Venezuela), an LL.M. degree from the University of Georgia, a J.D. degree from the University of Arizona College of Law, and a J.S.M. degree from Stanford Law School. Luis Bergolla is an international arbitrator, an expert on Venezuela law, and a lawyer admitted to the bar in New York, the District of Columbia, Arizona, Spain, and Venezuela.

**Published March/April 2022**

(Previously updated by Antonio Ramírez in [May/June 2011](#); and by Luis Bergolla in [October 2015](#))

**[See the Archive Version!](#)**



## Table of Contents

- 1. [Special Note](#)
- 2. [Venezuela's Political Organization](#)
  - 2.1. [Executive Branch](#)
  - 2.2. [Legislative Branch](#)
    - 2.2.1. [Legislative Process](#)
    - 2.2.2. [Types of Legislation](#)
  - 2.3. [Judicial Branch](#)
  - 2.4. [Citizen Branch](#)
  - 2.5. [Electoral Branch](#)
- 3. [Primary Sources of Legal Information](#)
  - 3.1. [Legal Codification](#)
  - 3.2. [International Trade and Investment Treaties](#)
  - 3.3. [Sources of Legislation](#)
    - 3.3.1. [Printed](#)
    - 3.3.2. [Online](#)
    - 3.3.3. [Venezuelan Legislation in English](#)
  - 3.4. [Sources of Judicial Decisions](#)
  - 3.5. [Sources of Executive Regulations, Decrees, etc.](#)
- 4. [Bibliography of Sources on Venezuelan Law in English](#)

# 1. Special Note

By all accounts Venezuela is undergoing a political, institutional, and humanitarian crisis without precedent in the country's history. Since 2019, two individuals—Nicolás Maduro and Juan Guaidó—have been simultaneously claiming to be Venezuela's legitimate president. This situation—ongoing at the time of print—is

also problematic in the international arena. Governments around the world are split on the issue of recognition of the Venezuelan president and tribunals in different jurisdictions and international organizations have struggled when representatives from the two regimes have appeared before them to exercise the legal representation of Venezuela. While the broad implications of this situation largely exceed the scope of this anticipated update to GlobaLex's report on Venezuela, two specific consequences of the Venezuelan crisis merit some discussion.

On the one hand, the fact that the laws' official texts are not always publicly available has impacted GlobaLex's ability to maintain the currency of this report on Venezuela. In fact, the current unreliability of the official publication outlet—the *Gaceta Oficial* (*see* 3.3.1 *infra*)—for legal texts in Venezuela hinders most researchers' ability to systematically find and catalog Venezuelan law. This is true even where a small issue of the *gacetas* may circulate from time to time within the Venezuelan territory. As a consequence, researching the Venezuelan laws and institutions from outside Venezuela over the last five years has turned into an increasingly difficult if not an impossible task.

On the other hand, the official (Maduro) regime continues to run the majority of the constitutional institutions described in this guide at the same time the interim (Guaidó) regime has created an institution that is analogous to the Executive Cabinet (*see* 2.1 *infra*)—the Government Center (*Centro de Gobierno*)—to run its government. The interim government finds its legitimacy in the National Assembly as it was constituted in 2019, and which Mr. Guaidó presided at the time. Following allegations of electoral fraud in the 2018 presidential election, the National Assembly then invoked Article 333 of the Venezuelan Constitution to depose the Maduro regime. And to govern the expected transitional period, the National Assembly proceeded to enact the "Statute that Regulates the Transition Towards Democracy for the Reestablishment of the Constitution of the Bolivarian Republic of Venezuela" (Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela) ("Transition Statute").

This Transition Statute confirmed the designation of the then president of the National Assembly (Juan Guaidó) as President *ad interim* (*Presidente Encargado*). At the time of print, Mr. Guaidó continues to occupy this post notwithstanding the members of the National Assembly who were incumbent in late 2019 have since been ousted and substituted by newly elected members akin to the Maduro regime.

Although the interim government has failed to meet its domestic objectives (to depose the Maduro regime) and to initiate a transitional period, the interim government has appointed numerous representenes who exercise quasi-ministerial functions within the Government Center. Unfortunately, the interim government's website does not provide a complete list of the offices that operate under the Government Center nor about the individuals appointed to those offices.

Despite its partial failure to accomplish its domestic goals, the interim regime has so far secured the recognition of a significant number of countries, including the United States of America and of many Latin American and European countries. Contrary to the case of other representatives exercising government functions with the interim government, a list of current interim ambassadors is available for consultation.

Irrespective of the ousting of the members of the National Assembly in 2020, the Transition Statute and its subsequent amendments extended each of its members' individual mandates beyond the term for which they were originally elected. The justification for extending the constitutional term in this case is grounded on several allegations of fraud surrounding the 2020 legislative election that resulted in a newly elected National Assembly controlled by Mr. Maduro's Executive. As a result, and similar to the situation with the Executive, today there are two groups of elected officials that claim to represent the legitimate National Assembly of Venezuela. Similarly, the two opposing groups also claim to be the legitimate representatives of the other governmental branches (the judicial, electoral, and citizen branches).

Notwithstanding this brief illustration of the wide array of obstacles that hinder, delay, or impede the systematic research on Venezuelan law, this last GlobaLex update brings to its readership the most recent organization of Venezuela's executive branch (including the existing ministries and so-called "sectorial" vice-presidencies), references to the interim government's main operating document, as well as an updated (albeit non-exhaustive)

list of existing empirical and doctrinal legal literature about the Venezuelan legal system that has been published in English to this date.

# 2. Venezuela's Political Organization (See Const., Title V)

The Bolivarian Republic of Venezuela is a federal republic comprising 23 states, two federal territories, one capital district, and 11 federal dependencies (groups of islands) comprising 72 individual islands. Since Venezuela adopts the representative, republican and federal form of democratic government, the government officials are representatives of the people, who are elected through direct vote. The country embraces a system made up of governmental powers (mainly an executive power, a legislative power, and a judicial power) and has a written constitution. It is one of the four federal republics in Latin America; the individual state governments keep their self-rule, but they must respond to a common government (the national government) and comply with the constitution and laws of the republic.

The constitution is the source and origin of all Venezuelan laws, and it has supremacy over all of them. There have been 29 constitutions since the country became independent in 1830, but it was the 1864 charter that established the federal form of government. Since then, all constitutions have kept this basic scheme of independence granted to the states and federal entities. They have also given full recognition to several basic principles, such as the preeminence of human rights, national sovereignty, division of powers, and the representative system.

The most recent constitution (ratified in a referendum in 1999) introduced important changes. It added two governmental branches (the citizen power and the electoral power). As an instrument that encourages social change, the constitution calls for an active government with a moral obligation to promote not only civil and political rights, but also cultural, economic, and social rights. Paramount among the latter is the right to work and the right to housing.

The 1999 constitution is divided into nine sequential titles (subdivided into chapters and articles) devoted to the political organization of the country and the formal acknowledgment of liberties and freedoms. The Constitution also has transitory provisions designed to facilitate the transition from the previous constitutional regime.

Since the national constitution confers upon the states a significant number of governmental powers and administrative functions, each state has a constitution that establishes its own system of administration of justice and municipal autonomy, and the scope and content of its institutional, political, administrative and tax systems. As a result of the federative scheme, each state counts with an independently elected executive power (headed by a governor) and a legislative assembly, which dictates state legislation. Each state also elects its own authorities and other state officers.

## 2.1. Executive Branch (See Const., Title V, Arts. 225-52)

The executive power dominates the other branches of government and is vested in the president, the vice-president, the sectorial vice-presidents, and the council of ministers.

**Presidency (*Presidencia de la República Bolivariana de Venezuela*)**: Under the 1999 constitution, the president is elected by a plurality vote, with direct and universal suffrage. The president (both head of government and chief of state) is in charge of the general administration of the country, the protection of the national state interests, and is also the Commander-in-Chief of all of the Armed Forces. The president is also empowered to direct foreign relations, to declare a state of emergency, to suspend all constitutional liberties, and to convene extraordinary sessions of the National Assembly. The presidential term of office is six years, and presidents may be re-elected to an unlimited number of consecutive terms. The president appoints the vice-president, the sectorial vice-presidents, decides about the size and composition of the council of ministers (*Consejo de Ministros* or Executive Cabinet), and makes appointments to it. Like all elected officials, the incumbent president is subject to impeachment by way of recall (*revocatorio*) referendum halfway through their terms.

**Cabinet (*Consejo de Ministros*):** Ministers are the heads of ministries or departments. Historically, there has been a distinction in Venezuela between statutory ministries (an invariable number of ministries required by law) and ministries of state (ad-hoc, temporary in nature). The Bolivarian Constitution's silence on this point, however, along with the presidential legislative practice (*see infra*, B.2, *decretos con fuerza de ley* or "D.F.L.") have rendered this distinction moot.

Decree N° 2.378 of 13 of July of 2016 currently regulates the cabinet. In addition to increasing the number of ministries to 31 (the number of ministries contemplated in the previous decree was 27), the decree also introduces the figure of sectorial vice-presidencies (*Vicepresidencias Sectoriales*), of which there are five. In practice, however, the role of the sectorial vice-presidents is a superfluous one because almost invariably the individuals designated as Sectorial Vice-Presidents are already serving as ministers in the Executive Cabinet. The decree further blurs the line that once distinguished between statutory ministries from state ministries. The decree mixes up traditional statutory ministries such as internal relations, justice, and peace; foreign relations; defense, banking and finance; education; petroleum; industry and commerce; labor; transportation and public works; health, agriculture, etc., with onetime so-called state ministries like the Ministry for Ecosocialism and Waters. Moreover, the decree contributes to further fragmenting the competencies that historically were attributed to statutory ministries such as the former ministries of transport and communications or the ministry for the environment, and re-assigns them to two or more new ministries.

The full list of the current cabinet sectorial vice-presidencies and ministries is the following:

- Sectorial Vice-Presidency for the Economy (*Vicepresidencia Sectorial de Economía*)
- Sectorial Vice-Presidency for Planning (*Vicepresidencia Sectorial de Planificación*)
- Sectorial Vice-Presidency for Social Development and the Revolution of the Missions (*Vicepresidencia Sectorial para el Desarrollo Social y la Revolución de las Misiones*)
- Sector Vice-Presidency for Political Sovereignty, Security and Peace (*Vicepresidencia Sectorial de Soberanía Política, Seguridad y Paz*)
- Sectorial Vice-Presidency for the Development of Territorial Socialism (*Vicepresidencia Sectorial de Desarrollo del Socialismo Territorial*)
- Ministry of the Popular Power for the Office of the Presidency and Monitoring of the Governmental Administration (*Ministerio del Poder Popular del Despacho de la Presidencia y Seguimiento de la Gestión de Gobierno*)
- Ministry of the Popular Power for Foreign Relations (*Ministerio del Poder Popular para Relaciones Exteriores*)
- Ministry of the Popular Power for Internal Relations, Justice and Peace (*Ministerio del Poder Popular para Relaciones Interiores, Justicia y Paz*)
- Ministry of the Popular Power for Defense (*Ministerio del Poder Popular para la Defensa*)
- Ministry of the Popular Power for Communication and Information (*Ministerio del Poder Popular para la Comunicación e Información*)
- Ministry of the Popular Power for Banking and Finance (*Ministerio del Poder Popular para la Banca y Finanzas*)
- Ministry of the Popular Power for Industry and Commerce (*Ministerio del Poder Popular para la Industria y Comercio*)
- Ministry of the Popular Power for Basic, Strategic and Socialist Industries (*Ministerio del Poder Popular para Industrias Básicas, Estratégicas y Socialistas*)
- Ministry of the Popular Power for Foreign Trade and International Investment (*Ministerio del Poder Popular para el Comercio Exterior e Inversión Internacional*)
- Ministry of the Popular Power for Productive Agriculture and Lands (*Ministerio del Poder Popular para la Agricultura Productiva y Tierras*)
- Ministry of the Popular Power for Urban Agriculture (*Ministerio del Poder Popular de Agricultura Urbana*)
- Ministry of the Popular Power of Fishing and Aquaculture (*Ministerio del Poder Popular de Pesca y Acuicultura*)
- Ministry of the Popular Power for Food (*Ministerio del Poder Popular para la Alimentación*)

- Ministry of the Popular Power for Tourism (*Ministerio del Poder Popular para el Turismo*)
- Ministry of the Popular Power for Petroleum (*Ministerio del Poder Popular de Petróleo*)
- Ministry of the Popular Power for Ecological Mining Development (*Ministerio del Poder Popular de Desarrollo Minero Ecológico*)
- Ministry of the Popular Power for Planning (*Ministerio del Poder Popular de Planificación*)
- Ministry of the Popular Power for Health (*Ministerio del Poder Popular para la Salud*)
- Ministry of the Popular Power for Indigenous Peoples (*Ministerio del Poder Popular para los Pueblos Indígenas*)
- Ministry of the Popular Power for Women and Gender Equality (*Ministerio del Poder Popular para la Mujer y la Igualdad de Género*)
- Ministry of the Popular Power for the Youth and Sports (*Ministerio del Poder Popular para la Juventud y el Deporte*)
- Ministry of the Popular Power for the Penitentiary Service (*Ministerio del Poder Popular para el Servicio Penitenciario*)
- Ministry of the Popular Power for the Social Process of Labor (*Ministerio del Poder Popular para el Proceso Social de Trabajo*)
- Ministry of the Popular Power for Culture (*Ministerio del Poder Popular para la Cultura*)
- Ministry of the Popular Power for Education (*Ministerio del Poder Popular para la Educación*)
- Ministry of the Popular Power for University Education, Science and Technology (*Ministerio del Poder Popular para la Educación Universitaria, Ciencia y Tecnología*)
- Ministry of the Popular Power for Ecosocialism and Waters (*Ministerio del Poder Popular para el Ecosocialismo y Aguas*)
- Ministry of the Popular Power for Habitat and Housing (*Ministerio del Poder Popular para Hábitat y Vivienda*)
- Ministry of the Popular Power for *Comunas* and Social Movements (*Ministerio del Poder Popular para las Comunas y los Movimientos Sociales*)
- Ministry of the Popular Power for Transportation and Public Works (*Ministerio del Poder Popular para Transporte y Obras Públicas*)
- Ministry of Popular Power for Electric Power (*Ministerio del Poder Popular para la Energía Eléctrica*)

Ministers endorse and authenticate, by virtue of their signatures, certain presidential actions that would not be effective otherwise. As head of a ministry or department and a member of the cabinet, a minister holds a position that is simultaneously administrative and political. As explained above, the historical presidential prerogative to appoint ministers of state (*ministros de estado*), with a mere advisory role, has now become the norm for all cabinet positions. This is so given that the president nowadays dictates, by way of D.F.L., the kind and the number of ministries that will integrate his cabinet at any point in time.

Although its members have their own functions and identity, the executive is seen as a collegiate entity. No institution embodies this idea better than the council of ministers. Its members are the president, the vice-president, the sectorial vice-presidents, and the ministers. The most important function of the council of ministers is to set national policy in all areas of governmental activity.

From a legal viewpoint, the most important task of the council of ministers is to issue regulations (*reglamentos*) to specific laws. The approval of these regulations thus requires that the president act jointly with the vice-president and ministers. Individually, the president may issue decrees (*decretos*) and the ministers may issue resolutions (*resoluciones*) regarding specific topics of their competence. Whether it is a regulation, a decree, or a resolution, it must be published (along with the most important documentation from the executive branch) in the official gazette before they become binding.

## 2.2. Legislative Branch (See Const., Title V, Arts. 186-224)

The new constitution replaced the traditional bicameral Congress (including a Senate) with a 162-member unicameral National Assembly. The new legislative body consists solely of the Chamber of Deputies, which is presided by one its members. Deputies serve five-year terms and may be re-elected for an indefinite number of

consecutive terms, since the First Amendment to the Constitution of the Bolivarian Republic of Venezuela (2009) removed the cap on the number of possible re-elections. Legislators are elected by direct, universal, and secret vote through a combination of party list and single member constituencies. Three seats are reserved for the indigenous peoples of Venezuela.

The number of members elected to the National Assembly recently increased to 277. While some variation in the number of members to the National Assembly is warranted in proportion to changes in the population figures, the most recent increase was politically motivated. For election purposes, the country is divided into districts and each one elects its members roughly proportional to their population. Each state is considered an electoral district and elects its Deputies by proportional representation.

Besides its legislative tasks, the National Assembly has exclusive powers *vis-à-vis* levying taxes, deploying troops, and prosecuting the president, ministers, and members of the Supreme Tribunal of Justice. The Assembly also elects the officers comprising the citizen power, which will be discussed below. Ordinary sessions of the National Assembly begin in January and continue until August, to be resumed from September to December. When the National Assembly is not in session, its delegated committee acts on matters relating to the executive and in oversight functions.

A note of historical importance from 2017-2020 is in order to understand the circumstances that led to the current institutional crisis. In 2017, president Nicolás Maduro convened a National Constituent Assembly with the publicized goal of drafting a new constitution necessary to guide Venezuelans through the next phase of the Bolivarian Revolution. The role of this body, however, was limited in practice to counter any attempts by the National Assembly, controlled since 2015 by the opposition, to depose Mr. Maduro from office. The 2017 National Constituent Assembly dissolved in 2020 without having completed a project to replace the 1999 Bolivarian Constitution.

### 2.2.1. Legislative Process

The law-making process is comprised of seven steps: initiative, debate, voting, passing, sanction, enactment, and publication. Legislation can be initiated by (1) the national executive power, (2) the legislative power (either a committee of the National Assembly or at least three of its members), (3) the Supreme Tribunal of Justice, in the case of laws relating to judicial procedures and organization of the judiciary, (4) the institutions comprising the citizen power (ombudsman, prosecutor general, and comptroller general), in the case of laws relating to the organization of their offices, (5) the electoral power, in the case of laws relating to electoral matters; and (6) a number at least equivalent to 0.1% of all permanently registered voters signing a public petition. In practice, since the Executive is the branch with the most political power, it initiates almost all legislation, especially legislation with any political significance.

Bills are submitted to the National Assembly's (permanent or temporary) standing committees for technical, material, and formal rounds of scrutiny. The areas of expertise of these standing committees closely parallel the ones corresponding to the executive departments (internal affairs, foreign affairs, defense, finance, etc.). The number of standing committees is variable and may not exceed 15 at any given time.

Once the Assembly votes and passes the law after at least two debates, the president has ten days to sanction it or promulgate it, propose amendments to it or ask for a reconsideration of any of its provisions. The president may ask the National Assembly to reconsider any statute (or parts of it) he finds objectionable, but a simple majority of the Assembly can override these objections. If it does, the bill becomes law. The only exception occurs when the president's objection is based upon a charge of unconstitutionality; in that case, upon the president's request, the Supreme Court has fifteen days to make a ruling. If it does not make a ruling or rejects the president's charge, the law is enacted.

The publication in the Official Gazette of the Bolivarian Republic of Venezuela, together with the enforcement order (*cúmplase*) issued by the national executive, is the last step in the process. The laws become mandatory as of the date of their publication in the Official Gazette or at a date indicated in the respective text.

A special procedure is required for constitutional amendments and constitutional reform. The Venezuelan constitution is considered a "rigid" one because of the strict conditions imposed to modify it. Constitutional amendments consist of changes to the constitutional text, of a large or small scope, making additions, deletions, or other modifications, without altering its fundamental structure. The constitution may be amended on a proposal from 15% of the citizens registered with the Civil and Electoral Registry, or from 39% of the members of the National Assembly, or from the president, acting jointly with the council of ministers. Approval requires the vote of a majority of the members of the Assembly. The Electoral Council must submit the amendments to a referendum within 30 days of formally receiving the approved proposal.

The purpose of constitutional reform is to implement a partial revision of the constitution and a replacement of one or more of its provisions, without modifying the fundamental principles and structure of the constitutional text. The initiative for a constitutional reform may proceed from the National Assembly, through a resolution approved by a majority vote of its members; from the president sitting with the council of ministers; or from registered voters through a request of at least 15% of the total number registered with the civil and electoral registry.

The National Assembly must debate on the draft of the constitutional reform three times (including title by title or chapter by chapter, and article by article discussions) and approve it with a two third majority vote in a time period no longer than 2 years. Once approved by the National Assembly, the constitutional reform draft (as a whole or in parts) must be submitted to a referendum within 30 days from the date of its approval and will be adopted if the number of affirmative votes is greater than the number of negative votes.

### 2.2.2. Types of Legislation

The hierarchy of Venezuelan norms is fairly typical of civil law jurisdictions. The supreme set of norms is the constitution. Under this scheme, the Assembly passes laws or statutes (*leyes*), placed at different hierarchical levels. Most statutes are ordinary acts or ordinary laws (*leyes ordinarias*). These are common laws, in the essential meaning of the word, originating from the Assembly, in the exercise of its primary legislating function. They deal with all subjects, except those that will be specifically dealt with by other categories of laws. Approval requires the vote of a simple majority, and sanction by the President of the Republic. Of equal hierarchy are the enabling laws (*leyes habilitantes*) from which decrees with the rank and force of law (*decreto con fuerza de ley* or D.F.L.) or delegated laws emerge. At a higher level are organic acts or charter or organic laws (*leyes orgánicas*). The last two kinds of laws deserve special attention.

Enabling laws are those enacted by a three-fifths vote of the members of the National Assembly to establish the guidelines, purposes, and framework for matters that are being delegated to the President of the Republic, so that delegated Laws or decrees with the rank and force of law (*decretos con fuerza de ley* or D.F.L.) may be issued. The Assembly may thus delegate to the president the power to set norms with the status of law on specific matters. The president has the power to enact these norms by means of delegation of powers from the National Assembly. The president (the delegate) would not normally have competence to sanction that law, but has acquired the power to do so. While these decrees used to deal with economic or fiscal regulation, support and control of enterprises, scarcity of natural resources, and politically related issues, they now virtually extend to every imaginable field of law.

"Organic" laws are: 1) those enacted to organize public powers or developing constitutional rights, 2) those serving as a normative framework for other laws, or 3) those identified as such by the constitution. With the exception of those in the last category, any bill for the enactment or amendment of an organic law must first be accepted by a two-thirds vote of the National Assembly, and will be sent, prior to promulgation, to the Constitutional Chamber of the Supreme Tribunal of Justice for a ruling on the constitutionality of its organic status.

## 2.3. Judicial Branch (See Const., Title V, Arts. 253-272)

The Supreme Tribunal of Justice (*Tribunal Supremo de Justicia*) is at the apex of the Venezuelan court system. The National Assembly elects the 32 justices (*magistrados*) for a single 12-year term. Appointments are made following recommendations from the Committee for Judicial Postulations, which consults with organizations dealing with legal issues and the organs of the citizen power.

The Supreme Tribunal is the court of last resort and may meet either in plenary sessions or in groups forming specialized chambers. These chambers or divisions are six: constitutional, political-administrative, electoral, civil appeals, criminal appeals, and social (mainly agrarian and labor) issues appeals. The Supreme Tribunal is empowered to invalidate any laws, regulations or other acts of the other governmental branches conflicting with the constitution. It also hears accusations against high public officials, cases involving diplomatic agents, and certain civil actions arising between the State and individuals.

The lower court system includes district and municipal courts as well as trial and appeal courts that deal with civil and criminal matters. The lower court system is somewhat complex. There are courts with special jurisdiction in the following areas: civil, commercial, criminal, labor, tax, customs, administrative, juvenile, military, and agrarian. In these jurisdictions (to varying degrees), courts are placed in hierarchical order and are competent on the basis of the amount involved or the importance of the case. For civil and commercial cases, for example, they are divided as follows: parish courts (*tribunales de parroquia*), district courts (*tribunales de distrito*), courts of first instance (*tribunales de primera instancia*), superior or appeal courts (*tribunales superiores*). As a rule, judicial decisions may be appealed to a higher tribunal, but cases may not be heard in more than two courts.

Recent innovations have been the introduction of a justice of the peace (*justicia de paz*) network and reforms to the criminal procedure scheme. The former seeks to alter the way of bringing about the resolution of conflicts and controversies arising in local communities by means of mediation, if possible, or by determining equity when the parties specifically request it or under certain circumstances established by law. The latter entails the establishment of a new accusatorial system (involving active parties contesting each other) as a substitute for the traditional inquisitorial system (underscoring the role of the judge as the decision-maker throughout the trial). Other new features are tentative steps toward the participation of citizens as lay judges and as jurors.

Other actors in the judicial sector are: the prosecutor general, who provides opinions to the courts on prosecution of criminal cases and brings to the attention of the proper authorities cases of public employee misconduct and violations of the constitutional rights of prisoners or accused persons; the Ministry of Justice and Internal Affairs, which oversees the prison system and manages the Bolivarian Intelligence Service (*Servicio Bolivariano de Inteligencia Nacional* or SEBIN), the national intelligence agency of Venezuela, and the organ devoted to the scientific investigation of crimes (*Cuerpo de Investigaciones Científicas Penales y Criminalísticas* or CICPC); and the Executive Office of the Magistracy (*Dirección Ejecutiva de la Magistratura* or DEM), which supervises the lower courts as well as the selection and training of judges.

## 2.4. Citizen Branch (See Const., Title V, Arts. 273-291)

Besides the traditional branches, the 1999 constitution creates two additional branches of the federal government: the citizen and electoral branches. They are embodied in the Republican Moral Council and the National Electoral Council respectively. The Office of the Prosecutor General, the Office of the General Ombudsman, and the Office of the Comptroller General are the three entities comprising the citizen power. They have a crucial role to play *vis-à-vis* adherence to the rule of law by governmental officials at all levels and, for that purpose, are charged with preventing, investigating, and punishing administrative irregularities.

**Office of the Prosecutor General (*Fiscalía General de la República*):** This office in charge of public prosecutions (*ministerio público*) is an autonomous and hierarchical organization. It belongs neither to the executive branch nor to the judicial branch. The 1999 constitution confers upon it an independent role so that it can better perform its functions as guardian of constitutional rights and liberties, democratic principles, public interests, and the rule of law in general. Its head is the prosecutor general of (*Fiscal General*), who is designated by the National Assembly for a seven-year term, and is charged mainly with prosecuting crimes and representing

the peoples' interests in those cases in which no initiative on the part of a party is required to start or continue such prosecution. The prosecutor general also files any appropriate action to hold liable public officials who have incurred civil, labor, military, criminal, administrative or disciplinary liability in the course of their official duties.

**General Ombudsman (*Defensoría del Pueblo*):** This entity is an independent body created within the sphere of the National Assembly and operates independently, without receiving instructions from any authority. It may take cases against the Government either on its own initiative or at the request of any third party. The services provided to the public are free of charge. The general ombudsman is appointed (and may be removed for cause) by the National Assembly with the vote of two-thirds of its members and the term of office is a single seven-year term. The mission of this officer is the defense and protection of human rights and other liberties and interests protected under the constitution and laws, in the face of deeds, acts or omissions of the administration.

**Office of the Comptroller General (*Contraloría General de la República*):** The comptroller general is appointed for a seven-year term by the National Assembly. This officer is in charge of supervising the management and auditing of revenues, expenses, public and national property, and transactions of the centralized and decentralized public entities, whatever its forms of organization may be, as well as of other branches of government. Like the other entities of the citizen power, this one enjoys operating, administrative and functional autonomy. It does not co-administer the public sector; it assesses facts, acts, and documents only after the organizations to be audited have finished their accounting exercises. Its main task is the approval or rejection of the revenue and investment accounts of public funds, the opening of investigations into irregularities, and the application of administrative measures and penalties as appropriate. It is upon the comptroller general to call on the prosecutor general to file the legal actions that may apply.

In addition to fulfilling their specific functions, these bodies act collectively as the "Republican Moral Council" to submit reports about their activities to the National Assembly and play an educational role *vis-à-vis* the defense of civil virtues and democratic principles.

## 2.5. Electoral Branch (See Const., Title V, Arts. 292-298)

The National Electoral Council (*Consejo Nacional Electoral or* CNE), embodying the electoral power, is responsible for organizing elections at all levels. The National Assembly also elects CNE rectors to seven-year terms. Besides the National Electoral Council as the governing body, the electoral power relies on three subordinate entities: the National Board of Elections, the Civil Status and Voter Registration Commission, and the Commission on Political Participation and Financing.

# 3. Primary Sources of Legal Information

## 3.1. Legal Codification

Venezuela's legal system has a legislative origin, grounded on "written law" (civil law), as opposed to the "common" or "judicial" law, which is the basis for the American, English, and Canadian legal systems. As a civil law jurisdiction, it has its roots in Roman law and is heavily influenced by the French (Napoleonic Code) system and the Italian and Spanish legal traditions, which established written codification of its laws. As systematic sets of rules pertaining to specific subject matters, codes thus emerged not long after the country became an independent nation. A Code of Judicial Procedure (both civil and criminal) was the first to appear in 1836. Internal conflicts prevented the enactment of other codes until 1862, when the Commercial Code was promulgated. A Civil Code and a Code of Civil Procedure soon followed it in 1863. The first Code of Criminal Procedure appeared in 1873. As their models changed, all these codes underwent significant reforms during the following decades and throughout the twentieth century and benefited from the developments occurring in Europe and other Latin American countries.

In recent decades, the work of legislative commissions has played a crucial role *vis-à-vis* code modernization. Important legislation has thus become more responsive to social needs. The changes have been more significant in the areas of criminal law and procedure, as recent code amendments attest.

Nowadays, the major codes comprising the basic legislation of Venezuela are the following:

- Civil Code (1982) – the scope and coverage of the Civil Code are extremely broad. It regulates contracts, torts, property, obligations, capacity of persons, marriage, divorce, paternity, guardianship, secured transactions, and wills and estates.
- Commercial Code (1955) – regulates commercial transactions and entities, negotiable instruments, and bankruptcy.
- Criminal Code or Penal Code (2005 via D.F.L.) – establishes criminal offenses punishable by law.
- Organic Code of Criminal Procedure (2021 via D.F.L.) - defines the procedures to be followed before the criminal courts.
- Code of Civil Procedure (1986) – defines the procedures required to litigate before the civil courts.
- Organic Tax Code (2020) – establishes the following principles: strict interpretation of tax laws and rules, elimination of the statute of limitations for serious tax offenses, penalties and sanctions for tax evasion crimes, expansion of the concept of imputed income, audit powers of the Tax Administration, rate of default interest, extension of the principle of solidarity to make it possible to reach the assets of Directors or tax advisors in cases they validate tax offenses, administrative procedures.

Of particular importance to business is the Commercial Code. For all residual matters not resolved by the Commercial Code, the provisions of the Civil Code apply.

As a rule, codes are organized into books, titles, chapters, articles, and sections. Titles are subdivided into chapters, which are sequential within their respective title only. Chapters are further subdivided into articles, which are sequential throughout the code. Each article in the code gets a unique number. All one needs to find a particular article is its number, and not the book, title, and chapter numbers.

## 3.2. International Trade and Investment Treaties

- UNCTAD provides free electronic access to a comprehensive list of Venezuela's Bilateral Investment Treaties (BITs), other investment agreements (IAAs), investment related instruments (IRIs), and investor-state arbitrations naming Venezuela as respondent.
- Similarly, the Executive Secretariat for Integral Development of the Organization of American States maintains an equally comprehensive compendium of Venezuela's trade agreements.

Venezuela's denunciation, in January 2012, of the Convention on the Settlement of Investment Disputes between States and National of Other States (the ICSID convention) is noteworthy. The denunciation of the treaty has certainly caused Venezuela to recently make the list of the top five respondent governments with the largest number of pending investment arbitrations.

## 3.3. Sources of Legislation

### 3.3.1. Printed

The quintessential source of Venezuelan legislation (in the broadest sense of the word) is the *Official Gazette* (*Gaceta Oficial*) published since 1872. Regular issues are released daily (except Saturdays, Sundays, and holidays). Special issues (including long statutes or regulations, codes, supreme tribunal decisions, etc.) are released sporadically. Laws do not have reference numbers.

Historically, the best and most comprehensive private compilation of laws and decrees is the *Ramírez & Garay Legal Gazette* (*Gaceta Legal Ramírez y Garay*) published since 1958. Nevertheless, as is the case with many other publications, the currency of *Ramírez y Garay* today is uncertain.

State laws are published in the official gazettes of those entities, and municipal ordinances are published in the respective municipal gazettes.

### 3.3.2. Online

- Venezuelan National Printing Office and Official Gazette – open access Official Gazette repository (from 2013).
- Microjuris Venezuela – a fee-based database containing cases from all courts, codes, laws, decrees, *reglamentos*, etc.
- Justia – open access database containing the text of the constitution, laws, decrees, and other norms.
- VLex – a fee-based database, contains cases from all courts, codes, *doctrina* (books and articles, some of them in English)
- Free access to the full text in Spanish of selected Official Gazettes and legislation.
- Free access to the full text in Spanish of a limited number of codes and laws.
- Free access to the full text in Spanish of a limited number of codes and laws arranged by subject.
- Free access to the full text in Spanish of labor laws and regulations.
- Free access to the full text in Spanish of environmental laws and regulations.
- Free access to the full text in Spanish of election laws and regulations.

Official collections of historical value are the following:

- *Laws and Regulatory Decrees of the United States of Venezuela* (Leyes y Decretos Reglamentarios de los Estados Unidos de Venezuela), which collects all the texts of laws enacted from 1811 to 1944;
- *Compilation of Laws and Decrees of Venezuela* (Recopilación de Leyes y Decretos de Venezuela*)*, published in 1964, which contains all the legislation enacted from 1830 to 1951;
- *Legislative Compilation of Venezuela* (Compilación Legislativa de Venezuela), which contains legislation in force until 1949;
- *Public Treaties and International Agreements of Venezuela* (Tratados Públicos y Acuerdos Internacionales de Venezuela), a set published between 1924 and 1956.

### 3.3.3. Venezuelan Legislation in English

A good number of Venezuelan codes and laws have been translated into English. Most of them are available in print. The following is a partial list:

- National Constitution (1999) (translation available in *Constitutions of the Countries of the World*).
- Code of Civil Procedure (1987) (translation of articles 608 to 629 available in *World Arbitration Reporter*)
- Commercial Code (1955) (translation available as a publication of *Traductores Técnicos*)
- Arbitration Law (1998) (translation available in *International Handbook on Commercial Arbitration*)
- Copyright Law (1993) (translation available in *Copyright and Neighboring Rights, Laws, and Treaties*).
- Estate and Gift Tax Law (1999) (digest available in *Taxation in Latin America*).
- Income Tax Law (2001) (translation available in *Tax Laws of the World*).
- Land Use Law (1983) (translation available in *Food and Agricultural Legislation*, Vol. 33, No. 2).
- Law on Electronic Signatures and Data Messages (2001) (translation available in *Foreign Tax Law Bulletin* No. 14).
- Law on Mining (1999) (translation available in *Mining Legislation*) (South America) 128-SA-22.
- Law on natural gas exploration and exploitation (2000) (translation available in *Petroleum legislation (South America)* supplements 149 and 160.
- Private International Law (1998) (translation available in *Yearbook of Private International Law*).
- Trust Law (1956) (translation available in *Foreign Tax Law Bulletin* No. 9).

A few items are directly available online:

- Constitution of the Bolivarian Republic of Venezuela (1999) (unofficial translation)

- Copyright Law (1993) (translation by the World Intellectual Property Organization)

## 3.4. Sources of Judicial Decisions

A few words about the value of jurisprudence in Venezuela are in order. In Venezuela, codification has not allowed case law to reach the same recognition it has within the common law system. Contradictions between statutes and judgments may render the latter useless. Legal provisions are considered mandatory, as long as judges do not believe that they violate the constitution. The role of case law is thus minimized by the tradition of codification and regulation and limited to fill in legislative blanks.

Although the Venezuelan Supreme Tribunal is considered the supreme interpreter of the national constitution and laws arising thereof, its decisions are not mandatory for similar cases. Even when judging similar cases, lower courts, by virtue of their autonomy, may set aside the Supreme Tribunal doctrine, without infringing the constitution. That dismissal, however, should not be arbitrary or groundless because although judges only decide the specific cases assigned to them, they must provide new arguments to justify their disagreement with the Supreme Tribunal ruling in analogous instances.

Regarding the reporting system, all Supreme Tribunal decisions used to be officially published in the *Forensic Gazette* (*Gaceta Forense*)*,* now in its second series (1953 onwards). The first series covered the years 1949 to 1953. Between 1874 and 1949, the Venezuelan highest court opinions were published in the different reports reserved for its opinions. Since the court changed names several times, the publication titles were modified accordingly. Most of the time it was entitled *Report of the Federal Court or Report of the Court of Cassation* (*Memorias de la Corte Federal y de Casación*). Like the highest court in France (*Cour de Cassation*), the court's name derived from its power to quash the decisions of all inferior courts.

Some Supreme Court decisions are published in special issues of the *Gaceta Oficial.* Two private reporters are entitled *Jurisprudence of the Supreme Court of Justice* (*Jurisprudencia de la Corte Suprema de Justicia*) (Caracas, Samadi, 1994 onwards) (also issued in CD-ROM or diskette) and *Jurisprudence of the Supreme Tribunal of Justice* (*Jurisprudencia del Tribunal Supremo de Justicia*) (Caracas, Pierre Tapia, 2000 onwards). Both are monthly publications, but their currency after 2015 is uncertain.

There is no regular publication of lower court opinions. Summaries of the most important decisions were collected and published sporadically, between 1950 and 1998, by the Ministry of Justice, under the title *Jurisprudence of the Courts of the Republic* (*Jurisprudencia de los Tribunales de la República*).

Selected decisions of the entire range of Venezuelan courts are included in *Ramirez & Garay Venezuelan Jurisprudence* (*Jurisprudencia Venezolana Ramirez & Garay*) (1960 onwards), a monthly publication and in the *Forensic Reporter* (*Repertorio Forense*), a comprehensive quarterly (1966-onwards). The currency of these source after 2015 is uncertain.

## 3.5. Sources of Executive Regulations, Decrees, etc.

As stated above, publication in the Official Gazette is a prerequisite to the enforcement of any regulatory instrument in Venezuela. With the caveat previously stated, a selection of the most important decrees and regulations is also published in the *Ramírez & Garay Legal Gazette* (*Ramírez & Garay Gaceta Legal*) (1958 onwards).

Of course, the internet is quickly becoming the medium of choice for the dissemination of these materials. Unfortunately, at this point, most official government websites are either inoperative or do not include any legislation, executive regulation or presidential decree databases that are systematically maintained.

Since the National Assembly regulates all areas of public administration, ministries and other agencies lack rulemaking power. As stated above, however, Ministries do issue resolutions on the matters of their competence. At some point in recent years, the homepage of many Ministerial websites offered links to bodies of its own

structure and to others, which deal with the same subject. These websites are for the most part inoperative or fail to offer access to statutes, regulations, and resolutions in their respective specialties.

# 4. Bibliography of Sources on Venezuelan Law in English

Although this brief guide has been devoted mainly to primary sources of legal information, it will conclude with a short list of titles representative of the literature on Venezuelan law in English. It is important to signal that the apparent out-datedness of some of them does not affect the quality of the analysis and value as providers of an overview of the Venezuelan legal system, despite all the challenges that today impede rigorous legal research in this jurisdiction.

- *Modern Legal Systems Cyclopedia* v.10 South America, Chap. 8. The legal system of the Republic of Venezuela in general -- Sec. 1. Specific performance under Venezuelan law -- Sec. 2. Security interests under the laws of Venezuela: an introductory guide. Buffalo, N.Y.: W.S. Hein, general editor, Kenneth Robert Redden. 1984.
- *International Encyclopedia of Comparative Law,* v. I, "National Reports, fascicle V/Z Venezuela [published under the auspices of the International Association of Legal Science. Editorial committee: R. David [et al.]. Tubingen, 1975.
- *Business Operations in Venezuela*, edited by Nicasio del Castillo [et al.] [BNA] Bureau of National Affairs, c2002- Washington, D.C. Tax Management Inc., Tax management portfolios 993-2nd
- *Doing business in Venezuela*, edited by Araque [et al.], Yonkers, N.Y., Juris Publishing, 2002- (loose-leaf).
- *A guide to the law and legal literature of Venezuela* H.L. Clagett, Washington, Library of Congress, 1947.
- *A statement of the laws of Venezuela in matters affecting business*. P. Silveira Barrios Washington, O.A.S. 1977.
- *Female Citizens, Patriarchs and the Law in Venezuela, 1786-1904*. Arlene J. Diaz. Lincoln: University of Nebraska Press, 2004.
- *Latin American Investment Protections: Comparative Perspectives on Laws, Treaties, and Disputes for Investors, States and Counsel*, (*See*, Chap. 18: Venezuela). Jonathan C. Hamilton, Omar E. García-Bolívar, Hernando Otero, eds., Martinus Nijhoff Publishers, 2012.

A broad array of articles and notes discussing the laws and institutions of Venezuela have been published in American law reviews and other academic journals published in English. Some articles are directly relevant for the research or study of Venezuelan law, while some are relevant only to a limited extent and in the contexts of international law or the Latin American region. The following articles (listed in reverse chronological order) are worthy of mention:

2021:

- Gómez, M.A., 2021. Does a Right to a Physical Hearing Exist in International Arbitration? Venezuela, International Council for Commercial Arbitration.
- Macía Briedis, R., 2021. Constitutional Self-negation in Venezuela: Problematizing Constitutionalism's Internalization of the Theory of Constituent Power. *International Journal of Constitutional Law*.
- Núñez M., A. C. and Pérez Perdomo, R., Forthcoming 2021. Constitution and Constitutionalism in Venezuela. In Gargarella, R. and Mendes, H. (Eds.). The Oxford Handbook of Constitutional Law in Latin America. Oxford University Press.
- Esis Villarroel, I., Forthcoming 2021. The Venezuelan Experience: From the Unilateral Termination of the Dutch treaty, the Denunciation of the ICSID Convention to its Continued Participation as Respondent State in Investment Arbitration. In *International Investment Law from a Latin American Perspective*. Springer.
- Sánchez Urribarri, R.A., García Soto, C. and Martínez-Meucci, M. A., Forthcoming 2021. Winds of Change: Comparing the Early Phases of Constitutional Redrafting in Chile and Venezuela. *Hague Journal on the Rule of Law*.
- Sánchez Urribarri, R.A., Forthcoming 2021. Populism, Constitutional Democracy and High Courts: Lessons from the Venezuelan Case. In *Constitutional Populism*. Czarnota, A., Krygier, M. and Sadurski,

W. (Eds.). Cambridge University Press.

- Sánchez Urribarri, R.A., García Soto, C. and Urosa Maggi, D., Forthcoming 2021. Venezuela: The State of Liberal Democracy. In Albert, R., Landau, D., Faraguna, P. and Drugda, S. (Eds.). I-CONnect-Clough Center 2020 Global Review of Constitutional Law.
- Bennaim, A., 2020. The Death of the Autonomous Venezuelan Judiciary. *U. Miami Inter-Am. L. Rev.*, *51*, p.137.

2020:

- Casal, J.M., 2020. The Constitutional Chamber and the Erosion of Democracy in Venezuela. *Zeitschrift für ausländisches öffentliches Recht und Völkerrecht/Heidelberg Journal of International Law*, *80*, pp.913-971.
- Gómez, M.A. and Guerrero-Rocca, G., 2020. National Report for Venezuela. In Lise Bosman (ed.), ICCA International Handbook on Commercial Arbitration, Kluwer Law International, pp. 1—54.
- Gómez, M.A. and Pérez-Perdomo, R., 2020. Venezuela: A Dispatch from the Abyss. In Abel, R.L., Hammerslev, O., Sommerlad, H. and Schultz, U. (Eds.). Lawyers in 21st-century Societies. Hart.
- Leon, H.B., 2020. The International Criminal Court: Interconnection Between International Bodies in Venezuela. *Lewis & Clark L. Rev.*, *24*, p.261.
- López, A.C., Valladares, M.L. and Fereira, L.G., 2020. Legal Nature of the Community Councils in Venezuela. *Espirales Revista Multidisciplinaria de investigación*, *4*(33), pp.1-17.
- Ospino, J., 2020. Imputation in International Criminal Law vs. Venezuelan Criminal Law. *Frónesis*, *27*(1).
- Sánchez Urribarri, R.A., García Soto, C. and Urosa Maggi, D., 2020. Venezuela: The State of Liberal Democracy." In Drugda, S. and Faraguna, P. (Eds.). I-CONnect-Clough Center 2019 Global Review of Constitutional Law.

2019:

- Hernandez, J.I. and Bellorín, C., 2019. The Case for a New Venezuelan Hydrocarbons Law as the Basis of a New Hydrocarbons Policy: Unlocking the Path for Recovery, Stabilization and Growth. *The Journal of World Energy Law & Business*, *12*(5), pp.394-407.
- Sánchez Urribarri, R.A., 2019. Venezuela: Between Autocracy and Hope for Acceptable Elections. Institute for Democracy and Electoral Assistance.
- Sánchez Urribarri, R.A., García Soto, C. and Hernández G., J.I., 2019. Venezuela: The State of Liberal Democracy. 2019. In Drugda, S. and Faraguna, P. (Eds.), 2019. I-CONnect-Clough Center 2018 Global Review of Constitutional Law.

2018:

- Gómez, M.A., 2018. Pran Justice: Social Order, Dispute Processing, and Adjudication in the Venezuelan Prison Subculture. *UC Irvine L. Rev.*, *8*, p.183.
- Gómez, M. and Pérez-Perdomo, R., 2018. Big Law in Venezuela: From Globalization to Revolution. In *Big Law in Latin America and Spain* (pp. 287-319). Palgrave Macmillan, Cham.
- Guerrero-Rocca, G., 2018. The Prodigal Son Comes Home: Ecuador Returns with Investment-Arbitration. 12 World Arbitration & Mediation Review.
- Fitzgerald, A.M., 2018. Crimes against Humanity in Venezuela: Can the ICC Bring Justice to Venezuelan Victims. *U. Miami Int'l & Comp. L. Rev.*, *26*, p.127.
- Hernández G, J.I., 2018. Compliance and Effectiveness of Consumer Law in Venezuela. *Enforcement and Effectiveness of Consumer Law*, pp.697-717.

2017:

- Bergolla, L.A., 2017. The Venezuela Awards: Tribunals Should Not Rule out Expropriation Risk. *Ariz. J. Int'l & Comp. L.*, *34*, p.123.
- Buchheit, L.C. and Gulati, G.M., 2017. How to Restructure Venezuelan Debt (¿Cómo restructurar la deuda venezolana?). *Duke Law School Public Law & Legal Theory Series*, (2017-52).

- Colla, P., Gelpern, A. and Gulati, M., 2017. The Puzzle of PDVSA Bond Prices. *Capital Markets Law Journal*, *12*(1), pp.66-77.
- De Cárdenas García, J., 2017. The New Integrated Oil Service Contracts in a Venezuela in Dire Straits. *Journal of Energy & Natural Resources Law*, *35*(4), pp.417-431.
- Fayyad, K. and Lyratzakis, D., 2017. Restructuring Venezuela's Debt Using Pari Passu. *Duke J. Comp. & Int'l L.*, *28*, p.185.
- Gómez, M.A. and Pérez-Perdomo, R. (Eds.), 2017. *Big Law in Latin America and Spain: Globalization and Adjustments in the Provision of High-End Legal Services*. Springer.
- Guerrero-Rocca, G., In Case of Fire, Please Denounce the ICSID Convention: The Socio-Legal Risks of Adopting a Pro-State Approach Towards Articles 71-72 Dealing with Sovereign Repeat Players. 11 World Arbitration & Mediation Review.
- Hernández-Bretón, E. and Martínez, C.M., 2017. Venezuela: Finding Foreign Law in Venezuela. General Overview. In Nishitani, Y. (Ed.). *Treatment of Foreign Law-Dynamics towards Convergence?* Springer, pp.487-500.
- Hernández-Bretón, E., 2017. Interpretation and Application of the New York Convention in Venezuela. In Bermann, G. (Ed.). *Recognition and Enforcement of Foreign Arbitral Awards* (pp. 1063-1074). Springer, Cham.
- Martínez, C.M., 2017. *Venezuela* (pp. 2648-2658). Edward Elgar Publishing Limited.
- Núñez Machado, A.C., 2017. State Censorship of the Press in Competitive Authoritarian Regimes: A Case Study of Venezuela Under Chavismo (1999-2016) (Doctoral dissertation). Stanford University.
- Pérez-Perdomo, R. and Santacruz Salazar, A., 2017. The Chavist revolution and the justice system. *Latin American Policy*, *8*(2), pp.189-200.
- Pettersson, R., 2017. PDVSA's Bankruptcy: A Look from Venezuelan Law, in the Context of a Default. *Available at SSRN 3064214*.
- Fraga, D., Esis Villarroel, I., de Medeiros Costa, Hirdan, K., dos Santos, E.M. and Santos, V.E.S., 2017. Comparing the Fiscal Regime in the Exploration and Production of Hydrocarbons in Brazil and Venezuela. In *New Energy Landscape: Impacts for Latin America, 6th ELAEE/IAEE Latin American Conference, April 2-5, 2017*. International Association for Energy Economics.

2016:

- Alvarez, A.E., 2016. Report on citizenship law: Venezuela. European Union Democracy Observatory.
- Antillano, A., Pojomovsky, I., Zubillaga, V., Sepúlveda, C. and Hanson, R., 2016. The Venezuelan Prison: From Neoliberalism to the Bolivarian Revolution. *Crime, Law and Social Change*, *65*(3), pp.195-211.
- Antillano, A., Zubillaga, V. and Ávila, K., 2016. Revolution and Counter-Reform: The Paradoxes of Drug Policy in Bolivarian Venezuela. In Caiuby Labate, B., Cavnar, C. and Rodrigues, T. (Eds.). *Drug Policies and the Politics of Drugs in the Americas* (pp. 105-122). Springer, Cham.
- Martínez, M.C., 2016. *Granier v. Venezuela*. *American Journal of International Law*, *110*(1), pp.109-115.
- Sánchez Urribarri, R., 2016. Constitutional Courts in the Region: Between Power and Submissiveness. *Comparative Constitutional Law in Latin America*.
- Sánchez Urribarri, R.A., 2016. Politicization of the Latin American Judiciary Via Informal Connections. In Linnan, D.K. (Ed.). *Legitimacy, Legal Development and Change*. Routledge, pp. 325-340.

2015:

- Brewer-Carías, A.R., 2015. The Government of Judges and Democracy. The Tragic Institutional Situation of the Venezuelan Judiciary. In Turenne, S. (Ed.) *Fair Reflection of Society in Judicial Systems-A Comparative Study* (pp. 205-231). Springer, Cham.
- Corrales, J., 2015. The Authoritarian Resurgence: Autocratic Legalism in Venezuela. *Journal of Democracy*, *26*(2), pp.37-51.
- Hernández-Bretón, E. and Martínez, C.M., 2015. Fighting Corruption from the Civil Side: Echoes from the Silence of Venezuelan Contract Law. In Bonell, M.J. and Meyer, O. (Eds.). *The Impact of Corruption on International Commercial Contracts* (pp. 439-446). Springer, Cham.

- Holmquist, C.L. and Reyes, M.R., 2015. *Divorce in the Venezuelan System of Private International Law*. In Bonomi, A. and Romano, G.P. (Eds.). Yearbook of Private International Law, Vol. XVI - 2014/2015. Otto Schmidt, pp. 441-456.
- Mijares Peña, S., 2014. # Sosvenezuela: Crimes against Humanity in Venezuela. *Gonz. J. Int'l L.*, *18*, p.27.
- Phillips, N.A., 2015. Mercosur: Venezuela's New Vehicle for Resistance to American Political and Economic Hegemony. *Hastings Int'l & Comp. L. Rev.*, *38*, p.169.

2014:

- Brewer-Carías, A.R. and Kleinheisterkamp, J., 2014. Venezuela: The End of Federalism? In Halberstam, D. and Reimann, M. (Eds.). *Federalism and Legal Unification* (pp. 523-543). Springer.
- Gómez, M.A., 2014. The Tower of David: Social Order in a Vertical Community. *FIU L. Rev.*, *10*, p.215.

2013:

- Bagdadi, N.M., 2012. When the Victim Becomes the Criminal: The Case of Ivan Simonovis. *ILSA J. Int'l & Comp. L.*, *19*, p.555.
- Brewer-Carías, A.R., 2013. The Process of Deconstitutionalization of the Venezuelan Constitutional State as the Most Important Current Constitutional Issue in Venezuela. *Duq. L. Rev.*, *51*, p.349.
- Carney, M., 2012. Balancing Regulation and Rights in Venezuela's Media War. *Loy. LA Int'l & Comp. L. Rev.*, *35*, p.273.
- Guerrero-Rocca, G., 2013. Praising Calvo and Wearing Investors' Robes: A Case Study of Venezuela and Its Strategy in Investment Arbitration in the Oil, Gas and Mining Sectors (JSM Thesis). Stanford Law School.
- Rimpfel, K., 2013. Treaty Shopping and Expansive Jurisdiction: Causes and Effects of Venezuela's Denunciation of the ICSID Convention. *Arbitration Law Review*, *5*(1), pp.371-388.

2012:

- García-Bolívar, O.E., 2012. Past and Present Legal Guarantees for Protection of Foreign Investments in Venezuela. *Law & Bus. Rev. Am.*, *18*, p.173.
- Gómez, M.A., 2012. Malleable Law: The (Mis)Use of Legal Tools in the Pursuit of a Political Agenda. *ILSA J. Int'l & Comp. L.*, *19*, p.509.
- Pérez-Perdomo, R., 2012. The Reception of Modern Law in 19th Century Venezuela. In Jorge A. Sánchez Cordero (Ed.). *Legal culture and legal transplants*. International Academy of Comparative Law & UNAM.

2011:

- Friedman, L.M., Pérez-Perdomo, R. and Gómez, M.A. (Eds.), 2011. *Law in Many Societies: A Reader*. Stanford Law Books.
- García, J.C., 2010. Rebalancing Oil Contracts in Venezuela. *Hous. J. Int'l L.*, *33*, p.235.
- Gómez, M.A., 2011. Greasing the Squeaky Wheel of Justice: Networks of Venezuelan Lawyers from the Pacted Democracy to the Bolivarian Revolution. In Dezalay, Y. and Garth, B (Eds.), 2011. *Lawyers and the Rule of Law in an Era of Globalization*. Routledge, pp. 28-47.
- Grinffiel, J., 2011. Media Laws in Latin America: A Comparison Between Venezuela and Argentina. *Law & Bus. Rev. Am.*, *17*, p.557.
- Sánchez Urribarri, R.A., 2011. Courts Between Democracy and Hybrid Authoritarianism: Evidence from the Venezuelan Supreme Court. *Law & Social Inquiry*, *36*(4), pp.854-884.

2010:

- Arnoldy, L., 2010. Fact and Fiction: Venezuelan Education Reform Law. *Law & Bus. Rev. Am.*, *16*, p.873.
- Brown, K.L., 2010. Venezuela Joins Mercosur: The Impact Felt Around the Americas. *Law & Bus. Rev. Am.*, *16*, p.85.

- Eljuri, E. and Treviño, C., 2010. Political Risk Management in Light of Venezuela's Partial Nationalisation of the Oilfield Services Sector. *J. Energy & Nat. Resources L.*, *28*, p.375.
- Gómez, M.A., 2010. Political Activism and the Practice of Law in Venezuela. In Couso, J., Huneeus, A. and Sieder, R. (Eds.). Cultures of Legality: Judicialization and Political Activism in Latin America. Cambridge University Press, pp.182-206.
- Nickles, M., 2009. Judicial Terrorism-Analysis of the Exxon/Venezuela Litigation and Prejudgment Attachment under the Foreign Sovereign Immunities Act. *SCJ Int'l L. & Bus.*, *6*, p.335.
- Sánchez Urribarri, R.A., 2010. Judges and Their Loyalties: A Comparative Study Focused on the Venezuelan Supreme Court (Doctoral dissertation). University of South Carolina.
- Tullos, K.M., 2010. More than Just Words: The Relations Between Venezuela and Colombia and UNASUR Intervention in Light of the Defense Cooperation Agreement Between the United States and Colombia. *Law & Bus. Rev. Am.*, *16*, p.559.
- Walsh, F.M., 2010. The Legal Death of the Latin American Democracy: Bolivarian Populism's Model for Centralizing Power, Eliminating Political Opposition, and Undermining the Rule of Law. *Law & Bus. Rev. Am.*, *16*, p.241.

2009:

- Brewer-Carías, A.R., 2009. The Principle of Separation of Powers and Authoritarian Government in Venezuela. *Duq. L. Rev.*, *47*, p.813.
- Blake, C.H., 2009. Dynamics of Economic Integration in Venezuela and Their Implications for the FTAA Process. *Law & Bus. Rev. Am.*, *15*, p.81.
- Cuervo, L.E., 2009. The Uncertain Fate of Venezuela's Black Pearl: The Petrostate and Its Ambiguous Oil and Gas Legislation. *Hous. J. Int'l L.*, *32*, p.637.
- Gómez, M.A., 2009. Knowledge and Social Networks in the Construction of Elite Lawyers in Venezuela. *Sociologia del Diritto*. Franco Angeli, pp. 113-135.
- Pascal, L.B., 2009. Developments in the Venezuelan Hydrocarbon Sector. *Law & Bus. Rev. Am.*, *15*, p.531.
- Pate, T.J., 2009. Evaluating Stabilization Clauses in Venezuela's Strategic Association Agreements for Heavy-Crude Extraction in the Orinoco Belt: The Return of a Forgotten Contractual Risk Reduction Mechanism for the Petroleum Industry. *U. Miami Inter-Am. L. Rev.*, *40*(2), pp.347-381.
- Pérez Perdomo, R., 2009. A Plea for the Social Study of Legal Scholars: The Case of 19th Century Venezuela. *Sociologia del Diritto*. Franco Angeli, pp.67-91.
- Sánchez-Murphy, L., 2009. Economic Development and Environmental Threats: Tipping the Balance in Venezuela. *Loy. U. Chi. Int'l L. Rev.*, *7*, p.73.
- Sánchez Urribarri, R.A., 2009. Venezuela, Turning Further Left? In Castañeda, J.G. and Morales, M.A. (Eds.). *Leftovers* Routledge, pp. 186-204.

2008:

- Alguindigue, C. and Pérez Perdomo, R., 2008. The Inquisitor Strikes Back: Obstacles to the Reform of Criminal Procedure. *Sw. J. Int'l L.*, *15*, p.101.
- Eljuri, E. and Tejera Pérez, V.J., 2008. 21st-Century Transformation of the Venezuelan Oil Industry. *Journal of Energy & Natural Resources Law*, *26*(4), pp.475-498.
- Gómez, M.A., 2007. All in the Family: The Influence of Social Networks on Dispute Processing (A Case Study of a Developing Economy). *Ga. J. Int'l & Comp. L.*, *36*, p.291.
- Lezcano Huncal, A. and Rachadell de Delgado, G., 2008. The Impact of the Organic Hydrocarbons Law on the Venezuelan Natural Gas Industry. *Oil, Gas & Energy Law*, *6*(2).
- Marsh, B., 2007. Preventing the Inevitable: The Benefits of Contractual Risk Engineering in Light of Venezuela's Recent Oil Field Nationalization. *Stan. JL Bus. & Fin.*, *13*, p.453.
- McNew, B.S., 2008. Full Sovereignty Over Oil: A Discussion of Venezuelan Oil Policy and Possible Consequences of Recent Changes. *Law & Bus. Rev. Am.*, *14*, p.149.
- Mielnik, A., 2008. Hugo Chavez: Venezuela's New Bandito or Zorro. *Law & Bus. Rev. Am.*, *14*, p.591.
- Olivera Soto, A.L., 2008. Prior Restraints in Venezuela's Social Responsibility on Radio and Television Act: Are They Justified? *Geo. Wash. Int'l L. Rev.*, *40*, p.401.

- Pérez Perdomo, R., 2008. Lawyers, Rule of Law, and Social Justice: A Latin American Perspectives. *U. St. Thomas LJ*, *5*, p.730.
- Rojas, C. and Galetta, M., 2008. Juridical Interpretation of Venezuelan Legislation. In *Proceedings of the XXII World Congress of Philosophy*, Vol. 40, pp. 153-161.
- Witten, E.A., 2008. Arbitration of Venezuelan Oil Contracts: A losing Strategy. *Tex. J. Oil Gas & Energy L.*, *4*, p.55.

2007:

- Brewer-Carías, A.R., 2006. Judicial Review in Venezuela. *Duq. L. Rev.*, *45*, p.439.
- De Jesús, A., 2007. Impact of Constitutional Law on International Commercial Arbitration in Venezuela, The. *J. Int'l Arb.*, *24*, p.69.
- Díaz-Candía, H., 2007. Non-Recognition of Kompetenz-Kompetenz in Developing Countries: The Venezuelan Example. *J. Int'l Arb.*, *24*, p.25.
- Pérez Perdomo, R., 2007. Lawyers and Political Liberalism in Venezuela. In Halliday, T.C., Karpik, L. and Feeley, M., (Eds.). *The Legal Complex and Struggles for Political Liberalism.* Oxford: Hart Publishing.

2006:

- Birkbeck, C. and Pérez-Santiago, N., 2006. The Character of Penal Control in Latin America: Sentence Remissions in a Venezuelan Prison. *Criminology & Criminal Justice*, *6*(3), pp.289-308.
- Pérez-Perdomo, R., 2006. Latin American lawyers: A historical introduction. Stanford University Press.
- VanBuren, V., 2006. The Colombia-Venezuela Maritime Boundary Case: Proposal for a Joint Development Zone in the Gulf of Venezuela. *Tex. J. Oil Gas & Energy L.*, *1*, p.68.

2005:

- Brewer-Carías, A.R., 2004. Centralized Federalism in Venezuela. *Duq. L. Rev.*, *43*, p.629.
- Castaldi, L., 2005. Judicial Independence Threatened in Venezuela: The Removal of Venezuelan Judges and the Complications of Rule of Law Reform. *Geo. J. Int'l L.*, *37*, p.477.
- Gómez, M.A., 2005. Like Migratory Birds: Latin American Claimants in US Courts and the Ford-Firestone Rollover Litigation. *Sw. JL & Trade Am.*, *11*, p.281.
- Kuppe, R., 2005. Reflections on the Rights of Indigenous Peoples in the New Venezuelan Constitution and the Establishment of a Participatory, Pluricultural, and Multiethnic Society. *Law & Anthropology 12*, p.152.
- Leon, J.A.R., 2005. Why Further Development of ADR in Latin America Makes Sense: The Venezuelan Model. *J. Disp. Resol.*, p.399.
- Pérez Perdomo, R., 2005. Judicialization and Regime Transformation: The Venezuelan Supreme Court. In Sieder, R., Schjolden, L., Angell, A. (Eds.). *The judicialization of politics in Latin America* (pp. 131-159). Palgrave Macmillan.
- Pérez Perdomo, R., 2005. Lawyers in Late Twentieth-Century Latin America. In Felstiner, W. (Ed.). *Reorganisation and Resistance: Legal Professions Confront a Changing World*. Bloomsbury Publishing, pp.195-236.
- Bardavid, J., 2003. Sentencia de los Militares: A Look at Venezuela's Supreme Court Ruling That Made a Coup Legal, La. *Sw. JL & Trade Am.*, *10*, p.219.
- Rentner, S., 2003. Venezuela: How a Hydrocarbons Law Crippled an Oil Giant. *Hastings Int'l & Comp. L. Rev.*, *27*, p.351.

2003:

- Friedman, L. and Pérez Perdomo, R. (Eds.), 2003. Legal Culture in the Age of Globalization: Latin America and Latin Europe. Stanford University Press.

2002:

- Praw, D.A., 2001. *Venezuela v. Ford Motor Company*: The Trend of Dismissing Mass Tort Cases on Grounds of Forum Non Conveniens. *Sw. LJ & Trade Am.*, *8*, p.373.
- Torres, M.A., 2002. The Human Right to Health, National Courts, and Access to HIV/AIDS Treatment: A Case Study from Venezuela. *Chi. J. Int'l L.*, *3*, p.105.

2001:

- Brooke, A. Z., 2001. Legislating Community-Based Management: Lessons from the Venezuelan Freshwater Fishery. *Journal of International Wildlife Law & Policy*, 4:3, 279-294.
- Fernandez, J.W., Delpino, A., Lau Dan, J. and Diaz-Granados, R., 2001. Corporate Caveat Emptor: Minority Shareholder Rights in Mexico, Chile, Brazil, Venezuela and Argentina. *U. Miami Inter-Am. L. Rev.*, *32*, p.157.
- García-Serra, M.J., 2001. The" Enabling Law": The Demise of the Separation of Powers in Hugo Chavez's Venezuela. *U. Miami Inter-Am. L. Rev.*, *32*(2), pp.265-293.
- Monaldi, F., 2001. Sunk-costs, institutions, and commitment: Foreign Investment in the Venezuelan Oil Industry. *Unpublished manuscript, Stanford University, Department of Political Science*.
- Pérez Perdomo, R., 2001. Oil Lawyers and the Globalisation of the Venezuelan Oil Industry. *Rules and Networks: The Legal Culture of Global Business Transactions*, p.301.
- Vass, U.R. and Lezcano, A., 2001. Heavy-Reliance on Hydro-Electric Power, Lack of Investment in Transmission, Attempts to Encourage Gas-Fired Generation, a New Legal Regime and the Crisis of Supply-Sound Familiar? The Case of Venezuela. *Law & Bus. Rev. Am.*, *7*, p.625.
- Vass, U.R. and Lezcano, A., 2001. The New Venezuelan Legal Regime for Natural Gas: A Hopeful New Beginning. *Tex. Int'l LJ*, *36*, p.99.

2000:

- Lujan, R.E. and Fleury, M.I., 2000. New Venezuelan Constitution. *Int'l Legal Prac.*, *25*, p.60.
- Parra Aranguren, G., 1999. Topics of Procedure in the Venezuelan 1998 Act on Private International Law. *La. L. Rev.*, *60*, p.1241.
- Pérez-Perdomo, R., 2000. Judicial Independence and Accountability. In Van Puymbroeck, R.V. (Ed.). *Comprehensive Legal and Judicial Development: Toward an Agenda for a Just and Equitable Society in the 21st Century* (Meeting). World Bank, Washington, DC, pp. 205-17.

1999:

- Guerra H., V.H., 1999. The Problem of Choice of Law Applicable to Products Liability: Comparative Study of the United States Legal System (common Law Family) and the Venezuelan Legal System (civil Law Family) (LLM Thesis). Harvard Law School.
- Flamarique, F., 1999. Commercialization of Gasoline and Other Hydro-Carbon Fuel Derivatives in Venezuela. *Sw. JL & Trade Am.*, *6*, p.119.
- Martin, J.G., 1999. Venezuela as an Opportunity for Investment in the Petroleum Industry. *Energy LJ*, *20*, p.325.
- Perez, B.B., 1999. Judicial Suspensions and Due Process Under Venezuela's New Democratic Model. *J. Nat'l Ass'n Admin. L. Judges*, *19*, p.125.

1998:

- Gutierrez-Machado, H.E., 1998. The Personal Property Secured Financing System of Venezuela: A Comparative Study and the Case for Harmonization. *U. Miami Inter-Am. L. Rev.*, *30*, p.343.
- Pérez Perdomo, R. and Bolivar, T., 1998. Legal Pluralism in Caracas, Venezuela. In Fernandes, E. and Varley, A. (Eds.). Illegal Cities: Law and Urban Change in Developing Countries. London: Zed Books.

1996:

- Black, G. (Ed.), 1996. Halfway to Reform: The World bank and the Venezuelan Justice System. Lawyers Committee for Human Rights.
- Castro-Bernieri, J. and Levine, P.A., 1996. Venezuelan Antidumping and Countervailing Duties Regime, The. *J. World Trade*, *30*, p.125.
- Vielleville, D.E., 1996. Choice of the applicable law in United States maritime law and the Venezuelan system (LLM Thesis). University of Georgia.

1995:

- Esparza, J., 1994. Venezuela: The New Peace Courts (Tribunales de Paz). *U. Louisville J. Fam. L.*, *33*, p.561.
- Pérez Perdomo, R., 1995. Corruption and Political Crisis. In Goodman, L., Forman, J.M., Naím, M., Tulchin, J. and Bland, G. (Eds.). Lessons of the Venezuelan experience. The Woodrow Wilson Center Press. Washington D.C. & John Hopkins University Press.
- Pérez Perdomo, R., 1995. Training Programs for Judges. In Rowat, M. (Ed.). *Judicial reform in Latin America and the Caribbean: proceedings of a World Bank conference* (Vol. 280). World Bank Publications.
- Pérez Perdomo, R., 1995. The Venezuelan Legal Profession: Lawyers in an Inegalitarian Society. *Lawyers in Society: An Overview*, p.201.

1993:

- Castro-Bernieri, J., 1993. The Administering Authority in the Venezuelan Antidumping and Subsidy Law. *Fla. J. Int'l L.*, *8*, p.421.
- De Leon, I. and Garcia, O.E., 1993. Venezuelan Competition Law. *Int'l Bus. Law.*, *21*, p.473.
- Pérez Perdomo, R., 1993. Western and Non-Western Themes in the Latin American Sociology of Law. In Chiba, M. (Ed.) *Sociology of Law in Non-Western Countries* (Vol. 15). Oñati International Institute for the Sociology of Law.

1990:

- Esparza, J., 1990. Venezuela: A New Approach to Family Law. *J. Fam. L.*, *29*, p.487.
- Pérez Perdomo, R., 1990. Corruption and Business in Present Day Venezuela. *Journal of Business Ethics*, *9*(7), pp.555-566.

1981:

- Pérez Perdomo, R., 1981. Jurists in Venezuelan History. In Dias, C.J., Luckham, R., Lynch, D.O. and Paul, J.C.N. (Eds.). *Lawyers in the Third World: Comparative and Developmental Perspectives* (Vol. 3). Scandinavian Inst. of African Studies [Nordiska Afrikainst.].

1980:

- Pérez Perdomo, R. and Nikken, P., 1980. Law and Housing Ownership in the Barrios of Caracas. *Urban Law and Policy*, *3*(4), pp.365-402.

1979:

- Pérez Perdomo, R., 1979. Lawyers and Venezuelan Independence. *International Journal of the Sociology of Law*, *7*(4), pp.377-394.

1978:

- Johnson, L., 1978. An Analysis of the Venezuelan Securities Legislation: Part I-The Primary Markets. In *Int'l L.* (Vol. 12, p. 171).

1976:

- Rossi-Guerrero, F.P., 1976. The Transition from Private to Public Control in the Venezuelan Petroleum Industry. *Vand. J. Transnat'l L.*, *9*, p.475.

1971:

- Karst, K.L., 1971. Rights in Land and Housing in an Informal Legal System: The Barrios of Caracas. *The American Journal of Comparative Law*, pp.550-574.
- Morles-Hernández, A., 1971. The 1970 Amendment to the Venezuelan Commercial Banking Law. *Law. Am.*, *3*, p.231.

1967:

- Bayer, W.J., 1967. Expropriation and the Venezuelan Law of Agrarian Reform. *Colum. J. Transnat'l L.*, *6*, p.273.
- Gittes, E.F., 1967. Income Tax Reform: The Venezuelan Experience. *Harv. J. on Legis.*, *5*, p.125.

1963:

- Febres-Cordero, C., 1963. A Look at the Scope of Venezuelan Labor Legislation. *Inter-Am. L. Rev.*, *5*, p.383.

1960:

- Nebreda-Urbaneja, J. and Berg, R.K., 1960. Introduction to the Venezuelan Legal System-A Typical Civil Law System of Latin American. *DePaul L. Rev.*, *10*, p.41.

1949:

- Brinsmade, H.L., 1949. Venezuelan Labor Relations. *Miami LQ*, *4*, p.475.