United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America,<br>Plaintiff | )<br>)<br>) |
| v. | )<br>) Criminal Case No. 19-20450-CR-Scola<br>) |
| Alex Nain Saab Moran,<br>Defendant. | )<br>) |

### **Final Order on the Defendant's Motion to Dismiss the Indictment**

This cause is before the Court upon Defendant Alex Nain Saab Moran's motion to dismiss the indictment based upon his claim of diplomatic immunity. (Mot., ECF No. 147.) The Government filed a response (Opp., ECF No. 153) and the Defendant filed a reply (Reply, ECF No. 157). Subsequently, the Court held an evidentiary hearing on December 12, 2022 and December 13, 2022, during which it heard the testimony of numerous witnesses, some of whom testified by videoconference from Venezuela. The Court later heard the parties' oral arguments on December 20, 2022.

Based upon the parties' presentations, their written submissions, the credible testimony and evidence, the record, and pertinent legal authorities, the Court **denies** Saab Moran's motion (**ECF No. 147**) for the reasons below.

### **1. Legal Standard**

Under Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." *See* Fed. R. Crim. P. 12(b)(1). However, an indictment may be dismissed "only if there is an 'infirmity of law in the prosecution.'" *See U.S. v. Belcher*, 927 F.2d 1182, 1185 (11th Cir. 1991) (quoting *U.S. v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987)).

In parallel, the "controlling statute on diplomatic immunity is the Diplomatic Relations Act of 1978 which incorporated the 1961 Vienna Convention on Diplomatic Relations." *Abdulaziz v. Metro. Dade Cnty.*, 741 F.2d 1328, 1330 (11th Cir. 1984). The Diplomatic Relations Act ("DRA"), 22 U.S.C. §§ 254a-e, requires "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under sections 254b or 254c of this title, or under any other laws extending diplomatic privileges and immunities, [to] be dismissed." *Id.* § 254d.

Because "'[t]he determination of whether a person has diplomatic immunity is a mixed question of fact and law[,]'" the Court finds it appropriate to delineate its findings of fact before applying the law based on the evidence before it. *Ali v. Dist. Dir.*, 743 Fed. App'x. 354, 358 (11th Cir. 2018) (quoting *U.S. v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004)).

### 2. Findings of Fact

Saab Moran faces charges in this case for bribing Venezuelan officials and channeling hundreds of millions of dollars into foreign accounts under the guise of a food program meant to benefit Venezuelans. His alleged criminal activity took place from 2011 through 2015.

In an apparent effort to either avoid prosecution or reduce his criminal exposure in the United States, Saab Moran began to meet secretly with United States law enforcement agents starting in August 2016. Saab Moran met with agents in August and September of 2016. The following year, he met with agents in November of 2017. The next year, he met with the agents in June and July, 2018. In fact, on June 27, 2018, Saab Moran entered into a signed cooperation agreement with the Drug Enforcement Agency ("DEA"). He continued to meet with agents in April 2019. From August 2018 through February 2019, Saab Moran made four payments to a DEA-controlled bank account totaling $12.5 million to disgorge his profits earned from his criminal conduct.

Saab Moran was indicted in this case on July 25, 2019, and a warrant for his arrest was issued. However, he was not arrested until June 12, 2020. On that date, Saab Moran was en route to Iran from Venezuela when the plane he was on stopped to re-fuel in Cape Verde. (ECF No. 24 at 4.) At the request of the United States, Saab Moran was detained by Cape Verdean authorities and held pending extradition to the United States.

Twice before his arrest, Saab Moran traveled to Iran under the auspices of Nicolás Maduro, who claims to be the president of Venezuela but is not recognized as such by the United States. Specifically, Saab Moran traveled to Iran once from March 8, 2020 to March 15, 2020, and another time from April 14, 2020 to April 20, 2020. During those travels, Saab Moran was a fugitive of this Court.

Saab Moran fought extradition in Cape Verde for 16 months. He was provided due process by Cape Verdean courts and was ultimately extradited to the United States in October 2021 after losing an appeal to Cape Verde's highest court.

Saab Moran now challenges his detention and the charges against him by invoking transit-based diplomatic immunity on account of his having

allegedly been designated as a "special envoy" of Maduro's regime in April 2018.

The Government contends that Saab Moran was not truly traveling as a "special envoy" at the time of his arrest. And it does so with good reason.

At the evidentiary hearing, Saab Moran tried to substantiate this "special envoy" status by relying on a credential purportedly signed in April 2018 by the Maduro regime's Minister of Foreign Affairs, Jorge Arreaza. (Def. Ex. BC.)[1] Labeling Saab Moran as a "special envoy," the credential allegedly authorized him "to make arrangements for procuring basic goods and services, both paid for and received as humanitarian aid, for national assistance programs, particularly, food, supplies, machines and equipment for the production and processing foodstuffs; medicines, materials, medical supplies and equipment[.]" (*Id.*) But nowhere does the purported credential mention Iran.

It also explicitly says that he may not "make any arrangements in relation to the public sector budget." (*Id.*) Yet, that is not consistent with Saab Moran's functions in Iran, where he says he "negotiated the exchange of Venezuelan gold for gasoline . . . [and] also secured an agreement for transport of oil refinery equipment to Venezuela." (Mot. 7.)

Indeed, State Department records corroborate that Saab Moran—a businessman, not a diplomat, by trade—traveled "with senior executives at Venezuela's state-owned oil company Petróleos de Venezuela as part of an agreement in which Iran sen[t] gasoline additives, parts, and technicians for gold." (Def. Ex. AG at 14.) Saab Moran's own exhibits corroborate this as well. They show the withdrawal and delivery of 80 bars of gold deposits from a number of Venezuelan banks in exchange for gasoline from Iran. (Def. Exs. AD, AF.) In fact, on his third trip, Saab Moran traveled carrying a letter from Maduro to Iran's leader pleading him to intervene and "guarantee a new urgent shipment of five million barrels of gasoline for this current month . . . [and] to specify the monthly and periodic shipment of gasoline to Venezuela for a year . . . [and to] accompany this scheme with mechanisms of financing defined by the teams of both countries." (Def. Ex. AM at 2.)

Following the news of Saab Moran's arrest, the Maduro regime sought to devise ways of avoiding his extradition to the United States by exploiting the law of diplomatic immunities.

A clear example of that is Saab Moran's sudden naming in December 2020 as the "Ambassador [and] Alternate Permanent Representative of the

---

[1] Where able, for ease of reference, the Court refers to the parties' exhibits by the markings assigned to them at the evidentiary hearing. Pursuant to Local Rule 5.3, these exhibits have been uploaded to the record at ECF Nos. 190-193.

Bolivarian Republic of Venezuela to the African Union," (Def. Ex. R), while he was pending extradition to the United States from Cape Verde. In an effort to have Saab Moran released, the Maduro regime sent a letter to the State Department notifying it of Saab Moran's appointment to that post on October 22, 2021 (*id.*) but evidently, it did so to no avail. In fact, that letter only adds more cause for suspicion.

It says that "Ambassador Saab Moran is the holder of Diplomatic Passport number 045778720, *date of issue 23 March 2020* and date of expiration 22 March 2020[.]" ((*id.*) (emphasis added).) However, Saab Moran did not travel with a diplomatic passport on his June 2020 trip to Iran. He traveled using a personal passport and represented to this Court that the reason for that was that "he was awaiting receipt of his renewed diplomatic passport (which had been issued but not physically given to him due to COVID-19 restrictions and shutdowns)." (Reply 4.) But upon questioning in the days following his arrest, Saab Moran told a Cape Verdean court that his diplomatic passport was in Venezuela. (*See* Gov't Ex. 3 at 8.)

Freddy Plathi, a representative of Venezuela's passport agency, testified at the hearing that at the time of Saab Moran's June 2020 trip, the passport office in Caracas was, indeed, closed due to the COVID pandemic. But, he also established that because all of Saab Moran's biometrical information was in a government database, a renewed diplomatic passport could have been printed out for him regardless of any COVID restrictions. So, it seems possible that Saab Moran could have been issued a diplomatic passport in March 23, 2020, as the letter from the Maduro regime to the State Department represents.

However, the Court is unconvinced by Saab Moran's representation that the Maduro regime was not be able to deliver to him a diplomatic passport in the nearly three-month period between the passport's purported issuance and his June 2020 trip to Iran. In fact, according to the testimony, the Maduro regime hand-delivered to him a series of letters on the day before his trip that were to be given to Iranian authorities. (ECF No. 183 at 89:22-92:16.)

Whether Saab Moran actually did have a diplomatic passport at the time of his arrest proves relevant because Plathi also testified that Venezuelan diplomatic passports could be issued for up to five years. The request for a diplomatic passport comes from the Minister of Foreign Affairs who has the discretion to determine the length of the validity of a diplomatic passport. That the Foreign Minister chose to award Saab Moran a diplomatic passport that was valid for only one year (March 23, 2019 through March 22, 2020) suggests that if, he had any role as a diplomat for the Maduro regime, it was only a temporary role. And that role's relation to his dealings in Iran are questionable. To be sure, the expired diplomatic passport bore a "special envoy" marking.

(*See* Gov't Ex. 5.) However, Saab Moran submitted no evidence of his using the diplomatic passport for his March 8, 2020 trip to Iran, while it was still valid.

Indeed, the evidence and testimony support the Government's contention that the Maduro regime doctored certain documents to make it appear that Saab Moran was traveling to Iran as a "special envoy" when he was arrested, thus calling into question the reliability of other documents submitted by Saab Moran.

Among those documents is a resolution purportedly published in the Venezuelan government's official gazette, which announced the earlier discussed credential naming Saab Moran as a "special envoy." According to a copy of the gazette that was obtained from the Venezuelan *Imprenta Nacional*, the resolution was included in the gazette's publication on April 26, 2018. (*See* Gov't Ex. 17.) However, the Government offered a copy of the April 26, 2018 gazette that was retained by the U.S. Library of Congress, and yet another copy of the same gazette as published on the Venezuelan Supreme Court's website. (*See* Gov't Exs. 17, 19.) Identical in the relevant respects, neither of these two copies reflects the purported resolution announcing Saab Moran as a special envoy. Samuel Marple, an FBI computer scientist, testified that the version that *does* include the announcement—*i.e.*, the one obtained from the Venezuelan *Imprenta Nacional*—showed traces of post-publication modifications whereas the other two versions did not.

Indeed, María González, an employee of the Venezuelan Ministry of Foreign Affairs since 1993 who handles official correspondence including documents accrediting diplomats, testified that it would be unusual for the gazette to include Saab Moran's appointment as special envoy.

In an attempt to explain this discrepancy, Saab Moran pointed to testimony of his expert on Venezuelan law, Hector Peña, who served as a judge on Venezuela's Supreme Court. He testified that the publication of a resolution naming a special envoy in the gazette is not required under Venezuelan law to render that appointment effective. But Peña also testified that the naming of a permanent representative *would* require such publication and formal approval by the National Assembly. Saab Moran presented no evidence that his appointment was approved by the National Assembly. So, in respect of whatever diplomatic status that Saab Moran may have had, all that Peña's testimony conclusively established is that Saab Moran was not a permanent diplomatic agent.

Saab Moran further pointed to letters between the Maduro regime and Iranian government officials dated to reflect the days leading to his June 2020 trip that refer to him as an "envoy." (*See* Def. Exs. B, D.) Although the Government stipulated that those documents represented "true and correct

copies of foreign public documents involving agencies and ministers of the governments of Venezuela and Iran," (Def. Ex. A), the Government did not stipulate to the veracity of the documents' contents and seemed to question the accuracy of their dates in its opposition brief. (*See* Opp. 37.)

More reason to doubt Saab Moran's status as a "special envoy" during the June 2020 trip comes from the fact that none of the letters in the days immediately following Saab Moran's arrest sent by Arreaza (who allegedly appointed him as "special envoy") to the Cape Verde's Ministry of Foreign Affairs refer to him as a "special envoy." They instead vaguely refer to him as a "representative" of Venezuela. (*See* Gov't Exs. 14, 15.) The same is true of the letter contesting his arrest sent by the Maduro regime to INTERPOL on June 15, 2020. (Gov't Ex. 11.) And, to be clear, Saab Moran argues that his diplomatic immunity stems from the fact that he was traveling as a "special envoy" on the basis of Arreaza's alleged 2018 appointment—not from his traveling to Iran as a "representative" of the Maduro regime in June 2020. ((Mot. 2.) ("From April 9, 2018, to the present Mr. Saab has *at all times* been an accredited diplomatic agent of Venezuela."))

Finally, Saab Moran met with United States law enforcement agents in June and July of 2018 and April 2019—all after his purported appointment as a diplomat of the Maduro regime. From August of 2018 through February 2019, he made four payments to the DEA totaling $12.5 million to repay his ill-gotten gains. All of those interactions took place after he was allegedly appointed as a special envoy in April 2018. Yet, during none of these meetings or interactions, including a meeting during which he signed a cooperation agreement with the agents, did he ever represent to the agents that he was working as a diplomat for the Maduro regime.

Against this sum of evidentiary inconsistencies and indications of documentary manipulation, the Court is left to conclude that the Maduro regime has, in a post hoc manner, done its best to imprint upon Saab Moran a diplomatic status that he did not factually possess on June 12, 2020.

The evidence suggests that the Maduro regime and its accomplices have fabricated documents to cloak Saab Moran in a diplomatic dress that does not befit him, all in an effort to exploit the law of diplomatic immunities and prevent his extradition to the United States.

The Court is not convinced that the 2018 credential that Saab Moran relied on to support his claim to diplomatic status is legitimate nor is the Court convinced of its relation to his dealings in Iran. And, even if Saab Moran had truly been proclaimed to be a "special envoy" in 2018, the evidence does not convince the Court that Saab Moran was traveling as anything more than a lay businessman to broker a deal when arrested in June of 2020.

For these reasons alone, the Court finds that Saab Moran's assertion of diplomatic immunity is a nonstarter.

At the time he was arrested, Saab Moran truly was no diplomat at all.

### 3. Conclusions of Law

Even more, Saab Moran cannot be entitled to diplomatic immunity because he could not—as a matter of law—have been an agent of the Venezuelan government. At the time of his arrest, Saab Moran was, at best, a special envoy of the Maduro regime, which the United States has not recognized to be the official government of Venezuela since January 2019. So, Saab Moran is not entitled to diplomatic immunity in the United States.

But even assuming that Saab Moran *was* traveling as a special envoy entitled to diplomatic status in the United States, his arguments under the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227 [hereinafter "VCDR"], and customary international law fail.

### A. Saab Moran Was Not a Diplomatic Agent of Venezuela

Saab Moran claims that he is entitled to transit-based diplomatic immunity because he was, and remains, in transit to his "diplomatic post" in Iran. Transit-based immunity is a limited form of protection that may be granted to a diplomatic agent while he is passing through the territory of a third country on his way to/from his diplomatic post upon that third country's consent. *See* RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 78 (1965).

Putting aside the question of consent, an evident prerequisite to a person's ability to assert such immunity is their diplomatic status. In the Government's eyes, Saab Moran was not one. (*See* Resp. 16.)

Only the President may determine "which governments are legitimate in the eyes of the United States and which are not[.]" *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 3 (2015); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 204. It is clear that the United States does not recognize the Maduro regime to represent the official government of Venezuela. Instead, "[t]he United States recognizes Interim President Juan Guaid[ó] and considers the 2014 democratically elected Venezuelan National Assembly, which he currently leads, to be the only legitimate federal institution, according to the Venezuelan Constitution." U.S. DEP'T OF STATE, U.S. RELATIONS WITH VENEZUELA (2022), https://www.state.gov/u-s-relations-with-venezuela/.

In fact, Maduro's regime has been deemed "illegitimate." *Id.* Accordingly, any claim to diplomatic immunity asserted by a representative of the Maduro regime must also be considered illegitimate. *See* RESTATEMENT (SECOND) OF

FOREIGN RELATIONS LAW § 73 cmt. g. ("A diplomatic agent claiming to represent a revolutionary government that is not recognized by the receiving state is not entitled to diplomatic immunity in the courts of that state."); *see also U.S. v. Cordones*, No. 11-cr-205, 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022) (denying a motion to dismiss an indictment filed by an official of the Maduro regime citing the President's non-recognition of the Maduro regime); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 204(1) ("a regime not recognized as the government of a state [ ] is ordinarily denied access to courts in the United States.").

Contrary to Saab Moran's suggestion, this ruling does not run afoul of the United States' responsibilities under international law. Indeed, any such responsibilities must be understood to extend to the acts and representatives of the Guaidó administration, not to those of Maduro's illegitimate regime. *See* Eileen Danza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 371 (4th ed. 2016) (noting that where a transit nation "does not recognize as a government the authorities who accredited the diplomat, it will in consequence not regard that person as a diplomatic agent at all [under the VCDR], so that it will not regard itself as bound by the duties in Article 40 so far as he is concerned.")

Although Saab Moran purports to invoke the autonomy of other regimes to recognize whom they wish as diplomats, the matter before this Court concerns not the decisions of those regimes but the sovereignty of the United States to choose which foreign governments it recognizes as legitimate. That power is vested exclusively in the Office of the President. *See Zivotofsky*, 576 U.S. at 3,14.

So, because Saab Moran, at best, represented only a regime deemed illegitimate by the President, he could not have carried any cognizable diplomatic status. The result is that he cannot assert any form of diplomatic immunity in this Court as a matter of law.

### B. Diplomatic Immunity Under the VCDR

Yet, even if Saab Moran had carried some cognizable diplomatic status as a "special envoy" of the Maduro regime, he would still not be entitled to transit immunity under the VCDR. The United States ratified the VCDR in 1972 and incorporated it into the DRA in 1978. *See* 22 U.S.C. § 254a(4). Neither the VCDR nor the DRA use or define the term "special envoy."

Instead, the VCDR speaks of immunities afforded to "diplomatic agents." Article 31 provides a straightforward example: "[a] diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State." VCDR art. 31.1. In arguing for immunity, Saab Moran invokes that provision and Article 40, which says: "If a diplomatic agent passes through or is in the territory of a

third State, which has granted him a passport visa if such visa was necessary, while proceeding to take up or return to his post, or when returning to his own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return." *Id.* art. 40.1.

Because the Court must determine if Saab Moran qualifies as a "diplomatic agent" under the VCDR, the Court "'begin[s] with the text of the treaty and the context in which the written words are used.'" *Pielage v. McConnell*, 516 F.3d 1282, 1287 (11th Cir. 2008) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699–700 (1988)).

The VCDR defines a "diplomatic agent" to be "the head of the *mission* or a member of the diplomatic staff of the *mission*." VCDR art. 1(e) (emphasis added). So, the threshold inquiry becomes whether Saab Moran was the head or member of a *diplomatic mission* in the sense of the VCDR. The answer is no.

The VCDR does not explicitly define what it qualifies as a "mission," and the DRA merely says that "the term 'mission' includes missions within the meaning of the Vienna Convention and any missions representing foreign governments, individually or collectively, which are extended the same privileges and immunities, pursuant to law, as are enjoyed by missions under the Vienna Convention." 22 U.S.C. § 254a(3). However, the VCDR's use of the term makes clear that the types of diplomatic "missions" the VCDR applies to are permanent representative missions, not special or temporary missions such as the one Saab Moran, at best, formed part of when arrested.

For example, the convention's text recognizes that the "establishment of diplomatic relations between States, and of *permanent diplomatic missions*, takes place by mutual consent." VCDR art. 2 (emphasis added). It also speaks of "missions" in the following context: "The mission and its head shall have the right to use the flag of the sending State on the premises of the mission, including the residence of the head of the mission, and on his means of transport." VCDR art. 20. And perhaps most indicative of the fact the VCDR concerns itself only with *permanent* missions is the very existence of a separate treaty that governs temporary missions, known as the United Nations Convention on Special Missions ("UNCSM"). 1400 U.N.T.S. 231, Dec. 8, 1969. That treaty came about after the U.N. Conference on Diplomatic Intercourse and Immunities adopted the VCDR's text and contemporaneously recommended that the U.N. separately undertake "further study of the subject of special missions." U.N. Doc. A/Conf.20/10/Add.1, at 90 (Apr. 10, 1961).

Now, to be sure, the Court is entitled to rely on these observations because it "may look beyond the written words to the history of [a] treaty, the negotiations, and the practical construction adopted by the parties," to discern a term's meaning. *Pielage*, 516 F.3d at 1287 (quoting *Volkswagenwerk*, 486

U.S. at 699-700).

So, the Court finds that the VCDR only concerns the protections of "diplomatic agents" in the context of *permanent* missions. That conclusion is consistent with past applications of the VCDR by this and other courts, including the International Court of Justice. *See Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 387 (S.D.N.Y. 2002) ("The genesis and negotiating history of the Vienna Convention make clear that the purpose the treaty intended to address was the codification of rules governing diplomatic relations between sovereign states and the organization and functioning of *permanent diplomatic missions* in states with established relations.") (emphasis added); *U.S. v. Sissoko*, 995 F. Supp. 1469, 1470-71 (S.D. Fla. 1997) (Moore, J.) (differentiating between the UNCSM and the diplomatic processes "set forth for members of a permanent mission in the Diplomatic Relations Act and the Vienna Convention."); *R v. Governor of Pentonville Prison, ex parte Teja* [1971] 2 All ER (QB) 11 at 17 (Eng.) (finding that the VCDR applies to permanent missions instead of ad hoc missions); *see also Satow's Diplomatic Practice* 188 (6th ed. 2009) ("The Vienna Convention on Diplomatic Relations therefore relates only to permanent diplomatic missions."); Jonathan Brown, *Diplomatic immunity: state practice under the Vienna Convention on Diplomatic Relations*, 37(1) INT'L & COMP. L. Q. 53, 62 (1988) ("In those circumstances, the Vienna Convention on Diplomatic Relations, which is concerned with permanent and not *ad hoc* diplomatic missions, should not have been applicable at all."); *see generally Immunities and Crim. Proc. (Eq. Guinea v. Fr.)*, Judgment, 2020 I.C.J. Rep. 300 (Dec. 11) (applying the VCDR to the question of whether certain property constituted the premises of Equatorial Guinea's permanent mission).

Given this understanding of the VCDR, the Court returns to the question of whether Saab Moran may invoke the convention's protections and reiterates that the answer is no. As noted, the evidence shows that Saab Moran was, at best, traveling to perform a temporary undertaking on behalf of Maduro's regime in Iran. He was *not* traveling as a member or head of a permanent mission during the trip in question. Consequently, Saab Moran is not a "diplomatic agent" in the sense of the VCDR and may not invoke any of the convention's provisions.

Saab Moran urges the Court to conclude differently in light of the Eleventh Circuit's ruling in *Abdulaziz v. Metropolitan Dade County*. 741 F.2d 1328. *Abdulaziz* addressed the question of whether civil counterclaims could stand against H.R.H. Prince Abdulaziz Bin Abdulaziz. Prince Abdulaziz had been designated as a "special envoy" by the Kingdom of Saudi Arabia but, despite his living in the United States, had not applied for diplomatic status with the State Department until the suit was pending. While the litigation was

ongoing, the State Department certified his diplomatic status, which led the Eleventh Circuit to find that Prince Abdulaziz was to be "afforded full protection pursuant to the Diplomatic Relations Act." *Id.* at 1331.

Saab Moran suggests that *Abdulaziz* extends the VCDR's protections to diplomatic agents on temporary missions that serve as the heads of such missions. He reasons as much because the Eleventh Circuit acknowledged that "envoys" are classified as "Heads of Missions" in the VCDR. *Id.* So, given that he was no ordinary "special envoy" but also the head of a mission, the argument goes, *Abdulaziz* compels this Court to find that the VCDR immunizes him. (*See* Reply 8.) The Court disagrees entirely.

*First*, nowhere in *Abdulaziz* did the Eleventh Circuit explicitly hold that Prince Abdulaziz was the head of a mission under the VCDR. That was an argument advanced by Prince Abdulaziz himself before this Court. (*See* Def. Ex. Y at 2.) The Eleventh Circuit simply noted, in passing, that the VCDR "classifies 'envoys' as Heads of Missions." *Abdulaziz*, 741 F.2d at 1331. Likewise, in its certification to the Court, the State Department only said that Prince Abdulaziz was entitled to protection under the DRA—and "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status." *Abdulaziz*, 741 F.2d at 1331. To be sure, the State Department's certification certainly referenced the VCDR's definition of diplomatic immunity, but it made no representation that Prince Abdulaziz's protection came from the VCDR itself. The certification reads: "*Pursuant to the [DRA]*, His Royal Highness Prince Turki Bin Abdulaziz is entitled to diplomatic immunity as defined by Article 31 of the [VCDR]." ((Def. Ex. AA) (internal citations omitted).) Nowhere else did the certification mention the VCDR.

Further, as the Government points out, it is unclear whether Prince Abdulaziz was a special envoy *attached to* the permanent mission of Saudi Arabia such that his nexus with that mission might be the basis upon which one might determine that the VCDR's protections applied to him. (Opp. 22.) In any event, it is clear is that Saab Moran was not a special envoy attached to the permanent mission of Venezuela to Iran. He was performing a temporary undertaking.

*Second, Abdulaziz* is more readily understood to be a decision concerning the proper interpretation of the DRA, not the VCDR. The Eleventh Circuit anchored its decision in its interpretation of Section 254d of the DRA. It particularly noted that the Senate Report accompanying the DRA "indicates that § 254d intends 'dismissal by a court . . . of any action or proceeding where immunity is found to exist[,]" and *then* proceeded to hold that, "[a]s special envoy Turki was afforded full protection *pursuant to the Diplomatic Relations Act.*" *Abdulaziz*, 741 F.2d at 1331 (emphasis added). And, indeed, Section 254d

provides immunity under the VCDR and "under *any other* laws extending diplomatic privileges and immunities." 22 U.S.C. § 254d (emphasis added).

*Third*, *Abdulaziz* did not involve a claim to transit-based immunity such as the one Saab Moran asserts. Prince Abdulaziz's immunity derived from his status *in situ*—that is, from his residence in the place of his diplomatic post. The law concerning transit-based immunity involves a separate legal regime, which appears to be ill-defined and largely non-binding, as is discussed below. So, *Abdulaziz*'s guidance, though useful, is limited here.

The case does *not* tell this Court how to treat claims to transit-based immunity that are asserted by purported diplomatic agents sent on temporary missions who are not recognized to hold diplomatic status in the United States. *Abdulaziz* tells the Court how to handle the assertion of *in-situ* immunity by a person that has been certified to be a diplomat by the State Department.

*Fourth*, reading the VCDR to immunize heads of temporary missions in the way Saab Moran suggests would open the door to the abuse of diplomatic immunities in a way that could seriously frustrate cross-border law enforcement activities. By his logic—assuming travel to a "diplomatic post"—a person traveling with a personal secretary who is wanted in Country A and transiting through Country A would automatically be untouchable there, if some Country B previously assigns to that person a diplomatic title to him thereby making him the head of a temporary "mission."

This Court is not the first to reject such a reading of the VCDR. In the nearly identical case of another "special envoy" asserting transit-based immunity, an English court in *Ex parte Teja* denied diplomatic protection under the VCDR for the same reasons the Court cites above. That court said:

> "Accordingly, counsel for the applicant puts the matter in a very simple form. He says, here is a man who was head of a mission, the mission being that referred to in the letter of credence . . . [so] from the very moment he lands in this country [while in transit] he is immune from any form of arrest or detention or criminal proceedings. I confess that at the very outset this argument, simple as it was, seemed to me to produce a frightening result in that any foreign country could claim immunity for representatives sent to this country unilaterally whether this country agreed or not . . . . A further point also arises, namely that the 1961 Vienna Convention, it is reasonably clear when looked at as a whole, is applying to what one might call permanent missions and not to something which is in the nature of ad hoc missions."

*Ex parte Teja* [1971] 2 All ER at 16-17.

*Fifth*, even if *Abdulaziz* could be understood to extend the VCDR to heads

of temporary missions, it would not compel a different outcome here. *Abdulaziz* was not based on Prince Abdulaziz's "special envoy" title or head of mission status alone. The court recognized that Prince Abdulaziz's immunities were only acquired *once* the State Department certified his diplomatic status: "Pursuant to 22 U.S.C.A. § 254d and the Senate Report accompanying the Act, the action was properly dismissed *when immunity was acquired* and the court was so notified." *Abdulaziz*, 741 F.2d at 1332 (emphasis added); *see also id.* at 1329 ("*once* the [State Department] has regularly certified a visitor to this country as having diplomatic status . . . the diplomatic immunity *flowing from that status* serves as a defense to suits already commenced.") (emphasis added). Thus, *Abdulaziz* compels no outcome based on a diplomatic title alone.

Further, contrary to what the State Department certified in respect of Prince Abdulaziz, the State Department has certified in no uncertain terms that it is aware of no "basis for Alex Nain Saab Moran to enjoy immunity from the criminal or civil jurisdiction of the United States." (Gov't Ex. 9.) And, again, "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status." *Abdulaziz*, 741 F.2d at 1331; *see also Ali*, 743 Fed. App'x at 358 ("In the United States in particular, a person's diplomatic status is established when it is recognized by the Department of State.") (cleaned up).

Accordingly, the Court finds that Saab Moran is not entitled to diplomatic immunity under the VCDR.

### C. Diplomatic Immunity Under Customary International Law

Next, Saab Moran argues that he is entitled to diplomatic immunity under customary international law. He begins this argument by pointing the Court to the UNCSM, which he says provides immunities for diplomatic agents on temporary or "special missions," such as himself.

At the same time, he concedes that "the United States has not ratified" the UNCSM, (Mot. 23), which means that the treaty has no force of law in this Court. Additionally, neither Venezuela nor Cape Verde have ratified it. Nevertheless, Saab Moran seems to posit that the UNCSM simply codifies the customary international law governing "core immunities of personal inviolability . . . for diplomats on special missions," (*see* Mot. 23 (cleaned up)), such that any nation's ratification of the UNCSM is irrelevant to the question of whether the United States owes him immunity under customary international law itself.

This Court has flatly held that the UNCSM does not represent binding customary international law. *Sissoko*, 995 F. Supp. at 1470. Regardless, Saab Moran attempts to draw support from *R v. Secretary of State for Foreign and*

*Commonwealth Affairs*, [2018] EWCA Civ 1719, 2018 WL 03459145, an intermediate appellate decision from the United Kingdom. That court found that "a rule of customary international law has been identified which now obliges a state to grant to the members of a special mission, which the state accepts and recognizes as such, immunity from arrest or detention (i.e. personal inviolability) and immunity from criminal proceedings for the duration of the special mission's visit." *Id.* However, this non-binding decision speaks nothing of customary international law's recognition of *transit-based* immunity, which is what Saab Moran purports to invoke here. The decision instead dealt with the *in-situ* immunity of a diplomatic agent taking up his post in the United Kingdom after the United Kingdom had consented to his presence on its territory as part of a temporary mission.

 Aside from invoking *R v. Secretary of State*, Saab Moran does little to discuss the parameters of transit immunity and fails to point the Court to any binding authority that recognizes its existence in the case of diplomatic agents serving temporary undertakings.

 But even if customary international law—independent of the UNCSM—somehow *did* recognize some form transit-based immunity for diplomatic agents on temporary missions, the weight of authority suggests that it would require the transiting state to proactively afford that immunity by consenting to it. *See* RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 78(1) (1965) ("[a] person entitled to immunity from the exercise of jurisdiction by the receiving state as indicated in §§ 73 and 74, *who has been permitted* to pass through the territory of another state . . . is entitled to [diplomatic immunity]") (emphasis added); *see also Ex parte Teja*, [1971] 2 All ER (QB) at 17 (rejecting a claim of transit-based immunity for a diplomatic agent on a temporary mission because "immunity depends on mutual agreement [of the transiting state] on the person entitled to the immunity.").

 This means that Saab Moran's "special envoy" title alone does not—and cannot—unilaterally compel any country to afford him diplomatic immunity under customary international law. *See, e.g., Sissoko*, 995 F. Supp. at 1471 (denying diplomatic protection to a "special advisor" of The Gambia where the State Department had not certified his diplomatic status); *U.S. v. Kuznetsov*, 442 F. Supp. 2d 102, 106 (S.D.N.Y. 2006) ("diplomatic immunity is premised upon recognition by the receiving State, so that no person or government may 'unilaterally assert diplomatic immunity.'") (quoting *U.S. v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984)); *see also* Op. of the Sup. Ct. of Just. of Cape Verde 33, ECF No. 153-1 ("Therefore, it is clear that the status of special envoy cannot result, contrary to what the Appellant [Saab Moran] seems to maintain, only from a unilateral declaration of the State that says it sent him on a mission[.]").

Even the VCDR recognizes that in the case of representatives of permanent missions, diplomatic recognition requires reciprocity. *See* VCDR arts. 4, 9.2, 11.2, 43; *Ali*, 743 Fed. App'x. at 358 (noting that the VCDR premises "diplomatic immunity upon recognition by the receiving state.") (cleaned up); *Satow's Diplomatic Practice* 170, 192 (6th ed. 2009) ("Article 40 of the Vienna Convention is clearly based on the assumption that the diplomat has no right of transit across a third State . . . . [and] as in the case of members of diplomatic missions, there is no right of passage through a third State [under the UNSMC] and [ ] the third State must consent to the transit before being required to accord any special privileges to members of special missions.").

Here, no transiting state's consent—including that of the United States—has been established. Indeed, the Supreme Court of Cape Verde explicitly found no evidence of Cape Verde's ever having consented to Saab Moran's passage through its territory as a diplomatic agent. (Op. of the Sup. Ct. of Just. of Cape Verde 33, ECF No. 153-1 ("What is reiterated is that there is no evidence in the record to date that the State of Cabo Verde has consented to the Appellant's transit through its territory with the status of special envoy."); *see also* Gov. Ex. 4. This Court is bound by that determination insofar as the act of state doctrine forecloses any inquiry into the matter. *See Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263, 1267 (S.D. Fla. 2005) (Moore, J.).

So, aside from proving immaterial under the VCDR, Saab Moran's title as a "special envoy" also proves inconsequential under customary international law. That title only "reflects the designation provided [to him]" by the Maduro regime. *See Abdulaziz*, 741 F.2d at 1331.

In sum, Saab Moran has failed to prove, as a threshold matter, that customary international law recognizes transit immunities for diplomatic agents on temporary missions. And even then, the weight of the authorities before the Court strongly indicates that, if it exists, such immunity would require the consent of the transiting state(s), which Saab Moran has also not proven.

Accordingly, his theories under customary international law fail.

### 4. Conclusion

For the above reasons, Saab Moran's motion (**ECF No. 147**) is **denied**.

**Done and ordered** in Miami, Florida, on December 23, 2022.

_____
Robert N. Scola, Jr.
United States District Judge