```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                        CASE NO: 1:19-CR-20450
 3

 4
      UNITED STATES OF AMERICA,            Miami, Florida
 5
            Plaintiff,                     December 20, 2022
 6
                vs.                        9:02 a.m. - 10:38 a.m.
 7
      ALEX NAIN SAAB MORAN,
 8
            Defendant.                     Pages 1 to 77
 9     _____

10
                ORAL ARGUMENTS ON DEFENDANT'S MOTION TO DISMISS
11                         BEFORE THE HONORABLE
                  UNITED STATES DISTRICT JUDGE ROBERT N. SCOLA
12

13
      APPEARANCES:
14
15    FOR THE PLAINTIFF:        ALEXANDER J. KRAMER, ESQ.
                                U.S. Department of Justice
16                              Criminal Division
                                Bond Building
17                              1400 New York Avenue, N.W.
                                8th Floor
18                              Washington, DC  20005
                                Alexander.kramer@usdoj.gov
19

20
                                KURT LUNKENHEIMER, ESQ.
21                              US Attorney's Office
                                99 NE 4th Street
22                              Miami, FL  33132
                                Kurt.lunkenheimer@usdoj.gov
23

24

25
```

```
 1
        FOR THE DEFENDANT:       JONATHAN BARR, ESQ.
 2                               Baker & Hostetler, LLP
                                 1050 Connecticut Ave NW
 3                               Ste 1100
                                 Washington, DC 20036-5318
 4                               Jbarr@bakerlaw.com

 5
                                 LEE A. CASEY, ESQ.
 6                               Baker & Hostetler, LLP
                                 1050 Connecticut Ave NW
 7                               Ste 1100
                                 Washington, DC 20036-5318
 8                               Lcasey@bakerlaw.com

 9
                                 ELIZABETH PRICE FOLEY, ESQ.
10                               Baker & Hostetler, LLP
                                 1050 Connecticut Ave NW
11                               Ste 1100
                                 Washington, DC 20036-5318
12                               Efoley@bakerlaw.com

13
                                 LINDY KEOWN, ESQUIRE
14                               Baker & Hostetler, LLP
                                 200 South Orange Avenue
15                               Suite 2300
                                 Orlando, FL 32801
16                               Lkeown@bakerlaw.com

17
                                 JOSEPH MICHAEL SCHUSTER, ESQ.
18                               Joseph M. Schuster, Esq., P.A.
                                 5750 Collins Avenue
19                               Suite 12G
                                 Miami Beach, FL  33140
20                               Joe@josephmschuster.com

21
                                 NEIL M. SCHUSTER, ESQ.
22                               555 NE 15th Street
                                 Suite 2-C
23                               Miami, FL  33132
                                 Neil@neilmschuster.com
24

25
```

```
 1
         STENOGRAPHICALLY REPORTED BY:
 2

 3                                  SHARON VELAZCO, RPR, FPR
                                    Official Court Reporter
 4                                  United States District Court
                                    400 North Miami Avenue
 5                                  Miami, Florida 33128

 6

 7

 8                              _        _       _

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (The following proceedings were had:)
 2            THE COURT:  Next, United States of America versus Alex
 3  Saab Moran.  Who is here for the government?
 4            MR. KRAMER:  Good morning, your Honor.  Alex Kramer on
 5  behalf of the United States, and with me is Kurt Lunkenheimer
 6  and Special Agent William Callow.
 7            THE COURT:  Good morning.
 8            And on behalf of the defense?
 9            MR. BARR:  Good morning, your Honor.  Jonathan Barr on
10  behalf of the defense, and with me is my partner, David Rivkin,
11  Lee Casey, Elizabeth Foley, and Joe Schuster and Neal Schuster,
12  and Mr. Saab Moran.
13            THE COURT:  Good morning.
14            Good morning, Mr. Saab Moran.
15            We are here for arguments on the defendant's motion to
16  dismiss.  I said each side can have an hour, if you want to
17  save some time for rebuttal.
18            MR. BARR:  Yes, your Honor.  Just a housekeeping
19  matter, we would like to save 15 minutes for rebuttal and, your
20  Honor, since I was one of the attorneys presenting evidence at
21  the evidentiary hearing, our plan is for me to spend a little
22  bit of time on the facts, hand the legal argument over to
23  Mr. Casey, and Mr. Rivkin will do the rebuttal.
24            And, I have spoken with the government and they don't
25  object.
```

1          THE COURT:  That is fine.

2          MR. BARR:  And, just one other small housekeeping

3   matter, your Honor.  Could we ask that the handcuffs be taken

4   off Mr. Saab so he can write notes and communicate more

5   effectively with his attorneys?

6          THE COURT:  Yes, we did that during the hearing and he

7   behaved.

8          So, would the marshals please take his handcuffs off?

9          MR. BARR:  Your Honor, we have a PowerPoint to show

10   during our presentation.

11          THE COURT:  Where is it?  Is it hooked up?

12          MS. KEOWN:  It should be working.

13          Okay.

14          MR. BARR:  Good morning, your Honor.  The factual issue

15   for the Court to decide here today is whether Mr. Saab was a

16   special envoy from Venezuela to Iran traveling on a mission

17   when he was detained in Cape Verde and extradited to the U.S.

18   and, therefore, entitled to diplomatic immunity.

19          As we said in our opening argument, your Honor, to

20   determine this, your Honor has to answer three key questions,

21   and if you look at the screen, those three questions are as

22   follows:

23          First, did the sending state, Venezuela, appoint

24   Mr. Saab as a special envoy for the purpose of obtaining

25   humanitarian aid in the form of food, medicine and oil?

1          Second, did the receiving state, Iran, accept Mr. Saab

2   as a special envoy?

3          And third, was Mr. Saab in transit on the mission at

4   the time of his detention and extradition?

5          Your Honor, before I detail the extensive evidence

6   introduced that shows by substantially more than a

7   preponderance of the evidence that the answer to all of these

8   questions is a resounding yes, I want to focus the attention of

9   the Court on five unrebutted pieces of evidence that

10  demonstrate overwhelmingly that Mr. Saab was a special envoy of

11  Venezuela, when he traveled on his way to Iran on an important

12  humanitarian mission, when he was detained.

13         And, your Honor, those -- those five pieces of evidence

14  are as follows:

15         First, Defense Exhibit BC, this is the April 9th, 2018,

16  credential letter signed by the Venezuelan Foreign Minister,

17  which specifically appointed Mr. Saab a special -- as a special

18  envoy to procure humanitarian aid for the Venezuelan people.

19  Ms. Gonzalez testified to the authenticity of this credential

20  letter, your Honor, and she also testified that it was provided

21  to her in April of 2018, and that it is still maintained in the

22  archives of the Venezuelan Foreign Ministry.

23         The government introduced no evidence, your Honor,

24  rebutting this April 2018 credential letter.  The clear

25  language of the letter, which is -- appears on your screen,

1   your Honor, says that it is appointing him as special envoy to

2   obtain humanitarian supplies from any other sovereign nation

3   willing to provide them to Venezuela.

4          Your Honor, the second piece of unrebutted evidence is

5   Defense Exhibit BD, this is the April 1st, 2020, letter, from

6   the Foreign Minister of Venezuela instructing Mr. Saab to

7   negotiate in his capacity as a special envoy in Iran to obtain

8   humanitarian aid in response to the COVID-19 pandemic.  And,

9   your Honor, you can see the language highlighted on the screen,

10  "In your capacity as special envoy."

11         Ms. Gonzalez also testified to the authenticity of this

12  letter, and she testified that this letter is contained in the

13  official files of the Ministry of Foreign Affairs of Venezuela.

14         And your Honor, the government introduced no evidence

15  rebutting this April 1st, 2020, letter.  This letter obviously

16  establishes, your Honor, that on April 1st, 2020, forward,

17  Mr. Saab was acting as a special envoy to Iran.

18         The third piece of unrebutted evidence, your Honor, is

19  Defense Exhibit B, which is the June 3rd letter, June 3rd,

20  2020, letter, from the Foreign Minister of Venezuela to the

21  ambassador of Iran in Caracas, notifying the ambassador that

22  Mr. Saab would be traveling to Tehran on June 12th in his

23  capacity as a special envoy.

24         You can see Defense Exhibit B on your screen, your

25  Honor, and I draw your attention to the language notifying the

 1    Iranian ambassador that Mr. Saab would be traveling to Tehran

 2    on June 12th in his capacity as special envoy, which is

 3    obviously highlighted there.

 4            The government stipulated, for purposes of this

 5    hearing, that this document is authentic correspondence between

 6    the individuals identified in the document.  And, that

 7    stipulation was Defense Exhibit A, your Honor.

 8            This is the unrebutted notification from the Foreign

 9    Ministry of Venezuela to Iran that Mr. Saab would be sent on an

10    official special envoy mission on June 12th, 2020.

11            The fourth piece of unrebutted evidence, your Honor, is

12    Defense Exhibit C, which is the June 8th, 2020, diplomatic note

13    sent by the Iranian embassy in Caracas to the Venezuelan

14    Foreign Ministry, formally accepting Mr. Saab as a special

15    envoy.  This was, your Honor, Iran's response to the letter --

16    to the letter that had been sent on June 3rd from the

17    Venezuelan Foreign Ministry.

18            In Defense Exhibit C, which your Honor can see on your

19    screen, Iran acknowledges, "The official visit of this, of the

20    -- of the envoy of the government of the Bolivarian Republic of

21    Venezuela to our country, the distinguished Alex Nain Saab

22    Moran."

23            Again, the government stipulated for purposes of this

24    hearing that this document is authentic correspondence between

25    the individuals identified in the document.  And, again, that's

1    Defense Exhibit A, that stipulation.  This is the unrebutted

2    confirmation from the government of Iran that it was sending

3    Mr. Saab as a special envoy to Iran for that June 12, 2020,

4    trip.

5            The fifth piece of evidence, unrebutted evidence, your

6    Honor, is that when Mr. Saab was detained, he was actually

7    carrying with him three pieces of diplomatic correspondence

8    that had been provided to him by the government of Venezuela to

9    take to the government of Iran.

10           And, you can see in front of you, your Honor, on your

11   screen, the defense exhibits which reflect the three envelopes

12   that Mr. Saab was carrying with him.  One of those letters,

13   Exhibit AM, which is also on your screen, your Honor, is dated

14   June 11th, 2020.  This is the correspondence from President

15   Maduro to the Supreme Leader of Iran.  He asks in this

16   correspondence, and you can see it highlighted on the screen in

17   front of you, your Honor, asking through the bearer of this

18   letter, who was Mr. Saab, to guarantee a new urgent shipment of

19   gasoline.

20           Your Honor, there can be no dispute that this letter

21   from President Maduro to the Supreme Leader of Iran was in the

22   possession of Mr. Saab when he was detained in Cape Verde.

23   First of all, Mr. Arrieche testified that he went to the

24   Venezuelan presidential palace at Mr. Saab's instruction to

25   pick the letter, this letter and two other letters, up from the

1    presidential palace, and then he took those letters and put

2    them in the briefcase of Mr. Saab.  And then it was --

3    Mr. Arrieche verified that it was on the plane when Mr. Saab

4    left on his trip that fateful day.

5         The second, Dr. Mandel, testified that when he went to

6    the prison to collect the belongings of Mr. Saab in Cape Verde,

7    that he found within the luggage the three envelopes and the

8    three letters, and he specifically testified about remembering

9    the letter from President Maduro to the Supreme Leader of Iran.

10        Finally, the version of the letter that was produced in

11   discovery by the government, which is Defense Exhibit AL -- and

12   it appears on your screen -- you can see, your Honor, at the

13   very top of that letter that that is a date, 6/20/2020, and a

14   file name that indicates this was digitized and, obviously, was

15   sent to the U.S. Government so that it could be produced in

16   discovery, ultimately.

17        And, your Honor, there were two other diplomatic

18   letters that Mr. Saab had in his possession on that fateful

19   day.  There were two letters from the Vice-President of

20   Venezuela to -- one to the Iranian Minister of Agriculture, and

21   one to the Senior Advisor to the Iranian Vice-President.  One

22   of these letters invited the Iranian Agricultural Minister to

23   come to Venezuela for a diplomatic visit.  The other letter

24   invited the Senior Advisor to the Iranian Vice-President to

25   come to Venezuela for a diplomatic visit.

1          Your Honor, these are classic diplomatic correspondence

2     letters inviting officials from another country to your country

3     for a visit.

4          As a prosecutor, Mr. Kramer was forced to concede

5     during the evidentiary hearing in response to your question,

6     your Honor, the government does not -- does not dispute that

7     Dr. Mandel found the correspondence from the president and the

8     vice-president, the two pieces of correspondence from the

9     vice-president of Venezuela in the -- Mr. Saab's luggage that

10    day when he picked the luggage up from the prison.

11         These five contemporaneous pieces of evidence alone,

12    your Honor, unequivocally demonstrate that the answer to the

13    three key factual questions before the Court regarding

14    Mr. Saab's diplomatic immunity must be answered in the

15    affirmative.

16         First, the sending state, Venezuela, did appoint

17    Mr. Saab as a special envoy, and sent him on a special mission,

18    on an official mission to Iran.  The receiving state, Iran,

19    accepted Mr. Saab as a special envoy, and Mr. Saab was, indeed,

20    in transit, your Honor, on that diplomatic mission when he was

21    detained in Cape Verde.  And that is --

22         THE COURT:  Let me go back to the first of those.

23         MR. BARR:  Sure.

24         THE COURT:  So, Mr. Saab was sent on an official

25    mission from Venezuela to Iran.  So, he was sent from the area

1  of Venezuela to Iran.  He was sent by the Maduro regime and his

2  representative to Iran.  But, why is he sent from the country

3  of Venezuela "as recognized by the government of the United

4  States"?

5        I mean, you guys cite all the time the Abdulaziz case

6  talking of diplomatic status, but doesn't that case say that

7  courts have generally accepted, as conclusive, the views of the

8  State Department about somebody's diplomatic status?

9        So, why, in this case, shouldn't I accept, as

10  conclusive, the views of the State Department that he doesn't

11  have diplomatic status because we don't recognize the Maduro

12  regime as a legitimate government in Venezuela?

13        MR. BARR:  My colleague, Mr. Casey, is going to address

14  the legal arguments to that, your Honor.  But, the answer is

15  pretty simple.  Mr. Saab was appointed by the Foreign Ministry

16  of Venezuela.  Our government, as we -- as you can see from

17  some of the evidence that has been put in, some of the papers

18  that have been put into evidence, our government still

19  routinely deals with the Venezuelan Foreign Ministry.  We still

20  deal with the government of Venezuela, notwithstanding that,

21  you know, the current president doesn't -- doesn't recognize

22  President Maduro.

23        THE COURT:  In our country, we have a former president

24  who claims that he is still the legitimate president, that he

25  didn't lose the election.  And, what if he, instead of making

1    and selling NFTs, decided to make and give away or sell

2    diplomatic passports?

3            As the self-recognized president of the United States,

4    would some other country have to recognize people traveling

5    with those diplomatic passports issued by somebody who claims

6    he was the -- is still the president, but not recognized by our

7    government?

8            What is the difference?

9    MR. BARR:  Well, your Honor, I think the big difference

10   here is this is a diplomatic mission from the country of

11   Venezuela to the country of Iran that did not depend on

12   traveling through the United States.  So, there was no need for

13   the United States to -- to be, to be told of Mr. Saab's status.

14          The United States had nothing to do with the mission.

15   It was the country of Venezuela and the country of Iran.  The

16   country of Venezuela, the Foreign Minister of Venezuela with

17   the Foreign Ministry sent the communication to Iran saying, "We

18   have appointed Saab as special envoy.  We are sending him on

19   June 12th."

20          The receiving country, Iran said, "Yes, we -- we look

21   forward to his visit."  The special envoy -- they recognized

22   him as a special envoy.

23          The government of Iran, the receiving state, certainly

24   recognized that it was receiving Mr. Saab as a special envoy on

25   a diplomatic mission.  And, that is what is relevant here; what

1   did the receiving state believe and what did the sending state

2   believe.

3          That's where the agreement is.  He becomes a diplomat,

4   then he is in transit to Iran.  And, so that's -- that's, your

5   Honor, I think the crux of the argument that Mr. Casey is going

6   to more artfully make.

7          Your Honor, that wasn't the only evidence that we saw.

8   It wasn't just these five pieces of unrebutted evidence that

9   you saw.  There was a host of other evidence demonstrated at

10  the hearing.  For example, the government stipulated to the

11  fact that Mr. Saab was on his third trip to Iran when he was

12  detained, and that's Defense Exhibit BU.

13         He previously traveled from Venezuela to Iran on two

14  separate occasions in -- earlier in 2020.  The government and

15  the public know that those two prior trips by Mr. Saab resulted

16  in the delivery of humanitarian aid to Venezuela to assist with

17  these crippling sanctions.

18         We know that, your Honor, because if we look at Defense

19  Exhibit AG, which is State Department open source intelligence

20  information that appears on your screen now, your Honor, it

21  confirms that the United States was well aware that Mr. Saab

22  was working on behalf of Venezuela to obtain fuel from Iran.

23  And, you can see there is a highlighted portion which

24  demonstrates that.

25         And notice, your Honor, in the footnotes of that

1  exhibit, various Bloomberg articles report on the results of
2  Mr. Saab's special envoy missions.  Then on the day before
3  Mr. Saab's scheduled flight, there is some critical email
4  correspondence between United States officials at the highest
5  levels discussing Mr. Saab.  And, it demonstrates that they
6  were well aware that he was working on brokering deals with
7  Venezuela with Iran.  And, this is one of those emails, your
8  Honor, and you can see the question being asked, "How are the
9  negotiations going?  I ask because Secretary Pompeo wants to
10 talk about Alex Saab who is brokering the Iran-Venezuela deals
11 next week."

12      So, this is clear evidence that high-level officials,
13 including Secretary Pompeo, were well aware that Mr. Saab was
14 negotiating these deals on behalf of Venezuela and Iran.

15      Then, your Honor, if you will look at the next exhibit,
16 which is Defense Exhibit AO, this is another email between high
17 level government officials where Secretary of State Pompeo
18 reportedly wonders if we can argue that Mr. Saab's Venezuelan
19 diplomatic passport is illicit.  So, these are senior officials
20 obviously wrestling with how they can evade the legal immunity
21 associated with Mr. Saab's diplomatic status.

22      Your Honor, Mr. Saab's two prior trips and the
23 successful results of those trips, which are undisputed at the
24 highest levels of the government, show a consistent course of
25 conduct as a special envoy in 2020, and corroborate that

1    Mr. Saab was, indeed, traveling as a special envoy in June of

2    2020.

3            Of course, Venezuela had also issued Mr. Saab a

4    diplomatic passport, which is further corroboration that he was

5    a diplomat.

6            But, as your Honor knows, and as Mr. Casey will further

7    explain, it is well settled in the 11th Circuit that the

8    issuance and use of a diplomatic passport is not necessary and

9    in no way determines whether there is diplomatic immunity.

10           And, moreover, Dr. Pena --

11           THE COURT:  What if he was on a mission to violate UN

12   sanctions against Iran, as Secretary Pompeo also suggests

13   there?

14           MR. BARR:  Your Honor, I think the fact that if -- if

15   your hypothetical were correct and he was on a mission to

16   violate the sanctions of Iran, the fact that a diplomat in the

17   service of its country is doing something that might be a

18   violation of law does not -- does not take away that diplomat

19   status, much like, you know, a congressman can be accused of

20   public corruption.  But, the congressman remains in his

21   position as congressman until either removed or until he

22   resigns or if he's acquitted of the conduct.  Then, he

23   certainly remains in his position with all the rights and

24   privileges associated with that position.  It is the same way

25   with the diplomat.  It doesn't affect his diplomatic status.

1          Moreover, Dr. Pena testified that there was no

2    requirement under Venezuelan law that a Venezuelan diplomat use

3    a diplomatic passport when traveling, or, on official business.

4          The Government's anticipated arguments concerning the

5    expiration of the diplomatic passport, your Honor, are simply

6    irrelevant.  Your Honor, when Mr. Saab first appeared in court

7    in Cape Verde, he informed the Court that he was traveling as a

8    diplomatic agent of Venezuela.  And, we know that because that

9    appears in the -- that fact appears in the decision on his

10   detention, which is Defense Exhibit BK, and we can see the --

11   you can see that language highlighted.

12         The Barlovento Relations Court in Cape Verde similarly

13   found that Mr. Saab had invoked his diplomatic status.

14         THE COURT:  So you want me to rely on all the findings

15   of the Cape Verde courts?

16         MR. BARR:  No, that's not what I meant.

17         No, your Honor.  I don't think the findings of the Cape

18   Verde court have any binding effect on your Honor.  I just -- I

19   just note that this is -- this is out there, and reflects that

20   he did -- he did, in fact, invoke his diplomatic status at an

21   early point.  You are certainly not bound by any findings of

22   the Cape Verde court.

23         Your Honor, I will note that subsequent diplomatic

24   correspondence only further confirms Mr. Saab's diplomatic

25   status.  Both Venezuela and Iran repeatedly and vociferously

1    protested the arrest, detention, and efforts to extradite

2    Mr. Saab.  This was done over and over again, through the

3    sending of diplomatic correspondence to Cape Verde by both the

4    sending state, which was Venezuela, and the receiving state,

5    which was Iran.

6         And, before you is one of the diplomatic notes from

7    Venezuela, which is Defense Exhibit H.  And, you can see that

8    they are addressing Cape Verde about the special envoy of

9    Venezuelan citizen Alex Nain Saab Moran.  And, they -- they

10   talk about his nomination as a special envoy and the mission

11   that he was undertaking.

12        Also before you is Defense Exhibit L on your screen.

13   And then one of the diplomatic notes by the country of Iran,

14   also -- also pushing the cause for Mr. Saab, and reaffirming

15   that he had been appointed as special envoy.

16        In total, your Honor, there were 17 diplomatic

17   communications and protests lodged.  And, again, this is

18   confirmation that Venezuela, who sent Mr. Saab, and Iran, who

19   is receiving Saab, both were filing these protests in Cape

20   Verde at the time.

21        Now, the government has cherry-picked a few of the

22   notes that don't specifically use the term "special envoy" or

23   "diplomatic immunity."  But, your Honor, that simply is a red

24   herring.  Even the initial -- even the initial note of Verbale,

25   quickly issued after Mr. Saab's immediate detention, makes

1    clear that Venezuela considered him to be acting on the behalf

2    of Venezuela and protected by immunity.

3         The government cites no authority because there is no

4    such authority that a foreign state has to use any magic

5    language when asserting immunity for its diplomats, other than

6    saying that there is immunity.

7         Against the weight of all this evidence, your Honor,

8    the Government's only avenue of attack is a grand conspiracy

9    theory that every document is falsified and every witness is

10   lying.  And, this grand conspiracy theory, your Honor, is based

11   on nothing more than insinuation and speculation.  There is

12   simply no evidence in the record to support this grand

13   conspiracy theory, and no findings can be relied -- can rely

14   upon that.

15        The government's arguments regarding the publication in

16   the Gaceta is another irrelevant red herring, your Honor.

17   Dr. Pena, a former judge of the Venezuela Supreme Court, came

18   to the court and testified.  He was the only expert on

19   Venezuelan law to testify, and after -- after your Honor heard

20   his qualifications, your Honor qualified him as an expert in

21   Venezuelan constitutional administrative law.  His testimony

22   was clear and unrebutted that there is no legal requirement,

23   under Venezuelan law, that the appointment of a special envoy

24   be published in the Gaceta.

25        Dr. Pena --

1          THE COURT:  But, the issue is not whether they had to

2     have it published at the time.  The issue is -- was, did they

3     create this document just to make their case better than it

4     already was?

5          MR. BARR:  Well, that's another issue.  The government

6     makes a big issue about the fact that the Gaceta was

7     electronically updated.  News flash, your Honor.  It's 2022.

8     Government websites are updated all the time.  That's how --

9     that's how things operate in the modern world.  And so, I think

10    that the Government's -- the Government's issues with, you

11    know, whether this was updated later is really much ado about

12    nothing.

13          Dr. Pena unequivocally -- sorry, your Honor.

14          Dr. Pena unequivocally testified that even if

15    Mr. Saab's appointment had never been published in the Gaceta,

16    this would not have affected the validity of the appointment.

17    And, your Honor, I will say this:  It would not be surprising

18    to me if somebody engaged in a special mission that was of

19    national security importance, if something wasn't published

20    about his special envoy status, and perhaps after he had been

21    detained and the need for national secrecy was over, an update

22    could be made.  That would not be surprising to me in the

23    least.  And, I think the Government's arguments really are much

24    to do about nothing.

25          I will say to your Honor, Dr. Pena's testimony was

1   unrebutted.  And, it is -- and I think, as Dr. Pena made clear,

2   Mr. Saab's appointment as a special envoy does not depend on

3   what is or is not in the Gaceta.  And, by the way, your Honor,

4   to bring the Court back to something that really is important,

5   I want to talk about the fact that the government has

6   stipulated to the authenticity of the June 3rd letter that

7   notified Iran that they were sending Mr. Saab as a special

8   envoy.  They stipulated to the authenticity of the letter from

9   Iran accepting Mr. Saab as a special envoy, and, given this --

10  given the stipulation of the authenticity of these two letters,

11  and also the fact that Mr. Saab was carrying those three very

12  important diplomatic notes on his mission to Iran, that is all

13  the Court should need to find easily that Mr. Saab was, in

14  fact, a special envoy on a mission to -- on a mission to Iran

15  when he was detained in Cape Verde.

16       Your Honor, facts and documentary evidence are stubborn

17  things, and the facts and evidence here lead to one conclusion,

18  that Mr. Saab was sent by Venezuela as a special envoy to Iran;

19  that Mr. Saab had been accepted by Iran as a special envoy; and

20  that Mr. Saab was detained while in transit as a special envoy.

21       Your Honor, the facts are made clear.  I will now turn

22  the legal argument over to my colleague, Mr. Casey.

23       MR. CASEY:  Good morning, your Honor.  And, may it

24  please the Court.

25       I will address the legal issues surrounding the motion.

1   But, let us start with your Honor's question about "the Maduro

2   regime," as the government calls it.

3          First of all, the cases you are referring to where the

4   State Department's certification has been taken as conclusive

5   has -- have all involved diplomats who are accredited to the

6   United States.  And, of course, as we know, under the

7   Constitution, the president has the exclusive right to receive

8   ambassadors and public ministers.  And, as a result, if the

9   State Department says an individual accredited to the United

10  States is a diplomat and they have been accepted, that is

11  conclusive.

12         If they say this person is not a diplomat, that is also

13  conclusive because, indeed, the president has plenary authority

14  to decide who is and who is not to be accepted as a diplomat

15  here.  Our case, of course, is entirely different.

16         Mr. Saab's immunity does not come from any action by

17  the United States.  It comes from the fact that he was

18  accredited by Venezuela to Iran, and Iran accepted that

19  accreditation and Iran also recognizes Mr. Maduro as president

20  of Venezuela.

21         As a result, the question for the United States,

22  frankly, is not whether or not he has diplomatic immunity,

23  because he certainly does.  The question is, does it comply

24  with its treaty obligations?

25         THE COURT:  So, getting back to my question, so if

1    President Trump, former president, gets indicted, okay, and he

2    flees the country and makes arrangements to go to Iran and,

3    stops in Cabo Verde on the way there, okay, and Iran recognizes

4    him as the legitimate president, and recognizes his diplomatic

5    status, then the United States is bound by that?

6          MR. CASEY:  Well, I am not -- given that it would be

7    the -- I mean, we are talking here about someone who claims to

8    be president of the United States.

9          THE COURT:  Somebody who claims to be president of

10   Venezuela, okay, which our government has said no, he is not

11   the legitimate president of Venezuela.  So, it wouldn't matter

12   what he does.

13         MR. CASEY:  That's true, but, again, the government

14   that has accepted Mr. Saab as a diplomat does recognize him as

15   the president of the Venezuela.

16         THE COURT:  Okay.  And, if Iran recognized President

17   Trump as the continuing president --

18         MR. CASEY:  Right.  In the case you are positing, your

19   Honor, it wouldn't simply be a case of two states deciding who

20   the diplomatic representation is going to be, and then the

21   United States has to accept that.  It would be a case where

22   someone is recognizing a government, the government of the

23   United States doesn't recognize, and, the diplomats that he

24   might appoint would only -- would only be recognized, would

25   only be possibly recognized by other countries, but the United

1    States, because of the intimate involvement, wouldn't be

2    required to recognize that.

3         And, I would say, if we turn the question around, and

4    say, you know, what if -- what if Venezuela or Iran or, you

5    know, North Korea decides that President Biden isn't president,

6    does that mean that every diplomat, American diplomat in the

7    world suddenly is not a diplomat and not entitled to immunity?

8         I mean, I think, as the 11th Circuit, in fact, said,

9    that the immunity arises by the actions of the sending and

10   receiving state.  And, once they have acknowledged the

11   individual as a diplomat, he is entitled to immunity, and the

12   other parties to the Vienna Convention on diplomatic relations

13   are required to respect that, at least insofar -- they are not

14   required to suddenly accept that individual as a diplomat

15   accredited to them.  But, they are required to comply with

16   their basic obligations to permit what we call in-transit to

17   immunity for the individuals accredited by one state to

18   another, to transit on their way to and from their assignment.

19        THE COURT:  But, doesn't the Vienna Convention on

20   diplomatic relations only apply to permanent missions,

21   diplomats that are on the way to and from permanent missions?

22        MR. CASEY:  It does not.  It is certainly true that the

23   Convention is largely concerned with the permanent missions.

24   Those are the most common.  And, of course, if you look at it,

25   there is -- there is, you know, much discussion of mission

1    premises and much discussion of, you know, the various

2    facilities that permanent missions have.  But, in this

3    instance, of course, Abdulaziz, the Court in Abdulaziz

4    recognized that that -- that individual, Prince Abdulaziz, who

5    was a special envoy like Mr. Saab, was a diplomat covered by

6    the Vienna Convention.

7            And, what is -- what is also -- I wouldn't say it is

8    more important because, of course, the Court says it is

9    binding.  But, when the State Department did certify Prince

10   Abdulaziz as a diplomat, a special envoy for matters, you know,

11   related to the government of Saudi Arabia to the United States,

12   it cited in its certification the Vienna Convention on diplomat

13   relations and the Diplomatic Relations Act so that the State

14   Department, itself, took the position that Prince Abdulaziz, as

15   a special envoy, was covered by that treaty, and that is

16   fundamentally inconsistent with what the government is saying

17   now.

18           And, frankly, the State Department, at least as far as

19   the record we have, hasn't changed its position.  If you look

20   at the State Department certification that is now -- that they

21   issued in this case, it is very interesting because they go

22   through and say, "Well, Mr. Saab has not been notified to the

23   United States in any one of his several diplomat capacities,

24   and, therefore, we know of no reason why he would have

25   diplomatic immunity in the United States."

1          Well, that's basically saying, "We don't know."

2          The State Department knows how to say when someone has

3    diplomatic immunity, as it did in Abdulaziz, and it also knows

4    how to say when they don't.

5          In terms of, you know, based on their interpretations

6    of the -- of the treaty, there is an interesting case, which I

7    believe we cited in the briefs calls Alhambia, in the Fourth

8    Circuit, where an individual, a young man was accused of some

9    firearm violations, and he thought he had diplomatic immunity

10   because his father was a diplomat.  Well, under the State

11   Department's construction of the Vienna Convention, families of

12   diplomats do, indeed, of course, also get diplomatic immunity.

13   But, after you reach the age of 21, unless you are still in

14   school, you don't.

15         And, the Court found that, well, that was a reasonable

16   interpretation of the treaty.  And before deference can be

17   given, at a minimum, the Court has to find that it is a

18   reasonable interpretation of the treaty.

19         And, therefore, because this young man was no longer in

20   school, he had aged out, he didn't have immunity, and the State

21   Department said that.  They didn't sort of say, "Well, we don't

22   know."

23         They said, "He doesn't have immunity; this is how we

24   interpret the treaty."

25         We don't have that here.  The only State Department

1    interpretation of the Vienna Convention on diplomatic relations

2    we have is from the Abdulaziz case, and that fully supports

3    Mr. Saab's position.

4         Let me -- I think that actually covers a number of

5    points I wanted to make.

6         Indeed, just -- we do know, of course, the government

7    had suggested, through one of their footnotes, that, well,

8    maybe Prince Abdulaziz was somehow connected to the permanent

9    mission in Washington.  We now know, based on the record in

10   Abdulaziz, that that wasn't the case; that he was living here

11   in Miami with his family engaged in business dealings -- and

12   that, indeed, the prosecutor, then-State Attorney, Janet Reno

13   who, of course, later became Attorney General, had asked the

14   State Department twice, directly and indirectly -- I think they

15   went through ATF the first time -- whether they had a

16   diplomatic immunity.  And, the State Department said no, and

17   so, they -- only then did they swear out a warrant to go to

18   search his house.

19        Well, of course, a private security detail prevented

20   that search, injured some police officers.  Lawsuits were filed

21   on both sides, and the -- and in terms of there was never any

22   suggestion that, you know, Prince Abdulaziz was connected to

23   Washington, and he was, in the middle of the litigation, named

24   a diplomat by Saudi Arabia.  Saudi Arabia, of course, has the

25   right to notify, as the term is, the United States that this is

1   to be a diplomat, and the State Department accepted that

2   notification, again, under the Vienna Convention and the

3   Diplomatic Relations Act.

4        Which is why, indeed, in this case, Mr. Saab doesn't

5   need a certification.  There is no -- there is no certification

6   for the Court to either find conclusive or defer to because, of

7   course, the United States is not the country certifying him as

8   a diplomat.  It is Venezuela and Iran that have done that.

9        And so, I think that explains why the certification

10  that the State Department did provide is so indeterminate and

11  effectively saying, "Well, we don't know.  We just don't know

12  of any reason why."

13       Now, on the question of Mr. Saab's diplomatic passport,

14  the truth is that diplomatic passports are, indeed, nothing but

15  a convenience.  And, in fact, I think probably there is a

16  quote, excellent quote from a case called -- one of several

17  Noriega cases, this one written by Judge Hoeveler of this

18  court, where he notes, or first of all, he denies Noriega's

19  argument that he had diplomatic immunity because he was

20  carrying diplomatic passports.  And then said, diplomatic

21  passports are the convenience providing, quote, "Certain

22  courtesies in international travel, but they are without

23  significance in international law and United States law, and do

24  not, by themselves, entitle an individual to any

25  internationally or domestically protected status."

1       The government also made this point, actually, in

2  Footnote 5 of its opposition where they said, "The possession

3  of a diplomatic passport does not entitle one to diplomatic

4  immunity."

5       And, that is absolutely correct.  It gets you in a

6  better line at the airport, is basically all it does.

7       And, in this instance, if Mr. Saab had tried to get his

8  passport renewed, frankly, it would have been a waste of his

9  time because it doesn't add anything to his status.  It doesn't

10  take away anything from his status.  It isn't necessary.  You

11  can, indeed, and a lot of diplomats do travel on your normal

12  passport, as in this instance, he did.

13       Okay.  I would also like to discuss the type of

14  immunity that Mr. Saab is entitled to in this country because,

15  of course, he is not posted here.  And so, under the treaty,

16  under Article 40.1 of the treaty, third party states, like the

17  United States, are required to respect basic immunities of

18  diplomats from other countries who are transiting their state,

19  if they are going directly from their sending to their

20  receiving state.

21       In this case, of course, and indeed, obviously,

22  Mr. Saab's aircraft stopped, was going directly from Caracas to

23  Tehran, his aircraft stopped in Cape Verde for refueling,

24  where, oddly enough, he bought a visa, like everybody else has

25  to buy a visa.  And one of the requirements of the 40.1 is that

1   if a visa is required, you should have one.  So, he actually

2   had one when he -- when he attempted to pass through Cape

3   Verde.

4           But, we are now beyond that.  Really, what happened in

5   Cape Verde is of no relevance here.  The government seems to be

6   trying to say, somehow, that the chain of his immunity was

7   broken because he stopped in Cape Verde.  But, that's just not

8   true.  Every state that is a member of the Vienna Convention on

9   diplomatic relations has an independent obligation and right to

10  interpret and apply the treaty for itself.

11          And, here, we are talking about the United States'

12  obligations under the treaty.  And, the fact is that Mr. Saab

13  never planned to travel to the United States.  It is not on his

14  route.  He was brought here, in fact, the United States

15  engineered his presence here through both convincing Cape Verde

16  to effect his arrest and then, ultimately, to extradite him

17  here.  And, it brought him here against his will and against

18  the will, of course, of his sending and receiving states.

19          So, in that sense, the United States has waived

20  whatever either visa or consent requirement there was.  It is

21  kind of like if you were to take someone to your home by

22  gunpoint and then charge them with trespassing.  It is

23  nonsensical.

24          Moreover, under the treaty, there is a provision that

25  also provides for the circumstance where a diplomat may find

1   him or herself in a country they never planned to transit, and

2   that's the force majeure provision.

3          If you are -- find yourself in a country, through no

4   fault of your own, based upon overwhelming power, that sort of

5   classic diplomatic definition is irresistible power, the

6   government has focused on the fact that they say he could have

7   anticipated that he might be arrested if he traveled to Iran.

8          But, that A, is speculation, and B, there are lots of

9   force majeure events that can be anticipated, in fact, even

10  predicted; strikes, civil disorders, weather events, all of

11  those things are force majeure happenings, actions, and they

12  are perfectly predictable.  But, they are still force majeure.

13         Here, of course, he falls, actually, within the

14  irresistible force category because the United States reached

15  out, knowing, knowing that he was a diplomat and, indeed, as we

16  saw, at the very highest levels, wondering if there was a way

17  that they could -- that they could find pretext for denying him

18  diplomatic immunity, and, and brought him here.

19         So, he, A, consent has been given, and B, even if it

20  hasn't, he is still entitled to his in-transit immunity based

21  on the force majeure of his being brought here.

22         Now, in-transit immunity, as the government points out,

23  is not the same as the full immunities that a diplomat would

24  have, whether they are for the receiving state or whether they

25  had sent you here.  What an in-transit diplomat is entitled to

1    is inviolability, a personal inviolability.  And, as a result,

2    in this case, it doesn't really -- it doesn't really matter

3    because that personal inviolability, as defined in Article 29,

4    Article 29 of the treaty provides that a person, the person of

5    a diplomatic agent shall be inviolable, he shall not be liable

6    to any form of arrest or detention; the receiving state shall

7    treat him with due respect and take all appropriate steps to

8    present -- prevent any attack on his person, freedom, or

9    dignity.

10           As a result, Mr. Saab is immune from arrest and

11    detention, the two fundamental --

12           THE COURT:  But, you are not asking for me just to

13    release him and send him on his merry way somewhere outside.

14    You are asking me to dismiss the indictment.  My question is,

15    if his conduct related to or formed the basis of the

16    indictment, it happened way before any of the events, assuming

17    he has diplomatic status, why is the remedy to dismiss the

18    indictment versus just releasing him?

19           MR. CASEY:  Well, your Honor, because under the text of

20    40.1, the requirement actually is that he has personal

21    inviolability, plus those other immunities necessary for him to

22    carry out his mission.  And, in this case, in fact, there are

23    -- there is not a case that actually construes the text of

24    40.1.  But, in another case, a case called Cacciona, the Second

25    Circuit, was -- did have occasion to interpret the definition

1  under Article 29 in a case where civil service had actually

2  been made on the President and Foreign Minister of Zimbabwe,

3  not in their capacities as President and Foreign Minister, but

4  in their capacities as party officials, in a -- in a political

5  party.  And, they actually were in the United States; however,

6  for a U.N. meeting.  And, based on various treaties that

7  applied to the U.N., they had full diplomatic immunity at that

8  time.

9          And, the Second Circuit said that this violated that

10  diplomatic immunity.  And, part of their rationale was, because

11  if you allowed people with diplomatic immunity to be served in

12  that way, or interfered with, then they would not only be

13  unable to continue or fulfill their missions, but they would

14  have to basically rearrange their activities.  They would

15  always be looking behind their backs to see, to see what --

16  whether someone might be seeking to serve them or arrest them.

17          And, I think here, if the indictment is not dismissed,

18  there is absolutely no doubt in my mind that the United States

19  will continue to try to arrest Mr. Saab as he passes through

20  other states and, therefore, simply freeing him, which

21  obviously would be minimum, but will not be sufficient to

22  ensure, under the requirements of Article 40.1 and Article 29,

23  that he is able to continue his mission to complete it and to

24  return home.

25          THE COURT:  You have used four minutes of Mr. Rivkin's

1    rebuttal.  You can go as long as you want.

2            MR. CASEY:  I think I will -- I think that basically

3    covers what I wanted to say, your Honor.  So, I will -- I will

4    thank you and stop there.

5            THE COURT:  Okay.  Who is going to make the argument on

6    behalf of the government?

7            Mr. Kramer?

8            MR. KRAMER:  I am.

9            Good morning, your Honor, may it please the Court.

10           Before getting into our argument in full, I would like

11   to address one specific document that defense counsel seems to

12   rely on in terms of the United States somehow accepting or

13   conceding that Mr. Saab was a diplomat.  It is their

14   Government's Exhibit AO.

15           We don't have electronic.  May I use the ELMO to put it

16   up?

17           THE COURT:  Yes.

18           MR. KRAMER:  This is the document, your Honor, wherein

19   they concede or state that the State Department and the United

20   States government has conceded that Mr. Saab was in possession

21   of a Venezuelan passport.  The excerpt of this that is included

22   in their motions, includes the top text there, but what it

23   excludes is the RIJOCK.blogspot.com section.  That blog entry

24   is a blog entry where a person, I guess, RIJOCK, opines on

25   certain -- whether or not Mr. Saab may have had certain

1    passports or certain things.  This email, I think, read in

2    context, is clearly them discussing this blog article.  It is

3    not actually conceding any knowledge of a Venezuelan diplomatic

4    passport or anything of the like.  It is simply a discussion

5    between the individuals on the email relating to the underlying

6    blog spot that was sent on June 14th, 2020, and a couple of

7    days after Mr. Saab was arrested, and there was loads of press

8    and loads of information about what was going on and what was

9    there.

10          So, I think we simply raise that to say this is not a

11   concession by any means by individuals within the State

12   Department or the Office of International Affairs of the

13   Department of Justice as to Mr. Saab's having a Venezuelan

14   passport, having any such status.  It's discussion about the

15   documents someone saw, and referencing -- I think it just bears

16   pointing out to the Court that without that blog spot and the

17   context there, it doesn't derive the full level of the

18   contents.

19          THE COURT:  Okay.  Since we are talking about

20   documents, there was a document that was filed either yesterday

21   or Friday --

22          MR. KRAMER:  Yesterday.

23          THE COURT:  -- by a nonparty.  So, just so it is clear,

24   I have not read -- I am not going to read it.  I am not

25   considering anything in that letter.  There is no reason for

1    anybody to address it.

2        MR. KRAMER:  I was not intending to.

3        THE COURT:  I just want to make it clear so that later

4    -- okay.

5        MR. KRAMER:  I appreciate that, your Honor.  Thank you.

6        Getting to the crux of the argument, Mr. Saab's motion

7    and his arguments here are predicated on the erroneous claim

8    that he is a diplomat under the VCDR, under the Vienna

9    Convention on Diplomatic Relations.  They also note, although

10   it was not really argued here today, that he is a diplomat

11   under the Special Missions Convention or Custody International

12   Law and, based on the transit-based components of both of those

13   treaties, that he is somehow immune from prosecution here in

14   the United States.  That is simply incorrect.

15       First, obviously, the VCDR applies to permanent mission

16   diplomats.  Abdulaziz does not change that.  We will get into

17   that argument in a moment.  But, I want to make it clear the

18   Government's position is that the VCDR applies to permanent

19   mission diplomats.

20       Abdulaziz found that Prince Abdulaziz was part of that

21   based on certification from the State Department.  But, it does

22   not usurp or add on to the protection of the VCDR.

23       The Special Missions Convention can be read as,

24   appropriately so, protection on special missions.

25       THE REPORTER:  I'm sorry, Counsel.  If you could slow

1    down --

2              MR. KRAMER:  Sure.

3              THE REPORTER:  Thank you, sir.

4              THE COURT:  Let me ask you a question.  If you lose

5    this motion, you are going to take an appeal, I assume, to the

6    11th Circuit?

7              MR. KRAMER:  Yes.

8              THE COURT:  If they lose, they are going to take an

9    appeal to the 11th Circuit.  How much time is the 11th Circuit

10   going to give you all, each, to make your arguments?

11             MR. KRAMER:  Your Honor, I -- am not equipped to speak

12   on behalf of the 11th Circuit.  I know that based on prior

13   discussions with defense counsel, I am sure we will both seek

14   expedited hearings on this.  But, in terms of the actual time

15   frame --

16             THE COURT:  Just generally, how much time do they give?

17             MR. RIVKIN:  Fifteen minutes, your Honor.

18             THE COURT:  Thank you.  15 minutes.  So, you have an

19   hour.  Plenty of time.  So, don't be rushing.

20             MR. KRAMER:  There's -- I like that.

21             The Special Missions Conventions, similarly, would not

22   actually provide Mr. Saab with any immunity here based on the

23   lack of notice provided to either Cabo Verde or to the United

24   States.  But, as a base level, first and foremost, entry --

25   Mr. Saab could not have any diplomatic immunity here because he

1   purportedly represents the government of the Maduro regime.

2   The United States does not recognize the Maduro regime.  They

3   recognize the Guaidó government as the appropriate government

4   of the sovereign state of Venezuela.

5          Therefore, as the Court alluded to in its questionings

6   of defense counsel, the -- an illegitimate or unrecognized

7   foreign individual providing and granting status to another

8   foreign individual, in no way, shape, or form provides any kind

9   of status that should be recognized here by this Court.

10          It has been clear in Zivotofsky v. Kerry, that's

11   Z-I-V-O-T-O-F-S-K-Y, where the Supreme Court held the president

12   has exclusive authority over recognizing foreign governments.

13          As it relates to the Maduro regime, specifically, other

14   courts, not in the 11th Circuit, but other courts have

15   addressed how that affects individuals under the Maduro regime,

16   and they have held that because the executive has recognized

17   the Guaidó government, that this, necessarily, means the Maduro

18   regime is illegitimate, and so are officials under the Maduro

19   regime.

20          In the case, United States versus Cordones, 2022

21   Westlaw 815229, an official there in the Maduro regime claimed

22   immunity, official immunity.  And, the Court there said, since

23   Mr. Maduro is illegitimate, anyone appointed under -- the

24   officials under that individual are, too, illegitimate and,

25   therefore, immunity doesn't apply.

1          It is not exactly the same type of immunity here.  But,

2     certainly, it is indicative of the respect intended to be given

3     to the executive in terms of recognizing foreign governments

4     and the natural consequence of individuals other -- under an

5     unrecognized government not being able to claim the immunities

6     or protections that would be consistent with having -- being

7     recognized as a foreign government and being the foreign

8     government of -- a legitimate government of a foreign sovereign

9     state.

10          The next point I would like to address here is the

11     VCDR, which I know was a big part of the discussion by defense

12     counsel.  The Vienna Convention on Diplomatic Relations relates

13     to permanent missions.  It doesn't mostly relate to permanent

14     missions.  It relates to permanent missions.  Article 2 makes

15     it clear that it relates to permanent diplomatic missions.

16          And, while the phrase, itself, "mission," is not

17     defined, other parts of the Convention go directly to the idea

18     of it being about permanent missions.

19          In Article 1, there are definitions of various

20     individuals.  It talks about the support staff.  It talks about

21     the technical staff.  It talks about the service staff of these

22     brick and mortar diplomatic, permanent diplomatic missions.

23     That is what it applies to.

24          The very existence of a UN convention on special

25     missions also necessarily indicates that the Vienna Convention

1    applies to permanent missions.  The Special Mission Convention

2    applies to temporary or special missions.

3           Mere -- you know, a pure understanding of statutory

4    construction says you don't create a new convention if the

5    first convention had already provided all the immunities and

6    privileges to those same individuals.  Indeed, the preamble of

7    the Special Mission Convention states that it was needed to

8    complement the VCDR to address temporary diplomatic missions,

9    and that's precisely, at best, what Mr. Saab was on here.

10          Indeed, the facts and the testimony and the documents

11   that came forth in the diplomatic -- excuse me, in the

12   evidentiary hearing last week made it absolutely clear Mr. Saab

13   was not on a permanent mission.

14          The credential letter that he so clearly focuses on

15   that was allegedly dated April 9th, 2018, in support of his

16   argument, makes no reference towards any kind of permanent

17   mission.  It makes no reference to the country of Iran.  It

18   simply says he was tasked with overseeing certain negotiations

19   on certain deals.

20          Other documents that they also provided -- these

21   letters that were purportedly being sent to Iran and

22   purportedly being delivered by Mr. Saab, go to discussions and

23   negotiations of specific discrete contracts and specific

24   discrete issues.  This is all absolutely consistent with the

25   idea of a special mission or a temporary mission, and having

1    nothing to do with a permanent mission.

2         We also saw in the evidentiary hearing last week that

3    Iran -- or, excuse me, Venezuela has a permanent ambassador on

4    a permanent mission to Iran.  Mr. Saab was not, and his

5    credential letter does not indicate anything about him acting

6    under that permanent mission or being appointed by that

7    permanent mission.  The embassy from Venezuela to Iran had

8    nothing to do with his credential letter appointment.

9         Regarding the credential letter, it is now the piece

10   that Mr. Saab focuses on.  But, before Mr. Saab focused on this

11   credential letter before the 11th Circuit, Mr. Saab focused on

12   Gaceta Number 6373 Extraordinaria.

13        In that Gaceta, which we talked a lot about last week,

14   Mr. Saab was not named as a special envoy or anything in the

15   original versions of that Gaceta.  The Gaceta came out in 2018.

16   The Court saw a version, a hard copy version of that document,

17   or a copy of a hard copy version of that document that was

18   received by the Library of Congress in 2018.  That document

19   includes no reference whatsoever to Mr. Saab.

20        That Gaceta Number 6373 was also located on the

21   Tribunal, the Supreme Court Tribunal website that is maintained

22   by the Venezuelan Supreme Court.  That document has no

23   reference to Mr. Saab.  The only document with any reference to

24   Mr. Saab is the Imprenta Nacional website.

25        Computer scientist Sam Marple testified last week about

 1    the metadata of those websites.  He testified that the

 2    library -- excuse me, the Supreme Court Tribunal website, the

 3    one that does not include Mr. Saab, the metadata shows the last

 4    change to that document was 2018.  Contrary to defense

 5    counsel's view that government websites are being updated all

 6    the time, the document was last changed in 2018 and includes no

 7    reference to Mr. Saab.

 8         The story of the Imprenta Nacional website is

 9    completely different.  That website was changed.  And, while

10    there were many changes, there were four changes that metadata

11    showed would have modified the actual text of the document.

12    And, while we cannot be sure as to what those changes are, we

13    know that the earlier versions that existed in time have no

14    reference towards Mr. Saab; and, that there were four changes

15    in November 2021, and February of 2022, lo and behold, those

16    occurred after Mr. Saab was detained, as he was fighting his

17    extradition, and now, all of a sudden, Mr. Saab's alleged

18    credential and alleged presentment as a special envoy are

19    included on this website.

20         Dr. Pena, their own expert, said that changes or

21    discrepancies in the Gaceta need to be noticed in the Gaceta.

22    Now, he later provided some sort of explanation that omissions

23    are not the same as discrepancies.  But, the government would

24    submit that that explanation is purely not credible.  The idea

25    that a misplaced comma or misplaced word requires notification

1    in the Gaceta under official Venezuelan rules is one thing.

2    But, completely leaving out an individual and then putting him

3    in afterwards, that somehow provides no such notice, it defies

4    logic, and it defies reason.  If there is a rule that says a

5    discrepancy requires notice to be provided, then notice should

6    be provided.  An omission is a change in that document, and

7    then there should have been notification.

8            Separately, and, perhaps more importantly, Dr. Pena

9    testified that, unequivocally, Mr. Saab was not on a permanent

10   mission.  He testified that he was only on a special mission.

11   He testified that a permanent mission, the head of a permanent

12   mission, as Mr. Saab claims he is, under Venezuelan law, under

13   the Venezuelan Constitution, requires the National Assembly's

14   approval and publication in the Gaceta.

15           He then testified that Mr. Saab, as a special envoy on

16   a temporary mission, did not require any National Assembly

17   approval and did not require publication in the Gaceta.  And,

18   that was because Mr. Saab was not a head of a permanent

19   mission.  He was not on a permanent mission.  Instead, he was

20   solely on a special mission.

21           That, in and of itself, that testimony from their own

22   expert, that concession as to what the Venezuelan constitution

23   states must be required for an official head of a diplomatic

24   permanent mission under Venezuelan law is dispositive, itself,

25   that Mr. Saab was not on a permanent mission, and that the VCDR

1   and the protections thereunder do not apply to Mr. Saab.

2       What is more, there is a question as to whether or not

3   Mr. Saab was an official diplomat of any kind at the time of

4   his arrest.  There were letters that were shown by the defense

5   that had references towards Mr. Saab being a special envoy.

6   But, in the letters that were dated on the days just following

7   his arrest, there was four letters sent to Interpol in Cabo

8   Verde from the Maduro regime.

9       And, in not a single one of those letters was there a

10  reference to Mr. Saab as a special envoy.  They referred to him

11  as a citizen of Venezuela.  They referred to him as an agent of

12  Venezuela.  They referred to him as standing in place and in

13  the stead of Nicolas Maduro, himself.

14      It was a, let's throw everything at the wall and see

15  what sticks to try to get him some kind of immunity.  But,

16  there was no reference to his alleged official title as special

17  envoy until a later time.

18      Maria Gonzalez, who testified, and was a witness called

19  by Mr. Saab, testified that she sees formal communications from

20  the Foreign Ministry come across her desk all the time.  She

21  says she receives one to two hundred a month for about

22  30 years, totalling 30 to 60,000 documents that she has seen

23  that she has written the official communique numbers on that

24  she has stamped.

25      She testified that formality in those types of letters

1   are of the utmost importance, and that in official

2   communications, if a person was -- had a title, that she would

3   expect to see that title.  If a person was officially a special

4   envoy, she would expect to see that person referenced as a

5   special envoy.

6         If we look at the documents later in time where

7   Mr. Saab and the Maduro regime had come to rest on the title of

8   special envoy being the term of art they would use for

9   Mr. Saab, those titles are all throughout the documents.

10         Defense Exhibits H and L that were shown to the Court

11   here repeatedly reference special envoy, Mr. Saab.  Special

12   envoy, Saab.  Special envoy to the Venezuelan government, Saab.

13         In those letters, the letters that were written by

14   Mr. Jorge Arreaza, the foreign minister who allegedly appointed

15   Mr. Saab as a special envoy in 2018, those letters written by

16   him in the days following his capture in Cabo Verde include

17   absolutely no reference to a special envoy.

18         The letters that Mr. Saab was traveling with, the three

19   documents that Mr. Arrieche allegedly remembers picking up, the

20   same Mr. Arrieche who, if the Court could recall, could

21   remember everything he was supposed to remember when he was

22   being asked questions on direct, but as the head of security,

23   he couldn't remember who Mr. Saab traveled with, couldn't

24   remember where Mr. Saab traveled, couldn't remember anything

25   else, other than these three specific documents of which he was

1    called here to testify about.

2         But, those three documents, even assuming Mr. Saab did

3    have them, prove nothing about the actual nature of Mr. Saab's

4    official role as diplomat.  The letters are letters from

5    Nicholas Maduro and his vice-president to individuals in the

6    Iranian government.  They make no reference to Mr. Saab.  They

7    make no reference to any of his roles or responsibilities.

8    They simply show that Mr. Saab was, at best, a courier.  But,

9    being a courier of diplomatic communications does not make one,

10   himself, a diplomat, certainly doesn't make someone a permanent

11   diplomat as a head of permanent mission.

12        THE INTERPRETER:  Counsel, could you slow down?

13        MR. KRAMER:  Mr. Saab's explanation regarding his

14   passport is similar to the explanation regarding the Gaceta.

15   It is ever-changing as to what best suits his argument at the

16   given time.  When he was in Cabo Verde, he claimed that he did

17   not travel with his passport because he left it at home.  And,

18   that is noted in a Barlovento court opinion that was introduced

19   by the government as Government's Exhibit 3 last week at

20   Page 8.  On Page 8 of that opinion, he states that he left his

21   diplomatic passport in Venezuela.

22        Following making that statement, and following the

23   motion to dismiss filed by Mr. Saab, wherein he provided a

24   picture or image of a diplomatic passport, it was addressed

25   that that passport wasn't even valid at the time of his arrest

1    in June of 2020.

2          So, in the reply brief, the argument changed.  Instead

3    of saying he left it at home, they argued that he did not bring

4    his passport with him because it had expired during the COVID

5    pandemic.  And, because it was during the COVID pandemic, he

6    could not obtain a new passport and he was, therefore,

7    traveling under his normal, ordinary Venezuelan passport.

8          Then we heard Mr. Plathe testify, who was the director

9    of SAIME, S-A-I-M-E, who was in charge of providing passports,

10   including diplomatic passports.  Mr. Plathe testified that

11   indeed, yes, the offices, due to the pandemic, were closed.

12   But, that a passport could absolutely have been provided,

13   created, and given to Mr. Saab if he needed a diplomatic

14   passport prior to his travel.  The fact that the offices were

15   closed due to the pandemic made no difference in that office's

16   ability to provide diplomatic passports to individuals who were

17   in need.

18         He also testified that the length of the validity of an

19   official diplomatic passport is based on a request from the

20   Foreign Ministry.  The Foreign Ministry can request those

21   passports to be valid for as little as one year and as many as

22   five years.

23         Mr. Saab's passport was noted for one year.  That is

24   the shortest period of time, and a period of time that was

25   asked for by the Foreign Ministry.  That, again, goes to the

1    point, Mr. Saab was not on a permanent mission.  He was given

2    the least amount -- even assuming this is all accurate and

3    true, he was given the shortest period of time a diplomatic

4    passport would indicate.  At best, he was on a special mission

5    and not on any kind of temp -- excuse me, permanent mission.

6         Regarding the passport, itself, there is no evidence

7    Mr. Saab actually ever traveled on a diplomatic passport.

8    Mr. Arrieche, again, head of security, testified that on March

9    8, 2020, there was a trip to Iran, as well.  On that trip, the

10   diplomatic passport was still valid.  Mr. Arrieche stated he

11   had no recollection and did not provide the diplomatic passport

12   on Mr. Saab's travel.  Indeed, the diplomatic passport that was

13   provided as an attachment to the Court in the motion to dismiss

14   only includes the image of Mr. Saab's face saying he had a

15   diplomatic passport.  There is no images of the rest of the

16   passport or any of the internal pages that would indicate he

17   ever actually traveled on that passport, that there are any

18   entry stamps from any other country.  It's just a picture of a

19   passport that wasn't valid at the time of his arrest, and, that

20   per Mr. Plathe, could have been renewed and provided to him if

21   he was actually on diplomatic official travel on his June trip.

22        All this goes to the point that Mr. Saab was not

23   actually an official diplomat in June of 2020.  He had no

24   status.  He may have acted as a courier, but that does not make

25   him an actual diplomat.

1          Finally, we look to one of the defense -- excuse me, a

2     witness that was on the defense's list, but not actually

3     called, Dr. Pinto.  While Dr. Pinto did not testify, he did

4     provide two declarations to this Court; one, I believe related

5     to the fugitive, it's entitled Doctrine Motion, and another

6     related to the motion to dismiss.

7          Dr. Pinto was Mr. Saab's counsel in Cabo Verde, his

8     lead counsel.  Mr. Pinto was the secretary of -- former

9     Secretary of State of Cabo Verde.

10         In his declaration, he repeatedly referred to Mr. Saab

11    as being on a special mission, not a permanent mission.  Cabo

12    Verde is a party to the Vienna Convention on diplomatic

13    relations.  It's also a party to the UN Convention on Special

14    Missions.  But, Dr. Pinto, on behalf of Mr. Saab, only argued

15    before the Cabo Verde courts that Mr. Saab had any protections

16    under the UN Convention on Special Missions, and never made any

17    argument that he was on a permanent mission or had any

18    protections under the Vienna Convention.

19         If Mr. Saab actually had any status under the Vienna

20    Convention, it stands to reason that he would have put forth

21    his best argument, that Dr. Pinto would have put forth his best

22    argument before that Court to fight extradition.  He did not

23    make any arguments under the Vienna Convention.  That is not

24    because the Vienna Convention doesn't apply in Cabo Verde.  It

25    is because it doesn't apply to Mr. Saab.

1          And, the Cabo Verde court echoed that decision.  It

2    found that based on what they had seen, the facts that they had

3    seen, Mr. Saab was on a special mission.  But, under special

4    mission immunity, there is a requirement of notice for travel.

5    And, as a result of there being a requirement at least for

6    notice, and possibly even for consent, and the fact that

7    Mr. Saab -- the Maduro regime provided no notice to Cabo Verde,

8    they ruled that he was validly extraditable to the United

9    States.

10         The evidence presented last week, at best, shows

11   Mr. Saab was on a temporary mission.  But, based on the

12   falsification of the Gaceta to try to bolster an argument that

13   wasn't there in the first place, and based on these issues

14   related to diplomatic passports, and based on the fact that the

15   letters, themselves, where they argued he was a diplomat had no

16   reference to his official title in the early days of his

17   extradition process, the government submits that the defense,

18   Mr. Saab, has not put forth any adequate evidence to show he is

19   a diplomat at all, much less one under the VCDR.

20         Recognizing that the facts show that Mr. Saab was, at

21   best, on a temporary mission, the -- Mr. Saab attempts to rely

22   solely on Abdulaziz and the 11th Circuit to say that you don't

23   need to be on a permanent mission to have status under the

24   VCDR.

25         In the Abdulaziz opinion, Prince Abdulaziz was a prince

1    and a member of the Saudi royal family that was sued in the

2    United States.

3          After that suit commenced, the embassy for Saudi Arabia

4    in the United States provided notice to the United States State

5    Department that Mr. Abdulaziz -- or Prince Abdulaziz, excuse

6    me -- was a special envoy for matters concerning the Saudi

7    Arabian government; further, that he had specific diplomatic

8    functions in the United States, he possessed a diplomatic

9    passport, and he possessed a diplomatic A-1 visa from the

10   United States upon his arrival.

11         The United States State Department receiving that

12   information provided a certification that said Prince Abdulaziz

13   was a special envoy, and that he was entitled to protections

14   under the VCDR.

15         The Court, having had certification and relying almost

16   exclusively on that certification said, since the State

17   Department said he has protections under VCDR, the suit was

18   dismissed.

19         Here, I think, there are points made by defense that

20   there was somehow no connection to the permanent mission

21   because Mr. -- excuse me, Prince Abdulaziz was not in

22   Washington, DC.  First, your Honor, that is not necessary to be

23   a permanent mission diplomat.  In countries that are large,

24   like the United States, you have a main embassy in the United

25   States.  But, you also have consulates and locations all

1    throughout the country.

2         What is relevant here is that Prince Abdulaziz was

3    noticed by the permanent mission.  He was noticed by the

4    embassy in the United States for Saudi Arabia.  The fact that

5    he wasn't living in DC is not dispositive.  He is allowed to

6    live elsewhere and still have the certifications.  And, what is

7    more, what is important, is the fact that the State Department

8    is the one that is certified in its having protections under

9    the VCDR.

10         In Abdulaziz, the phrase "special envoy," itself, was

11    not dispositive.  The issue wasn't whether he was a special

12    envoy, an agent, or representative.  The 11th Circuit, in

13    Abdulaziz, said that the State Department has to have broad

14    discretion in classifying diplomats, and that is necessary

15    because foreign countries rank and name their diplomats, not

16    the United States.

17         What is important is the actual nature of what that

18    diplomat was.  And, what the Court specifically relied on and

19    found controlling was that the certification of the State

20    Department, itself -- they held that courts have generally

21    accepted as conclusive the views the State Department has as to

22    the fact of diplomatic status.  Here, in Abdulaziz -- excuse

23    me -- in Abdulaziz, the Court or the State Department held or

24    certified that Mr. Saab did not have -- or, excuse me, I

25    apologize -- in Abdulaziz, the Court held that Prince Abdulaziz

1    was a special envoy with specific protections under the Vienna

2    Convention.

3         Here, the State Department certified that Mr. Saab has

4    no such protections, and they are aware of no reason that he

5    should have any immunity in the United States.  That is

6    completely in opposite to the Abdulaziz case.

7         Indeed, that specific issue as to the factual question

8    of diplomatic status, in Saab's motion, they concede that when

9    it relates to the factual question of diplomatic status,

10   specific deference is warranted to the State Department.  And

11   that's based on various cases.  The Supreme Court, in Emering

12   Bays, said "The certificate of the Secretary of State is the

13   best evidence to prove the diplomatic character of an

14   accredited person.  We do not assume to sit in judgment upon

15   the decision of the executive in reference to the public

16   character of a person claiming to be a Foreign Minister."

17        In Weixum versus Xilai, that's W-E-I-X-U-M, versus

18   X-I-L-A-I, it is a District of DC case out of 2008, they held

19   that you accord the executive branch deference in determining

20   whether an individual is protected by immunity, and that the

21   executive branch's suggestion of immunity is referred to as it

22   is influenced by the longstanding reluctance or the judicial

23   branch to intrude into the conduct of Foreign Affairs, a matter

24   exclusively vested in the executive branch by our founding

25   fathers.

1          What is more, Weixum is actually instructed here

2     because in Weixum, they were claiming immunity as a special

3     mission.  But, in that court case, the United States did not

4     intercede on behalf of Weixum, as the diplomat under the VCDR,

5     instead, they sought to interject, under 28 U.S.C. 517, the

6     interest of US in pending suits.  There is no claim whatsoever

7     that Mr. Weixum, an individual who was on a special mission,

8     had any immunities under the VCDR.  Instead, he was under a

9     separate level of protection.

10          Given that the VCDR does not apply, we are left with a

11     special mission, your Honor, in customary and international

12     law.  Here, whether or not Mr. Saab has any kind of protection

13     under the Special Mission Convention was the exact decision and

14     exact ruling that was made before the Cabo Verde courts.

15     Mr. Saab, in that situation, as I previously stated, the Cabo

16     Verde courts found he was on a special mission, but that he had

17     no immunity based on a lack of notice.

18          Mr. Saab now looks for this Court to give him a second

19     bite of the apple in making those same arguments.  But, the

20     Court should refuse to do so under the Active State Doctrine.

21     In U.S v. Knowles, the 11th Circuit states that the Active

22     State Doctrine is based on principles of international --

23          THE INTERPRETER:  Counsel, could you repeat the last

24     sentence for the interpreter?

25          MR. KRAMER:  The United States versus Knowles, the 11th

1    Circuit held that the Active State Doctrine is based on

2    Principles of International Comity and expediency and precludes

3    the Court of this country from inquiring into the public acts

4    of a recognized foreign sovereign power committed within its

5    own territory.  Such official acts include extraditions.  In

6    fact, Knowles was about a case where the 11th Circuit refused

7    to second-guess the Bahamian court's order to extradite the

8    individual.

9         Even where the Court does not fully apply the Active

10   State Doctrine and not second-guess the orders of foreign

11   courts, there is still, under Principles of International

12   Comity -- should be strong deference to those rulings of the

13   foreign courts.

14        Even if this Court were not to apply the Active State

15   Doctrine or to defer to the Cabo Verde courts, Mr. Saab still

16   would not have any immunity under the Special Mission

17   Convention or Customary International Law related to the

18   Special Mission Convention.  The United States is not a

19   signatory to the Special Mission Convention; neither, for that

20   matter, is Venezuela.

21        Under customary and international law, and excuse me,

22   under the debates related to the convention on special

23   missions, there were specific debates related to the

24   transit-based immunity issue in the Special Mission Convention.

25   There was concern by some countries that the convention only

 1    required notice and did not actually require affirmative

 2    consent.  As a result of that, and essentially various other

 3    issues, a number of countries did not sign onto that

 4    convention.  Again, the United States, the United Kingdom,

 5    France, Venezuela are all countries that did not sign on to it.

 6         Mr. Saab says it is customary international law anyway.

 7    However, a court case before -- in the Southern District of

 8    Florida before Judge Moore, United States versus Soto, held and

 9    addressed the very question of whether or not the Special

10    Mission Convention was customary international law.

11         In that case, Judge Moore held that it was not, noting

12    in part for his reasoning, that no members of UN Security

13    Council had signed on to the treaty.  That was true when Judge

14    Moore made the decision in 1997.  It is still true today.  The

15    reasoning still stands as to why it is not indicative of being

16    customary international law.

17         Further, even if it were, this Court would be in the

18    same situation as the Cabo Verde court was.  No notice was

19    provided.  Cabo Verde has provided a certification of no

20    records to say that no notice was given to them indicating that

21    Mr. Saab provided notice of his travel for Cabo Verde and, as

22    such, even if it did apply and even if the Court were to

23    conduct the same analysis here, Mr. Saab would not have any

24    protection under the Special Mission Convention or customary

25    international law.

1          Finally, Mr. Saab, through an essential Hail Mary

2     argument, says that somehow, there's a force majeure component

3     to this that should usurp all the other problems with his case

4     and that, therefore, he should have diplomatic immunity.

5          Under that, he says that force majeure applies when

6     something occurs that is no fault of their own.  Another way to

7     look at it is if the event is unanticipated or uncontrolled.

8          Here, the operative act was Mr. Saab being stopped in

9     Cabo Verde and arrested to start his extradition proceedings.

10    That happened because Mr. Saab's plane could not do a direct

11    flight from Venezuela to Iran.  It needed to have a refueling

12    stop.  It scheduled that refueling stop to occur in Cabo Verde.

13    A scheduled refueling stop is neither unanticipated or

14    unplanned.  In fact, it is very planned and anticipated.  It is

15    something that was done with intentionality.  If Mr. Saab or

16    the Maduro regime felt Mr. Saab was a diplomat and that he had

17    any such immunities, they could have provided notice to Cabo

18    Verde saying, "This individual, who is a diplomat, is going to

19    travel through your country."

20         They did not.  And, as such, they forgo any protections

21    under the UN Convention of Special Missions under that

22    provision.

23         In terms of the movement of Mr. Saab to the United

24    States, again, Mr. Saab -- there is nothing about this that was

25    unexpected or unknown.  He was publicly indicted.  There were

1    press releases about his indictment.  There was a State

2    Department reward, leading to -- providing money that would

3    lead to his capture or arrest and, more importantly, he was

4    actually captured in Cabo Verde, and a 16-month long proceeding

5    went on wherein he lost at various different courts and

6    appealed, indicating that he would eventually be extradited to

7    the United States.

8            During that entire process, the fact of Mr. Saab's

9    eventual extradition and moving to the United States may have

10   been undesired by Mr. Saab.  But, it certainly wasn't unknown

11   or unanticipated.  Again, no notice was provided, no attempts

12   to notice were provided to the United States related to his

13   travel.

14           Mr. Saab seeks to dismiss the Government's indictment,

15   and, for any number of reasons, the Court can dismiss -- excuse

16   me, can deny that motion to dismiss, whether it is the Court

17   agreeing that as a member of the Maduro regime he has no

18   protections here, the Court could choose to deny the motion.

19           It could be on the fact that the Vienna Convention

20   doesn't apply because he is not a permanent mission diplomat

21   and, therefor, has no protections under the Vienna Convention.

22   For that reason, the Court could choose to deny the motion to

23   dismiss.

24           The Court could also deny the motion to dismiss based

25   on the Active State Doctrine and the fact that Cabo Verde

1   courts should have a say in what happened when he was traveling

2   through their country.

3          The Court could also deny the motion to dismiss purely

4   based on the UN Special Missions Convention, the fact that we

5   are not signatories and even if it were to apply, he doesn't

6   meet the requirements.  For any number of these reasons, the

7   Court could deny this motion and should deny this motion, and

8   the government would ask that the Court denies it on all these

9   reasons.

10          If the Court has any questions for the government, I am

11   happy to answer any of them.  Otherwise, I do not need the rest

12   of my time.

13          THE COURT:  If I grant their motion, what is the proper

14   remedy?

15          MR. KRAMER:  The government's view of the proper remedy

16   would be if you were to grant his motion, that it would be to

17   release Mr. Saab but to not dismiss the indictment.  Mr. Saab

18   has been indicted prior to -- you know, he was indicted in

19   2019.  That was prior to this trip.  He is not, we believe, an

20   official diplomat, he is not part of the valid Venezuelan

21   government, and that his actions that took place prior to any

22   standing as a diplomat should not result in a full dismissal of

23   the case against him.  At best, it should result in a release.

24          THE COURT:  Thank you.

25          All right.  Mr. Rivkin?

1            MR. CASEY:  Your Honor, would the Court allow me to do

2      the rebuttal?

3            THE COURT:  Sure.

4            MR. RIVKIN:  I want to apologize to the Court, but I am

5      not feeling very well.

6            THE COURT:  That's okay.

7            MR. CASEY:  Very briefly, on the point of Zivotofsky,

8      Zivotofsky was a separation of powers case.  It was not an

9      immunities case.  The question being could Congress force the

10     executive to recognize Jerusalem as part of Israel.

11           The real interesting part of Zivotofsky is, finally,

12     the Supreme Court said that Curtiss-Wright Export, which the

13     government has heard, decades, relied on to say that only the

14     president has foreign affairs authority, did not say that.  And

15     so, that case is no longer applicable, anywhere.

16           As to Cordones, the immunity issue was, indeed,

17     different.  It was official acts immunity.  It was not the kind

18     of status immunity that Mr. Saab has.  And, ultimately, what

19     the Court said was -- had nothing to do with Mr. Maduro.  It

20     said, "What you did was not part of your official acts, part of

21     your official duties."

22           In terms of the Active State Doctrine, there is simply

23     no -- no question of Cape Verde law at issue here.  There is no

24     basis on which to apply the Active State Doctrine, either

25     discretionary or mandatory.

1          On the question of Abdulaziz, always keep in mind that

2     there is only one head of mission in a permanent mission.  So,

3     the 11th Circuit said that Prince Abdulaziz was also a head of

4     mission, that is to say, he was head of a temporary mission.

5     So, it is clearly a temporary mission, it had nothing to do

6     with the permanent mission in Washington.  There cannot be two

7     heads of mission.

8          And, let's see, one last thing with respect to the

9     treaty, itself.  If you actually look at the treaty, there is

10     no indication in the treaty that says temporary missions are

11     not included.  And, importantly, the argument the government is

12     making on that was made to both this Court and to the 11th

13     Circuit in Abdulaziz.  Indeed, they even cited some of the same

14     authorities the government has cited in its brief, and it was

15     rejected in that case.  And, your Honor, it also should be

16     rejected here.

17          Thank you.

18          MR. RIVKIN:  If I can have the Court's indulgence just

19     to make one point?

20          THE COURT:  All right.  Make sure you speak into the

21     microphone.

22          MR. RIVKIN:  Thank you, your Honor, I will come up.

23          This Court was obviously quite interested in the

24     hypothetical where former President Trump designates himself

25     head of government and engages in some effort to obtain

1    benefits from it.

2         I wanted to emphasize that one of the key points of

3    Abdulaziz is the classification of a given envoy, not immunity,

4    which is a question of interpretation, but classification is a

5    matter between the sending state and the receiving state.  So,

6    if former President Trump were to escape -- clearly, he is

7    entitled to some immunity -- the United States, obviously, will

8    obtain his extradition.  It is the United States that is a

9    sending state.

10        And, your Honor would have an opportunity, or any other

11   court would have an opportunity to conclude, since the U.S. is

12   the sending state, and thus is justiciable, who, in fact, is a

13   special envoy.  To emphasize it, the heart of Abdulaziz and,

14   your Honor, perhaps can --

15        MS. KEOWN:  Your Honor, can I publish, please?

16        MR. RIVKIN: -- see my point.  So, this is a totally

17   different situation where you have two third countries, one is

18   sending and receiving, take a position, recognize itself as

19   fundamentally different from the United States.  It is actually

20   at the heart of Abdulaziz where the 11th Circuit, exercising

21   its own independent judicial concern, concluded that as a

22   matter of treaty interpretation, which is something that

23   Article 1 did, as far as the DRA is concerned, Article 3 has

24   full discretion, it is a question of the applicability of the

25   Vienna Convention to the head of special mission, temporary or

1    permanent, by Mr. Abdulaziz, that made his immunity.

2            As far as his recognition as a diplomat by the United

3    States, it would have been no case, your Honor, that was in

4    play because the people, the police officers were arguing that

5    even if he was a diplomat accepted by the United States,

6    precisely because he was not a member of a permanent diplomatic

7    establishment of Saudi Arabia, he was not entitled to immunity.

8            So what the DOJ is actually doing, your Honor, is

9    asking this Court to flout Abdulaziz.  That cannot be

10   countenanced, in my opinion.

11           And one other point, because your Honor seemed to be

12   asking the question about it, as far as the timing of immunity

13   is concerned, if you are entitled to diplomatic immunity under

14   VCDR today and you did something 20 years ago, you are entitled

15   to immunity today -- it doesn't matter if you had it at the

16   time you did it, it's immunity at the time the motion to

17   dismiss in this case is being brought.  And, in fact, we think

18   that absolutely, the import of Abdulaziz is such that you

19   should grant the motion to dismiss and take steps consistent,

20   consistent with that position.

21           One final point, DOJ has talked about Special Mission

22   Convention.  The reason a Special Mission Convention is in

23   place is precisely to deal with the multitude of people,

24   hundreds of them, who comprise special mission -- special

25   missions, not the head of a special mission, who is covered by

1   VCDR, that presents a perfectly clear relationship between the

2   two, between the two missions.  And, again, as far as that

3   Active State Doctrine and all the other stuff, none of it

4   applies because we are not challenging anything as far as his

5   extradition is concerned, to paraphrase the doctrine or

6   anything like that.

7           Thank you, your Honor.  I appreciate your indulgence.

8           THE COURT:  All right.  Thank you.

9           I thank you for your presentations.  I will take this

10  under advisement, and I will get the order out before the end

11  of next week.

12          We are in recess.  Thank you.

13          (Proceedings concluded at 10:38 a.m.)

14

15                      C E R T I F I C A T E

16

17

18          I hereby certify that the foregoing is an

19  accurate transcription of the proceedings in the

20  above-entitled matter.

21

22  December 20, 2022        /s/Sharon Velazco
    DATE                     SHARON VELAZCO, RPR, FPR
23                           Official Court Reporter
                             United States District Court
24                           400 North Miami Avenue
                             8th Floor
25                           Miami, Florida 33128

## /

**/s/Sharon** [1] - 64:21

## 1

**1** [3] - 1:8, 39:19, 62:23
**1050** [3] - 2:2, 2:6, 2:10
**10:38** [2] - 1:6, 64:13
**1100** [3] - 2:3, 2:7, 2:11
**11th** [17] - 9:14, 16:7, 24:8, 37:6, 37:9, 37:12, 38:14, 41:11, 50:22, 52:12, 54:21, 54:25, 55:6, 61:3, 61:12, 62:20
**12** [1] - 9:3
**12G** [1] - 2:19
**12th** [4] - 7:22, 8:2, 8:10, 13:19
**1400** [1] - 1:17
**14th** [1] - 35:6
**15** [2] - 4:19, 37:18
**15th** [1] - 2:22
**16-month** [1] - 58:4
**17** [1] - 18:16
**1997** [1] - 56:14
**1:19-CR-20450** [1] - 1:3
**1st** [3] - 7:5, 7:15, 7:16

## 2

**2** [1] - 39:14
**2-C** [1] - 2:22
**20** [3] - 1:5, 63:14, 64:21
**200** [1] - 2:14
**20005** [1] - 1:18
**20036-5318** [3] - 2:3, 2:7, 2:11
**2008** [1] - 53:18
**2018** [9] - 6:15, 6:21, 6:24, 40:15, 41:15, 41:18, 42:4, 42:6, 45:15
**2019** [1] - 59:19
**2020** [15] - 7:5, 7:15, 7:16, 7:20, 8:10, 8:12, 9:3, 9:14, 14:14, 15:25, 16:2, 35:6, 47:1, 48:9, 48:23
**2021** [1] - 42:15
**2022** [5] - 1:5, 20:7, 38:20, 42:15, 64:21
**21** [1] - 26:13

**2300** [1] - 2:15
**28** [1] - 54:5
**29** [4] - 32:3, 32:4, 33:1, 33:22

## 3

**3** [2] - 46:19, 62:23
**30** [2] - 44:22
**32801** [1] - 2:15
**33128** [2] - 3:5, 64:24
**33132** [2] - 1:22, 2:23
**33140** [1] - 2:19
**3rd** [4] - 7:19, 8:16, 21:6

## 4

**40.1** [5] - 29:16, 29:25, 32:20, 32:24, 33:22
**400** [2] - 3:4, 64:23
**4th** [1] - 1:21

## 5

**5** [1] - 29:2
**517** [1] - 54:5
**555** [1] - 2:22
**5750** [1] - 2:18

## 6

**6/20/2020** [1] - 10:13
**60,000** [1] - 44:22
**6373** [2] - 41:12, 41:20

## 7

**77** [1] - 1:8

## 8

**8** [3] - 46:20, 48:9
**815229** [1] - 38:21
**8th** [3] - 1:17, 8:12, 64:24

## 9

**99** [1] - 1:21
**9:02** [1] - 1:6
**9th** [2] - 6:15, 40:15

## A

**A-1** [1] - 51:9
**a.m** [3] - 1:6, 64:13
**Abdulaziz** [38] - 12:5, 25:3, 25:4, 25:10,

25:14, 26:3, 27:2, 27:8, 27:10, 27:22, 36:16, 36:20, 50:22, 50:25, 51:5, 51:12, 51:21, 52:2, 52:10, 52:13, 52:22, 52:23, 52:25, 53:6, 61:1, 61:3, 61:13, 62:3, 62:13, 62:20, 63:1, 63:9, 63:18
**ability** [1] - 47:16
**able** [2] - 33:23, 39:5
**above-entitled** [1] - 64:19
**absolutely** [7] - 29:5, 33:18, 40:12, 40:24, 45:17, 47:12, 63:18
**accept** [4] - 6:1, 12:9, 23:21, 24:14
**accepted** [10] - 11:19, 12:7, 21:19, 22:10, 22:14, 22:18, 23:14, 28:1, 52:21, 63:5
**accepting** [3] - 8:14, 21:9, 34:12
**accord** [1] - 53:19
**accreditation** [1] - 22:19
**accredited** [6] - 22:5, 22:9, 22:18, 24:15, 24:17, 53:14
**accurate** [2] - 48:2, 64:18
**accused** [2] - 16:19, 26:8
**acknowledged** [1] - 24:10
**acknowledges** [1] - 8:19
**acquitted** [1] - 16:22
**act** [1] - 57:8
**Act** [2] - 25:13, 28:3
**acted** [1] - 48:24
**acting** [3] - 7:17, 19:1, 41:5
**action** [1] - 22:16
**actions** [2] - 24:9, 31:11, 59:21
**Active** [9] - 54:20, 54:21, 55:1, 55:9, 55:14, 58:25, 60:22, 60:24, 64:3
**activities** [1] - 33:14
**acts** [4] - 55:3, 55:5, 60:17, 60:20
**actual** [5] - 37:14, 42:11, 46:3, 48:25, 52:17
**add** [2] - 29:9, 36:22

**address** [6] - 12:13, 21:25, 34:11, 36:1, 39:10, 40:8
**addressed** [3] - 38:15, 46:24, 56:9
**addressing** [1] - 18:8
**adequate** [1] - 50:18
**administrative** [1] - 19:21
**ado** [1] - 20:11
**advisement** [1] - 64:10
**Advisor** [2] - 10:21, 10:24
**Affairs** [3] - 7:13, 35:12, 53:23
**affairs** [1] - 60:14
**affect** [1] - 16:25
**affected** [1] - 20:16
**affects** [1] - 38:15
**afterwards** [1] - 43:3
**AG** [1] - 14:19
**age** [1] - 26:13
**aged** [1] - 26:20
**Agent** [1] - 4:6
**agent** [4] - 17:8, 32:5, 44:11, 52:12
**ago** [1] - 63:14
**agreeing** [1] - 58:17
**agreement** [1] - 14:3
**Agricultural** [1] - 10:22
**Agriculture** [1] - 10:20
**aid** [4] - 5:25, 6:18, 7:8, 14:16
**aircraft** [2] - 29:22, 29:23
**airport** [1] - 29:6
**AL** [1] - 10:11
**ALEX** [1] - 1:7
**Alex** [5] - 4:2, 4:4, 8:21, 15:10, 18:9
**ALEXANDER** [1] - 1:15
**alexander.kramer@ usdoj.gov** [1] - 1:18
**Alhambia** [1] - 26:7
**alleged** [3] - 42:17, 42:18, 44:16
**allegedly** [3] - 40:15, 45:14, 45:19
**allow** [1] - 60:1
**allowed** [2] - 33:11, 52:5
**alluded** [1] - 38:5
**almost** [1] - 51:15
**alone** [1] - 11:11
**AM** [1] - 9:13

**ambassador** [4] - 7:21, 8:1, 41:3
**ambassadors** [1] - 22:8
**AMERICA** [1] - 1:4
**America** [1] - 4:2
**American** [1] - 24:6
**amount** [1] - 48:2
**analysis** [1] - 56:23
**answer** [5] - 5:20, 6:7, 11:12, 12:14, 59:11
**answered** [1] - 11:14
**anticipated** [4] - 17:4, 31:7, 31:9, 57:14
**anyway** [1] - 56:6
**AO** [2] - 15:16, 34:14
**apologize** [2] - 52:25, 60:4
**appeal** [2] - 37:5, 37:9
**appealed** [1] - 58:6
**APPEARANCES** [1] - 1:13
**appeared** [1] - 17:6
**apple** [1] - 54:19
**applicability** [1] - 62:24
**applicable** [1] - 60:15
**applied** [1] - 33:7
**applies** [7] - 36:15, 36:18, 39:23, 40:1, 40:2, 57:5, 64:4
**apply** [13] - 24:20, 30:10, 38:25, 44:1, 49:24, 49:25, 54:10, 55:9, 55:14, 56:22, 58:20, 59:5, 60:24
**appoint** [3] - 5:23, 11:16, 23:24
**appointed** [6] - 6:17, 12:15, 13:18, 18:15, 38:23, 41:6, 45:14
**appointing** [1] - 7:1
**appointment** [5] - 19:23, 20:15, 20:16, 21:2, 41:8
**appreciate** [2] - 36:5, 64:7
**appropriate** [2] - 32:7, 38:3
**appropriately** [1] - 36:24
**approval** [2] - 43:14, 43:17
**April** [7] - 6:15, 6:21, 6:24, 7:5, 7:15, 7:16, 40:15

**Arabia** [6] - 25:11, 27:24, 51:3, 52:4, 63:7

**Arabian** [1] - 51:7

**archives** [1] - 6:22

**area** [1] - 11:25

**argue** [1] - 15:18

**argued** [4] - 36:10, 47:3, 49:14, 50:15

**arguing** [1] - 63:4

**argument** [18] - 4:22, 5:19, 14:5, 21:22, 28:19, 34:5, 34:10, 36:6, 36:17, 40:16, 46:15, 47:2, 49:17, 49:21, 49:22, 50:12, 57:2, 61:11

**ARGUMENTS** [1] - 1:10

**arguments** [9] - 4:15, 12:14, 17:4, 19:15, 20:23, 36:7, 37:10, 49:23, 54:19

**arises** [1] - 24:9

**arrangements** [1] - 23:2

**Arreaza** [1] - 45:14

**arrest** [11] - 18:1, 30:16, 32:6, 32:10, 33:16, 33:19, 44:4, 44:7, 46:25, 48:19, 58:3

**arrested** [3] - 31:7, 35:7, 57:9

**Arrieche** [6] - 9:23, 10:3, 45:19, 45:20, 48:8, 48:10

**arrival** [1] - 51:10

**art** [1] - 45:8

**artfully** [1] - 14:6

**article** [2] - 35:2, 39:14

**Article** [9] - 29:16, 32:3, 32:4, 33:1, 33:22, 39:19, 62:23

**articles** [1] - 15:1

**Assembly** [1] - 43:16

**Assembly's** [1] - 43:13

**asserting** [1] - 19:5

**assignment** [1] - 24:18

**assist** [1] - 14:16

**associated** [2] - 15:21, 16:24

**assume** [2] - 37:5, 53:14

**assuming** [3] - 32:16, 46:2, 48:2

**ATF** [1] - 27:15

**attachment** [1] - 48:13

**attack** [2] - 19:8, 32:8

**attempted** [1] - 30:2

**attempts** [2] - 50:21, 58:11

**attention** [2] - 6:8, 7:25

**Attorney** [2] - 27:12, 27:13

**Attorney's** [1] - 1:21

**attorneys** [2] - 4:20, 5:5

**authentic** [2] - 8:5, 8:24

**authenticity** [5] - 6:19, 7:11, 21:6, 21:8, 21:10

**authorities** [1] - 61:14

**authority** [5] - 19:3, 19:4, 22:13, 38:12, 60:14

**Ave** [3] - 2:2, 2:6, 2:10

**Avenue** [5] - 1:17, 2:14, 2:18, 3:4, 64:23

**avenue** [1] - 19:8

**aware** [4] - 14:21, 15:6, 15:13, 53:4

---

**B**

**backs** [1] - 33:15

**Bahamian** [1] - 55:7

**Baker** [4] - 2:2, 2:6, 2:10, 2:14

**Barlovento** [2] - 17:12, 46:18

**Barr** [1] - 4:9

**BARR** [12] - 2:1, 4:9, 4:18, 5:2, 5:9, 5:14, 11:23, 12:13, 13:9, 16:14, 17:16, 20:5

**base** [1] - 37:24

**based** [2] - 19:10, 26:5, 27:9, 31:4, 31:20, 33:6, 36:12, 36:21, 37:12, 37:22, 47:19, 50:2, 50:11, 50:13, 50:14, 53:11, 54:17, 54:22, 55:1, 55:24, 58:24, 59:4

**basic** [2] - 24:16, 29:17

**basis** [2] - 32:15, 60:24

**Bays** [1] - 53:12

**BC** [1] - 6:15

**BD** [1] - 7:5

**Beach** [1] - 2:19

**bearer** [1] - 9:17

**bears** [1] - 35:15

**became** [1] - 27:13

**becomes** [1] - 14:3

**BEFORE** [1] - 1:11

**behalf** [10] - 4:5, 4:8, 4:10, 14:22, 15:14, 19:1, 34:6, 37:12, 49:14, 54:4

**behaved** [1] - 5:7

**behind** [1] - 33:15

**behold** [1] - 42:15

**belongings** [1] - 10:6

**benefits** [1] - 62:1

**best** [10] - 40:9, 46:8, 46:15, 48:4, 49:21, 50:10, 50:21, 53:13, 59:23

**better** [2] - 20:3, 29:6

**between** [8] - 8:5, 8:24, 15:4, 15:16, 35:5, 62:5, 64:1, 64:2

**beyond** [1] - 30:4

**Biden** [1] - 24:5

**big** [3] - 13:9, 20:6, 39:11

**binding** [2] - 17:18, 25:9

**bit** [1] - 4:22

**bite** [1] - 54:19

**BK** [1] - 17:10

**blog** [5] - 34:23, 34:24, 35:2, 35:6, 35:16

**Bloomberg** [1] - 15:1

**Bolivarian** [1] - 8:20

**bolster** [1] - 50:12

**Bond** [1] - 1:16

**bought** [1] - 29:24

**bound** [2] - 17:21, 23:5

**branch** [3] - 53:19, 53:23, 53:24

**branch's** [1] - 53:21

**brick** [1] - 39:22

**brief** [2] - 47:2, 61:14

**briefcase** [1] - 10:2

**briefly** [1] - 60:7

**briefs** [1] - 26:7

**bring** [2] - 21:4, 47:3

**broad** [1] - 52:13

**broken** [1] - 30:7

**brokering** [2] - 15:6, 15:10

**brought** [5] - 30:14, 30:17, 31:18, 31:21, 63:17

**BU** [1] - 14:12

**Building** [1] - 1:16

**business** [2] - 17:3, 27:11

**buy** [1] - 29:25

**BY** [1] - 3:1

---

**C**

**Cabo** [23] - 23:3, 37:23, 44:7, 45:16, 46:16, 49:7, 49:9, 49:11, 49:15, 49:24, 50:1, 50:7, 54:14, 54:15, 55:15, 56:18, 56:19, 56:21, 57:9, 57:12, 57:17, 58:4, 58:25

**Cacciona** [1] - 32:24

**Callow** [1] - 4:6

**cannot** [3] - 42:12, 61:6, 63:9

**capacities** [3] - 25:23, 33:3, 33:4

**capacity** [4] - 7:7, 7:10, 7:23, 8:2

**Cape** [19] - 5:17, 9:22, 10:6, 11:21, 17:7, 17:12, 17:15, 17:17, 17:22, 18:3, 18:8, 18:19, 21:15, 29:23, 30:2, 30:5, 30:7, 30:15, 60:23

**capture** [2] - 45:16, 58:3

**captured** [1] - 58:4

**Caracas** [3] - 7:21, 8:13, 29:22

**carry** [1] - 32:22

**carrying** [4] - 9:7, 9:12, 21:11, 28:20

**case** [36] - 12:5, 12:6, 12:9, 20:3, 22:15, 23:18, 23:19, 23:21, 25:21, 26:6, 27:2, 27:10, 28:4, 28:16, 29:21, 32:2, 32:22, 32:23, 32:24, 33:1, 38:20, 53:6, 53:18, 54:3, 55:6, 56:7, 56:11, 57:3, 59:23, 60:8, 60:9, 60:15, 61:15, 63:3, 63:17

**CASE** [1] - 1:3

**cases** [3] - 22:3, 28:17, 53:11

**CASEY** [10] - 2:5, 21:23, 23:6, 23:13, 23:18, 24:22, 32:19,

**34:2, 60:1, 60:7**

**Casey** [6] - 4:11, 4:23, 12:13, 14:5, 16:6, 21:22

**category** [1] - 31:14

**Certain** [1] - 28:21

**certain** [5] - 34:25, 35:1, 40:18, 40:19

**certainly** [8] - 13:23, 16:23, 17:21, 22:23, 24:22, 39:2, 46:10, 58:10

**certificate** [1] - 53:12

**certification** [12] - 22:4, 25:12, 25:20, 28:5, 28:9, 36:21, 51:12, 51:15, 51:16, 52:19, 56:19

**certifications** [1] - 52:6

**certified** [3] - 52:8, 52:24, 53:3

**certify** [2] - 25:9, 64:17

**certifying** [1] - 28:7

**chain** [1] - 30:6

**challenging** [1] - 64:4

**change** [3] - 36:16, 42:4, 43:6

**changed** [4] - 25:19, 42:6, 42:9, 47:2

**changes** [5] - 42:10, 42:12, 42:14, 42:20

**changing** [1] - 46:15

**character** [2] - 53:13, 53:16

**charge** [2] - 30:22, 47:9

**cherry** [1] - 18:21

**cherry-picked** [1] - 18:21

**choose** [2] - 58:18, 58:22

**Circuit** [19] - 16:7, 24:8, 26:8, 32:25, 33:9, 37:6, 37:9, 37:12, 38:14, 41:11, 50:22, 52:12, 54:21, 55:1, 55:6, 61:3, 61:13, 62:20

**circumstance** [1] - 30:25

**cite** [1] - 12:5

**cited** [4] - 25:12, 26:7, 61:13, 61:14

**cites** [1] - 19:3

**citizen** [2] - 18:9, 44:11

**civil** [2] - 31:10, 33:1

**claim** [3] - 36:7, 39:5, 54:6

**claimed** [2] - 38:21, 46:16

**claiming** [2] - 53:16, 54:2

**claims** [5] - 12:24, 13:5, 23:7, 23:9, 43:12

**classic** [2] - 11:1, 31:5

**classification** [2] - 62:3, 62:4

**classifying** [1] - 52:14

**clear** [13] - 6:24, 15:12, 19:1, 19:22, 21:1, 21:21, 35:23, 36:3, 36:17, 38:10, 39:15, 40:12, 64:1

**clearly** [4] - 35:2, 40:14, 61:5, 62:6

**closed** [2] - 47:11, 47:15

**colleague** [2] - 12:13, 21:22

**collect** [1] - 10:6

**Collins** [1] - 2:18

**Comity** [2] - 55:2, 55:12

**comma** [1] - 42:25

**commenced** [1] - 51:3

**committed** [1] - 55:4

**common** [1] - 24:24

**communicate** [1] - 5:4

**communication** [1] - 13:17

**communications** [4] - 18:17, 44:19, 45:2, 46:9

**communique** [1] - 44:23

**complement** [1] - 40:8

**complete** [1] - 33:23

**completely** [3] - 42:9, 43:2, 53:6

**comply** [2] - 22:23, 24:15

**component** [1] - 57:2

**components** [1] - 36:12

**comprise** [1] - 63:24

**computer** [1] - 41:25

**concede** [3] - 11:4, 34:19, 53:8

**conceded** [1] - 34:20

**conceding** [2] - 34:13, 35:3

**concern** [2] - 55:25, 62:21

**concerned** [4] - 24:23, 62:23, 63:13, 64:5

**concerning** [2] - 17:4, 51:6

**concession** [2] - 35:11, 43:22

**conclude** [1] - 62:11

**concluded** [2] - 62:21, 64:13

**conclusion** [1] - 21:17

**conclusive** [7] - 12:7, 12:10, 22:4, 22:11, 22:13, 28:6, 52:21

**conduct** [5] - 15:25, 16:22, 32:15, 53:23, 56:23

**confirmation** [2] - 9:2, 18:18

**confirms** [2] - 14:21, 17:24

**Congress** [2] - 41:18, 60:9

**congressman** [3] - 16:19, 16:20, 16:21

**connected** [2] - 27:8, 27:22

**Connecticut** [3] - 2:2, 2:6, 2:10

**connection** [1] - 51:20

**consent** [4] - 30:20, 31:19, 50:6, 56:2

**consequence** [1] - 39:4

**considered** [1] - 19:1

**considering** [1] - 35:25

**consistent** [5] - 15:24, 39:6, 40:24, 63:19, 63:20

**conspiracy** [3] - 19:8, 19:10, 19:13

**constitution** [1] - 43:22

**Constitution** [2] - 22:7, 43:13

**constitutional** [1] - 19:21

**construction** [2] - 26:11, 40:4

**construes** [1] - 32:23

**consulates** [1] - 51:25

**contained** [1] - 7:12

**contemporaneous** [1] - 11:11

**contents** [1] - 35:18

**context** [2] - 35:2, 35:17

**continue** [3] - 33:13, 33:19, 33:23

**continuing** [1] - 23:17

**contracts** [1] - 40:23

**contrary** [1] - 42:4

**controlling** [1] - 52:19

**convenience** [2] - 28:15, 28:21

**convention** [6] - 39:24, 40:4, 40:5, 55:22, 55:25, 56:4

**Convention** [39] - 24:12, 24:19, 24:23, 25:6, 25:12, 26:11, 27:1, 28:2, 30:8, 36:9, 36:11, 36:23, 39:12, 39:17, 39:25, 40:1, 40:7, 49:12, 49:13, 49:16, 49:18, 49:20, 49:23, 49:24, 53:2, 54:13, 55:17, 55:18, 55:19, 55:24, 56:10, 56:24, 57:21, 58:19, 58:21, 59:4, 62:25, 63:22

**Conventions** [1] - 37:21

**convincing** [1] - 30:15

**copy** [3] - 41:16, 41:17

**Cordones** [2] - 38:20, 60:16

**correct** [2] - 16:15, 29:5

**correspondence** [11] - 8:5, 8:24, 9:7, 9:14, 9:16, 11:1, 11:7, 11:8, 15:4, 17:24, 18:3

**corroborate** [1] - 15:25

**corroboration** [1] - 16:4

**corruption** [1] - 16:20

**Council** [1] - 56:13

**counsel** [7] - 34:11, 37:13, 38:6, 39:12, 49:7, 49:8, 54:23

**Counsel** [2] - 36:25, 46:12

**counsel's** [1] - 42:5

**countenanced** [1] - 63:10

**countries** [8] - 23:25, 29:18, 51:23, 52:15, 55:25, 56:3, 56:5, 62:17

**country** [25] - 8:21, 11:2, 12:2, 12:23, 13:4, 13:10, 13:11, 13:15, 13:16, 13:20, 16:17, 18:13, 23:2, 28:7, 29:14, 31:1, 31:3, 40:17, 48:18, 52:1, 55:3, 57:19, 59:2

**couple** [1] - 35:6

**courier** [2] - 46:8, 46:9, 48:24

**course** [17] - 15:24, 16:3, 22:6, 22:15, 24:24, 25:3, 25:8, 26:12, 27:6, 27:13, 27:19, 27:24, 28:7, 29:15, 29:21, 30:18, 31:13

**Court** [61] - 3:3, 3:4, 5:15, 6:9, 11:13, 17:7, 17:12, 19:17, 21:4, 21:13, 21:24, 25:3, 25:8, 26:15, 26:17, 28:6, 34:9, 35:16, 38:5, 38:9, 38:11, 38:22, 41:16, 41:21, 41:22, 42:2, 45:10, 45:20, 48:13, 49:4, 49:22, 51:15, 52:18, 52:23, 52:25, 53:11, 54:18, 54:20, 55:3, 55:9, 55:14, 56:17, 56:22, 58:15, 58:16, 58:18, 58:22, 58:24, 59:3, 59:7, 59:8, 59:10, 60:1, 60:4, 60:12, 60:19, 61:12, 61:23, 63:9, 64:22, 64:23

**court** [11] - 17:6, 17:18, 17:22, 19:18, 28:18, 46:18, 50:1, 54:3, 56:7, 56:18, 62:11

**COURT** [34] - 1:1, 4:2, 4:7, 4:13, 5:1, 5:6, 5:11, 11:22, 11:24, 12:23, 16:11, 17:14, 20:1, 22:25, 23:9, 23:16, 24:19, 32:12, 33:25, 34:5, 34:17, 35:19, 35:23, 36:3, 37:4, 37:8,

37:16, 37:18, 59:13, 59:24, 60:3, 60:6, 61:20, 64:8

**Court's** [1] - 61:18

**court's** [1] - 55:7

**courtesies** [1] - 28:22

**courts** [13] - 12:7, 17:15, 38:14, 49:15, 52:20, 54:14, 54:16, 55:11, 55:13, 55:15, 58:5, 59:1

**covered** [3] - 25:5, 25:15, 63:25

**covers** [2] - 27:4, 34:3

**COVID** [2] - 47:4, 47:5

**COVID-19** [1] - 7:8

**create** [1] - 20:3, 40:4

**created** [1] - 47:13

**credential** [9] - 6:16, 6:19, 6:24, 40:14, 41:5, 41:8, 41:9, 41:11, 42:18

**credible** [1] - 42:24

**Criminal** [1] - 1:16

**crippling** [1] - 14:17

**critical** [1] - 15:3

**crux** [2] - 14:5, 36:6

**current** [1] - 12:21

**Curtiss** [1] - 60:12

**Curtiss-Wright** [1] - 60:12

**Custody** [1] - 36:11

**customary** [6] - 54:11, 55:21, 56:6, 56:10, 56:16, 56:24

**Customary** [1] - 55:17

**D**

**DATE** [1] - 64:22

**date** [1] - 10:13

**dated** [3] - 9:13, 40:15, 44:6

**David** [1] - 4:10

**days** [4] - 35:7, 44:6, 45:16, 50:16

**DC** [7] - 1:18, 2:3, 2:7, 2:11, 51:22, 52:5, 53:18

**deal** [2] - 12:20, 63:23

**dealings** [1] - 27:11

**deals** [5] - 12:19, 15:6, 15:10, 15:14, 40:19

**debates** [2] - 55:22, 55:23
**decades** [1] - 60:13
**December** [2] - 1:5, 64:21
**decide** [2] - 5:15, 22:14
**decided** [1] - 13:1
**decides** [1] - 24:5
**deciding** [1] - 23:19
**decision** [5] - 17:9, 50:1, 53:15, 54:13, 56:14
**declaration** [1] - 49:10
**declarations** [1] - 49:4
**DEFENDANT** [1] - 2:1
**defendant** [1] - 1:8
**defendant's** [1] - 4:15
**DEFENDANT'S** [1] - 1:10
**Defense** [15] - 6:15, 7:5, 7:19, 7:24, 8:7, 8:12, 8:18, 9:1, 10:11, 14:12, 14:18, 15:16, 17:10, 18:7, 18:12
**defense** [13] - 4:8, 4:10, 9:11, 34:11, 37:13, 38:6, 39:11, 42:4, 44:4, 45:10, 49:1, 50:17, 51:19
**defense's** [1] - 49:2
**defer** [2] - 28:6, 55:15
**deference** [4] - 26:16, 53:10, 53:19, 55:12
**defies** [2] - 43:3, 43:4
**defined** [2] - 32:3, 39:17
**definition** [2] - 31:5, 32:25
**definitions** [1] - 39:19
**delivered** [1] - 40:22
**delivery** [1] - 14:16
**demonstrate** [2] - 6:10, 11:12
**demonstrated** [1] - 14:9
**demonstrates** [2] - 14:24, 15:5
**denies** [2] - 28:18, 59:8
**deny** [7] - 58:16, 58:18, 58:22, 58:24,

59:3, 59:7
**denying** [1] - 31:17
**Department** [31] - 1:15, 12:8, 12:10, 14:19, 22:9, 25:9, 25:14, 25:18, 25:20, 26:2, 26:21, 26:25, 27:14, 27:16, 28:1, 28:10, 34:19, 35:12, 35:13, 36:21, 51:5, 51:11, 51:17, 52:7, 52:13, 52:20, 52:21, 52:23, 53:3, 53:10, 58:2
**Department's** [2] - 22:4, 26:11
**derive** [1] - 35:17
**designates** [1] - 61:24
**desk** [1] - 44:20
**detail** [2] - 6:5, 27:19
**detained** [10] - 5:17, 6:12, 9:6, 9:22, 11:21, 14:12, 20:21, 21:15, 21:20, 42:16
**detention** [6] - 6:4, 17:10, 18:1, 18:25, 32:6, 32:11
**determine** [1] - 5:20
**determines** [1] - 16:9
**determining** [1] - 53:19
**difference** [3] - 13:8, 13:9, 47:15
**different** [6] - 22:15, 42:9, 58:5, 60:17, 62:17, 62:19
**digitized** [1] - 10:14
**dignity** [1] - 32:9
**diplomat** [48] - 14:3, 16:5, 16:16, 16:18, 16:25, 17:2, 22:10, 22:12, 22:14, 23:14, 24:6, 24:7, 24:11, 24:14, 25:5, 25:10, 25:12, 25:23, 26:10, 27:24, 28:1, 28:8, 30:25, 31:15, 31:23, 31:25, 34:13, 36:8, 36:10, 44:3, 46:4, 46:10, 46:11, 48:23, 48:25, 50:15, 50:19, 51:23, 52:18, 54:4, 57:16, 57:18, 58:20, 59:20, 59:22, 63:2, 63:5
**diplomatic** [95] - 5:18, 8:12, 9:7, 10:17, 10:23, 10:25, 11:1, 11:14, 11:20, 12:6,

12:8, 12:11, 13:2, 13:5, 13:10, 13:25, 15:19, 15:21, 16:4, 16:8, 16:9, 16:25, 17:3, 17:5, 17:8, 17:13, 17:20, 17:23, 17:24, 18:3, 18:6, 18:13, 18:16, 18:23, 21:12, 22:22, 23:4, 23:20, 24:12, 24:20, 25:25, 26:3, 26:9, 26:12, 27:1, 27:16, 28:13, 28:14, 28:19, 28:20, 29:3, 30:9, 31:5, 31:18, 32:5, 32:17, 33:7, 33:10, 33:11, 35:3, 37:25, 39:15, 39:22, 40:8, 40:11, 43:23, 46:9, 46:21, 46:24, 47:10, 47:13, 47:16, 47:19, 48:3, 48:7, 48:10, 48:11, 48:12, 48:15, 48:21, 49:12, 50:14, 51:7, 51:8, 51:9, 52:22, 53:8, 53:9, 53:13, 57:4, 63:6, 63:13
**Diplomatic** [4] - 25:13, 28:3, 36:9, 39:12
**diplomats** [11] - 19:5, 22:5, 23:23, 24:21, 26:12, 29:11, 29:18, 36:16, 36:19, 52:14, 52:15
**direct** [2] - 45:22, 57:10
**directly** [4] - 27:14, 29:19, 29:22, 39:17
**director** [1] - 47:8
**discovery** [2] - 10:11, 10:16
**discrepancies** [2] - 42:21, 42:23
**discrepancy** [1] - 43:5
**discrete** [2] - 40:23, 40:24
**discretion** [2] - 52:14, 62:24
**discretionary** [1] - 60:25
**discuss** [1] - 29:13
**discussing** [2] - 15:5, 35:2
**discussion** [5] - 24:25, 25:1, 35:4, 35:14, 39:11
**discussions** [2] -

37:13, 40:22
**DISMISS** [1] - 1:10
**dismiss** [6] - 4:16, 32:14, 32:17, 46:23, 48:13, 49:6, 58:14, 58:15, 58:16, 58:23, 58:24, 59:3, 59:17, 63:17, 63:19
**dismissal** [1] - 59:22
**dismissed** [2] - 33:17, 51:18
**disorders** [1] - 31:10
**dispositive** [3] - 43:24, 52:5, 52:11
**dispute** [2] - 9:20, 11:6
**distinguished** [1] - 8:21
**District** [4] - 3:4, 53:18, 56:7, 64:23
**DISTRICT** [3] - 1:1, 1:2, 1:11
**DIVISION** [1] - 1:2
**Division** [1] - 1:16
**doctrine** [1] - 64:5
**Doctrine** [10] - 49:5, 54:20, 54:22, 55:1, 55:10, 55:15, 58:25, 60:22, 60:24, 64:3
**document** [18] - 8:5, 8:6, 8:24, 8:25, 19:9, 20:3, 34:11, 34:18, 35:20, 41:16, 41:17, 41:18, 41:22, 41:23, 42:4, 42:6, 42:11, 43:6
**documentary** [1] - 21:16
**documents** [10] - 35:15, 35:20, 40:10, 40:20, 44:22, 45:6, 45:9, 45:19, 45:25, 46:2
**DOJ** [2] - 63:8, 63:21
**domestically** [1] - 28:25
**done** [3] - 18:2, 28:8, 57:15
**doubt** [1] - 33:18
**down** [2] - 37:1, 46:12
**Dr** [17] - 10:5, 11:7, 16:10, 17:1, 19:17, 19:25, 20:13, 20:14, 20:25, 21:1, 42:20, 43:8, 49:3, 49:7, 49:14, 49:21
**DRA** [1] - 62:23
**draw** [1] - 7:25
**due** [3] - 32:7, 47:11,

47:15
**during** [6] - 5:6, 5:10, 11:5, 47:4, 47:5, 58:8
**duties** [1] - 60:21

**E**

**early** [2] - 17:21, 50:16
**easily** [1] - 21:13
**echoed** [1] - 50:1
**effect** [2] - 17:18, 30:16
**effectively** [2] - 5:5, 28:11
**effort** [1] - 61:25
**efforts** [1] - 18:1
**efoley@bakerlaw. com** [1] - 2:12
**either** [6] - 16:21, 28:6, 30:20, 35:20, 37:23, 60:24
**election** [1] - 12:25
**electronic** [1] - 34:15
**electronically** [1] - 20:7
**ELIZABETH** [1] - 2:9
**Elizabeth** [1] - 4:11
**ELMO** [1] - 34:15
**elsewhere** [1] - 52:6
**email** [4] - 15:3, 15:16, 35:1, 35:5
**emails** [1] - 15:7
**embassy** [5] - 8:13, 41:7, 51:3, 51:24, 52:4
**Emering** [1] - 53:11
**emphasize** [2] - 62:2, 62:13
**end** [1] - 64:10
**engaged** [2] - 20:18, 27:11
**engages** [1] - 61:25
**engineered** [1] - 30:15
**ensure** [1] - 33:22
**entire** [1] - 58:8
**entirely** [1] - 22:15
**entitle** [2] - 28:24, 29:3
**entitled** [13] - 5:18, 24:7, 24:11, 29:14, 31:20, 31:25, 49:5, 51:13, 62:7, 63:7, 63:13, 63:14, 64:19
**entry** [4] - 34:23, 34:24, 37:24, 48:18
**envelopes** [2] - 9:11, 10:7
**envoy** [61] - 5:16,

5:24, 6:2, 6:10, 6:18, 7:1, 7:7, 7:10, 7:17, 7:23, 8:2, 8:10, 8:15, 8:20, 9:3, 11:17, 11:19, 13:18, 13:21, 13:22, 13:24, 15:2, 15:25, 16:1, 18:8, 18:10, 18:15, 18:22, 19:23, 20:20, 21:2, 21:8, 21:9, 21:14, 21:18, 21:19, 21:20, 25:5, 25:10, 25:15, 41:14, 42:18, 43:15, 44:5, 44:10, 44:17, 45:4, 45:5, 45:8, 45:11, 45:12, 45:15, 45:17, 51:6, 51:13, 52:10, 52:12, 53:1, 62:3, 62:13

**equipped** [1] - 37:11
**erroneous** [1] - 36:7
**escape** [1] - 62:6
**ESQ** [7] - 1:15, 1:20, 2:1, 2:5, 2:9, 2:17, 2:21
**Esq** [1] - 2:18
**ESQUIRE** [1] - 2:13
**essential** [1] - 57:1
**essentially** [1] - 56:2
**establishes** [1] - 7:16
**establishment** [1] - 63:7
**evade** [1] - 15:20
**event** [1] - 57:7
**events** [3] - 31:9, 31:10, 32:16
**eventual** [1] - 58:9
**eventually** [1] - 58:6
**ever-changing** [1] - 46:15
**evidence** [27] - 4:20, 6:5, 6:7, 6:9, 6:13, 6:23, 7:4, 7:14, 7:18, 8:11, 9:5, 11:11, 12:17, 12:18, 14:7, 14:8, 14:9, 15:12, 19:7, 19:12, 21:16, 21:17, 48:6, 50:10, 50:18, 53:13
**evidentiary** [4] - 4:21, 11:5, 40:12, 41:2
**exact** [2] - 54:13, 54:14
**exactly** [1] - 39:1
**example** [1] - 14:10
**excellent** [1] - 28:16
**excerpt** [1] - 34:21
**excludes** [1] - 34:23

**exclusive** [2] - 22:7, 38:12
**exclusively** [2] - 51:16, 53:24
**excuse** [11] - 40:11, 41:3, 42:2, 48:5, 49:1, 51:5, 51:21, 52:22, 52:24, 55:21, 58:15
**executive** [7] - 38:16, 39:3, 53:15, 53:19, 53:21, 53:24, 60:10
**exercising** [1] - 62:20
**exhibit** [2] - 15:1, 15:15
**Exhibit** [18] - 6:15, 7:5, 7:19, 7:24, 8:7, 8:12, 8:18, 9:1, 9:13, 10:11, 14:12, 14:19, 15:16, 17:10, 18:7, 18:12, 34:14, 46:19
**exhibits** [1] - 9:11
**Exhibits** [1] - 45:10
**existed** [1] - 42:13
**existence** [1] - 39:24
**expect** [2] - 45:3, 45:4
**expediency** [1] - 55:2
**expedited** [1] - 37:14
**expert** [4] - 19:18, 19:20, 42:20, 43:22
**expiration** [1] - 17:5
**expired** [1] - 47:4
**explain** [1] - 16:7
**explains** [1] - 28:9
**explanation** [4] - 42:22, 42:24, 46:13, 46:14
**Export** [1] - 60:12
**extensive** [1] - 6:5
**extraditable** [1] - 50:8
**extradite** [3] - 18:1, 30:16, 55:7
**extradited** [2] - 5:17, 58:6
**extradition** [8] - 6:4, 42:17, 49:22, 50:17, 57:9, 58:9, 62:8, 64:5
**extraditions** [1] - 55:5
**Extraordinaria** [1] - 41:12

**F**

**face** [1] - 48:14
**facilities** [1] - 25:2

**fact** [31] - 14:11, 16:14, 16:16, 17:9, 17:20, 20:6, 21:5, 21:11, 21:14, 22:17, 24:8, 28:15, 30:12, 30:14, 31:6, 31:9, 32:22, 47:14, 50:6, 50:14, 52:4, 52:7, 52:22, 55:6, 57:14, 58:8, 58:19, 58:25, 59:4, 62:12, 63:17
**facts** [7] - 4:22, 21:16, 21:17, 21:21, 40:10, 50:2, 50:20
**factual** [4] - 5:14, 11:13, 53:7, 53:9
**falls** [1] - 31:13
**falsification** [1] - 50:12
**falsified** [1] - 19:9
**families** [1] - 26:11
**family** [2] - 27:11, 51:1
**far** [6] - 25:18, 62:23, 63:2, 63:12, 64:2, 64:4
**fateful** [2] - 10:4, 10:18
**father** [1] - 26:10
**fathers** [1] - 53:25
**fault** [2] - 31:4, 57:6
**February** [1] - 42:15
**felt** [1] - 57:16
**few** [1] - 18:21
**Fifteen** [1] - 37:17
**fifth** [1] - 9:5
**fight** [1] - 49:22
**fighting** [1] - 42:16
**file** [1] - 10:14
**filed** [3] - 27:20, 35:20, 46:23
**files** [1] - 7:13
**filing** [1] - 18:19
**final** [1] - 63:21
**finally** [4] - 10:10, 49:1, 57:1, 60:11
**findings** [4] - 17:14, 17:17, 17:21, 19:13
**fine** [1] - 5:1
**firearm** [1] - 26:9
**first** [14] - 5:23, 6:15, 9:23, 11:16, 11:22, 17:6, 22:3, 27:15, 28:18, 36:15, 37:24, 40:5, 50:13, 51:22
**five** [5] - 6:9, 6:13, 11:11, 14:8, 47:22
**FL** [4] - 1:22, 2:15, 2:19, 2:23
**flash** [1] - 20:7

**flees** [1] - 23:2
**flight** [2] - 15:3, 57:11
**Floor** [2] - 1:17, 64:24
**FLORIDA** [1] - 1:2
**Florida** [4] - 1:4, 3:5, 56:8, 64:24
**flout** [1] - 63:9
**focus** [1] - 6:8
**focused** [3] - 31:6, 41:10, 41:11
**focuses** [2] - 40:14, 41:10
**Foley** [1] - 4:11
**FOLEY** [1] - 2:9
**following** [5] - 4:1, 44:6, 45:16, 46:22
**follows** [2] - 5:22, 6:14
**food** [1] - 5:25
**Footnote** [1] - 29:2
**footnotes** [2] - 14:25, 27:7
**FOR** [2] - 1:15, 2:1
**force** [9] - 31:2, 31:9, 31:11, 31:12, 31:14, 31:21, 57:2, 57:5, 60:9
**forced** [1] - 11:4
**foregoing** [1] - 64:17
**foreign** [14] - 19:4, 38:7, 38:8, 38:12, 39:3, 39:7, 39:8, 45:14, 52:15, 55:4, 55:10, 55:13, 60:14
**Foreign** [20] - 6:16, 6:22, 7:6, 7:13, 7:20, 8:8, 8:14, 8:17, 12:15, 12:19, 13:16, 13:17, 33:2, 33:3, 44:20, 47:20, 47:25, 53:16, 53:23
**foremost** [1] - 37:24
**forgo** [1] - 57:20
**form** [3] - 5:25, 32:6, 38:8
**formal** [1] - 44:19
**formality** [1] - 44:25
**formally** [1] - 8:14
**formed** [1] - 32:15
**former** [6] - 12:23, 19:17, 23:1, 49:8, 61:24, 62:6
**forth** [4] - 40:11, 49:20, 49:21, 50:18
**forward** [2] - 7:16, 13:21
**founding** [1] - 53:24
**four** [4] - 33:25,

42:10, 42:14, 44:7
**Fourth** [1] - 26:7
**fourth** [1] - 8:11
**FPR** [2] - 3:3, 64:22
**frame** [1] - 37:15
**France** [1] - 56:5
**frankly** [3] - 22:22, 25:18, 29:8
**freedom** [1] - 32:8
**freeing** [1] - 33:20
**Friday** [1] - 35:21
**front** [2] - 9:10, 9:17
**fuel** [1] - 14:22
**fugitive** [1] - 49:5
**fulfill** [1] - 33:13
**full** [6] - 31:23, 33:7, 34:10, 35:17, 59:22, 62:24
**fully** [2] - 27:2, 55:9
**functions** [1] - 51:8
**fundamental** [1] - 32:11
**fundamentally** [2] - 25:16, 62:19

**G**

**Gaceta** [17] - 19:16, 19:24, 20:6, 20:15, 21:3, 41:12, 41:13, 41:15, 41:20, 42:21, 43:1, 43:14, 43:17, 46:14, 50:12
**gasoline** [1] - 9:19
**General** [1] - 27:13
**generally** [3] - 12:7, 37:16, 52:20
**given** [12] - 21:9, 21:10, 23:6, 26:17, 31:19, 39:2, 46:16, 47:13, 48:1, 48:3, 54:10, 56:20, 62:3
**Gonzalez** [3] - 6:19, 7:11, 44:18
**government** [64] - 4:3, 4:24, 6:23, 7:14, 8:4, 8:20, 8:23, 9:2, 9:8, 9:9, 10:11, 11:6, 12:3, 12:12, 12:16, 12:18, 12:20, 13:7, 13:23, 14:10, 14:14, 15:17, 15:24, 18:21, 19:3, 20:5, 20:8, 21:5, 22:2, 23:10, 23:13, 23:22, 25:11, 25:16, 27:6, 29:1, 30:5, 31:6, 31:22, 34:6, 34:20, 38:1, 38:3, 38:17, 39:5, 39:7, 39:8, 42:5, 42:23, 45:12, 46:6,

46:19, 50:17, 51:7,
59:8, 59:10, 59:21,
60:13, 61:11, 61:14,
61:25
**Government** [1] -
10:15
**Government's** [9] -
17:4, 19:8, 20:10,
20:23, 34:14, 36:18,
46:19, 58:14
**government's** [2] -
19:15, 59:15
**governments** [2] -
38:12, 39:3
**grand** [3] - 19:8,
19:10, 19:12
**grant** [3] - 59:13,
59:16, 63:19
**granting** [1] - 38:7
**Guaidó** [2] - 38:3,
38:17
**guarantee** [1] - 9:18
**guess** [3] - 34:24,
55:7, 55:10
**gunpoint** [1] - 30:22
**guys** [1] - 12:5

## H

**Hail** [1] - 57:1
**hand** [1] - 4:22
**handcuffs** [2] - 5:3,
5:8
**happenings** [1] -
31:11
**happy** [1] - 59:11
**hard** [2] - 41:16,
41:17
**head** [12] - 43:11,
43:18, 43:23, 45:22,
46:11, 48:8, 61:2,
61:3, 61:4, 61:25,
62:25, 63:25
**heads** [1] - 61:7
**heard** [3] - 19:19,
47:8, 60:13
**hearing** [8] - 4:21,
5:6, 8:5, 8:24, 11:5,
14:10, 40:12, 41:2
**hearings** [1] - 37:14
**heart** [2] - 62:13,
62:20
**held** [9] - 38:11,
38:16, 52:20, 52:23,
52:25, 53:18, 55:1,
56:8, 56:11
**hereby** [1] - 64:17
**herring** [2] - 18:24,
19:16
**herself** [1] - 31:1

**high** [2] - 15:12,
15:16
**high-level** [1] - 15:12
**highest** [3] - 15:4,
15:24, 31:16
**highlighted** [5] - 7:9,
8:3, 9:16, 14:23,
17:11
**himself** [3] - 44:13,
46:10, 61:24
**Hoeveler** [1] - 28:17
**home** [4] - 30:21,
33:24, 46:17, 47:3
**Honor** [87] - 4:4, 4:9,
4:18, 4:20, 5:3, 5:9,
5:14, 5:19, 5:20, 6:5,
6:13, 6:20, 6:23, 7:1,
7:4, 7:9, 7:14, 7:16,
7:18, 7:25, 8:7, 8:11,
8:15, 8:18, 9:6, 9:10,
9:13, 9:17, 9:20,
10:12, 10:17, 11:1,
11:6, 11:12, 11:20,
12:14, 13:9, 14:5,
14:7, 14:18, 14:20,
14:25, 15:8, 15:15,
15:22, 16:6, 16:14,
17:5, 17:6, 17:17,
17:18, 17:23, 18:16,
18:23, 19:7, 19:10,
19:16, 19:19, 19:20,
20:7, 20:13, 20:17,
20:25, 21:3, 21:16,
21:21, 21:23, 23:19,
32:19, 34:3, 34:9,
34:18, 36:5, 37:11,
37:17, 51:22, 54:11,
60:1, 61:15, 61:22,
62:10, 62:14, 62:15,
63:3, 63:8, 63:11,
64:7
**Honor's** [1] - 22:1
**HONORABLE** [1] -
1:11
**hooked** [1] - 5:11
**host** [1] - 14:9
**Hostetler** [4] - 2:2,
2:6, 2:10, 2:14
**hour** [2] - 4:16, 37:19
**house** [1] - 27:18
**housekeeping** [2] -
4:18, 5:2
**humanitarian** [6] -
5:25, 6:12, 6:18, 7:2,
7:8, 14:16
**hundred** [1] - 44:21
**hundreds** [1] - 63:24
**hypothetical** [2] -
16:15, 61:24

## I

**idea** [3] - 39:17,
40:25, 42:24
**identified** [2] - 8:6,
8:25
**illegitimate** [4] -
38:6, 38:18, 38:23,
38:24
**illicit** [1] - 15:19
**image** [2] - 46:24,
48:14
**images** [1] - 48:15
**immediate** [1] -
18:25
**immune** [2] - 32:10,
36:13
**immunities** [8] -
29:17, 31:23, 32:21,
39:5, 40:5, 54:8,
57:17, 60:9
**immunity** [58] - 5:18,
11:14, 15:20, 16:9,
18:23, 19:2, 19:5,
19:6, 22:16, 22:22,
24:7, 24:9, 24:11,
24:17, 25:25, 26:3,
26:9, 26:12, 26:20,
26:23, 27:16, 28:19,
29:4, 29:14, 30:6,
31:18, 31:20, 31:22,
33:7, 33:10, 33:11,
37:22, 37:25, 38:22,
38:25, 39:1, 44:15,
50:4, 53:5, 53:20,
53:21, 54:2, 54:17,
55:16, 55:24, 57:4,
60:16, 60:17, 60:18,
62:3, 62:7, 63:1, 63:7,
63:12, 63:13, 63:15,
63:16
**import** [1] - 63:18
**importance** [2] -
20:19, 45:1
**important** [6] - 6:11,
21:4, 21:12, 25:8,
52:7, 52:17
**importantly** [3] -
43:8, 58:3, 61:11
**Imprenta** [2] - 41:24,
42:8
**in-transit** [4] - 24:16,
31:20, 31:22, 31:25
**include** [3] - 42:3,
45:16, 55:5
**included** [3] - 34:21,
42:19, 61:11
**includes** [4] - 34:22,
41:19, 42:6, 48:14
**including** [2] - 15:13,

47:10
**inconsistent** [1] -
25:16
**incorrect** [1] - 36:14
**indeed** [18] - 11:19,
16:1, 22:13, 26:12,
27:6, 27:12, 28:4,
28:14, 29:11, 29:21,
31:15, 40:6, 40:10,
47:11, 48:12, 53:7,
60:16, 61:13
**independent** [2] -
30:9, 62:21
**indeterminate** [1] -
28:10
**indicate** [3] - 41:5,
48:4, 48:16
**indicates** [2] - 10:14,
39:25
**indicating** [2] -
56:20, 58:6
**indication** [1] - 61:10
**indicative** [2] - 39:2,
56:15
**indicted** [4] - 23:1,
57:25, 59:18
**indictment** [7] -
32:14, 32:16, 32:18,
33:17, 58:1, 58:14,
59:17
**indirectly** [1] - 27:14
**individual** [14] -
22:9, 24:11, 24:14,
25:4, 26:8, 28:24,
38:7, 38:8, 38:24,
43:2, 53:20, 54:7,
55:8, 57:18
**individuals** [11] -
8:6, 8:25, 24:17, 35:5,
35:11, 38:15, 39:4,
39:20, 40:6, 46:5,
47:16
**indulgence** [2] -
61:18, 64:7
**influenced** [1] -
53:22
**information** [3] -
14:20, 35:8, 51:12
**informed** [1] - 17:7
**initial** [1] - 18:24
**injured** [1] - 27:20
**inquiring** [1] - 55:3
**insinuation** [1] -
19:11
**insofar** [1] - 24:13
**instance** [3] - 25:3,
29:7, 29:12
**instead** [5] - 12:25,
43:19, 47:2, 54:5,
54:8

**instructed** [1] - 54:1
**instructing** [1] - 7:6
**instruction** [1] - 9:24
**intelligence** [1] -
14:19
**intended** [1] - 39:2
**intending** [1] - 36:2
**intentionality** [1] -
57:15
**intercede** [1] - 54:4
**interest** [1] - 54:6
**interested** [1] - 61:23
**interesting** [3] -
25:21, 26:6, 60:11
**interfered** [1] - 33:12
**interject** [1] - 54:5
**internal** [1] - 48:16
**international** [9] -
28:22, 28:23, 54:11,
54:22, 55:21, 56:6,
56:10, 56:16, 56:25
**International** [5] -
35:12, 36:11, 55:2,
55:11, 55:17
**internationally** [1] -
28:25
**Interpol** [1] - 44:7
**interpret** [3] - 26:24,
30:10, 32:25
**interpretation** [5] -
26:16, 26:18, 27:1,
62:4, 62:22
**interpretations** [1] -
26:5
**INTERPRETER** [2] -
46:12, 54:23
**interpreter** [1] -
54:24
**intimate** [1] - 24:1
**introduced** [4] - 6:6,
6:23, 7:14, 46:18
**intrude** [1] - 53:23
**inviolability** [4] -
32:1, 32:3, 32:21
**inviolable** [1] - 32:5
**invited** [2] - 10:22,
10:24
**inviting** [1] - 11:2
**invoke** [1] - 17:20
**invoked** [1] - 17:13
**involved** [1] - 22:5
**involvement** [1] -
24:1
**Iran** [59] - 5:16, 6:1,
6:11, 7:7, 7:17, 7:21,
8:9, 8:19, 9:2, 9:3,
9:9, 9:15, 9:21, 10:9,
11:18, 11:25, 12:1,
12:2, 13:11, 13:15,
13:17, 13:20, 13:23,

14:4, 14:11, 14:13,
14:22, 15:7, 15:10,
15:14, 16:12, 16:16,
17:25, 18:5, 18:13,
18:18, 21:7, 21:9,
21:12, 21:14, 21:18,
21:19, 22:18, 22:19,
23:2, 23:3, 23:16,
24:4, 28:8, 31:7,
40:17, 40:21, 41:3,
41:4, 41:7, 48:9,
57:11
**Iran's** [1] - 8:15
**Iran-Venezuela** [1] -
15:10
**Iranian** [7] - 8:1,
8:13, 10:20, 10:21,
10:22, 10:24, 46:6
**irrelevant** [2] - 17:6,
19:16
**irresistible** [2] - 31:5,
31:14
**Israel** [1] - 60:10
**issuance** [1] - 16:8
**issue** [10] - 5:14,
20:1, 20:2, 20:5, 20:6,
52:11, 53:7, 55:24,
60:16, 60:23
**issued** [4] - 13:5,
16:3, 18:25, 25:21
**issues** [5] - 20:10,
21:25, 40:24, 50:13,
56:3
**itself** [10] - 25:14,
30:10, 39:16, 43:21,
43:24, 48:6, 52:10,
52:20, 61:9, 62:18

## J

**Janet** [1] - 27:12
**jbarr@bakerlaw.
com** [1] - 2:4
**Jerusalem** [1] -
60:10
**Joe** [1] - 4:11
**joe@
josephmschuster.
com** [1] - 2:20
**Jonathan** [1] - 4:9
**JONATHAN** [1] - 2:1
**Jorge** [1] - 45:14
**JOSEPH** [1] - 2:17
**Joseph** [1] - 2:18
**Judge** [4] - 28:17,
56:8, 56:11, 56:13
**judge** [1] - 19:17
**JUDGE** [1] - 1:11
**judgment** [1] - 53:14
**judicial** [2] - 53:22,

62:21
**June** [16] - 7:19,
7:22, 8:2, 8:10, 8:12,
8:16, 9:3, 9:14, 13:19,
16:1, 21:6, 35:6, 47:1,
48:21, 48:23
**Justice** [2] - 1:15,
35:13
**justiciable** [1] -
62:12

## K

**keep** [1] - 61:1
**KEOWN** [3] - 2:13,
5:12, 62:15
**Kerry** [1] - 38:10
**key** [3] - 5:20, 11:13,
62:2
**kind** [8] - 30:21,
38:8, 40:16, 44:3,
44:15, 48:5, 54:12,
60:17
**Kingdom** [1] - 56:4
**knowing** [2] - 31:15
**knowledge** [1] - 35:3
**Knowles** [1] - 54:21,
54:25, 55:6
**knows** [3] - 16:6,
26:2, 26:3
**Korea** [1] - 24:5
**Kramer** [3] - 4:4,
11:4, 34:7
**KRAMER** [14] - 1:15,
4:4, 34:8, 34:18,
35:22, 36:2, 36:5,
37:2, 37:7, 37:11,
37:20, 46:13, 54:25,
59:15
**KURT** [1] - 1:20
**Kurt** [1] - 4:5
**kurt.lunkenheimer
@usdoj.gov** [1] - 1:22

## L

**lack** [1] - 37:23,
54:17
**language** [5] - 6:25,
7:9, 7:25, 17:11, 19:5
**large** [1] - 51:23
**largely** [1] - 24:23
**last** [10] - 40:12,
41:2, 41:13, 41:25,
42:3, 42:6, 46:19,
50:10, 54:23, 61:8
**Law** [1] - 36:12,
55:17
**law** [16] - 16:18,
17:2, 19:19, 19:21,

19:23, 28:23, 43:12,
43:24, 54:12, 55:21,
56:6, 56:10, 56:16,
56:25, 60:23
**lawsuits** [1] - 17:20
**lcasey@bakerlaw.
com** [1] - 2:8
**lead** [3] - 21:17, 49:8,
58:3
**Leader** [3] - 9:15,
9:21, 10:9
**leading** [1] - 58:2
**least** [5] - 20:23,
24:13, 25:18, 48:2,
50:5
**leaving** [1] - 43:2
**Lee** [1] - 4:11
**LEE** [1] - 2:5
**left** [5] - 10:4, 46:17,
46:20, 47:3, 54:10
**legal** [6] - 4:22,
12:14, 15:20, 19:22,
21:22, 21:25
**legitimate** [5] -
12:12, 12:24, 23:4,
23:11, 39:8
**length** [1] - 47:18
**less** [1] - 50:19
**letter** [29] - 6:16,
6:20, 6:24, 6:25, 7:5,
7:12, 7:15, 7:19, 7:20,
8:15, 8:16, 9:18, 9:20,
9:25, 10:9, 10:10,
10:13, 10:23, 21:6,
21:8, 35:25, 40:14,
41:5, 41:8, 41:9,
41:11
**letters** [22] - 9:12,
9:25, 10:1, 10:8,
10:18, 10:19, 10:22,
11:2, 21:10, 40:21,
44:4, 44:6, 44:7, 44:9,
44:25, 45:13, 45:15,
45:18, 46:4, 50:15
**level** [5] - 15:12,
15:17, 35:17, 37:24,
54:9
**levels** [3] - 15:5,
15:24, 31:16
**liable** [1] - 32:5
**Library** [1] - 41:18
**library** [1] - 42:2
**LINDY** [1] - 2:13
**line** [1] - 29:6
**list** [1] - 49:2
**litigation** [1] - 27:23
**live** [1] - 52:6
**living** [2] - 27:10,
52:5
**lkeown@bakerlaw.**

com [1] - 2:16
**LLP** [4] - 2:2, 2:6,
2:10, 2:14
**lo** [1] - 42:15
**loads** [2] - 35:7, 35:8
**located** [1] - 41:20
**locations** [1] - 51:25
**lodged** [1] - 18:17
**logic** [1] - 43:4
**longstanding** [1] -
53:22
**look** [10] - 5:21,
13:20, 14:18, 15:15,
24:24, 25:19, 45:6,
49:1, 57:7, 61:9
**looking** [1] - 33:15
**looks** [1] - 54:18
**lose** [3] - 12:25, 37:4,
37:8
**lost** [1] - 58:5
**luggage** [3] - 10:7,
11:9, 11:10
**LUNKENHEIMER** [1]
- 1:20
**Lunkenheimer** [1] -
4:5
**lying** [1] - 19:10

## M

**maduro** [3] - 22:19,
38:23, 60:19
**Maduro** [21] - 9:15,
9:21, 10:9, 12:1,
12:11, 12:22, 22:1,
38:1, 38:2, 38:13,
38:15, 38:17, 38:18,
38:21, 44:8, 44:13,
45:7, 46:5, 50:7,
57:16, 58:17
**magic** [1] - 19:4
**main** [1] - 51:24
**maintained** [2] -
6:21, 41:21
**majeure** [7] - 31:2,
31:9, 31:11, 31:12,
31:21, 57:2, 57:5
**man** [2] - 26:8, 26:19
**mandatory** [1] -
60:25
**Mandel** [2] - 10:5,
11:7
**March** [1] - 48:8
**Maria** [1] - 44:18
**Marple** [1] - 41:25
**marshals** [1] - 5:8
**Mary** [1] - 57:1
**matter** [10] - 4:19,
5:3, 23:11, 32:2,
53:23, 55:20, 62:5,

62:22, 63:15, 64:19
**matters** [2] - 25:10,
51:6
**mean** [4] - 12:5,
23:7, 24:6, 24:8
**means** [2] - 35:11,
38:17
**meant** [1] - 17:16
**medicine** [1] - 5:25
**meet** [1] - 59:6
**meeting** [1] - 33:6
**member** [4] - 30:8,
51:1, 58:17, 63:6
**members** [1] - 56:12
**mere** [1] - 40:3
**merry** [1] - 32:13
**metadata** [3] - 42:1,
42:3, 42:10
**MIAMI** [1] - 1:2
**Miami** [9] - 1:4, 1:22,
2:19, 2:23, 3:4, 3:5,
27:11, 64:23, 64:24
**MICHAEL** [1] - 2:17
**microphone** [1] -
61:21
**middle** [1] - 27:23
**might** [4] - 16:17,
23:24, 31:7, 33:16
**mind** [2] - 33:18,
61:1
**minimum** [2] - 26:17,
33:21
**Minister** [9] - 6:16,
7:6, 7:20, 10:20,
10:22, 13:16, 33:2,
33:3, 53:16
**minister** [1] - 45:14
**ministers** [1] - 22:8
**Ministry** [12] - 6:22,
7:13, 8:9, 8:14, 8:17,
12:15, 12:19, 13:17,
44:20, 47:20, 47:25
**minutes** [4] - 4:19,
33:25, 37:17, 37:18
**misplaced** [2] -
42:25
**Mission** [11] - 40:1,
40:7, 54:13, 55:16,
55:18, 55:19, 55:24,
56:10, 56:24, 63:21,
63:22
**mission** [73] - 5:16,
6:3, 6:12, 8:10, 11:17,
11:18, 11:20, 11:25,
13:10, 13:14, 13:25,
16:11, 16:15, 18:10,
20:18, 21:12, 21:14,
24:25, 27:9, 32:22,
33:23, 36:15, 36:19,
39:16, 40:13, 40:17,

40:25, 41:1, 41:4,
41:6, 41:7, 43:10,
43:11, 43:12, 43:16,
43:19, 43:20, 43:24,
43:25, 46:11, 48:1,
48:4, 48:5, 49:11,
49:17, 50:3, 50:4,
50:11, 50:21, 50:23,
51:20, 51:23, 52:3,
54:3, 54:7, 54:11,
54:16, 58:20, 61:2,
61:4, 61:5, 61:6, 61:7,
62:25, 63:24, 63:25

**Missions** [7] - 36:11,
36:23, 37:21, 49:14,
49:16, 57:21, 59:4

**missions** [21] - 15:2,
24:20, 24:21, 24:23,
25:2, 33:13, 36:24,
39:13, 39:14, 39:15,
39:18, 39:22, 39:25,
40:1, 40:2, 40:8,
55:23, 61:10, 63:25,
64:2

**modern** [1] - 20:9
**modified** [1] - 42:11
**moment** [1] - 36:17
**money** [1] - 58:2
**month** [1] - 44:21
**Moore** [3] - 56:8,
56:11, 56:14
**Moran** [5] - 4:3, 4:12,
4:14, 8:22, 18:9
**MORAN** [1] - 1:7
**moreover** [3] - 16:10,
17:1, 30:24
**morning** [8] - 4:4,
4:7, 4:9, 4:13, 4:14,
5:14, 21:23, 34:9
**mortar** [1] - 39:22
**most** [1] - 24:24
**mostly** [1] - 39:13
**Motion** [1] - 49:5
**MOTION** [1] - 1:10
**motion** [19] - 4:15,
21:25, 36:6, 37:5,
46:23, 48:13, 49:6,
53:8, 58:16, 58:18,
58:22, 58:24, 59:3,
59:7, 59:13, 59:16,
63:16, 63:19
**motions** [1] - 34:22
**movement** [1] -
57:23
**moving** [1] - 58:9
**MR** [38] - 4:4, 4:9,
4:18, 5:2, 5:9, 5:14,
11:23, 12:13, 13:9,
16:14, 17:16, 20:5,
21:23, 23:6, 23:13,

23:18, 24:22, 32:19,
34:2, 34:8, 34:18,
35:22, 36:2, 36:5,
37:2, 37:7, 37:11,
37:17, 37:20, 46:13,
54:25, 59:15, 60:1,
60:4, 60:7, 61:18,
61:22, 62:16
**MS** [2] - 5:12, 62:15
**multitude** [1] - 63:23
**must** [2] - 11:14,
43:23

**N**

**N.W** [1] - 1:17
**Nacional** [2] - 41:24,
42:8
**Nain** [2] - 8:21, 18:9
**NAIN** [1] - 1:7
**name** [2] - 10:14,
52:15
**named** [2] - 27:23,
41:14
**nation** [1] - 7:2
**National** [2] - 43:13,
43:16
**national** [2] - 20:19,
20:21
**natural** [1] - 39:4
**nature** [2] - 46:3,
52:17
**NE** [2] - 1:21, 2:22
**Neal** [1] - 4:11
**necessarily** [2] -
38:17, 39:25
**necessary** [5] - 16:8,
29:10, 32:21, 51:22,
52:14
**need** [8] - 13:12,
20:21, 21:13, 28:5,
42:21, 47:17, 50:23,
59:11
**needed** [3] - 40:7,
47:13, 57:11
**negotiate** [1] - 7:7
**negotiating** [1] -
15:14
**negotiations** [3] -
15:9, 40:18, 40:23
**NEIL** [1] - 2:21
**neil@**
**neilmschuster.com**
[1] - 2:23
**never** [5] - 20:15,
27:21, 30:13, 31:1,
49:16
**New** [1] - 1:17
**new** [3] - 9:18, 40:4,
47:6

**news** [1] - 20:7
**next** [5] - 4:2, 15:11,
15:15, 39:10, 64:11
**NFTs** [1] - 13:1
**Nicholas** [1] - 46:5
**Nicolas** [1] - 44:13
**NO** [1] - 1:3
**nomination** [1] -
18:10
**none** [1] - 64:3
**nonparty** [1] - 35:23
**nonsensical** [1] -
30:23
**Noriega** [1] - 28:17
**Noriega's** [1] - 28:18
**normal** [2] - 29:11,
47:7
**North** [3] - 3:4, 24:5,
64:23
**note** [5] - 8:12,
17:19, 17:23, 18:24,
36:9
**noted** [2] - 46:18,
47:23
**notes** [6] - 5:4, 18:6,
18:13, 18:22, 21:12,
28:18
**nothing** [11] - 13:14,
19:11, 20:12, 20:24,
28:14, 41:1, 41:8,
46:3, 57:24, 60:19,
61:5
**notice** [17] - 14:25,
37:23, 43:3, 43:5,
50:4, 50:6, 50:7, 51:4,
54:17, 56:1, 56:18,
56:20, 56:21, 57:17,
58:11, 58:12
**noticed** [3] - 42:21,
52:3
**notification** [4] - 8:8,
28:2, 42:25, 43:7
**notified** [2] - 21:7,
25:22
**notify** [1] - 27:25
**notifying** [2] - 7:21,
7:25
**noting** [1] - 56:11
**notwithstanding** [1]
- 12:20
**November** [1] -
42:15
**number** [4] - 27:4,
56:3, 58:15, 59:6
**Number** [2] - 41:12,
41:20
**numbers** [1] - 44:23
**NW** [3] - 2:2, 2:6,
2:10

**O**

**object** [1] - 4:25
**obligation** [1] - 30:9
**obligations** [3] -
22:24, 24:16, 30:12
**obtain** [6] - 7:2, 7:7,
14:22, 47:6, 61:25,
62:8
**obtaining** [1] - 5:24
**obviously** [9] - 7:15,
8:3, 10:14, 15:20,
29:21, 33:21, 36:15,
61:23, 62:7
**occasion** [1] - 32:25
**occasions** [1] -
14:14
**occur** [1] - 57:12
**occurred** [1] - 42:16
**occurs** [1] - 57:6
**oddly** [1] - 29:24
**OF** [2] - 1:2, 1:4
**Office** [2] - 1:21,
35:12
**office's** [1] - 47:15
**officers** [2] - 27:20,
63:4
**offices** [2] - 47:11,
47:14
**official** [25] - 3:3,
7:13, 8:10, 8:19,
11:18, 11:24, 17:3,
38:21, 38:22, 43:1,
43:23, 44:3, 44:16,
44:23, 45:1, 46:4,
47:19, 48:21, 48:23,
50:16, 55:5, 59:20,
60:17, 60:20, 60:21
**Official** [1] - 64:22
**officially** [1] - 45:3
**officials** [8] - 11:2,
15:4, 15:12, 15:17,
15:19, 33:4, 38:18,
38:24
**oil** [1] - 5:25
**omission** [1] - 43:6
**omissions** [1] -
42:22
**ON** [1] - 1:10
**once** [1] - 24:10
**one** [38] - 4:20, 5:2,
9:12, 10:20, 10:21,
15:7, 18:6, 18:13,
21:17, 24:17, 25:23,
27:7, 28:16, 28:17,
29:3, 29:25, 30:1,
30:2, 34:11, 42:3,
43:1, 44:9, 44:21,
46:9, 47:21, 47:23,
49:1, 49:4, 50:19,

52:8, 61:2, 61:8,
61:19, 62:2, 62:17,
63:11, 63:21
**open** [1] - 14:19
**opening** [1] - 5:19
**operate** [1] - 20:9
**operative** [1] - 57:8
**opines** [1] - 34:24
**opinion** [4] - 46:18,
46:20, 50:25, 63:10
**opportunity** [2] -
62:10, 62:11
**opposite** [1] - 53:6
**opposition** [1] - 29:2
**ORAL** [1] - 1:10
**Orange** [1] - 2:14
**order** [2] - 55:7,
64:10
**orders** [1] - 55:10
**ordinary** [1] - 47:7
**original** [1] - 41:15
**Orlando** [1] - 2:15
**otherwise** [1] - 59:11
**outside** [1] - 32:13
**overseeing** [1] -
40:18
**overwhelming** [1] -
31:4
**overwhelmingly** [1] -
6:10
**own** [6] - 31:4, 42:20,
43:21, 55:5, 57:6,
62:21

**P**

**P.A** [1] - 2:18
**Page** [1] - 46:20
**Pages** [1] - 1:8
**pages** [1] - 48:16
**palace** [2] - 9:24,
10:1
**pandemic** [5] - 7:8,
47:5, 47:11, 47:15
**papers** [1] - 12:17
**paraphrase** [1] -
64:5
**part** [9] - 33:10,
36:20, 39:11, 56:12,
59:20, 60:10, 60:11,
60:20
**parties** [1] - 24:12
**partner** [1] - 4:10
**parts** [1] - 39:17
**party** [5] - 29:16,
33:4, 33:5, 49:12,
49:13
**pass** [1] - 30:2
**passes** [1] - 33:19
**passport** [35] -

15:19, 16:4, 16:8,
17:3, 17:5, 28:13,
29:3, 29:8, 29:12,
34:21, 35:4, 35:14,
46:14, 46:17, 46:21,
46:24, 46:25, 47:4,
47:6, 47:7, 47:12,
47:14, 47:19, 47:23,
48:4, 48:6, 48:7,
48:10, 48:11, 48:12,
48:15, 48:16, 48:17,
48:19, 51:9

**passports** [11] -
13:2, 13:5, 28:14,
28:20, 28:21, 35:1,
47:9, 47:10, 47:16,
47:21, 50:14

**Pena** [8] - 16:10,
19:17, 19:25, 20:13,
20:14, 21:1, 42:20,
43:8

**pena** [1] - 17:1

**pena's** [1] - 20:25

**pending** [1] - 54:6

**people** [5] - 6:18,
13:4, 33:11, 63:4,
63:23

**per** [1] - 48:20

**perfectly** [2] - 31:12,
64:1

**perhaps** [3] - 20:20,
43:8, 62:14

**period** [3] - 47:24,
48:3

**permanent** [43] -
24:20, 24:21, 24:23,
25:2, 27:8, 36:15,
36:18, 39:13, 39:14,
39:15, 39:18, 39:22,
40:1, 40:13, 40:16,
41:1, 41:3, 41:4, 41:6,
41:7, 43:9, 43:11,
43:18, 43:19, 43:24,
43:25, 46:10, 46:11,
48:1, 48:5, 49:11,
49:17, 50:23, 51:20,
51:23, 52:3, 58:20,
61:2, 61:6, 63:1, 63:6

**permit** [1] - 24:16

**person** [10] - 22:12,
32:4, 32:8, 34:24,
45:2, 45:3, 45:4,
53:14, 53:16

**personal** [3] - 32:1,
32:3, 32:20

**phrase** [2] - 39:16,
52:10

**pick** [1] - 9:25

**picked** [2] - 11:10,
18:21

**picking** [1] - 45:19

**picture** [2] - 46:24,
48:18

**piece** [5] - 7:4, 7:18,
8:11, 9:5, 41:9

**pieces** [6] - 6:9, 6:13,
9:7, 11:8, 11:11, 14:8

**Pinto** [5] - 49:3, 49:7,
49:8, 49:14, 49:21

**pinto** [1] - 49:3

**place** [4] - 44:12,
50:13, 59:21, 63:23

**Plaintiff** [1] - 1:5

**PLAINTIFF** [1] - 1:15

**plan** [1] - 4:21

**plane** [2] - 10:3,
57:10

**planned** [3] - 30:13,
31:1, 57:14

**Plathe** [3] - 47:8,
47:10, 48:20

**play** [1] - 63:4

**plenary** [1] - 22:13

**plenty** [1] - 37:19

**plus** [1] - 32:21

**point** [10] - 17:21,
29:1, 39:10, 48:1,
48:22, 60:7, 61:19,
62:16, 63:11, 63:21

**pointing** [1] - 35:16

**points** [4] - 27:5,
31:22, 51:19, 62:2

**police** [2] - 27:20,
63:4

**political** [1] - 33:4

**Pompeo** [4] - 15:9,
15:13, 15:17, 16:12

**portion** [1] - 14:23

**positing** [1] - 23:18

**position** [9] - 16:21,
16:23, 16:24, 25:14,
25:19, 27:3, 36:18,
62:18, 63:20

**possessed** [2] -
51:8, 51:9

**possession** [4] -
9:22, 10:18, 29:2,
34:20

**possibly** [2] - 23:25,
50:6

**posted** [1] - 29:15

**power** [3] - 31:4,
31:5, 55:4

**PowerPoint** [1] - 5:9

**powers** [1] - 60:8

**preamble** [1] - 40:6

**precisely** [3] - 40:9,
63:6, 63:23

**precludes** [1] - 55:2

**predicated** [1] - 36:7

**predictable** [1] -
31:12

**predicted** [1] - 31:10

**premises** [1] - 25:1

**preponderance** [1] -
6:7

**presence** [1] - 30:15

**present** [1] - 32:8

**presentation** [1] -
5:10

**presentations** [1] -
64:9

**presented** [1] - 50:10

**presenting** [1] - 4:20

**presentment** [1] -
42:18

**presents** [1] - 64:1

**President** [14] - 9:14,
9:21, 10:9, 10:19,
10:21, 10:24, 12:22,
23:1, 23:16, 24:5,
33:2, 33:3, 61:24,
62:6

**president** [22] - 11:7,
11:8, 11:9, 12:21,
12:23, 12:24, 13:3,
13:6, 22:7, 22:13,
22:19, 23:1, 23:4,
23:8, 23:9, 23:11,
23:15, 23:17, 24:5,
38:11, 46:5, 60:14

**presidential** [2] -
9:24, 10:1

**press** [3] - 35:7, 58:1

**pretext** [1] - 31:17

**pretty** [1] - 12:15

**prevent** [1] - 32:8

**prevented** [1] - 27:19

**previously** [2] -
14:13, 54:15

**PRICE** [1] - 2:9

**Prince** [13] - 25:4,
25:9, 25:14, 27:8,
27:22, 36:20, 50:25,
51:5, 51:12, 51:21,
52:2, 52:25, 61:3

**prince** [1] - 50:25

**principles** [1] - 54:22

**Principles** [2] - 55:2,
55:11

**prison** [2] - 10:6,
11:10

**private** [1] - 27:19

**privileges** [2] -
16:24, 40:6

**problems** [1] - 57:3

**proceeding** [1] -
58:4

**Proceedings** [1] -
64:13

**proceedings** [3] -
4:1, 57:9, 64:18

**process** [2] - 50:17,
58:8

**procure** [1] - 6:18

**produced** [2] -
10:10, 10:15

**proper** [2] - 59:13,
59:15

**prosecution** [1] -
36:13

**prosecutor** [2] -
11:4, 27:12

**protected** [3] - 19:2,
28:25, 53:20

**protection** [5] -
36:22, 36:24, 54:9,
54:12, 56:24

**protections** [12] -
39:6, 44:1, 49:15,
49:18, 51:13, 51:17,
52:8, 53:1, 53:4,
57:20, 58:18, 58:21

**protested** [1] - 18:1

**protests** [2] - 18:17,
18:19

**prove** [2] - 46:3,
53:13

**provide** [6] - 7:3,
28:10, 37:22, 47:16,
48:11, 49:4

**provided** [21] - 6:20,
9:8, 37:23, 40:5,
40:20, 42:22, 43:5,
43:6, 46:23, 47:12,
48:13, 48:20, 50:7,
51:4, 51:12, 56:19,
56:21, 57:17, 58:11,
58:12

**provides** [4] - 30:25,
32:4, 38:8, 43:3

**providing** [4] -
28:21, 38:7, 47:9,
58:2

**provision** [3] - 30:24,
31:2, 57:22

**public** [5] - 14:15,
16:20, 22:8, 53:15,
55:3

**publication** [3] -
19:15, 43:14, 43:17

**publicly** [1] - 57:25

**publish** [1] - 62:15

**published** [4] -
19:24, 20:2, 20:15,
20:19

**pure** [1] - 40:3

**purely** [2] - 42:24,
59:3

**purportedly** [3] -

38:1, 40:21, 40:22

**purpose** [1] - 5:24

**purposes** [2] - 8:4,
8:23

**pushing** [1] - 18:14

**put** [7] - 10:1, 12:17,
12:18, 34:15, 49:20,
49:21, 50:18

**putting** [1] - 43:2

**Q**

**qualifications** [1] -
19:20

**qualified** [1] - 19:20

**questionings** [1] -
38:5

**questions** [6] - 5:20,
5:21, 6:8, 11:13,
45:22, 59:10

**quickly** [1] - 18:25

**quite** [1] - 61:23

**quote** [3] - 28:16,
28:21

**R**

**raise** [1] - 35:10

**rank** [1] - 52:15

**rationale** [1] - 33:10

**reach** [1] - 26:13

**reached** [1] - 31:14

**read** [4] - 35:1,
35:24, 36:23

**reaffirming** [1] -
18:14

**real** [1] - 60:11

**really** [7] - 20:11,
20:23, 21:4, 30:4,
32:2, 36:10

**rearrange** [1] - 33:14

**reason** [8] - 25:24,
28:12, 35:25, 43:4,
49:20, 53:4, 58:22,
63:22

**reasonable** [2] -
26:15, 26:18

**reasoning** [2] -
56:12, 56:15

**reasons** [3] - 58:15,
59:6, 59:9

**rebuttal** [5] - 4:17,
4:19, 4:23, 34:1, 60:2

**rebutting** [2] - 6:24,
7:15

**receive** [1] - 22:7

**received** [1] - 41:18

**receives** [1] - 44:21

**receiving** [16] - 6:1,
11:18, 13:20, 13:23,

13:24, 14:1, 18:4,
18:19, 24:10, 29:20,
30:18, 31:24, 32:6,
51:11, 62:5, 62:18
**recess** [1] - 64:12
**recognition** [1] -
63:2
**recognize** [10] -
12:11, 12:21, 13:4,
23:14, 23:23, 24:2,
38:2, 38:3, 60:10,
62:18
**recognized** [13] -
12:3, 13:3, 13:6,
13:21, 13:24, 23:16,
23:24, 23:25, 25:4,
38:9, 38:16, 39:7,
55:4
**recognizes** [3] -
22:19, 23:3, 23:4
**recognizing** [4] -
23:22, 38:12, 39:3,
50:20
**recollection** [1] -
48:11
**record** [3] - 19:12,
25:19, 27:9
**records** [1] - 56:20
**red** [2] - 18:23, 19:16
**reference** [15] -
40:16, 40:17, 41:19,
41:23, 42:7, 42:14,
44:10, 44:16, 45:11,
45:17, 46:6, 46:7,
50:16, 53:15
**referenced** [1] - 45:4
**references** [1] - 44:5
**referencing** [1] -
35:15
**referred** [5] - 44:10,
44:11, 44:12, 49:10,
53:21
**referring** [1] - 22:3
**reflect** [1] - 9:11
**reflects** [1] - 17:19
**refueling** [4] - 29:23,
57:11, 57:12, 57:13
**refuse** [1] - 54:20
**refused** [1] - 55:6
**regarding** [6] -
11:13, 19:15, 41:9,
46:13, 46:14, 48:6
**regime** [15] - 12:1,
12:12, 22:2, 38:1,
38:2, 38:13, 38:15,
38:18, 38:19, 38:21,
44:8, 45:7, 50:7,
57:16, 58:17
**rejected** [2] - 61:15,
61:16

**relate** [1] - 39:13
**related** [9] - 25:11,
32:15, 49:4, 49:6,
50:14, 55:17, 55:22,
55:23, 58:12
**relates** [5] - 38:13,
39:12, 39:14, 39:15,
53:9
**relating** [1] - 35:5
**relations** [6] - 24:12,
24:20, 25:13, 27:1,
30:9, 49:13
**Relations** [5] - 17:12,
25:13, 28:3, 36:9,
39:12
**relationship** [1] -
64:1
**release** [3] - 32:13,
59:17, 59:23
**releases** [1] - 58:1
**releasing** [1] - 32:18
**relevance** [1] - 30:5
**relevant** [2] - 13:25,
52:2
**relied** [3] - 19:13,
52:18, 60:13
**reluctance** [1] -
53:22
**rely** [4] - 17:14,
19:13, 34:12, 50:21
**relying** [1] - 51:15
**remains** [2] - 16:20,
16:23
**remedy** [3] - 32:17,
59:14, 59:15
**remember** [5] -
45:21, 45:23, 45:24
**remembering** [1] -
10:8
**remembers** [1] -
45:19
**removed** [1] - 16:21
**renewed** [2] - 29:8,
48:20
**Reno** [1] - 27:12
**repeat** [1] - 54:23
**repeatedly** [3] -
17:25, 45:11, 49:10
**reply** [1] - 47:2
**report** [1] - 15:1
**REPORTED** [1] - 3:1
**reportedly** [1] -
15:18
**REPORTER** [2] -
36:25, 37:3
**Reporter** [2] - 3:3,
64:22
**representation** [1] -
23:20
**representative** [2] -

12:2, 52:12
**represents** [1] - 38:1
**Republic** [1] - 8:20
**request** [2] - 47:19,
47:20
**require** [3] - 43:16,
43:17, 56:1
**required** [8] - 24:2,
24:13, 24:14, 24:15,
29:17, 30:1, 43:23,
56:1
**requirement** [6] -
17:2, 19:22, 30:20,
32:20, 50:4, 50:5
**requirements** [3] -
29:25, 33:22, 59:6
**requires** [3] - 42:25,
43:5, 43:13
**resigns** [1] - 16:22
**resounding** [1] - 6:8
**respect** [5] - 24:13,
29:17, 32:7, 39:2,
61:8
**response** [3] - 7:8,
8:15, 11:5
**responsibilities** [1] -
46:7
**rest** [3] - 45:7, 48:15,
59:11
**result** [8] - 22:8,
22:21, 32:1, 32:10,
50:5, 56:2, 59:22,
59:23
**resulted** [1] - 14:15
**results** [2] - 15:1,
15:23
**return** [1] - 33:24
**reward** [1] - 58:2
**rights** [1] - 16:23
**RIJOCK** [1] - 34:24
**RIJOCK.blogspot.**
**com** [1] - 34:23
**RIVKIN** [5] - 37:17,
60:4, 61:18, 61:22,
62:16
**Rivkin** [3] - 4:10,
4:23, 59:25
**Rivkin's** [1] - 33:25
**ROBERT** [1] - 1:11
**role** [1] - 46:4
**roles** [1] - 46:7
**route** [1] - 30:14
**routinely** [1] - 12:19
**royal** [1] - 51:1
**RPR** [2] - 3:3, 64:22
**rule** [1] - 43:4
**ruled** [1] - 50:8
**rules** [1] - 43:1
**ruling** [1] - 54:14
**rulings** [1] - 55:12

**rushing** [1] - 37:19

# S

**SAAB** [1] - 1:7
**Saab** [143] - 4:3,
4:12, 4:14, 5:4, 5:15,
5:24, 6:1, 6:3, 6:10,
6:17, 7:6, 7:17, 7:22,
8:1, 8:9, 8:14, 8:21,
9:3, 9:6, 9:12, 9:18,
9:22, 10:2, 10:3, 10:6,
10:18, 11:17, 11:19,
11:24, 12:15, 13:18,
13:24, 14:11, 14:15,
14:21, 15:5, 15:10,
15:13, 16:1, 16:3,
17:6, 17:13, 18:2,
18:9, 18:14, 18:18,
18:19, 21:7, 21:9,
21:11, 21:13, 21:18,
21:19, 21:20, 23:14,
25:5, 25:22, 28:4,
29:7, 29:14, 30:12,
32:10, 33:19, 34:13,
34:20, 34:25, 35:7,
37:22, 37:25, 40:9,
40:12, 40:22, 41:4,
41:10, 41:11, 41:14,
41:19, 41:23, 41:24,
42:3, 42:7, 42:14,
42:16, 43:9, 43:12,
43:15, 43:18, 43:25,
44:1, 44:3, 44:5,
44:10, 44:19, 45:7,
45:9, 45:11, 45:12,
45:15, 45:18, 45:23,
45:24, 46:2, 46:6,
46:8, 46:23, 47:13,
48:1, 48:7, 48:22,
49:10, 49:14, 49:15,
49:19, 49:25, 50:3,
50:7, 50:11, 50:18,
50:20, 50:21, 52:24,
53:3, 54:12, 54:15,
54:18, 55:15, 56:6,
56:21, 56:23, 57:1,
57:8, 57:15, 57:16,
57:23, 57:24, 58:10,
58:14, 59:17, 60:18
**Saab's** [29] - 9:24,
11:9, 11:14, 13:13,
15:2, 15:3, 15:18,
15:21, 15:22, 17:24,
18:25, 20:15, 21:2,
22:16, 27:3, 28:13,
29:22, 35:13, 36:6,
42:17, 46:3, 46:13,
47:23, 48:12, 48:14,
49:7, 53:8, 57:10,
58:8

**SAIME** [2] - 47:9
**Sam** [1] - 41:25
**sanctions** [3] -
14:17, 16:12, 16:16
**Saudi** [8] - 25:11,
27:24, 51:1, 51:3,
51:6, 52:4, 63:7
**save** [2] - 4:17, 4:19
**saw** [6] - 14:7, 14:9,
31:16, 35:15, 41:2,
41:16
**scheduled** [3] - 15:3,
57:12, 57:13
**school** [2] - 26:14,
26:20
**SCHUSTER** [2] -
2:17, 2:21
**Schuster** [3] - 2:18,
4:11
**scientist** [1] - 41:25
**SCOLA** [1] - 1:11
**screen** [11] - 5:21,
6:25, 7:9, 7:24, 8:19,
9:11, 9:13, 9:16,
10:12, 14:20, 18:12
**search** [2] - 27:18,
27:20
**Second** [2] - 32:24,
33:9
**second** [6] - 6:1, 7:4,
10:5, 54:18, 55:7,
55:10
**second-guess** [2] -
55:7, 55:10
**secrecy** [1] - 20:21
**secretary** [1] - 49:8
**Secretary** [6] - 15:9,
15:13, 15:17, 16:12,
49:9, 53:12
**section** [1] - 34:23
**Security** [1] - 56:12
**security** [4] - 20:19,
27:19, 45:22, 48:8
**see** [19] - 7:9, 7:24,
8:18, 9:10, 9:16,
10:12, 12:16, 14:23,
15:8, 17:10, 17:11,
18:7, 33:15, 44:14,
45:3, 45:4, 61:8,
62:16
**seek** [1] - 37:13
**seeking** [1] - 33:16
**seeks** [1] - 58:14
**sees** [1] - 44:19
**self** [1] - 13:3
**self-recognized** [1] -
13:3
**sell** [1] - 13:1
**selling** [1] - 13:1
**send** [1] - 32:13

**sending** [15] - 5:23, 9:2, 11:16, 13:18, 14:1, 18:3, 18:4, 21:7, 24:9, 29:19, 30:18, 62:5, 62:9, 62:12, 62:18

**senior** [1] - 15:19

**Senior** [2] - 10:21, 10:24

**sense** [1] - 30:19

**sent** [16] - 8:9, 8:13, 8:16, 10:15, 11:17, 11:24, 11:25, 12:1, 12:2, 13:17, 18:18, 21:18, 31:25, 35:6, 40:21, 44:7

**sentence** [1] - 54:24

**separate** [2] - 14:14, 54:9

**separately** [1] - 43:8

**separation** [1] - 60:8

**serve** [1] - 33:16

**served** [1] - 33:11

**service** [3] - 16:17, 33:1, 39:21

**settled** [1] - 16:7

**several** [2] - 25:23, 28:16

**shall** [3] - 32:5, 32:6

**shape** [1] - 38:8

**SHARON** [2] - 3:3, 64:22

**shipment** [1] - 9:18

**shortest** [2] - 47:24, 48:3

**show** [5] - 5:9, 15:24, 46:8, 50:18, 50:20

**showed** [1] - 42:11

**shown** [2] - 44:4, 45:10

**shows** [3] - 6:6, 42:3, 50:10

**side** [1] - 4:16

**sides** [1] - 27:21

**sign** [2] - 56:3, 56:5

**signatories** [1] - 59:5

**signatory** [1] - 55:19

**signed** [2] - 6:16, 56:13

**significance** [1] - 28:23

**similar** [1] - 46:14

**similarly** [2] - 17:12, 37:21

**simple** [1] - 12:15

**simply** [11] - 17:5, 18:23, 19:12, 23:19, 33:20, 35:4, 35:10, 36:14, 40:18, 46:8, 60:22

**single** [1] - 44:9

**sit** [1] - 53:14

**situation** [3] - 54:15, 56:18, 62:17

**slow** [2] - 36:25, 46:12

**small** [1] - 5:2

**solely** [2] - 43:20, 50:22

**someone** [7] - 23:7, 23:22, 26:2, 30:21, 33:16, 35:15, 46:10

**somewhere** [1] - 32:13

**sorry** [2] - 20:13, 36:25

**sort** [3] - 26:21, 31:4, 42:22

**Soto** [1] - 56:8

**sought** [1] - 54:5

**source** [1] - 14:19

**South** [1] - 2:14

**SOUTHERN** [1] - 1:2

**Southern** [1] - 56:7

**sovereign** [4] - 7:2, 38:4, 39:8, 55:4

**Special** [19] - 4:6, 36:11, 36:23, 37:21, 40:1, 40:7, 49:13, 49:16, 54:13, 55:16, 55:18, 55:19, 55:24, 56:9, 56:24, 57:21, 59:4, 63:21, 63:22

**special** [81] - 5:16, 5:24, 6:2, 6:10, 6:17, 7:1, 7:7, 7:10, 7:17, 7:23, 8:2, 8:10, 8:14, 9:3, 11:17, 11:19, 13:18, 13:21, 13:22, 13:24, 15:2, 15:25, 16:1, 18:8, 18:10, 18:15, 18:22, 19:23, 20:18, 20:20, 21:2, 21:7, 21:9, 21:14, 21:18, 21:19, 21:20, 25:5, 25:10, 25:15, 36:24, 39:24, 40:2, 40:25, 41:14, 42:18, 43:10, 43:15, 43:20, 44:5, 44:10, 44:16, 45:3, 45:5, 45:8, 45:11, 45:12, 45:15, 45:17, 48:4, 49:11, 50:3, 51:6, 51:13, 52:10, 52:11, 53:1, 54:2, 54:7, 54:11, 54:16, 55:22, 62:13, 62:25, 63:24, 63:25

**specific** [9] - 34:11, 40:23, 45:25, 51:7,

53:1, 53:7, 53:10, 55:23

**specifically** [5] - 6:17, 10:8, 18:22, 38:13, 52:18

**speculation** [2] - 19:11, 31:8

**spend** [1] - 4:21

**spoken** [1] - 4:24

**spot** [2] - 35:6, 35:16

**staff** [3] - 39:20, 39:21

**stamped** [1] - 44:24

**stamps** [1] - 48:18

**standing** [1] - 44:12, 59:22

**stands** [2] - 49:20, 56:15

**start** [2] - 22:1, 57:9

**State** [44] - 12:8, 12:10, 14:19, 15:17, 22:4, 22:9, 25:9, 25:13, 25:18, 25:20, 26:2, 26:10, 26:20, 26:25, 27:12, 27:14, 27:16, 28:1, 28:10, 34:19, 35:11, 36:21, 49:9, 51:4, 51:11, 51:16, 52:7, 52:13, 52:19, 52:21, 52:23, 53:3, 53:10, 53:12, 54:20, 54:22, 55:1, 55:10, 55:14, 58:1, 58:25, 60:22, 60:24, 64:3

**state** [24] - 5:23, 6:1, 11:16, 11:18, 13:23, 14:1, 18:4, 19:4, 24:10, 24:17, 29:18, 29:20, 30:8, 31:24, 32:6, 34:19, 38:4, 39:9, 62:5, 62:9, 62:12

**statement** [1] - 46:22

**States** [65] - 3:4, 4:2, 4:5, 12:4, 13:3, 13:12, 13:13, 13:14, 14:21, 15:4, 22:6, 22:10, 22:17, 22:21, 23:5, 23:8, 23:21, 23:23, 24:1, 25:11, 25:23, 25:25, 27:25, 28:7, 28:23, 29:17, 30:13, 30:14, 30:19, 31:14, 33:5, 33:18, 34:12, 34:20, 36:14, 37:24, 38:2, 38:20, 50:9, 51:2, 51:4, 51:8, 51:10, 51:11, 51:24, 51:25, 52:4, 52:16,

53:5, 54:3, 54:25, 55:18, 56:4, 56:8, 57:24, 58:7, 58:9, 58:12, 62:7, 62:8, 62:19, 63:3, 63:5, 64:23

**states** [8] - 23:19, 29:16, 30:18, 33:20, 40:7, 43:23, 46:20, 54:21

**STATES** [3] - 1:1, 1:4, 1:11

**States'** [1] - 30:11

**status** [26] - 12:6, 12:8, 12:11, 13:13, 15:21, 16:19, 16:25, 17:13, 17:20, 17:25, 20:20, 23:5, 28:25, 29:9, 29:10, 32:17, 35:14, 38:7, 38:9, 48:24, 49:19, 50:23, 52:22, 53:8, 53:9, 60:18

**statutory** [1] - 40:3

**Ste** [3] - 2:3, 2:7, 2:11

**stead** [1] - 44:13

**STENOGRAPHICALLY** [1] - 3:1

**steps** [2] - 32:7, 63:19

**sticks** [1] - 44:15

**still** [14] - 6:21, 12:18, 12:19, 12:24, 13:6, 26:13, 31:12, 31:20, 48:10, 52:6, 55:11, 55:15, 56:14, 56:15

**stipulated** [5] - 8:4, 8:23, 14:10, 21:6, 21:8

**stipulation** [3] - 8:7, 9:1, 21:10

**stop** [4] - 34:4, 57:12, 57:13

**stopped** [4] - 29:22, 29:23, 30:7, 57:8

**stops** [1] - 23:3

**story** [1] - 42:8

**Street** [2] - 1:21, 2:22

**strikes** [1] - 31:10

**strong** [1] - 55:12

**stubborn** [1] - 21:16

**stuff** [1] - 64:3

**submit** [1] - 42:24

**submits** [1] - 50:17

**subsequent** [1] - 17:23

**substantially** [1] - 6:6

**successful** [1] - 15:23

**sudden** [1] - 42:17

**suddenly** [2] - 24:7, 24:14

**sued** [1] - 51:1

**sufficient** [1] - 33:21

**suggested** [1] - 27:7

**suggestion** [2] - 27:22, 53:21

**suggests** [1] - 16:12

**suit** [2] - 51:3, 51:17

**Suite** [3] - 2:15, 2:19, 2:22

**suits** [2] - 46:15, 54:6

**supplies** [1] - 7:2

**support** [3] - 19:12, 39:20, 40:15

**supports** [1] - 27:2

**supposed** [1] - 45:21

**Supreme** [10] - 9:15, 9:21, 10:9, 19:17, 38:11, 41:21, 41:22, 42:2, 53:11, 60:12

**surprising** [2] - 20:17, 20:22

**surrounding** [1] - 21:25

**swear** [1] - 27:17

**T**

**talks** [3] - 39:20, 39:21

**tasked** [1] - 40:18

**technical** [1] - 39:21

**Tehran** [3] - 7:22, 8:1, 29:23

**temp** [1] - 48:5

**temporary** [10] - 40:2, 40:8, 40:25, 43:16, 50:11, 50:21, 61:4, 61:5, 61:10, 62:25

**term** [3] - 18:22, 27:25, 45:8

**terms** [7] - 26:5, 27:21, 34:12, 37:14, 39:3, 57:23, 60:22

**territory** [1] - 55:5

**testified** [22] - 6:19, 6:20, 7:11, 7:12, 9:23, 10:5, 10:8, 17:1, 19:18, 20:14, 41:25, 42:1, 43:9, 43:10, 43:11, 43:15, 44:18, 44:19, 44:25, 47:10, 47:18, 48:8

**testify** [4] - 19:19,

46:1, 47:8, 49:3
**testimony** [4] -
19:21, 20:25, 40:10,
43:21
**text** [4] - 32:19,
32:23, 34:22, 42:11
**THE** [40] - 1:11, 1:15,
2:1, 4:2, 4:7, 4:13,
5:1, 5:6, 5:11, 11:22,
11:24, 12:23, 16:11,
17:14, 20:1, 22:25,
23:9, 23:16, 24:19,
32:12, 33:25, 34:5,
34:17, 35:19, 35:23,
36:3, 36:25, 37:3,
37:4, 37:8, 37:16,
37:18, 46:12, 54:23,
59:13, 59:24, 60:3,
60:6, 61:20, 64:8
**themselves** [2] -
28:24, 50:15
**then-State** [1] -
27:12
**theory** [3] - 19:9,
19:10, 19:13
**therefor** [1] - 58:21
**therefore** [8] - 5:18,
25:24, 26:19, 33:20,
38:5, 38:25, 47:6,
57:4
**thereunder** [1] - 44:1
**third** [5] - 6:3, 7:18,
14:11, 29:16, 62:17
**three** [11] - 5:20,
5:21, 9:7, 9:11, 10:7,
10:8, 11:13, 21:11,
45:18, 45:25, 46:2
**throughout** [2] -
45:9, 52:1
**throw** [1] - 44:14
**timing** [1] - 63:12
**title** [5] - 44:16, 45:2,
45:3, 45:7, 50:16
**titles** [1] - 45:9
**TO** [1] - 1:10
**today** [5] - 5:15,
36:10, 56:14, 63:14,
63:15
**took** [3] - 10:1,
25:14, 59:21
**top** [2] - 10:13, 34:22
**total** [1] - 18:16
**totalling** [1] - 44:22
**totally** [1] - 62:16
**towards** [3] - 40:16,
42:14, 44:5
**transcription** [1] -
64:18
**transit** [12] - 6:3,
11:20, 14:4, 21:20,

24:16, 24:18, 31:1,
31:20, 31:22, 31:25,
36:12, 55:24
**transit-based** [2] -
36:12, 55:24
**transiting** [1] - 29:18
**travel** [11] - 28:22,
29:11, 30:13, 46:17,
47:14, 48:12, 48:21,
50:4, 56:21, 57:19,
58:13
**traveled** [7] - 6:11,
14:13, 31:7, 45:23,
45:24, 48:7, 48:17
**traveling** [11] - 5:16,
7:22, 8:1, 13:4, 13:12,
16:1, 17:3, 17:7,
45:18, 47:7, 59:1
**treat** [1] - 32:7
**treaties** [2] - 33:6,
36:13
**treaty** [17] - 22:24,
25:15, 26:6, 26:16,
26:18, 26:24, 29:15,
29:16, 30:10, 30:12,
30:24, 32:4, 56:13,
61:9, 61:10, 62:22
**trespassing** [1] -
30:22
**Tribunal** [3] - 41:21,
42:2
**tried** [1] - 29:7
**trip** [7] - 9:4, 10:4,
14:11, 48:9, 48:21,
59:19
**trips** [3] - 14:15,
15:22, 15:23
**true** [6] - 23:13,
24:22, 30:8, 48:3,
56:13, 56:14
**Trump** [4] - 23:1,
23:17, 61:24, 62:6
**truth** [1] - 28:14
**try** [3] - 33:19, 44:15,
50:12
**trying** [1] - 30:6
**turn** [2] - 21:21, 24:3
**twice** [1] - 27:14
**two** [16] - 9:25,
10:17, 10:19, 11:8,
14:13, 14:15, 15:22,
21:10, 23:19, 32:11,
44:21, 49:4, 61:6,
62:17, 64:2
**type** [2] - 29:13, 39:1
**types** [1] - 44:25

## U

**U.N** [2] - 33:6, 33:7

**u.S** [1] - 1:15
**U.S** [4] - 5:17, 10:15,
54:21, 62:11
**U.S.C** [1] - 54:5
**ultimately** [3] -
10:16, 30:16, 60:18
**UN** [7] - 16:11, 39:24,
49:13, 49:16, 56:12,
57:21, 59:4
**unable** [1] - 33:13
**unanticipated** [3] -
57:7, 57:13, 58:11
**uncontrolled** [1] -
57:7
**under** [54] - 17:2,
19:23, 22:6, 26:10,
28:2, 29:15, 29:16,
30:12, 30:24, 32:19,
33:1, 33:22, 36:8,
36:11, 38:15, 38:18,
38:23, 38:24, 39:4,
41:6, 43:1, 43:12,
43:24, 47:7, 49:16,
49:18, 49:19, 49:23,
50:3, 50:19, 50:23,
51:14, 51:17, 52:8,
53:1, 54:4, 54:5, 54:8,
54:13, 54:20, 55:11,
55:16, 55:21, 55:22,
56:24, 57:5, 57:21,
58:21, 63:13, 64:10
**underlying** [1] - 35:5
**undertaking** [1] -
18:11
**undesired** [1] - 58:10
**undisputed** [1] -
15:23
**unequivocally** [4] -
11:12, 20:13, 20:14,
43:9
**unexpected** [1] -
57:25
**UNITED** [3] - 1:1,
1:4, 1:11
**united** [1] - 3:4
**United** [66] - 4:2, 4:5,
12:3, 13:3, 13:12,
13:13, 13:14, 14:21,
15:4, 22:6, 22:9,
22:17, 22:21, 23:5,
23:8, 23:21, 23:23,
23:25, 25:11, 25:23,
25:25, 27:25, 28:7,
28:23, 29:17, 30:11,
30:13, 30:14, 30:19,
31:14, 33:5, 33:18,
34:12, 34:19, 36:14,
37:23, 38:2, 38:20,
50:8, 51:2, 51:4, 51:8,
51:10, 51:11, 51:24,

52:4, 52:16, 53:5,
54:3, 54:25, 55:18,
56:4, 56:8, 57:23,
58:7, 58:9, 58:12,
62:7, 62:8, 62:19,
63:2, 63:5, 64:23
**unknown** [2] - 57:25,
58:10
**unless** [1] - 26:13
**unplanned** [1] -
57:14
**unrebutted** [10] -
6:9, 7:4, 7:18, 8:8,
8:11, 9:1, 9:5, 14:8,
19:22, 21:1
**unrecognized** [2] -
38:6, 39:5
**up** [6] - 5:11, 9:25,
11:10, 34:16, 45:19,
61:22
**update** [1] - 20:21
**updated** [4] - 20:7,
20:8, 20:11, 42:5
**urgent** [1] - 9:18
**US** [1] - 54:6
**usurp** [2] - 36:22,
57:3

## V

**valid** [5] - 46:25,
47:21, 48:10, 48:19,
59:20
**validity** [2] - 20:16,
47:18
**validly** [1] - 50:8
**various** [5] - 15:1,
25:1, 33:6, 39:19,
53:11, 56:2, 58:5
**VCDR** [17] - 36:8,
36:15, 36:18, 36:22,
39:11, 40:8, 43:25,
50:19, 50:24, 51:14,
51:17, 52:9, 54:4,
54:8, 54:10, 63:14,
64:1
**Velazco** [1] - 64:21
**VELAZCO** [2] - 3:3,
64:22
**Venezuela** [57] -
5:16, 5:23, 6:11, 7:3,
7:6, 7:13, 7:20, 8:9,
8:21, 9:8, 10:20,
10:23, 10:25, 11:9,
11:16, 11:25, 12:1,
12:3, 12:12, 12:16,
12:20, 13:11, 13:15,
13:16, 14:13, 14:16,
14:22, 15:7, 15:10,

15:14, 16:3, 17:8,
17:25, 18:4, 18:7,
18:18, 19:1, 19:2,
19:17, 21:18, 22:18,
22:20, 23:10, 23:11,
23:15, 24:4, 28:8,
38:4, 41:3, 41:7,
44:11, 44:12, 46:21,
55:20, 56:5, 57:11
**Venezuelan** [26] -
6:16, 6:18, 6:22, 8:13,
8:17, 9:24, 12:19,
15:18, 17:2, 18:9,
19:19, 19:21, 19:23,
34:21, 35:3, 35:13,
41:22, 43:1, 43:12,
43:13, 43:22, 43:24,
45:12, 47:7, 59:20
**Verbale** [1] - 18:24
**Verde** [42] - 5:17,
9:22, 10:6, 11:21,
17:7, 17:12, 17:15,
17:18, 17:22, 18:3,
18:8, 18:20, 21:15,
23:3, 29:23, 30:3,
30:5, 30:7, 30:15,
37:23, 44:8, 45:16,
46:16, 49:7, 49:9,
49:12, 49:15, 49:24,
50:1, 50:7, 54:14,
54:16, 55:15, 56:18,
56:19, 56:21, 57:9,
57:12, 57:18, 58:4,
58:25, 60:23
**verified** [1] - 10:3
**version** [4] - 10:10,
41:16, 41:17
**versions** [2] - 41:15,
42:13
**versus** [7] - 4:2,
32:18, 38:20, 53:17,
54:25, 56:8
**vested** [1] - 53:24
**Vice** [3] - 10:19,
10:21, 10:24
**vice** [3] - 11:8, 11:9,
46:5
**Vice-President** [3] -
10:19, 10:21, 10:24
**vice-president** [3] -
11:8, 11:9, 46:5
**Vienna** [20] - 24:12,
24:19, 25:6, 25:12,
26:11, 27:1, 28:2,
30:8, 36:8, 39:12,
39:25, 49:12, 49:18,
49:19, 49:23, 49:24,
53:1, 58:19, 58:21,
62:25
**view** [2] - 42:5, 59:15

**views** [3] - 12:7, 12:10, 52:21
**violate** [2] - 16:11, 16:16
**violated** [1] - 33:9
**violation** [1] - 16:18
**violations** [1] - 26:9
**visa** [5] - 29:24, 29:25, 30:1, 30:20, 51:9
**visit** [5] - 8:19, 10:23, 10:25, 11:3, 13:21
**vociferously** [1] - 17:25
**vs** [1] - 1:6

## W

**waived** [1] - 30:19
**wall** [1] - 44:14
**wants** [1] - 15:9
**warrant** [1] - 27:17
**warranted** [1] - 53:10
**Washington** [8] - 1:18, 2:3, 2:7, 2:11, 27:9, 27:23, 51:22, 61:6
**waste** [1] - 29:8
**weather** [1] - 31:10
**website** [6] - 41:21, 41:24, 42:2, 42:8, 42:9, 42:19
**websites** [3] - 20:8, 42:1, 42:5
**week** [8] - 15:11, 40:12, 41:2, 41:13, 41:25, 46:19, 50:10, 64:11
**weight** [1] - 19:7
**Weixum** [5] - 53:17, 54:1, 54:2, 54:4, 54:7
**WEIXUM** [1] - 53:17
**Westlaw** [1] - 38:21
**whatsoever** [2] - 41:19, 54:6
**wherein** [3] - 34:18, 46:23, 58:5
**William** [1] - 4:6
**willing** [1] - 7:3
**witness** [3] - 19:9, 44:18, 49:2
**wondering** [1] - 31:16
**wonders** [1] - 15:18
**word** [1] - 42:25
**world** [2] - 20:9, 24:7
**wrestling** [1] - 15:20
**Wright** [1] - 60:12
**write** [1] - 5:4
**written** [4] - 28:17,

44:23, 45:13, 45:15

## X

**Xilai** [1] - 53:17
**XILAI** [1] - 53:18

## Y

**year** [2] - 47:21, 47:23
**years** [3] - 44:22, 47:22, 63:14
**yesterday** [2] - 35:20, 35:22
**York** [1] - 1:17
**young** [2] - 26:8, 26:19
**yourself** [1] - 31:3

## Z

**Zimbabwe** [1] - 33:2
**Zivotofsky** [4] - 38:10, 60:7, 60:8, 60:11
**ZIVOTOFSKY** [1] - 38:11